ORAL ARGUMENT NOT YET SCHEDULED

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| SIERRA CLUB, et al.,<br><br>*Petitioners*,<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,<br><br>*Respondents*. | No. 26-1055 |

**PETITIONERS' MOTION FOR A LIMITED ABEYANCE PENDING RESPONDENTS' FINAL ACTION ON PETITIONS FOR ADMINISTRATIVE RECONSIDERATION**

Petitioners move to hold this case in abeyance for six months to provide respondents Environmental Protection Agency and its Administrator Lee Zeldin (collectively, EPA or the "Agency") time to take action on a pending petition for administrative reconsideration of the Clean Air Act rulemaking at issue in this litigation, 91 Fed. Reg. 1910 (Jan. 15, 2026) (Final Rule), filed by three of the petitioners: Environmental Defense Fund, Natural Resources Defense Council, and Sierra Club, as well as Clean Air Task Force. The Final Rule set revised standards for emissions of nitrogen oxides, or "$NO_X$," pollution from new stationary combustion turbines that fail to adequately protect public health as the Clean Air

Act requires. Environmental Defense Fund et al.'s reconsideration petition identified several central determinations in the Final Rule for which EPA provided no notice or opportunity for public comment. Significant objections to those serious procedural errors could not practicably have been raised during the comment period, and EPA must now address these serious defects via reconsideration under Section 307(d)(7)(B) of the Clean Air Act, 42 U.S.C. § 7607(d)(7)(B). A six-month abeyance provides EPA an appropriate amount of time to grant the petition and complete reconsideration, and thereby to correct errors in the Final Rule in the first instance.

Abeyance promotes judicial economy by ensuring a fully informed, orderly, and efficient disposition of petitioners' challenges to the Final Rule. If EPA grants reconsideration—as it here must—that action may obviate the need for further litigation of certain issues raised by petitioners in this case. And if EPA denies reconsideration, petitioners will seek to consolidate this case with a petition for review of EPA's denial, thereby ensuring the Court can review all of petitioners' related challenges to the Final Rule at once.

The requested abeyance will not injure EPA or movant-intervenors as the Final Rule is now in effect. Further, a time-limited abeyance would ensure that EPA takes timely action on the reconsideration petition and that petitioners' challenge to the Final Rule is not delayed indefinitely. Accordingly, petitioners

request that the Court hold this case in abeyance for six months, until November 5, 2026, pending final action by EPA on Environmental Defense Fund et al.'s reconsideration petition, and require the parties to file motions to govern by that date. Petitioners further request the Court require EPA to file reports concerning the status of its action on the reconsideration petition every 30 days during the abeyance period.

Respondents have informed counsel that they oppose this motion.[1]

## BACKGROUND

### A. Statutory and Regulatory Background

EPA has a long history of regulating emissions from stationary combustion turbines—a type of fossil-fuel-fired technology that produces electrical or useful mechanical output and that is often used in power plants, at compressor stations along gas transmission pipelines, and at other industrial facilities. There are thousands of stationary turbines operating across the country today. 89 Fed. Reg. 101,306, 101,310 (Dec. 13, 2024). Those turbines produce numerous health-harming and toxic chemicals and are among the nation's biggest industrial emitters of $NO_X$—a highly dangerous and pervasive pollutant. Among other harms, $NO_X$

[1] The Court granted three motions for intervention in this case in the hours before this motion was filed. *See* ECF#2171833. Given the timing, counsel for petitioners was unable to seek positions on this motion from those intervenors before filing.

emissions react with organic compounds in the presence of sunlight to form ozone pollution, or smog, which can cause immediate breathing problems, respiratory and cardiovascular disease, other serious health harms, and premature death. *See id.* at 101,316; 91 Fed. Reg. at 1964 (citing EPA, *Integrated Science Assessment for Ozone and Related Photochemical Oxidants* (2020), EPA-HQ-OAR-2024-0419-0013). Tens of millions of Americans are forced to breathe unhealthy smog in communities across the country, including children and older people who are especially vulnerable.[2]

To protect public health and attain Congress's "primary goal" of "pollution prevention," 42 U.S.C. § 7401(c), the Clean Air Act directs EPA to set standards for pollution from certain categories of sources. *See id.* § 7411(a), (b). Relevant here, that obligation covers $NO_X$ pollution from new gas turbines. *See* 91 Fed. Reg. at 1911-12. Specifically, EPA must prescribe standards of performance for new, modified, or reconstructed turbines based on the "degree of emission limitation" that is "achievable" for those sources through application of the "best system of emission reduction … adequately demonstrated." 42 U.S.C. § 7411(a). EPA is required to, "at least every 8 years, review and, if appropriate, revise" those standards. *Id.* § 7411(b)(1)(B). These "new source performance standards" apply to

[2] *See* Am. Lung Ass'n, *State of the Air 2026 Report*, at 13 (2026), https://www.lung.org/research/sota.

all sources in the category that are newly constructed, modified, or reconstructed after a particular date.

EPA first promulgated new source performance standards for combustion turbines in 1979, 44 Fed. Reg. 52,792 (Sept. 10, 1979). Prior to this year, however, it had only revised those standards once, in 2006, *see* 71 Fed. Reg. 38,482 (July 6, 2006). The 2006 standards identified 14 subcategories of turbines and established specific $NO_X$ emissions limits for each subcategory based on application of combustion control technology. *See id.* at 38,483 (tbl.1). In the decades since, $NO_X$ pollution-control technologies have increased significantly in efficacy, while adoption of those technologies has expanded even more widely across industries. These technologies—including combustion controls, post-combustion selective catalytic reduction or "SCR," and continuous emission monitoring systems—are now in widespread use in turbines and engines and available at reasonable cost, and they provide massive reductions in harmful $NO_X$ emissions. *See* 89 Fed. Reg. at 101,323, 101,324.

In light of those developments, two of the petitioners in this case, Environmental Defense Fund and Sierra Club, filed a lawsuit in 2022 to enforce EPA's statutory obligation to review and, if appropriate, revise $NO_X$ standards for

new turbines. Pursuant to a consent decree in that lawsuit,[3] in 2024, EPA proposed to revise the standards for new combustion turbines, 89 Fed. Reg. at 101,306. Reflecting the Agency's review of a range of widely available, cost-reasonable pollution-control measures, EPA proposed that, for many subcategories, combustion controls with the addition of post-combustion selective catalytic reduction is the best system for reducing $NO_X$ emissions from combustion turbines. *See id.* at 101,323 (tbl.1). Petitioners submitted detailed technical and legal comments addressing EPA's proposal and urging the Agency to finalize standards that would adequately protect public health and welfare from harmful $NO_X$ emissions as it had proposed.[4]

In the Final Rule, however, EPA reversed course. EPA finalized revised $NO_X$ emissions limits and other pollution-control requirements that are substantially weaker than what the Agency had proposed, and that even permit *greater* $NO_X$ emissions for some classes of turbines relative to the 2006 standards. To justify its change in direction, EPA cited multiple new justifications and determinations that were not previously noticed to the public. Among other

[3] Consent Decree, Doc. No. 26, *Envtl. Def. Fund v. EPA*, No. 3:22-cv-07731-WHO (N.D. Cal. July 27, 2023).

[4] *See* Comments of Sierra Club, Environmental Defense Fund, Clean Air Task Force & Clean Wisconsin (Mar. 13, 2025), EPA-HQ-OAR-2024-0419-0061, *available at*: https://www.regulations.gov/comment/EPA-HQ-OAR-2024-0419-0061.

significant and unanticipated changes, the Final Rule identified combustion controls alone—without post-combustion selective catalytic reduction—as the best system for most turbines, except for one narrow subcategory of sources. *See* 91 Fed. Reg. at 1943-53 & tbl.1. Furthermore, unlike the proposal, the Final Rule entirely failed to monetize or even quantify the anticipated public health effects of the revised standards, claiming for the first time that EPA's long-time analytic tools for undertaking such evaluations were too uncertain to justify using. *See id.* at 1964.

**B. Procedural Background**

Petitioners timely filed this petition for review of the Final Rule on March 16, 2026. *See* 42 U.S.C. § 7607(b)(1).[5] That same day, in light of the significant procedural and substantive infirmities in the Final Rule, three of the petitioners here also petitioned EPA to reconsider and strengthen the Rule pursuant to section 307(d)(7)(B) of the Clean Air Act, 42 U.S.C. § 7607(d)(7)(B).[6] The reconsideration

---

[5] American Petroleum Institute filed a separate petition for review of the Final Rule, No. 26-1053, which the Court initially consolidated with this petition. On April 24, 2026, the Court ordered that No. 26-1053 be severed from this petition and held in abeyance pending further order of the Court, ECF#2170287.

[6] Petition for Reconsideration of Clean Air Task Force, Environmental Defense Fund, Natural Resources Defense Council, & Sierra Club (Mar. 16, 2026). A copy is attached hereto as Exhibit 1. In the reconsideration petition, Ex. 1 at 2, Environmental Defense Fund et al. reserved the right to seek immediate judicial review of any of the issues covered and did not concede that any issues were not raised with reasonable specificity or exhausted.

petition identified multiple core determinations in the Final Rule for which EPA did not provide public notice and opportunity for comment, and explains why EPA's errors are of "central relevance" to the Rule, 42 U.S.C. § 7607(d)(7)(B). In summary: *first*, as noted above, EPA failed to meaningfully assess the health impacts of the Final Rule, even though protecting public health from harmful turbine emissions is the fundamental purpose of the Rule and the Agency's statutory mandate. *Second*, EPA overhauled its subcategories for regulated sources, significantly changed its position on what the Agency considers cost-reasonable, and greatly increased its estimates of the capital costs associated with post-combustion selective catalytic reduction technology—all of which were central to EPA's determination about which measures are the best system of reducing $NO_X$ emissions from combustion turbines. *Third*, EPA unexpectedly weakened the standards for certain units compared to the previous 2006 standards. *Fourth*, EPA formulated new alternative standards for temporary turbines based on data not available during the comment period. And *fifth*, EPA exempted certain units from the operating permit requirements of Title V of the Clean Air Act without any prior notice that it intended to create such an exemption. Both individually and collectively, these infirmities directly led EPA to finalize a rule with pollution-control requirements that are weaker both than what the Agency had proposed and

what the Clean Air Act requires. The reconsideration petition remains pending before EPA.

## ARGUMENT

This Court has inherent discretion to manage its docket and place cases in abeyance. *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). On multiple occasions, the Court has held petitions for review of a final rule in abeyance where related administrative proceedings were ongoing and abeyance would not materially harm the litigants—including in the context of Clean Air Act cases where reconsideration petitions were pending before EPA.[7] The Court's inquiry into whether judicial review should be paused because a Clean Air Act reconsideration petition has been filed with EPA is inherently case-specific, *see, e.g.*, *Lead Indus. Ass'n v. EPA*, 647 F.2d 1184, 1187 (D.C. Cir. 1980). So long as the new

---

[7] *See, e.g.*, *Alon Refining Krotz Springs, Inc. v. EPA*, No. 16-1052, 2019 WL 4123519, at *4 (D.C. Cir. Aug. 30, 2019) (noting that Court had held petitions for review in abeyance pending EPA's disposition of reconsideration petitions); *Sierra Club v. EPA*, 884 F.3d 1185, 1191 (D.C. Cir. 2018) (petitions for review held in abeyance pending EPA's reconsideration); *New York v. EPA*, No. 02-1387, 2003 WL 22326398, at *1 (D.C. Cir. Sept. 30, 2003) (holding petitions for review in abeyance pending EPA's action on reconsideration petition); *see also Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012) (abeyance pending agency's related administrative proceedings under prudential ripeness doctrine); *Basardh v. Gates*, 545 F.3d 1068, 1069 (D.C. Cir. 2008); *Devia v. NRC*, 492 F.3d 421, 427 (D.C. Cir. 2007); *Time Warner Ent. Co. v. FCC*, 240 F.3d 1126, 1128 n.1 (D.C. Cir. 2001) (noting Court held challenges to rule in abeyance while agency completed a related new rulemaking).

information underlying a reconsideration petition "raises substantial questions about the validity of the Agency's analysis," *id.*, the Court is well within its discretion to defer judicial proceedings as needed to serve the interest of the parties and the Court.

Here, a limited pause of litigation to allow time for EPA to act on Environmental Defense Fund et al.'s reconsideration petition is in the interest of the parties and the Court because it will ensure fair and orderly resolution of all of petitioners' claims related to the Final Rule and avoid the risk of unnecessary piecemeal litigation.

Under the Clean Air Act's judicial review provision, if a party identifies an objection that was impracticable to raise in the comment period and such objection is of "central relevance" to the rule, EPA must grant reconsideration. 42 U.S.C. § 7607(d)(7)(B). Environmental Defense Fund et al.'s reconsideration petition identifies issues at the heart of the Final Rule that were not adequately noticed at proposal and "provides substantial support for the argument that the regulation should be revised." *Coal. for Responsible Regul. v. EPA*, 684 F.3d 102, 125 (D.C. Cir. 2012), *cert. denied in relevant part*, 573 U.S. 302 (2014); *see also Chesapeake Climate Action Network v. EPA*, 952 F.3d 310, 322 (D.C. Cir. 2020). In particular, the reconsideration petition raises objections to EPA's assessment of health impacts and EPA's determination of the best system of emission reduction under

Section 111 of the Clean Air Act, 42 U.S.C. § 7411—both of which underpin the Rule's inadequate pollution-control requirements and differ substantially from what EPA had proposed.

For instance, in the Final Rule, without any notice, EPA abruptly abandoned its longstanding practice of evaluating the quantified health benefits of reducing $NO_X$ pollution and did so without reasoned explanation or consideration of any public comment on this consequential policy change. *See* 91 Fed. Reg. at 1964-65. Because EPA's assessment of the health impacts of reducing $NO_X$ pollution is a relevant factor in setting standards, the capricious and inadequate analysis in the Final Rule contributed directly to EPA's decision to abandon the more health-protective standards it had proposed for many types of covered turbines and even to weaken standards for certain types of large turbines compared to the preexisting standards set in 2006. *See* 42 U.S.C. § 7411(a), (b); *Sierra Club v. Costle*, 657 F.2d 298, 326 (D.C. Cir. 1981) (interpreting statutory provision to "incorporate the amount of air pollution as a relevant factor").

Also without any notice, EPA overhauled its approach to analyzing the costs of reducing $NO_X$ emissions from regulated turbines. *See* 91 Fed. Reg. at 1934. EPA also changed the way it designates subcategories of regulated turbines, took a new position on how it evaluates cost-reasonableness, and greatly expanded its estimates of the capital costs associated with selective catalytic reduction

technology for certain types of turbines. *See id.* at 1919-30, 1932-37. Each of these new justifications and approaches is arbitrary and unlawful, and was advanced without affording the public an opportunity to object in comments. And each of them led EPA to adopt weaker standards in the Final Rule than the Clean Air Act mandates to protect public health from dangerous $NO_X$ pollution.

EPA also announced, for the first time in the Final Rule, that certain turbines will now be exempt from the operating permit requirements of Title V of the Clean Air Act, 42 U.S.C. § 7661c. *See* 91 Fed. Reg. 1959-60. That consequential change eliminates for exempted sources the important benefits of the Title V program, including pollution reduction, transparency of emissions, and public participation opportunities. In contrast, EPA's proposal said that the Agency was "not proposing to exempt any such sources from title V permitting," 89 Fed. Reg. at 101,347.

The Clean Air Act expressly requires that EPA provide notice and an opportunity for the public to comment on any data, methodology, legal interpretations, or policy considerations in a proposed rule, 42 U.S.C. § 7607(d)(3). EPA plainly failed to follow these requirements for key elements of the Final Rule. This constitutes "serious procedural error" that directly led EPA to finalize pollution-control requirements that are weaker than the Agency proposed, weaker than necessary to protect public health, and far short of EPA's statutory mandate. *Conn. Light & Power Co. v. Nuclear Regul. Comm'n*, 673 F.2d 525, 530-31 (D.C.

Cir. 1982) ("An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary.").

A limited abeyance period will enable EPA to correct the multiple significant procedural errors identified in the reconsideration petition in the first instance, which could narrow the issues to be decided in this case. Even if EPA were to deny the reconsideration petition, an abeyance period would allow petitioners' challenges to such denial to be efficiently consolidated with this case. Consolidation would ensure this Court can consider petitioners' interrelated objections to the Final Rule in a single proceeding, thus preventing inefficient piecemeal litigation that would prolong uncertainty about EPA's Final Rule.

A six-month abeyance period would provide EPA ample time to act on the petition. Such a period is consistent with abeyance periods that this Court has ordered pending administrative reconsideration in other Clean Air Act cases—even over EPA's opposition to abeyance,[8] and is similar to the time it has taken EPA to

---

[8] *See, e.g.*, *Am. Trucking Ass'ns, Inc. v. EPA*, No. 97-1440, 1998 WL 65651, at *1 (D.C. Cir. Jan. 21, 1998) (granting opposed motion to hold case in abeyance pending EPA's disposition of reconsideration petition); Order, ECF#1843071, *Air Alliance Houston v. EPA,* No. 19-1260 (D.C. Cir. May 15, 2020) (granting opposed motion to hold case in abeyance for six months to permit EPA action on reconsideration petitions).

act on other reconsideration petitions.[9] EPA has already had more than a month to consider Environmental Defense Fund et al.'s reconsideration petition, so the Agency should not need long to decide whether it will comply with its statutory duty to provide notice and a full opportunity to comment on key elements of the Final Rule.

The requested six-month abeyance would not prejudice any party. Because the Final Rule remains in effect, abeyance would not alter its implementation or harm parties benefited by it. *See Devia*, 492 F.3d at 427-28. Further, the timing of EPA's action on the reconsideration petition is within the Agency's control (subject to challenge by the parties and judicial intervention were EPA to delay unreasonably). At the same time, the Court should limit such abeyance to six months to ensure that EPA acts in a timely fashion on the important issues raised in Environmental Defense Fund et al.'s reconsideration petition.

In contrast, immediate briefing at this time not only would be inefficient but could be prejudicial to petitioners. Under the Clean Air Act, judicial review of issues that were impracticable to raise during the public comment period must

---

[9] *See, e.g.*, 90 Fed. Reg. 3702 (Jan. 15, 2025) (acting on reconsideration petitions in 5.5 months); 89 Fed. Reg. 23,526 (Apr. 4, 2024) (acting on reconsideration petitions in 7.5 months); 85 Fed. Reg. 67,665 (Oct. 26, 2020) (acting on reconsideration petitions in 5 months); 79 Fed. Reg. 18,248 (Apr. 1, 2014) (acting on reconsideration petitions in 5 months); 78 Fed. Reg. 23,497 (Apr. 19, 2013) (acting on reconsideration petitions in 4 months).

await EPA's action on a reconsideration petition. *See* 42 U.S.C. § 7607(d)(7)(B); *Coal. for Renewable Natural Gas v. EPA*, 108 F.4th 846, 858 (D.C. Cir. 2024). The issues raised in Environmental Defense Fund et al.'s reconsideration petition, however, are intertwined with other issues that *were* properly noticed and that are now ripe for litigation. Therefore, without the requested abeyance, petitioners would be forced to choose which issues to raise and how to present them in a vacuum, without knowing how the Agency will respond to their objections on reconsideration and whether EPA will reopen portions of the Rule to correct the identified notice failures. Abeyance pending EPA's action on the reconsideration petition would likely remove these barriers to effective judicial review of petitioners' challenge. Overall, granting the requested six-month abeyance would be the best path to fair and orderly adjudication of this petition and in the interests of all parties and the Court.

## CONCLUSION

For the foregoing reasons, petitioners respectfully request that this case be held in abeyance for six months, until November 5, 2026, to permit EPA to take final action on Environmental Defense Fund et al.'s pending reconsideration petition, with motions to govern due by that date. Petitioners further request that

the Court order EPA to file reports every 30 days concerning the status of the ongoing administrative proceedings.

Dated: May 5, 2026

Respectfully submitted,


/s/ Thomas Zimpleman
Thomas Zimpleman
Abirami Vijayan
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington, DC 20005
(202) 513-6244
tzimpleman@nrdc.org
avijayan@nrdc.org

*Counsel for Natural Resources Defense Council*

/s/ Chloe H. Kolman
Sean H. Donahue
Megan M. Herzog
Chloe H. Kolman
Donahue, Goldberg, Herzog & Davidson
1008 Pennsylvania Ave., SE
Washington, DC 20003
(650) 353-8719
sean@donahuegoldberg.com
megan@donahuegoldberg.com
chloe@donahuegoldberg.com

Noha Haggag
Vickie Patton
Environmental Defense Fund
555 12th St., NW, Suite 400
Washington, DC 20004
202-572-3286
nhaggag@edf.org
vpatton@edf.org

*Counsel for Environmental Defense Fund*

/s/ Andres Restrepo
Andres Restrepo
Sierra Club
50 F Street NW, Eighth Floor
Washington, D.C. 20001
(856) 240-0964
andres.restrepo@sierraclub.org

/s/ Hayden W. Hashimoto
Hayden W. Hashimoto
Francis W. Sturges, Jr.
Shaun A. Goho
Alan Masinter
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109

Jim Dennison
Sierra Club
1630 38th Street, #103W
Boulder, CO 80301
(435) 232-5784
jim.dennison@sierraclub.org

*Counsel for Sierra Club*

(617) 624-0234
hhashimoto@catf.us
fsturges@catf.us
sgoho@catf.us
amasinter@catf.us

*Counsel for American Lung Association, Citizens for Pennsylvania's Future, and Clean Wisconsin*

## CERTIFICATE OF COMPLIANCE

I hereby certify that on this 5th day of May, 2026, that the foregoing motion contains 3,378 words and was composed in Times New Roman font, 14-point. The motion complies with all applicable type-volume and typeface requirements.

*/s/ Chloe H. Kolman*
Chloe H. Kolman

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of May, 2026, I have served the foregoing document on all parties through the Court's electronic case filing (CM/ECF) system.

*/s/ Chloe H. Kolman*
Chloe H. Kolman

EXHIBIT 1

March 16, 2026

**VIA CERTIFIED AND ELECTRONIC MAIL**

The Honorable Lee Zeldin, Administrator, EPA
Office of the Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Mail Code: 1101A
Washington, DC 20460
zeldin.lee@epa.gov

Gautam Srinivasan
Associate General Counsel for the Air and Radiation Law Office
Office of General Counsel (Mail Code 2344A)
U.S. Environmental Protection Agency
1200 Pennsylvania Ave. NW
Washington, DC 20460
srinivasan.gautam@epa.gov

John Ashley
Industrial Processing and Power Division (D243–02)
Office of Clean Air Programs
U.S. Environmental Protection Agency
109 T.W. Alexander Drive, P.O. Box 12055
RTP, North Carolina 27711
ashley.john@epa.gov

**Re: New Source Performance Standards Review for Stationary Combustion Turbines and Stationary Gas Turbines, Docket No: EPA-HQ-OAR-2024-0419, 91 Fed. Reg. 1910 (Jan. 15, 2026).**

Pursuant to Section 307(d)(7)(B) of the Clean Air Act,[1] the Clean Air Task Force, Environmental Defense Fund, Natural Resources Defense Council, and Sierra Club ("Petitioners") respectfully petition the Environmental Protection Agency ("EPA") for reconsideration and strengthening of its Final Rules ("Final Rule" or "Rule") adopting New Source Performance Standards for Stationary Combustion Turbines, which protect the public from nitrogen oxide (NOx) emissions.[2] Because judicial review of the rule is available by the filing of a petition for review within 60 days of rule publication on January 15, 2026, the grounds for the objections arose "within the time specified for judicial review." Clean Air Act § 307(d)(7)(B).

Reconsideration is warranted because the objections raised in this petition are of central relevance to the outcome of the Final Rule, and address aspects of the rule where EPA failed to provide adequate notice and opportunity for public comment. Our objections are of "central relevance" to

[1] 42 U.S.C. § 7607(d)(7)(B).
[2] 91 Fed. Reg. 1910 (Jan. 15, 2026)

the outcome of this rule, 42 U.S.C. § 7607(d)(7)(B), because—consistent with EPA's interpretation of that term—they present "substantial support for the argument that the regulation should be revised." *Chesapeake Climate Action Network, et al. v. EPA*, 952 F.3d 310, 322 (D.C. Cir. 2020). Indeed, our objections go to one of the fundamental purposes of the Final Rule: to reduce health-harming emissions from combustion turbines. Moreover, each of these issues involve aspects of the Final Rule that differed substantially from the proposed rule. As such, "it was impracticable to raise such objection[s]" during the public comment period. 42 U.S.C. § 7607(d)(7)(B). But to the extent that Section 7607(d)(7)(B) criteria are not met, EPA should exercise discretionary authority to reconsider the Rule so that the serious errors and missteps identified herein are corrected.

Although reconsideration is warranted, Petitioners reserve the right to seek immediate judicial review on all of the issues raised herein, and do not concede that they failed to raise with reasonable specificity and exhaust any issues or claims during the public comment period.[3]

[3] *See Comments of Sierra Club, Environmental Defense Fund, Clean Air Task Force, and Clean Wisconsin on EPA's Review of New Source Performance Standards for Stationary Combustion Turbines and Stationary Gas Turbines*, Dkt. No. EPA-HQ-OAR-2024-0419-0061 (Mar. 15, 2025), https://downloads.regulations.gov/EPA-HQ-OAR-2024-0419-0061/attachment_1.pdf (hereinafter "Pet. Rulemaking Comments").

**Contents**

**I. EPA's Failure to Quantify and Consider Health Benefits is Unlawful and Arbitrary ........... 4**

A. EPA's Justification for Abandoning SCR-Based Standards and Failing to Analyze Associated Health Impacts is Unlawful and Arbitrary ........................................................................................ 4

B. EPA's Stated Basis for Refusing to Quantify Health Impacts is Arbitrary ..................................... 7

i. Background on EPA's Methodology ........................................................................................... 7

ii. EPA's choice to abruptly abandon its longstanding policy regarding calculation of environmental benefits is arbitrary. ........................................................................................ 10

iii. EPA's reversal of its approach to quantifying benefits violates Clean Air Act procedural requirements. ........................................................................................................................... 14

iv. EPA's failure to report and consider quantified benefits was a material error warranting reconsideration. ........................................................................................................................ 15

**II. EPA's Approach to Costs and Its Determination of the Best System of Emission Reduction in the Final Rule Was Unlawful and Arbitrary in Multiple Ways. .................................................. 17**

A. EPA's determination in the Final Rule to exclude SCR from the best system for all large combustion turbines with annual utilization rates below 45 percent was flawed. ................................ 17

B. The Final Rule's method of evaluating the cost-reasonableness of NOx controls was arbitrary and capricious. ........................................................................................................................... 22

i. To determine the best system of emission reduction, EPA must consider associated public health impacts when determining whether a particular cost-effectiveness value or range of values for NOx controls is reasonable, yet failed to do so in the Final Rule. .................................................... 22

ii. In any event, the Final Rule's treatment of EPA's cost-effectiveness determinations for NOx controls from prior rulemakings was arbitrary and capricious. ........................................................ 25

iii. Relative to EPA's proposal, the Final Rule drastically increases the cost estimates for installing and operating SCR at simple-cycle turbines without justification. .................................................... 29

**III. EPA's Approach to Subcategorization in the Final Rule Is Arbitrary. ................................. 33**

**IV. The Final Rule Arbitrarily Weakens the NOx Standards for Large Modified and Reconstructed Units Relative to the 2006 NOx NSPS, and Arbitrarily Rejects SCR as the Best System for these Modified and Reconstructed Units. .......................................................................... 36**

**V. The Final Rule's Alternative Formulations of the Standard (the Four-Hour Average Output-Based Standard, the 30-Day Average Output-Based Standard, and the Annual Mass-Based Standard) Are Arbitrary and Capricious. ................................................................................. 37**

**VI. EPA Did Not Provide Adequate Justification for its Temporary Turbine Standard ............ 40**

**VII. EPA Did Not Provide Adequate Notice for its Title V Exemption ..................................... 40**

A. EPA did not provide notice that it intended to create an exemption for area source stationary turbines subject to the NSPS. ......................................................................................................... 40

B. Had EPA proposed to exempt area source stationary turbines from Title V permitting, petitioners would have provided substantially different comments. ........................................................................ 42

## I. EPA's Failure to Quantify and Consider Health Benefits is Unlawful and Arbitrary

In the proposal, EPA quantified the present value of its proposed standards' health benefits as ranging from $107 million to $505 million, applying a 2% discount rate. *Regulatory Impact Analysis for the New Source Performance Standards Review for Stationary Combustion Turbines* 61 tbl.22 (Nov. 2024), EPA-HQ-OAR-2024-0419-0005 [hereinafter Proposed Rule RIA]. But in the Final Rule, EPA abruptly abandoned its longstanding practice of evaluating the quantified health benefits – a decision it made without any advance notice or solicitation of comment, and without reasoned explanation.

EPA did not provide an opportunity to comment on this approach in the Proposed Rule. Its choice to abandon its established practice of quantifying human health benefits, and to ignore those health benefits in making regulatory decisions in the Final Rule, runs afoul of substantive and procedural Clean Air Act requirements. These errors are "of central relevance to the outcome of the rule" and warrant reconsideration. 42 U.S.C. §7607(d)(7)(B). Despite lack of notice, Petitioners and others emphasized the importance of the Rule's health benefits in comments.

Protecting public health and welfare is the central purpose of section 111. *See* 42 U.S.C. § 7411(b)(1); *Am. Lung Ass'n v. EPA*, 985 F.3d 914, 993 (2021) ("Control of emissions from existing sources before they harm people and the environment is the central purpose of Section 7411(d) of the Clean Air Act"); *id.* at 993-95. Here, EPA finalized a rule that is projected to forego nearly all of the expected NOx reductions associated with the proposed rule and even has the potential to *increase* NOx emissions compared to the previous 2006 Rule. *See infra* Table 3 (reflecting estimated increases in years 2027, 2028, 2029, 2030, 2031). EPA cites cost-savings and reductions in emissions of other pollutants as a basis for weakening the NOx standards from the proposal. 91 Fed. Reg. at 1962. At the same time, EPA chose not to quantify or monetize health impacts, citing uncertainty. *Economic Impact Analysis for the New Source Performance Standards Review for Stationary Combustion Turbines* 34-36 (Jan. 2026), EPA-HQ-OAR-2024-0419-0237 [hereinafter Final Rule EIA].

As detailed below, EPA's failure to adequately assess the health impacts of its standards as a relevant factor in its assessment of the BSER criteria was arbitrary. In addition, EPA's decision to abandon its rigorous, peer-reviewed methodology for quantifying impacts given alleged uncertainty is arbitrary.

### A. EPA's Justification for Abandoning SCR-Based Standards and Failing to Analyze Associated Health Impacts is Unlawful and Arbitrary

CAA section 111(a)(1) provides that performance standards are to reflect "the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated." 42 U.S.C. § 7411(a)(1). EPA evaluated two technologies as potential components of the best system of emissions reduction ("BSER"): combustion controls and post-combustion selective-catalytic reduction ("SCR").

Based on its analysis of the section 111 factors, EPA proposed SCR in combination with combustion controls as the BSER for several subcategories (*see* Table 1). As acknowledged by EPA in the proposal, SCR is more protective than combustion control technology alone and is already widely adopted as an emissions control strategy for many types and sizes of stationary combustion turbines. EPA explained that 100 percent of all new combined cycle units and approximately 75 percent of all new simple cycle units in the power sector installed SCR in the 5 years preceding the proposal. 89 Fed. Reg. at 101,326.

As part of its analysis of non-air quality health, environmental, and energy considerations under section 111, EPA found that SCR could result in increases of ammonia emissions given the ammonia reagent needed to operate SCR. EPA also explained that SCR reduces the efficiency of a combustion turbine through the auxiliary/parasitic load requirements, which would result in increases of carbon dioxide emissions. EPA ultimately found that the non-air quality health and environmental impacts and energy requirements of SCR are acceptable for stationary combustion turbines. 89 Fed. Reg. at 101,306, 101,330, 101,332, 101,334.

EPA reversed course in the Final Rule and finalized SCR as a component of the BSER for a single subcategory. 91 Fed. Reg. 1910. In addition, EPA weakened the standard for large, low-utilization, high efficiency turbines compared to the 2006 Rule. (compare Table 1 and Table 2, below).

**Table 1: Proposed New or Reconstructed Gas Plant Standards** *CC means combustion controls only, SCR means combustion controls *and* SCR, and DFC means diffusion flame controls. EPA standard is in lb/MMBtu, table shows PPM equivalent for convenience.

| Capacity Factor & Base Load Rating | ≤ 250 MMBtu/h | > 250 MMBtu/h and ≤ 850 MMBtu/h | > 850 MMBtu/h |
|---|---|---|---|
| ≤ 20 percent | | 25 ppm (CC) | 15 ppm (CC) |
| > 20 percent | | 3 ppm (SCR) | 3 ppm (SCR) |
| ≤ 40 percent | 25 ppm (CC) | | |
| > 40 percent | 3 ppm (SCR) | | |

**Table 2: Final New or Reconstructed Gas Plant Standards**

| Utilization & Base Load Rating | ≤ 50 MMBtu/h | > 50 MMBtu/h and ≤ 850 MMBtu/h | > 850 MMBtu/h |
|---|---|---|---|
| Low | | 25 ppm (CC) | 25 ppm (CC) (high efficiency)<br>9 ppm (CC) (low efficiency) |
| High | | 15 ppm (CC) | 5 ppm (SCR) |
| Any | 25 ppm (CC) | | |

As a basis for reversing course on SCR, EPA cited cost considerations[4] and increases in potential ammonia emissions and "other" pollutants.[5] EPA noted that these increases in emissions "support the conclusion" that SCR does not qualify as the BSER for large turbines and "tip[s] the scale away" from qualifying SCR as the BSER for small and medium combustion turbines. 91 Fed. Reg. at 1937-38. However, EPA fails to demonstrate why the Rule's decrease in ammonia emissions outweighs the increase in NOx resulting from EPA's decision to finalize less stringent standards than proposed. Indeed, the analysis EPA presented in the Proposed Rule RIA – which quantified both the health benefits of NOx reductions as well as ammonia-related disbenefits – indicates that the SCR-based standards in the proposed rule would result in substantial overall health benefits.[6] Compared to the Proposal, in 2032 alone the Final Rule results in 178 tons less of ammonia emissions, but an increase of 2,363 tons of NOx (*See* Tables 3, 4). Notably, between 2027 and 2032, the Final Rule's standards may even result in an *increase* of NOx emissions relative to the previous standards that had been in effect since 2006 (*See* Table 3).

**Table 3: Estimated NOx Impacts in Proposal and Final Rule**

| NOx Emissions (tons) | Proposal[7] | Final[8] |
|---|---|---|
| **2027** | -198 | 41 to 88 |
| **2028** | -714 | −26 to 68 |
| **2029** | -1,229 | −94 to 47 |
| **2030** | -1,744 | −161 to 27 |
| **2031** | -2,259 | −229 to 5 |
| **2032** | -2,659 | −296 to −15 |

**Table 4: Estimated Ammonia Impacts in Proposal and Final Rule**

| Ammonia Emissions (tons) | Proposal[9] | Final[10] |
|---|---|---|
| **2027** | -21 | -1 |
| **2028** | -65 | -12 |
| **2029** | -108 | -22 |
| **2030** | -152 | -33 |
| **2031** | -196 | -44 |
| **2032** | -232 | -54 |

EPA's decision to decrease other pollutants at the expense of thousands of tons of NOx emissions, in the absence of *any* readily quantifiable information about the relative health impacts of these pollutants, fails to consider an "important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Cost and tons reduced alone cannot be used as an effective metric to compare whether harms from one pollutant outweigh harms from

[4] Petitioners' discuss EPA's cost considerations below in section II.
[5] In the proposal, EPA detailed potential increases in carbon emissions. In the Final Rule, EPA broadly asserts potential increases in formaldehyde emissions. 91 Fed. Reg. at 1937.
[6] *See* Proposed Rule RIA at 61 (comparing monetized benefits from NOx reductions with disbenefits from ammonia emissions).
[7] 89 Fed. Reg. at 101,350.
[8] 91 Fed. Reg. at 1962.
[9] 89 Fed. Reg. at 101,350.
[10] 91 Fed. Reg. at 1963.

another. And EPA's vague assertions that ammonia slip "tip[s] the scale away" from a more protective BSER, when the actual health impacts of NOx and ammonia emissions are readily susceptible to quantification and comparison (as EPA demonstrated in the Proposed Rule), is clearly arbitrary. That EPA's quantified analysis of health benefits for the Proposed Rule found that the health benefits of greater NOx reductions clearly outweigh ammonia disbenefits makes EPA's failure to explain its weighing of these two pollutants in the Final Rule even more arbitrary. By finalizing a Rule that demonstrates a potential *increase* in NOx emissions and failing to analyze associated health impacts, EPA failed to "articulate a satisfactory explanation" and set forth a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). EPA ultimately failed to account for the important health impacts that § 111 requires it to consider. *Sierra Club v. Costle*, 657 F.2d 298, 326 (D.C. Cir. 1981) (EPA must treat the amount of air pollution as a relevant factor under § 111); 42 U.S.C. § 7411(b)(1)(A) (statute's protective purpose to address pollution that endangers public health and welfare).

### B. EPA's Stated Basis for Refusing to Quantify Health Impacts is Arbitrary

In the Final Rule, EPA abruptly abandoned without reasoned explanation its longstanding practice of reporting the quantified health benefits projected to result from Clean Air Act emission standards. In declining to project or consider the health benefits associated with the weaker standards established in the Final Rule, EPA disregarded decades of guidance from experts, its own formal economic analysis guidelines and a large body of empirical evidence documenting a strong relationship between pollution exposure, mortality and morbidity.

EPA's choice to abandon its established practice of quantifying human health benefits is arbitrary and runs afoul of substantive and procedural Clean Air Act requirements. These errors are "of central relevance to the outcome of the rule" and warrant reconsideration. 42 U.S.C. § 7607(d)(7)(B). Had EPA properly reported and considered available information concerning monetized benefits, that information could have informed its selection of appropriate best systems of emission reduction—resulting in more protective NOx standards for combustion sources.

#### *i. Background on EPA's Methodology*

For decades, EPA has built and refined the scientific infrastructure to answer a fundamental question: what is the cost, in human lives and suffering, of industrial pollution within the air we breathe? Over the years, EPA, working in close collaboration with outside experts, has developed and improved a rigorous suite of peer-reviewed and robust methodologies to quantify and monetize the public health benefits of air pollution reductions. These methodologies have been used to aid policymakers and the public in understanding the health impacts of EPA's regulatory actions in countless rulemakings across administrations of both parties.

Since 1993, EPA has maintained a practice of quantifying public health benefits as fully as possible within regulatory impact analyses. That practice has been required by Executive Order 12,866, which directs that agencies "assess all costs and benefits of available regulatory alternatives" with such costs and benefits to include both "quantifiable measures" "to the fullest extent that these can

be usefully estimated," as well as "qualitative measures . . . that are difficult to quantify, but nevertheless essential to consider." Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Oct. 4, 1993).

To meet the requirements of Executive Order 12,866, EPA has formally memorialized benefits quantification methodologies through its Guidelines for Preparing Economic Analyses. U.S. EPA., *Guidelines for Preparing Economic Analyses* (2024) [hereinafter Guidelines]. EPA most recently revised and published in 2024 a third edition of the Guidelines. The Guidelines as revised "establish a sound scientific framework for performing economic analyses of environmental regulations and policies." US EPA, Landing Page for *Guidelines for Preparing Economic Analyses, 3rd Edition,* https://www.epa.gov/environmental-economics/guidelines-preparing-economic-analyses-3rd-edition (last updated Dec. 1, 2025). They describe the very "best practices for economic analysis grounded in the economics literature." U.S. EPA, *Guidelines for Preparing Economic Analyses, 3rd Edition* at 1-1 (Dec. 2024), https://www.epa.gov/system/files/documents/2024-12/guidelines-for-preparing-economic-analyses_final_508-compliant_compressed.pdf. And they ensure "high-quality analyses and consistency" in how "economic analyses are prepared, performed and reported." *Id.*

Among other things, the Guidelines include detailed guidance regarding how to prepare mortality risk valuation estimates (*see* Guidance Appendix B). The Guidelines also contain detailed guidance for how to address and account for analytic uncertainty, which is inherent in all benefit cost analyses. *See* Guidelines at 5-29 to 5-34. The Guidelines, for example, explain that in assessing and presenting uncertainty, analysis should generally present outcomes or conclusions based on the most plausible values and perform sensitivity analysis on key assumptions. *Id.* at 5-29. The Guidelines also address how to communicate uncertainty in the analysis. *Id.* at 11-13.

The Guidelines as most recently revised underwent extensive external peer review prior to finalization. All chapters of the Guidelines underwent external peer review either through EPA's Science Advisory Board or through independent review by external experts.

Consistent with its Guidelines and its long-standing practice in Clean Air Act rulemakings, EPA released with its proposed rule a regulatory impact analysis that assessed the monetized benefits related to avoided premature mortality and morbidity associated with reduced exposure to NOx as a precursor to ozone and PM2.5. *See* Proposed Rule RIA. EPA generally calculated health benefits by estimating counts of air pollution-attributable cases of adverse health outcomes and assigning dollar values to those counts. *Id.* at 27-28. EPA constructed those estimates by adapting primary research—specifically air pollution epidemiology studies and economic value studies—from similar contexts. *Id.* EPA extensively described the scientific bases for its estimates and explained how it addressed uncertainty in the proposal. *Id.* at 30-31, 34-41.

Each one of these steps relied on well-established resources and methods that EPA has repeatedly used in Clean Air Act rulemakings across administrations, that utilize transparent and rigorous means for identifying and accounting for uncertainties, and that have undergone rigorous review by the Science Advisory Board and the Clean Air Scientific Advisory Committee ("CASAC"). In identifying specific health-related impacts associated with PM2.5 and ozone, for example, EPA expressly relied upon the most recent Integrated Science Assessments ("ISAs") prepared for

review of the National Ambient Air Quality Standards ("NAAQS"), each of which underwent external review by the CASAC and subsequent EPA revision and improvement. *Id.* at 28, 32. Likewise, EPA's approach to quantifying and monetizing the health impacts associated with changing concentrations of these pollutants is grounded in its 2023 Technical Support Document ("TSD"), *Estimating PM2.5- and Ozone-Attributable Health Benefits*, which was updated for the 2023 proposed reconsideration of the PM2.5 NAAQS. Proposed Rule RIA 27-31 (citing *Technical Support Document for the 2022 PM NAAQS Reconsideration Proposal RIA: Estimating PM2.5- and Ozone-Attributable Health Benefits* (2023), https://www.regulations.gov/document/EPA-HQ-OAR-2019-0587-0063 [hereinafter 2023 TSD]. This TSD was further revised and improved in June 2024, just months before the Proposed Rule, in response to an SAB review that concluded the TSD's approaches are "scientifically robust and appropriate for regulatory analyses."[11]

Notably, this TSD includes an entire chapter exhaustively discussing the various sources of uncertainty associated with quantifying and valuing PM2.5 and ozone-related health impacts, as well as the multiple techniques the Agency has incorporated into its analysis to assess and characterize those uncertainties. *Estimating PM2.5- and Ozone-Attributable Health Benefits: 2024 Update* 103 (2024), https://www.epa.gov/system/files/documents/2024-06/estimating-pm2.5-and-ozone-attributable-health-benefits-tsd-2024.pdf [hereinafter 2024 TSD]. For example, for PM2.5 risks, the TSD discusses EPA's use of Monte Carlo methods to quantitatively assess statistical uncertainties with respect to health risks and economic valuation of health harms; statistical techniques and use of sensitivities to assess confounding factors and other sources of uncertainty in the key health studies used to evaluate mortality risk; and consideration of a variety of studies featuring alternative risk estimates for non-mortality health impacts. *Id.* at 103-118. The TSD contains a similar discussion of multiple methods used to characterize uncertainty for ozone-related health impacts, *id.* at 119-127, as well as an explanation of how EPA has used sensitivity analysis and other techniques to evaluate uncertainties associated with cross-cutting factors such as the baseline incidence of health conditions that are exacerbated by PM2.5 and ozone, the "lag" between air pollution exposure and health effects, and other sources of uncertainty. *Id.* at 128-147.

Finally, the Proposed Rule RIA describes how EPA has used this approach to quantifying and valuing health impacts from PM2.5 and ozone as the basis for a simplified or "reduced form" methodology to estimate health impacts based on the average health benefits of reducing these pollutants on a per-ton basis. Proposed Rule RIA at 37, 74. EPA has most recently documented this benefit-per-ton approach in a 2023 TSD, which incorporated revisions and improvements in response to a 2021 review by the SAB, as well as updated emissions inventories and the most recent ISAs for PM2.5 and ozone. *Technical Support Document: Estimating the Benefit per Ton of Reducing Directly-Emitted PM2.5, PM2.5 Precursors and Ozone Precursors from 21 Sector*s 6 (2023) (Doc ID EPA-HQ-OAR-2024-0419-0013, attach. 105); Proposed Rule RIA at 73-74. In the Proposed Rule RIA, EPA explained that it was using national estimates of benefits-per-ton for NOx due to the time constraints of the rulemaking and uncertainty as to where new sources would

[11] EPA Science Advisory Board, *Review of BenMAP and Benefits Methods,* EPA-SAB-24-003, Transmittal Letter (2024), https://sab.epa.gov/ords/sab/f?p=114:0:17107614755045:APPLICATION_PROCESS=REPORT_DOC:::REPORT_ID:1124.

be constructed. EPA acknowledged that the use of BPTs is subject to uncertainty, and provided both a qualitative description of the sources of uncertainty as well as quantitative information about how BPTs for different sectors compare with each other as well as with "full-form" air quality modeling. Proposed Rule RIA at 40, 42-43. To further characterize the uncertainty around its estimates, EPA presented alternative estimates of the health impacts associated with the rule based on BPTs for three different source categories (industrial boilers, oil and gas facilities, and electric generating units). *Id.* at 44.

In sum, the analysis of ozone and PM2.5-related health impacts presented in the Proposed Rule RIA was consistent with EPA's well-established methodologies and agency-wide guidelines for regulatory analyses; rested on a vast body of public health science and EPA technical resources that have undergone peer review and/or review by EPA's external advisory boards; and thoroughly explained both the assumptions and approaches used as well as the nature and extent of relevant uncertainties.

*ii. EPA's choice to abruptly abandon its longstanding policy regarding calculation of environmental benefits is arbitrary.*

EPA's decision in the Final Rule to abruptly abandon this well-established and scientifically robust approach to evaluating health impacts is arbitrary. Where benefits are practicable to quantify through scientific methods, but difficult to quantify with precision, the appropriate response is to assign a value and disclose the nature of the uncertainty as EPA did at the proposal stage. By continuing to quantify compliance costs in precise dollar terms while casting aside any quantification of health benefits, EPA has produced a systematically skewed regulatory impact analysis that overstates net costs and precludes fair comparison of regulatory alternatives. *Cf. Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1198 (9th Cir. 2008) (where an agency uses a cost-benefit analysis, it "cannot put a thumb on the scale by undervaluing the benefits and overvaluing the costs of more stringent standards").

EPA's abrupt reversal on benefits quantification also flouts established administrative law principles. When an agency reverses a longstanding policy, it must acknowledge it is changing course and, in some cases, provide a more "detailed" and reasoned justification than in a circumstance where it is operating on a blank slate. *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515-16 (2009). Here, EPA's stated justification for declining to report and consider hundreds of millions of dollars in potential quantified health benefits—set forth in a few short paragraphs of the preamble—falls far short of that standard.

As an initial point, EPA fails in the Final Rule to acknowledge the extent to which it is changing course and the nature of the scientific foundation and support for its prior approach. In the brief passage that EPA devotes to the announced policy change, EPA does not once even reference its peer-reviewed, twelve-chapter, four-hundred-plus page Guidelines for Economic Analyses or begin to explain why its numerous specific departures from the specific recommendations therein are justified (even though to this day EPA commits to adhering to those guidelines on its website). EPA provides no explanation as to why its long-standing methods for evaluating and presenting uncertainties around its health impacts estimates are no longer appropriate. Nor does EPA

acknowledge that nearly all aspects of its prior approach have been extensively vetted and endorsed by EPA's Science Advisory Board. Nor does EPA explain why it is violating the requirement in Executive Order 12,866 compelling the Agency to quantify health benefits to the fullest extent possible.

Under these circumstances, EPA's brief acknowledgement that it held a previous practice of quantifying environmental benefits is not enough to meet requirements for adequately explaining a shift in Agency position. EPA's obligation to "provide a reasoned explanation" for "disregarding" the specific "facts and circumstances that underlay or were engendered by the prior policy," *Fox Television Stations*, 556 U.S. at 516, encompasses an obligation to acknowledge and address all of the particular factual premises and reasoning that underpinned the Agency's longstanding prior approach to benefits quantification. Thus, EPA must not just acknowledge the general change in policy direction, it must disclose each of the pertinent aspects of its Guidelines that it is now departing from, and provide a reasoned explanation for abandoning all of them. EPA falls short of doing so in the brief six-paragraph passage where EPA announces its sudden refusal to quantify health benefits. Indeed, in this passage EPA does not even acknowledge that it has in place extraordinarily detailed, and rigorously peer-reviewed economic analysis guidelines.

In any event, beyond failing to acknowledge all the facts and circumstances underlying its prior policy, EPA fails to provide a coherent basis for reversing its longstanding approach to economic analysis. EPA identifies no new scientific evidence or flaw in the existing scientific literature that could justify entirely failing to quantify or monetize health benefits wholesale.

EPA principally points to uncertainty, stating that its "analytical practices often provided the public with a false sense of precision and more confidence regarding the monetized impacts of fine particulate matter and ozone than the underlying science could fully support." 91 Fed. Reg. at 1964. However, this conclusory statement neither acknowledges nor grapples with the strong scientific underpinnings for the approach EPA used to assess health impacts in the Proposed Rule RIA – including, as discussed above, the suite of ISAs and TSDs documenting EPA's analytical methods and characterizing sources of uncertainty, the SAB and CASAC reviews that scrutinized and supported EPA's methods for assessing health impacts, and the Agency's guidelines for economic analysis that have guided the development of its methodologies. *See* Bryan Hubbell and Alan Krupnick, Resources for the Future, *How the Environmental Protection Agency Got it Wrong About Monetizing Benefits of Air Pollution Regulations* (2026), https://media.rff.org/documents/Report_26-04_-_Update_2.3.26.pdf [hereinafter RFF Report] (submitted as attachment) (rebutting EPA's justification for abandoning impacts).

EPA's general invocation of uncertainty ignores that all economic benefits analyses involve uncertainty, and EPA has always acknowledged such sources of uncertainty and made the degree of uncertainty clear to the public within its economic analyses. As described above, EPA has exhaustively explained sources of uncertainty – and used a variety of tools to probe and present the extent of that uncertainty – at every step in the analytical process it used to assess the health

impacts of the proposed rule.[12] Further, in the analysis accompanying the proposed rule, EPA details the sources of uncertainty, presents multiple alternative estimates of health impacts to illustrate that uncertainty, and makes clear that in view of the significant uncertainties, the estimates of annual benefits "should be viewed as representative of the magnitude of benefits expected, rather than the actual benefits that would occur every year." Proposed Rule RIA at 48-49. In the Proposed Rule, EPA acknowledged that the use of BPTs is subject to uncertainty and provided both a qualitative description of the sources of uncertainty as well as quantitative information about how BPTs for different sectors compare with each other as well as with "full-form" air quality modeling. Proposed Rule RIA at 40, 42-43. EPA additionally presented alternative estimates of the health impacts associated with the rule based on BPTs for three different comparable sources. Proposed Rule RIA at 44.

The Final Rule never explains why this well-vetted and transparent approach now fails to pass muster – or why it is reasonable for EPA to provide *no estimates whatsoever* of the health impacts of its Final Rule, as opposed to utilizing its existing approaches while working to improve them over time. *See Ctr. for Biological Diversity*, 508 F.3d at 533 (finding that federal agency's refusal to quantify benefits of greenhouse gas reduction was arbitrary because "while the record shows that there is a range of values, the value of carbon emissions reduction is certainly not zero," and because the agency "has monetized other uncertain benefits" such as crash, noise, and congestion costs). In addition, EPA here did not discuss any alternative methodology to quantifying emissions. *See, e.g.* IEc, *Evaluating Reduced-Form Tools for Estimating Air Quality Benefits* (2019) (evaluating reduced form models), https://www.epa.gov/sites/default/files/2020-09/documents/adapted_rft_report_10.31.19.pdf (submitted as attachment). EPA claims that uncertainty "provide[s] the public with a false sense of precision and more confidence" (Final Rule EIA at 34) but fails to explain why the public would misunderstand uncertainties accompanying any health benefits quantification and why it is better to avoid quantification rather than explain the uncertainty.

EPA has thought extensively about the role of uncertainty in characterizing the impacts of regulatory actions. In its 2002 report, *Estimating the Public Health Benefits of Proposed Air Pollution Regulations* the National Academy of Sciences encouraged EPA to do more to characterize the uncertainty in its estimates and directly rejected the idea that uncertain results are of no value to decision-makers.[13] Partially in response to that report, in 2006 EPA completed its

---

[12] *See also* IEc, *Uncertainty Analyses to Support the Second Section 812 Benefit-Cost Analysis of the Clean Air Act* (2011) (analyzing uncertainty), www.epa.gov/sites/default/files/2016-01/documents/uncertaintyfullreport.pdf (submitted as attachment)

[13] National Research Council, *Estimating the Public Health Benefits of Proposed Air Pollution Regulations*, The National Academies 148 (2002), https://www.nationalacademies.org/read/10511/chapter/7#p20005c9f9970126001 ("There is a common misperception that a high degree of certainty is required for regulatory actions to take place to protect public health. As a result, primary health benefits analyses that more fully and accurately portray the uncertainties might not be considered useful. It is unrealistic for EPA to defer decisions until it can make them on the basis of perfect science. A careful and deliberate balancing of the benefits and costs is required, and this balancing must be informed by a fair assessment of the current levels of uncertainty and a realistic evaluation of the likely reductions in uncertainty attainable through further research.") (submitted as attachment)

expert judgment assessment[14] of the mortality impacts of exposure to fine particulate matter and subsequently used those results to characterize uncertainty in its analyses of major air quality rules affecting PM2.5, such as the 2012 PM NAAQS RIA.[15]

Moreover, as discussed in the RFF Report, substantial uncertainties surround regulatory cost estimates, and yet EPA makes no mention of equivalent concerns for those. RFF Report at 5. EPA's inconsistent treatment of uncertainty when it comes to evaluating costs is unexplained and arbitrary.[16] In any event, to the extent uncertainty is inherent to economic benefits analysis, the appropriate and logical response is for EPA to do what it did in the Proposed Rule and has done in every other comparable Clean Air Act rulemaking involving PM2.5 exposure in recent decades: EPA should identify the sources of uncertainties (and run accompanying sensitivity analyses as appropriate), as opposed to declining to report quantitative benefits. EPA's previous, well-established approach aligns with the Agency's guidelines as well as OMB guidance on regulatory cost-benefit analysis. *See* OMB Circular A-4 2, 28, 38-42 (2003) (stating that "[s]ound quantitative estimates of benefits and costs, where feasible, are preferable to qualitative descriptions of benefits and costs," and requiring agencies to address uncertainty transparently (e.g. through describing probability distribution and characterizing evidence under alternative scenarios, not to treat uncertain but real benefits as zero)).

EPA's new approach also fails to comport with Congress's general direction in the Clean Air Act. Recognizing the importance of meaningfully assessing benefits, Congress directed that EPA issue periodic reports about the impacts of the Clean Air Act and that EPA "consider all of the economic, public health, and environmental benefits" and further specified that "where numerical values are assigned to such benefits, a default assumption of zero value shall not be assigned to such benefits unless supported by specific data." 42 U.S.C. 7612(b). Although this directive is not directly applicable to section 111 rulemakings, it indicates Congressional support for quantification of health benefits where possible and bolsters the inference that EPA's refusal to quantify benefits based on vague assertions of uncertainty is arbitrary.

Moreover, the environmental benefits at issue are not nearly as uncertain as EPA now suggests. Expert scientific panels in the United States and globally have been consistent in their fundamental findings that short- and long-term exposures to PM2.5 are causally linked to premature mortality and that the overall evidence supports the use of a linear, no-threshold relationship to estimating

[14] IEc, Expanded Expert Judgment Assessment of the Concentration-Response Relationship Between PM2.5 Exposure and Mortality (2006), https://www.epa.gov/sites/default/files/2020-07/documents/pm_ee_report.pdf (submitted as attachment)

[15] *Regulatory Impact Analysis for the Proposed Revisions to the National Ambient Air Quality Standards for Particulate Matter* 5-12 to 5-19 (2012), https://www.epa.gov/sites/default/files/2020-07/documents/naaqs-pm_ria_proposed_2012-06.pdf.

[16] *See .e.g.,* Harrington, Morgenstern, and Nelson, On the Accuracy of Regulatory Cost Estimates, J. Pol'y Analysis and Mgmt, (2000) (finding that cost estimation is also uncertain, and that for half of the rules evaluated ex ante costs were overestimated, compared to only three rules where costs were underestimated.) (submitted as attachment)

mortality impacts. *See* RFF Report at 4. Also notably, there is reason to believe based on input from the Science Advisory Board that EPA's methodologies may be understating health harms.[17]

Beyond pointing to uncertainties, EPA suggests that it is interested in evaluating the benefits of air quality improvements relative to the national ambient air quality standards for PM2.5 and ozone, under the theory that no benefits are secured from reducing pollution in attainment areas. 91 Fed. Reg. at 1964. But as discussed in the RFF Report, the fact that a standard may be "requisite" to protect public health does not mean that there is no risk below the standard level. RFF Report at 6-7. As EPA concluded in its 2024 NAAQS PM2.5 Rule, studies examining this issue "continue to provide evidence of linear, no-threshold relationships between long-term PM2.5 exposures and all-cause and cause-specific mortality." 89 Fed. Reg. at 16,226 (Mar. 6, 2024). Moreover, as explained in the 2024 TSD for estimating health impacts from PM2.5 and ozone, the studies EPA uses to assess mortality impacts from long-term exposure to PM2.5 include substantial data from low-concentration exposures. EPA's SAB-reviewed assessment of those studies includes detailed evaluation of this source of uncertainty. 2024 TSD at 106-107. In the Final Rule, EPA has not identified any basis for ignoring its prior scientific judgment.

*iii. EPA's reversal of its approach to quantifying benefits violates Clean Air Act procedural requirements.*

EPA's reversal of its longstanding quantification policy is not just arbitrary substantively, it fails to meet procedural requirements set forth in subsections 307(d)(3), 307(d)(5) and 307(d)(6) of the Act. These provisions require that EPA provide adequate notice and opportunity for comment on significant aspects of a final rule. Subsection (d)(6)(A) further provides that a promulgated Final Rule must be accompanied by an explanation of the reasons for any major changes in the promulgated rule from the proposed rule along with a "statement" like that which must accompany a proposed rule that "set[s] forth or summarize[s] and provide[s] a reference to any pertinent findings, recommendations, and comments by the Scientific Review Committee . . . and the National Academy of Sciences, and, if the proposal differs in any important respect from any of these recommendations, an explanation of the reasons for such differences." 42 U.S.C. 7607(d)(3)(C), 7607(d)(6)(A)." In the proposal, EPA found that:

> The PM ISA, which was reviewed by the Clean Air Scientific Advisory Committee of the EPA's Science Advisory Board (U.S. EPA-SAB, 2019), concluded that there is a causal relationship between mortality and both long-term and short-term exposure to PM2.5 based on the body of scientific evidence. The PM ISA also

[17] *See* EPA Science Advisory Board*, Review of BenMAP and Benefits Methods* at 48-51 (2024) ("Literature suggests that exposure misclassification tends to bias reported hazard ratios downward leading to a low bias in risk estimates.") ("There is already good evidence that the CR function is increased by co-exposure to COVID-19 … and this is not reflected in historical epidemiologic studies developing the CR function used in BenMAP.") ("Emerging evidence suggests that mortality may be greater during the co-occurrence of extreme temperature and short-term peaks of PM2.5.") ("Mortality associated with PM2.5 may also be enhanced by climate change.") ("The studies available are not inconsistent with a linear relationship at levels below 12 ug/m3, but there is some limited evidence … for both supra and threshold effects at lower levels.")

> concluded that the scientific literature supports the use of a *no-threshold* log-linear model to portray the PM-mortality concentration-response relationship while recognizing potential uncertainty about the exact shape of the concentration-response function.

Proposed RIA at 30 (emphasis added). In the Final Rule, EPA now claims that it "may be appropriate for the EPA to separate exposures and impacts above the level of the [NAAQS] from those occurring at lower ambient concentrations." 91 Fed. Reg. at 1964. EPA does not reconcile this finding with review conducted by CASAC in the PM ISA. Based on the PM ISA, there is "evidence of linear, *no-threshold* relationships between long-term $PM_{2.5}$ exposures and all-cause and cause-specific mortality." 89 Fed. Reg. 16,202, 16,266 (2024) (citing 2019 ISA, pgs 11.84-11.89, 2022 ISA) (emphasis added); *See also* Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter 3-10 (2021), https://www.epa.gov/system/files/documents/2021-10/final-policy-assessment-for-the-review-of-the-pm-naaqs-01-2020.pdf. EPA reached this conclusion after CASAC review of its 2019 PM ISA and 2022 Supplement to the ISA. *Id.* at 16,253; *See* Letter from Elizabeth A. (Lianne) Sheppard, Chair, Clean Air Scientific Advisory Committee, to Administrator Michael S. Regan. *Re: CASAC Review of the EPA's Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter* 16 (March 18, 2022), https://www.4cleanair.org/wp-content/uploads/PM-NAAQS-CASAC-Responses-to-EPA-PM-Draft-PA-031822.pdf. Although there are potential uncertainties about the shape of the concentration-response function at lower concentrations (below 8 ug/m3), 89 Fed. Reg. at 16,266*,* EPA's statement in the EIA for the Final Rule that the NAAQS "are widely understood to represent the divide between clean air and air with an unacceptable level of pollution" does not accurately reflect either the statutory standard that governs the NAAQS or the CASAC-reviewed science. Final Rule EIA at 35. The Administrator's determination as to what level of the NAAQS will be "requisite to protect the public health" with an "adequate margin of safety" does not equate to a scientific finding that there are no or diminished health impacts below the NAAQS. RFF Report at 6.

In the Final Rule, EPA does not confront these pertinent findings, as it is required to do under Section 307(d). EPA's failure to engage with the ISA further underscores the substantive inadequacy, discussed in Section B above, of EPA's cursory justification for abandoning its longstanding benefits practice.

*iv. EPA's failure to report and consider quantified benefits was a material error warranting reconsideration.*

EPA's failure to report and consider quantified benefits, and its failure to comport with the procedural requirements of Section 307(d), were material errors "of central relevance to the outcome of the rule" and warrant reconsideration. 42 U.S.C. § 7607(d)(7)(B). There is a substantial likelihood that established standards would have been more stringent if quantified benefits had been calculated and considered by EPA.

To be clear, this is not to say that EPA must undertake and principally rely upon a formal cost-benefit analysis in the context of establishing section 111 standards. *See Portland Cement Ass'n v.*

*Ruckelshaus*, 486 F.2d 375, 387 (D.C. Cir. 1973) (holding that while cost-benefit studies "should be considered" where they are "adduced," they are not "a necessary condition of action"). Petitioners agree that EPA may take into account a number of different approaches to determining whether the costs of a control technology are reasonable, provided that whatever metric it relies upon is adequately explained and justified (and it was not here).

Where EPA endeavors to apply and rely upon an incremental dollars-per-ton cost-effectiveness metric to determine cost-reasonableness as it did in this rulemaking, EPA typically (a) first determines the incremental cost-effectiveness for a particular pollution control by assessing the amount of money it will cost for each ton of pollution removed from the air, and then (b) uses those figures to determine if the costs of the pollution control system is unreasonably high when considering the pollution reduction benefits and comparing to similar rules. The key lies in how EPA justifies its evaluation of cost-reasonableness: in all circumstances, EPA must be able articulate a rational basis for what it considers either a reasonable or unreasonable amount of money for regulated units to spend (in terms of dollars-per-ton) on NOx controls. If the agency establishes a cost-effectiveness limit that clearly separates reasonable from unreasonable level expenditures for NOx abatement, it must adequately justify that limit. Here, EPA's determination that SCR controls are not cost-reasonable for most affected units – based solely on apples-to-oranges comparisons with much older cost-effectiveness analyses for rules addressing different statutory standards, and in the absence of any information about the relative health benefits of reducing this pollution – fails to provide such a reasonable basis. *Cf. Michigan v. EPA*, 576 U.S. 743, 752-53 (no regulation is appropriate if it does significantly more harm than good and "consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions"). EPA cannot rationally rule out technologies on a cost-per-ton basis while giving no weight or consideration to the health benefits that can be secured through that level of reduction.

In this case, and as discussed further below in Section II of this petition, EPA failed to justify its methodology for evaluating the cost-reasonableness of NOx controls while at the same time ignoring quantitative economic benefits information that would have been particularly probative in assisting EPA in arriving at an appropriate cost-effectiveness metric. Had EPA generated and considered information regarding the value of NOx-related health impacts associated with alternative potential standard levels, then those alternatives could have informed EPA's identification and application of a suitable cost-reasonableness metric, and EPA would likely have identified SCR as an appropriate best system of emission reduction for a broader scope of sources. In any event, even if EPA were not required to formally apply quantified benefits information in any particular way, entirely ignoring such highly probative information still constitutes, at a minimum, a failure to examine an important aspect of the problem—the hallmark of arbitrary agency action. *State Farm*, 463 U.S. at 43. The materiality of EPA's error is well-illustrated by the numbers at the proposal stage. EPA itself calculated that the health benefits of NOx reductions associated with the more stringent proposed standards ranged from approximately $200 million to $670 million in present value—a range of quantified benefits so substantial that no rational cost-reasonableness determination could treat it as irrelevant, and whose omission from the Final Rule

analysis cannot plausibly be characterized as inconsequential to the outcome. Propose Rule RIA at 42.

Further, as explained above, EPA's refusal to quantify or monetize the health impacts of the Final Rule is tied to its arbitrary and unexplained conclusion that the disbenefits of ammonia slip outweigh the benefits of NOx reductions resulting from SCR-based controls. The RIA for the Proposed Rule found that the overall health benefits of SCR-based standards were strongly positive, contrary to EPA's unsupported conclusions in the Final Rule.

In short, EPA should reconsider and reinstate its time-tested practice of reporting projected monetized public health benefits, while then additionally revising and strengthening the promulgated standards in the manner discussed below.

## II. EPA's Approach to Costs and Its Determination of the Best System of Emission Reduction in the Final Rule Was Unlawful and Arbitrary in Multiple Ways.

### A. EPA's determination in the Final Rule to exclude SCR from the best system for all large combustion turbines with annual utilization rates below 45 percent was flawed.

EPA should also reconsider its decision in the Final Rule to reject SCR as a component of the best system for large combustion turbines (>850 MMBtu/hr) with utilization rates below 45 percent. In the Final Rule, the agency justified its decision to consider only simple-cycle plant data for determining the cost-effectiveness of SCR at this cohort of units by citing to historical power plant operating data, which it did not do at proposal. *See* 91 Fed. Reg. at 1934. As we discuss below, this data undercuts, rather than supports, EPA's point. In the Final Rule, EPA also overhauled its capacity-based and utilization-based subcategories, significantly changed its position on what the Agency considers cost-reasonable, and greatly expanded its estimates of the capital costs associated with SCR at simple-cycle turbines. All of these unanticipated aspects of the Final Rule affected the outcome of EPA's decision to evaluate the cost-effectiveness of SCR at large, low-utilization turbines on the basis of simple-cycle technology only. Because they are centrally relevant to the rule, reconsideration is appropriate.

To reiterate, EPA determined in the Final Rule that SCR was not cost-effective at large-turbines at utilization rates below 45 percent, but erroneously relied solely on cost-per-ton figures associated with simple-cycle rather than combined-cycle units. The agency justified this approach as follows:

> Historical data indicates that simple cycle turbines in the utility sector typically have utilization rates of less than 20 percent, considerably lower than the 45 percent utilization level that defines the high-utilization subcategory. The long-term, fleetwide average utilization for large simple cycle turbines is approximately 9 percent. While some combined cycle turbines may also occasionally operate below a 45 percent utilization level on a 12-month basis, this is more unusual. Therefore, the EPA uses the costs of SCR for simple cycle turbines rather than combined cycle turbines when evaluating low-utilization turbines.

91 Fed. Reg. at 1934. While it is true that simple-cycle units operate at lower average utilization rates than combined-cycle units, this in no way justifies excluding *all* large turbines under 45 percent annual capacity factors from SCR-based requirements. On the contrary, except at very low utilization levels (i.e., below 10 percent annually), the substantial *majority* of large units operating below 45 percent are combined-cycle turbines, and an even greater percentage of the electricity generated at these levels comes from combined-cycle turbines.

EPA's own data illustrate this. As part of our review of the Final Rule, we carefully analyzed the spreadsheet "CAPD Data 2023 Nov 2024 (teams)," which EPA included in the docket as an attachment to *Combustion Turbines Inventory and NOx Control Technology Baseline TSD* (Docket No. EPA-HQ-OAR-2024-0419-0019).[18] This data set provides unit-level performance data for fossil fuel-fired electric generators in calendar year 2023. Considering the natural gas-fired combustion turbines in this data set, we found that 29 percent of units in this cohort operating at annual utilization levels of between 0 and 45 percent were combined-cycle facilities, and that over 70 percent of the electricity generated by such units was from combined-cycle turbines. Of gas-fired turbines with annual capacity factors between 10 and 45 percent, 63 percent of such units were combined-cycle, which generated 87 percent of the electricity for that cohort. And of the gas-fired turbines with annual capacity factors between 20 and 45 percent, 83 percent were combined-cycle units, which generated nearly 93 percent of the electricity provided by that cohort.

Despite these statistics, EPA's cost-effectiveness calculations for large turbines operating at annual factors below 45 percent assume that *none* of these units are combined-cycle turbines. In this regard, EPA has "offered an explanation for its decision that runs counter to the evidence before the agency," a textbook example of arbitrary and capricious decisionmaking. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In the proposed rule, EPA had a better method of addressing this: it created a sub-category of "intermediate utilization," which covered those with utilization rates of between 20 and 40 percent, and which, for large turbines, established SCR-based NOx limits. Only those large units operating at capacity factors below 20 percent were exempt from SCR-based limits.[19] While petitioners' comments urged the agency to include SCR in the best system for *all* regulated units,[20] the proposal at least recognized that there was no cost-based justification to exclude SCR from the best system for large turbines at annual capacity factors above 20 percent.[21]

In the Final Rule, however, EPA lumps all large turbines with utilization rates below 45 percent into a single subcategory. The agency justifies its decision as follows:

> Based on the EPA's updated analysis of the cost and feasibility of available controls for combustion turbines, the Agency is determining in this Final Rule that SCR does not qualify as the BSER for any subcategory of stationary combustion turbines with 12-calendar month capacity factors less than or equal to 45 percent. Therefore,

---

[18] EPA, *CAPD Data 2023 Nov 2024 (teams),* Combustion Turbines Inventory and NOx Control Technology Baseline TSD, Dkt. No. EPA-HQ-OAR-2024-0419-0019 (Dec. 17, 2024), available at https://www.regulations.gov/document/EPA-HQ-OAR-2024-0419-0019.

[19] Review of New Source Performance Standards for Stationary Combustion Turbines and Stationary Gas Turbines, 89 Fed. Reg. 101306, 101315 (Dec. 13, 2024).

[20] Pet. Rulemaking Comments at 19-20.

[21] *See* 89 Fed. Reg. at 101325-26.

the proposed "intermediate load" subcategory that would have covered combustion turbines operating at annual capacity factors greater than 20 percent and less than or equal to 40 percent is no longer necessary.

91 Fed. Reg. at 1921. This is a classic case of begging the question. EPA asserts that an intermediate-load subcategory is "no longer necessary" because it has determined that SCR is not cost-effective for the entire cohort of large units with capacity factors below 45 percent. Yet in lumping together all of the units between 0 and 45 percent for the purposes of calculating cost-effectiveness, EPA's analysis assumes the very thing that is in question: whether a subcategory for units between 20 and 45 percent (or, for that matter, between 10 and 45 percent) is appropriate. Had EPA not performed a single catch-all cost-effectiveness calculation, but instead separately evaluated the cost-effectiveness of SCR at units with annual utilization rates between 20 and 45 and between 10 and 45 percent—*relying primarily on combined-cycle data, as reflected in EPA's own data set*—the agency would have found substantially lower dollars-per-ton of NOx abatement for SCR at those units.

As further evidence of its flawed approach, EPA did not even attempt to determine a truly representative capacity factor for simple-cycle turbines when determining the appropriate threshold for distinguishing high-utilization from low-utilization turbines. It did not, for instance, refer to the average or median capacity factors in its data set for simple-cycle turbines. Rather, it used the 99-percent confidence maximum 12-calendar-month capacity factor for such units over many years. 91 Fed. Reg. at 1921. In other words, it relied on a number that is predicted to occur *just one percent of the time.* This figure ended up being 43 percent, which EPA increased to 45 percent "[t]o account for potential future uncertainty." *Id.*

The actual record evidence paints a starkly different picture. As the next two charts show, simple-cycle turbines operate overwhelmingly at annual capacity factors below 10 percent, with only 8 percent of units operating above 20 percent utilization rates and far fewer above 25-30 percent.


2024 Simple Cycle Capacity Factor


2024 Simple Cycle Capacity Factor

On the other hand, more than one-third of combined-cycle units operate below annual capacity factors of 45 percent, as seen in the chart below.




And, as discussed above, the sizable majority of units operating at utilization rates of between 10 and 45 percent—and even greater majority operating at rates between 20 and 45 percent—are combined-cycle. As the table below shows, even assuming EPA's NOx cost-reasonableness assumptions are sound (which, as discussed elsewhere in this petition, we do not), SCR is broadly cost-effective for large units at capacity factors well below 45 percent, even assuming EPA's low dry low-NOx burner ("DLNB") input emissions.

| Turbine Size (MMBtu/h) | Inlet NOX (ppm) | Outlet NOX (ppm) | 40% annual CP | 30% annual CP | 20% annual CP | 10% annual CP |
|---|---|---|---|---|---|---|
| 47 | 20.3 | 3.0 | $19,222 | $24,710 | $35,645 | $68,273 |
| 57 | 20.3 | 3.0 | $17,129 | $21,990 | $31,669 | $60,531 |
| 134 | 20.3 | 3.0 | $10,915 | $13,891 | $19,804 | $37,363 |
| 57 | 13.8 | 3.0 | $26,778 | $34,564 | $50,069 | $96,301 |
| 134 | 13.8 | 3.0 | $16,823 | $21,592 | $31,062 | $59,190 |
| 320 | 13.8 | 3.0 | $11,478 | $14,593 | $20,755 | $38,962 |
| 575 | 13.8 | 3.0 | $9,267 | $11,683 | $16,449 | $30,471 |
| 661 | 13.8 | 3.0 | $8,844 | $11,124 | $15,620 | $28,834 |
| 905 | 13.8 | 3.0 | $7,996 | $10,004 | $13,956 | $25,545 |
| 1,008 | 13.8 | 3.0 | $7,735 | $9,658 | $13,441 | $24,526 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2,349 | 13.8 | 3.0 | $6,028 | $7,395 | $10,074 | $17,891 |
| 2,675 | 13.8 | 3.0 | $5,802 | $7,096 | $9,632 | $17,031 |
| 3,000 | 13.8 | 3.0 | $5,608 | $6,840 | $9,253 | $16,299 |
| 3,892 | 13.8 | 3.0 | $5,180 | $6,277 | $8,429 | $14,724 |
| 905 | 7.0 | 3.0 | $14,737 | $18,835 | $26,928 | $50,783 |
| 1,008 | 7.0 | 3.0 | $14,154 | $18,067 | $25,790 | $48,539 |
| 2,349 | 7.0 | 3.0 | $10,467 | $13,198 | $18,575 | $34,369 |
| 2,675 | 7.0 | 3.0 | $9,998 | $12,580 | $17,663 | $32,597 |
| 3,000 | 7.0 | 3.0 | $9,598 | $12,054 | $16,889 | $31,102 |
| 3,892 | 7.0 | 3.0 | $8,731 | $10,918 | $15,229 | $27,929 |
| 905 | 5.0 | 3.0 | $28,320 | $36,517 | $52,703 | $100,412 |
| 1,008 | 5.0 | 3.0 | $27,155 | $34,980 | $50,426 | $95,924 |
| 2,349 | 5.0 | 3.0 | $19,781 | $25,243 | $35,996 | $67,584 |
| 2,675 | 5.0 | 3.0 | $18,843 | $24,006 | $34,172 | $64,041 |

By entirely excluding combined-cycle operations and data in rejecting SCR as part of the "best system" for large turbines at utilization rates below 45 percent, EPA ignored its own data and reached an arbitrary decision. The agency must therefore reconsider the rule and re-evaluate SCR as an element of the best system for large combustion turbines with annual CFs as low as 10 percent.

**B. The Final Rule's method of evaluating the cost-reasonableness of NOx controls was arbitrary and capricious.**

*i. To determine the best system of emission reduction, EPA must consider associated public health impacts when determining whether a particular cost-effectiveness value or range of values for NOx controls is reasonable, yet failed to do so in the Final Rule.*

In the Final Rule, EPA relied heavily on an incremental dollars-per-ton cost-effectiveness metric when passing judgment on different NOx control technologies for inclusion in each relevant subcategory's best system of emission reduction. At no point in this process did EPA consider the public health benefits of NOx reductions when determining whether different technologies' cost-effectiveness values were or were not reasonable. At proposal, Petitioners had no way of anticipating that EPA would arbitrarily refuse to quantify or monetize the public health benefits provided through NOx reductions, nor that it would conclude that the accepted methodologies for doing so were so uncertain as to justify their exclusion from any regulatory decisionmaking process.[22]

Furthermore, whereas the proposal relied on cost-effectiveness values that were found to be reasonable in a prior rule geared toward safeguarding public health from NOx emissions—the 2023 Good Neighbor Plan—the Final Rule disclaims this precedent, and instead refers to cost-effectiveness evaluations for NOx controls from a *visibility-based* (rather than health-based)

[22] 91 Fed. Reg. at 1964 (discussing uncertainties in methodologies).

rulemaking—the agency's 2012 approval of North Dakota's Regional Haze SIP. This indicates a fundamental change in EPA's stance on the relationship between the public health impacts of NOx emissions and the dollars per ton that the agency considers reasonable for abating NOx emissions under Section 111. Petitioners could not have anticipated this change at the time of proposal, and because it directly affects EPA's determination of the best system and thus the rule's stringency, it is of central relevance. Reconsideration is thus warranted.

EPA's Final Rule excludes SCR as an element of the best system for all affected turbines except large, high-utilization turbines, primarily due to the agency's judgment that SCR would not be cost-effective for all other sub-categories of turbines. Yet the agency's apparent dollars-per-ton thresholds for NOx controls, such as the $12,000/ton figure from the inapposite North Dakota Regional Haze rule, do not reflect reasoned decision-making, and the agency must reconsider the rule to provide a more defensible, evidence-based foundation for evaluating whether a particular NOx control technology is or is not cost-effective.

In a section 111 rulemaking such as this one, EPA often addresses costs—one of the relevant statutory factors under 42 U.S.C. § 7411(a)(1)—by calculating the amount of money required for a particular control technology to reduce one ton of the target pollutant. This is called a cost-effectiveness value. If a particular control technology's dollars-per-ton cost-effectiveness value is above a level that EPA considers reasonable, and after considering other relevant cost considerations, it will often reject that technology as an element of the best system of emission reduction. The problem is, in the Final Rule, EPA articulates no rational basis for what it considers to be reasonable with respect to the cost-effectiveness values—whether incremental or total costs—for NOx controls, and makes no effort to incorporate the public health impacts of NOx into its evaluation of reasonableness. The rule is therefore arbitrary and capricious in this regard, and EPA must reconsider it to identify meaningful, evidence-based cost-effectiveness values for NOx controls that directly account for impacts to public health.

Although EPA must consider costs in selecting the best system of emission reduction, 42 U.S.C. § 7411(a)(1), the statute does not specifically require EPA to calculate dollars-per-ton cost-effectiveness values for each control option it considers, nor must the agency show that the best system satisfies a formal cost-benefit test analysis in the context of section 111. *See Ruckelshaus*, 486 F.2d at 387. Nor is it necessarily the case that a cost-effectiveness evaluation is always the best or most appropriate methodology for considering costs under section 111. Indeed, the case law holds that, to satisfy section 111's cost factor, EPA must only show that the costs associated with the best system are not "greater than the industry could bear and survive," *Portland Cement Association v. Train*, 513 F.2d 506, 508 (D.C. Cir. 1975), and that "EPA's choice [of a best system"] will be sustained unless the environmental or economic costs of using the technology are exorbitant." *Lignite Energy Council v. EPA*, 198 F.3d 930, 933 (D.C. Cir. 1999) (citing *National Asphalt Pavement Ass'n v. Train*, 539 F.2d 775, 786 (D.C. Cir. 1976)). In its regular practice, however, EPA nearly always evaluates—and gives great weight to—the cost-effectiveness values of different control options under section 111, often using both incremental and total cost analyses to inform its decisionmaking. The extent, then, that the agency does rely on such metrics—whether for total average cost, incremental cost, or both—EPA must explain why it considers certain values reasonable and others not.

EPA has failed to do so in the Final Rule. In justifying how it determines whether the cost-effectiveness values of NOx controls are reasonable, EPA merely points to two prior rulemakings: the 2006 section 111 NOx standards for industrial, commercial and institutional boilers (which EPA interprets as approving incremental NOx control costs of $7,400/ton in 2024 dollars as reasonable)[23] and 2012 approval by EPA of North Dakota's state implementation plan under the regional haze program (which had rejected an SCR-based NOx control requirement for a coal-fired power plant that would have imposed incremental $12,000/ton in 2024 money).[24] 91 Fed. Reg. 1933, n.110-111 (citing 71 Fed. Reg. 9866, 9870 (Feb. 27, 2006) and 77 Fed. Reg. 20894, 20929 (Apr. 6, 2012)). Yet neither of those rules describes *why* those values are or are not reasonable. For instance, nowhere in its review of North Dakota's regional haze SIP did EPA assert that the additional NOx-related health benefits that would have been achieved through SCR were not substantial enough to justify the $12,000/ton figure that the state had calculated for an SCR retrofit at that facility. Instead, EPA simply stated that this value was "high enough that we are not prepared to change our conclusion that the State's BART determination [excluding SCR] was reasonable." 77 Fed. Reg. at 20929. That EPA now treats the $12,000/ton figure from the 2012 North Dakota Regional Haze SIP as some kind of threshold calculation for an NSPS rulemaking is completely arbitrary, and a meaningful and unforeseeable departure from the proposed rule.

In the absence of any actual data, evidence, or even discussion pertaining to public health, "high enough" is not a meaningful standard. *Id.* As noted above, a cost-effectiveness calculation describes how much an operator must pay to achieve each ton of pollution abatement through a given technology, either as an average of total costs or on an incremental basis. But without analyzing the concrete benefits that would result from adopting that control technology, EPA has no way of determining whether the cost-per-ton is reasonable or not particularly in light of section 111's goal of safeguarding public health.

This requires an evidence-based inquiry that reflects the specific characteristics of the target pollutant and the statutory standard, and this cannot be a one-size-fits-all determination. This point is well illustrated by EPA's 2023 report on the social cost of greenhouse gases.[25] There, the agency used rigorous, peer-reviewed modeling platforms to estimate the negative social costs imposed by a marginal ton of carbon dioxide, methane, and nitrous oxide for each year between 2020 and 2080.[26] To use the 2030 estimates as an example, EPA found the social cost of carbon to be between $144 and $384 per ton; the social cost of methane to be between $1,924 and $3,169 per ton; and the social cost of nitrous oxide to be between $44,712 and $103,137 per ton.[27] The reason for the orders of magnitude difference in the three pollutants' social cost values is that methane is substantially more potent than carbon dioxide on a ton-for-ton basis, and nitrous oxide is, in turn,

[23] *See* 71 Fed. Reg. 9866 (Feb. 27, 2006).
[24] *See* 77 Fed. Reg. 20894 (Apr. 6, 2012).
[25] EPA, *Supplementary Material for the Regulatory Impact Analysis for the Final Rulemaking, "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review:" EPA Report on the Social Cost of Greenhouse Gases: Estimates Incorporating Recent Scientific Advances* (Nov. 2023), https://www.epa.gov/system/files/documents/2023-12/epa_scghg_2023_report_final.pdf. (submitted as attachment).
26 *See id.* at 1-19 (executive summary and introduction), 154-55 (table of social cost values).
[27] *Id.* at 154.

substantially more powerful than methane.[28] To arrive at these values, EPA undertook a comprehensive analysis of the specific impacts of each pollutant at a given quantity.

By contrast, EPA performed *no* analysis of the health impacts of NOx in determining the cost-reasonableness of NOx controls. Without in any way evaluating in concrete terms the impact that the regulated pollutant will have at a given scale, EPA cannot say that it is unreasonable to require operators to pay more than a certain dollar amount for each ton of that pollutant it reduces using a particular control technology. Nor can EPA simply import cost-effectiveness values used in prior rulemakings accomplishing different objectives and not noticed in the proposed rule to decide what is or is not reasonable today for NOx controls at combustion turbines. Particularly if those previous instances did not account for pollutant-specific health considerations, EPA cannot rely on them here without undertaking that same analysis.

The agency's arbitrary approach to cost-effectiveness not only compounds its failure to quantify and monetize health impacts across the rule more broadly, which we discuss in Section I, but it undercuts its rationale for that failure. EPA now asserts that its past practice of quantifying and monetizing the PM2.5 and NOx-related health impacts of its Final Rules "often provided the public with a false sense of precision and more confidence regarding the monetized impacts of fine particulate matter (PM2.5) and ozone than the underlying science could fully support, especially as overall emissions have significantly decreased, and impacts have become more uncertain." 91 Fed. Reg. 1964. Therefore, in order to "ensure the public is not misled regarding the level of scientific understanding," *id*, EPA has decided to forgo altogether any effort to quantify and monetize the PM2.5 and NOx impacts associated with the Final Rule's updated standards. Ironically, the agency nonetheless uses arbitrary dollar-per-ton values to exclude as unreasonable SCR-based NOx controls based on no science or evidence at all. It is EPA's groundless approach to evaluating cost-effectiveness that obscures the value of reducing NOx emissions – not the Agency's previous and long-standing practice of providing monetized health impacts of its rulemakings based on rigorous, peer-reviewed modeling.

In short, even while section 111 does not require EPA to use a dollars-per-ton cost-effectiveness metric to determine whether a control technology is financially reasonable or not, we assert that *if* EPA relies on cost-effectiveness calculations to evaluate NOx controls such as SCR, its approach must "reflect reasoned decisionmaking based on evidence in the record." By ignoring the public health impacts of NOx and by narrowly relying on unnoticed, incremental cost-effectiveness comparisons to rules from different contexts, EPA did not do that here, and must reconsider the rule to avoid the irrational and arbitrary result of applying a cost-effectiveness threshold that lacks any reasoned basis in the record.

*ii. In any event, the Final Rule's treatment of EPA's cost-effectiveness determinations for NOx controls from prior rulemakings was arbitrary and capricious.*

[28] *See id.* at 141-142 (discussing global warming potentials for methane and nitrous oxide relative to carbon dioxide).

EPA should also reconsider EPA's treatment of cost-effectiveness for NOx controls because the agency relied on entirely different precedents in the proposed and Final Rules for deciding what dollars-per-ton values are reasonable, and because EPA myopically focused on incremental costs instead of putting those costs in proper context. In particular, the Final Rule veers drastically from the proposal in that now it rejects the cost-effectiveness values that the agency had considered reasonable for NOx controls in 2023's Good Neighbor Plan. 88 Fed. Reg. 36654, 36746 (June 5, 2023). In the proposal, the agency relied primarily on this rule as a relevant precedent for determining the range of reasonable cost-per-ton values when evaluating options to reduce NOx emissions. EPA's primary basis for rejecting this precedent is a flawed interpretation of *Ohio v. EPA*, 603 U.S. 279, 292–94 (2024), 91 Fed. Reg. at 1933, a Supreme Court decision that stayed the Good Neighbor Plan for reasons unrelated to its cost-effectiveness evaluations. Nowhere in the proposal did EPA cite *Ohio* or otherwise indicate that the decision had any bearing on the cost-effectiveness values of NOx controls. *See generally* 88 Fed. Reg. 101306.

Furthermore, in the Final Rule, EPA cites approvingly to the cost-effectiveness determinations for NOx controls that appear in two prior rulemakings: the 2006 NSPS for industrial, institutional, and commercial boilers and the 2012 approval of North Dakota's state implementation plan under the regional haze program.[29] Yet the agency cited neither of these prior rulemakings in the proposal. *See generally* 88 Fed. Reg. 101306. Still worse, EPA seemingly and without explanation treats the calculations in those rules as absolute thresholds rather than points of comparison. For these reasons, and because this issue is of central relevance to the rule due to its impact on the stringency of the standards, EPA should grant reconsideration on the issue of its cost-effectiveness determinations.

EPA's new cost-effectiveness reasoning is arbitrary and capricious. First, as discussed above, EPA cites its 2012 approval of North Dakota's 2012 Regional Haze plan, which determined that NOx controls that cost $12,000/ton were not reasonable. 91 Fed. Reg. at 1933. Yet unlike section 111, the Clean Air Act's Regional Haze Program is designed exclusively to protect scenic visibility in Class-1 protected areas such as National Parks rather than the full range of human health and welfare impacts recognized in section 111. Section 111 and Regional Haze serve different ends. EPA has not justified why it may use an approval of a Regional Haze SIP to set a precedent for a section 111 standard nearly 15 years later. This alone is arbitrary and capricious.

Second, EPA has unjustifiably rejected the proposal's reliance on the cost-effectiveness evaluations performed in the 2023 Good Neighbor Plan. As explained at proposal, in the Good Neighbor Plan, the agency determined that SCR retrofits that cost approximately $14,000/ton in 2024 dollars were reasonable, and that "costs on an individual unit basis may range higher than $20,000/ton on a unit specific basis and yet still be justified." 89 Fed. Reg. at 101326 (citing 88 Fed. Reg. 36654, 36746 (June 5, 2023)). Like the present rule, the Good Neighbor Plan is directed at reducing ground-level ozone pollution, and is the most recent and up-to-date prior determination EPA made regarding the cost-effectiveness of NOx controls. Nonetheless, EPA disclaimed any

[29] *Supra* Section II.B.i.

reliance on the Good Neighbor Plan in the Final Rule, citing the Supreme Court's judgment in *Ohio*, 603 U.S. at 292–94, staying the rule during the pendency of litigation. 91 Fed. Reg. at 1933. EPA itself acknowledges that the Supreme Court's stay was based on the "Agency's failure to consider *a different aspect of the problem*," yet nevertheless claims that "its opinion raised significant doubts about the adequacy of the EPA's analysis and engagement with comments received," and so justifies discarding the cost-effectiveness values used in that rule to identify economically reasonable control technologies. *Id.* (emphasis added).

This is patently untrue. *Ohio v. EPA* found fault in one - and only one - aspect of the Good Neighbor Plan: EPA had designed a federal implementation plan that was specifically tailored to the emission profiles of 23 states, yet failed to recalibrate the plan after approximately half of those states were excluded from the federal program as a result of circuit court rulings staying EPA's disapproval of their *state* implementation plans. *Ohio*, 603 U.S. at 285-90, 292-94. Because the agency had not analyzed this issue, nor responded adequately to comments that raised it, the Supreme Court held that EPA was unlikely to prevail on the merits of a court challenge and thus issued a stay. Nowhere did the court cast doubt on the *general* "adequacy of the EPA's analysis and engagement with comments received" in the Good Neighbor Plan, 91 Fed. Reg. at 1933, nor did it call into question in any way the agency's determination that $14,000/ton (converted into 2024 dollars) was a reasonable value for NOx controls. *Id.* The agency thus has no basis to rely on *Ohio v. EPA* in rejecting the Good Neighbor Plan's evaluation of cost-effectiveness.

EPA additionally states that "[b]ecause the Good Neighbor Plan was never implemented and its assumptions about cost reasonableness were not tested in the real world, we do not believe the cost analysis in that rule is entitled to significant weight as a regulatory precedent." 91 Fed. Reg. at 1933. However, the question of whether NOx control costs of $14,000/ton (and in some cases above $20,000/ton) are, in fact, reasonable does not at all depend on whether the Good Neighbor Plan was "tested in the real world." Rather, it reflects EPA's determination that the public health benefits of reducing NOx pollution justify those particular costs on a dollars-per-ton basis. It is true that on-the-ground implementation of the Good Neighbor Plan could plausibly, demonstrate that, at the rulemaking stage, EPA had either underestimated or overestimated the average real-world costs of SCR retrofits for regulated units; but any such outcome would not retroactively alter the agency's prior determination that $14,000/ton represented a reasonable amount of money to spend to achieve a certain level of health and environmental benefits.

Next, EPA claims that "the cost analysis in the Good Neighbor Plan assessed retrofit costs for coal units for the purpose of promoting attainment of the NAAQS and therefore does not directly translate to the situation here." *Id.* Ironically, the very rule that EPA cites for its determination that a lower value of $12,000/ton is *not* reasonable for achieving NOx reductions—the agency's 2012 approval of the North Dakota Regional Haze SIP—*also* assessed SCR retrofit costs for coal units, but—unlike the Good Neighbor Plan—did not even share section 111's statutory goal of improving public health.[30] If the Good Neighbor Plan is not sufficiently analogous to the NSPS

[30] *See* 77 Fed. Reg. 20894 (Apr. 6, 2012).

program to provide a relevant precedent for cost-effectiveness, then the North Dakota Regional Haze SIP is even less so. The agency goes on to argue that "more stringent standards may be appropriate under the specific set of facts presented in an individual permitting context than would be appropriate for a NSPS." 91 Fed. Reg. at 1933. This observation is irrelevant to the Good Neighbor Plan, which is not a source-by-source permitting program, but rather applies its cost-reasonableness determination broadly across all affected units.

EPA further notes that "more stringent standards, and greater associated costs, may be appropriate when necessary to meet statutory requirements for nonattainment areas." *Id.* By the same token, however, more stringent standards and greater associated costs may *also* be appropriate for new units (such as those subject to the NSPS) rather than existing units (such as those coal plants subject to the Good Neighbor Plan). Likewise, higher control costs, including when evaluated on a total cost or capital cost metric, may be justified for rules (such as the NSPS) that cover peaker plants that will operate more often in the summer months and thus during high-ozone season, rather than rules that cover more baseload units and fewer peakers (e.g., the Good Neighbor Plan).

Fundamentally, though, this issue turns on health-specific inquiries: the extent to which ozone nonattainment areas, or expected operations during ozone-heavy summer months, justify higher control costs depends on a finding of facts regarding the health benefits of ozone reduction under those circumstances. EPA has not provided any such analysis, and so cannot reject the Good Neighbor Plan's cost-effectiveness precedent on those grounds. For that same reason, the agency's final justification—that it "is in the process of reconsidering the Good Neighbor Plan, and as such, no longer believes this cost-per-ton figure should serve as an appropriate comparison point," *id.*—bears no weight. The Good Neighbor Plan, of course, had not been revised or rescinded as of the date of EPA's Final Rule, and it remains the Agency's most recent effort to determine cost-effectiveness values that are reasonable for reducing NOx reductions from closely related sources. And unless EPA can show *why* the Good Neighbor Plan's cost-reasonableness determinations are no longer an "appropriate comparison point" based on health-based evidence, it cannot support its reversal from the proposal.

Finally, it is evident that EPA cherry-picked past agency determinations—or, rather a single past determination from the 2012 North Dakota Regional Haze SIP—to justify a cost-reasonableness value for NOx controls that is as low as possible in terms of dollars-per-ton. 91 Fed. Reg. at 1933 & n.111. In multiple other prior cases, EPA relied on substantially higher dollars-per-ton values including estimates markedly higher than the Good Neighbor Plan's —to define what it considered to be economically reasonable NOx controls. To reject those now without explanation is arbitrary on its face.

Consider, for instance, EPA's 2011 study titled *The Benefits and Costs of the Clean Air Act from 1990 to 2020.*[31] As parts of its evaluation of Clean Air Act implementation costs for the three

[31] EPA, Office of Air and Radiation, *The Benefits and Costs of the Clean Air Act from 1990 to 2020: Final Report--Rev. A*, at 3-6 (Apr. 2011), https://www.epa.gov/sites/default/files/2015-07/documents/fullreport_rev_a.pdf. (submitted as attachment)

decades in question, EPA "limited the application of these known controls to those with an estimated cost not exceeding $15,000 per ton for PM and ozone precursors (i.e., SO2, NOx, and VOCs). The rationale for incorporating this threshold into the analysis is that controls more costly than $15,000 per ton may not be cost effective. Thus, local air quality agencies would seek reductions from other (unidentified) control measures."[32] This report's cost-reasonableness value of $15,000/ton appear to reflect 2006 dollars, which, adjusted to 2026,[33] amounts to approximately $24,600/ton—double the value that EPA characterized as a limit in the Final Rule.

Another example is the regulatory impact assessment for the 2015 ozone NAAQS.[34] There, EPA not only considered the health impacts of ozone (and thus NOx emissions), but was legally prohibited from considering anything *but* health impacts in setting the standard. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471(2001). The agency did, however, perform a regulatory impact analysis that reported the anticipated implementation costs for the new 70-ppm ozone NAAQS, even if it could not account for those costs in setting the appropriate level of the NAAQS. In that analysis, EPA evaluated the cost of achieving the ozone NAAQS by referencing controls up to $19,000/ton, explaining that "[w]e selected $19,000 per ton as the control cost value above which we would not apply additional identified NOx controls because controls above this value are not likely to be cost-effective."[35] In this case, EPA appeared to use 2011 dollars,[36] making its cost-reasonableness value nearly $28,000 in today's money—again, far higher than the agency's arbitrary cut point in the Final Rule and even in the Good Neighbor Plan. EPA's decision to focus on precedents that justify less stringent regulations while ignoring those that would support more substantial levels of control is arbitrary and capricious and merits reconsideration.

*iii. Relative to EPA's proposal, the Final Rule drastically increases the cost estimates for installing and operating SCR at simple-cycle turbines without justification.*

In the Final Rule, EPA reversed the proposal's finding that SCR-based standards are economically reasonable for many simple-cycle units (depending on size and/or utilization), now determining that SCR is *never* cost-reasonable for a simple-cycle turbine. Moreover, EPA relied on new and unnoticed reasoning to reach this determination. The proposal's cost estimates for SCR were based largely on rigorous, systemic research conducted by the National Energy Technology Laboratory (NETL). *See* 89 Fed. Reg. at 101327. The Final Rule also uses NETL for its baseline calculations of the cost-effectiveness values for SCR at simple-cycle units, but then significantly "adjusts" these values to account for non-systematic industry assertions that Petitioners could not have addressed or rebutted during the comment period. 91 Fed. Reg. at 1932. Among other flaws, EPA

---

[32] *Id.* at 3-6 & 3-7.
[33] This adjustment, as well as the one described in the next paragraph regarding the values used in the RIA for the 2015 ozone NAAQS revision, is based on the Bureau of Labor Statistics CPI Inflation Calculator, available at: https://www.bls.gov/data/inflation_calculator.htm.
[34] EPA, Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone (Sept. 2015), https://www.epa.gov/sites/default/files/2016-02/documents/20151001ria.pdf (submitted as attachment)
[35] *Id.* at 4-6.
[36] *See id.*

asserts a novel "three-fold increase in capital costs as a bounding assumption," 91 Fed. Reg. at 1934. Because this was not properly noticed and goes to the central relevance of the rule, reconsideration is warranted.

In rejecting SCR as part of the best system for all small turbines, regardless of utilization levels, EPA gives undue weight to anecdotal, unsubstantiated evidence from industry commenters that (according to the agency) call into question its own cost-effectiveness analysis, which reflects system-wide data primarily culled from NETL. As EPA explains in the preamble to the Final Rule, "several industry commenters asserted that estimated SCR costs for large simple cycle turbines are far higher than the estimates derived from the EPA's primary data sources," and so the agency "assum[ed] the capital costs that could be experienced by some firms may be up to three times higher than [EPA's] estimates." 91 Fed. Reg. at 1934; *see also id.* at 1933 ("EPA finds commenters' information credible and representative, [which] suggests that actual costs could be as high as twice the EPA's derived costs. Consequently, the EPA's cost analysis for simple cycle turbines likely represents best-case scenario costs.").

In the rulemaking, EPA provides an Excel spreadsheet where it compares the results of industry cost estimates for SCR with those of NETL and finds that the industry estimates are 74 to 450 percent higher.[37] The industry achieves these results through different and wide-ranging assumptions as to the capital cost of SCR, the useful life of the unit, the capital charge factor, and the effectiveness of combustion controls (and hence, the input-loading to the SCR). In each of these instances, there is at least one factor that appears incorrect, or at least not broadly applicable. For example, one estimate assumes that the input loading to the SCR is 4-6 ppm *at all times* (including during low-load operations) and that emissions from the SCR are 2.5 ppm. These figures are in stark contrast to the 96 ppm emissions recognized by EPA as typical emissions during unconstrained operation at less than 75 percent of full load. If, in fact, EPA believes that combustion controls alone are capable of limiting emissions to 4-6 ppm at all times, it should establish the NSPS limit at that level for all units, but of course did not.

Unlike the NETL data that inform the agency's baseline cost calculations, the comments from companies or trade associations that EPA relies on are essentially anecdotal. A prominent example is the joint submission of the American Fuel and Petrochemical Manufacturers (AFPM), American Forest and Paper Association (AF&PA), and the American Petroleum Institute (API) (the Associations). In relevant part, this comment reads as follows:[38]

> Our members have prepared cost analyses that demonstrate SCR is not cost effective for certain projects involving industrial turbine installations or modifications. For example:

---

[37] EPA, *NOx Mitigation Measures- Selective Catalytic Reduction and Combustion Controls for Combustion Turbines: Technical Support Documen*t (Jan. 2026), Dkt. No. EPA-HQ-OAR-2024-0419-0242, Attachment 1 ("NETL Detailed Costs SCR Jan 2026," "Comment Cost Comparison" tab), https://downloads.regulations.gov/EPA-HQ-OAR-2024-0419-0242/attachment_1.xlsx.

[38] Am. Fuel and Petrochemical Manufacturers, Am., Forest and Paper Assoc., and Am. Petroleum Inst., C*omments on EPA's Proposed Review of New Source Performance Standards for Stationary Combustion Turbines and Stationary Gas Turbines*, Dkt. No. EPA-HQ-OAR-2024-0419-0078, at 32 (Apr. 15, 2025), https://downloads.regulations.gov/EPA-HQ-OAR-2024-0419-0078/attachment_1.pdf.

- One LNG plant example from Alaska found that the cost effectiveness of SCR was between $22,000 and $28,000/ton for the project units (gas compressors and CO2 compressors) and determined BACT was installation of a DLE combustor to achieve 9 ppm NOx at 15% oxygen. SCR was also evaluated for power generation turbines and it was found to be $66,000/ton, so BACT was determined to be installation of DLE to achieve 9 ppm NOx at 15% oxygen. The details of the cost analyses were submitted to the permitting agency as confidential information.

- One member is required to install SCR on two Solar Titan 130 cogeneration turbines by the state of Utah as part of a SIP action with the following costs: installed capital costs of over $23 million, annual operating costs of almost $600,000, at a cost per ton of pollutant removed of over $39,000.

- One member performed a BACT analysis to evaluate application of SCR on a gas-fired Solar Mars 90S combustion turbine equipped with SoLoNOx. Quotes were solicited from three vendors. Total installed capital costs ranged from $2.2 million to $2.7 million, with annual costs ranging from $566k to $722k. The ranges of cost effectiveness was $26,980 to $34,380/ton. Installation of the SCR catalyst would have caused approximately 10 inches of water back pressure on the turbine and resulted in a horsepower loss of approximately 1.8 percent. The SCR system was not required as BACT because it was not cost effective. BACT was determined to be use of SoLoNOx to achieve 15 ppm NOx.

- A non-member permitted two simple cycle turbines around 207 MMBtu/hr each in Louisiana. BACT for NOx was to equip the units with DLN burners to achieve 9 ppm on a 30-day rolling average (not including startup/shutdown and tuning periods). SCR was rejected as economically infeasible at $23,000 per ton of NOx removed (2018 dollars).

These isolated instances are not sufficient to overcome the systemic data provided by NETL. First, many details of the projects which are necessary to determine their relevance are absent. For example, these instances don't discuss what regulatory program the units in question were operating under, what their assumptions were regarding part-load or low-temperature operations, what their expected utilization rates might be, what capital charge rate and unit useful life they assumed for the capital expenditures, and whether the SCR installations were at entirely new turbines or were instead retrofits. Second, only one of the four cited examples provides realistic equipment cost estimates for the SCR (between $2.2 and $2.7 million). The other examples estimate SCR equipment costs as large as the cost of the gas turbine itself, which is highly unlikely absent truly extenuating or unusual factors. For instance, with regard to the unit discussed in the second bullet, EPA's data on turbine prices indicates that the baseline hardware costs for the Solar

Titan 130 are $8.25.[39] Yet the Associations claim that the "installed capital costs" of just the SCR component at that turbine were over $23 million. This not only suggests that the example is highly unreliable, but also drives home the more general point that industry's comments cannot in any way supplant the broad-ranging and unbiased data gathered by NETL.

As for the third bullet listed above, the Louisiana permit cited in the comments allows the applicant to install and operate two large 207-MW simple-cycle turbines for 7,000 hours per year (each) and emit a combined 259.76 tons of NOx per year.[40] Notwithstanding the fact that the air quality modeling demonstrated that these emissions would cause an exceedance of the 1-hour NOx NAAQS, the Louisiana Department of Environmental Quality (LDEQ) determined that SCR was not cost-effective and chose a 9 ppm limit, with exclusions for up to 600 hours of startup and shutdown events in addition to the 7,000 "normal" operating hours.[41] This is in stark contrast to other analyses of large combustion turbines with very high capacity factors (87 percent). The permit states that the applicant based its cost estimate on figures provided to the applicant by others.[42] Yet there is no indication that LDEQ independently evaluated these data. Indeed, it appears the LDEQ may have been unaware that the 9 ppm DLNB system cannot function properly below a minimum load, in which situations the SCR unit would not only remain operable (provided it remains above a certain threshold temperature) but would achieve vastly greater emission reductions than when the DLNB were functional, thus achieving much greater cost-effectiveness values. Similarly, the permit for the Alaska unit described in the first bullet assumes 9 ppm performance from the DLNB at all times. There is no indication that the permitting authority considered the low-load and low-temperature limitations of DLNB.

The examples in the Associations' comment additionally undercut EPA's rationale for its Final Rule in several important ways. First, in three of these examples, the project demonstrates the ability to procure DLNB at less than 25 ppm—on both electric generation and mechanical drive combustion turbines. Second, the Utah project went forward with the SCR installation even with a projected cost-effectiveness of $39,000 per ton of NOx abated. To the extent that this value is accurate, it greatly undermines the agency's unsupported assumption that cost-effectiveness values of $12,000/ton are not reasonable, and is much more aligned with Petitioners' assertion that NOx controls are economically justified at values well above $20,000/ton—and potentially much higher. Third, it is also reasonable to assume that the Utah permitting authority followed applicable NSR permitting guidance respecting the use of "incremental cost calculation" and, having evaluated the applicant's submission in greater detail than EPA's, has considered it unreliable.

Fundamentally, EPA's attempt to effectively "hedge its bets" on this issue by assuming substantially higher SCR costs than its own data set showed is unjustified. EPA's baseline cost calculations reflect systemic, broadly representative data compiled primarily by NETL. By contrast, the industry comments in question are vague, unit-specific, unsubstantiated, and entirely

[39] EPA, *Combustion Turbine Manufacturer Specifications*, Attachment 3 to *NOx Emission Rates Technical Support Document*, Dkt. No. EPA-HQ-OAR-2024-0419-0020 (Nov. 2024), available at https://downloads.regulations.gov/EPA-HQ-OAR-2024-0419-0020/attachment_3.xlsx.

[40] La. Dep't of Envtl. Quality, EDmS Doc. No. 11133852 (May 23, 2018), https://edms.deq.louisiana.gov/app/doc/view?doc=11133852.

[41] *Id.* at 7-8, 11-17.

[42] *Id.* at 17.

lacking in any evidence of replicability. To the extent that these industry examples are even applicable, it is far more likely that they represent worst-case scenarios than that EPA's NETL-based calculations reflect best-case scenarios. EPA has provided no basis other than its conclusory assertion that these industry examples are in any way "representative" of the industry as a whole. Particularly given the widespread application of SCR at new simple-cycle units—including at three-quarters of those cited in EPA's proposal—the idea that this technology cannot be adopted as the "best system" because of examples raised in comments is arbitrary and capricious.

## III. EPA's Approach to Subcategorization in the Final Rule Is Arbitrary.

In the Final Rule, EPA significantly overhauled the structure of its regulatory subcategories relative to the proposal. Petitioners could not have anticipated the precise delineation of EPA's final approach to subcategorization, which—as described below—operates to lump together units that may have quite different cost-effectiveness profiles with regard to SCR. For instance, commenters could not have foreseen that EPA would eliminate altogether the intermediate-utilization subcategory, thus grouping units with 1 percent annual capacity factors together with units operating at 44 percent annual capacity factors. Nor did EPA indicate at proposal that it might fully eliminate the distinction between turbines with heat input ratings above and below 250 MMBtu/h, resulting in a huge subcategory that includes very small boilers (down to 51 MMBtu/h) with legitimately medium-sized units (up to 850 MMBtu/h).

In addition, nowhere did EPA signal in the proposal it considered subcategory determinations dependent on its ultimate choice of the BSER for units in each subcategory. This inverts how section 111 categories are intended to operate, in which the agency's subcategory determinations guide its selection of the best system and not the other way around. Yet in the Final Rule, EPA justified its elimination of the intermediate-utilization (20-40 percent) and medium capacity (250-850 MMBtu/h) subcategories based on the fact that it was not ultimately identifying SCR as the BSER for those units, so the distinctions were no longer necessary. Ultimately, the effect of the Final Rule's revised structure of subcategories is to greatly diminish the cohort of sources subject to SCR-based standards, which is a drastic and unanticipated departure from the proposal.

In effect, EPA's Final Rule deploys a regulatory version of gerrymandering, lumping together units for which adding SCR is relatively more costly on a dollars-per-ton basis (i.e., large simple-cycle units) with units for which adding SCR is considerably less expensive (i.e. medium-sized, intermediate-utilization combined-cycle units), and then setting lenient NOx limits based on the former cohort of turbines in order to accommodate the entire subcategory. This is most clear in the agency's decision to subcategorize units based on capacity rather than simple-cycle/combined-cycle configuration. Even though EPA acknowledges that SCR is more cost-effective at combined-cycle units, and results in output-based emission rates that are approximately 30 percent lower, it nonetheless declines to provide distinct subcategories for combined vs. simple-cycle units on the grounds that such distinctions "are already effectively accounted for by the utilization subcategories." 91 Fed. Reg. at 1929. This is untrue: even while simple-cycle units do, on average, operate at lower capacity factors than combined-cycle units, there is nonetheless substantial

overlap in the utilization profiles of simple-cycle and combined-cycle units. Indeed, many combined-cycle units operate at capacity factors below the 45-percent threshold for "high utilization" units, (including at capacity factors down to 10 percent or even lower), and many simple-cycles operate at higher capacity factors, including in baseload applications.

As a result, many combined-cycle units will be subject to emission standards that are based on the cost-effectiveness and feasibility of reducing NOx from higher-polluting simple-cycle turbines. As discussed in Section II.A above, EPA's own data show that combined-cycle units constituted over 80 percent of large turbines operating in 2023 at annual capacity factors between 20 and 45 percent and over 60 percent at large units operating between 10 and 45 percent. Yet EPA's cost-effectiveness analysis assumes that *all* units operating at annual utilization rates below 45 percent are simple-cycle. This is a perfect example of how EPA's failure to subcategorize based on simple-cycle/combined-cycle configuration effectively "gerrymanders" one kind of unit into a more leniently-regulated subcategory without any justification. Of course, Petitioners assert that SCR *is* broadly cost-reasonable for the vast majority of simple-cycle turbines as well; yet under the agency's chosen approach, it cannot justify ignoring the distinction between combined-cycle and simple-cycle units, particularly where cost-effectiveness is the sole (or at least overwhelming) justification for excluding SCR from the "best system" determination for all but large, high-utilization turbines.

Similarly, EPA should reverse the merger of the mid-size (>250<850 MMBtu/h) subcategory with the small units (<250 MMBtu/h category). In doing so, EPA lumps most popular aeroderivative units currently meeting 3 ppm limits with smaller, more inefficient peakers. This results in a single subcategory that includes all of the following:

- Simple-cycle units with heat input ratings below 250 MMBtu/h, with an average heat rate of 12,390 Btu/Kwh (equal to 32.1 percent efficiency);
- Simple-cycle units with heat input ratings between 250 and 850 MMBtu/h, with an average heat rate of 9,713 Btu/kWh (equal to 38.9 percent efficiency); and
- Combined-cycle turbines below 850 MMBtu/h with heat rates as low as 5,500 Btu/kWh (equal to 61 percent efficiency).

EPA provides no compelling reason for eliminating the mid-size subcategory. As with its decision to scrap the proposed rule's intermediate utilization subcategory (i.e., covering units with utilization rates between 20 and 40 percent), the agency simply asserts that because it is "not determining that SCR is the BSER for any units smaller than 850 MMBtu/h," there is "therefore no reason to define the boundary between small and medium combustion turbines at 250 MMBtu/h." 91 Fed. Reg. at 1920. Again, this is inverted logic: the reason EPA has decided against including SCR-based requirements for any units below 850 MMBtu/h is precisely *because* (at least in part) it has "gerrymandered" all such units into a single subcategory for the purposes of determining cost-effectiveness. The same is true for its failure to distinguish between frame and aeroderivative turbines, which merit separate subcategories based on markedly different efficiencies.

EPA must also reconsider its decision in the Final Rule to provide a more lenient standard for large, low-utilization turbines that are "high-efficiency." Petitioners assert that all such units—or at least those with annual utilization rates above 10 percent—should be subject to SCR-based standards. In reality, purchasers of these turbine models typically equip them with SCR and meet NOx limits of 3 ppm. There is therefore no basis—including for reasons of cost—to exclude these sources from SCR-based requirements. Yet when considering the performance of DLNB at such units, the agency cannot justify establishing a 25-ppm standard for such units when "low-efficiency" counterparts are subject to 15 ppm.

EPA has created a special category for such "high-efficiency" turbines based on eight simple cycle combustion turbine models, each with a published efficiency greater than 38 percent. The agency justifies the 25 ppm standard based on the premise that "there is a tradeoff between efficiency and $NO_x$ emissions such that some models of large higher efficiency turbines cannot meet a 15 ppm $NO_x$ standard," claiming further that "[t]he most common way to increase the efficiency of a combustion turbine is to increase the firing temperature. However, an increase in firing temperature also results in increased formation of thermal $NO_x$." *Id.* at 1922. Here, the agency ignores other design factors apart from temperature that may be more important to unit efficiency, such as the number of turbine stages. Indeed, three of the eight models in this "high-efficiency group" operate at relatively low temperatures, and at least two of the units can be purchased in configurations that are guaranteed at 15 ppm. Similarly, numerous other models with "high" operating temperatures but lower efficiencies offer DLNB at less than 25 ppm.

Thus, the agency's basic claim—that higher efficiencies require higher temperatures, and that higher temperatures mean greater $NO_x$ emissions—breaks down. Section 111 requires "*the best*" system of emission reduction. As the agency itself notes, only "*some* models of large higher efficiency turbines cannot meet a 15 ppm $NO_x$ standard," *id.* (emphasis added), yet calibrating a standard to accommodate the *weakest*-performing units within a particular cohort falls short of section 111's mandate. Indeed, as EPA has often acknowledged in the past, Congress intended "that CAA section 111 would be significantly technology-forcing," and courts have affirmed this. 89 Fed. Reg. 39789, 39831 (May 9, 2024); *see Ruckelshaus*, 486 F.2d at 391 ("Section 111 looks toward what may fairly be projected for the regulated future, rather than the state of the art at present, since it is addressed to standards for new plants."). Given that high-efficiency turbines *can* meet 15 ppm based on DLNB—a fact EPA does not dispute—EPA must reconsider the rule to establish this limit as reflect the "best system" for such units, rather than set a standard that is based on the *worst*-performing units.

It is worth noting that, while EPA raised the issue of unit efficiency and its effect on NOx emissions in the proposal, it also observed that new large, high-efficiency turbines that might not satisfy the 2006 NOx NSPS's 15-ppm limit using combustion controls alone typically comply through the use of SCR. While the proposal went on to "solicit[] comment on whether combustion controls are being developed for the high-efficiency machines currently guaranteed at 25 ppm NOx that would reduce the guaranteed NOx emissions rate," 89 Fed. Reg. at 101333, nowhere did it suggest that it

might actually *weaken* the applicable NSPS in the Final Rule relative to the 2006 standard, nor did it indicate that the use of SCR for any such units unable to satisfy 15 ppm through combustion controls was not an appropriate requirement to establish in the Final Rule. Furthermore, EPA did not cite any legal authority (either in the proposed or Final Rule) indicating section 111 countenances the bizarre scenario in which older units in this subcategory (i.e., large high-efficiency turbines) are subject to a more stringent standard than identical newer units, or otherwise suggest that this outcome is permissible.

## IV. The Final Rule Arbitrarily Weakens the NOx Standards for Large Modified and Reconstructed Units Relative to the 2006 NOx NSPS, and Arbitrarily Rejects SCR as the Best System for these Modified and Reconstructed Units.

In their rulemaking comments,[43] Petitioners could not have anticipated that EPA might weaken the standards for large (>850 MMBtu/h) modified and reconstructed turbines relative to the 2006 NOx NSPS, which have been in effect for 20 years. As discussed above with respect to the weakened standards for large, low-utilization, high-efficiency turbines, it is far from clear whether section 111(b) even permits this type of regulatory structure. Furthermore, whereas the proposal required SCR at various classes of modified and reconstructed units depending on size and utilization, the Final Rule exempts *all* modified and reconstructed turbines from SCR-based requirements, relying on industry assertions that were not raised in the proposal. Because of this, and because these issues affect the stringency of emission reductions required and are thus of central relevance, reconsideration is appropriate on this point.

Under the 2006 NOx NSPS, all new, modified, and reconstructed turbines with heat input ratings above 850 MMBtu/h are subject to a NOx limit of 15 ppm. *See* 40 C.F.R. Subpart KKKK, Table 1. Under the Final Rule, however, modified and reconstructed units that achieve efficiencies equal to or greater than 38 percent are granted a relaxed standard of 25 ppm, regardless of utilization level, of whether or not they were already in compliance with the 2006 standard, and whether they already have an SCR installed. Not only would a unit that modifies or reconstructs after the Final Rule's applicable date (December 13, 2024) receive a weaker standard than an identical unit that modifies or reconstructs before that date, but any existing unit that modifies n and ends up achieving efficiency of over 38 percent, including units subject to (and that had already been achieving) a 15-ppm limit under the 2006 standard, would qualify for a weaker standard, regardless of the actual modification's impact on efficiency. Similarly, an existing unit that already achieved an efficiency of 38 percent or higher would qualify for a weaker standard after modifying, even if the modification did *not* improve efficiency, and even if it already had been satisfying the 15-ppm standard for years.

As a legal matter, this is potentially unlawful under section 111, and could incentivize certain units to undertake small modifications in order to qualify for a substantially weaker standard, even if those units could easily satisfy the 15 ppm requirement after modification and regardless of whether they have an SCR already installed at the unit and can thus meet emission limits far lower

[43] *See id.* at 25-26, 80.

even than 15 ppm. In these scenarios, units could simply turn their SCR off and save on operation and maintenance costs, resulting in greater NOx emissions despite having the technology on site to achieve greater performance. This regulatory arrangement is arbitrary and capricious, and EPA must reconsider it.

Furthermore, whereas the proposed rule established SCR-based requirements for multiple cohorts of modified and reconstructed units (and, in fact, made no distinction between new and reconstructed units for the purposes of setting NOx limits), the Final Rule excludes *all* modified and reconstructed units from SCR-based limits. EPA rationalizes this major u-turn by referring to "comments that explained that many existing turbines undergoing modification or reconstruction face unique, site-specific challenges to retrofitting SCR, which can dramatically increase costs." 91 Fed. Reg. at 1918. First, these are precisely the kinds of anecdotal, unsubstantiated claims by industry we discussed above, which do not justify a sweeping decision that *no* modified or reconstructed units can install SCR in a cost-effective manner. The agency does not provide any data or analyses to back up these anecdotes, nor does it identify what the "unique, site-specific challenges may be," calculate anticipated cost increases, or demonstrate that any cost-increases would not justify SCR-based requirements for at least some units. Nor did EPA consider imposing SCR-based requirements on modified or reconstructed units that already had such technology installed beforehand. For these reasons, EPA's approach to modified and reconstructed turbines is arbitrary and capricious and should be reconsidered.

## V. The Final Rule's Alternative Formulations of the Standard (the Four-Hour Average Output-Based Standard, the 30-Day Average Output-Based Standard, and the Annual Mass-Based Standard) Are Arbitrary and Capricious.

EPA's proposed rule provided an alternative output-based limit that operators could elect as a compliance option in lieu of the primary concentration-based limit or its input-based equivalent. Yet the proposal offered only a single output-based alternative limit using a 30-day averaging period. The Final Rule includes this option, but also adds two other alternatives: a four-hour average output-based standard and annual mass-based limits. While the agency solicited comment on different forms of an output-based standard, nowhere did it indicate that it might provide *all* of these rate formulations as compliance options, effectively giving sources a menu from which to select the least-stringent alternative (even while all are intended to be equivalent). Nor did EPA describe the particular calculations or methodologies it would use to derive each of these alternative output-based standards starting from the primary forms of the standard. Thus, Petitioners therefore had no meaningful opportunity to address EPA's alternative formulations. Because this structure is central to the rule's practical stringency, reconsideration is warranted.

In addition to the primary concentration-based standard, EPA provides four alternative versions of the applicable standard that operators may select as their compliance option. Each of these options provides a favorable compliance limit for a targeted subset of the population, including, for example an annual mass-based standard that may be more achievable for low-capacity-factor peaking units with a high ratio of startup and shutdown events , but then does not incorporate the effective emissions allowed under these alternatives in its cost-effectiveness calculations. The alternative standards are as follows:

- Heat input-based limits – 0.018 – 0.092 lb/MMBtu (5-25 ppm) based on a 4-hour average, 0.37 lb/MMBtu (96 ppm) limit for operation at less than 70 percent full rated load;
- Electrical output-based limits: 0.12 – 1.2 lb/MWh on a 30 operating day average depending on the category. Does not distinguish between low or high load or between simple cycle and combined cycle.
- 4-hour mass rate 0.83 lb NOx/MW-rated output for all.
- Annual mass rate 0.48 ton/MW-rated output for all.

Of these alternatives, the three output-based limits are problematic and should be reconsidered for the reasons discussed below.

- **Electrical output-based limits (lb/MWh, 30-day average)**: This option (like each of the other compliance alternatives) is intended to be equivalent to the primary concentration-based limits. However, in actual application, its stringency varies widely depending on unit efficiency. To calculate these rates, EPA translates a unit's heat input (in terms of MMBtu/h) to its electricity output (MWh) assuming a fixed heat rate for *all* units based on operation of a fairly low-efficiency simple-cycle turbine. However, in practice, the heat rates of gas combustion turbines range from 6,667 Btu/KWh to 13,403 Btu/KWh (assuming full-load operations), with combined-cycle units typically between 20 and 30 percent more efficient than simple-cycle turbines. As a result, under this compliance option, combined-cycle units are permitted to emit up to 30 percent more NOx per unit of input (and thus more parts-per-million) than simple-cycle turbines accepting this option. There is no justification for this feature of the Rule, and EPA has not provided one. The agency must reconsider it, and must base each unit's equivalent output-based option on that unit's actual efficiency, rather than the erroneous one-size-fits-all approach adopted in the Final Rule.

- **Mass-based limit- annual (lb/MWh)**: This option provides an annual cap of 0.48 ton NOx/MW-rated output. The cap is calibrated in a way that would, if it were an *additional* requirement, effectively ensure that units do not partake in excessive part-load operations, during which periods their NOx emissions are, under EPA's approach, effectively uncontrolled. Under these circumstances, affected units would be disincentivized from operating at part-load, since doing so would consume more of the unit's fixed mass limit and thus potentially result in periods of mandatory shut-down. Thus, in the proposed rule, EPA solicited comment on whether it should establish "mass-based standards *in addition to* short-term emission rates to address any regulatory incentive for owners or operators to reduce operating loads so that the part-load standard is applicable." 89 Fed. Reg. at 101320 (emphasis added). Yet the Final Rule allows units to select this mass-based limit as the *sole* compliance option, which defeats its entire purpose. Because operators can now compare standards and determine which option is the least stringent, or the most likely to "reward" operations below 70 percent of load, the agency's proposed rationale for offering an annual mass cap is not only lost, but is in fact undercut. The agency must reconsider this approach and either eliminate the annual mass-based option or ensure that it is in

addition to an appropriately stringent short-term limit (or to a concentration- or input-based limit).

- **Mass-based limit- four-hour:** This option permits sources to emit 0.83 lb/MW averaged over a four-hour period. Thus, in contrast to a lb/MWh standard, this is a lb/MW-4h standard. As such, while it provides units with less flexibility than would the annual mass cap described above, the four-hour standard ultimately allows sources to emit up to 1817.7 lbs of NOx per year, nearly twice the emissions permitted under the annual mass-based standard.

  The following chart reflects data EPA provided in the record comparing the annual NOx emissions permitted under the four-hour mass limit versus the input-based standard, as applied to a hypothetical large (100-MW, 900-MMBtu/h) unit with 37.9 percent efficiency.[44] The x-axis depicts the unit's operations at a given annual capacity factor (also assuming a certain frequency of part-load operations at that capacity factor), while the y-axis depicts the NOx emissions permitted at that capacity factor/load profile. The blue line shows the NOx emissions allowed under the 4-hour mass-based limit and the red line shows the NOx emissions allowed under the 4-hour input-based limit.




[44] EPA, *NOx Emission Rates Technical Support Document*, Dkt. No. EPA-HQ-OAR-2024-0419-0240 (Jan. 15, 2026), Attachment 2 ("Combustion Turbine Manufacturer Specifications," "Mass Based Example" tab), https://downloads.regulations.gov/EPA-HQ-OAR-2024-0419-0240/attachment_2.xlsx.

As the chart shows, at very low annual capacity factors (which correspond to relatively high part-load operations), these two compliance options are largely equivalent. But above a capacity factor of approximately six percent, the lines start to diverge, with a dramatic separation occurring at the 45-percent threshold separating baseload units from lower-utilization turbines. The SCR-based requirement is clearly depicted in the line representing the input-based standard, and is virtually non-existent in the line representing the four-hour output-based standard. Thus, for large, high-capacity factor units—i.e., those turbines subject to SCR-based limits—the four-hour mass cap is *substantially* less stringent than the primary limit, allowing up to five times the annual emissions compared to the primary standard. EPA appears to have included this standard in part to allow turbines in the large, high-utilization subcategory to avoid having to install SCR, even though that technology is the designated as the "best system" for such units. EPA does not explain the need for this option and does not justify it other than to provide "flexibility" for operators. It must reconsider it and either exclude this option from the compliance alternatives or otherwise correct it to ensure full equivalence with the concentration and input-based limits.

## VI. EPA Did Not Provide Adequate Justification for its Temporary Turbine Standard

In the Final Rule, EPA states for the first time that the "complexity" of SCR would "defeat the purpose of being able to bring in such turbines quickly." 91 Fed. Reg. at 1925. However, xAI installed SCR controls on temporary turbines in a matter of days to weeks; for instance, xAI equipped numerous Solar SMT-130 turbines with SCR in the span of a few weeks (at most) at its Mississippi site.[45] EPA further dismisses non-SCR technology that reduces emissions well below 25 ppm because these turbines are "less efficient and lower rated models." 91 Fed. Reg at. 1925-26. However, 35 MW GE 2500 series turbines are marketed as achieving 9 ppm without any add-on controls like SCR.[46] The 35 MW GE 2500 series turbines are quite common, and EPA has not demonstrated that portable turbines in regular use are rated significantly higher than 35 MW. As such, we dispute EPA's characterization that only "lower rated models" are capable of achieving NOx emission rates well below 25 ppm without SCR. Likewise, although rated at a more modest 16.5 MW, Solar SMT series turbines are likewise able to guarantee emission rates down to 9 ppm.[47] In light of the above, EPA should reconsider the temporary turbine standard and allow opportunity for comment on EPA's justification for the temporary turbine standar.d

## VII. EPA Did Not Provide Adequate Notice for its Title V Exemption

### A. EPA Did not Provide Notice That it Intended to Create an Exemption for Area Source Stationary Turbines Subject to the NSPS.

[45] Emails from Shannon Lynn, Trinity Consultants (consultant for xAI's MZX Tech affiliate), to Jaricus Whitlock, Mississippi DEQ (Sep. 6, 2025) (submitted as attachment). These emails show that as of August 18th, 2025, xAI had not installed any SMT-130s, but by September 6th, 2025, xAI had installed six of these turbines *with* SCR control construction completed.

[46] *See* Solaris Energy Infrastructure, Spec Sheet for 35 MW Turbine (powered by GE LM2500+G4), https://irp.cdn-website.com/f809ccf0/files/uploaded/Solaris_35MW_Turbine_Power_-_Tech_Specs-83f9c921.pdf (submitted as attachment)

[47] A Caterpillar Company, *Solar Turbines* (2024) https://s7d2.scene7.com/is/content/Caterpillar/CM20201215-9943b-379e0 (submitted as attachment)

EPA should also reconsider the Final Rule's adoption of a Title V exemption for stationary turbines that qualify as area sources. 91 Fed. Reg. 1959-60. EPA's decision to exempt these sources was a significant change from the proposed rule, which disclaimed any proposal to create new Title V exemptions. While EPA has the authority to exempt area sources from Title V permitting, the Agency has not established that complying with Title V would be "impracticable, infeasible, or unnecessarily burdensome" for stationary turbines. 42 U.S.C. § 7661a(a). Nor did EPA give interested parties adequate notice that it would adopt such an exemption as part of this rulemaking.

The proposed NSPS standards for stationary turbines included a call for comment "on whether it would be appropriate to exempt certain low-emitting stationary combustion turbines subject to [the NSPS standards] from title V permitting requirements." 89 Fed. Reg. at 101347. The purpose of this solicitation was "to better understand whether there are circumstances in which the burdens and costs of going through title V permitting . . . would not be justified" when compared with the purposes of Title V, including improving compliance, providing transparency about "the location and operation" of stationary turbines, and to ensure public participation in permitting decisions. *Id.* EPA put in the docket a memo from 2012 describing a "proposed section 502(a) exemption from title V permitting requirements for non-major stationary combustion turbines," which EPA never finalized, *id.*, but the proposed rule expressly stated that "EPA has not determined that title V permitting is 'impracticable, infeasible, or unnecessarily burdensome'" and that it was "*not proposing to exempt any such sources from title V permitting*." *Id.* (emphasis added).

In the Final Rule, EPA nonetheless included an exemption from Title V permitting for area sources "subject to subparts GG, KKKK, or subpart KKKKa." 91 Fed. Reg. at 1959. It drew the rationale for the exemption entirely from the 2012 Memo, notwithstanding that approximately 14 years have passed: It drew on a four-factor test used in that Memo (and drawn from an earlier exemption rulemaking), incorporated that Memo's "consider[ation] and balanc[ing]" of those factors, and instructed interested parties to "refer to that memorandum for a full explanation of our reasoning." *Id.* Despite that Memo being 14 years old, the Final Rule did not explain why or how EPA concluded that nothing had changed during that time, nor did it cite anything gleaned from the rulemaking record that led to that conclusion. *Id.*

The proposal failed to put interested parties on notice that EPA would adopt a Title V exemption in the Final Rule. Because EPA disclaimed its intent to exempt anyone from Title V, EPA's proposed rule did not articulate either "the factual data" or "the major legal interpretations and policy considerations" supporting such an exemption. 42 U.S.C. § 7607(d)(3)(A), (C); *see also* 5 U.S.C. § 553 (notice requirements under the APA). EPA's invitation to comment on the circumstances justifying Title V exemptions, when read alongside EPA's disclaimers, could not provide such a notice. That call for comments on the "circumstances in which the burdens and costs of going through title V permitting . . . would not be justified" was at best analogous to an advance notice of proposed rulemaking seeking information relevant to possible future rules. All that parties could know for sure is that EPA was *not* proposing to make such an exemption in the current proceeding, and so the notice manifestly did not put them on notice of EPA's change of course in the Final Rule. EPA may not, as it did here, "use the rulemaking process to pull a surprise switcheroo on regulated entities." *Env'tl Integrity Proj. v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005); *see also Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1108 (D.C. Cir. 2014). EPA's

deficient notice of its intention to adopt Title V exemptions for these NSPS standards warrants reconsideration.

### B. Had EPA Proposed to Exempt Area Source Stationary Turbines from Title V Permitting, Petitioners Would Have Provided Substantially Different Comments.

Petitioners seek reconsideration because EPA's revived 2012 Memo does not support the exemption that EPA actually adopted, and because the finalized exemption has no support in statutory text or further statutory purposes. Reconsideration is warranted so that Petitioners can address these defects. *See Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1299 (D.C. Cir. 2000) ("[A] new round of notice and comment would provide the *first* opportunity for interested parties to offer comment that could persuade the agency to modify its rule.") (internal quotations omitted) (emphasis original).

Section 502(a) requires that operators obtain Title V permits for facilities subject to Clean Air Act regulations, but allows EPA "to exempt one or more source categories (in whole or in part) from" Title V permitting "if the Administrator finds that compliance with such requirements is impracticable, infeasible, or unnecessarily burdensome on such categories." 42 U.S.C. § 7661a(a). EPA exempted area source stationary turbines from Title V permitting for this NSPS because it concluded that permitting would be "unnecessarily burdensome." 91 Fed. Reg. at 1959. That conclusion was based on an *ad hoc* four-part test that EPA discussed in the 2012 Memo and borrowed from an earlier exemption rulemaking. *See* 2012 Memo at 1. That test considered: "(1) whether title V would result in significant improvements to the compliance requirements under subpart KKKK for the stationary combustion turbine NSPS non-major sources; (2) whether title V permitting would impose a significant burden on these non-major sources and whether that burden would be aggravated by any difficulty these sources may have in obtaining assistance from permitting agencies; (3) whether the costs of title V permitting for these non-major sources would be justified, taking into consideration any potential gains incompliance likely to occur for such sources; and (4) whether there are implementation and enforcement programs in place that are sufficient to assure compliance with subpart KKKK without relying on title V permits." *Id.* In the Final Rule, EPA did not analyze or discuss these factors in any detail but asserted that it had "specifically considered whether any information or analysis in that document is out of date," saying nothing more than that the Memo remained "applicable."

Even assuming that the four-factor test described in the Memo is the right one under section 502(a) (and it is not, as we explain below), EPA's conclusion that Title V permitting would not provide any added compliance benefit was wrong and overlooked differences in recordkeeping and monitoring requirements between the Final Rule and previous rules. For example, the 2012 Memo found that Title V would not provide additional compliance benefits because "[s]ubpart KKKK requires annual compliance demonstration tests, and the notification requirements of §60.8 ensure that the Administrator and delegated authorities are aware of tests and other events before they are performed to provide opportunity for observation." 2012 Memo at 2. However, both Subparts KKKK and KKKKa allow some facilities to conduct performance testing every 26 months, while Subpart KKKKa permits up to five years for some units. These are significant changes from the 2012 Memo and EPA did not consider (or explain) why Title V (which imposes more frequent testing requirements) would have no additional compliance benefit. EPA also relied on outdated assumptions about compliance burdens. In the 2012 Memo, EPA concluded that many small facilities would need Title V permits absent an exemption "based on the growing interest in using

natural gas-fired stationary combustion turbines for electric power generation, gas pipeline transmission, and CHP," and that "EPA anticipates a significant increase in the number of permit applications that permitting authorities would have to process each year." 2012 Memo at 2. But EPA did not finalize its Title V exemption in 2012, and the Final Rule does not consider whether this particular concern did in fact represent a compliance burden on small entities in the intervening fourteen years. Instead, EPA appears to have assumed that nothing changed since 2012.

Not updating the prior analysis was not EPA's only mistake. Its conclusion that Title V permitting will not have any additional compliance benefit is also wrong. Title V permits must include "enforceable emission limitations and standards," "a schedule of compliance," required monitoring reports at least every six months, along with "inspection, entry, monitoring, compliance certification, and reporting requirements to assure compliance with the permit terms and conditions." 42 U.S.C. § 7661c(a), (c). Yet air quality regulators do not have the same authority to require inspections and compliance certifications. Title V's public notice requirements also provide an additional compliance benefit, as public vetting of permit terms and conditions often results in more stringent requirements to ensure a facility meets air quality standards.

Additionally, the *ad hoc* four-part test that EPA uses to determine whether Title V compliance is "unnecessarily burdensome" does not reflect the best reading of that statutory phrase. *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 373 (2024). Determining whether complying with Title V permitting would be "unnecessarily burdensome" requires considering the full range of benefits that Title V permitting provides, comparing them with the corresponding burdens, and seeing whether those burdens are "unnecessary" in light of the benefits. EPA's test fails to consider the full range of benefits afforded by Title V, however.

First, it examines *only* so-called "compliance benefits" and fails to consider other benefits of Title V permitting that are at the core of the program. EPA acknowledged in the proposed rule that Title V's purposes also include "provid[ing] transparency to the public concerning the location and operation of stationary sources of air pollution, and . . . ensur[ing] public participation in the process of permitting the operation of such sources." 89 Fed. Reg. at 101,347. The 2012 Memo, incorporated by EPA as the rationale for this round of exemptions, did not acknowledge or consider the benefits of transparency and public participation. In addition to requiring prompt reporting of violations (a compliance benefit that adds to transparency), Title V affords opportunities for public participation when permit terms relevant to a stationary source are modified, and allows EPA objections to the Title V permit's renewal with opportunities for petitions to the EPA Administrator to object. A complete accounting of whether Title V compliance is "unnecessarily burdensome" would include these benefits.

Second, Title V permits also serve more comprehensive air pollution control efforts, as they "assure[] compliance by [sources] with all applicable requirements under the Clean Air Act. 40 C.F.R. § 70.1(b). States incorporate information and requirements from SIPs into Title V permits, and in turn state agencies and the public can more stringently monitor air quality plans based on those permit limits. EPA previously considered how exemptions would affect SIP plans in the context of NESHAP exemptions, *see* Exemption of Certain Area Sources From Title V Operating Permit Programs, 70 Fed. Reg. 75,320 (Dec. 19, 2005), but ignored the issue here.

Further comment on EPA's Title V exemptions is warranted. The objections that Petitioners seek to present in reconsideration proceedings, as outlined above, are of central

relevance to the rulemaking, and justify reconsideration of the rule. 42 U.S.C. § 7607(d)(7)(B); *see also Chesapeake Climate Action Network v. EPA*, 952 F.3d 310, 322 (D.C. Cir. 2020) (petitioners' issues are of central relevance if they "go to the very legality of the Final Rule[]").

Respectfully submitted,

Andres Restrepo
Jim Dennison
**Sierra Club**
andres.restrepo@sierraclub.org
jim.dennison@sierraclub.org

Noha Haggag
**Environmental Defense Fund**
nhaggag@edf.org

Thomas Zimpleman
Abirami Vijayan
**Natural Resources Defense Council**
tzimpleman@nrdc.org
avijayan@nrdc.org

Hayden W. Hashimoto
Francis W. Sturges, Jr.
Shaun A. Goho
Alan Masinter
**Clean Air Task Force**
hhashimoto@catf.us
fsturges@catf.us
sgoho@catf.us
amasinter@catf.us

Abigail M. Jones, Esq.
**Citizens for Pennsylvania's Future**
jones@pennfuture.org

**SUBMITTED VIA CERTIFIED AND ELECTRONIC MAIL**

The Honorable Lee Zeldin, Administrator, EPA
Office of the Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Mail Code: 1101A
Washington, DC 20460
zeldin.lee@epa.gov

Gautam Srinivasan
Associate General Counsel for the Air and Radiation Law Office
Office of General Counsel (Mail Code 2344A)
U.S. Environmental Protection Agency
1200 Pennsylvania Ave. NW
Washington, DC 20460.
srinivasan.gautam@epa.gov

John Ashley
Industrial Processing and Power Division (D243–02)
Office of Clean Air Programs
U.S. Environmental Protection Agency,
109 T.W. Alexander Drive, P.O. Box 12055
RTP, North Carolina 27711
ashley.john@epa.gov

Petition submitted via certified and electronic mail. List of attachments submitted by certified mail to the Administrator and via electronic mail to the Administrator, Guatam Srinivasan, and John Ashley.

**List of Attachments included with Petition:**

Bryan Hubbell and Alan Krupnick, Resources for the Future, *How the Environmental Protection Agency Got it Wrong About Monetizing Benefits of Air Pollution Regulations* (2026), https://media.rff.org/documents/Report_26-04_-_Update_2.3.26.pdf.

IEc, *Evaluating Reduced-Form Tools for Estimating Air Quality Benefits* (2019), https://www.epa.gov/sites/default/files/2020-09/documents/adapted_rft_report_10.31.19.pdf

National Research Council, *Estimating the Public Health Benefits of Proposed Air Pollution Regulations*, The National Academies 148 (2002), https://www.nationalacademies.org/read/10511/chapter/7#p20005c9f9970126001

IEc, Expanded Expert Judgment Assessment of the Concentration-Response Relationship Between PM2.5 Exposure and Mortality (2006), https://www.epa.gov/sites/default/files/2020-07/documents/pm_ee_report.pdf

IEc, *Uncertainty Analyses to Support the Second Section 812 Benefit-Cost Analysis of the Clean Air Act* (2011), www.epa.gov/sites/default/files/2016-01/documents/uncertaintyfullreport.pdf

Harrington, Morgenstern, and Nelson, *On the Accuracy of Regulatory Cost Estimates,* J. Pol'y Analysis and Mgmt (2000)

U.S. EPA, S*upplementary Material for the Regulatory Impact Analysis for the Final Rulemaking, "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review:" EPA Report on the Social Cost of Greenhouse Gases: Estimates Incorporating Recent Scientific Advances* (Nov. 2023), https://www.epa.gov/system/files/documents/2023-12/epa_scghg_2023_report_final.pdf.

U.S. EPA, *The Benefits and Costs of the Clean Air Act from 1990 to 2020: Final Report-- Rev. A* (Apr. 2011), https://www.epa.gov/sites/default/files/2015-07/documents/fullreport_rev_a.pdf.

U.S. EPA, *Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone* (Sept. 2015), https://www.epa.gov/sites/default/files/2016-02/documents/20151001ria.pdf

Emails from Shannon Lynn, Trinity Consultants (consultant for xAI's MZX Tech affiliate), to Jaricus Whitlock, Mississippi DEQ (Sep. 6, 2025)

Solaris Energy Infrastructure, Spec Sheet for 35 MW Turbine (powered by GE LM2500+G4), https://irp.cdn-website.com/f809ccf0/files/uploaded/Solaris_35MW_Turbine_Power_-_Tech_Specs-83f9c921.pdf

A Caterpillar Company, *Solar Turbines* (2024) https://s7d2.scene7.com/is/content/Caterpillar/CM20201215-9943b-379e0



RESOURCES *for the* FUTURE

# How the US Environmental Protection Agency Got It Wrong About Monetizing Benefits of Air Pollution Regulations

Bryan Hubbell and Alan Krupnick

Report 26-04
January 2026
Updated February 2026

# About the Authors

**Bryan Hubbell** is a senior fellow at Resources for the Future (RFF). Hubbell is an expert on the health and environmental impacts of air pollution. He served as the national program director for the Air, Climate, and Energy Research Program in the US Environmental Protection Agency's Office of Research and Development. He notably led the EPA team that developed the Environmental Benefits Mapping and Analysis Program (BenMAP), a tool now used worldwide to evaluate the benefits of clean air. He also led the Risk and Benefits Group, where he was responsible for assessing exposure and risks related to criteria air pollutants and performing benefits analyses for major air pollution regulations. His research interests involve strengthening evidence-based approaches to climate adaptation and resilience to inform environmental policy decisions.

**Alan Krupnick** is an RFF senior fellow and director of the Industry and Fuels Program. Krupnick is an expert on the oil and gas sector, reducing greenhouse gas emissions from this and the industrial sectors, and cost-benefit analysis. In particular, Krupnick's recent research focuses on green public procurement, decarbonized hydrogen and tax credits, and developing markets for green natural gas. His portfolio also includes guiding the value of information agenda covered by our VALUABLES initiative with NASA, the valuation of reducing asthma risks, estimating the value of statistical life, and issues of regulatory reform.

# About RFF

Resources for the Future (RFF) is an independent, nonprofit research institution in Washington, DC. Its mission is to improve environmental, energy, and natural resource decisions through impartial economic research and policy engagement. RFF is committed to being the most widely trusted source of research insights and policy solutions leading to a healthy environment and a thriving economy.

The views expressed here are those of the individual authors and may differ from those of other RFF experts, its officers, or its directors.

# Sharing Our Work

Our work is available for sharing and adaptation under an Attribution-NonCommercial-NoDerivatives 4.0 International (CC BY-NC-ND 4.0) license. You can copy and redistribute our material in any medium or format; you must give appropriate credit, provide a link to the license, and indicate if changes were made, and you may not apply additional restrictions. You may do so in any reasonable manner, but not in any way that suggests the licensor endorses you or your use. You may not use the material for commercial purposes. If you remix, transform, or build upon the material, you may not distribute the modified material. For more information, visit **https://creativecommons.org/licenses/by-nc-nd/4.0/**.

# Abstract

The Trump administration's US Environmental Protect Agency (EPA) has decided to stop quantifying and monetizing human health benefits when analyzing the impacts of federal regulations, overturning decades of established and peer-reviewed conventions. Instead, only the costs incurred by companies for complying with a regulation will be quantified when implementing regulatory decisions, leading to an unbalanced assessment of impacts. The EPA's arguments for not quantifying and monetizing benefits are unsupported and out of step with the best available science and established practice. We provide a point-by-point rebuttal to these arguments and conclude that by failing to include quantified and monetized benefits in economic impact analysis, EPA has chosen to abandon adherence to economic principles, decades of guidance from experts, its own economic analysis guidelines, and guidance from the Office of Management and Budget.

# Contents

1. Introduction 1

2. Uncertainty Has Always Been a Part of Regulatory Analyses 4

3. Benefits Gained by Reducing Particulate Matter Concentrations Below National Standards 6

4. The Value of a Statistical Life Is the Best Method for Monetizing Mortality Benefits 7

5. No Co-benefits—Only Benefits 8

6. Conclusion 9

References 11

# 1. Introduction

A critical part of the US Environmental Protect Agency (EPA) rulemaking process is the preparation of regulatory impact analyses (RIAs) that assess the costs, benefits, and economic and equity impacts of proposed and final regulations. By providing information about both the costs and benefits of proposed regulations, RIAs meet requirements of executive orders and ensure that the public is aware of how regulations may affect their health and economic wellbeing.

However, the Trump administration in its recent economic impact analysis[1] of new source performance standards for combustion turbines has proposed to not quantify or monetize human health benefits, focusing solely on the costs to the regulated industry (**EPA 2026**). Such an approach would ignore human health benefits, which EPA has previously estimated to be large, thereby tilting the analysis in favor of less stringent regulation. Excluding the health benefits of regulation would go against widely accepted economic and scientific methodology, run counter to the longstanding practice by the federal government under both political parties, and violate EPA's own formal guidance for conducting such analyses.

In this report, which builds upon a recent If/Then blog, we assess each of EPA's arguments for making such a drastic change to its proposed analytical process (**Hubbell and Krupnick 2026**). We find that its arguments don't hold up to even the most cursory scrutiny.

Both EPA (EPA 2011a) and outside analysts (Palmer, Burtraw, and Shih 2007; Chestnut and Mills 2005) have estimated large human health benefits of EPA's air pollution regulations. Mortality benefits from reduced ozone and particulate matter less than 2.5 micrometers in diameter ($PM_{2.5}$) have provided the majority of all benefits of federal regulations in the last several decades (OMB 2024).

Excluding air quality health benefits is inconsistent with EPA's Guidelines for Economic Analysis, Circular A-4 from the Office of Management and Budget (OMB), and with core economic principles (**EPA 2024a**; **OMB 2003**). If EPA fails to quantify the human health benefits of air quality regulations (or the foregone benefits of deregulation), it will likely lead to suboptimal decisions that result in foregone health and economic benefits and net losses in welfare to the American people.

While in many cases costs and benefits estimated in RIAs cannot form the legal basis for regulatory decisions, they are critical parts of the agency's public justification for the regulations. For example, when EPA issued the revised National Ambient Air Quality Standard (NAAQS) for $PM_{2.5}$ in 2024, the first paragraph of the agency's press release focused on information provided in the associated RIA:

1 RIAs assess the overall benefits, costs, and impacts of proposed national air pollution regulations, while economic impact analyses (EIAs) quantify how existing regulations reallocate resources and impact the economy. In most cases, an RIA is structured similarly to an EIA, except that a benefits analysis is included along with an estimation of net benefits.

*"By strengthening the annual health-based national ambient air quality standard for fine particulate matter ($PM_{2.5}$) from a level of 12 micrograms per cubic meter to 9 micrograms per cubic meter, the US Environmental Protection Agency's updated standard will save lives—preventing up to 4,500 premature deaths and 290,000 lost workdays, yielding up to $46 billion in net health benefits in 2032. For every $1 spent from this action, there could be as much as $77 in human health benefits in 2032."*

– US Environmental Protection Agency, on the 2024 NAAQS for $PM_{2.5}$

When the agency is comparing different alternative regulatory options, RIAs can help identify whether society will be better off with the regulation and which alternative has the highest net benefits to society overall.  For example, the RIA for the proposed Clean Power Plan from 2014 evaluated four different regulatory options and reported net benefits for each (**EPA 2014**).

In the first Trump administration, analyses of the health benefits of air pollution regulation (or the health costs of deregulation) came under attack. Subsequently, EPA published several RIAs that excluded important human health benefits associated with reductions in greenhouse gases and air pollution. For example, the RIA for the Affordable Clean Energy rule (replacing the Obama administration's Clean Power Plan) excluded global benefits of greenhouse gas reductions in its primary estimates, and the RIA[2] for the proposed revision to the Mercury and Air Toxics Rule omitted benefits of particulate matter reductions, arguing that these ancillary effects of the rule shouldn't count when estimating net benefits (**EPA 2020**; **EPA 2019**). These analytical decisions were heavily criticized in the scientific community, including by Resources for the Future (RFF) (Aldy 2019). Under the Biden administration, EPA returned to producing RIAs that were consistent with best practices and peer-reviewed methods.

2 Technically, EPA did not complete a full regulatory impact analysis for the 2020 reconsideration of the Mercury and Air Toxics rule, instead submitting to the rule docket a memo titled "Compliance Cost, HAP Benefits, and Ancillary Co-Pollutant Benefits for National Emission Standards for Hazardous Air Pollutants: Coal-and Oil-Fired Electric Utility Steam Generating Units—Reconsideration of Supplemental Finding and Residual Risk and Technology Review."

However, now EPA is returning to the discredited methods of the first Trump term and taking them to a new level by making unsubstantiated claims about the benefits analysis methods that were developed through decades of consultations with experts in air pollution health and economics. In the recently released economic impact analysis for the stationary combustion turbines rule, EPA advances multiple angles of attack on the peer-reviewed approaches that the agency has used for decades (**EPA 2026**). In the new rule, the agency makes the following arguments:

1. EPA's past analytical practice did not adequately characterize uncertainties in benefits.[3]
2. Providing point estimates (otherwise known as the expected values for monetized benefits) is inappropriate when there are uncertainties.[4]
3. EPA does not have sufficient confidence to monetize health benefits; for example, by using the value of a statistical life (VSL).[5]
4. Benefits from reducing $PM_{2.5}$ below the level of the national ambient air quality standards are so uncertain that they should not be included.[6]
5. Estimating $PM_{2.5}$ and ozone "co-benefits" for air regulations targeting other pollutants is inappropriate.[7]

In the following sections we discuss and rebut each of these arguments and show they are out of step with the best available science and established analytical practices.

---

3 "Historically, however, the EPA's analytical practices often provided the public with a false sense of precision and more confidence regarding the monetized impacts of fine particulate matter (PM2.5) and ozone than the underlying science could fully support, especially as overall emissions have significantly decreased, and impacts have become more uncertain." (p.34)

4 "However, the EPA historically provided point estimates instead of just ranges or only quantifying emissions, which leads the public to believe the Agency has a better understanding of the monetized impacts of exposure to $PM_{2.5}$ and ozone than in reality" (**EPA 2026**, p.34).

5 "Therefore, to rectify this error, the EPA is no longer monetizing benefits from $PM_{2.5}$ and ozone but will continue to quantify the emissions until the Agency is confident enough in the modeling to properly monetize those impacts" (**EPA 2026**).

6 "In particular, the EPA is interested in evaluating the validity of estimating the benefits of air quality improvements relative to the National Ambient Air Quality Standards (NAAQS) for $PM_{2.5}$ and ozone. These standards, which have been set at a level which the Administrator judges to be requisite to protect public health or welfare with an adequate margin of safety, are widely understood to represent the divide between clean air and air with an unacceptable level of pollution" (**EPA 2026**, p. 35).

7 "Historically, the EPA estimated the monetized benefits of avoided $PM_{2.5}$- and ozone related impacts, which accounted for most, if not all, of the monetized benefits of many air regulations–even when the regulation was not regulating $PM_{2.5}$ or ozone–within Regulatory Impact Analyses (RIAs)" (**EPA 2026**).

# 2. Uncertainty Has Always Been a Part of Regulatory Analyses

EPA has quantified the human health benefits of regulations for decades under both Republican and Democratic administrations. The economic value of those benefits has been the largest contributor to the overall benefits of all federal regulations, largely driven by the benefits of reducing $PM_{2.5}$. EPA's methods for quantifying and monetizing the health benefits of air pollution, including how uncertainties are characterized, have been the subject of intense peer reviews, including by the **National Academies of Science, Engineering, and Medicine**; the **EPA Science Advisory Board Council on Clean Air Act Compliance Analysis**; the **EPA Clean Air Scientific Advisory Committee**; the **EPA Environmental Economics Advisory Committee**; and the **EPA Science Advisory Board**. These scientific review bodies have consistently supported EPA's approaches for quantifying and monetizing human health benefits, including EPA's approaches to characterizing uncertainty.

In response to feedback from the panels, EPA consistently improved its approaches to better address uncertainties in benefit estimates. For example, based on recommendations from the National Academies in the report *Estimating the Public Health Benefits of Proposed Air Pollution Regulations*, EPA collaborated with OMB to conduct an expert elicitation to better characterize uncertainties in the relationship between annual mean $PM_{2.5}$ and premature mortality (**National Research Council 2002**; Roman et al. 2008). Results of that analysis were incorporated into dozens of RIAs in the 2000s and 2010s, including the reviews of particulate matter NAAQS conducted in 2006 and 2012 (**EPA 2006**; **EPA 2012**).

Benefits of reducing fine particulate matter are not as uncertain as the Trump EPA has suggested. Since the $PM_{2.5}$ standards were established in 1997, EPA and other federal science organizations, such as the National Institutes of Health, have spent hundreds of millions of dollars to strengthen the science evaluating the links between particulate matter and health and address identified uncertainties (National Research Council 1999). Fundamental conclusions of expert scientific panels in the United States and globally reviewing this science have been consistent in their findings that short- and long-term exposures to $PM_{2.5}$ are causally linked to premature mortality and that the overall body of evidence supports the use of a linear, no-threshold relationship in estimating mortality impacts (**EPA 2010a**; **WHO 2021**).[8] The most recent review of the particulate matter science by the EPA Clean Air Scientific Advisory Committee noted that new advances in causal modeling have only strengthened the conclusions

8 Recent studies, such as Nasari et al. 2016 and Burnett et al. 2018 that have focused on the shape of the concentration-response relationship, have found that there may be a non-linear relationship which is in some cases supralinear at low $PM_{2.5}$ concentrations (which indicates a greater mortality response to $PM_{2.5}$), with some flattening of response at very high concentrations. The Global Burden of Disease uses a nonlinear relationship with a lower bound centered at 3.5 $ug/m^3$ (**Cohen 2017**).

regarding the determination that $PM_{2.5}$ is causally linked to premature mortality (**EPA CASAC 2010b**). A set of important studies[9] demonstrated that when $PM_{2.5}$ concentrations have been reduced, life expectancy has increased.

At least since the 1990s, EPA's RIAs for air regulations have always acknowledged uncertainties in both benefit and cost estimates, arising from multiple sources, including market information, emissions, air quality modeling, concentration-response functions, health data, and economic valuation. Many of these sources are difficult to quantify, but EPA has been estimating confidence bounds on its estimates of health benefits for decades, reflecting the statistical power of the epidemiological studies from which concentration-response functions are estimated, and uncertainty distributions around key economic valuation parameters such as the VSL. EPA has operationalized the quantification of uncertainties in its peer-reviewed, open source, publicly available benefits estimation software: the environmental **Benefits Mapping Analysis Program (BenMAP)** (Sacks et al 2018).

In addition to point estimates, BenMAP routinely produces percentiles of uncertainty distributions for both the counts of health effects and the monetized values of those effects. Beyond providing probabilistic estimates of benefits, EPA also provides numerous sensitivity analyses examining important parameters, including estimates of benefits at different particulate matter ambient concentration cut points, alternative concentration-response functions, additional health endpoints, and discount rates. EPA's approach to estimating health benefits of air pollution regulations is well documented in a publicly accessible technical support document (**EPA 2024c**). In the case of particulate matter-attributable premature mortality, EPA has also provided a range of benefits based on two different key epidemiological studies and clearly noted that they represent separate estimates and should not be averaged given lack of knowledge about the relative likelihood of each estimate. Thus, EPA has striven to balance different types of uncertainties, providing expected values (i.e., point estimates) and probability distributions where appropriate, and presenting ranges where probability distributions were unknown.

Moreover, there are substantial uncertainties (and biases) in cost estimates, such as an inability to predict future innovations and the results of human ingenuity in finding the cheapest mitigation strategy. But EPA, while arguing uncertainties are so large as to warrant not monetizing health benefits, including through the use of the VSL, makes no mention of the equivalent concerns about presenting point estimates or distributions of costs. The combustion turbines EIA devotes only six lines to cost uncertainties, ending with the conclusion that "costs presented in this RIA may be overestimates." (**EPA 2026**, p. 63). There is no quantified treatment of cost uncertainties presented. Ranges of costs presented in the EIA reflect different assumptions about rates of construction of new turbines, not uncertainties in the cost estimates (**EPA 2026**, p.31).

9 These include Correia et al. 2013 and Bennet et al. 2019, both of which examined gains in life expectancy in the United States resulting from reductions in $PM_{2.5}$ during different time periods with higher and lower $PM_{2.5}$ concentrations.

Federal guidance in OMB Circular A-4 calls on agencies to “discuss the expected benefits and costs of the selected regulatory option and any reasonable alternatives,” address uncertainties, and “report benefit and cost estimates (including benefits of risk reductions) that reflect the full probability distribution of potential consequences” (OMB 2003). Where possible, Circular A-4 asks agencies to present probability distributions of benefits and costs and include the upper- and lower-bound estimates as complements to central tendency and other estimates. EPA’s practice for decades has been to do just that, as well as providing extensive sensitivity analyses for analytical elements that are difficult to characterize probabilistically.

EPA’s own Guidelines for Preparing Economic Analyses recommends that “[c]onsistent with recommendations in these Guidelines for communicating uncertainty, quantitative entries should generally include a central or best estimate in addition to a range or confidence interval” (**EPA 2024a**). EPA’s assertion that providing point estimates when there are substantial uncertainties flies in the face of decades of established and peer-reviewed practices. Moving away from these best practices hinders the ability to compare benefits and costs to produce estimates of net benefits, which in turn provides less information to inform decisions.

# 3. Benefits Gained by Reducing Particulate Matter Concentrations Below National Standards

EPA sets standards that are “requisite” to protect public health, including vulnerable populations with an “adequate margin of safety.”[10] Of course, what defines an adequate margin of safety is a policy decision, not an absolute determined by the science. EPA has interpreted “requisite” to mean that standards should be set where, in its interpretation, the confidence in the associations between $PM_{2.5}$ and health effects is strongest. In the most recent revision to the $PM_{2.5}$ NAAQS in 2024, the rule notes that, “[i]n considering the appropriate level for a revised annual standard, the Administrator concludes that a standard set at a level of 9.0 mg/m$^3$ reflects his judgment about placing the most weight on the strongest available evidence while appropriately weighing the uncertainties” (**EPA 2024d**).

This does not mean that there is no risk below the standard. In the 2024 NAAQS rule, EPA states clearly that, “[s]tudies evaluated in the 2019 [Integrated Science Assessment (ISA)] and the ISA Supplement examine this issue, and continue to provide evidence of linear, no-threshold relationships between long-term $PM_{2.5}$ exposures and all-cause and cause-specific mortality” (**EPA 2024d**). EPA also acknowledges that there are uncertainties about the shape of the concentration-response function (which specifies how mortality risk changes with increases in $PM_{2.5}$) at lower concentrations (below 8 ug/m$^3$). EPA also summarized expert opinions regarding the existence of a

10 Clean Air Act 42 U.S.C. §7409 (1970). See **https://www.govinfo.gov/content/pkg/US-CODE-2013-title42/html/USCODE-2013-title42-chap85-subchapI-partA-sec7409.htm**.

threshold in the concentration-response function for $PM_{2.5}$-related mortality, and in almost all cases,[11] experts agreed that the evidence supports a non-threshold, linear relationship (**EPA 2010a**).

All of this is to say that the standards are a public health policy instrument, not a level below which no health effects occur. Therefore, and following EPA and OMB guidance, it is fully appropriate to include the expected benefits of reductions in $PM_{2.5}$ concentrations below the NAAQS, with appropriate characterization of uncertainties. EPA has addressed these uncertainties in previous RIAs by including sensitivity analyses showing the distribution of benefits across concentration levels, including above and below the relevant NAAQS at the time the RIA was conducted (**EPA 2011b**). EPA also qualitatively notes that there is increasing uncertainty in benefits estimates at concentrations well below the mean levels in the underlying epidemiological studies.[12]

# 4. The Value of a Statistical Life Is the Best Method for Monetizing Mortality Benefits

The VSL is emphatically not the value of a human life. Rather, this value of *statistical* life can be useful for regulatory impact analyses. The VSL quantifies people's willingness to pay to reduce their risk of death by a small amount. The VSL can be based on decisions made in everyday life; for example, by choosing a safer occupation or buying more expensive but safer cars and bike helmets. Economists also can determine the VSL by analyzing responses to highly structured surveys. The VSL itself is defined as the willingness to pay for lower death risk divided by the amount of risk reduction that payment provides; for example, if people are willing to pay on average $10 for a 1-in-100,000 reduction in risk, then the VSL will be $10 multiplied by 100,000, giving a VSL of $1 million for reducing one expected death in a population of 100,000 people. These calculations also involve statistical representations of uncertainty, such as confidence intervals and sensitivity analysis.

Environmental economists, like ourselves, have been conducting such analyses for about five decades, resulting in hundreds of published studies, many in the United States, but also covering populations around the world. Because of their importance in RIAs, these values have, in turn, been reviewed and heavily scrutinized by EPA's Science Advisory Boards, the National Academy of Sciences, and similar bodies in other countries.

In the United States, a series of executive orders have endorsed use of the VSL for all major rules affecting health and safety going back to President Jimmy Carter and including all Republican (and Democratic) presidents. It is codified in OMB Guidance

11 In one case from 2005, the EPA Clean Air Scientific Advisory Committee suggested for quantitative risk assessments that a threshold of 10 $ug/m^3$ should be assumed for short-term mortality (EPA 2010a). However, subsequent CASAC reviews did not carry through with this recommended assumed threshold.

12 See for example the RIA for the 2023 Good Neighbor Rule (**EPA 2023**, p. 212).

Documents, such as Circular A-4 (OMB 2003). With those and many other global endorsements and codifications, VSLs have appeared in thousands of benefit-cost analyses in the United States and around the world, not only in EPA's RIAs for major rules (including under the first Trump administration and early in the second) but in RIAs from other health and safety agencies, such as the US Food and Drug Administration and US Department of Transportation).

As for the uncertainties in the VSL, the heavy review this literature has received, the continuation of academic publications to the present and the VSL's long history of use speaks volumes that uncertainties in the estimates—which are always present in any statistical and technical analysis—are well within acceptable levels for informing public policy. Of course, EPA and other agencies represent such uncertainties with confidence intervals and sensitivity analyses (such as about how the lag between exposures to particulate matter and reductions in the risk of death affects their value) and continually review the literature, while adjusting the VSLs for income growth and inflation. The latest authoritative review of VSL studies comes from the Organization for Economic Co-operation and Development, which analyzed and compared 277 studies covering 49 countries from 1970 to 2023, with 30 new US studies just from 2009 to 2023 (OECD 2025).

If mortality impacts are not valued, then the impact of this important health endpoint, which is often the largest contributor to economic benefits in air pollution regulations, cannot be compared to regulatory costs, resulting in a large bias toward issuing rules that are too weak.

## 5. No Co-benefits—Only Benefits

The scientific and economic consensus is that cost-benefit analysis should include all of the positive and negative effects of a regulation, not just those related to the targeted pollutant.

EPA's Guidelines for Preparing Economic Analyses recommend that analysts should "…capture all relevant outcomes to the extent possible…" and "…[not] exclude an important benefit or cost category…even if it cannot be placed in dollar terms." OMB Circular A-4 directs federal agencies that, "[y]our analysis should look beyond the direct benefits and direct costs of your rulemaking and consider any important ancillary benefits and countervailing risks" (**EPA 2024a**, OMB 2003).

RFF's researchers have addressed the issue of co-benefits in a 2021 peer-reviewed article, noting that "co-benefits are simply a semantic category of benefits that should be included in benefit-cost analyses" (**Aldy et al. 2021**). They find that excluding co-benefits could lead to inappropriate conclusions about whether policies are economically efficient or provide net benefits to society. Graham and Wiener (2024) also evaluated the appropriateness of including co-benefits and "countervailing risks", and recommended estimating the full scope of impacts, both positive and negative.

Co-benefits have long been considered when evaluating regulations or other policy actions, and not just for air quality. A classic example noted in the RFF article (Aldy et al. 2021) is the Emergency Highway Energy Conservation Act of 1974, which established a speed limit of 55 miles per hour, with the primary goal of fuel conservation, and also achieved a co-benefit of reduced road fatalities (Friedman et al. 2009). Ancillary effects are not always beneficial. For example, the RIA for the 2010 National Emission Standards for Hazardous Air Pollutants and New Source Performance Standards for the Portland Cement Manufacturing Industry estimated the disbenefits of carbon dioxide increases resulting from increasing electricity use from rule compliance (**EPA 2010b**).

More generally, inclusion of co-benefits (or costs) improves rather than weakens regulatory analyses. As a society, we want regulations that achieve the most net benefits (i.e., that are the most efficient). In the best case, policies can incorporate these co-benefits into their designs, and even if co-benefits are not part of the policy design, efficiency is enhanced when a regulation targeting one societal problem results in additional benefits for another.

Failing to include all benefits and costs of a regulation, whether the direct intent or not, will bias estimates of net benefits and if applied in decision-making, could lead to worse policy outcomes.

# 6. Conclusion

In a recent If/Then blog, Alan Krupnick made the case that as the Trump administration's EPA moves forward with its ambitious deregulatory agenda, it should follow good principles of regulatory impact analysis that uses transparent methodologies (**Krupnick 2025**). The blog noted that, under the first Trump administration, RFF researchers developed an approach for looking at the merits of deregulation. The researchers called for a structured approach that examined the net benefits of deregulation, looking at both the costs and benefits, consistent with economic theory and best practice as well as OMB's 2003 version of **Circular A-4** and EPA's **Guidelines for Preparing Economic Analysis**.

RFF analyzed regulations that were considered for repeal in the first Trump administration (**Krupnick et al. 2018**). The analysis showed that in a number of cases, for example EPA's **2016 Oil and Natural Gas Sector Emission Standards rule**, only including industry cost savings would lead to a decision to repeal a rule. Considering both costs and benefits showed that such a repeal would lead to negative net benefits, making society worse off. This emphasizes the importance of including benefits and costs for all major regulations.

In the second Trump administration, EPA's arguments against best practice benefit-cost analysis seem likely to be applied across the federal bureaucracy and set the stage for proposing major changes in Circular A-4 and federal agency RIA guidance documents. By failing to include quantified and monetized benefits in economic impact

analysis—for the recent rule on combustion turbines and likely for many upcoming deregulatory actions—EPA has chosen to abandon adherence to economic principles, decades of guidance from experts, its own economic analysis guidelines, and guidance from OMB.

EPA's arguments for abandoning health benefits in the recent rule are neither persuasive nor well founded in science. The whole idea of a RIA becomes irrelevant without the assessment of economic benefits. Without applying the important tool of benefit-cost analysis, air-quality regulators cannot evaluate clearly whether rules have positive net benefits for society, and this lack of clarity will likely lead to worse policy outcomes for public health.

# References


Aldy, Joseph, M. Kotchen, M. Evans, M. Fowlie, A. Levinson, and K. Palmer. *Report on the Proposed Changes to the Federal Mercury and Air Toxics Standards (MATS)*. Resources for the Future, 2019. **https://www.rff.org/publications/reports/report-proposed-changes-federal-mercury-and-air-toxics-standards-mats/**.

Aldy, Joseph, Matthew J. Kotchen, Mary Evans, Meredith Fowlie, Arik Levinson, and Karen Palmer. "Cobenefits and Regulatory Impact Analysis: Theory and Evidence from Federal Air Quality Regulations." *Environmental and Energy Policy and the Economy*, 2(2021): 117-156. **https://doi.org/10.1086/711308**.

Bennett, James E., Helen Tamura-Wicks, Robbie M. Parks, Richard T. Burnett, C. Arden Pope III, Matthew J. Bechle, Julian D. Marshall, Goodarz Danaei, and Majid Ezzati. "Particulate Matter Air Pollution and National and County Life Expectancy Loss in the USA: A Spatiotemporal Analysis." *PLOS Medicine* 16, no. 7 (2019): e1002856. **https://doi.org/10.1371/journal.pmed.1002856**.

Burnett, Richard, Hong Chen, Mieczysław Szyszkowicz, et al. "Global Estimates of Mortality Associated with Long-Term Exposure to Outdoor Fine Particulate Matter." *Proceedings of the National Academy of Sciences* 115, no. 38 (2018): 9592–97. **https://doi.org/10.1073/pnas.1803222115**.

Chestnut, Lauraine G., David M. Mills. "A fresh look at the benefits and costs of the US acid rain program," *Journal of Environmental Management*, 77, no. 3 (2005): 252-266. **https://doi.org/10.1016/j.jenvman.2005.05.014**.

Cohen, Aaron J., Michael Brauer, Richard Burnett, Heather R. Anderson, Ryan Frostad, Kalpana Estep, et al. "Estimates and 25-Year Trends of the Global Burden of Disease Attributable to Ambient Air Pollution: An Analysis of Data from the Global Burden of Diseases Study 2015." The Lancet 389, no. 10082 (2017): 1907–1918. **https://doi.org/10.1016/S0140-6736(17)30505-6**.

Correia, Andrew W., C. Arden Pope, Douglas W. Dockery, Yun Wang, Majid Ezzati, and Francesca Dominici. "Effect of Air Pollution Control on Life Expectancy in the United States: An Analysis of 545 U.S. Counties for the Period from 2000 to 2007." *Epidemiology* (Cambridge, Mass.) 24, no. 1 (2013): 23–31. **https://doi.org/10.1097/EDE.0b013e3182770237**.

Friedman LS, Hedeker D, Richter ED. "Long-term effects of repealing the national maximum speed limit in the United States." *American Journal of Public Health* 99, no. 9 (2009): 1626-31. **https://doi.org/10.2105/AJPH.2008.153726**.

Graham, J.D. and Wiener, J.B. "Co-Benefits, Countervailing Risks, and Cost–Benefit Analysis." in *Human and Ecological Risk Assessment*, ed. D.J. Paustenbach and K. Feinberg). (2024). **https://doi.org/10.1002/9781119742975.ch34**.

EPA (US Environmental Protection Agency). 2026. "Economic Impact Analysis for the New Source Performance Standards Review for Stationary Combustion Turbines: Final Rule." Economic Impact Analysis. Research Triangle Park, North Carolina, January 2026. **https://www.epa.gov/system/files/documents/2026-01/combustion_turbines_eia_final_2026-01.pdf**.

——————. 2024a. Guidelines for Preparing Economic Analyses (3rd edition). Report number EPA-240-R-24-001. Washington, DC. **https://www.epa.gov/environmental-economics/guidelines-preparing-economic-analyses-3rd-edition**.

——————. 2024b. "EPA Finalizes Stronger Standards for Harmful Soot Pollution, Significantly Increasing Health and Clean Air Protections for Families, Workers, and Communities." News Release. February 7, 2024. **https://www.epa.gov/newsreleases/epa-finalizes-stronger-standards-harmful-soot-pollution-significantly-increasing**.

———. 2024c. "Estimating $PM_{2.5}$- and Ozone-Attributable Health Benefits: 2024 Update." Technical Support Document. U.S Environmental Protection Agency Office of Air and Radiation Research Triangle Park, North Carolina June 2024. **https://www.epa.gov/system/files/documents/2024-06/estimating-pm2.5-and-ozone-attributable-health-benefits-tsd-2024.pdf**.

———. 2024d. "Reconsideration of the National Ambient Air Quality Standards for Particulate Matter." *Federal Register* 89, no. 45 (March 6, 2024): 16202-16406. **https://www.federalregister.gov/documents/2024/03/06/2024-02637/reconsideration-of-the-national-ambient-air-quality-standards-for-particulate-matter**.

———. 2020. "Compliance Cost, HAP Benefits, and Ancillary Co-Pollutant Benefits for 'National Emission Standards for Hazardous Air Pollutants: Coal-and Oil-Fired Electric Utility Steam Generating Units -- Reconsideration of Supplemental Finding and Residual Risk and Technology Review.'" Memorandum. May 2020. **https://www.regulations.gov/document/EPA-HQ-OAR-2018-0794-4559**.

———. 2019. "Regulatory Impact Analysis for the Repeal of the Clean Power Plan, and the Emission Guidelines for Greenhouse Gas Emissions from Existing Electric Utility Generating Units." Regulatory Impact Analysis. Research Triangle Park, North Carolina, June 2019. **https://www.epa.gov/sites/default/files/2019-06/documents/utilities_ria_final_cpp_repeal_and_ace_2019-06.pdf**.

———. 2016. "Regulatory Impact Analysis of the Final Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources." Regulatory Impact Analysis. EPA-452/R-16-002, May 2016. **https://www.epa.gov/sites/default/files/2020-07/documents/oilgas_ria_nsps_final_2016-05.pdf**.

———. 2012. "Regulatory Impact Analysis for the Final Revisions to the National Ambient Air Quality Standards for Particulate Matter." Regulatory Impact Analysis. Research Triangle Park, North Carolina, December 2012. **https://www.epa.gov/sites/default/files/2020-07/documents/naaqs-pm_ria_final_2012-12.pdf**.

———. 2011a. "The Benefits and Costs of the Clean Air Act from 1990 to 2020 Final Report – Rev. A." Report. Office of Air and Radiation. **https://www.epa.gov/clean-air-act-overview/benefits-and-costs-clean-air-act-1990-2020-second-prospective-study**.

———. 2011b. "Regulatory Impact Analysis for the Final Mercury and Air Toxics Standards." Regulatory Impact Analysis. EPA-452/R-11-011 December 2011. **https://www.epa.gov/sites/default/files/2020-07/documents/utilities_ria_final-mats_2011-12.pdf**.

———. 2010a. "Summary of Expert Opinions on the Existence of a Threshold in the Concentration-Response Function for $PM_{2.5}$-Related Mortality." Technical Support Document. Research Triangle Park, North Carolina, June 2010. **https://www.epa.gov/sites/default/files/2020-07/documents/thresholdstsd.pdf**.

———. 2010b. "Regulatory Impact Analysis: Amendments to the National Emission Standards for Hazardous Air Pollutants and New Source Performance Standards (NSPS) for the Portland Cement Manufacturing Industry." Regulatory Impact Analysis. Research Triangle Park, North Carolina, August 2010. **https://www.epa.gov/sites/default/files/2020-07/documents/nonmetallic-minerals_ria_final-cement-neshap-nsps_2010-08.pdf**.

———. 2006. "PM NAAQS 2006." Regulatory Impact Analysis. **https://www.epa.gov/sites/default/files/2020-07/documents/naaqs-pm_ria_final_2006-10.pdf**.

EPA Clean Air Scientific Advisory Committee. 2023. "CASAC Review of the EPA's Supplement to the 2019 Integrated Science Assessment for Particulate Matter (External Review Draft – October 2021)." EPA-CASAC-22-001. **https://casac.epa.gov/ords/sab/r/sab_apex/casac/0?report_id=1093&request=APPLICATION_PROCESS%3DREPORT_DOC&session=4621649146960**.

Hubbell, Bryan and Krupnick, Alan. If/Then: Ignoring the Benefits of Air Pollution Regulations Will Lead to Worse Policy Decisions. January 2026. **https://www.resources.org/common-resources/ifthen-ignoring-the-benefits-of-air-pollution-regulations-will-lead-to-worse-policy-decisions/**.

Krupnick, Alan. If/Then: The Economics of Regulatory Repeal. April 2025. **https://www.resources.org/common-resources/if-then-the-economics-of-regulatory-repeal/**.

Nasari, Masoud M., Mieczysław Szyszkowicz, Hong Chen, Daniel Crouse, Michelle C. Turner, Michael Jerrett, C. Arden Pope III, Bryan Hubbell, Neal Fann, Aaron Cohen, Susan M. Gapstur, W. Ryan Diver, David Stieb, Mohammad H. Forouzanfar, Sun-Young Kim, Casey Olives, Daniel Krewski, and Richard T. Burnett. "A Class of Non-Linear Exposure-Response Models Suitable for Health Impact Assessment Applicable to Large Cohort Studies of Ambient Air Pollution." *Air Quality, Atmosphere & Health* 9, no. 8 (2016): 961–72. **https://doi.org/10.1007/s11869-016-0398-z**.

National Research Council. 2002. *Estimating the Public Health Benefits of Proposed Air Pollution Regulations*. Washington, DC: The National Academies Press. **https://www.nationalacademies.org/publications/10511**.

National Research Council Committee on Research Priorities for Airborne Particulate Matter. "The Committee's First Report and Its Impact." In *Research Priorities for Airborne Particulate Matter: II. Evaluating Research Progress and Updating the Portfolio*. National Academies Press, 1999. **https://www.ncbi.nlm.nih.gov/books/NBK224803/**.

OECD (Organization for Economic Co-operation and Development). *Mortality Risk Valuation in Policy Assessment: A Global Meta-Analysis of Value of Statistical Life Studies*, (OECD Publishing, Paris, 2025). **https://doi.org/10.1787/76ca89a2-en**.

OMB (US Office of Management and Budget). *Report to Congress on the Benefits and Costs of Federal Regulations and Agency Compliance with the Unfunded Mandates Reform Act*. Draft Report. Executive Office of the President, 2024. **https://bidenwhitehouse.archives.gov/wp-content/uploads/2025/01/FY23-Benefit-Cost-Report.pdf**.

——————. "Circular A-4." Washington, DC, September 2003. **https://www.whitehouse.gov/wp-content/uploads/2025/08/CircularA-4.pdf**.

Palmer K, Burtraw D, Shih JS. "The benefits and costs of reducing emissions from the electricity sector." *Journal of Environmental Management*. 83, no. 1 (2007);115–30. **https://doi.org/10.1016/j.jenvman.2006.02.011**.

Roman, Henry A., Katherine D Walker, Tyra L. Walsh, Lisa Conner, Harvey M. Richmond, Bryan J. Hubbell, and Patrick L. Kinney. "Expert Judgment Assessment of the Mortality Impact of Changes in Ambient Fine Particulate Matter in the US." *Environmental Science & Technology* 42, no. 7 (2008): 2268–74. **https://doi.org/10.1021/es0713882**.

Sacks JD, Lloyd JM, Zhu Y, Anderton J, Jang CJ, Hubbell B, Fann N. "The Environmental Benefits Mapping and Analysis Program - Community Edition (BenMAP-CE): A tool to estimate the health and economic benefits of reducing air pollution." *Environmental Modelling Software*, 104 (2018): 118-129. **https://pmc.ncbi.nlm.nih.gov/articles/PMC6022291/**.

WHO (World Health Organization). 2021. "World Health Organization Global Air Quality Guidelines. Particulate Matter ($PM_{2.5}$ and $PM_{10}$), Ozone, Nitrogen Dioxide, Sulfur Dioxide and Carbon Monoxide." Geneva: World Health Organization; 2021. License: CC BY-NC-SA 3.0 IGO. **https://aqmx.org/sites/default/files/resources/WHO2021_AQG.pdf**.

IEc

# Evaluating Reduced-Form Tools for Estimating Air Quality Benefits

Final Report | October 31, 2019

prepared for:

US Environmental Protection Agency

Office of Air Quality Planning and Standards

109 T.W. Alexander Drive

Durham, NC 27709

prepared by:

Industrial Economics, Incorporated*

2067 Massachusetts Avenue

Cambridge, MA 02140

617/354-0074

***This version of the contractor-developed report was adapted by U.S. EPA for review by the U.S. EPA Science Advisory Board.**

## TABLE OF CONTENTS

Executive Summary ....................ES-1
Chapter 1 | Introduction .................... 1-1
1.1 Background and Study Motivation .................... 1-1
1.2 Study Objective .................... 1-2
1.3 Organization of this Document .................... 1-3
Chapter 2 | Analytical Approach .................... 2-1
2.1 Air Quality Policy Scenarios .................... 2-1
2.1.1 CPP Proposal .................... 2-3
2.1.2 Tier 3 .................... 2-4
2.1.3 Cement Kilns .................... 2-5
2.1.4 Refineries .................... 2-6
2.1.5 Pulp and Paper .................... 2-7
2.2 Full-Form Models .................... 2-8
2.3 Reduced-Form Tools .................... 2-8
2.3.1 SA Direct .................... 2-10
2.3.2 APX .................... 2-12
2.3.3 InMAP .................... 2-13
2.3.4 EASIUR Direct .................... 2-14
2.4 Approach to BenMAP-CE Derived Results .................... 2-15
2.5 Model Comparisons .................... 2-16
Chapter 3 | Results .................... 3-1
3.1 Comparison of Reduced-form Tools at the National-Level .................... 3-1
3.1.1 Total Benefits .................... 3-1
3.1.2 Benefits by Precursor .................... 3-5
3.2 Regional Results .................... 3-9
3.2.1 $R^2$ values .................... 3-10
3.2.2 Normalized Mean Bias (NMB) .................... 3-11
3.2.3 Normalized Mean Error (NME) .................... 3-12
3.3 REDUCED-FORM TOOL COMPLEXITY AND LEVEL OF EFFORT ....... 3-13

Chapter 4 | Discussion ........ 4-1
4.1 Comparison of Full-form Air Quality Models ........ 4-1
4.2 Overall Reduced-form Tool Performance for $PM_{2.5}$ and its Components ........ 4-1
4.3 Performance Across Different Air Quality Policies ........ 4-3
4.4 Limitations of the Analysis ........ 4-4
Chapter 5 | Conclusion ........ 5-1
5.1 Recommendations for CONTINUED EVALUATION of Reduced-form Tools5-1
5.2 Future Research ........ 5-1
References ........ 1

Appendix A: Detailed Reduced-Form Tool Methods
Appendix B: States in Each NCA Region in the Continental US
Appendix C: National Benefits and Model Statistics

# EXECUTIVE SUMMARY

Quantifying and valuing the health impacts of changes in air quality can be a time- and resource-intensive endeavor that often requires large, detailed datasets and sophisticated computer models. The US Environmental Protection Agency (EPA) routinely undertakes these analyses as part of Regulatory Impact Analyses (RIAs) for major air pollution regulations. EPA strives to estimate the health benefits of air quality changes using a state-of-the-science "full-form" approach that couples a photochemical air quality model, such as the Community Multiscale Air Quality (CMAQ) model or the Comprehensive Air Quality Model with Extensions (CAMx), with its Environmental Benefits Mapping and Analysis Program – Community Edition (BenMAP-CE) health benefits tool. However, there are times when EPA has used "reduced-form" tools, which employ simpler models to approximate these more complex analyses with a lower computational burden. This can occur when time and resources are constrained, such as when rule development timelines are compressed, or air quality policy details required for full-form photochemical modeling are not available until very late in the rulemaking process.

The number of reduced form tools that quantify air quality benefits has grown over the last several years, giving EPA and other analysts of air policies more options to consider. To date, EPA has not formally explored the ability of these alternatives to estimate reliably full-form-based benefits of reducing emissions across a range of policies. The study described in this report demonstrates an approach to systematically comparing monetized health benefits estimated using reduced-form tools against those generated using full-form air quality models. The goal of this comparison was not to make any determinations as to whether any specific reduced-form tools are better-suited for use in regulatory applications than others, but rather to: 1) learn more about the reduced-form approaches available to regulatory analysts at EPA and elsewhere; and 2) provide an example of how one could conduct an evaluation of multiple approaches that could provide insights into relevant factors for choosing among alternative tools. The study did not evaluate the ability of each approach to characterize the distribution of PM2.5-related premature deaths according to the annual mean concentration at which they occurred. The need for the evaluation of reduced form techniques as described in this report was identified in the 2017 proposed rule to repeal the Clean Power Plan (FR 82 48035).

## MODELS AND POLICY SCENARIOS

We compare results across four reduced-form tools, using each to quantify the impacts of five air quality policies. The tools we evaluated and associated sample references of model applications are listed in Exhibit ES-1.

**EXHIBIT ES-1. REDUCED-FORM TOOLS EVALUATED**

| REDUCED-FORM TOOL | SAMPLE REFERNCE(S) |
|---|---|
| Source Apportionment (SA) Benefit Per Ton (BPT) | Fann, Baker, & Fulcher, 2012; Fann, Fulcher, & Baker, 2013; United States Environmental Protection Agency, 2013 |
| Air Pollution Emission Experiment and Policy Analysis Model (APX) | Muller & Mendelsohn, 2006 |
| Intervention Model for Air Pollution (InMAP) | Tessum, Hill, et al., 2017 |
| Estimating Air Pollution Social Impacts Using Regression (EASIUR) | Heo et al., 2016 |

These tools vary in design, implementation, and ease-of-use. To ensure a reasonably fair comparison, we followed two guiding principles when applying these tools in this analysis:

1. Key model inputs should be standardized across reduced-form tools to the extent allowable by each tool to ensure that results are as comparable as possible.
2. The underlying model architecture should not be substantially altered so that the results still reflect the unique properties of each reduced-form tool.

The first principle ensured that differences would not be attributable to, for instance, use of an alternative concentration-response function or value of statistical life (VSL) value. The second principle helped ensure that the models we evaluated would be substantially similar to that downloaded or accessed by an analyst.

In some cases, we applied models directly to obtain monetized health benefit results from emissions inputs; in those cases, we append "Direct" to the model name (e.g., EASIUR Direct") when describing the tool; in other cases we achieved the first principle by coupling the reduced-form air quality modeling aspect of the tool with EPA's BenMAP-CE tool. This approach allowed us to specifically evaluate the air quality modeling aspect of some of the tools. In those cases, we append "BenMAP" to the tool name when we refer to the results (e.g., AP2-BenMAP). For the APEEP (versions 2 and 3; APX) models we applied them both directly and coupled with BenMAP.

We generated benefits estimates using the reduced form tools for the five example policies shown in Exhibit ES-2.

EXHIBIT ES-2 AIR QUALITY POLICIES ANALYZED

| POLICY SCENARIO | POLICY YEARS (BASE/FUTURE) | SOURCE SECTOR |
|---|---|---|
| Clean Power Plan (CPP) Proposal | 2011/2025 | Electricity generating units (EGUs) |
| Tier 3 Rule | 2005/2030 | On-road vehicles |
| Cement Kilns* | 2011/2025 | Cement kilns |
| Refineries* | 2011/2025 | Oil refineries |
| Pulp and Paper* | 2011/2025 | Pulp and paper processing |
| *These policies apply hypothetical across-the-board emissions reductions rather than a detailed policy representation with spatially- and temporally-varying emissions impacts | | |

These example air quality policies vary in the magnitude and composition of their emissions changes and in the emissions source affected (e.g., mobile, industrial point, or electricity generating units [EGUs]). They also differ in the spatial distribution of emissions and concentration changes and in their impacts on primary particulate matter ($prPM_{2.5}$) emissions and secondary $PM_{2.5}$ precursors (e.g., nitrous oxides and sulfur dioxide). Finally, they differ in complexity, with some representing uniform emissions changes to all facilities in a particular sector while others represent more realistic cases where the policy results in emissions changes that vary both spatially and temporally.

We compared all reduced form tool results for the scenarios in Exhibit ES-2 against full-form results that were generated using a combination of the CMAQ air quality model and BenMAP-CE. For four of the five scenarios (all except Tier 3) we also had results generated using a combination of CAMx and BenMAP. We compared the CMAQ-based results against CAMx where available to identify any potential biases associated with using CMAQ alone as our full-form comparator.

## ANALYSIS

We evaluated the reduced-form tools across two dimensions:

- A quantitative analysis at the national and regional level to explore the deviation of reduced-form tool results from full-form BenMAP results (this comparison was performed for total benefits as well as the fraction of benefits attributed to each $PM_{2.5}$ component), and
- A qualitative comparison of the computational complexity of each reduced-form tool and level of technical expertise needed to operate it.

The SA Direct, APX Direct, and EASIUR Direct results all use the tool itself to directly quantify the benefits of each air quality policy scenario. Results for the full-form models as well as the APX BenMAP and InMAP BenMAP reduced-form tools were generated

by using the tools/models to create air quality surfaces that were then run through BenMAP-CE version 1.5.0.4 using the parameters in Exhibit ES-3.

#### EXHIBIT ES-3. BENMAP-CE PARAMETERS BY POLICY

| BENMAP-CE INPUT | 2025 POLICIES: CPP PROPOSAL, CEMENT KILNS, REFINERIES, PULP AND PAPER | 2030 POLICY: TIER 3 |
|---|---|---|
| Population[A] | County-level US Census population estimate for 2025 | County-level US Census population estimate for 2030 |
| Health Incidence[A] | County-level death rates projected to 2025 | County-level death rates projected to 2030 |
| Concentration-Response Relationship[B] | All-cause mortality, ages 30-99 (Krewski et al., 2009) | All-cause mortality, ages 30-99 (Krewski et al., 2009) |
| Valuation[B] | VSL based on 26 value-of-life studies with an inflation adjustment to $2015 and an income growth adjustment to 2025. A 3% discount rate and a 20-year cessation lag were applied to all estimated benefits. | VSL based on 26 value-of-life studies with an inflation adjustment to $2015 and an income growth adjustment to 2026 (the latest value provided in BenMAP-CE). A 3% discount rate and a 20-year cessation lag were applied to all estimated benefits. |

[A] These population and incidence datasets are also reflected in the SA Direct and APX Direct BPT values. The only model that does not reflect these inputs is the EASIUR Direct reduced-form tool.
[B] This is the same concentration-response function and VSL estimate used to estimate the economic value of avoided premature deaths across all reduced-form tools. See https://www.epa.gov/environmental-economics/mortality-risk-valuation for more information.

We generated results for each full-form model and reduced-form tool expressed in terms of monetized benefits of avoided premature mortality ($2015). Results were compared at the national- and regional-level for primary $PM_{2.5}$ ($prPM_{2.5}$; defined as the results attributed to changes in elemental carbon [EC] emissions only), $NO_3$ (results attributed to changes in $NO_X$ emissions), $SO_4$ (results attributed to changes in $SO_2$ emissions), and $PM_{2.5}$ (results attributed to EC, $NO_X$, and $SO_2$ emissions as well as $NH_3$ and VOC emissions, where applicable).

For comparisons of $PM_{2.5}$ at the national level, we use $prPM_{2.5}$ benefits that have been scaled up to better represent the fraction of $PM_{2.5}$ benefits that would be attributed to total $prPM_{2.5}$ emissions (i.e., EC, crustal and prOC). We multiplied the $prPM_{2.5}$ benefit per ton based on EC by the total amount of primary $PM_{2.5}$ emissions to estimate benefits related to all primary $PM_{2.5}$ emissions. Model comparison at the national-level is limited to: a) an overall comparison of total estimated benefits and b) ratios of total reduced-form tool benefits to CMAQ-derived benefits. At the regional-level, we compared full- and reduced-form tool results using a wider set of statistical metrics including:

- Total estimated benefits

- Mean bias (MB)
- Mean error (ME)
- Normalized mean bias (NMB)
- Normalized mean error (NME)
- Coefficient of determination ($r^2$)

This set of statistics is both widely reported in the literature and is consistent with the recommendations provided in Simon et al. (2012). It is important to note that while this document sometimes uses a factor of two to differentiate relative performance against the full-form models, the factor of two delineation is not a measure of acceptability for any particular type of assessment.

### RESULTS AND CONCLUSIONS

Our quantitative analysis led to several observations relevant for analysts considering using reduced form tools:

- Across all comparators examined in this analysis, CMAQ and CAMx produce very similar estimates of both total $PM_{2.5}$ benefits and benefits related to specific components of $PM_{2.5}$. They are also in agreement on the spatial distribution of those benefits at the region-level. This finding, which was consistent across all policies for which both results were available, gives us confidence that we are not introducing significant uncertainty into our analysis of reduced-form tools by relying on a single full-form model as our sole comparator.
- The difference between reduced-form and full-form models can vary substantially across different policy scenarios. For example, in Exhibit ES-4, which groups national results by policy, we can see that the two policies that resulted in the best alignment between CMAQ results and reduced-form tool results were the CPP Proposal and Pulp and Paper scenarios. On the other hand, differences between the two model types were largest for the mobile-source Tier 3 scenario. In general, point source scenarios with non-ground-level emissions showed much better agreement with CMAQ-based estimates across reduced-form tools.
- We also observed differences in tools when comparing national-level benefits by precursor. Across components, we observed that reduced-form tools generally matched CMAQ more closely for primary $PM_{2.5}$ (estimated using EC only) and for sulfate than for nitrate. With just a few exceptions, most estimates for the first two components fell within a factor of two of the CMAQ estimates. However, estimates for nitrate were much more variable, with only SA Direct and EASIUR Direct having estimates within a factor of two of the CMAQ estimates for all scenarios. In general, estimates of nitrate were much higher for the reduced form tools than for CMAQ. This appears to be a significant contributor to the large variances seen for Tier 3.

EXHIBIT ES-4. RATIO OF NATIONAL AVOIDED PREMATURE MORTALITY BENEFITS ESTIMATES COMPARED AGAINST CMAQ ESTIMATES, BY POLICY SCENARIO. ORANGE DOTS REPRESENT RATIOS LESS THAN 1 AND BLUE DOTS RATIOS GREATER THAN 1.




- A drawback of the benefit-per-ton (BPT) based reduced-form tools (SA Direct, EASIUR Direct, and APX Direct) is that because they assign benefits to locations with emissions changes rather than air quality changes, they are not able to provide estimates that could substitute for full-scale modeling at fine spatial scales such as county-level. We conducted an analysis at a regional scale to see if this effect was less pronounced when results are aggregated to larger areas. Our initial analysis of regional estimates is somewhat inconclusive as to which model types

might perform better at this scale at matching CMAQ, with varying results by policy and type of statistic. Additional research is warranted to further explore variances at sub-national levels and assess if there are consistent biases in particular locations that may affect these results.

- As far as ease of use, SA Direct and EASIUR Direct had the lowest time requirements and require minimal special skills or software. All APEEP models run directly have a moderate time requirement but require MATLAB expertise and a MATLAB license. InMAP and any model paired with BenMAP-CE would have a higher time requirement than APX Direct, EASIUR Direct, or SA Direct.
- Overall, we believe there continues to be value in evaluating how reduced-form tools compare to full-form air quality model estimates in emission reduction scenarios. Several of the reduced-form tools considered in this analysis produced results that were reasonably comparable to those derived from full-form models and offer a quicker approach to generating ballpark estimates of the health-related benefits or costs associated with an air quality policy. However, none of the reduced-form tools in the form evaluated here should be considered a substitute for a full-form analysis, particularly in situations with large changes in precursor emissions and where a non-linear response is anticipated (e.g., $NO_X$ to $PM_{2.5}$ nitrate).

# Chapter 1 | INTRODUCTION

Quantifying and valuing the health impacts of changes in air quality can be a time- and resource-intensive endeavor that often requires large, detailed datasets and sophisticated computer models that predict the formation and transport of air pollutants. The US Environmental Protection Agency (EPA) routinely undertakes these analyses as part of Regulatory Impact Analyses (RIAs) for major air pollution regulations. EPA often employs a traditional "full-form" analysis linking emission inventories, photochemical transport models and a benefits tool. This approach captures the complexities of environmental processes (e.g., atmospheric reactions, chemical processes, diffusion and dispersion of pollutants) and associated health outcomes. In the last decade, both EPA and independent researchers have developed simpler models or "reduced-form tools" to approximate these more complex analyses with a lower computational burden. The primary purpose of this assessment was to 1) learn more about reduced-form approaches, and 2) provide an intercomparison of currently available tools, including discussing how they perform relative to one another as well as to full-form models. It is anticipated that the evaluation framework, and model input and output data, generated as part of this project could be used to test updates to these models and other similar tools. Given these broad objectives, a decision was made to apply each tool as consistently as possible in terms of emissions, meteorology (where possible), and domain structure. This report presents a review and evaluation of several of these publicly available reduced-form tools. Both full-form and reduced-form approaches are in a continual cycle of evaluation and update. It is important to note that the purpose of this comparison was not to make any determinations as to whether any specific reduced-form tools are better-suited for use in regulatory applications than others.

## 1.1 BACKGROUND AND STUDY MOTIVATION

EPA strives to estimate the health benefits of air pollutant emissions changes using a state-of-the-science full-form photochemical air quality model coupled with its Environmental Benefits Mapping and Analysis Program – Community Edition (BenMAP-CE) health benefits tool. Air quality models such as the Community Multiscale Air Quality (CMAQ[1]) model or the Comprehensive Air Quality Model with Extensions (CAMx[2]) simulate the emission, production, decay, deposition, and transport of gas and particle phase pollutants in the atmosphere to produce air pollutant

[1] https://www.epa.gov/cmaq

[2] http://www.camx.com

concentration surfaces typically at a spatial resolution of 12km by 12km for national assessments in the US. Surfaces generated for different policy scenarios can then be input into BenMAP-CE to quantify and monetize changes in mortality and morbidity incidence resulting from the modeled changes in air pollution.

However, there are times when EPA has used reduced-form tools. This can occur when time and resources are constrained, such as when rule development timelines are compressed; the air quality policy details required for full-form photochemical modeling are not available until very late in the rulemaking process; or when public health benefits related to changes in air quality are "co-benefits" of the policy rather than benefits from reducing the pollutant targeted by the policy.

EPA has employed reduced-form tools in support of RIAs by calculating the value of reducing one ton of emissions from individual emission sectors. More recently, EPA estimated "benefit-per-ton" (BPT) values using CAMx source apportionment modeling. Several recent national rules, including the Mercury and Air Toxics Standards and the Ozone Cross-State Air Pollution Rule Update, have used BPT values to quantify the health benefits of reducing fine particulate matter concentrations ($PM_{2.5}$) (US EPA, 2011a; US EPA 2011b). However, to date, EPA has not formally explored the ability of the BPT values to estimate reliably the benefits of reducing emissions across all sectors. In addition, the proliferation of other reduced-form tools that quantify air quality benefits over the last several years has produced more choices for EPA and other analysts to consider. The multi-scenario comparison we conducted of various analytical approaches will help EPA to better understand how health benefit estimates from reduced-form tools can differ from their full-form counterparts across an array of policies and spatial scales.

## 1.2 STUDY OBJECTIVE

The objective of this study is to demonstrate an approach to systematically compare monetized health benefits estimated using full-form air quality models against those generated using reduced-form tools. We compare results across four reduced-form tools, using each to quantify impacts of five air quality policies. These example air quality policies vary in the magnitude and composition of their emissions changes and in the emissions source affected (e.g., mobile, industrial point, or electricity generating units [EGUs]). They also differ in the spatial distribution of emissions and concentration changes and in their impacts on primary particulate matter emissions ($prPM_{2.5}$) and secondary $PM_{2.5}$ precursors (e.g., nitrous oxides and sulfur dioxide). Finally, they differ in complexity, with some representing uniform changes to entire sectors while others represent more realistic cases where the policy results in emissions changes that vary both spatially and temporally.

Specifically, we statistically evaluate the deviation of reduced-form tool estimated benefits from full-form model derived benefits for each of the five policy scenarios. Performance statistics are quantified at the regional scale for total $PM_{2.5}$ and for each major component of $PM_{2.5}$ (i.e., $prPM_{2.5}$ represented by elemental carbon (EC) only,

nitrate, and sulfate). The goal of the analysis is to compare differences in model results and note the conditions under which different reduced-form tools perform similarly to the full-form approach. In addition, we provide a sense of the overall complexity of each model formulation, such as whether it involves straightforward mathematics or an understanding of and experience with specific tools and models, and the level of effort required to operate it.

## 1.3 ORGANIZATION OF THIS DOCUMENT

The remainder of this report is organized into four chapters. Chapter 2 describes our analytical approach to performing the comparative analysis, including descriptions of the reduced-form tools and air quality policies, the methods used to run each of the reduced-form tools, and the statistical comparisons used to quantify model differences. Chapter 3 presents the results of the comparative analysis for each reduced-form tool by policy scenario and $PM_{2.5}$ component. Chapter 4 discusses and compares the relative performance of each reduced-form tool. Finally, Chapter 5 presents broad conclusions as well as limitations of the analysis and suggestions for future research. In addition, there are three Appendices to this document. Appendix A provides additional detail on our approach to generating results for each of the reduced-form tools we evaluated. Appendix B provides a table of states grouped by National Climate Assessment (NCA) region in the continental US. Appendix C provides tables of national benefits estimates for each model as well as the calculated regional statistics.

# Chapter 2 | ANALYTICAL APPROACH

This chapter describes the analytical approach we used to compare reduced-form tool results against full-form model results. The goal was to assess how well each reduced-form tool replicated the air quality changes and associated health benefits derived from full-form photochemical models (hereafter referred to as "full form-BenMAP results") across five different policy scenarios. We evaluated the reduced-form tools across two dimensions:

- A quantitative analysis at the national and regional level to explore the deviation of reduced-form tool results from full-form BenMAP results (this comparison was performed for total benefits as well as the fraction of benefits attributed to each $PM_{2.5}$ component), and
- A qualitative comparison of the computational complexity of each reduced-form tool and level of technical expertise needed to operate it.

The goal of these comparisons was to assess whether there were types of questions that each model may be better suited to answer and the conditions under which it might serve as a possible surrogate for full-form analysis of a policy assessment. Appendix A at the end of this report supplements this chapter and provides more detailed information on how each tool was used in this analysis.

## 2.1 AIR QUALITY POLICY SCENARIOS

We used a set of five policy scenarios to compare reduced-form tools to full-form BenMAP results across the contiguous US. (Exhibit 2-1). These policy scenarios were chosen as illustrative examples intended to capture an array of spatial and sectoral differences. Importantly, these were examples for which EPA had conducted full-form modeling, so that we had a target against which to compare results from reduced form tools. These policies were projected to impact $PM_{2.5}$ emissions from sources that have varying geographic distributions within the US (and consequently proximity to population centers); as well as variations in the relative magnitudes of $prPM_{2.5}$ and $PM_{2.5}$ precursor species emissions, temporal patterns of emissions, and effective stack heights. These differences enable us to explore model performance across a range of policy characteristics and examine the impact of specific model differences such as the emissions species included in each reduced-form tool.

We focused our analysis on three $PM_{2.5}$ components: $prPM_{2.5}$ derived from EC emissions only, $PM_{2.5}$ sulfate particles derived from $SO_2$ emissions, and $PM_{2.5}$ nitrate particles derived from $NO_X$ emissions. While there are three main components of $prPM_{2.5}$ (EC,

organic carbon and crustal material), the $prPM_{2.5}$ results in this analysis focus on EC for multiple reasons: 1) CAMx was not configured to incorporate the same crustal emissions species as CMAQ for these simulations, and 2) organic aerosol in CAMx and CMAQ includes some components of secondary organic aerosols that are not attributable solely to $prPM_{2.5}$ emissions. Since the major physical processes that impact the various $prPM_{2.5}$ components are the same (i.e. dispersion and deposition), EC was used as surrogate for all $prPM_{2.5}$ emissions. The EASIUR tool also represents all $prPM_{2.5}$ impacts with the EC component. In addition, some of the tools estimate changes in PM2.5 from changes in ammonia ($NH_3$) and volatile organic compound (VOC) emissions. The tools that predict benefits associated with these precursors are noted in Exhibit 2-9 and scenarios with changes these precursors are shown in Exhibit 2-2. Each policy scenario is described in more detail below.

Because EPA generally evaluates impacts of policies that are targeted to take effect in the future, modeling is generally carried out for both a base year and a future year. The base year is the most recent year with detailed emissions and meteorological inputs available. The future year represents a year in which policy impacts are expected to occur. The future-year modeling captures two scenarios: a baseline scenario using emissions that are projected to occur without any policy in place; and a policy case or control scenario using emission that would occur if the policy in question were implemented. The impact of the policy in the future year is calculated as the difference between the future year policy case air pollution levels and the future year baseline pollution levels.

### EXHIBIT 2-1. AIR QUALITY POLICIES ANALYZED

| POLICY SCENARIO | POLICY YEARS (BASE/FUTURE) | SOURCE SECTOR |
|---|---|---|
| Clean Power Plan (CPP) Proposal | 2011/2025 | Electricity generating units (EGUs) |
| Tier 3 Rule | 2005/2030 | On-road vehicles |
| Cement Kilns* | 2011/2025 | Cement kilns |
| Refineries* | 2011/2025 | Oil refineries |
| Pulp and Paper* | 2011/2025 | Pulp and paper processing |
| *These policies apply hypothetical across-the-board emissions reductions rather than a detailed policy representation with spatially- and temporally-varying emissions impacts | | |

**EXHIBIT 2-2. AIR QUALITY POLICY EMISSIONS CHANGES BY PRECURSOR (TONS [% OF TOTAL CHANGE])**

| POLICY SCENARIO | PRIMARY $PM_{2.5}$[A] | $NO_X$ | $SO_2$ | $NH_3$ | VOCS |
|---|---|---|---|---|---|
| CPP Proposal | 2,481 (0.29%) | 414,479 (48.59%) | 422,670 (49.55%) | 3,318 (0.39%) | 9,992 (1.17%) |
| Tier 3 Rule | 1,322 (0.25%) | 345,333 (64.05%) | 13,002 (2.41%) | - | 179,531 (33.30%) |
| Cement Kilns | 557 (0.37%) | 96,468 (63.29%) | 55,398 (36.34%) | - | - |
| Refineries | 424 (0.82%) | 34,967 (67.49%) | 16,421 (31.69%) | - | - |
| Pulp and Paper | 278 (0.39%) | 34,616 (48.51%) | 36,464 (51.10%) | - | - |

[A] For all scenarios Primary $PM_{2.5}$ is represented by EC emissions only.

### 2.1.1 CPP PROPOSAL

The Standards of Performance for Greenhouse Gas Emissions from New, Modified, and Reconstructed Stationary Sources: EGUs, more commonly known as the Clean Power Plan (CPP) was published in the Federal Register in October 2015. It established standards for emissions of carbon dioxide ($CO_2$) for newly constructed, modified, and reconstructed fossil-fuel-fired EGUs. The CPP proposal included several potential policy options and was published in the Federal Register on June 18, 2014.[3] The final rule went into effect on October 23, 2015.[4] Repeal of the CPP was subsequently proposed by EPA on October 10, 2017. The CPP was eventually replaced with the Affordable Clean Energy (ACE) rule that was signed on July 8, 2019.[5] While the CPP was aimed at reducing emissions of $CO_2$ specifically, it was expected to also yield significant co-benefits in the form of $PM_{2.5}$ reductions. We specifically analyzed the $PM_{2.5}$ changes associated with proposed CPP Option 1 State (Exhibit 2-3; blue shading represents an emissions decrease and orange an emissions increase) whose emissions were modeled using the Integrated Planning Model (IPM) version 5.13, as described in Chapter 3 of EPA's regulatory impact analysis document.[6]

---

[3] Federal Register, Vol. 79, No. 117, Wednesday, June 18, 2014. https://www.govinfo.gov/content/pkg/FR-2014-06-18/pdf/2014-13726.pdf

[4] Federal Register, Vol. 80, No. 205, Friday, October 23, 2015. https://www.gpo.gov/fdsys/pkg/FR-2015-10-23/pdf/2015-22837.pdf.

[5] Federal Register, Vol. 84, No. 130, Monday, July 8, 2019. https://www.govinfo.gov/content/pkg/FR-2019-07-08/pdf/2019-13507.pdf.

[6] US EPA (2014a). Regulatory Impact Analysis for the Proposed Carbon Pollution Guidelines for Existing Power Plants and Emission Standards for Modified and Reconstructed Power Plants. https://www.epa.gov/sites/production/files/2014-06/documents/20140602ria-clean-power-plan.pdf.

EXHIBIT 2-3. CPP PROPOSAL COUNTY-LEVEL TOTAL EMISSIONS CHANGES




The CPP Proposal scenario targeted non-ground stationary point sources distributed across the US. Relative to other policy scenarios included in this analysis, the CPP Proposal scenario had the largest total emissions change and includes emissions increases as well as reductions. It is also the only scenario to include ammonia ($NH_3$) emissions changes and one of two scenarios to include changes in emissions of volatile organic compounds (VOCs). Emissions changes occur at locations of large power plants which may either be situated in rural or near highly populated areas. Emissions increases and reductions are distributed across the country.

### 2.1.2 TIER 3

The Tier 3 Emission and Fuel Standards established more stringent vehicle emission standards and reduced the sulfur content of gasoline. It was published in the Federal Register in April 2014 and took effect beginning in 2017.[7] The action took a holistic approach to addressing the impacts of both motor vehicle technologies and their fuels on air quality and public health. This approach enabled emissions reductions that are both technologically feasible and cost effective beyond what would be possible through addressing vehicle and fuel standards in isolation. The Tier 3 vehicle standards reduced tailpipe and evaporative emissions from passenger and some heavy-duty vehicles, and the lower gasoline sulfur standard reduced sulfur dioxide emissions and made vehicular emissions control systems more effective.

[7] Federal Register, Vol. 79 No. 81, Monday, April 28, 2014 https://www.gpo.gov/fdsys/pkg/FR-2014-04-28/pdf/2014-06954.pdf

**EXHIBIT 2-4. TIER 3 COUNTY-LEVEL TOTAL EMISSIONS CHANGES**




The Tier 3 scenario targeted on-road mobile sources that are widely distributed across the US (Exhibit 2-4; blue shading represents an emissions decrease and orange an emissions increase).[8] Emissions changes from this scenario were modeled using an internal regulatory version of MOVES (MOtor Vehicle Emissions Simulator).[9] Relative to other policy scenarios included in this analysis, the Tier 3 scenario was dominated by $NO_X$ emissions reductions, and had VOC emissions reductions that account for a third of total emissions reductions. All emissions reductions in California are solely attributed to VOC changes. Most reductions occur in highly populated areas with a lot of vehicle traffic.

### 2.1.3 CEMENT KILNS

Cement is the binding agent that holds together the ingredients in concrete, a widely used construction material in buildings and roads. Cement is manufactured in kilns, which produce large amounts of carbon dioxide as well as particulate matter, NOx and $SO_2$. This policy scenario was based on a hypothetical policy that substantially reduces emissions from cement kilns. This does not reflect an actual EPA policy, but rather is meant to reflect how a hypothetical reduction in emissions based on available control technology would affect air quality across the US (Exhibit 2-5). This hypothetical scenario assumed uniform emissions reductions from the 2025 emissions baseline that was developed as part of the analysis for the CPP proposal: 40% reduction in baseline

---

[8] US EPA, (2014b) Emissions Modeling Technical Support Document: Tier 3 Motor Vehicle Emission and Fuel Standards, EPA-454/R-14-003.

[9] US EPA, 2014. MOVES and Nonroad Code and Databases Used to Generate Inventories for Air Quality Modeling and National Inventories for the Tier 3 FRM. (EPA-HQ-OAR-2011-0135).

$NO_X$ emissions, 50% reduction in baseline $SO_2$ emissions, and 40% reduction in baseline $prPM_{2.5}$ emissions.

Relative to the CPP Proposal and Tier 3 scenarios, the Cement Kilns scenario focused on smaller emissions reductions, primarily of $NO_X$ and $SO_2$, in diffuse locations across the country. Two thirds of the emissions reductions are attributed to $NO_X$ and one third of the emissions reductions are attributed to $SO_2$. Emissions reductions are focused in industrialized areas of the continental US, particularly the rust belt region, Texas, and the desert Southwest.

EXHIBIT 2-5. CEMENT KILNS COUNTY-LEVEL EMISSIONS CHANGES




### 2.1.4 REFINERIES

The petroleum refining industry performs the process of separating crude oil into a range of petroleum products using physical and chemical separation techniques. Petroleum refineries are a major source of air pollutants, including $prPM_{2.5}$, $NO_X$, carbon monoxide, hydrogen sulfide, and $SO_2$. This policy scenario was based on a hypothetical policy that substantially reduced emissions from refineries. This does not reflect an actual EPA policy, but rather is meant to reflect how a hypothetical reduction in emissions based on available control technology would affect air quality across the US (Exhibit 2-6). This hypothetical scenario assumed uniform emissions reductions from the 2025 emissions baseline that was developed as part of the analysis for the CPP proposal: 40% reduction in baseline $NO_X$ emissions, 15% reduction in baseline $SO_2$ emissions, and 15% reduction in baseline $prPM_{2.5}$ emissions.

The Refineries scenario was quite similar to the Cement Kilns scenario, and focused on smaller emissions reductions, primarily of $NO_X$ and $SO_2$, in diffuse locations across the

country. Two thirds of the emissions reductions were attributed $NO_X$ and one third of the emissions reductions were attributed to $SO_2$. Emissions reductions occur primarily along the Gulf Coast and in low-populated areas of the Midwest.

EXHIBIT 2-6. REFINERIES COUNTY-LEVEL EMISSIONS CHANGES




### 2.1.5 PULP AND PAPER

The Pulp and Paper industry includes companies that process wood into paper and other cellulose-based products. Facilities involved in this process produce emissions of nitrogen dioxide, sulfur dioxide, and carbon dioxide. This analysis examined a hypothetical policy scenario based on available control technology in which $PM_{2.5}$ precursor emissions from Pulp and Paper production facilities were reduced. This does not reflect an actual EPA policy, but rather is meant to reflect how a hypothetical reduction in emissions based on available control technology would affect air quality across the US (Exhibit 2-7). This hypothetical scenario assumed uniform emissions reductions from the 2025 emissions baseline that was developed as part of the analysis for the CPP proposal: 20% reduction in baseline $NO_X$ emissions, 35% reduction in baseline $SO_2$ emissions, and 25% reduction in baseline $prPM_{2.5}$ emissions.

The Pulp and Paper scenario was also similar to the other industrial point source scenarios, and focused on smaller emissions reductions, primarily of $NO_X$ and $SO_2$, in diffuse locations across the country. However, for this scenario, the reductions of $NO_X$ and $SO_2$ each account for about half of the total emissions reductions. Emissions reductions are concentrated in forested areas of the continental US, including the Southeast, northern Midwest, Pacific Northwest, and rural Maine.

EXHIBIT 2-7. PULP AND PAPER COUNTY-LEVEL EMISSIONS CHANGES




## 2.2 FULL-FORM MODELS

For each of the policy scenarios outlined above, we compared reduced-form tool results to full-form BenMAP results calculated by running the future-year baseline and policy emissions scenarios through a full-form chemical transport model and then running the full-form model-generated $PM_{2.5}$ air quality surfaces through BenMAP-CE. We evaluated both CMAQ- and CAMx-based results for each scenario, except for Tier 3, for which only the CMAQ output was available. CAMx modeling was not available for Tier 3 because the chemical speciation used for that scenario do not conform to input requirements for the currently available version of CAMx.

We used the CMAQ BenMAP results as the primary point of comparison for each of the reduced-form tools. However, while full-form models represent the current state-of-the-science, they are themselves representations of actual processes and the results of different full-form models can vary to some degree. For example, they can differ with respect to how they treat secondary $PM_{2.5}$ formation. Therefore, we also compared the CMAQ BenMAP results to CAMx BenMAP results in order to assess the congruence between these two models and better understand the potential limitations of our analysis. Both full-form models produced air quality estimates at a 12 km resolution.

## 2.3 REDUCED-FORM TOOLS

We conducted an extensive literature review to identify reduced-form approaches for predicting policy-related air quality changes and associated benefits.[10] Based on this review, we selected four reduced-form tools for this analysis. All four tools are both publicly available and published in the peer-reviewed scientific literature (Exhibit 2-8).[11] They also comprise a range of complexity, geographic scope, and usability.

### EXHIBIT 2-8. REDUCED-FORM TOOLS

| REDUCED-FORM TOOL | SAMPLE REFERNCE(S) |
|---|---|
| Source Apportionment (SA) BPT | Fann, Baker, & Fulcher, 2012; Fann, Fulcher, & Baker, 2013; United States Environmental Protection Agency, 2013 |
| Air Pollution Emission Experiment and Policy Analysis Model (APX) | Muller & Mendelsohn, 2006 |
| Intervention Model for Air Pollution (InMAP) | Tessum, Hill, et al., 2017 |
| Estimating Air Pollution Social Impacts Using Regression (EASIUR) | Heo et al., 2016 |

We followed two guiding principles when applying these tools in this analysis:

1. Key model inputs should be standardized across reduced-form tools to the extent allowable to ensure that results are as comparable as possible.
2. The underlying model architecture should not be substantially altered so that the results still reflect the unique properties of each reduced-form tool.

Adjustments made to accommodate the first principle typically involved relatively straightforward input changes to each model. For example, because not all models can produce morbidity benefits, we estimated benefits for mortality impacts only. In addition, we standardized the concentration response function and value of statistical life (VSL) applied in each tool or model. The second principle dictated that some differences be preserved in order to avoid substantively changing the model design. For example, the reduced-form tools differed in the $PM_{2.5}$ precursors they modeled (Exhibit 2-9). We did not attempt to standardize that component across models. Additional detail on the models are provided below, as well as specific adjustments made to each model and/or its inputs.

[10] Bankert J, Amend M, Penn S, Roman H, personal communication memorandum, November 17, 2017.

[11] The AP3 model is not yet publicly available but can be obtained by contacting the developer – Nicholas Muller at Carnegie Mellon University. When available, it will be posted at: https://public.tepper.cmu.edu/nmuller/APModel.aspx.

**EXHIBIT 2-9. INPUT AND OUTPUT SPECIES AND GEOGRAPHIC RESOLUTION FOR EACH REDUCED-FORM TOOL**

| TOOL | | INPUTS | GEOGRAPHIC RESOLUTION OF INPUTS AND OUTPUTS | OUTPUTS |
|---|---|---|---|---|
| SA Direct | | $prPM_{2.5}$, $SO_2$, and $NO_x$ emissions | National | $prPM_{2.5}$, $NO_3$, $SO_4$, and Total $PM_{2.5}$ benefits (ultimately applied to emissions deltas) |
| AP3 | Direct | $prPM_{2.5}$, $SO_2$, $NO_x$, $NH_3$, and VOC emissions | US counties | $prPM_{2.5}$, $SO_2$, $NO_x$, $NH_3$, and VOC BPT estimates (ultimately applied to emissions deltas) |
| | BenMAP | $prPM_{2.5}$, $NO_3$, $NH_4$, $SO_4$, SOA, and Total $PM_{2.5}$ concentrations | US counties | $prPM_{2.5}$, $NO_3$, $NH_4$, $SO_4$, SOA, and Total $PM_{2.5}$ benefits |
| AP2 | Direct | $prPM_{2.5}$, $SO_2$, $NO_x$, $NH_3$, and VOC emissions | US counties | $prPM_{2.5}$, $SO_2$, $NO_x$, $NH_3$, and VOC BPT estimates (ultimately applied to emissions deltas) |
| | BenMAP | $prPM_{2.5}$, $NO_3$, $NH_4$, $SO_4$, SOA, and Total $PM_{2.5}$ concentrations | US counties | $prPM_{2.5}$, $NO_3$, $NH_4$, $SO_4$, SOA, and Total $PM_{2.5}$ benefits |
| InMAP BenMAP | | $prPM_{2.5}$, $SO_2$, $NO_x$, $NH_3$, and VOC emissions | 12 km x 12 km grid | $prPM_{2.5}$, $NO_3$, $NH_4$, $SO_4$, SOA, and Total $PM_{2.5}$ benefits |
| EASIUR Direct | | $prPM_{2.5}$, $SO_2$, $NO_x$, and $NH_3$ emissions | 36 km x 36 km grid | $prPM_{2.5}$, $NO_3$, $NH_4$, $SO_4$, and Total $PM_{2.5}$ benefits |

Note: all models were adjusted to use an underlying all-cause mortality concentration-response function for ages 30-99 derived from Krewski et al., 2009. In addition, all benefits were quantified using a VSL of $8.7M in ($2015) derived from a distribution based on 26 value-of-life studies.

### 2.3.1 SA DIRECT

The SA Direct BPTs report the economic value of reducing a ton of directly emitted $PM_{2.5}$ or $PM_{2.5}$ precursor from a given class of area, industrial and mobile sectors. The BPT estimates were originally derived from full-form BenMAP results for sector-specific air quality scenarios that were divided by the total emissions changes underlying the air quality surfaces. EPA has historically calculated BPT estimates across various source sectors to understand different proposed air quality policies.

When using a BPT, one assumes that the key attributes of the policy scenario match the "source" modeling and assumptions (e.g., the policy scenario and source modeling share the same emissions profile, affected population, etc.) (Fann et al., 2012). The SA BPT

values used in this analysis are publicly available.[12] There is one set of BPT values for each sector that are applicable to emissions changes within the contiguous US. Specifically, the SA BPT estimates were calculated using CAMx version 5.30 with Particulate Matter Source Apportionment Technology (PSAT) to trace $PM_{2.5}$ precursor emissions, including directly-emitted $prPM_{2.5}$, $SO_2$, $NO_X$, and volatile organic compounds (VOCs), from individual source sectors in the continental US.

The Fann et al. (2012) BPT reflect emissions levels and facility operation from the 2005 National Emission Inventory. Air quality impacts were estimated using 2005 meteorology input to the CAMx model. The BPT values reflect any deficiencies in the characterization of sources in different sectors as part of the 2005 NEI and may not reflect the more contemporary state of these sectors. It is important that the SA BPT be updated periodically so that estimated results reflect a current realization of facility emissions and locations.

For this analysis, the original Fann et al. (2012) SA BPT values were updated in December 2017. The Fann et al. (2012) BPT values were used with a newer version of BenMAP-CE v. 1.3.7.1, which included updated population, baseline incidence rates, and income growth, in currency year 2015.[13]

SA BPT values described above reflect per-ton benefits related to changes in mortality and morbidity incidence for $prPM_{2.5}$, $NO_X$, and $SO_2$. We applied adjustment factors to the SA BPT values so that they accounted for mortality benefits only. We multiplied these mortality-only SA BPT values by the $NO_X$, $SO_2$, and $PM_{2.5}$ emissions changes associated with each policy scenario to produce national-level results for each scenario. BPT estimates were available for the following source sectors to match our five policy scenarios:

- Electricity generating units (used to estimate the benefits of the CPP Proposal),
- On-road vehicles (used to estimate the benefits of Tier 3),
- Cement kilns (used to estimate the benefits of the Cement Kilns sector-specific policy),
- Refineries (used to estimate the benefits of the Refineries sector-specific policy), and
- Pulp and paper facilities (used to estimate the benefits of the Pulp and Paper sector-specific policy).

[12] US EPA. Technical Support Document: Estimating the benefit per ton of reducing $PM_{2.5}$ precursors from 17 sectors. Retrieved from: https://www.epa.gov/sites/production/files/2018-02/documents/sourceapportionmentbpttsd_2018.pdf

[13] After the December 2017 update of the SA BPT values, IEc discovered an error in baseline mortality rates in the BenMAP-CE version used for the update of these values. This error may result in the overestimation of benefits by less than three percent for aggregate benefits values. This difference is unlikely to alter the relative comparison of SA BPT values to full-form modeling or to other reduced-form tools.

Additional information on the calculation of SA Direct results, including the mortality-only adjustment factors, is included in Appendix A. Relative to other BPT reduced-form tools included in this analysis, the SA BPT values we applied were available for a smaller number of $PM_{2.5}$ precursors and do not contain different values for different emission heights.

### 2.3.2 APX

AP2 and AP3 (elsewhere referred to jointly as APX) are more recent updates of the Air Pollution Emission Experiments and Policy Analysis (APEEP) model.[14] These models are comprised of several scripts that run in the MathWorks program MATLAB and calculate marginal damage-per-ton values, or the social cost of increasing emissions above baseline by one ton. These values can alternatively be viewed as the benefits of avoiding or reducing one ton of emissions and are therefore similar to other BPT estimates. AP2 and AP3 estimate the marginal cost of emissions by quantifying the total health burden and monetized costs associated with a baseline emissions scenario, systematically increasing the baseline emissions by one ton, recalculating the total health burden and monetized costs, and taking the difference between the two estimates. BPT values are generated for five $PM_{2.5}$ precursors (pr$PM_{2.5}$, $SO_2$, $NO_X$, $NH_3$, and VOCs), each county in the contiguous US, and four different stack heights (ground sources, low stacks, medium stacks, and tall stacks).

The APX models can estimate damages from both health-related and non-health-related (e.g., materials damage) impacts associated with changes in emissions and associated changes in air quality. They can also be tailored to estimate costs associated with different combinations of specific impacts under each of those broad categories. For this analysis, we configured the models to quantify only the damages associated with all-cause mortality for ages 30-99 as estimated by the Krewski et al., 2009 concentration-response function. The model VSL estimates were also updated to use a value consistent with the other reduced-form tools we evaluated. Using an approach detailed in the BenMAP-CE user manual (US EPA, 2018), we adjusted the base VSL to account both for inflation and future growth in personal income.

We compared two types of APX results to full-form model results: one generated by applying the APX BPT values to changes in emissions (AP3 Direct and AP2 Direct), and one generated by running the APX-generated air quality surfaces through BenMAP-CE (AP3 BenMAP and AP2 BenMAP). We calculated APX Direct values by multiplying the precursor- and county-specific BPT values for each stack height by the corresponding change in emissions in each county for each policy. For example, if the $SO_2$ low stack height emissions for county 1001 decreased by five tons, the associated benefits were calculated as five times the $SO_2$ low stack height APX BPT value for that county. This

[14] Muller, Nicholas. AP3 (AP2, APEEP) Model. Retrieved from: https://public.tepper.cmu.edu/nmuller/APModel.aspx. Note, currently only the AP2 model is available on this site.

resulted in policy-specific benefits attributed at the county-level based on the change in emissions in that county.

It's also possible to export the underlying county-level air quality surfaces from APX by slightly modifying the model source code. Although this is not a feature of the standard model, this change enabled us to test the reduced-form air quality model element of the APX tools separately from the benefits assessment module. We extracted baseline and control policy scenario air quality surfaces from AP3 and AP2 runs and fed into BenMAP-CE to assess the avoided mortality benefits associated with the change in air quality between the baseline and control scenarios. We refer to these results as "AP3 BenMAP" and "AP2 BenMAP" results, because they represent a hybrid of APX air quality modeling with BenMAP health benefits modeling.

We analyzed both AP2 and AP3 because these two versions of the model use different approaches to quantify the marginal costs of $NO_X$ emissions relative to the baseline. APX is distributed so that users can obtain estimates of benefits to the counties where the *emissions* changes occur whereas the full-form and other BenMAP results link benefits to the counties where *air quality* changes occur. APX was modified to also output where air quality changes occur, and those air quality surfaces were input to BenMAP for more direct comparison to the modeling systems that estimate health impacts where they occur (e.g., InMAP) rather than the county in which the emissions change occurs (e.g., EASIUR). The APX Direct results were included in this analysis because some users may not have the technical expertise to modify the standard APX models to extract the air quality surfaces as well as to understand the magnitude of these potential effects.

Additional detail on the calculation of APX results as well as how the AP2 and AP3 models were modified for this analysis is provided in Appendix A. Relative to other BPT reduced-form tools included in this analysis, the APX Direct model utilizes policy-specific BPT estimates for a larger number of $PM_{2.5}$ precursors as well as different emissions stack heights.

### 2.3.3 INMAP

The InMAP model estimates the annual average primary and secondary $PM_{2.5}$ related to changes in emissions. The modeling system can provide marginal health damages based on source-receptor relationships calculated by the WRF-Chem full-form chemical transport model using 2005 emissions and meteorology.[15] For consistency in comparison with CMAQ and CAMx we applied InMAP version 1.4.1 with emissions and meteorology consistent with each emissions scenario. The Tier 3 simulation used 2007 emissions and meteorology/chemistry/deposition and the other scenarios used 2011 emissions and meteorology/chemistry/deposition.

Inputs to the model include precursor emissions (i.e., $NH_3$, $SO_2$, $prPM_{2.5}$ [not speciated], $NO_X$, and VOCs) as well as 3D annual average meteorology, air quality, and deposition

[15] InMAP Intervention Model for Air Pollution. Retrieved from: http://spatialmodel.com/inmap/

information. Emission inputs include annual gridded surface emissions and point sources that include stack parameter information (e.g., stack height). Inputs are fed into the model as shapefiles and therefore InMAP can be applied with a range of geographic resolutions. For this analysis, we applied the same 12 km grid used by the full-form models to ensure maximum compatibility. Gridded model predictions were later aggregated for comparison to the other tools.

The InMAP model generates air quality surfaces related to the emissions input to the modeling system. The tool passes through population and health incidence data that can be used to estimate health impacts post-model simulation. For this analysis, the air quality surfaces from the model were used as input to BenMAP-CE to ensure consistency across tools for the health impact analysis.

Relative to other air quality reduced-form tools, InMAP required the most computational time to complete each simulation. Additionally, generating new source-receptor relationships to reflect the 2007 and 2011 meteorology and air quality required the application of a prognostic meteorological and photochemical model.

#### 2.3.4 EASIUR DIRECT

EASIUR is a web-based model that calculates the monetized health impacts of emissions changes in the contiguous US.[16] The model consists of multiple sets of BPT estimates that can be applied to annual or seasonal emissions changes for EC, $SO_2$, $NO_X$, and $NH_3$ (20 sets = 4 species x 5 seasons). The elemental carbon BPT was the only $prPM_{2.5}$ BPT provided as part of the tool and was used to estimate benefits associated with any $prPM_{2.5}$ emission species for this analysis. BPT estimates are available at both the 36 km resolution and the county-level resolution. Benefits were estimated with EASIUR version 0.2 at the 36 km resolution and then interpolated to county-level. As with the APX BPT values, the EASIUR BPT values are attributed to the counties with emissions changes rather than the counties in which the mortality effects accrue.

EASIUR's BPT estimates were based on a statistical regression analysis of tagged simulations of 2005 National Emissions Inventory (NEI) emissions run through CAMx with PSAT. Because EASIUR consists of BPT values this reduced-form tool is most comparable to the SA Direct and APX Direct results.[17]

While the EASIUR BPT values were developed using a slightly different VSL and concentration-response function, the authors provide equations that can be used to adjust the standard BPT values to reflect concentration-response and VSL inputs consistent with the other models. For this analysis, we adjusted the standard EASIUR BPT values to

[16] EASIUR: Marginal social costs of emissions in the United States. Retrieved from: https://barney.ce.cmu.edu/~jinhyok/easiur/. We used version 0.2 for this analysis.

[17] A separate reduced-form tool – Air Pollution Social Cost Accounting (APSCA; https://barney.ce.cmu.edu/~jinhyok/apsca/), was released after this study began that estimates air quality related to changes in emissions, but was not used as part of this analysis.

reflect the Krewski et al., 2009 all-cause mortality function for ages 30-99 and the $8.7M VSL estimate.

EPA developed a simple tool to match the BPT for each precursor and grid cell in the 36 km domain with the emissions change in each grid cell of that domain. This was done to efficiently estimate benefits for these complex emissions scenarios that impacted many different grid cells.

Additional detail on the calculation of EASIUR Direct results as well as how to apply the BPT values can be found in Appendix A of this document as well as EASIUR's online User's Guide, respectively.[18]

## 2.4 APPROACH TO BENMAP-CE DERIVED RESULTS

The SA Direct, APX Direct, and EASIUR Direct results all directly quantify the benefits of each air quality policy scenario and can be normalized per ton of emissions. Results for the full-form models as well as the APX BenMAP and InMAP BenMAP reduced-form tools were generated by using the tools/models to create air quality surfaces that were then run through BenMAP-CE. This section provides additional detail on the BenMAP analyses.

BenMAP-CE version 1.5.0.4 was used for all analyses. We ran the baseline and control $PM_{2.5}$ air quality surfaces from each model and scenario through the program to generate the total avoided-mortality-related benefits estimated by each model. To run an analysis in BenMAP-CE the user must select a population dataset, baseline incidence dataset, concentration-response function, and valuation function. For each model run, we relied on datasets from the United States Setup that is pre-loaded in BenMAP-CE (Exhibit 2-10). We ran each BenMAP-CE analysis at the resolution matching each model's air quality surface resolution (i.e., 12 km for the full-form models and InMAP and county-level for APX).

[18] https://barney.ce.cmu.edu/~jinhyok/easiur/EASIUR-Users-Guide-200505-Jinhyok.pdf

EXHIBIT 2-10. BENMAP-CE PARAMETERS BY POLICY

| BENMAP-CE INPUT | 2025 POLICIES: CPP PROPOSAL, CEMENT KILNS, REFINERIES, PULP AND PAPER | 2030 POLICY: TIER 3 |
|---|---|---|
| Population[A] | County-level US Census population estimate for 2025 | County-level US Census population estimate for 2030 |
| Health Incidence[A] | County-level death rates projected to 2025 | County-level death rates projected to 2030 |
| Concentration-Response Relationship[B] | All-cause mortality, ages 30-99 (Krewski et al., 2009) | All-cause mortality, ages 30-99 (Krewski et al., 2009) |
| Valuation[B] | VSL based on 26 value-of-life studies with an inflation adjustment to $2015 and an income growth adjustment to 2025. A 3% discount rate and a 20-year cessation lag was applied to all estimated benefits. | VSL based on 26 value-of-life studies with an inflation adjustment to $2015 and an income growth adjustment to 2026 (the latest value provided in BenMAP-CE). A 3% discount rate and a 20-year cessation lag was applied to all estimated benefits. |
| [A] These population and incidence datasets are also reflected in the SA Direct and APX Direct BPT values. The only model that does not reflect these inputs is the EASIUR Direct reduced-form tool.<br>[B] This is the same concentration-response function and VSL estimate used for all reduced-form tools. | | |

We derived precursor-specific benefits by apportioning the total benefits for each scenario to each $PM_{2.5}$ component based on its fractional contribution to the change in overall $PM_{2.5}$ concentrations. For example, if the change in sulfate concentrations accounted for 70% of the change in total $PM_{2.5}$ concentrations, then 70% of the total benefits would be attributed to sulfate. We summarized total benefits and all component-specific benefits output at the county-level initially and aggregated as necessary for comparison to other tools.

## 2.5 MODEL COMPARISONS

We generated county-level results for each full-form model and reduced-form tool and expressed these in terms of monetized benefits of avoided premature mortality ($2015). Results were compared at the national- and regional-level for $prPM_{2.5}$ (defined as the results attributed to changes in EC emissions only), $NO_3$ (results attributed to changes in $NO_X$ emissions), $SO_4$ (results attributed to changes in $SO_2$ emissions), and $PM_{2.5}$ (results attributed to EC, $NO_X$, and $SO_2$ emissions as well as $NH_3$ and VOC emissions, where applicable).

For comparisons of $PM_{2.5}$ at the national level, we use $prPM_{2.5}$ benefits that have been scaled up to better represent the fraction of $PM_{2.5}$ benefits that would be attributed to total

$prPM_{2.5}$ emissions (EC, crustal and prOC). We scaled the results by multiplying the $prPM_{2.5}$ benefit-per-ton based on EC only by the total amount of primary $PM_{2.5}$ emissions to generate an estimate of impacts for total primary $PM_{2.5}$ emissions. Model comparison at the national-level is limited to an overall comparison of total estimated benefits and ratios of total reduced-form tool benefits to CMAQ-derived benefits.

At the regional-level, we compared full- and reduced-form tool results using a subset of the statistical metrics defined in Exhibit 2-11, which have been published previously in the peer-reviewed literature (Boylan and Russel, 2006 and Simon et al., 2012). Most studies that have employed these metrics have used them to compare observed pollutant concentrations ($O_i$) to modeled results from full-form air quality models ($M_i$), such as CMAQ or CAMx. However, for this analysis, CMAQ BenMAP results took the place of observed pollutant concentrations and are compared to the results of the reduced-form tools. In this context, the relative performance of reduced-form tools compares more closely to the full-form model when bias and error metrics approached zero and when the coefficient of determination approached one.

We focused on the following statistics for this analysis:

- Total estimated benefits
- Mean bias (MB)
- Mean error (ME)
- Normalized mean bias (NMB)
- Normalized mean error (NME)
- Coefficient of determination ($r^2$)

This set of statistics is both widely reported in the literature and is consistent with the recommendations provided in Simon et al. (2012). It was necessary to examine several metrics to comprehensively characterize performance of reduced-form tools because the results of different statistics are not always correlated. For example, not all models with low bias estimates have high coefficient of determination ($r^2$) estimates. Including multiple metrics provided a fuller picture of model differences.

Where this document uses certain bounds to differentiate metrics closer to the predictions made by photochemical grid models (e.g., factor of two), this document does not intend that differentiation to be a threshold indicating “good” or “bad” performance or an indicator of model acceptability for particular assessments.

EXHIBIT 2-11. DEFINITIONS OF PERFORMANCE METRICS (TABLE 2 OF SIMON ET AL., 2012)

| Abbreviation | Term | Definition |
|---|---|---|
| MB | Mean bias | $\frac{1}{N}\sum(M_i - O_i)$ |
| ME | Mean error | $\frac{1}{N}\sum\lvert M_i - O_i\rvert$ |
| NMB | Normalized mean bias | $100\% \times \frac{\sum(M_i - O_i)}{\sum O_i}$ |
| NME | Normalized mean error | $100\% \times \frac{\sum\lvert M_i - O_i\rvert}{\sum O_i}$ |
| $r^2$ | Coefficient of determination | $\left(\frac{\sum_1^N((M_i - \overline{M}) \times (O_i - \overline{O}))}{\sqrt{\sum_1^N(M_i - \overline{M})^2 \sum_1^N(O_i - \overline{O})^2}}\right)$ |

We compared model results at the region-level, where regional results are simply the sum of county results within each of seven NCA areas.[19] As noted above, BPT estimates allocate benefits to the counties where emissions changes occur rather than the counties where air quality changes occur. By aggregating the results to the regional scale, we minimized the distinction between emissions locations and receptor locations caused by emissions transport.

In addition to these quantitative metrics, we also qualitatively compared the strengths and weaknesses of each reduced-form tool as well as the amount of time and level of expertise required to run it.

[19] https://www.epa.gov/cira. A table identifying which states are included in each NCA region is provided in Appendix B.

# Chapter 3 | RESULTS

This chapter presents the results of the comparison between reduced-form tool mortality and valuation estimates and full-form model mortality and valuation estimates. First, for each policy scenario, we compare the total national-level $PM_{2.5}$ benefits calculated by each reduced-form tool against the full-form benefits calculated using the combination of CMAQ and BenMAP-CE. We also examine these results by $PM_{2.5}$ component. We then present region-level results for a subset of the statistics considered in this analysis, focusing on $r^2$ values, normalized mean bias (NMB) and normalized mean error (NME) results for total $PM_{2.5}$ benefits. Finally, we present a qualitative comparison of the level of effort needed to operate each reduced-form tool based on our experience conducting this analysis.

In discussing these results, we focus on distinctions that can be identified across four primary axes:

1. Ability to predict benefits from $PM_{2.5}$ concentrations from all constituent species/precursors versus individual component species/precursors.;
2. How model type affects model performance – highlighting similarities and differences between BPT reduced-form tools (i.e., SA Direct, EASIUR Direct, and APX Direct) and air quality model based reduced-form tool projected concentration changes coupled with BenMAP (i.e., APX BenMAP and InMAP BenMAP);
3. How geographic scale affects model comparisons – national versus region; and
4. How scenario type affects model comparisons.

A table of national-level results for each reduced-form tool as well as all regional statistics are provided in Appendix C.

## 3.1 COMPARISON OF REDUCED-FORM TOOLS AT THE NATIONAL-LEVEL

### 3.1.1 TOTAL BENEFITS

The policies considered in this analysis produce a wide range of benefits estimates, reflecting both the range in emissions control scenarios underlying each policy and the number and location of affected facilities. The benefits estimated for the CPP Proposal were by far the largest among the policies we considered, followed by Tier 3 and the industrial point source scenarios. Nationally aggregated monetized benefits were compared between full-form and reduced-form tools. Predictions of total $PM_{2.5}$ benefits

vary substantially across the policies considered (Exhibit 3-1). For example, there is not a consistent pattern in the reduced-form tool results across policy scenarios (i.e., the relative size of the benefits estimated among the tools was not consistent across the scenarios).

However, some overall patterns are clear. Some reduced-form tools tend to consistently underestimate CMAQ benefits, while others tend to overestimate. In addition, almost all reduced-form tools fail to reproduce the CMAQ $PM_{2.5}$-related benefits estimated for Tier 3.

EXHIBIT 3-1. NATIONAL AVOIDED PREMATURE MORTALITY BENEFITS FROM $PM_{2.5}$ REDUCTIONS, AS ESTIMATED BY REDUCED- AND FULL-FORM TOOLS FOR EACH POLICY SCENARIO (BILLIONS OF 2015$)




Presenting the same results as ratios of CMAQ benefits allows for a clearer depiction of similarities and differences in performance across reduced-form tools (Exhibit 3-2). First, there is significant agreement between the two full-form model-derived benefits. All CAMx-based estimates are within 5% of the CMAQ estimates.[20] In addition, the overall predictions made by these reduced-form tools were often fairly similar, with a few exceptions.

[20] Note that there are no CAMx full-form model results for the Tier 3 policy scenario.

**EXHIBIT 3-2. RATIO OF NATIONAL AVOIDED PREMATURE MORTALITY BENEFITS ESTIMATES COMPARED AGAINST CMAQ ESTIMATES, BY TOOL AND POLICY SCENARIO. ORANGE DOTS REPRESENT RATIOS LESS THAN 1 AND BLUE DOTS RATIOS GREATER THAN 1.**




First, InMAP BenMAP benefits tend to be further from CMAQ benefits, relative to other reduced-form tools. InMAP BenMAP results were between 40-310% higher than the CMAQ BenMAP benefits. In addition, AP3 Direct's performance varied across policies the most with relative bias of the full-form benefits ranging from -10% (Pulp and Paper) to 430% (Tier 3). EASIUR Direct was the most consistent in its performance across policies, underestimating by 30-40% for all scenarios except Tier 3. All other reduced-

form tools produced benefits that were typically within 10-40% of CMAQ benefits (excluding estimates for Tier 3).

Exhibit 3-2 also demonstrates that most of the reduced-form tools tended to consistently over- or underestimate the CMAQ-derived benefits. AP2 BenMAP, AP2 Direct, and EASIUR Direct all underestimate CMAQ benefits except for Tier 3, while SA Direct, AP3 BenMAP, AP3 Direct, and InMAP BenMAP all overestimate CMAQ results to varying degrees. There is no apparent consistent difference between the performance of BPT reduced-form tools and the reduced-form air quality tools coupled with BenMAP, i.e., one type of model does not tend to over- or underestimate CMAQ benefits.

The APX models perform more similarly based on the version of the model (AP2 versus AP3) rather than the approach used to generate the benefits estimates (Direct versus BenMAP). The AP2 results across all policy scenarios are remarkably similar. Likewise, the AP3 results across policy scenarios show a consistent pattern, although the AP3 Direct results tend to overestimate CMAQ benefits by a larger amount.

Of all the models, AP3 BenMAP and AP3 Direct estimates of health benefits are within 10% of CMAQ benefits estimates for more scenarios (3: CPP Proposal, Cement Kilns, and Pulp and Paper) than any of the other reduced form tools. SA Direct, AP2 BenMAP and AP2 Direct each perform within 10% of CMAQ estimates for a single scenario.

Showing the same comparison by policy scenario makes it easier to compare how reduced-form tools performed for specific types of policies. Exhibit 3-3 highlights how each reduced-form tool poorly replicated CMAQ-based estimates for the Tier 3 policy. The SA Direct and EASIUR Direct reduced-form tools perform best with this scenario, but even those models overestimate CMAQ benefits by 60% and 30%, respectively.

In general, the point source scenarios with non-ground-level emissions showed much better agreement with CMAQ-based estimates across reduced-form tools. The two policies that resulted in the best alignment between CMAQ results and reduced-form tool results were the CPP Proposal and Pulp and Paper scenarios. For the CPP Proposal scenario, the reduced-form tools produced benefits within 10-30% of CMAQ (except for InMAP BenMAP, which overestimates by 200%). This is particularly interesting given that the CPP Proposal has the largest emissions change of any policy scenario considered, and it is the only policy scenario that includes both emissions *increases* as well as emissions *reductions*. For Pulp and Paper, all reduced-form tools, including InMAP BenMAP, produced benefits within 10-40% of CMAQ benefits. This scenario has the second lowest amount of emissions reductions relative to the other scenarios and, along with the CPP Proposal, is one of the two scenarios where $NO_X$ and $SO_2$ emissions reductions are relatively equal.

EXHIBIT 3-3. RATIO OF NATIONAL AVOIDED PREMATURE MORTALITY BENEFITS ESTIMATES COMPARED AGAINST CMAQ ESTIMATES, BY POLICY SCENARIO. ORANGE DOTS REPRESENT RATIOS LESS THAN 1 AND BLUE DOTS RATIOS GREATER THAN 1.




### 3.1.2 BENEFITS BY PRECURSOR

Separating total $PM_{2.5}$ benefits into the fraction contributed by $prPM_{2.5}$, sulfate, and nitrate allows us to examine how well each reduced-form tool predicts these individual components (Exhibit 3-4). It also reveals how much of the results for total $PM_{2.5}$ are due to potentially offsetting errors. Tools that perform similarly for individual precursors as well as total $PM_{2.5}$ are more likely to have predictable performance for additional policy scenarios.

## EXHIBIT 3-4. RATIO OF REDUCED-FORM TO FULL-FORM NATIONAL AVOIDED PREMATURE MORTALITY BENEFITS BY $PM_{2.5}$ SPECIES FOR EACH MODEL AND POLICY SCENARIO

### PRIMARY $PM_{2.5}$ (EC ONLY):



### SULFATE:


SO4
CAMx BenMAP
SA Direct
AP2 BenMAP
AP2 Direct
AP3 BenMAP
AP3 Direct
InMAP BenMAP
EASIUR Direct
CPP Proposal
Tier 3
Cement Kilns
Pulp and Paper
Refineries
0
1
2
3
4
5
6
7
8
9
10
National Benefits Ratio vs. CMAQ

**NITRATE[21]:**




Again, we see that CAMx-derived benefits are in close agreement with CMAQ-derived benefits. The differences at the component level are slightly larger than for total $PM_{2.5}$. However, CAMx benefits for each component across all policy scenarios are less than 20% different than those predicted by CMAQ.

Across components, we see that reduced-form tools generally perform better for $prPM_{2.5}$ and sulfate than for nitrate. The tools produced estimates of $prPM_{2.5}$ that fell within a factor of two of CMAQ in all cases. Results for sulfate were also within a factor of two of the CMAQ-based estimates, with the exceptions of APX for Tier 3 (ratios ranging from 2.5 to 4.4) and EASIUR Direct for refineries (ratio of 0.4).

Comparisons to CMAQ results showed poor agreement for nitrate for most models with only SA Direct and EASIUR Direct having estimates within a factor of two of the CMAQ estimates for all scenarios. The other models all overestimated CMAQ estimates by at

[21] Note the 0.0 nitrate value for the Pulp and Paper scenario for AP3 BenMAP is actually a ratio of 0.049, representing an ~95% underestimation.

least a factor of three for at least one scenario. InMAP BenMAP overestimated CMAQ nitrate by a factor of 9.5 for the refineries scenario. AP3 BenMAP had both large underestimates and large overestimates of nitrate benefits compared to CMAQ.

Many of the largest exceedances for both sulfate and nitrate are associated with the Tier 3 scenario (although for sulfate this effect is limited to the APX models). However, for nitrate, we see that the Refineries scenario also generates large differences between CMAQ and reduced-form tools.

All reduced-form tools consistently overestimate nitrate, except AP3 BenMAP, which has both large overestimates and underestimates depending on the policy scenario. Consistent with total $PM_{2.5}$, we see that some of the largest differences from CMAQ-based benefits are exhibited by InMAP BenMAP and AP3 Direct, which means the nitrate component of those models is driving the total $PM_{2.5}$ results. However, AP3 Direct also produces estimates that agree most closely to CMAQ results for $prPM_{2.5}$ and sulfate for several scenarios.

Comparing species-specific results can illuminate whether total $PM_{2.5}$ performance is masking compensating errors. The SA Direct model consistently produces overestimates of CMAQ benefits for all PM components as well as for total $PM_{2.5}$. Similarly, InMAP BenMAP consistently overestimates CMAQ benefits for both total $PM_{2.5}$ as well as for each component of $PM_{2.5}$. In contrast, EASIUR Direct underestimates total $PM_{2.5}$, $prPM_{2.5}$ and sulfate, but overestimates nitrate.

The APX models perform consistently by model version at the component level. AP2 underestimates total $PM_{2.5}$, $prPM_{2.5}$ and sulfate, but overestimates nitrate whether applied directly or in combination with BenMAP. AP3 produces consistently better matches to CMAQ than AP2 for both total $PM_{2.5}$ and sulfate, with slight overestimates in some cases, but it consistently produces greater bias than AP2 when estimating nitrate. This effect is somewhat mitigated by coupling AP3 with BenMAP but can also lead to underestimates of nitrate.

Finally, comparing across policies, we see that Tier 3 continues to result in the greatest variance against CMAQ at the component level, and Refineries also produced relatively wide variances for nitrate. The CPP Proposal and Pulp and Paper scenarios continue to result in some of the closest reduced-form tool/CMAQ comparisons.

## 3.2 REGIONAL RESULTS

Using results at the region-level we can generate comparison statistics for each reduced-form tool to quantitatively compare their performance relative to CMAQ. For this comparison, we focus on the $r^2$, NMB, and NME statistics calculated with total $PM_{2.5}$-related avoided mortality benefits at the region-level. We provide additional statistics results in Appendix C.

### 3.2.1 $R^2$ VALUES

The $r^2$ values describe the proportion of the variance in CMAQ benefits across regions that can be predicted by the variance of reduced-form tool benefits (Exhibit 3-5). Reduced-form tool performance improves as $r^2$ values approach one.

EXHIBIT 3-5. COMPARISON BETWEEN REDUCED-FORM AND FULL-FORM MODEL BENEFITS ESTIMATES AT REGIONAL SCALE, $R^2$




Comparing AP2 BenMAP and AP3 BenMAP, AP2 BenMAP performs slightly better on this metric on average and performs significantly better for the Tier 3 scenario. In contrast, InMAP has the lowest $r^2$ values of any of the reduced-form models coupled with BenMAP. CAMx and CMAQ were highly correlated for the point source-based emissions scenarios. AP3 BenMAP performed better for the point source-based scenarios compared to the mobile scenario while InMAP BenMAP performed best for the mobile scenario.

### 3.2.2 NORMALIZED MEAN BIAS (NMB)

NMB estimates summarize total regional differences in reduced-form tool benefits and CMAQ benefits as a percentage of total CMAQ benefits (Exhibit 3-6). These values vary between -100% and positive infinity, and performance improves as values approach zero.

The AP2 BenMAP estimates tended to be slightly lower than CMAQ for the point source scenarios while AP3 BenMAP estimates tended to be slightly higher than CMAQ. The InMAP BenMAP predictions were generally higher than CMAQ estimated benefits. Both APX and InMAP BenMAP had the highest error related to the Tier 3 scenario. The CAMx model predicted benefits were very similar to CMAQ for the point source-based scenarios.

EXHIBIT 3-6. NORMALIZED MEAN BIAS OF REGIONAL ESTIMATES BY MODEL, COMPARED AGAINST CMAQ ESTIMATES



### 3.2.3 NORMALIZED MEAN ERROR (NME)

Like NMB, NME estimates also summarize total regional differences in reduced-form tool benefits and CMAQ benefits as a percentage of total CMAQ benefits (Exhibit 3-7). However, for NME, it is the absolute value of regional differences that is used; thus, NME emphasizes accuracy independent of direction. NME values vary between zero and positive infinity, and performance improves as values approach zero.

**EXHIBIT 3-7. NORMALIZED MEAN ERROR OF REGIONAL ESTIMATES BY MODEL, COMPARED AGAINST CMAQ ESTIMATES**




The metrics for NME were similar to the NMB results for each of these modeling systems and emissions scenarios. CAMx BenMAP, AP2 BenMAP, and AP2 BenMAP performed very consistently against CMAQ BenMAP for the point source-based scenarios while the Tier 3 mobile scenario had notably worse performance for the reduced form tools.

### 3.3 REDUCED-FORM TOOL COMPLEXITY AND LEVEL OF EFFORT

Each of the reduced-form tools considered in this analysis required a different level of analytical and technical skill to produce benefits estimates. While running these tools, we maintained a log of the amount of time each tool took to use, whether specific pre- or post-processing steps were required, what software programs were needed to execute the analyses, and other descriptive factors (Exhibit 3-8).

SA Direct has the lowest time requirements and does not require any special skills or software programs. EASIUR Direct also has low time requirements and only involves the use of Excel, or similar software. If BenMAP-CE is used in conjunction with air quality estimated by a reduce form tool (rather than allowing the reduced form tool to calculate benefits directly), this increases the time requirement and degree of knowledge required for BenMAP-CE application. All APX models require both MATLAB expertise and a MATLAB license but, for AP2 and AP3 Direct results, have a more moderate time requirement. Finally, InMAP requires knowledge of the GO programming language and has a relatively high level of effort.

### EXHIBIT 3-8. LEVEL OF EFFORT REQUIRED TO USE EACH REDUCED-FORM TOOL

| TOOL | TOOL FORMAT | PRE-PROCESSING REQUIREMENTS | POST-PROCESSING REQUIREMENTS | TIME REQUIREMENTS[1] | SPECIAL SKILLS / SOFTWARE REQURED |
|---|---|---|---|---|---|
| SA Direct | Table of nationally-applicable BPT values that can be applied to policy-specific emissions changes. | Acquire and format emissions data. Depending on the endpoints of interest, the raw BPT values may need to be adjusted to consider mortality or morbidity impacts alone. | N/A | Low | N/A |
| AP2 Direct and AP3 Direct | AP2 and AP3 are MATLAB-based programs and require a license for that software program. | Acquire and format emissions, population, and mortality rate data. Adjust APX code to include desired impacts in BPT values. | Multiply the model-generated county- and precursor-specific BPT values by corresponding emissions deltas for each source type. | Medium | MATLAB |
| AP2 BenMAP and AP3 BenMAP | AP2 and AP3 are MATLAB-based programs and require a license for that software program. BenMAP is an open-source software program available for download on EPA's website. | Acquire and format emissions data. Modify APX code to output air quality concentrations. Run APX to obtain air quality surfaces and format surfaces into BenMAP-ready inputs. | Run APX-generated air quality surfaces through BenMAP. | High | MATLAB and BenMAP-CE; Must modify MATLAB code. |
| InMAP BenMAP | InMAP is an open-source program written in the GO programming language available for download from the InMAP GitHub repository. BenMAP is an open-source software program available for download on EPA's website. | Acquire and format emissions data. Develop annual average meteorology, chemistry, and deposition information. Run InMAP to obtain air quality surfaces and format surfaces into BenMAP ready inputs. | Run InMAP-generated air quality surfaces through BenMAP. | High | GO programming language and BenMAP-CE |
| EASIUR Direct | 16 pollutant- and season-specific BPT arrays that can be applied to policy-specific emissions changes. | Acquire and format emissions data. EASIUR provides a web tool that can be used to help format emissions data. | Multiply the pollutant- and season-specific 36 km BPT values by corresponding emissions deltas for each season. | Low | N/A; some familiarity with GIS or spatial analysis for formatting emissions data would be helpful. |

[1] "Low" indicates 1-5 hours, "Medium" indicates 5-10 hours, "High" indicates 10+ hours required to perform a model run for one policy scenario. Full-form models are known to be time- and resource-intensive. None of the reduced-form tools are as time- and resource-intensive as running a full-form model.

# Chapter 4 | DISCUSSION

The objective of this analysis was to demonstrate a systematic comparison of the monetized health benefits estimated using reduced-form tools for air quality health benefits assessment against those generated using full-form air quality and health modeling approaches. The goal was to identify the primary drivers for observed differences in model results and the conditions under which different reduced-form tools might be expected to provide similar estimates as the full-form approach.

The results presented in Chapter 3 allow us to make several important observations about this set of reduced-form tools and their potential utility in Regulatory Impact Analyses (RIAs). We also briefly discuss the similarities and differences between the two full-form models (CAMx and CMAQ). It is important to note that this document sometimes nominally uses a factor of two to differentiate performance metrics more similar to the photochemical grid model prediction but the factor of two delineation is not a measure of acceptability for any particular type of assessment.

## 4.1 COMPARISON OF FULL-FORM AIR QUALITY MODELS

Across all comparators examined in this analysis, CMAQ and CAMx produce very similar estimates of both total $PM_{2.5}$ benefits and benefits related to specific components of $PM_{2.5}$. They are also in agreement on the spatial distribution of those benefits at the region-level. This finding, which was consistent across all policies for which both results were available, is important to validate our approach for evaluating the reduced-form tools.

EPA uses both CMAQ and CAMx to perform full-form health benefits analyses for RIAs. Based on the similarity between benefits estimates from these two models, we can have confidence that the performance of reduced-form tools relative to CMAQ estimates would also hold if CAMx were the full-form model being used. In addition, it gives us confidence that there are no issues unique to CMAQ that could skew the performance of the reduced-form tools. Knowing that the full-form air quality models agree gives us more confidence that we are not introducing significant uncertainty into our analysis of reduced-form tools by relying on a single model as our sole comparator.

## 4.2 OVERALL REDUCED-FORM TOOL PERFORMANCE FOR $PM_{2.5}$ AND ITS COMPONENTS

The results presented in Chapter 3 allow us to draw important conclusions about each reduced-form tool's ability to replicate CMAQ benefits for the policies considered. Using

those results, we can begin to identify which reduced-form tools may be more or less suitable for particular policy analyses.

Overall, we find that the InMAP BenMAP model matched least well with CMAQ's predictions. For the specific scenarios we evaluated, it consistently overestimated CMAQ benefits and was also one of the more complicated reduced-form tools to use.

In contrast, the SA Direct and EASIUR Direct models require the lowest level of effort across reduced-form tools and produce some of the most similar estimates to CMAQ at the national level. These models were the only ones that produced comparable results for the Tier 3 policy. Furthermore, they demonstrated consistent performance for total $PM_{2.5}$ and its components, which indicates that they would perform in a similarly reliable way for air quality policies beyond those considered in this analysis. EASIUR Direct also did a reasonable job capturing variation in benefits across large regions of the US (0.88 $r^2$ value on average). They key differences between these two models were in direction of bias, with SA Direct tending to overestimate and EASIUR tending to underestimate CMAQ results, and in performance for sector-specific policies, where SA Direct tended to be slightly closer to the CMAQ estimates.

A drawback of these reduced-form tools (SA Direct, EASIUR Direct, and APX Direct) is their inability to provide geographically-specific estimates of where benefits occur, primarily because they are BPT tools that assign benefits to locations with emissions changes rather than air quality changes. Thus, they cannot provide fine-scale insight into the locations or populations that might be most affected by a policy, nor can they be used to break impacts out by locations with differing $PM_{2.5}$ levels. In addition, EASIUR Direct results displayed a consistent downward bias of 30 to 40% compared to CMAQ, with the exception of the Tier 3 analysis.

The other BPT tools considered in this analysis, AP2 Direct and AP3 Direct, did not produce a similar level of consistent performance as SA Direct and EASIUR Direct. While AP2 Direct and AP3 Direct generate BPT estimates specific to a set of baseline emissions, this different emissions baseline implemented in AP2 and AP3 does not appear to result in better performance for the set of policies considered in this analysis, owing primarily to differences related to estimation and processing of nitrate results. We found that AP3 Direct improves on AP2's performance with respect to modeling EC and sulfate $PM_{2.5}$ components, producing values quite similar to CMAQ. In addition, APX requires proprietary software (i.e., MATLAB) and a significant level of technical expertise.

The remaining reduced-form tools are the AP2 BenMAP and AP3 BenMAP models that we adapted for this analysis. Both models replicate CMAQ benefits relatively well, with the newer version of the model, AP3, comparing slightly better across the statistics considered in this analysis. In addition, of all the reduced-form tools, AP3 BenMAP produced several estimates of total $PM_{2.5}$ that were within <10% of CMAQ estimates. Furthermore, because AP3 BenMAP provides an air quality surface, it can provide insight into the locations and populations that might be most affected by a policy. Given the

relatively high $r^2$ estimates for this model at the region-level, this combination of tools provides promising evidence that a reduced-form tool could perform well matching the distribution of full-form benefits at smaller spatial scales, though additional analysis would be required to confirm this.

The primary drawback of the AP3 BenMAP model is its complexity. It is complex to run and requires proprietary software (i.e., MATLAB). In addition, it produces somewhat inconsistent nitrate results, which may make it harder to predict how this model would perform for policies that include large changes in $NO_x$ emissions.

As a final note, while we saw a high degree of consistency between AP2 Direct and AP2 BenMAP, we saw slightly less consistency between AP3 Direct and AP3 BenMAP. Based on our examinations of the AP3 model, we believe this is attributable to how the AP3 model addresses the nitrate component of $PM_{2.5}$. As noted in the methods section, AP2 and AP3 estimate the marginal cost of emissions by quantifying the total health burden and monetized costs associated with a baseline emissions scenario, systematically increasing the baseline emissions by one ton, recalculating the total health burden and monetized costs, and taking the difference between the two estimates. In the AP2 model, the chemical transformation of $NO_X$ emissions into nitrate is calculated the same way in both the baseline and marginal estimates. However, the AP3 model uses slightly different approaches for the baseline and marginal cases. This results in a portion of the difference between the baseline and marginal benefits estimates being attributable to nitrate calculation rather than an actual difference in effect. We believe this is a contributor to the larger degree of overestimation observed for the AP3 Direct model, particularly for the Tier 3 scenario, which is dominated by changes in $NO_X$ emissions.

## 4.3 PERFORMANCE ACROSS DIFFERENT AIR QUALITY POLICIES

It is important to understand how particular aspects of the air quality policies examined in this analysis may have contributed to reduced-form tool performance in order to understand how well the reduced-form tools might perform for other policies. We saw that relative performance across reduced-form tools in general was best for the CPP Proposal and Pulp and Paper scenarios and worst for the Tier 3, and to a lesser extent, the Refineries scenarios.

Based on the emission changes associated with these scenarios, we think the primary driver of this difference in performance is attributable to the reduced-form tools' ability to predict the nitrate component of $PM_{2.5}$ and its effects. The Tier 3 and Refineries scenarios have the highest fraction of emissions changes that are attributable to nitrate (64% and 67%, respectively). In contrast, the CPP Proposal and Pulp and Paper scenarios have the lowest fraction of emissions changes that are attributable to nitrate (49% for both).

However, it is possible that the exceptionally poor performance for Tier 3 may be attributable to more than just nitrate predictions. The Refineries scenario has a larger fraction of $NO_X$ emissions, but is associated with better performance than the Tier 3

scenario. Thus, the fact that the Tier 3 scenario is exclusively comprised of ground-level emissions may be a secondary contributing factor, as may the use of a different base year emissions inventory (2005) than the other policies. Additional investigation or model runs would be required to determine this definitively. Regardless, the reduced-form tools considered in this analysis should be applied with caution to policies with large changes in $NO_X$ emissions.

Finally, some of the policies affected ammonia and VOC emissions, yet only some reduced-form tools had the ability to account for those precursors. The photochemical grid models account for these changes and so do some of the reduced-form tools (see Exhibit 2-9). Overall, the impact of these precursors was small compared to $SO_2$, $NO_X$, and primary $PM_{2.5}$ changes for the emission scenarios examined here. Given the complexities in SOA formation from anthropogenic VOC and challenges in the underlying science related to SOA formation it is not expected that these tools would be comparable for VOC impacts on $PM_{2.5}$ concentrations; however, the limited data from this study does not enable us to test this hypothesis.

## 4.4 LIMITATIONS OF THE ANALYSIS

While this analysis provides a representative snapshot of reduced-form tool performance across a range of potential policy scenarios, there are several limitations and important caveats worth describing. While the policies that were analyzed to demonstrate the abilities of each reduced-form tool compared with full-form model results are a thorough subset of policy types, ranging from mobile sources to industrial point sources to EGUs, it is not an exhaustive or fully representative set of policies. Furthermore, when subdivided by policy type, it only includes one mobile source policy (Tier 3), one EGU policy (CPP Proposal), and three sector-specific policies which each apply uniform emissions reductions. This limited sample size makes it difficult to draw conclusive opinions about reduced-form tool performance for any particular type of policy scenario. In addition, this set of policies is not representative of all potential policy scenarios that may be analyzed by these tools in the future. Other policies could vary from those we evaluated in the size, timing, and distribution of emissions changes across both time and PM precursors. Therefore, future users should carefully consider the specific characteristics of a policy before deciding whether a specific reduced-form tool is or is not a good fit for estimating benefits.

A second limitation relates to the lack of CAMx-based full-form estimates for the Tier 3 scenario. We are confident in the congruence of the CMAQ and CAMx results for the four scenarios for which we have data from both models. The results of those comparisons suggest that treatment of key precursors for $PM_{2.5}$ would also be consistent across other scenarios, and that using CMAQ as our single full-form comparator does not introduce significant uncertainty into our analysis. However, this conclusion would be stronger if we were able to review Tier 3 data from both models; especially since Tier 3 is the only scenario comprised of exclusively ground-level emissions sources. As a result,

our ability to draw conclusions about the large variances observed between the reduced-form tool and full-form benefits estimates associated with the Tier 3 scenario is limited.

As noted in the methods section, we calculate statistics related to each reduced-form tool as compared to CMAQ, but do not establish strict model performance thresholds. We have instead sought to provide a picture of performance across a range of metrics that measure different aspects of performance relevant to the use of these models in a policy assessment context.

In addition, the present analysis does not attempt to identify and quantify potential sources of uncertainty within each of the model types. Previous studies have identified some of these sources, which include uncertainty in the VSL estimate and the slope of the mortality concentration-response relationship (Holland et al., 2016a; Holland et al., 2016b). While these sources of uncertainty are common across the reduced- and full-form models (since they use the same values for these parameters), there may be additional sources of uncertainty that are unique to each reduced-form tool, including the source-receptor relationship between precursor emissions and ambient pollutant concentrations, policy impacts on emissions, the emissions inventory, and others. Without characterizing uncertainty, we can only compare point estimates and therefore cannot evaluate whether differences in reduced-form tool estimates are statistically different from full-form model results for any of the policy scenarios analyzed.

Finally, some of the reduced-form tools, such as EASIUR Direct, InMAP, and AP3 are relatively new (or in the case of AP3 a recent iteration on an existing model). In addition, the models are periodically updated; our observations are only accurate with respect to the versions of the reduced-form tools we tested.

The use of EC to represent the impacts of all primarily emitted $PM_{2.5}$ may not always reflect the impacts of a particular scenario in situations where the speciation of primary $PM_{2.5}$ emissions varies geographically or in relative amount of the total primary $PM_{2.5}$ such that the components of $PM_{2.5}$ differentially impact particular downwind populated areas.

Despite these limitations, this analysis provides useful initial insights into the agreement of multiple reduced-form tool estimates with full-form results for a broad array of policy scenarios. Furthermore, our analysis of individual $PM_{2.5}$ component benefit estimates allows us to provide insights into what specific aspects of the reduced-form tools may be driving overall performance differences across the scenarios. As a result, this analysis provides valuable information on how these models can best be utilized in the policy assessment context.

# Chapter 5 | CONCLUSION

## 5.1 RECOMMENDATIONS FOR CONTINUED EVALUATION OF REDUCED-FORM TOOLS

Based on the results of this analysis, we believe there continues to be value in evaluating how reduced-form tools compare to full-form air quality model estimates in emission reduction scenarios. Some of the reduced-form tools considered in this analysis produced results that were reasonably comparable at the national level to national level results derived from less refined full-form models and offer a quicker approach to generating ballpark estimates of the health-related benefits or costs associated with an air quality policy. In particular, the SA Direct and EASIUR Direct models are easy to use and produce estimates of national $PM_{2.5}$ benefits that match those generated by full-form models relatively well. Some reduced-form tools produced estimates that were extremely close to CMAQ estimates at the national level, but they were not able to do so uniformly across policy scenarios, nor at finer spatial scales.

## 5.2 FUTURE RESEARCH

This analysis comparing reduced-form tools has identified several areas for future research. We examined a small number of policy scenarios in our analysis; performing similar analyses for a broader range of scenarios would help to clarify the nature of the differences between reduced-form tools. Additional analyses could incorporate comparison of these reduced-form tools for an expanded set of policy types, including non-road mobile sources like aircraft and marine vessels, area sources, iron and steel facilities, residential wood combustion, and others. Expanding the set of policy scenarios included in the analysis may help to provide further detail on the relative differences between reduced- and full-form approaches, as well as advance understanding about which reduced-form tool(s) may be more or less appropriate for specific policy types or emissions source sectors.

The Tier 3 scenario was notable for the high bias of the reduced-form tools when compared against CMAQ results. Not only did models that performed relatively well for other scenarios perform much more poorly for Tier 3, some models that appeared to systematically underestimate results across all other scenarios overestimated results for Tier 3. As noted above, while it appears that this difficulty matching CMAQ relates at least in part to the higher proportion of nitrate-related impacts in Tier 3, other factors may be at play as well. It may be worth investigating how these tools compare for a more recent mobile source scenario that has input files compatible with contemporary photochemical model formulations (e.g., gas phase chemical mechanism).

In our analysis we saw differences in how the tools performed at different geographical scales and locations. Future research to examine if there are consistent biases in particular locations would be useful. For AP2 and AP3, additional detail in the model documentation would help users to determine when and how the models should be calibrated for a particular policy scenario, or if there are particular scenarios for which the models may not be suitable.

The accuracy of a reduced form tool depends very heavily on the air quality modeling that underlies it. The extent that the air quality modeling can be updated and improved over time may enable improved benefits estimates that better compare with full form model results. Further, the source-receptor relationships in these tools may need periodic updates to reflect contemporary emission inventories and representation of chemistry. Additional work to understand how these models improve when underlying assumptions are adjusted to better reflect current conditions or expected future conditions would be useful when prioritizing model development and understanding circumstances where certain tools may be more or less informative.

# REFERENCES

Fann, N., Baker, K. R., & Fulcher, C. M. (2012). Characterizing the PM(2).(5)-related health benefits of emission reductions for 17 industrial, area and mobile emission sectors across the U.S. *Environ Int, 49*, 141-151. doi:10.1016/j.envint.2012.08.017

Fann, N., Fulcher, C. M., & Baker, K. (2013). The recent and future health burden of air pollution apportioned across U.S. sectors. *Environ Sci Technol, 47*(8), 3580-3589. doi:10.1021/es304831q

Heo, J., Adams, P., & Gao, H. (2016). Reduced-form modeling of public health impacts of inorganic $PM_{2.5}$ and precursor emissions. *Atmospheric Environment, 137*, 80-89. doi:10.1016/j.atmosenv.2016.04.026

Holland, S. P., Mansur, E. T., Muller, N. Z., & Yates, A. J. (2016a). Are There Environmental Benefits from Driving Electric Vehicles? The Importance of Local Factors. *American Economic Review, 106*(12), 3700-3729. doi:10.1257/aer.20150897

Holland, S. P., Mansur, E. T., Muller, N. Z., & Yates, A. J. (2016b). Damages and Expected Deaths Due to Excess NOx Emissions from 2009 to 2015 Volkswagen Diesel Vehicles. *Environ Sci Technol, 50*(3), 1111-1117. doi:10.1021/acs.est.5b05190

Muller, N., & Mendelsohn, R. (2006). The air pollution emission and policy analysis model (APEEP): Technical appendix. New Haven, CT.

Simon, H. Baker, K.R. & Phillips, S. (2012). Compilation and interpretation of photochemical model performance statistics published between 2006 and 2012. *Atmospheric Environment*, 61, 124-139.

Tessum, C. W., Hill, J. D., & Marshall, J. D. (2017). InMAP: A model for air pollution interventions. *PLoS One, 12*(4), e0176131. doi:10.1371/journal.pone.0176131

US EPA. (2011a). Regulatory Impact Analysis for the Final Mercury and Air Toxics Standards. Research Triangle Park, NC, Office of Air Quality Planning and Standards. US Environmental Protection Agency. December 2011. EPA-452/R-11-011. Available at: https://www3.epa.gov/ttnecas1/regdata/RIAs/matsriafinal.pdf.

US EPA. (2011b). Regulatory Impact Analysis for the Federal Implementation Plans to Reduce Interstate Transport of Fine Particulate Matter and Ozone in 27 States; Correction of SIP Approvals for 22 States. Research Triangle Park, NC, Office of Air and Radiation. US Environmental Protection Agency. June 2011. Available at: https://www.epa.gov/sites/production/files/2017-07/documents/epa-hq-oar-2009-0491-4547.pdf.

US EPA. (2018). Environmental Benefits Mapping and Analysis Program – Community Edition (BenMAP) User's Manual. Research Triangle Park, NC, Office of Air Quality Planning and Standards. US Environmental Protection Agency. July 2018. Available at: https://www.epa.gov/sites/production/files/2015-04/documents/benmap-ce_user_manual_march_2015.pdf

# APPENDIX A | DETAILED REDUCED-FORM TOOL METHODS

This Appendix describes in detail the approach used to run the different reduced form tools we used in this analysis. Detailed input, configuration, and output files from these approaches were provided separately to EPA (https://github.com/epa-kpc/RFMEVAL) and are available upon request.

## A1. AP3 METHODS

The AP3 reduced-form tool was designed for and runs in the MathWorks program MATLAB, which is required to run the AP3 model. The model is composed of 20 individual script files and two data files that operate together to estimate pollutant- and county-specific BPT estimates for each of four emissions source types. To facilitate the use of the 2014 AP3 model as part of this project, several of the original scripts were modified to enable the import and export of data. Exhibit A-1 below provides a brief description of the calculations that occur in each script, and identifies where scripts were modified by IEc. The scripts run in the following order; several scripts are called more than once throughout the program:

PM_CRDM_Marginal.m

- Emissions_Import.m
- PM_Setup.m
- Population.m
- PM_Base_Conc.m
    - Nitrate_Sulfate_Ammonium.m
    - PM_25_Base_Raw.m
    - PM_25_Health_Base.m
- Mortality.m
    - Area_Sources.m
        - Area_Reset.m
        - Nitrate_Sulfate_Ammonium_Marginal_New.m (for $NO_X$ only)
        - Nitrate_Sulfate_Ammonium.m (for all other pollutants)
        - PM_25_Health.m

Low_Stacks.m

Area_Reset.m

Low_Reset.m

Nitrate_Sulfate_Ammonium_Marginal_New.m (for $NO_X$ only)

Nitrate_Sulfate_Ammonium.m (for all other pollutants)

PM_25_Health.m

Medium_Stacks.m

Med_Reset.m

Nitrate_Sulfate_Ammonium_Marginal_New.m (for $NO_X$ only)

Nitrate_Sulfate_Ammonium.m (for all other pollutants)

PM_25_Health.m

Tall_Stacks.m

Med_Reset.m

Tall_Reset.m

Nitrate_Sulfate_Ammonium_Marginal_New.m (for $NO_X$ only)

Nitrate_Sulfate_Ammonium.m (for all other pollutants)

PM_25_Health.m

Damages.m

#### EXHIBIT A-1. AP3 MODEL SCRIPTS

| AP3 MODEL SCRIPTS | |
|---|---|
| PM_CRDM_Marginal | This is the master script that runs all other components of the AP3 model. |
| Emissions_Import | This script was created by IEc and allows the user to update the area, low stack, medium stack, tall stack and new tall stack emissions stored in the two .mat files that the AP3 model calls. |
| PM_Setup | This script initializes a series of output matrices and is where the value per statistical life is set. It also includes a set of hard coded calibration factors for each precursor that are used in converting emissions into concentrations. These calibration factors are different between AP2 and AP3. |
| Population | This script creates a set of matrices that store different population data (e.g., total population or population over 30). |

| AP3 MODEL SCRIPTS | |
|---|---|
| PM_Base_Conc | This script translates the raw precursor pollutant emissions into their $PM_{2.5}$ components and then calculates total $PM_{2.5}$ concentrations. |
| Nitrate_Sulfate_Ammonium | This script is run is several places throughout the model and is used to capture the secondary transformation of precursor pollutants into $PM_{2.5}$. |
| PM_25_Base_Raw | This script calculates and stores the baseline $PM_{2.5}$ concentration. |
| PM_25_Health_Base | This script calculates the estimated number of health impacts, and their cost, associated with the baseline quantity of precursor emissions. |
| Mortality | This script runs the “Area_Sources”, “Low_Stacks”, “Medium_Stacks”, and “Tall_Stacks” scripts that incrementally adjust the baseline emissions and calculate the marginal change in health impacts. |
| Area_Sources, Low_Stacks, Medium_Stacks, and Tall_Stacks | These scripts loop over each precursor pollutant and each county, incrementally adjusting the baseline emissions by 1 ton and calculating the marginal change in health impacts. This marginal change becomes the county- and pollutant- specific BPT value for each source type. |
| Area_Reset, Low_Reset, Med_Reset, and Tall_Reset | These scripts re-calculate the precursor pollutant concentrations from the baseline emissions for each source type. |
| Nitrate_Sulfate_Ammonium _Marginal_New | This script is run is several places throughout the model and is used to capture the secondary transformation of precursor pollutants into $PM_{2.5}$. This script is only run for marginal changes in NOx emissions. |
| PM_25_Health | This script calculates the estimated number of health impacts, and their cost, associated with the incrementally adjusted precursor emissions. |
| Damages | This script combines the BPT values into a set of output matrices. This code was modified by IEc to export these results to an Excel file. |

In addition to the model scripts described above, the AP3 model also includes two .mat data files: one including data associated with the area and low stack sources (“2014_PM_Worksheet_Area_Low_Western_Adj.mat”) and the other including data for the medium and tall stack sources (“2014_PM_Worksheet_Med_Tall_Western_ Adj.mat”). Both of these files also contain the population and incidence rate data utilized by the model[22]. Prior to running the model, the data stored in these files need to be updated with values that are specific to the policy scenario being analyzed. The next few

[22] As distributed, these data represent 2014.

sections provide instructions for updating the .mat files, describe the outputs generated by the AP3 model, and outline how the AP3 BPT values are used to estimate benefits.

### A.1.1 AP3 MODEL INPUTS

For this project, two types of AP3 results were compared to full-form model results: one generated from applying the AP3 BPT values to changes in emissions, and one generated by running the AP3 air quality surfaces through BenMAP. Note that the AP3 BPT values are generated by running the baseline scenario emissions through the model. The control emissions are only run to obtain the air quality surfaces needed to generate the second set of results. Therefore, when doing model runs using control emissions, the code can be stopped after running "PM_Base_Conc.m." To run AP3 for a new policy scenario, the following steps should be followed. These steps are necessary to ensure that all of the model inputs are consistent with the policy scenario being analyzed.

1. Emissions file preparation[23]:
   a. Save each source type's emissions as individual .csv files.
   b. The first column should contain county FIPS codes and columns 2-8 should contain pollutant-specific emissions in tons [$NH_3$, $NO_X$, $PM_{10}$, $PM_{2.5}$, $SO_2$, VOC (anthropogenic origin), and VOC (biologic origin)].
   c. The FIPS order and included FIPS must match each source type's AP3 source/receptor matrix.
   d. No headers should be included.
2. Population data preparation
   a. The population data occupies a 3,109x19 matrix in AP3. The data should contain population totals for the following age groups for each of the 3,109 counties included in A3: 0TO0, 1TO4, 5TO9, 10TO14, 15TO19, 20TO24, 25TO34, 30TO34, 35TO39, 40TO44, 45TO49, 50TO54, 55TO59, 60TO64, 65TO69, 70TO74, 75TO79, 80TO84, 85TOUP.
   b. The FIPS order and included FIPS must match AP3's FIPs order.
3. Mortality data preparation
   a. The mortality data occupies a 3,109x19 matrix in AP3. The data should contain all-cause mortality rates for the following age groups for each of the 3,109 counties included in A3: 0TO0, 1TO4, 5TO9, 10TO14, 15TO19,

[23] Three of the five source receptor matrices include transport coefficients for the total quantity of emissions generated in a particular county in the contiguous United States. However, the tall stack and new tall stack source types have source-specific values. As such, factors are only available for a subset of counties. For this project, any tall stack emissions generated in a county not included in either the tall stack or new tall stack matrices were combined with the medium stack county-level emissions. Furthermore, the tall stack and new tall stack matrices contain coefficients for multiple point sources in some counties. Because the scenario emissions could not be linked to these specific sources, they were divided evenly among the different point sources.

20TO24, 25TO34, 30TO34, 35TO39, 40TO44, 45TO49, 50TO54, 55TO59, 60TO64, 65TO69, 70TO74, 75TO79, 80TO84, 85TOUP.

b. The FIPS order and included FIPS must match AP3's FIPs order.

4. Updates to script code and data files:

   a. Load the scenario-specific population data into cell reference "Mortality{6,1}" in both AP3 .mat files and save.

   b. Load the scenario-specific all-cause mortality rates into cell reference "Mortality{3,1}" in both AP3 .mat files and save.

   c. Update the load file references in "Emissions_Import.m", "PM_Setup.m", "PM_Base_Conc.m", "Area_Sources.m", and "Medium_Stacks.m".

   d. Update "Emissions_Import.m" with the .csv file names for the scenario-specific emissions files for each source type.

   e. Update "PM_Setup.m" with the scenario-specific value of statistical life.

### A.1.2 AP3 MODEL OUTPUTS

Four files are directly output of the AP3 scripts as modified by IEc:

1. A .mat file called "AP3 BPT Estimates" containing the source-specific BPT values for each county and precursor pollutant. The columns correspond to: $NH_3$, $NO_X$, $PM_{10}$, $PM_{2.5}$, $SO_2$, VOC (anthropogenic origin), and VOC (biologic origin). By default this file will be saved in the same directory as the AP3 scripts.
2. An Excel spreadsheet called "AP3 BPT Estimates" containing the source-specific BPT values for each county and precursor pollutant. The columns correspond to: $NH_3$, $NO_X$, $PM_{10}$, $PM_{2.5}$, $SO_2$, VOC (anthropogenic origin), and VOC (biologic origin). By default this file will be saved in the same directory as the AP3 scripts.
3. An Excel spreadsheet called "Total $PM_{2.5}$ Concentrations" containing the estimated $PM_{2.5}$ values for each county. By default this file will be saved in the same directory as the AP3 .mat files.
4. An Excel spreadsheet called "Speciated $PM_{2.5}$" containing the speciated $PM_{2.5}$ concentrations for each precursor pollutant and county. The columns correspond to: $NO_3$, $SO_4$, $PM_{2.5}$ primary, VOC (anthropogenic origin, VOC (biologic origin), and $NH_4$. By default this file will be saved in the same directory as the AP3 .mat files.

To facilitate future use of these output files, FIPS codes and column headers are added to each of the spreadsheets outside of MATLAB.

#### A.1.3 CALCULATING AP3-DIRECT BENEFITS

AP3-Direct benefits for each scenario are calculated by multiplying the precursor- and county-specific BPT values for each source type by the corresponding change in emissions.[24] For example, if the $NH_3$ low stack height emissions for county 1001 decreased by five tons, the associated benefits would be five times the $NH_3$ low stack height BPT value. The total benefits associated with each scenario are then simply the sum of all of these individual calculations. This makes it possible to analyze how the benefits are distributed across the different precursor pollutants, counties, and source types. For the purposes of this analysis, a three percent discount rate was applied to all benefits estimates. All tools use the same discount rate and cessation lag structure.

Because the reduced-form tools were developed at different times, the counties included in each model are slightly different, reflecting changes to counties in the US over time. To ensure consistency when comparing results from different models the following adjustments were made to AP3 direct model results:

1. Results from FIPS code 12025 were re-assigned to FIPS code 12086.
2. Results from FIPS code 51560 were combined with those from FIPS code 51005.

#### A.1.4 CALCULATING AP3-BENMAP BENEFITS

As noted above, the air quality surfaces generated in AP3 were also run through BenMAP for a separate point of comparison. Please refer to the appendix section A3 covering BenMAP methods for a detailed description of how those analyses were performed.

### A.2 AP2 METHODS

The AP2 reduced-form tool was designed for and runs in the MathWorks program MATLAB, and that program is required to run the AP2 model. The model is composed of 19 individual script files and two data files that operate together to estimate pollutant- and county-specific BPT estimates for each of four emissions source types. To facilitate the use of the 2011 AP2 model as part of this project, several of the original scripts were modified to enable the import and export of data. Exhibit A-2 below provides a brief description of the calculations that occur in each script, and identifies where scripts were modified by IEc. The scripts run in the following order; several scripts are called more than once throughout the program:

PM_CRDM_Marginal.m

Emissions_Import.m

[24] For the tall stack counties where multiple BPT values were available, a single BPT value was used to calculate the tall stack benefits. The different BPT estimates were often less than 1% different from each other so the use of a single value did not significantly impact results.

PM_Setup.m

Population.m

PM_Base_Conc.m

- Ammonium_Excess.m
- PM_25_Base_Raw.m
- PM_25_Health_Base.m

Mortality.m

- Area_Sources.m
  - Area_Reset.m
  - Ammonium_Excess.m
  - PM_25_Health.m
- Low_Stacks.m
  - Area_Reset.m
  - Low_Reset.m
  - Ammonium_Excess.m
  - PM_25_Health.m
- Medium_Stacks.m
  - Med_Reset.m
  - Ammonium_Excess.m
  - PM_25_Health.m
- Tall_Stacks.m
  - Med_Reset.m
  - Tall_Reset.m
  - Ammonium_Excess.m
  - PM_25_Health.m

Damages.m

**EXHIBIT A-2. AP2 MODEL SCRIPTS**

| AP2 MODEL SCRIPTS | |
|---|---|
| PM_CRDM_Marginal | This is the master script that runs all other components of the AP2 model. |

| AP2 MODEL SCRIPTS | |
|---|---|
| Emissions_Import | This script was created by IEc and allows the user to update the area, low stack, medium stack, tall stack and new tall stack emissions stored in the two .mat files that the AP2 model calls. |
| PM_Setup | This script initializes a series of output matrices and is where the value per statistical life is set. |
| Population | This script creates a set of matrices that store different population data (e.g., total population or population over 30). |
| PM_Base_Conc | This script translates the raw precursor pollutant emissions into their $PM_{2.5}$ components and then calculates total $PM_{2.5}$ concentrations. It also includes a set of hard coded calibration factors for each precursor that are used in converting emissions into concentrations. These calibration factors are different between AP2 and AP3. |
| Ammonium_Excess | This script is run is several places throughout the model and is used to capture the secondary transformation of precursor pollutants into $PM_{2.5}$. |
| PM_25_Base_Raw | This script calculates and stores the baseline $PM_{2.5}$ concentration. |
| PM_25_Health_Base and | This script calculates the estimated number of health impacts, and their cost, associated with the baseline quantity of precursor emissions. |
| Mortality | This script runs the “Area_Sources”, “Low_Stacks”, “Medium_Stacks”, and “Tall_Stacks” scripts that incrementally adjust the baseline emissions and calculate the marginal change in health impacts. |
| Area_Sources, Low_Stacks, Medium_Stacks, and Tall_Stacks | These scripts loop over each precursor pollutant and each county, incrementally adjusting the baseline emissions by 1 ton and calculating the marginal change in health impacts. This marginal change becomes the county- and pollutant- specific BPT value for each source type. |
| Area_Reset, Low_Reset, Med_Reset, and Tall_Reset | These scripts re-calculate the precursor pollutant concentrations from the baseline emissions for each source type. |
| PM_25_Health | This script calculates the estimated number of health impacts, and their cost, associated with the incrementally adjusted precursor emissions. |
| Damages | This script combines the BPT values into a set of output matrices. This code was modified by IEc to export these results to an Excel file. |

In addition to the model scripts described above, the AP2 model also includes two .mat data files: one including data associated with the area and low stack sources (“2011_PM_Worksheet_Area_Low_Western_Adj.mat”) and the other including data for the medium and tall stack sources (“2011_PM_Worksheet_Med_Tall_Western_

Adj.mat"). Both of these files also contain the population and incidence rate data utilized by the model.[25] Prior to running the model, the data stored in these files need to be updated with values that are specific to the policy scenario being analyzed. The next few sections provide instructions for updating the .mat files, describe the outputs generated by the AP2 model, and outline how the AP2 BPT values are used to estimate benefits.

### A.2.1 AP2 MODEL INPUTS

For this project, two types of AP2 results were compared to full-form model results: one generated from applying the AP2 BPT values to changes in emissions, and one generated by running the AP2 air quality surfaces through BenMAP. Note that the AP2 BPT values are generated by running the baseline scenario emissions through the model. The control emissions are only run to obtain the air quality surfaces needed to generate the second set of results. Therefore, when doing model runs using control emissions, the code can be stopped after running "PM_Base_Conc.m." To run AP2 for a new policy scenario, the following steps should be followed. These steps are necessary to ensure that all of the model inputs are consistent with the policy scenario being analyzed.

1. Emissions file preparation[26]:
   a. Save each source type's emissions as individual .csv files.
   b. The first column should contain county FIPS codes and columns 2-8 should contain pollutant-specific emissions in tons [$NH_3$, $NO_X$, $PM_{10}$, $PM_{2.5}$, $SO_2$, VOC (anthropogenic origin), and VOC (biologic origin)].
   c. The FIPS order and included FIPS must match each source type's AP2 source/receptor matrix.
   d. No headers should be included.
2. Population data preparation
   a. The population data occupies a 3,109x19 matrix in AP2. The data should contain population totals for the following age groups for each of the 3,109 counties included in A2: 0TO0, 1TO4, 5TO9, 10TO14, 15TO19, 20TO24, 25TO34, 30TO34, 35TO39, 40TO44, 45TO49, 50TO54, 55TO59, 60TO64, 65TO69, 70TO74, 75TO79, 80TO84, 85TOUP.

---

[25] In the un-modified version of the model, these data will be from 2011.

[26] Three of the five source receptor matrices include transport coefficients for the total quantity of emissions generated in a particular county in the contiguous United States. However, the tall stack and new tall stack source types have source-specific values. As such, factors are only available for a subset of counties. For this project, any tall stack emissions generated in a county not included in either the tall stack or new tall stack matrices were combined with the medium stack county-level emissions. Furthermore, the tall stack and new tall stack matrices contain coefficients for multiple point sources in some counties. Because the scenario emissions could not be linked to these specific sources, they were divided evenly among the different point sources.

b. The FIPS order and included FIPS must match AP2's FIPs order.

3. Mortality data preparation

   a. The mortality data occupies a 3,109x19 matrix in AP2. The data should contain all-cause mortality rates for the following age groups for each of the 3,109 counties included in A3: 0TO0, 1TO4, 5TO9, 10TO14, 15TO19, 20TO24, 25TO34, 30TO34, 35TO39, 40TO44, 45TO49, 50TO54, 55TO59, 60TO64, 65TO69, 70TO74, 75TO79, 80TO84, 85TOUP.

   b. The FIPS order and included FIPS must match AP2's FIPs order.

4. Updates to script code and data files:

   a. Load the scenario-specific population data into cell reference "Mortality{6,1}" in both AP2 .mat files and save.

   b. Load the scenario-specific all-cause mortality rates into cell reference "Mortality{3,1}" in both AP2 .mat files and save.

   c. Update the load file references in "Emissions_Import.m", "PM_Setup.m", "PM_Base_Conc.m", "Area_Sources.m", and "Medium_Stacks.m".

   d. Update "Emissions_Import.m" with the .csv file names for the scenario-specific emissions files for each source type.

   e. Update "PM_Setup.m" with the scenario-specific value of statistical life.

### A.2.2 AP2 MODEL OUTPUTS

Four files are directly output of the AP2 scripts as modified by IEc:

1. A .mat file called "AP2 BPT Estimates" containing the source-specific BPT values for each county and precursor pollutant. The columns correspond to: $NH_3$, $NO_X$, $PM_{10}$, $PM_{2.5}$, $SO_2$, VOC (anthropogenic origin), and VOC (biologic origin). By default this file will be saved in the same directory as the AP2 scripts.

2. An Excel spreadsheet called "AP2 BPT Estimates" containing the source-specific BPT values for each county and precursor pollutant. The columns correspond to: $NH_3$, $NO_X$, $PM_{10}$, $PM_{2.5}$, $SO_2$, VOC (anthropogenic origin), and VOC (biologic origin). By default this file will be saved in the same directory as the AP2 scripts.

3. An Excel spreadsheet called "Total $PM_{2.5}$ Concentrations" containing the estimated $PM_{2.5}$ values for each county. By default this file will be saved in the same directory as the AP2 .mat files.

4. An Excel spreadsheet called "Speciated $PM_{2.5}$" containing the speciated $PM_{2.5}$ concentrations for each precursor pollutant and county. The columns correspond to: $NO_3$, $SO_4$, $PM_{2.5}$ primary, VOC (anthropogenic origin, and VOC (biologic origin). By default this file will be saved in the same directory as the AP2 .mat files.

To facilitate future use of these output files, FIPS codes and column headers are added to each of the spreadsheets outside of MATLAB.

### A.2.3 CALCULATING AP2-DIRECT BENEFITS

AP2 direct benefits for each scenario are calculated by multiplying the precursor- and county-specific BPT values for each source type by the corresponding change in emissions.[27] For example, if the $NH_3$ low stack height emissions for county 1001 decreased by five tons, the associated benefits would be five times the $NH_3$ low stack height BPT value. The total benefits associated with each scenario are then simply the sum of all of these individual calculations. This makes it possible to analyze how the benefits are distributed across the different precursor pollutants, counties, and source types. For the purposes of this analysis, a three percent discount rate was applied to all benefits estimates.

Because the reduced-form tools were developed at different times, the counties included in each model are slightly different, reflecting changes to counties in the US over time. To ensure consistency when comparing results from different models the following adjustments were made to AP2 direct model results:

1. Results from FIPS code 12025 were re-assigned to FIPS code 12086.
2. Results from FIPS code 51560 were combined with those from FIPS code 51005.

### A.2.4 CALCULATING AP2-BENMAP BENEFITS

As noted above, the air quality surfaces generated in AP2 were also run through BenMAP for a separate point of comparison. Please refer to the appendix section A3 covering BenMAP methods for a detailed description of how those analyses were performed.

## A3. SOURCE APPORTIONMENT BENEFIT PER TON METHODS

The steps below describe the process for applying the source apportionment benefit-per-ton (SA BPT) values to emissions changes in tons for five different policy scenarios – Clean Power Plan Proposal, Tier 3, Cement Kilns, Pulp and Paper, and Refineries – to obtain the SA Direct results discussed in this report.

[27] For the tall stack counties where multiple BPT values were available, a single BPT value was used to calculate the tall stack benefits. The different BPT estimates were often less than 1% different from each other so the use of a single value did not significantly impact results.

The methodology for the SA BPT development was originally published by EPA in a Technical Support Document (TSD) in 2013[28] and updated in a February 2018 TSD.[29] The values represent estimates of the average avoided human health impacts, and monetized benefits related to emissions of $prPM_{2.5}$, $NO_x$ and $SO_2$ from 17 sectors using the results of source apportionment photochemical modeling. In our analysis we used BPT values for 5 of these 17 sectors: cement kilns, electricity generating units (CPP Proposal), on-road mobile sources (Tier 3), pulp and paper facilities, and refineries.

In the 2018 TSD, these values are presented as the total dollar value (mortality and morbidity) per ton of $prPM_{2.5}$, $NO_x$, and $SO_{2.}$ According to the TSD, "These values represent a national average $/ton of total emissions for each sector; the $/ton for a given location (e.g. state or county) may be higher or lower than the value reported here. Estimates do not capture important differences in marginal $/ton that may exist due to different combinations of reductions (i.e., all other sectors are held constant) or nonlinearities within a particular pollutant."[30] EPA produces BPT estimates for each precursor using two mortality estimates from Krewski et al. (2009) and Lepeule et al. (2012) both paired with a 3% and 7% discount rate. In our analysis we use only the BPT values for Krewski et al. (2009) and the 3% discount rate.

To calculate the SA Direct values in this report, we multiplied the Krewski 3% SA BPT values for 2025 (all scenarios except Tier 3) and 2030 (for the Tier 3 scenario) by emissions reduction amounts in tons for each of the five policy scenarios. Since the SA BPT values represent total dollar value for both mortality and morbidity, we applied adjustment factors to isolate mortality-only benefits (Exhibit A-3).

### EXHIBIT A-3. SA DIRECT MORTALITY-ONLY ADJUSTMENT FACTORS

| POLICY | ADJUSTMENT FACTOR |
|---|---|
| EGU | 0.973 |
| On-Road | 0.972 |
| Cement | 0.977 |
| Pulp & Paper | 0.973 |
| Refineries | 0.971 |

We performed these calculations using county-level emissions change data to obtain SA Direct benefits estimates at the county level, and summed these to produce nation-level

[28] Technical Support Document - Estimating the Benefit per Ton of Reducing PM2.5 Precursors from 17 Sectors. January 2013. Accessed at: https://www.epa.gov/sites/production/files/2014-10/documents/sourceapportionmentbpttsd.pdf

[29] Technical Support Document - Estimating the Benefit per Ton of Reducing PM2.5 Precursors from 17 Sectors. February 2018. Accessed at: https://www.epa.gov/sites/production/files/2018-02/documents/sourceapportionmentbpttsd_2018.pdf:

[30] Technical Support Document - Estimating the Benefit per Ton of Reducing PM2.5 Precursors from 17 Sectors. February 2018. Accessed at: https://www.epa.gov/sites/production/files/2018-02/documents/sourceapportionmentbpttsd_2018.pdf

estimates. Since SA BPT values exist only for $prPM_{2.5}$[31], $NO_x$, and $SO_2$, we summed the benefits for these three precursors to get a SA Direct benefits estimates for Total $PM_{2.5}$.

## A4. [MODEL] BENMAP METHODS

BenMAP-CE version 1.5.0.4 was used to generate health benefits estimates for both the full-form models as well as several reduced-form tools. This section describes in greater detail the steps used to convert air quality concentration changes into changes in mortality incidence for those models. For CMAQ, CAMx, and InMAP, benefits were estimated at the 12 km grid level and then aggregated to the county- and national-level. For AP2 and AP3, benefits were estimated at the county-level and aggregated to the national-level. Total $PM_{2.5}$ benefits for each model were generated using the approach outlined in Chapter 2. Total benefits were apportioned to each precursor ($prPM_{2.5}$ represented by EC only, $NO_3$, and $SO_4$) based on its contribution to the total $PM_{2.5}$ air quality delta. We performed the analysis using Excel, and we describe the specific steps of this process for each model in greater detail below.

### A.4.1. FULL-FORM MODELS AND INMAP

For the CMAQ and CAMx full-form models, and the InMAP reduced-form tool, we used air quality data provided by EPA at the 12 km level and the 12 km total $PM_{2.5}$ benefits produced by BenMAP-CE for each policy scenario. The precursors of interest for this analysis were EC, total sulfate, and total nitrate. We calculated benefits for each precursor at the county- and national-level as follows:

1. Calculating air quality deltas: for total $PM_{2.5}$, $prPM_{2.5}$, $SO_4$, and $NO_3$, we subtracted the control air quality concentrations from the baseline.
2. Calculating delta percent: we also calculated the percent that each precursor delta contributes to the total $PM_{2.5}$ delta for each grid cell by dividing the precursor-specific delta by the total $PM_{2.5}$ delta. Due to rounding in the air quality concentrations, we encountered instances where total $PM_{2.5}$ did not have an air quality change, but some precursors in the same grid cell did. In these instances, we assigned all precursors 0 deltas as well.
3. Apportioning total benefits[32]: we multiplied the precursor delta percentages by the total $PM_{2.5}$ benefits for each grid cell. Note, air quality data were available at the 12 km grid level (which extended beyond the contiguous US boundary) while total $PM_{2.5}$ benefits were calculated for the 12 km clipped grid definition in BenMAP-CE (which only contains all 12 km grid cells with population data).

---

[31] The prPM2.5 values represent emissions from elemental carbon (EC) only.

[32] Total $PM_{2.5}$ benefits included contributions from OC and Crustal. Therefore, total benefits were also allocated to those precursors and then later subtracted out of total $PM_{2.5}$ benefits. Such that total $PM_{2.5}$ benefits ultimately only reflected the contribution of EC.

Thus, only 47,800 grid cells with air quality data have corresponding benefits estimates.

4. Converting 12 km benefits to county level: we used the 12 km clipped to US county crosswalk from BenMAP-CE to aggregate the 12 km results to the county-level. This crosswalk identifies the fraction of each 12 km grid cell's population which falls within the different counties it intersects. We multiplied this percent by the 12 km benefits to apportion the benefits to the appropriate county/counties. We encountered 3 issues with this step.

    a. During this analysis, we identified four grid cells that contain population data (and therefore should contain total $PM_{2.5}$ benefits) that are missing from BenMAP-CE's 12 km clipped grid definition. Thus, the total $PM_{2.5}$ benefits dataset inadvertently excludes any benefits that would have been calculated for these grid cells. However, the total population in these grid cells was only 68 individuals so this exclusion does not have a significant impact on the final results.

    b. There are also three 12 km clipped grid cells which have total $PM_{2.5}$ benefits, but which are excluded from the 12 km to county crosswalk.[33] These results are also excluded from the analysis, but do not have a significant impact on the final results.

    c. Finally, for 12 km grid cells that intersected multiple counties, the factions in the crosswalk did not always sum to exactly 100%. Therefore, a small percentage (less than .001%) of benefits from these grid cells was not carried through to the county-level.

5. Standardizing county designations: Because the reduced-form tools were developed at different times, the counties included in each model are slightly different, reflecting changes to counties in the US over time. To ensure consistency when comparing results from different models, the following adjustments were made to the county-level results:

    a. Benefits from county 08014 were added to those from 08013.

6. Applying a cessation lag adjustment with a 3% discount rate: all county results were multiplied by an adjustment factor to address how reductions in the incidence of monetized health benefits accrue over time, which is termed the "cessation lag". The adjustment factor we applied, 0.90605998, reflects a 20-year distributed lag structure commonly employed by EPA that assumes 30% of the benefits accrue in the first year, 50% accrue evenly over years two through five,

[33] These three grid cells are located in the Florida Keys and their exclusion seems to be related to a misalignment between the national and county borders.

and the remaining 20% accrue evenly over the remaining years.[34] The adjustment factor also discounts the value of this stream of benefits to account for the time value of money, using a discount rate of 3%.

7. Calculating national-level benefits: we summed the county-level benefits to calculate the national results.

### A.4.2. APX BENMAP

For the AP2 and AP3 BenMAP reduced-form tools, we generated air quality data at the county level and exported it from the model. We combined these data with county-level total $PM_{2.5}$ benefits produced by BenMAP-CE for each policy scenario. The precursors of interest for this analysis were EC, $SO_4$, and $NO_3$. We calculated benefits for each precursor at the county- and national-level as follows:

1. Calculating air quality deltas: for total $PM_{2.5}$, $prPM_{2.5}$, $SO_4$, $NO_3$ we subtracted the control air quality concentrations from the baseline.
2. Calculating delta percent: we also calculated the percent that each precursor delta contributes to the total $PM_{2.5}$ delta for each grid cell by dividing the precursor-specific delta by the total $PM_{2.5}$ delta. There were two exceptions to this:
    a. The counties with FIPs codes 12025 and 51560 in the APX outputs do not have identical matches in the BenMAP-CE county grid definition. These counties were matched with benefits from counties 12086 and 51005, which are the counties that correspond to the same geographic locations in the more recent county grid definition used by BenMAP-CE.
    b. We summed the total $PM_{2.5}$ delta of the old and new FIPs for each pair and divided the precursor-specific deltas by the sum.
3. Apportioning total benefits[35]: we multiplied the precursor delta percentages by the total $PM_{2.5}$ benefits for each grid cell.
4. Standardizing county designations: Because the county differences between APX and BenMAP were already addressed earlier in the process, no other county adjustments were required at this stage.
5. Applying a cessation lag adjustment with a 3% discount rate: all county results were multiplied by the cessation lag and discounting adjustment factor of 0.90605998, as described above for full-form models and INMAP.

---

[34] See, for example, Chapter 5 of EPA's 2012 Regulatory Impact Analysis for the most recently promulgated National Ambient Air Quality Standard (NAAQS) for PM2.5. https://www3.epa.gov/ttn/ecas/docs/ria/naaqs-pm_ria_final_2012-12.pdf

[35] Total $PM_{2.5}$ benefits included contributions from OC and Crustal. Therefore, total benefits were also allocated to those precursors and then later subtracted out of total $PM_{2.5}$ benefits. Such that total $PM_{2.5}$ benefits ultimately only reflected the contribution of EC.

6. Calculating national-level benefits: we summed the county-level benefits to calculate the national results.

## A5. EASIUR DIRECT METHODS

For the EASIUR Direct reduced-form tool, EPA provided speciated benefits results at the 36 km grid level for each policy scenario. Benefits were provided for $prPM_{2.5}$ (represented by EC only), $SO_4$, $NO_3$, and $NH_3$. We summed the benefits for $prPM_{2.5}$, $SO_4$, $NO_3$, and $NH_3$ to calculate total $PM_{2.5}$ benefits. The precursors of interest for this analysis were $prPM_{2.5}$, $SO_4$, and $NO_3$. We calculated benefits at the county- and national-level as follows:

1. Converting 36 km benefits to county level: We used the 36 km to US county crosswalk from BenMAP-CE to aggregate the 36 km results to the county-level. The crosswalk identifies the fraction of the 36 km grid cell's population which falls within the different counties it intersects. We multiplied this percent by the 36 km benefits to apportion the benefits to the appropriate county/counties. We encountered one issue with this step.
    a. The 36 km to US county crosswalk excludes grid cells that do not contain population. However, the EASIUR Direct benefits were not calculated using BenMAP-CE. Therefore, EASIUR generated benefits in 173 36 km grid cells that were not included in the BenMAP-CE crosswalk. The grid cells missing varied by policy scenario. Thus, these results are excluded from the county-level EASIUR Direct results. These results average 0.05% of total benefits across the scenarios.
2. Standardizing county designations: Because the reduced-form tools were developed at different times, the counties included in each model are slightly different, reflecting changes to counties in the US over time. To ensure consistency when comparing results from different models, the following adjustments were made to the county-level results:
    a. Benefits from county 08014 were added to those from 08013.
3. Applying a cessation lag adjustment with a 3% discount rate: all county results were multiplied by the cessation lag and discounting adjustment factor of 0.90605998, as described above for full-form models and INMAP.
4. Calculating national-level benefits: since the county-level results excluded some of the 36 km benefits due to a crosswalk issue, we calculated the national-level benefits using the 36 km level benefits. These results are thus slightly larger than they would be if the county-level results were simply summed.
    a. Using ArcGIS, we clipped the 36 km grid to the contiguous US boundary.

b. Using this grid, we identified the 36 km level benefits within the contiguous US.

c. We summed those 36 km benefits by precursor to calculate the national-level benefits.

d. These national results were also multiplied by the same cessation lag and discounting adjustment factor of 0.90605998 that we applied to the other model results.

# APPENDIX B | STATES IN EACH NCA REGION IN THE CONTINENTAL US

### EXHIBIT B-1. STATES IN EACH NCA REGION IN THE CONTINENTAL US

| NCA REGION | STATES |
|---|---|
| Midwest | Arkansas |
| | Illinois |
| | Indiana |
| | Iowa |
| | Kansas |
| | Kentucky |
| | Michigan |
| | Minnesota |
| | Missouri |
| | Nebraska |
| | North Dakota |
| | Ohio |
| | Oklahoma |
| | Pennsylvania |
| | South Dakota |
| | Tennessee |
| | West Virginia |
| | Wisconsin |
| Northeast | Connecticut |
| | Delaware |
| | District of Columbia |
| | Kentucky |
| | Maine |
| | Maryland |
| | Massachusetts |
| | New Hampshire |
| | New Jersey |
| | New York |
| | Pennsylvania |
| | Rhode Island |
| | Vermont |
| | Virginia |
| | West Virginia |

| NCA REGION | STATES |
|---|---|
| Northern Great Plains | Colorado |
| | Idaho |
| | Kansas |
| | Montana |
| | Nebraska |
| | North Dakota |
| | South Dakota |
| | Utah |
| | Wyoming |
| Northwest | California |
| | Idaho |
| | Nevada |
| | Oregon |
| | Utah |
| | Washington |
| Southeast | Alabama |
| | Arkansas |
| | Florida |
| | Georgia |
| | Kentucky |
| | Louisiana |
| | Mississippi |
| | North Carolina |
| | Oklahoma |
| | South Carolina |
| | Tennessee |
| | Texas |
| | Virginia |
| Southern Great Plains | Colorado |
| | Kansas |
| | New Mexico |
| | Oklahoma |
| | Texas |
| Southwest | Arizona |
| | California |
| | Colorado |
| | Nevada |
| | New Mexico |
| | Utah |

# APPENDIX C | NATIONAL BENEFITS AND MODEL STATISTICS

EXHIBIT C-1. SCALED NATIONAL BENEFITS BY POLICY AND $PM_{2.5}$ COMPONENT (MILLIONS). NOTE THAT TOTAL PM2.5 IS NOT ALWAYS THE SUM OF NITRATE, SULFATE, AND PRIMARY BENEFITS BECAUSE SOME TOOLS AND SCENARIOS HAD NON-ZERO BENEFITS RELATED TO SECONDARY PM2.5 FORMATION FROM AMMONIA AND/OR VOC.

| POLICY SCENARIO | $PM_{2.5}$ COMPONENT | CMAQ BENMAP | CAMX BENMAP | AP2 DIRECT | AP2 BENMAP | AP3 DIRECT | AP3 BENMAP | INMAP BENMAP | EASIUR DIRECT | SA DIRECT |
|---|---|---|---|---|---|---|---|---|---|---|
| Cement Kilns | NO3 | $600 | $620 | $970 | $990 | $1,700 | $350 | $3,200 | $730 | $670 |
| Cement Kilns | Primary $PM_{2.5}$ | $1,900 | $2,000 | $940 | $980 | $1,900 | $2,000 | $1,600 | $1,000 | $2,600 |
| Cement Kilns | SO4 | $2,700 | $2,700 | $2,000 | $2,000 | $2,900 | $3,400 | $3,100 | $1,300 | $3,000 |
| Cement Kilns | Total $PM_{2.5}$ | $5,300 | $5,400 | $3,900 | $4,000 | $6,500 | $5,700 | $8,000 | $3,100 | $6,300 |
| CPP Proposal | NO3 | $1,700 | $1,400 | $3,400 | $3,400 | $5,700 | $720 | $11,000 | $2,500 | $2,700 |
| CPP Proposal | Primary $PM_{2.5}$ | $3,500 | $4,000 | $1,700 | $1,700 | $3,100 | $3,600 | $5,800 | $4,200 | $5,800 |
| CPP Proposal | SO4 | $15,000 | $16,000 | $9,600 | $10,000 | $14,000 | $17,000 | $24,000 | $7,900 | $19,000 |
| CPP Proposal | Total $PM_{2.5}$ | $21,000 | $21,000 | $15,000 | $15,000 | $23,000 | $21,000 | $41,000 | $15,000 | $28,000 |
| Pulp and Paper | NO3 | $130 | $130 | $180 | $250 | $330 | $7 | $740 | $200 | $160 |
| Pulp and Paper | Primary $PM_{2.5}$ | $710 | $720 | $370 | $380 | $730 | $780 | $740 | $570 | $520 |
| Pulp and Paper | SO4 | $1,600 | $1,600 | $890 | $1,100 | $1,300 | $1,800 | $2,000 | $800 | $2,100 |
| Pulp and Paper | Total $PM_{2.5}$ | $2,600 | $2,600 | $1,400 | $1,700 | $2,400 | $2,500 | $3,500 | $1,600 | $2,800 |
| Refineries | NO3 | $160 | $190 | $610 | $640 | $1,300 | $470 | $1,500 | $300 | $290 |
| Refineries | Primary $PM_{2.5}$ | $630 | $650 | $410 | $430 | $820 | $880 | $890 | $410 | $610 |
| Refineries | SO4 | $810 | $740 | $590 | $620 | $830 | $1,000 | $920 | $340 | $1,400 |
| Refineries | Total $PM_{2.5}$ | $1,800 | $1,800 | $1,600 | $1,700 | $2,900 | $2,400 | $3,300 | $1,100 | $2,300 |
| Tier 3 | NO3 | $1,900 | - | $7,000 | $7,300 | $12,000 | $4,600 | $11,000 | $3,500 | $3,500 |
| Tier 3 | Primary $PM_{2.5}$ | $1,800 | - | $1,200 | $1,300 | $2,400 | $2,600 | $1,800 | $1,500 | $3,000 |
| Tier 3 | SO4 | $320 | - | $810 | $850 | $1,200 | $1,400 | $400 | $290 | $360 |
| Tier 3 | Total $PM_{2.5}$ | $4,100 | - | $11,000 | $12,000 | $18,000 | $11,000 | $13,000 | $5,300 | $6,800 |

**EXHIBIT C-2. REGIONAL STATISTICS (DOLLAR VALUES IN THOUSANDS)**

| SCENARIO | $PM_{2.5}$ COMPONENT | STATISTIC | SCALE | AP2 BENMAP | AP3 BENMAP | INMAP BENMAP |
|---|---|---|---|---|---|---|
| CPP | NO3 | Mean Bias | Region | $251,761.35 | $(134,098.12) | $1,323,708.16 |
| Cement Kilns | NO3 | Mean Bias | Region | $55,287.85 | $(35,485.88) | $375,999.35 |
| Pulp and Paper | NO3 | Mean Bias | Region | $16,096.54 | $(18,267.02) | $87,095.65 |
| Refineries | NO3 | Mean Bias | Region | $68,388.10 | $44,640.73 | $194,445.83 |
| Tier 3 | NO3 | Mean Bias | Region | $767,714.69 | $389,608.87 | $1,243,170.87 |
| CPP | SO4 | Mean Bias | Region | $(779,540.71) | $171,762.39 | $1,220,552.66 |
| Cement Kilns | SO4 | Mean Bias | Region | $(91,680.99) | $102,573.66 | $58,598.68 |
| Pulp and Paper | SO4 | Mean Bias | Region | $(76,986.36) | $23,920.46 | $53,939.56 |
| Refineries | SO4 | Mean Bias | Region | $(28,014.00) | $30,852.81 | $15,287.08 |
| Tier 3 | SO4 | Mean Bias | Region | $75,724.59 | $156,974.71 | $11,384.81 |
| CPP | Primary $PM_{2.5}$ | Mean Bias | Region | $(9,902.94) | $360.88 | $12,979.02 |
| Cement Kilns | Primary $PM_{2.5}$ | Mean Bias | Region | $(5,868.34) | $276.71 | $(1,817.59) |
| Pulp and Paper | Primary $PM_{2.5}$ | Mean Bias | Region | $(1,808.46) | $358.26 | $147.87 |
| Refineries | Primary $PM_{2.5}$ | Mean Bias | Region | $(2,957.18) | $3,928.56 | $4,005.52 |
| Tier 3 | Primary $PM_{2.5}$ | Mean Bias | Region | $(12,788.66) | $16,214.44 | $(1,033.83) |
| CPP | Total $PM_{2.5}$ | Mean Bias | Region | $(533,542.85) | $56,715.00 | $2,557,360.23 |
| Cement Kilns | Total $PM_{2.5}$ | Mean Bias | Region | $(48,971.66) | $60,654.30 | $426,078.99 |
| Pulp and Paper | Total $PM_{2.5}$ | Mean Bias | Region | $(78,886.19) | $(10,176.21) | $125,002.49 |
| Refineries | Total $PM_{2.5}$ | Mean Bias | Region | $8,360.64 | $50,365.81 | $184,689.33 |
| Tier 3 | Total $PM_{2.5}$ | Mean Bias | Region | $1,189,944.56 | $922,114.83 | $1,254,971.93 |
| CPP | NO3 | Mean Error | Region | $251,761.35 | $139,662.67 | $1,323,708.16 |
| Cement Kilns | NO3 | Mean Error | Region | $55,287.85 | $56,009.65 | $375,999.35 |
| Pulp and Paper | NO3 | Mean Error | Region | $16,096.54 | $20,428.15 | $87,095.65 |
| Refineries | NO3 | Mean Error | Region | $68,388.10 | $49,326.09 | $194,445.83 |
| Tier 3 | NO3 | Mean Error | Region | $767,714.69 | $390,172.86 | $1,243,170.87 |
| CPP | SO4 | Mean Error | Region | $789,561.72 | $706,130.81 | $1,433,445.88 |

| SCENARIO | $PM_{2.5}$ COMPONENT | STATISTIC | SCALE | AP2 BENMAP | AP3 BENMAP | INMAP BENMAP |
|---|---|---|---|---|---|---|
| Cement Kilns | SO4 | Mean Error | Region | $91,680.99 | $150,561.96 | $198,051.11 |
| Pulp and Paper | SO4 | Mean Error | Region | $78,164.93 | $67,264.91 | $180,260.29 |
| Refineries | SO4 | Mean Error | Region | $39,279.95 | $37,105.64 | $79,833.25 |
| Tier 3 | SO4 | Mean Error | Region | $86,808.91 | $158,042.20 | $52,976.74 |
| CPP | Primary $PM_{2.5}$ | Mean Error | Region | $9,910.04 | $3,134.81 | $12,989.40 |
| Cement Kilns | Primary $PM_{2.5}$ | Mean Error | Region | $5,868.34 | $838.90 | $2,718.37 |
| Pulp and Paper | Primary $PM_{2.5}$ | Mean Error | Region | $1,808.46 | $400.00 | $828.64 |
| Refineries | Primary $PM_{2.5}$ | Mean Error | Region | $2,985.37 | $4,023.71 | $4,064.39 |
| Tier 3 | Primary $PM_{2.5}$ | Mean Error | Region | $12,788.66 | $22,688.18 | $5,141.99 |
| CPP | Total $PM_{2.5}$ | Mean Error | Region | $630,986.72 | $603,943.70 | $2,559,376.43 |
| Cement Kilns | Total $PM_{2.5}$ | Mean Error | Region | $59,022.02 | $112,279.48 | $426,078.99 |
| Pulp and Paper | Total $PM_{2.5}$ | Mean Error | Region | $78,886.19 | $61,265.82 | $173,246.40 |
| Refineries | Total $PM_{2.5}$ | Mean Error | Region | $42,997.28 | $63,872.26 | $184,689.33 |
| Tier 3 | Total $PM_{2.5}$ | Mean Error | Region | $1,189,944.56 | $922,114.83 | $1,254,971.93 |
| CPP | NO3 | Normalized Mean Bias | Region | 106% | -56% | 557% |
| Cement Kilns | NO3 | Normalized Mean Bias | Region | 64% | -41% | 437% |
| Pulp and Paper | NO3 | Normalized Mean Bias | Region | 84% | -95% | 453% |
| Refineries | NO3 | Normalized Mean Bias | Region | 299% | 195% | 851% |
| Tier 3 | NO3 | Normalized Mean Bias | Region | 280% | 142% | 453% |
| CPP | SO4 | Normalized Mean Bias | Region | -35% | 8% | 55% |
| Cement Kilns | SO4 | Normalized Mean Bias | Region | -24% | 27% | 15% |
| Pulp and Paper | SO4 | Normalized Mean Bias | Region | -34% | 10% | 24% |
| Refineries | SO4 | Normalized Mean Bias | Region | -24% | 27% | 13% |
| Tier 3 | SO4 | Normalized Mean Bias | Region | 164% | 340% | 25% |

| SCENARIO | $PM_{2.5}$ COMPONENT | STATISTIC | SCALE | AP2 BENMAP | AP3 BENMAP | INMAP BENMAP |
|---|---|---|---|---|---|---|
| CPP | Primary $PM_{2.5}$ | Normalized Mean Bias | Region | -50% | 2% | 65% |
| Cement Kilns | Primary $PM_{2.5}$ | Normalized Mean Bias | Region | -50% | 2% | -15% |
| Pulp and Paper | Primary $PM_{2.5}$ | Normalized Mean Bias | Region | -46% | 9% | 4% |
| Refineries | Primary $PM_{2.5}$ | Normalized Mean Bias | Region | -31% | 41% | 42% |
| Tier 3 | Primary $PM_{2.5}$ | Normalized Mean Bias | Region | -31% | 40% | -3% |
| CPP | Total $PM_{2.5}$ | Normalized Mean Bias | Region | -22% | 2% | 104% |
| Cement Kilns | Total $PM_{2.5}$ | Normalized Mean Bias | Region | -10% | 12% | 87% |
| Pulp and Paper | Total $PM_{2.5}$ | Normalized Mean Bias | Region | -29% | -4% | 47% |
| Refineries | Total $PM_{2.5}$ | Normalized Mean Bias | Region | 5% | 28% | 104% |
| Tier 3 | Total $PM_{2.5}$ | Normalized Mean Bias | Region | 321% | 249% | 339% |
| CPP | NO3 | Normalized Mean Error | Region | 106% | 59% | 557% |
| Cement Kilns | NO3 | Normalized Mean Error | Region | 64% | 65% | 437% |
| Pulp and Paper | NO3 | Normalized Mean Error | Region | 84% | 106% | 453% |
| Refineries | NO3 | Normalized Mean Error | Region | 299% | 216% | 851% |
| Tier 3 | NO3 | Normalized Mean Error | Region | 280% | 142% | 453% |
| CPP | SO4 | Normalized Mean Error | Region | 36% | 32% | 65% |
| Cement Kilns | SO4 | Normalized Mean Error | Region | 24% | 39% | 52% |
| Pulp and Paper | SO4 | Normalized Mean Error | Region | 34% | 29% | 79% |
| Refineries | SO4 | Normalized Mean Error | Region | 34% | 32% | 69% |
| Tier 3 | SO4 | Normalized Mean Error | Region | 188% | 342% | 115% |

| SCENARIO | $PM_{2.5}$ COMPONENT | STATISTIC | SCALE | AP2 BENMAP | AP3 BENMAP | INMAP BENMAP |
|---|---|---|---|---|---|---|
| CPP | Primary $PM_{2.5}$ | Normalized Mean Error | Region | 50% | 16% | 65% |
| Cement Kilns | Primary $PM_{2.5}$ | Normalized Mean Error | Region | 50% | 7% | 23% |
| Pulp and Paper | Primary $PM_{2.5}$ | Normalized Mean Error | Region | 46% | 10% | 21% |
| Refineries | Primary $PM_{2.5}$ | Normalized Mean Error | Region | 31% | 42% | 42% |
| Tier 3 | Primary $PM_{2.5}$ | Normalized Mean Error | Region | 31% | 55% | 13% |
| CPP | Total $PM_{2.5}$ | Normalized Mean Error | Region | 26% | 25% | 104% |
| Cement Kilns | Total $PM_{2.5}$ | Normalized Mean Error | Region | 12% | 23% | 87% |
| Pulp and Paper | Total $PM_{2.5}$ | Normalized Mean Error | Region | 29% | 23% | 65% |
| Refineries | Total $PM_{2.5}$ | Normalized Mean Error | Region | 24% | 36% | 104% |
| Tier 3 | Total $PM_{2.5}$ | Normalized Mean Error | Region | 321% | 249% | 339% |
| CPP | NO3 | R squared | Region | 0.82 | 0.74 | 0.43 |
| Cement Kilns | NO3 | R squared | Region | 0.89 | 0.34 | 0.85 |
| Pulp and Paper | NO3 | R squared | Region | 0.58 | 0.01 | 0.27 |
| Refineries | NO3 | R squared | Region | 0.89 | 0.55 | 0.73 |
| Tier 3 | NO3 | R squared | Region | 0.81 | 0.53 | 0.73 |
| CPP | SO4 | R squared | Region | 0.85 | 0.85 | 0.76 |
| Cement Kilns | SO4 | R squared | Region | 0.91 | 0.91 | 0.54 |
| Pulp and Paper | SO4 | R squared | Region | 0.85 | 0.85 | 0.40 |
| Refineries | SO4 | R squared | Region | 0.78 | 0.78 | 0.18 |
| Tier 3 | SO4 | R squared | Region | 0.14 | 0.14 | 0.27 |
| CPP | Primary $PM_{2.5}$ | R squared | Region | 0.96 | 0.96 | 0.99 |
| Cement Kilns | Primary $PM_{2.5}$ | R squared | Region | 0.98 | 0.98 | 0.73 |
| Pulp and Paper | Primary $PM_{2.5}$ | R squared | Region | 1.00 | 1.00 | 0.92 |
| Refineries | Primary $PM_{2.5}$ | R squared | Region | 0.99 | 0.99 | 0.92 |

| SCENARIO | $PM_{2.5}$ COMPONENT | STATISTIC | SCALE | AP2 BENMAP | AP3 BENMAP | INMAP BENMAP |
| --- | --- | --- | --- | --- | --- | --- |
| Tier 3 | Primary $PM_{2.5}$ | R squared | Region | 0.90 | 0.90 | 0.96 |
| CPP | Total $PM_{2.5}$ | R squared | Region | 0.86 | 0.90 | 0.77 |
| Cement Kilns | Total $PM_{2.5}$ | R squared | Region | 0.97 | 0.96 | 0.74 |
| Pulp and Paper | Total $PM_{2.5}$ | R squared | Region | 0.91 | 0.90 | 0.58 |
| Refineries | Total $PM_{2.5}$ | R squared | Region | 0.88 | 0.89 | 0.62 |
| Tier 3 | Total $PM_{2.5}$ | R squared | Region | 0.90 | 0.73 | 0.90 |

NATIONAL ACADEMIES Sciences Engineering Medicine

NATIONAL ACADEMIES PRESS Washington, DC

This PDF is available at https://nap.nationalacademies.org/10511




# Estimating the Public Health Benefits of Proposed Air Pollution Regulations (2002)

**DETAILS**

187 pages | 8.5 x 11 | HARDBACK

ISBN 978-0-309-38380-6 | DOI 10.17226/10511

**CONTRIBUTORS**

Committee on Estimating the Health-Risk-Reduction Benefits of Proposed Air Pollution Regulations; Board on Environmental Studies and Toxicology; National Research Council

BUY THIS BOOK

FIND RELATED TITLES

**SUGGESTED CITATION**

National Research Council. 2002. *Estimating the Public Health Benefits of Proposed Air Pollution Regulations*. Washington, DC: The National Academies Press. https://doi.org/10.17226/10511.

Visit the National Academies Press at nap.edu and login or register to get:

- Access to free PDF downloads of thousands of publications
- 10% off the price of print publications
- Email or social media notifications of new titles related to your interests
- Special offers and discounts

All downloadable National Academies titles are free to be used for personal and/or non-commercial academic use. Users may also freely post links to our titles on this website; non-commercial academic users are encouraged to link to the version on this website rather than distribute a downloaded PDF to ensure that all users are accessing the latest authoritative version of the work. All other uses require written permission. (Request Permission)

This PDF is protected by copyright and owned by the National Academy of Sciences; unless otherwise indicated, the National Academy of Sciences retains copyright to all materials in this PDF with all rights reserved.

# Estimating The Public Health Benefits Of Proposed Air Pollution Regulations

Committee on Estimating the
Health-Risk-Reduction Benefits of
Proposed Air Pollution Regulations

Board on Environmental Studies and Toxicology

NATIONAL RESEARCH COUNCIL
*OF THE NATIONAL ACADEMIES*

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
**www.nap.edu**

Copyright National Academy of Sciences. All rights reserved.

certainty. Such ways include rounding to fewer significant digits, increasing the use of graphs, presenting projected baseline along with projected health benefits, and placing less emphasis on single numbers (for example, the mean of the probability distribution for a health benefit) and greater emphasis on ranges (for example, the range between 5th and 95th percentiles of the distribution).

- There is a common misperception that a high degree of certainty is required for regulatory actions to take place to protect public health. As a result, primary health benefits analyses that more fully and accurately portray the uncertainties might not be considered useful. It is unrealistic for EPA to defer decisions until it can make them on the basis of perfect science. A careful and deliberate balancing of the benefits and costs is required, and this balancing must be informed by a fair assessment of the current levels of uncertainty and a realistic evaluation of the likely reductions in uncertainty attainable through further research.
- EPA should perform similar detailed analyses of uncertainty in the valuation of health benefits and in the regulatory cost analyses that the committee recommends for the health benefits analyses.

## REFERENCES

CASAC (Clean Air Scientific Advisory Committee). 1986a. Letter to Craig Potter, Assistant Administrator for Air and Radiation, U.S. Environmental Protection, Washington, DC, from Morton Lippmann, Chairman, Clean Air Scientific Advisory Committee. SAB-CASAC-86-024. August 29, 1986.

CASAC (Clean Air Scientific Advisory Committee). 1986b. Letter to Lee Thomas, Administrator, U.S. Environmental Protection, Washington, DC, from Morton Lippmann, Chairman, Clean Air Scientific Advisory Committee. SAB-CASAC-86-023. August 29, 1986.

Cooke, R.M. 1991. Experts in Uncertainty: Opinion and Subjective Probability in Science. New York: Oxford University Press.

Dockery, D.W., C.A. Pope, X. Xu, J.D. Spengler, J.H. Ware, M.E. Fay, B.G. Ferris, and F.E. Speizer. 1993. An association between air pollution and mortality in six U.S. cities. N. Engl. J. Med. 329(24):1753-1759.

Dominici, F., A. McDermott, S. Zeger, and J. Samet. 2002. On the use of generalized additive models in time-series studies of air pollution and health. Am. J. Epidemiol. 156(3):193-203.

EPA (U.S. Environmental Protection Agency). 1978. A Method for Assessing the Health Risks Associated with Alternative Air Quality Standards for Ozone.

Copyright National Academy of Sciences. All rights reserved.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
RESEARCH TRIANGLE PARK, NC 27711

OFFICE OF
AIR QUALITY PLANNING
AND STANDARDS

This expert elicitation report was prepared in support of the characterization of uncertainty in EPA's benefits analyses associated with reductions in exposure to particulate matter pollution. As recommended by the National Academy of Sciences, EPA is using expert judgment as part of an effort to better describe the uncertainties inherent in any benefits analysis. This report and its findings are intended solely for this purpose.

IEc

# Expanded Expert Judgment Assessment of the Concentration-Response Relationship Between $PM_{2.5}$ Exposure and Mortality

Final Report | September 21, 2006

prepared for:

Office of Air Quality Planning and Standards

U.S. Environmental Protection Agency

Research Triangle Park, NC 27711

prepared by:

Industrial Economics, Incorporated

2067 Massachusetts Avenue

Cambridge, MA 02140

INDUSTRIAL ECONOMICS, INCORPORATED

## EXECUTIVE SUMMARY

In 2002, the National Research Council (NRC) report, *Estimating the Public Health Benefits of Proposed Air Pollution Regulations*, presented the results of an NRC review of U.S. Environmental Protection Agency's (EPA's) benefits assessment methods for evaluating proposed regulations of air pollutants. The NRC committee approved of EPA's benefits analysis framework but provided a number of recommendations for improving EPA's characterization of uncertainty in benefit analysis. The NRC report recommended that probability distributions for key sources of uncertainty be developed using available empirical data or through formal elicitation of expert judgments in situations where scientific data are limited or conflicting.

The effect of changes in ambient fine particulate matter ($PM_{2.5}$) levels on mortality constitutes a key component of the EPA's approach for assessing potential health benefits associated with air quality regulations targeting emissions of $PM_{2.5}$ and its precursors. Avoided premature deaths constitute, on a dollars basis, between 85 and 95 percent of the monetized benefits reported in EPA's retrospective and prospective Section 812A benefit-cost analyses of the Clean Air Act (U.S. EPA, 1997 and 1999) and in Regulatory Impact Analyses (RIAs) for rules such as the Heavy Duty Diesel Engine/Fuel Rule (U.S. EPA, 2000) and the Non-road Diesel Engine Rule (EPA, 2004). Because it is such a large component of benefits, obtaining a good characterization of uncertainties regarding the mortality effects of changes in $PM_{2.5}$ exposure could capture the largest portion of uncertainty characterization of an entire benefit analysis (aside from unquantified or unmeasurable benefit endpoints).

In response to the 2002 NRC report, EPA has taken steps to incorporate the formal elicitation of expert judgments into uncertainty analyses for the benefits of air pollution rules affecting $PM_{2.5}$. Since 2003, Industrial Economics (IEc) has worked with a team of EPA and OMB analysts (collectively, the Project Team)[1] to conduct two expert judgment studies of the mortality impacts of $PM_{2.5}$ for EPA's Office of Air and Radiation (OAR). The first was a pilot study of five experts conducted in 2003 and 2004 aimed at exploring and refining the application of expert elicitation methods in the context of air pollution policy, and the second, which began in late 2004, was a full-scale study of 12 experts that built on the experience gained from the pilot and incorporated numerous refinements. This report documents the full-scale study of expert judgments concerning the impact of a

[1] The term "Project Team" refers to IEc staff and subcontractors, including Dr. Katy Walker, a specialist in expert judgment elicitations, and Patrick Kinney, an expert in the health effects of $PM_{2.5}$, plus a group of analysts from several EPA offices (Office of Air and Radiation, Office of Research and Development, and Office of Policy, Economics, and Innovation) and from the Office of Management and Budget.

one µg/m$^3$ change in ambient, annual average $PM_{2.5}$ on annual, adult, all-cause mortality in the U.S.

Expert elicitation uses carefully structured interviews to elicit from each expert his best estimate of the true value for an outcome or variable of interest as well as his uncertainty about the true value. This uncertainty, expressed as a subjective probabilistic distribution of values, reflects each expert's interpretation of theory and empirical evidence from relevant disciplines and ultimately his beliefs about what is known and not known about the subject of the study.

Exhibit ES-1 provides an overview of the steps of the expert elicitation process followed for this study, which includes the following elements: development of an elicitation protocol, selection of experts, development of a briefing book, conducting elicitation interviews, the use of expert workshops prior to and following individual elicitation of judgments, as well as the expert judgments themselves.

The expanded $PM_{2.5}$-mortality elicitation involved personal interviews with 12 health experts who have conducted research on the relationship between $PM_{2.5}$ exposures and mortality. The elicitation interview consisted of a protocol of carefully structured questions about the nature and magnitude of the relationship between changes in annual average $PM_{2.5}$ and annual, adult, all-cause mortality in the U.S. The Project Team developed the interview protocol between October 2004 and January 2006. Development of the protocol was informed by an April 2005 symposium held by the project team where numerous health scientists and analysts provided feedback, by detailed pre-testing with independent EPA scientists in November 2005, and by discussion with the participating experts at a Pre-elicitation Workshop in January 2006.

The 12 experts participating in the study were selected through a two-part peer-nomination process and included eight experts in epidemiology, three in toxicology, and one in medicine. The peer nomination process was designed to obtain a balanced set of views and serves to minimize the influence of the analysts and sponsors on expert selection. The experts selected for participation are shown in Exhibit ES-2.

EXHIBIT ES-1: OVERVIEW OF THE EXPERT JUDGMENT PROCESS



### EXHIBIT ES-2: FINAL EXPERT LIST

| NAME | AFFILIATION |
|---|---|
| Dockery, Doug W. | Harvard School of Public Health |
| Ito, Kazuhiko | New York University School of Medicine |
| Krewski, Daniel | University of Ottawa |
| Künzli, Nino | University of Southern California Keck School of Medicine (currently at Institut Municipal d'Investigació Mèdica (IMIM) - Center for Research in Environmental Epidemiology, Barcelona, SPAIN) |
| Lippmann, Morton | New York University School of Medicine |
| Mauderly, Joe | Lovelace Respiratory Research Institute |
| Ostro, Bart D. | California Office of Environmental Health Hazard Assessment |
| Pope, C. Arden III | Brigham Young University |
| Schlesinger, Richard | Pace University |
| Schwartz, Joel | Harvard School of Public Health |
| Thurston, George D. | New York University School of Medicine |
| Utell, Mark | University of Rochester School of Medicine and Dentistry |

In January 2006, the Project Team held a Pre-elicitation Workshop with the selected experts. The workshop educated the experts as to the objectives of the study and the expert judgment process. It also fostered discussion among the participants about the key evidence available to answer questions in the protocol and provided an opportunity for experts to provide feedback on the protocol prior to beginning the interviews.

The elicitation interviews were conducted between January and April 2006. Each expert was provided a briefing book of reference materials and a copy of the elicitation protocol prior to the interviews. Each interview lasted approximately 8 hours and covered both qualitative and quantitative questions. The qualitative questions probed experts' beliefs concerning key evidence and critical sources of uncertainty and were intended to make the conceptual basis for their quantitative judgments explicit. These questions covered topics such as potential biological mechanisms linking $PM_{2.5}$ exposures with mortality; key scientific evidence on the magnitude of the PM-mortality relationship; sources of potential error or bias in epidemiological results; the likelihood of a causal relationship between $PM_{2.5}$ and mortality, and the shape of the concentration-response (C-R) function. The main quantitative question asked each expert to provide a probabilistic distribution for the average expected decrease in U.S. annual, adult, all-cause mortality associated with a 1 $\mu g/m^3$ decrease in annual average $PM_{2.5}$ levels. In addressing this question, the experts first specified a functional form for the $PM_{2.5}$ mortality C-R function and then developed an uncertainty distribution for the slope of that function (the mortality impact per unit change in annual average $PM_{2.5}$), taking into account the evidence and judgments discussed during the qualitative questions.

When answering the main quantitative question, each expert was instructed to consider that the total mortality effect of a 1 $\mu g/m^3$ decrease in ambient annual average $PM_{2.5}$ may reflect reductions in both short-term peak and long-term average exposures to $PM_{2.5}$. Each expert was asked to aggregate the effects of both types of changes in his answers.

Each expert was given the option to integrate their judgments about the likelihood of a causal relationship and/or threshold in the C-R function into his distribution or to provide a distribution "conditional on" one or both of these factors. The interviewers asked each expert to characterize his distribution by assigning values to fixed percentiles (5th, 25th, 50th, 75th, 95th). To assist experts in the elicitation process, the interviewers provided real-time feedback during the interviews in the form of graphs and example calculations, using spreadsheet tools and Internet teleconferencing. During the interviews, experts were able to view their responses plotted onto a distribution using a software interface. They then adjusted their estimates until the distribution represented the views they expressed during the day-long interview.

Following the interviews, the Project Team reconvened the experts for a Post-elicitation Workshop in June 2006. At this workshop, the Project Team anonymously shared the results of all experts with the group, and gave experts the opportunity to raise issues that may have emerged during the interviews for further discussion with the group. The workshop was not intended to promote consensus, and the Project Team made no effort to encourage experts to change their responses. Experts were, however, allowed to modify their responses privately if they chose to do so based on insights gained during workshop discussions, provided they included the detailed rationale for their changes. Four experts made adjustments to their judgments following the workshop; one of them made changes to the percentiles of his distribution. (A sensitivity analysis conducted on the results showed minimal impact of these changes when compared to the results prior to this workshop.)

In Exhibits ES-3 and ES-4 we display the responses of the experts to the main quantitative elicitation question. The distributions provided by each expert, identified by the letters A through L, are depicted as box and whisker plots with the solid circle symbol showing the median (50th percentile); the open circle showing the mean;[2] the box defining the interquartile range (bounded by the 25th and 75th percentiles); and the ends of the "whiskers" defining each expert's 5th and 95th percentiles. Each expert's stated best estimate of the likelihood of a causal relationship between $PM_{2.5}$ and mortality is shown on the x-axis and the experts are arrayed in order of decreasing certainty of causality. Exhibit ES-3 displays the distributions for the experts who chose to provide a distribution conditional on the existence of a causal relationship between $PM_{2.5}$ and mortality; Exhibit ES-4 shows the distributions for the group who chose to integrate their judgments about the likelihood of causality directly into their distribution. Each figure displays the expert distributions for two different $PM_{2.5}$ levels, 18 $\mu g/m^3$and 7 $\mu g/m^3$, to observe the implications of four experts' (B, F, K, and L) assumptions about non-linearities in the C-R function and about differing degrees of uncertainty in the slope of the function across specific ranges of PM. Also, as a point of reference for the results, we include box plots of two epidemiology studies used in EPA benefit analyses – Pope et al., 2002 and Dockery et al., 1993.

[2] The mean of the expert's distribution was not directly elicited. IEc generated this value using Crystal Ball™ statistical modeling software.

## EXHIBIT ES-3: GROUP 1: UNCERTAINTY DISTRIBUTIONS FOR $PM_{2.5}$- MORTALITY C-R COEFFICIENTS; CONDITIONAL ON THE EXISTENCE OF A CAUSAL RELATIONSHIP

**Expert C-R Coefficient Distributions at a Baseline Annual Average $PM_{2.5}$ of 18 ug/m$^3$**




**Expert C-R Coefficient Distributions at a Baseline Annual Average $PM_{2.5}$ of 7 ug/m$^3$**




Note: Box plots represent distributions as provided by the experts to the elicitation team. When asked, experts in this group preferred to give conditional distributions and keep their probabilistic judgment about the likelihood of a causal or non-causal relationship separate.

*Experts' C-R coefficient distribution changes between 7 and 18 μg/m$^3$.

Expert K specified a threshold (not shown).

Expert L provided two different likelihoods of causality for his C-R coefficient distributions at 7 and 18 μg/m$^3$, although his distribution appears in the same location in both graphs.

### EXHIBIT ES-4: GROUP 2: EXPERT UNCERTAINTY DISTRIBUTIONS FOR THE $PM_{2.5}$-MORTALITY COEFFICIENT INCORPORATING THE EXPERT'S LIKELIHOOD OF A CAUSAL RELATIONSHIP







Note: Box plots represent distributions as provided by the experts to the elicitation team. When asked, experts in this group preferred to give distributions that incorporate their likelihood that the $PM_{2.5}$ mortality association may be non-causal

*Experts' C-R coefficient distribution changes between 7 and 18 μg/m$^3$.

Among the experts who provided distributions that were conditional on the existence of a causal relationship (Exhibit ES-3), median estimates ranged from a 0.7 to 1.6 percent decrease in annual, adult, all-cause mortality per 1 $\mu g/m^3$ decrease in annual average $PM_{2.5}$. For five of the seven experts in this group the effect of ultimately integrating their judgments about causality in a benefits assessment will be small, given the high likelihoods of causality they expressed. Median benefits estimated using the distributions of the two experts in this group who expressed greater doubt about a causal relationship will show more significant declines. Among the experts who directly incorporated their views on the likelihood of a causal relationship into their distributions (Exhibit ES-4), the median estimates ranged from a 0.7 to 1.6 percent decrease in annual, adult, all-cause mortality per 1 $\mu g/m^3$ decrease in annual average $PM_{2.5}$.

Because of the different approaches taken by the experts to characterizing their views about uncertainty in the $PM_{2.5}$ mortality relationship, it is difficult to compare all the distributions. Direct comparison can only be done when the distributions are applied to the same scenario in a benefits analysis. However, certain observations and conclusions can be drawn from these plots and from the experts' responses to the qualitative questions:

- Experts in this study tended to be confident that $PM_{2.5}$ exposure can cause premature death. Ten of twelve experts believed that the likelihood of a causal relationship was 90 percent or higher. The remaining two experts gave causal probabilities of 35 and 70 percent. Recent research in both epidemiology (e.g., Jerrett et al., 2005, Laden et al., 2006) and toxicology (e.g., Sun et al., 2005) significantly contributed to experts' confidence.
- Only one of 12 experts explicitly incorporated a threshold into his C-R function.[3] The rest believed there was a lack of empirical and/or theoretical support for a population threshold. However, three other experts gave differing effect estimate distributions above and below some cut-off concentration. The adjustments these experts made to median estimates and/or uncertainty at lower $PM_{2.5}$ concentrations were modest.
- Experts relied upon a core set of cohort epidemiology studies to derive their quantitative estimates, mainly those associated with the ACS and Six Cities cohorts. The Six Cities results tended to be weighted more highly by experts in this study than in the pilot study. The greater emphasis on Six Cities appeared to result from corroborating evidence in the recent Six Cities follow-up (Laden et al., 2006) and from concerns about potential exposure misclassification issues and/or effect modification in the ACS cohort (see below).

[3] Expert K indicated that he was 50 percent sure that a threshold existed. If there were a threshold, he thought that there was an 80 percent chance that it would be less than or equal to 5 $\mu g/m^3$, and a 20 percent chance that it would fall between 5 and 10 $\mu g/m^3$.

- Although the quantitative question asked experts to consider mortality changes due both to short-term and long-term $PM_{2.5}$ exposures, all experts based their median effect estimates on effects due to long-term exposures. Short-term exposure effects were sometimes used to derive lower-bound effect estimates.
- Confounding of epidemiological results tended to be a minor concern for most experts. Only one of 12 experts expressed substantial concern about confounding as a source of error in the key literature on $PM_{2.5}$ and premature mortality.
- Experts' concerns regarding potential negative bias in the ACS main study results due to effect modification (see Pope and Dockery, 2006) and/or exposure misclassification (Jerrett et al., 2005; Willis et al., 2003; and Mallick et al., 2002) led many experts to adjust the published results upwards when considering the percentiles of their distribution.
- A sensitivity analysis conducted using a simplified benefits analysis demonstrated that no individual expert's distribution of effect estimates had more than a plus or minus 8 percent impact on an overall, pooled distribution of effects. The influence of individual experts appeared symmetrically distributed.

Compared to the pilot study, experts in this study were in general more confident in a causal relationship, less likely to incorporate thresholds, and reported higher mortality effect estimates. The differences in results compared with the pilot appear to reflect the influence of new research on the interpretation of the key epidemiological studies that were the focus of both elicitation studies, more than the influence of changes to the structure of the protocol. They may also reflect differences in the composition of the expert panel. The experts' distributions in the current study display a similar diversity in the degree of uncertainty expressed as in the pilot study. The variation in the experts' responses reflects a number of factors, including differences in their views about the degree of uncertainty inherent in key epidemiological results from long-term cohort studies, the evidential support for a causal relationship, and, for one expert, the shape of the C-R function. In almost all cases, however, the spread of the uncertainty distributions elicited from the experts exceeded the statistical uncertainty bounds reported by the most influential epidemiologic studies, suggesting that the expert elicitation process was successful in developing more comprehensive estimates of uncertainty for the $PM_{2.5}$ mortality relationship.

# TABLE OF CONTENTS


**EXECUTIVE SUMMARY** *i*

**CHAPTER 1 INTRODUCTION** *1-1*

1.1 Purpose and Scope *1-2*
1.2 Relationship to the Pilot Study *1-3*
1.2.1 Overview of the Pilot Study *1-3*
1.2.2 Improvements in the Full-Scale Study *1-4*
1.3 Organization of this Document *1-6*

**CHAPTER 2 ANALYTICAL APPROACH** *2-1*

2.1 Protocol Development *2-3*
2.1.1 Structuring the Problem *2-3*
2.1.2 EPA Symposium *2-4*
2.1.3 Protocol Pre-Testing *2-6*
2.1.4 Protocol Design *2-6*
2.2 Expert Selection *2-10*
2.3 Briefing Book *2-15*
2.4 Pre-elicitation Workshop *2-15*
2.5 Elicitation Interviews *2-16*
2.6 Post-elicitation Workshop *2-20*
2.7 Evaluating Experts' Judgments *2-21*
2.8 Approaches to Presenting Results *2-22*

**CHAPTER 3 RESULTS** *3-1*

3.1 Responses to Conditioning Questions *3-1*
3.1.1 Major Causes of and Mechanism for $PM_{2.5}$ Related Mortality *3-2*
3.1.2 Relative Importance of Mortality Impacts from Short-Term and Long-Term Exposure Changes *3-5*
3.1.3 Key Epidemiological Evidence *3-8*
3.1.4 Confounding *3-13*
3.1.5 Effect Modification *3-15*
3.1.6 Exposure Issues *3-17*
3.1.7 Likelihood of a Causal Relationship Between Long- and Short-Term $PM_{2.5}$ Exposures and Mortality *3-20*
3.1.8 Thresholds *3-25*
3.2 Responses to the Quantitative Question *3-26*
3.2.1 Shape of the Concentration-Response Function *3-26*

## TABLE OF CONTENTS (CONTINUED)

3.2.2 Expert Characterization of Uncertainty 3-28

3.3 Post Elicitation Workshop 3-40

3.3.1 Exposure Misclassification 3-41

3.3.2 Effect Modification 3-41

3.3.3 Causality 3-42

CHAPTER 4 DISCUSSION 4-1

4.1 Sensitivity Analysis 4-2

4.1.1 Sensitivity to Individual Experts 4-2

4.1.2 Sensitivity to Choice of Distributional form to Characterize Uncertainty 4-3

4.1.3 Sensitivity to Pre-Elicitation Workshop Participation and to Changes Made after the Post-Elicitation Workshop 4-4

4.2 Comparison to the Pilot Study Findings 4-4

4.3 Evaluation of the Expert Elicitation Process 4-8

4.3.1 Strengths 4-8

4.3.2 Limitations 4-10

CHAPTER 5 CONCLUSIONS 5-1

REFERENCES R-1

## APPENDICES

Appendix A: Elicitation Protocol
Appendix B: Briefing Book Materials
Appendix C: Sensitivity Analysis

## EXHIBITS

Exhibit ES-1: Overview of the Expert Judgment Process *iii*
Exhibit ES-2: Final Expert List *iv*
Exhibit ES-3: Group 1: Uncertainty Distributions for $PM_{2.5}$- Mortality C-R Coefficients, Conditional on the Existence of a Causal Relationship *vi*
Exhibit ES-4: Group 2: Expert Uncertainty Distributions For The $PM_{2.5}$-Mortality Coefficient Incorporating The Expert's Likelihood Of a Causal Relationship *vii*
Exhibit 2-1: Overview of the Expert Judgment Process *2-2*
Exhibit 2-2: Structure Of the Elicitation Protocol *2-8*
Exhibit 2-3: Nominators Derived from Publication Count *2-13*
Exhibit 2-4: Final Expert List *2-14*
Exhibit 3-1: Conceptual Framework for Short-Term and Long-Term Mortality Effects *3-6*
Exhibit 3-2: Relative Importance of Short-Term and Long-Term Impacts *3-7*
Exhibit 3-3: Epidemiologic Studies Discussed by Experts while Answering Conditioning Questions *3-11*
Exhibit 3-4: Summary of Experts' Views on Effect Modifiers *3-17*
Exhibit 3-5: Summary of Experts' Views on Exposure Issues *3-20*
Exhibit 3-6: Likelihood of a Causal Relationship Between $PM_{2.5}$ and Total All-Cause Mortality *3-24*
Exhibit 3-7: Expert Judgments Concerning Form of the C-R Function *3-27*
Exhibit 3-8: Break-Points Delineating Segments of the $PM_{2.5}$-Mortality C-R Function *3-27*
Exhibit 3-9: Summary of Expert Subjective Uncertainty Distributions for C-R Coefficients *3-30*
Exhibit 3-10: Group 1: Uncertainty Distributions for $PM_{2.5}$- Mortality C-R Coefficients; Conditional on the Existence of a Causal Relationship *3-32*
Exhibit 3-11: Group 2: Expert Uncertainty Distributions for the $PM_{2.5}$-Mortality Coefficient Incorporating the Expert's Likelihood of a Causal Relationship *3-33*

## EXHIBITS (CONTINUED)

Exhibit 3-12: C-R Coefficient Distributions for Experts who Specified Non-Linear Functions 3-36
Exhibit 3-13: The Effect of Incorporating a Threshold into the C-R Coefficient Uncertainty Distribution of Expert K 3-37
Exhibit 3-14: Epidemiologic Studies Relied Upon by Experts in Creating their C-R Coefficient Uncertainty Distributions 3-39
Exhibit 4-1: Percent Change in the Mean and Standard Deviation of an Example Pooled Mortality Benefit Estimate Based on Results of the Expert Elicitations, After Removing Each Expert 4-3
Exhibit 4-2: Pilot Study Results - Comparison Of Experts' Judgments About the Percent Increase in Annual Non-Accidental Mortality Associated with a 1 $\mu g/m^3$ Increase In Annual Average Exposures To $PM_{2.5}$ (U.S. Baseline 8 to 20 $\mu g/m^3$) 4-5
Exhibit 4-3: Pilot Study Results on the Likelihood of a Causal Relationship Between $PM_{2.5}$ and Non-Accidental Premature Mortality 4-7

# CHAPTER 1 | INTRODUCTION

The effect of changes in ambient fine particulate matter ($PM_{2.5}$) levels on mortality constitutes a key component of the U.S. Environmental Protection Agency's (EPA's) approach for assessing potential health benefits associated with air quality regulations targeting emissions of $PM_{2.5}$ and its precursors. Avoided premature deaths constitute, on a dollars basis, between 85 and 95 percent of the benefits reported in EPA's retrospective and prospective Section 812A benefit-cost analyses of the Clean Air Act (U.S. EPA, 1997 and 1999) and in Regulatory Impact Analyses (RIAs) for rules such as the Heavy Duty Diesel Engine/Fuel Rule (U.S. EPA, 2000) and the Non-road Diesel Engine Rule (EPA, 2004). Because it is such a large component of benefits, uncertainties regarding the mortality effects of changes in $PM_{2.5}$ exposure could have a significant impact on the range of plausible benefit values reported for air pollution rules and on the interpretation of the results of benefit analyses.

In 2002, the National Research Council (NRC) report, *Estimating the Public Health Benefits of Proposed Air Pollution Regulations*, presented the results of an NRC review of EPA's benefits assessment methods for evaluating proposed regulations of air pollutants. The NRC committee approved of EPA's benefits analysis framework but provided a number of recommendations for improving the implementation of that framework, including recommendations for improving uncertainty analysis. The committee recommended that EPA take steps to improve its characterization of uncertainties associated with key components of its health benefits analyses, such as PM-related mortality effects. The NRC report recommended that probability distributions for key sources of uncertainty be developed using available data or, where scientific data are limited or conflicting through formal elicitation of expert judgments.

In response to the 2002 NRC report, EPA has taken steps to incorporate the formal elicitation of expert judgments into uncertainty analyses for the benefits of air pollution rules affecting $PM_{2.5}$. Since 2003, Industrial Economics (IEc) has conducted for EPA's Office of Air and Radiation (OAR) two expert judgment studies of the mortality impacts of $PM_{2.5}$; the first was a pilot study of five experts conducted in 2003 and 2004 aimed at exploring and refining the application of expert elicitation methods in the context of air pollution policy, and the second, which began in late 2004, was a full-scale study of 12 experts that built on the experience gained from the pilot and incorporated numerous refinements. This report documents the full-scale study of the formal elicitation of expert judgments concerning the mortality impacts of a 1 $\mu g/m^3$ change in ambient, annual average $PM_{2.5}$.

In the remainder of this introductory chapter, we discuss the purpose and scope of the full-scale study, discuss the relationship of this study to the pilot, and provide a road map to the rest of the report.

## 1.1 PURPOSE AND SCOPE

The purpose of this project is to provide a more complete characterization, both qualitative and quantitative, of the uncertainties associated with the relationship between reductions in ambient $PM_{2.5}$ (measured as total gravimetric mass) and mortality. The study was designed to produce results that EPA can apply in its benefit models when preparing future regulatory analyses.

The full-scale study involved personal interviews with 12 health experts who have conducted research on the relationship between $PM_{2.5}$ exposures and mortality. These experts were selected through a peer-nomination process and included experts in epidemiology, toxicology, and medicine. The elicitation interview consisted of a protocol of carefully structured questions about the nature and magnitude of the $PM_{2.5}$-mortality relationship, developed by IEc in consultation with a Project Team of EPA and Office of Management and Budget (OMB) staff scientists (hereafter "Project Team"). The protocol included both qualitative and quantitative questions. The questions requiring qualitative responses probed experts' beliefs concerning key evidence and critical sources of uncertainty and were intended to make the conceptual basis for their quantitative judgments explicit.[4] The main quantitative question sought experts' probabilistic judgments about the average expected decrease in U.S. adult, annual all-cause mortality associated with a 1 $\mu g/m^3$ decrease in annual average $PM_{2.5}$ levels. Experts were instructed to consider that the total mortality effect of a 1 $\mu g/m^3$ decrease in ambient annual average $PM_{2.5}$ may reflect reductions in both short-term peak and long-term average exposures to $PM_{2.5}$. Experts were asked to characterize the distribution of possible values for the mortality effect (hereafter, "uncertainty distribution") by assigning values to fixed percentiles (5th, 25th, 50th, 75th, 95th). They were also asked for the minimum and maximum values of the distribution.

The elicitation focused on the concentration-response (C-R) function relating $PM_{2.5}$ mass changes with mortality, and was not intended to characterize the uncertainty surrounding the role of specific PM components (e.g., diesel particulates) or sources (e.g., power plants) in the $PM_{2.5}$-mortality relationship. Also this study did not ask experts to characterize the time sequence of any mortality reductions following a 1 $\mu g/m^3$ decrease in ambient annual average $PM_{2.5}$.

[4] These questions covered topics such as potential biological mechanisms linking $PM_{2.5}$ exposures with mortality; key scientific evidence on the magnitude of the PM/mortality relationship; sources of potential error or bias in epidemiological results; the likelihood of a causal relationship between $PM_{2.5}$ and mortality, and the shape of the C-R function.

## 1.2 RELATIONSHIP TO THE PILOT STUDY

The current study is not an extension of the pilot. Rather, it is a separate study that features a number of refinements intended to improve the elicitation process. It also reflects more recent research on $PM_{2.5}$-related mortality that has become public since the pilot study. To provide some perspective on the current study, we provide below an overview of the pilot study and its results and then discuss the key refinements incorporated into the full-scale study.

### 1.2.1 OVERVIEW OF THE PILOT STUDY

In 2003 and 2004, the Project Team conducted a pilot-scale elicitation study with five experts to explore the effectiveness of expert judgment techniques for characterizing uncertainty and to explore the use of the expert judgment results in the context of economic benefits analysis (IEc, 2004) (hereafter, "pilot study"). In particular, the pilot study was designed to provide feedback on the efficacy of the protocol developed and the analytic challenges, as well as to provide insight regarding potential implications of the results on the degree of uncertainty surrounding the C-R function for $PM_{2.5}$ mortality.

Like the full-scale study, the pilot study consisted of individual interviews featuring a series of qualitative and quantitative questions about the nature of the $PM_{2.5}$-mortality relationship. One key difference was that the quantitative questions in the pilot protocol asked experts to provide separate uncertainty distributions for changes in mortality due to long-term exposure (a 1 $\mu g/m^3$ decrease in annual average $PM_{2.5}$ levels) and changes in mortality due to short-term exposure (a 10 $\mu g/m^3$ reduction in daily average $PM_{2.5}$ levels). A detailed report on the pilot study (IEc, 2004); the results of a peer review of the pilot conducted in the summer of 2004; and descriptions of EPA's use of the pilot results as part of its uncertainty analysis for assessing benefits of the Non-road Diesel Engine Rule (EPA, 2004), the Clean Air Interstate Rule (EPA, 2005a), and the Guidelines for Best Available Retrofit Technology (BART) (EPA, 2005b) can be found at the following website: http://www.epa.gov/ttn/ecas/benefits.html.

For changes in annual average $PM_{2.5}$ levels (which are the focus of the present study), experts in the pilot study estimated median values ranging from zero to a 0.7 percent reduction in mortality associated with a 1 $\mu g/m^3$ decrease in annual average $PM_{2.5}$ levels in the U.S. Four of the five experts provided median values of 0.5 percent or less, and the combined mean effect across all experts was 0.33 percent. Most experts were influenced most heavily by results of the American Cancer Society (ACS) cohort, including the HEI reanalysis (Krewski et al., 2000) and the Pope et al. follow-up (2002). Experts placed less weight on the results of the Six Cities cohort (Dockery et al., 1993), despite citing numerous strengths of that study during the interviews. Experts varied in their level of confidence that the relationship between mortality and long-term $PM_{2.5}$ changes was causal, with three experts providing probabilities of a causal relationship in the 40 to 50 percent range and two providing probabilities in the 80 to 90 percent range. Two of the five experts incorporated thresholds into their distributions (IEc, 2004).

The peer review of the pilot study was generally positive but raised three main issues. First, reviewers recommended that we provide opportunities for communication between

experts before and/or after the elicitation interviews, which was not possible in the pilot due to time constraints. Second, they encouraged us to take steps to minimize the potential that experts anchor too closely to individual studies (i.e., anchoring and adjustment bias), which can lead to overconfidence in judgments.[5] Third, several reviewers expressed reservations about the reporting of combined (or pooled) expert judgments in the pilot report.[6]

### 1.2.2 IMPROVEMENTS IN THE FULL-SCALE STUDY

The full-scale study features numerous improvements intended to address both comments from the peer review of the pilot and issues identified by the Project Team while conducting the pilot. Changes from the pilot study include the following:

- **Shorter protocol.** This study features a shorter protocol focused on total changes in adult, all-cause mortality associated with a 1 μg/m3 decrease in annual average $PM_{2.5}$ in the U.S. The protocol for the pilot study was too long and difficult to complete in an 8-hour day, because it required elicitation of two separate distributions, one for short-term and one for long-term impacts of $PM_{2.5}$ exposures. As a result, the interviews often felt rushed, which may have had an impact on the quality of the judgments we received. Based on our experience in the pilot study and advice received from health experts who reviewed early drafts of the protocol, the full-scale study takes a more integrated approach that covers issues related to short- and long-term exposure, but elicits a single C-R function that integrates experts' judgments about the impacts of changes in peak and long term exposure associated with a 1 μg/m3 decrease in annual average $PM_{2.5}$ in the U.S.

- **Additional expert review and feedback on protocol.** Protocol development benefited from additional review and feedback from the scientific community. The Project Team conducted an EPA Symposium in April 2005 with more than 30 internationally-recognized experts knowledgeable about PM health effects. The purpose of the EPA Symposium was to present EPA's plans for conducting the full-scale elicitation and to get feedback on the structure and content of the protocol.

- **Larger expert panel.** This study interviewed a larger panel of 12 experts selected from an unrestricted pool of potential experts via a peer nomination process. The panel includes expertise in epidemiology, toxicology, and medicine. Expert selection in the pilot used 5 experts selected from a restricted pool derived from the

---

[5] "Anchoring and adjustment" refers to when an expert begins his estimates with, or "anchors" on, a particular value then develops confidence intervals by adjusting that value to account for various factors that influence his judgment. Some expert judgment research has shown that use of this approach may lead to overconfidence, and thus poor accuracy, because respondents often fail to adjust confidence intervals adequately for what they do not know.

[6] One reviewer did not feel that it was appropriate to combine the individual distributions into a single estimate. Another preferred that expert results be applied in benefits analysis individually and then pooled, rather than being combined as part of the expert judgment study. Some reviewers commented that the combination of judgments using averaging across experts might generate results with which none of the experts would agree. While not endorsing combination of responses, some of the experts indicated that if results must be combined, they would be most comfortable with a process that uses equal weighting.

membership of two NAS committees. The small sample size of the pilot study was a concern noted by the EPA Science Advisory Board (SAB) Health Effects Subcommittee, which reviewed early plans for the pilot study (EPA SAB, 2004).

- **Improved briefing book materials.** The study featured improved briefing book materials for experts, including a CD containing over a hundred relevant studies, plus background information pages with data on air quality in the U.S., population demographics, health status, summaries of published effect estimates, and data on other factors (air conditioning use, housing stock, PM composition) that may affect experts' judgments. While the pilot study relied more heavily on compendia such as EPA's criteria document for PM for briefing book materials, we supplemented these materials in the full-scale study to provide clear and easy access to relevant studies and key data useful for developing quantitative estimates specific to the current U.S. population.

- **Pre-elicitation Workshop.** In response to peer-review comments, the full-scale study included a Pre-elicitation Workshop held in January 2006 to better prepare experts in advance of the interviews. The workshop provided training on the history of subjective judgment, and opportunity for review and comment on the elicitation protocol, and encouraged experts to share and critique data and analyses they believed were relevant to the questions in the protocol.

- **Better accounting of experts' views on relevant scientific issues.** The new protocol employed a more systematic approach to cataloguing and assessing expert views related to confounding, effect modification, exposure issues, and other potential sources of error or bias in published mortality effect estimates. During the pilot study, the Elicitation Team at times found it challenging to make sure that each expert systematically addressed in his quantitative estimates each of the major issues he may have raised in the conditioning phase of the protocol. Following a method used in a protocol designed for a study of climate change (Morgan et al., 2001), we modified the protocol for the full-scale study to give each expert a set of cards on which we asked him to write down key factors he wished to discuss. The cards were then used to organize and rank the factors, and to ensure that all factors are discussed and evaluated.

- **Greater flexibility.** The new protocol was designed to allow experts greater flexibility in specifying the shape of the C-R function and in eliciting the values for their uncertainty distributions. Our experience from the pilot elicitation indicated that the pilot protocol was not sufficiently explicit about the options available for characterizing the C-R function. We revised the protocol to facilitate the elicitation of judgments for experts who wished to specify a non-linear C-R function and/or incorporate uncertainty about thresholds. Also, at the EPA Symposium, several experts indicated that they would prefer to be able to explore specifying parametric distributions to assist them in estimating their intermediate percentiles, such as the 25th and 75th. The real-time feedback system, described below, provided alternative approaches to characterizing the uncertainty distributions.

- **More extensive real-time feedback.** The elicitation of judgments is a complex and iterative process. The pilot study lacked mechanisms to provide experts with real-time data and graphs that would allow them to better visualize, evaluate, and refine their initial judgments. The interviews for the expanded study included a new real-time feedback system that used spreadsheet models and Crystal Ball™ probabilistic modeling software to provide experts with graphs and data during the elicitation. The system, provided via Internet teleconferencing allowed for experts to visualize their distributions, to assess the effect of judgments about causality and threshold, to compare their results against published mortality effect estimates, and to estimate and compare the change in deaths associated with specific $PM_{2.5}$ reductions against U.S. mortality data for major causes of death.[7]

- **Post-elicitation Workshop.** The current study also included a workshop held following completion of the interviews (hereafter, "Post-elicitation Workshop") that allowed for a final discussion of themes that emerge in expert responses, differences in interpretation of key studies used to support responses, and any areas of confusion that arose during the interviews. The goal of this workshop was not to promote consensus, but again to ensure that all experts had access to the same information, could have outstanding questions addressed, and were able to provide feedback to EPA on the study. Experts had the opportunity to adjust their estimates following the workshop. As in the case of the Pre-elicitation Workshop, the Post-elicitation Workshop addressed a frequent concern expressed by peer reviewers of the pilot study that there should be more opportunity for communication between the experts.

- **Reporting of individual expert distributions only.** In response to concerns raised by peer reviewers related to the potential pitfalls of generating and presenting a single combined estimate as well as other feedback received during the planning for the pilot and full-scale studies, we have chosen to present only the individual expert distributions in this report, preserving the diversity of opinion across experts on this topic. However, we have conducted a sensitivity analysis using data pooled across experts from a simplified mortality benefits analysis (see Chapter 4 for further details).

## 1.3 ORGANIZATION OF THIS DOCUMENT

The remainder of this document is organized into four chapters. Chapter 2 describes IEc's analytical approach to conducting the expert judgment study, including the design of an elicitation protocol, testing of the protocol, selection of experts, expert workshops, and the interview process. Chapter 3 presents the results of the assessment, summarizing expert responses to both quantitative and qualitative questions. Chapter 4 provides discussion of both the quantitative findings of the study and the elicitation process itself. Chapter 5 includes the overall conclusions of the study.

---

[7] The elicitation team used either WebEx™ or Go To Meeting™ Internet conferencing software during the interviews.

# CHAPTER 2 | ANALYTICAL APPROACH

While researchers have been studying the process of eliciting and interpreting expert judgments for several decades, no single accepted, standardized method has emerged for this type of assessment. However, numerous studies conducted over the last two decades (e.g., Morgan et al., 1984 & 2001; Evans et al., 1994; Walker et al., 2001) have often shared common elements such as use of criteria for the selection of experts, the use of a detailed written protocol, the preparation of briefing materials, the elicitation of judgments in individual interviews, and where feasible, the convening of experts prior to and following the elicitation.

The motivation behind the development of the elements of formal elicitation studies is ultimately to help experts provide judgments that are informative, unbiased and well-calibrated. Specifically, they are intended to help avoid some of the well-documented heuristics and biases (Kahneman et al., 1982) that lead to poorly calibrated judgments. These heuristics include the tendency to rely on data or studies most cognitively available or recent (the availability heuristic), and the tendency to adhere too closely to published or initial estimates and failing to make adequate adjustments for key uncertainties (anchoring and adjustment heuristic). These and other heuristics can contribute to expert over-confidence (i.e., the tendency to express more certainty about a quantitative estimate than is warranted).

IEc has relied on the experience of earlier studies to inform the design of the overall process for this study. Exhibit 2-1 outlines the expert judgment process of this study. The main elements of the process included development of an elicitation protocol, selection of experts, development of a briefing book, the elicitation interviews, and expert workshops prior to and following individual elicitation of judgments. The diagram also indicates the influences of certain elements in the process on the development of others. For example, developing the protocol was an iterative process that was influenced not only by Project Team discussion, but also by the EPA Symposium and pre-testing of the protocol with two independent EPA scientists with expertise in the study of $PM_{2.5}$-mortality. In addition, discussions during the Pre-elicitation Workshop influenced elements of the protocol as well as the briefing book. Finally, the expert judgments were elicited during the personal interviews with members of the project team, but experts were allowed to adjust their responses following the Post-elicitation Workshop.

The following sections discuss each of the main elements of the expert judgment process described above. We also provide discussion of the decisions reached by the project team regarding the evaluation and presentation of experts' judgments.

EXHIBIT 2-1: OVERVIEW OF THE EXPERT JUDGMENT PROCESS



## 2.1 PROTOCOL DEVELOPMENT

In a formal elicitation process, the interview protocol serves several purposes. It ensures that experts are answering the same, clearly specified question;[8] makes explicit the critical assumptions and rationale underlying the expert's judgments; encourages experts to think critically about potential uncertainties; and helps the expert avoid some of the common pitfalls and biases when providing subjective judgments about uncertainty (Otway and von Winterfeldt, 1992). The Project Team developed a protocol over a period of 16 months that included a clear statement of the questions to be answered, including the critical assumptions underlying the main quantitative question, and provided a process for identifying and raising key issues, evidence, and interpretations upon which the expert could base his quantitative judgments.

The protocol evolved through a series of steps beginning with collaborative discussions with the Project Team aimed at scoping and structuring the problem that would be posed to the experts. A draft protocol was next reviewed and discussed by health experts at an expert elicitation symposium sponsored by EPA.[9] Following revisions to the protocol based on recommendations from the EPA symposium, the protocol underwent pre-testing with two independent EPA experts on $PM_{2.5}$ mortality. The Project Team finalized the protocol in January 2006, following the Pre-elicitation Workshop with the selected expert panel (discussed below).

The following sections discuss the development of the protocol, in particular the process of structuring the problem, the influence of the EPA Symposium, and the protocol pre-testing. It also describes the final structure of the protocol. A copy of the protocol used in the interviews is included as Appendix A.

### 2.1.1 STRUCTURING THE PROBLEM

The expert judgment literature discusses two broad approaches to elicitation of judgments; an aggregated and a disaggregated approach. As the term implies, an aggregated approach asks the expert to estimate the quantity of interest directly; for example, the numbers of newspapers sold in the U.S. in a particular year. In a disaggregated approach, the expert (or group of experts) would be asked to construct a model for estimating the quantity of interest and would be asked directly about the inputs to that model (e.g., population in each state, percentage of the population that reads newspapers). The theory behind the disaggregated approach is that it is easier for experts to answer questions about the intermediate quantities than about the total quantity. Relatively few studies have been done to compare the two approaches, however. Morgan and Henrion (1990) note that studies that have attempted to document the superiority of the disaggregated approach have shown mixed results.

---

[8] The "clairvoyance" test is often used to determine if a question is well-specified. The clairvoyance test asks whether an all-knowing individual would be able to answer the question without asking for additional information (Hora, 1992).

9 IEc also received valuable early input from Dr. Andrew Wilson of the Harvard Center for Risk Analysis, a researcher in expert judgment elicitation.

The Project Team carefully considered the relative advantages and disadvantages of the two approaches. A major advantage of the disaggregated approach is a more structured and transparent characterization of the key inputs and sources of uncertainty in the final quantity of interest. However, this method does require additional time and resources to develop not only a set of input variables, but also a model structure (or in some cases, multiple models) specifying the mathematical relationship between the variables on which the experts can agree prior to the individual elicitations. An aggregated approach can be easier to implement, both because it does not require extensive consultation with the expert panel to reach consensus on a model structure and because can reduce the length of the elicitation protocol. However, these benefits must be weighed against concerns about transparency of expert responses and the difficulties faced by experts who will be expected to mentally integrate the various problem components to provide their judgments.

The Project Team opted to pursue a largely aggregated approach, with some disaggregated elements. The protocol elicits a single distribution of the mortality impact of a unit change in annual average $PM_{2.5.}$ This effect distribution integrates the mortality impacts of the changes in both short-term (e.g., peak 24-hour) and longer-term $PM_{2.5}$ exposures that may contribute to a 1 $\mu g/m^3$ reduction in annual average ambient $PM_{2.5}$. The Project Team selected this approach for several reasons. First, our experience with the pilot study showed that eliciting separate distributions for the mortality impacts of short-term and long-term changes in exposure was very time consuming and difficult to complete in the 8-hour timeframe of the interview. Second, the team believed the large panel of experts recruited for this study made it unlikely that we could reach agreement among the group on a quantitative model for disaggregating the PM mortality effect estimate. Attendees of the EPA Symposium (see below) also supported this approach.

In an effort to ameliorate concerns about the aggregated approach we developed a comprehensive and detailed set of conditioning questions and also incorporated some quantitative disaggregated elements. The team designed the conditioning questions to promote transparency and provide a thorough understanding of the foundation of beliefs underlying each expert's quantitative distribution, including the ranking of key elements of uncertainty and careful documentation of key evidence in support of judgments. In addition, we gave experts the option to disaggregate two potentially challenging elements of an aggregated model: the likelihood that a causal relationship does or does not exist linking $PM_{2.5}$ exposures with mortality, and the likelihood and location of a threshold for PM mortality effects.

#### 2.1.2 EPA SYMPOSIUM

The protocol development was also influenced by an EPA Symposium on the proposed expert elicitation project in April of 2005. The purpose of the EPA Symposium was to discuss the role of expert elicitation in EPA's efforts to improve the characterization of uncertainty in regulatory benefits analysis, particularly in the relationship between long-term $PM_{2.5}$ exposures and mortality. Attendees of the first day of the symposium included representatives of EPA and OMB, a group of invited scientists with expertise in the health effects of $PM_{2.5}$, and members of the public.

During the first half of the EPA Symposium, which was open to the public, members of the Project Team provided an overview of the use of expert elicitation in uncertainty analysis, including a presentation of the results of the pilot study and their use in an RIA as well as a discussion of plans for the full-scale expert elicitation study on $PM_{2.5}$ and mortality. This portion of the EPA Symposium concluded with an opportunity for audience members to comment on the design and content of the elicitation.

The second half of the EPA Symposium consisted of a closed meeting with Project Team members and the invited scientists to carefully review the draft elicitation protocol for the full-scale study. A series of moderated discussions were held to help assess whether the draft protocol was focused on the right questions, that it was comprehensive (i.e., addressing key elements of uncertainty) and that the questions and associated assumptions were clearly specified.

Following the symposium the Project Team and additional representatives from EPA and OMB met for half a day to discuss possible modifications to the draft elicitation protocol in response to suggestions made during the EPA Symposium. Comments by members of the public, the invited experts, OMB, and EPA were considered when revising the elicitation protocol and other study design aspects. Examples of specific decisions informed by the EPA Symposium included the following:

- The questions should focus on $PM_{2.5}$ (mass concentration); data on $PM_{2.5}$ components are too limited to support meaningful judgments;
- The questions should explicitly encourage experts to think broadly about evidence and theories from all relevant disciplines, and should be clear to both epidemiologists and non-epidemiologists;
- The protocol should provide experts with the option to either include judgments about causality either directly into their effect distribution or separately;
- The main quantitative question should focus on all-cause mortality as the outcome, rather than eliciting separate C-R functions for specific causes of death;
- The protocol should employ an aggregated approach to eliciting total mortality effects from long-term and short-term $PM_{2.5}$ exposures, rather than a disaggregated approach in which judgments about the effects of short-term and long-term exposures are elicited separately;
- The Project Team should include PM values in the study ranging from background up to the upper end of concentrations found in epidemiologic studies (4-30 $\mu g/m^3$);
- The protocol should specify that housing stock and levels of susceptibility in the U.S. population will remain constant for purposes of the study and co-pollutant concentration is unknown and remains a source of uncertainty;
- The briefing book should include data on the current U.S. population, such as health status and educational attainment;
- The interview should feature real-time feedback tools to allow experts to visualize their distributions as well as the impact of their views on causality and threshold.

In addition, the tools would provide experts with a “back of the envelope” calculation to show how their judgments translate into number of deaths as a "reality check."

### 2.1.3 PROTOCOL PRE-TESTING

Pre-testing of the protocol using experts not on the expert panel is critical to developing a well-functioning protocol. It enables the elicitation team to test the clarity of the questions and enables the team to practice and refine the process for administering the protocol. IEc conducted two full-length pre-tests of the protocol with two EPA experts in PM-related mortality: Dr. Tony Huang of EPA’s National Health and Environmental Effects Research Laboratory (NHEERL), an expert in PM toxicology in humans, and Dr. Lucas Neas of EPA’s NHEERL, an expert in PM epidemiology. The pre-tests were conducted in November of 2005. The pre-test subjects were not paid for their participation.

The pre-tests provided valuable input to the protocol development. Changes made to the protocol in response to the pre-tests included clarifications to the question about population thresholds and to the main quantitative question, the addition of a section where experts could discuss any important topics not previously covered (e.g., publication bias), and the inclusion of questions asking the experts to describe the strengths and limitations of the studies used to support their answers on mechanisms, causality, and threshold.

The pre-tests were also useful for identifying topics that would be helpful to discuss with experts at the workshop held before the Pre-elicitation Workshop. For example, it was evident that some confusion remained over the distinction between the causality and threshold question. Therefore, this was included as a topic discussion.

### 2.1.4 PROTOCOL DESIGN

The structure of the protocol is outlined in Exhibit 2-2. The protocol was divided into three parts: the preview and assumptions, conditioning questions regarding issues and evidence, and the quantification of a C-R function. (For experts who did not attend the Pre-elicitation Workshop, we also spent some time at the beginning of the interview discussing the objectives of the elicitation project and reviewing the expert elicitation process.)

The ultimate goal of the protocol was to get the experts to answer the following question:

> **What is your estimate of the true percent change in annual, all-cause mortality in the adult U.S. population resulting from a permanent 1 μg/$m^3$ reduction in annual average ambient $PM_{2.5}$ across the U.S.? In formulating your answer, please consider mortality effects of both reductions in long-term and short-term exposures.**

The protocol is divided into the following three parts:

**1) Preview and Assumptions.** In this section the elicitation team previewed the key quantitative question concerning the mortality impact of changes in annual average $PM_{2.5}$ concentrations in the U.S. In addition to emphasizing the ultimate goal of the elicitation, this section gave each expert the opportunity to examine carefully the underlying assumptions about factors such as historical and baseline exposures, regulatory implementation that might result in the hypothetical change in $PM_{2.5}$ concentrations, and characteristics of the U.S. population over time. After the preview, the expert had the opportunity to ask clarifying questions and raise any concerns regarding the specification of the main question and the assumptions.

**2) Conditioning Questions.** This section consisted of largely qualitative questions about factors to consider when characterizing the relationship between $PM_{2.5}$ exposure and premature mortality. These questions covered the following categories:

- Scientific evidence supporting physiological mechanisms linking $PM_{2.5}$ exposures to mortality;
- Key causes of death associated with $PM_{2.5}$ exposures;
- Conceptual framework for mortality effects of short-term and long-term $PM_{2.5}$ exposures;
- Role of study design in capturing effects of changes in annual average $PM_{2.5}$ exposures;
- Epidemiologic evidence for the impact of exposures to $PM_{2.5}$ on mortality;
- Evidence and impacts of confounding;
- Evidence and impacts of effect modification;
- Evidence and impacts of exposure misclassification;
- Likelihood of a causal relationship between $PM_{2.5}$ exposures and mortality;
- Potential thresholds in the C-R function; and
- Other influential factors (e.g., selection bias, statistical methodology, publication bias)

EXHIBIT 2-2: STRUCTURE OF THE ELICITATION PROTOCOL



These questions encouraged the experts to thoroughly and comprehensively consider key concepts, theories, and scientific evidence concerning the nature and potential magnitude of the $PM_{2.5}$/mortality C-R relationship. The expert's responses provided a conceptual foundation to support his quantitative judgments in the final section of the protocol. In answering these questions, experts were encouraged to rely on evidence from multiple disciplines and to consider impacts of both short-term and long-term $PM_{2.5}$ exposure, to the extent they believe both contribute to the mortality impacts of changes in annual average $PM_{2.5}$.

Unlike the pilot study, this protocol did not include questions about the relative toxicity of different PM components and sources. While the issue of differential toxicity remains a topic of interest to EPA, we removed these questions because of concerns expressed by the experts in the pilot study and the experts attending the EPA Symposium that available research is insufficient to support meaningful judgments on this issue.

**3) Elicitation of Quantitative Judgments.** The final section of the protocol presented the key quantitative question to be elicited:

> **What is your estimate of the true percent change in annual, all-cause mortality in the adult U.S. population resulting from a permanent 1 μg/m$^3$ reduction in annual average ambient $PM_{2.5}$ across the U.S.? In formulating your answer, please consider mortality effects of both reductions in long-term and short-term exposures. To characterize your uncertainty in the C-R relationship, please provide the 5th, 25th, 50th, 75th, and 95th percentiles of your estimate.**

In this section, the expert specified a functional form for the $PM_{2.5}$ mortality C-R function and then developed an uncertainty distribution for the slope of that function (the mortality impact per unit change in annual average $PM_{2.5}$). Experts could specify a functional form with a single slope that applies across the entire range of $PM_{2.5}$ annual average values specified in this study (4-30 μg/m$^3$) or could specify a more complex function by segmenting the study range of $PM_{2.5}$ and specifying different slopes for different segments. [10] The expert was also asked in this section to consider whether and how to factor his quantitative responses to the questions

[10] The $PM_{2.5}$ study range was developed through review of EPA monitoring data for the U.S., consultation with the EPA Project Team, and discussions during the EPA Symposium.

about the likelihood of a causal relationship and the potential for a population threshold into his distribution.

As shown in Exhibit 2-2, the elicitation was an iterative process. During the elicitation of the probabilistic distribution of $PM_{2.5}$ mortality effect estimates in the last part of the protocol, the elicitation team revisited responses to conditioning questions to ensure the expert's distribution was consistent with the judgments provided in the second section of the protocol regarding the various sources of uncertainty and their potential impacts.

## 2.2 EXPERT SELECTION

A well-designed expert selection process for an expert elicitation study should ensure that the final panel of experts has the appropriate expertise to address the questions posed to them and represents, as a group, a reasonably balanced range of respected scientific opinion on the issues being addressed. Previous studies (e.g., Hawkins and Graham, 1990) have also identified several additional criteria: the process should be explicit and reproducible, be reasonably cost-effective and straightforward to execute, and should minimize the level of control of the researcher conducting the elicitation.

We conducted expert selection in two parts, both of which relied on a peer nomination process and chose 12 experts for participation in this study. The first phase of the expert selection process was designed to select nine experts. The initial decision to include nine experts was based on several factors, including 1) a literature search that found most of the elicitation studies conducted to date (60 percent) use panels of six to eight experts, and 90 percent use panels of 11 or fewer experts (Walker, 2004); 2) it was deemed that nine experts would provide a balanced set of views on this topic; 3) the pilot study was criticized for the small panel size of five experts (EPA SAB, 2004); 4) government agencies are required to undergo an Information Collection Request process for the Paperwork Reduction Act if information is collected from more than nine individuals; and 5) resource and time requirements increase with each additional expert. The first phase of the selection process included the following steps:

1. **Identifying Experts to Provide Peer Nominations.** IEc conducted a literature search and publication count to identify a group of experts in the field who have published articles in peer-reviewed journals on the mortality and/or morbidity effects of PM exposure. We performed a search of pertinent literature published in the past 60 years (1945-2005) using the search engine Web of Science.[11] We used the results of the literature search to rank the authors based on the total number of first, second and last authorships combined. We selected the 32 highest-ranking authors to serve as nominators. The 32 nominators obtained from the publication count represented a range of expertise and perspective on the elicitation topic.

[11] The search included the following search terms: ("air pollution" or "particulate matter" or "fine particles" or "$PM_{2.5}$" or "$PM_{10}$") and ("death" or "mortality" or "survival" or "morbidity") and ("epidemiology" or "human" or "time-series" or "cohort" or "clinical"). IEc acknowledges support from Andrew Wilson of the Harvard Center for Risk Analysis in conducting the publication count.

2. **Obtaining Peer Nominations.** To encourage nomination of a broad array of experts on this topic, we divided the pool of potential nominators into four groups of eight. Potential nominators were assigned randomly to a group. We asked nominators to provide 10 names of individuals that met general criteria common to all groups. We also asked that the individuals nominated meet a set of criteria that was specific to each group (See text boxes for the criteria.) For instance, nominators in Group 1 received a list of criteria that included all of those listed in the "General Selection Criteria" as well as the two criteria listed in the "Group Specific Criteria" under "Group 1." Exhibit 2-3 shows the group assignments. We received 25 sets of nominations overall (seven from Groups 1 and 2; five from Group 3; and six from Group 4; nominators who provided lists are shown in bolded italics in Exhibit 2-3).[12]

**GENERAL SELECTION CRITERIA**

1. Ideal experts should possess the educational background and/or experience to both display a thorough understanding of results from the epidemiological literature addressing the relationship between chronic exposure to $PM_{2.5}$ and mortality, and to evaluate these results in the context of other evidence pertinent to the $PM_{2.5}$/mortality issue, such as relevant toxicological and physiological literature.

2. Experts may include primary scientific researchers as well as prominent individuals from scientific panels, institutions, journal editorial boards, and other such groups who, through their educational background and experience, are in a position to carefully interpret the key evidence regarding $PM_{2.5}$ exposures and mortality.

3. The overall set of experts nominated should be a balanced group that reflects the full range of respected scientific opinions concerning the strength of the evidence linking premature mortality with ambient $PM_{2.5}$ concentrations.

4. The nominees should all be based in either the U.S. or Canada.

[12] While this study did not allow nominators to self-nominate, eight experts in Exhibit 2-3 were nominated by others in the list and were ultimately selected as part of our expert panel. Given that the process of identifying nominators produced a list of frequently published researchers in the area of PM mortality, we believe it is reasonable that there would be significant overlap between the nominators and the selected experts.

**GROUP SPECIFIC CRITERIA**

We would like you to nominate experts that you feel:

**Group 1:**

- Are the most knowledgeable about the relationship between long-term $PM_{2.5}$ exposures and mortality; and/or
- Have studied in-depth the uncertainties and methodological limitations of existing cohort studies on $PM_{2.5}$ and mortality.

**Group 2:**

- Have made the most significant contributions to our understanding of the potential underlying biological mechanisms of the $PM_{2.5}$/mortality relationship; and/or
- Have made the most significant contributions to our understanding of the likelihood of a causal relationship between $PM_{2.5}$ and mortality.

**Group 3:**

- Display significant experience analyzing the relationship between $PM_{2.5}$ and mortality through participation in expert committees and workshops, and/or publication of review articles; and/or
- Display significant experience analyzing and applying the PM/mortality literature within a risk assessment and/or policy context.

**Group 4:**

- Are conducting innovative, cutting-edge research investigating the relationship between $PM_{2.5}$ and mortality; and/or
- Have made the most significant contribution to our understanding of the relationship between health effects and $PM_{2.5}$ exposures.

3. **Ranking and Selecting Experts.** We ranked experts based on the number of peer nominations they received within each specific group. We also compiled the groups into a combined ranked list. We then selected the top two nominees from each of the four groups, plus the most highly nominated expert from the remaining combined list, for a total of nine experts.[13]

4. **Replacing Experts.** If an invited expert was unwilling or unable to participate in the assessment, IEc replaced the expert with the next most highly nominated candidate in that expert's group, provided they were nominated by at least half of the respondents in that group. Otherwise, IEc replaced the expert with the next most highly nominated expert overall.

To aid the experts in the nomination process, we described the overall objectives of the expert elicitation project and provided them with an alphabetical list of first and last authors with at least two authorships as identified through the literature search, who are based either in the U.S. or Canada. To increase response rates, we followed-up the mailings with phone calls to the nominators.

[13] When faced with a group of two or more experts with the same number of nominations, we randomly selected from the tied set of experts.

### EXHIBIT 2-3: NOMINATORS DERIVED FROM PUBLICATION COUNT

| NOMINATOR | AFFILIATION |
|---|---|
| **GROUP 1** | |
| *Burnett, Richard T.* | Health Canada |
| *Ito, Kazuhiko* | New York University School of Medicine |
| Katsouyanni, Klea | University of Athens Medical School |
| *Saldiva, Paulo Hilario Nascimento* | University of Sao Paulo |
| *Zanobetti, Antonella* | Harvard School of Public Health |
| *Devlin, Robert B.* | U.S. EPA |
| *Dockery, Douglas W.* | Harvard School of Public Health |
| *Pope, C. Arden* | Brigham Young University |
| **GROUP 2** | |
| Brunekreef, Bert | Utrecht University |
| *Diaz, Julio* | Central University of Public Health, Madrid |
| *Ghio, Andew J.* | U.S. EPA |
| *Samet, Jonathan M.* | Johns Hopkins University |
| *Sunyer, Jordi* | Institut Municipal d'Investigacio Medica (IMIM) |
| *Costa, Daniel L.* | U.S. EPA |
| *Ostro, Bart D.* | California Office of Environmental Health Hazard Assessment |
| *Peters, Annette* | GSF-National Research Center for Environment and Health |
| **GROUP 3** | |
| Braga, Alfesio Luis Ferreira | University of Santo Amaro |
| Hoek, Gerard | Utrecht University |
| *Jerrett, Michael* | University of Southern California |
| *Künzli, Nino* | University of Southern California |
| Lee, Jong-Tae | Yonsei University |
| *Spengler, John D.* | Harvard School of Public Health |
| *Anderson, H. Ross* | St. George's Hospital Medical School |
| *Schwartz, Joel* | Harvard School of Public Health |
| **GROUP 4** | |
| *Ballester, Ferran (Diez)* | Valencian School of Studies for Health |
| *Brauer, Michael* | University of British Columbia |
| Dominici, Francesca | Johns Hopkins University |
| *Goldberg, Mark S.* | McGill University |
| *Krewski, Daniel* | University of Ottawa |
| *Levy, Jonathan I.* | Harvard School of Public Health |
| Lipfert, Frederick W. | Independent Consultant |
| *Thurston, George D.* | New York University School of Medicine |
| Note: Names in bolded italics indicate those who responded with a list of nominations. | |

While this process featured a good acceptance rate and yielded nine experts, the panel exhibited less diversity in expertise than we anticipated in design, with most experts being epidemiologists. In an effort to increase representation of the biological, medical, and toxicological disciplines, we conducted a second phase of selections. EPA sought additional nominations of experts in these fields based on nominations provided by the Health Effects Institute (HEI). The general criteria for nominations were the same as for the first part of the selection process (Holmstead, 2005). HEI provided EPA with an unranked list of 10 nominees, plus two alternates (O'Keefe, 2005).14 IEc used a random ordering process to determine the order in which these experts would be contacted, with a goal of inviting three additional experts from this list, for a total of 12 experts overall. If an expert declined, either the specified alternate for that expert or the next expert on the list was contacted. The acceptance rate for this second step was not as high as the first; IEc recruited three additional experts to participate.15 Exhibit 2-4 presents the final list of the 12 participating experts.

### EXHIBIT 2-4: FINAL EXPERT LIST

| NAME | AFFILIATION |
|---|---|
| Dockery, Doug W. | Harvard School of Public Health |
| Ito, Kazuhiko | New York University School of Medicine |
| Krewski, Daniel | University of Ottawa |
| Künzli, Nino* | University of Southern California Keck School of Medicine (currently at Institut Municipal d'Investigació Mèdica (IMIM) - Center for Research in Environmental Epidemiology, Barcelona, SPAIN) |
| Lippmann, Morton | New York University School of Medicine |
| Mauderly, Joe | Lovelace Respiratory Research Institute |
| Ostro, Bart D. | California Office of Environmental Health Hazard Assessment |
| Pope, C. Arden III | Brigham Young University |
| Schlesinger, Richard | Pace University |
| Schwartz, Joel | Harvard School of Public Health |
| Thurston, George D. | New York University School of Medicine |
| Utell, Mark | University of Rochester School of Medicine and Dentistry |

*Dr. Künzli was based in the U.S. at the time of expert selection, and subsequently began a sabbatical in Barcelona midway through the project.

The following experts were contacted, but declined to participate: Dr. Richard Burnett; Dr. Jonathan Samet; Dr. Michael Brauer; Dr. Carol Henry; Dr. Judith Graham; Dr. John Balmes; Dr. Gunter Oberdorster; and Dr. James Crapo. The most frequently cited reason for declining was scheduling concerns given the level of commitment asked of the experts.

[14] The alternates were provided for specific nominees, based on similarity of background and expertise.

[15] Three experts from the first group declined to participate, whereas five experts from the HEI list declined.

## 2.3 BRIEFING BOOK

All experts were sent a "briefing book" binder at least two weeks in advance of his interview (IEc, 2006). The purpose of the briefing book was to provide experts with a baseline set of materials to assist them in preparing for their elicitation interview; however, experts were free to consider other materials not included in the briefing book. The briefing book contained the following materials:

- The elicitation interview protocol;
- A CD containing over 150 relevant papers and compendia, searchable both alphabetically and by topic area;[16]
- A set of background information pages with recent U.S. data on air quality, health status, population demographics and other topics that may factor into the experts' probabilistic judgments; and
- Background materials, including a document describing factors to consider when providing probability judgments in order to avoid potential sources of bias, and an excerpt from 2002 National Research Council report on estimating public health benefits of proposed air rules.

Experts were given the opportunity to comment on the protocol and other materials either at the Pre-elicitation Workshop (discussed below) or privately, and where necessary, materials were updated and re-sent to all experts in response to the comments received prior to commencement of the first interview. Examples of the briefing book materials are included in Appendix B.

## 2.4 PRE-ELICITATION WORKSHOP

The expert panel was invited to participate in a day-long workshop in January of 2006. The workshop was designed to introduce the project, provide background information to the experts on expert judgment and the elicitation process, and to foster discussion about the key evidence available to answer the questions posed by the study.

The first half of the workshop consisted of presentations by the Project Team focused on educating the experts about the history of expert judgment elicitation, the objectives of this study, the design of the protocol, and the overall structure of the project. The experts also participated in a calibration exercise designed to familiarize them with the process of providing subjective probabilistic judgments. Another important goal of the morning session was to obtain feedback on the protocol.

The second half featured structured discussion sessions on three topics related to the $PM_{2.5}$-mortality issue (causality, shape of the C-R function, and evidence for quantitative estimates of the mortality effect of $PM_{2.5}$ exposure). In each discussions session, one

[16] For some of the topic areas, publications on the CD were restricted to those published since 2000 due to a large volume of studies in that area. The binder also included a list of additional PM health studies that had been compiled separately by EPA's National Center for Environmental Assessment for another purpose. Experts were able to request copies of these or any other papers they felt were relevant to the topic.

expert presented evidence related to the topic being discussed, and two other experts served as discussants. The purpose of these sessions was to both introduce important evidence for making judgments about each topic and to provide an opportunity for a critical discussion among all the expert participants about the strengths and limitations of that evidence. The Project Team was explicit that the goal of these discussions was not to encourage a consensus within the group, but to allow each expert to develop his own informed judgments.

Although every effort was made to find a date for the workshop that was amenable to all of the experts, eight of the 12 experts were able to participate in person for the full workshop; one participated by telephone for part of the day; and three were unable to participate. A workshop summary and copies of presentation slides from the workshop were sent to all 12 experts. Experts who did not attend the workshop were encouraged to review these materials carefully. In addition, papers cited at the workshop that were not already included in the briefing book were sent to all 12 experts in advance of their interviews, as was the finalized protocol, reflecting minor revisions requested by the experts at the workshop.[17]

### 2.5 ELICITATION INTERVIEWS

As in the pilot study, the Project Team chose to elicit the judgments of each expert individually during a personal interview. This choice reflects a preference based on a review of the expert judgment literature, and the goals of the project. Numerous approaches for obtaining subjective judgments from groups of experts with differing opinions have been proposed and demonstrated in the expert judgment literature (Morgan and Henrion, 1990; Cooke, 1991). Approaches vary widely in the degree of interaction between experts during or after the process and in whether the process is intended to achieve group consensus. Unfortunately, little research has been done that rigorously examines the relative ability of the different methods to achieve well-calibrated results (Morgan and Henrion, 1990). Most of the research comparing methodologies has involved almanac-type questions (e.g., "What is the height of Mount Everest?") and has shown little difference in the quality of the results obtained by the various approaches. The research does suggest that interactions between experts can increase rather than decrease the problem of overconfidence (and thus, poor calibration) (Morgan and Henrion, 1990). Whether these findings can be extrapolated to studies like this one that feature complex questions posed to relevant experts requires further research.

Prior to the interviews, IEc provided each expert a copy of the protocol and the briefing book materials, including the pre-elicitation workshop summary. The material was provided to allow each expert to familiarize himself with the questions to be asked and the resources available in the briefing book.

---

[17] IEc clarified that experts should assume for the purpose of this exercise that the regulatory action will achieve proportional reductions in all $PM_{2.5}$ components, and added differential impacts of $PM_{2.5}$ sources and/or $PM_{2.5}$ components to the examples of factors experts may address in the Other Issues question.

The elicitations were conducted between January 31 and April 28, 2006. The Elicitation Team consisted of two interviewers, one experienced in the elicitation of expert judgments, Dr. Katherine Walker, and one with expertise in PM exposure assessment, Dr. Patrick Kinney of Columbia University. Dr. Kinney was selected for his expertise in the subject matter of the elicitation and for his ability to objectively evaluate the responses of the various experts. Mr. Henry Roman and/or Ms. Tyra Gettleman of IEc also participated in the latter half of each interview, using internet-based conferencing software to provide experts with real-time feedback on their quantitative responses, as discussed below. Eleven of the 12 interviews were conducted at the expert's offices; one was conducted at Dr. Kinney's office.[18]

Most of the elicitations were conducted over the course of a single 8-hour day. Due to scheduling constraints, one of the elicitations was conducted over two days, the first half being completed the afternoon of the first day and the second half the next morning. Typically, covering the introductory material took about an hour, while the remaining time was split approximately evenly between answering the conditioning questions, and answering the quantitative questions.

For each question in the protocol, experts were asked to think systematically about the relevant evidence and to consider any sources of uncertainty, error, or bias that might influence their interpretation of that evidence. The elicitation team requested that experts cite specific studies or other evidence supporting their judgment on a particular issue, and also prompted experts to consider specific evidence that would support an opposing or alternative position. This approach gave experts the opportunity to more fully evaluate the robustness of their conclusions, allowing them to make adjustments to their judgments in light of the full range of evidence or explain why they found the alternative evidence unpersuasive.

For the conditioning questions related to the influence of confounding, effect modification, and exposure misclassification on published epidemiological studies, the elicitation team asked the expert to write each factor he wished to discuss on a card. The team then asked the expert to physically group and rank the cards in response to questions about the direction and size of the impact of these factors on the results from each of the epidemiological studies the expert cited as most relevant.

For the quantitative questions, each expert was first asked to specify his assumptions about the overall shape of the $PM_{2.5}$-mortality C-R function for the range of $PM_{2.5}$ concentration changes specified. This step included questions about the functional form for the C-R relationship (e.g., linear, log linear, piece-wise linear, curvilinear and whether he planned to incorporate a threshold).

Another key decision each expert faced at this juncture was whether he wished to incorporate his quantitative judgments about the likelihood of a causal relationship

[18] One expert's schedule could not accommodate an interview at his office during the timeframe of this study. The expert was able to travel to New York during this time period, however, and he agreed to conduct the interview at Dr. Kinney's office at Columbia University instead.

directly into his characterization of uncertainty or whether he wished to have it be incorporated at a later stage. Experts who chose the latter approach were asked to acknowledge that they planned to develop their uncertainty distributions about the $PM_{2.5}$-mortality relationship conditional on the assumption that a causal relationship exists.

As part of the process of eliciting quantitative values, we asked each expert to identify the most important factors that might contribute to bias in published, peer-reviewed estimates of the percent increase in mortality associated with PM exposures and to quantify the effect of such biases on the overall uncertainty in those estimates. Each expert was then instructed to consider whether his quantitative responses needed to be adjusted to account for those potential biases.

Each expert was then asked to estimate the percent reduction in all-cause mortality associated with a 1 $\mu g/m^3$ decline in $PM_{2.5}$ associated with several fixed percentiles; minimum, 5th, 25th, 50th, 75th, 95th, and maximum of the distribution intended to describe his uncertainty in the magnitude of the "true" but unknown relationship (hereafter, his "uncertainty distribution) In an effort to minimize use of the "anchoring and adjustment" heuristic, the protocol was designed to begin with the theoretical basis for bounding the estimates (min, max, 5th and 95th percentiles), although some experts found this approach counter-intuitive preferred to begin with the median.

Each expert was also given the opportunity to use spreadsheet tools developed by the Elicitation Team that provide real-time feedback regarding the expert's responses. The Elicitation Team used two spreadsheets that were shared via an internet conferencing software. The first spreadsheet ("Spreadsheet Tool 1") was used to record the expert's estimated values for each of the fixed percentiles, his likelihood of a causal relationship, and his quantitative views on the existence of a threshold. The expert could either specify all of the percentile values of the distribution directly, or could specify a parametric distribution to assist with estimating some percentiles and/or to visualize the final distribution. Experts who chose the parametric approach could specify two or more parameters (e.g., 5th and 95th percentile or mean and standard deviation) of a parametric distribution (e.g., normal, Weibull) that described their judgments. The Elicitation Team used Spreadsheet Tool 1, along with Crystal Ball™ probabilistic software (CB), to build the distribution and then showed the expert a probability density function (PDF) and/or a cumulative density function (CDF) representation of his distribution.

If the expert specified that his mortality effect distribution was conditional on the existence of a causal relationship between $PM_{2.5}$ exposures and mortality, the protocol originally called for the Elicitation Team to incorporate the expert's estimate of the causal likelihood into the distribution probabilistically.[19] The Elicitation Team then displayed a

[19] The elicitation team multiplied the expert's uncertainty distribution by a Yes/No distribution representing the expert's likelihood of a causal relationship to illustrate how his view of causality would impact his distribution when applied in a benefits analysis. For example, if an expert specified a causal likelihood of 95 percent, his distribution would be multiplied by one for 95 percent of the time and by zero for five percent of the time. This approach assumes that the expert's causality distribution and conditional mortality effect distribution are independent.

PDF and CDF of his distribution incorporating the causal likelihood for the expert to review.[20]

As in the pilot study, when experts used approaches to characterize the concentration response function as non-linear, or incorporated thresholds, and/or developed distributions conditional on a causal relationship, the elicitation team thought it was important for experts to be able to visualize the integrated impact of these various assumptions on an overall uncertainty distribution for the percent reduction in mortality. The elicitation team accomplished this step using Spreadsheet Tool 1 and CB. Crystal Ball was used to sample from the expert's uncertainty distribution and his distribution of possible threshold levels, in relationship to the 2002 distribution of population-weighted $PM_{2.5}$ annual average concentrations in the U.S., obtained from EPA's benefits analysis model, BenMAP.[21] A similar approach was also used to illustrate the effect of specifying different slopes of the C-R function for different ranges of baseline annual average $PM_{2.5}$.

The second spreadsheet ("Spreadsheet Tool 2") was intended to show the expert alternate displays of his distribution as well as some of the implications of his distribution for estimates of mortality in the U.S. The first display in Spreadsheet Tool 2 showed each expert a graph plotting his uncertainty distribution as well as the analogous distributions from selected epidemiologic studies. Alternatively an expert could view his uncertainty distribution in the form of juxtaposed box plots of mortality estimates from the epidemiologic studies on which the expert relied for his quantitative estimates.[22] Finally, an expert could view two "back of the envelope" calculations based on his distribution.[23] The first was an estimate of the number of annual deaths that might be avoided if the annual average $PM_{2.5}$ concentration in the U.S. were reduced from 12 to 11 μg/m$^3$. The second was an estimate of the number of annual deaths that might be avoided if the annual average $PM_{2.5}$ concentration in the U.S. were reduced from 12 to 4 μg/m$^3$.[24] The expert was then shown a bar graph plotting the estimated annual deaths attributable to this drop in air pollution compared with annual deaths attributed to other major risk factors

---

[20] As discussed later under the discussion of the post-elicitation workshop, the Project Team agreed that this approach was not suitable approach for combining these two elements of the experts' judgments, and subsequently has presented them separately. The result of this change is that the uncertainty distributions of those experts who incorporated causal likelihood estimates are not directly comparable to those who did not and they are therefore presented separately.

[21] The Example Applied distribution was created as follows: On each iteration of CB, a value for baseline PM2.5 was selected from the BenMAP distribution, a value for the effect threshold was selected from the expert's threshold distribution, and a mortality effect estimate was selected from the expert's distribution incorporating causality. For each iteration, if the PM2.5 value equaled or exceeded the threshold, then the value from the distribution incorporating causality was selected for the example applied distribution; otherwise zero was selected. The process was repeated 10,000 times to generate the Example Applied distribution.

[22] All box plots consisted of the median, interquartile range, and 90% confidence interval.

[23] In order to perform the "back of the envelope" calculations of avoided deaths, we used the following damage model $D = P \times M \times (\exp(\beta \times \Delta PM) - 1)$, where: D = Number of Annual Deaths Avoided; P = U.S. Population (data taken from the Census Bureau website (www.census.gov)); M = Background mortality rate in the U.S. (deaths/100,000 population) (data taken from the Centers for Disease Control and Prevention (www.cdc.gov)); β = expert's C-R coefficient (percent change in mortality per 1 μg/m$^3$ change in $PM_{2.5}$ divided by 100); and ΔPM = change in annual average $PM_{2.5}$ (μg/m$^3$).

[24] In this example, 4 μg/m$^3$ is assumed to be the background level.

(e.g., smoking) and to the major causes of death in the U.S. The calculations were intended to provide a "reality check" for the expert. The two calculations were performed for the expert's 5th, 50th, and 95th percentiles of his distribution, and were also completed for other values at the request of the expert.

The Elicitation Team took extensive notes during the interviews. In some cases, experts may have written or sketched responses to certain questions. Following each interview, IEc provided the expert with a summary of his qualitative and quantitative judgments for review, adjustment and/or confirmation of his responses.

To maintain confidentiality, each expert was assigned a randomized letter between A and J with which his judgments would be associated in this report. We provided confidentiality to allow experts the freedom to express candid, independent opinions even if they should differ from those he has expressed publicly or from those of his employer.

### 2.6 POST-ELICITATION WORKSHOP

The project team held a final workshop with the experts following the completion of the elicitation interviews. The objectives of this workshop were to:

- Anonymously share the results of all experts with the group;
- Highlight areas where expert opinion varied for possible additional discussion;
- Clarify points of confusion that may have emerged during the interviews;
- Discuss data not available to all experts at outset of interviews;
- Give experts the chance experts to raise issues with which they had struggled during the interview for a broader discussion; and
- Encourage critical review by the experts of their judgments.

The Post-elicitation Workshop was not intended to force or otherwise promote a consensus. If points of agreement on issues occurred naturally, we documented them. No efforts were made to encourage experts to change their responses. All expert responses were presented using randomly assigned letters. Individual expert summaries prepared following the elicitations were not provided to the rest of the expert group.

The Post-elicitation Workshop was held in June of 2006. Eleven of the 12 experts participated in at least part of the workshop, and ten were present for three quarters of the discussions. The 4-hour workshop consisted of an overview of the qualitative and quantitative results from the 12 interviews, highlighting both areas of general agreement and areas where expert opinion varied. The overview was followed by a series of discussion sessions focused on topics identified by the elicitation team that exhibited significant variation in opinion across experts and that were viewed as having a significant impact on the results. The purpose of these discussions was not to promote consensus, but rather to clarify points of confusion or differences in interpretation of specific questions. The workshop included an open discussion session where experts could raise topics for discussion or clarification, as well as a session where experts could

provide feedback on the elicitation process. A discussion of the results of this workshop can be found in Chapter 3.

Following the Post-elicitation Workshop, a meeting summary and other follow-up materials requested at the Workshop were sent to all 12 experts. All experts were provided an opportunity to revise their judgments privately following the workshop, on the basis of insights gained from the Post-elicitation Workshop discussions, and were given a form to complete if they opted to make changes. Experts were allowed to modify both their quantitative probabilistic distributions as well as other quantitative and qualitative responses given during the interview. Experts were asked to clearly describe the changes requested and provide a detailed rationale suitable for inclusion in this report. Where necessary, the Elicitation team followed up with the experts by phone to clarify information submitted on the modification form.

## 2.7 EVALUATING EXPERTS' JUDGMENTS

To understand how experts' performance is assessed, both in the broader expert judgment field and for this project, it is important to understand that each expert's probabilistic judgment is a reflection of his or her own state of knowledge. (How well or with what degree of certainty does he think he can predict the quantity of interest?) One measure of his success is therefore related to how well he knows the limits of his knowledge. In the expert judgment field, this measure is known as calibration. An expert is well-calibrated if, for example, when asked to give his 90 percent confidence intervals for 100 predictions, his intervals contain the true value 90 percent of the time. A second important measure of the quality of an expert's judgment is "informativeness," an attribute reflecting the breadth of his confidence intervals. Two experts, one giving very broad intervals and the other very narrow, can both be well calibrated, but the latter is more informative. Finally, good judgments should be unbiased. That is, even if an expert is well-calibrated using the definition above, his median should fall close to the expected "true" median for the predicted value.

Of particular concern for analysis and decision-making is that research has suggested that experts tend to be overconfident, and therefore poorly calibrated (see Morgan and Henrion, 1990 for a review). In essence, they think they know more about the subject than they do, and therefore they express greater certainty in their predictions than is warranted. Their confidence intervals tend to be overly narrow, causing them to "miss' the true value entirely, or they may provide biased estimates. In the calibration example discussed above, an overconfident expert's 90 percent confidence intervals would contain the true value less than 90 percent of the time. Such inaccuracy in a key input to an analysis could have significant effects on the outcome.

At the same time, we do know that experts can perform well making predictions in their own areas of expertise. Studies have also shown that experts who receive regular feedback on their judgments (e.g., weather forecasters, see Murphy and Winkler, (1992); and physicians, see Winkler and Poses, (1993)). Walker et al. (2003) demonstrated that

exposure experts asked to predict benzene concentrations in EPA Region V were relatively well-calibrated.

Techniques do exist to objectively evaluate experts' performance. The "gold standard" for judging their performance requires that the "truth," for example the true $PM_{2.5}$ C-R function, become known. For studies like this one, the gold standard is clearly beyond reach due to data gaps. Other investigators have used additional sets of questions, for which the truth can subsequently be known, to assess the calibration of experts (Cooke, 1991). This approach requires careful selection of a set of questions that are likely to be valid predictors of calibration on the questions that are the focus of the assessment. Neither of these calibration alternatives was available for this study. Concern about feasibility of devising calibration questions that would be equally applicable to experts with the variability in technical background represented by the expert panel led the Project Team to decide not to incorporate a calibration component into this study.

In the absence of these calibration measures, we developed the protocol, followed elicitation procedures, held workshops, and provided extensive briefing materials with the objective of helping the experts avoid some of the common biases and errors of judgment (also referred to as heuristics) that can lead to poor calibration. Both during and subsequent to the interviews, we have evaluated the results of this study considering whether: 1) the judgments were statistically coherent; 2) the judgments were reasonably consistent with the rationales given by the experts; and 3) whether the process did help experts to avoid some of the common pitfalls associated with giving subjective judgments. The results of this evaluation are described in Chapter 4.

### 2.8 APPROACHES TO PRESENTING RESULTS

When faced with differing judgments across experts, analysts must give careful thought to whether and how to combine these judgments into a single value or distribution. Many investigators (e.g., Hawkins and Graham, 1990; Winkler and Wallsten, 1995; and Morgan et al., 1984) have preferred to keep expert judgments separate in order to preserve the diversity of opinion on the issues of interest. In such situations, the range of values expressed by the experts can help decision-makers by serving as inputs to sensitivity analyses of analytical models and thereby bounding possible outcomes. Individual judgments can also illustrate dichotomies of opinion arising from different disciplinary perspectives or from the rational selection of alternative theoretical models or data sets (Morgan and Henrion, 1990).

For this analysis, IEc has presented only the individual quantitative distributions of the mortality effect estimate elicited from the 12 experts interviewed. This approach differs from the Pilot Study, where we presented both individual expert distributions and a single, combined distribution using equal weights for each of the five experts. The Project Team discussed this issue extensively during the planning phase of this project and considered feedback on this issue from several sources. The decision not to combine expert responses was ultimately based on consideration of peer review comments on the pilot study, advice from EPA's Science Advisory Board (SAB), discussions from EPA's

April 2005 symposium on the full-scale PM Expert Elicitation study, and the composition and nature of the expert panel.

The external peer review of the pilot study yielded extensive comments on the issue of combining of expert responses. The peer reviewers disagreed about whether experts' judgments should be combined as part of the expert elicitation study and none identified a generally agreed-upon method of combining expert responses. One reviewer felt strongly that expert judgments should not be combined, cautioning that the combined distribution could produce a result that none of the experts would endorse, and another recommended that combination should only occur outside of the expert elicitation study (e.g., through the pooling of benefit estimates generated by running each expert's distribution individually through a benefits model.) No consensus approach to this issue emerged from the external peer review.

The Health Effects Subcommittee (HES) of EPA's SAB Advisory Council on Clean Air Compliance Analysis provided EPA with a limited review of the pilot study methodology as part of its review of plans for EPA's second prospective Analysis of the Costs and Benefits of the Clean Air Act (EPA-SAB-COUNCIL-ADV-04-002, March 2004). In its recommendations, the committee strongly emphasized the presentation of individual judgments:

> "…the HES advises EPA to present the entire collection of individual judgments; to carefully examine the collection of individual judgments noting the extent of agreement or disagreement; to thoughtfully assess the reasons for any disagreement; and to consider formal combinations of judgments only after such deliberation and with full awareness of the context ..."

At the April 2005 EPA Symposium, the issue of combining results was discussed among the invited health experts, some of who cited concerns over the equal weighting of results in the pilot study. Several attendees suggested the use of weights derived from the content and quality of responses.[25] Ideally, these weighting systems would address problems of uneven calibration (i.e., accuracy) and informativeness (i.e., precision) across experts, as well as potential motivational biases (Cooke, 1991).[26] However, implementation can be problematic. Weights determined based on the analyst's judgment or the judgment of the other experts are likely to have a significant subjective component and may themselves be subject to motivational biases; more objective methods that rely on an expert's answers to calibration questions with known answers are appealing, but not universally endorsed, in part because of the difficulties of identifying appropriate

---

[25] The literature includes several approaches that have been used to assign weights to individual experts based on content and expertise. Weights can be assigned based on the analyst's opinion of the relative expertise of each expert; on a quantitative assessment of the calibration and informativeness (i.e., precision) of each expert based on their responses to a set of calibration questions (as described in Cooke, 1991); or on weights assigned by each expert, either to him or herself or to the other experts on the panel (see Evans et al., 1994 for an example of this approach).

[26] "Motivational bias" refers to the willful distortion of an expert's true judgments. The origins of this bias can vary, but could include, for example, a reluctance to contradict views expressed by one's employer or a deliberate attempt to skew the outcome of the study for political gain.

questions for measuring expertise in the subject matter. The Project Team ultimately did not identify a preferable weighting scheme for combining responses.

Finally, the Project Team considered the selection process for the expert panel and its implications for combining judgments. A key objective of the selection process was to ensure representation of the full range of respected scientific opinion. However, the resulting panel is not a statistical sample; it does not reflect the relative weights of the various opinions expressed by the experts. Thus, a combination approach using equal weighting, for example, might overweight some opinions and underweight others. Lacking data on the prevalence of opinion in the expert universe, the team felt it would be inappropriate to present a mathematically combined distribution based on this sample.

The Project Team also considered behavioral approaches to combining expert responses, which require experts to interact in an effort to reach a consensus opinion. As in the pilot study, we chose not to consider a behavioral approach for several reasons. First, because there is disagreement regarding certain aspects of the likely nature of the PM-mortality relationship, we viewed the potential for achieving consensus to be very limited. Second, because the experts were selected to reflect the range of respected scientific opinions on this issue, individual elicitations enabled us to examine and preserve the variability in the experts' responses. Finally, the use of individual elicitations also avoids the dominance of the group opinion by any one individual and "attempts to preserve the unique perspective of each expert" (Wolff et al., 1990).

# CHAPTER 3 | RESULTS

This chapter of the report presents the experts' responses to the questions posed in the elicitation protocol. We divide the results into two sections. We begin by summarizing expert discussions in response to the conditioning questions, which covered topics addressing the key evidence for or against a $PM_{2.5}$-mortality relationship as well as specific characteristics of such a relationship. The conditioning section generally follows the order in which the topics were raised in the elicitation interview. We then summarize the experts' responses to Part 4 of the protocol, including, their judgments concerning the shape of the concentration-response (C-R) function and their quantitative estimates of the percent change in annual, all-cause mortality in the adult U.S. population resulting from a permanent for a 1 $\mu g/m^3$ reduction in annual average $PM_{2.5}$ concentration across the U.S.

In the sections that follow, we identify the key rationales, key sources of data, and major uncertainties behind the experts' quantitative estimates of uncertainty, highlighting the important commonalities and differences among the experts' opinions. Where feasible, we also present tables summarizing the responses of each of the experts on a particular issue. (To preserve confidentiality of responses, we refer to experts using the letters A through L, which were randomly assigned to them.) Detailed summaries of each expert's responses to the protocol questions can be found in the Technical Support Document for this study (IEc, under development).

## 3.1 RESPONSES TO CONDITIONING QUESTIONS

The first half of each interview was devoted to addressing a broad set of "conditioning questions." The goal of these questions was to help each expert bring to mind and critique the scientific evidence they thought to be relevant to answering the quantitative questions about the $PM_{2.5}$-mortality relationship. Experts were encouraged to consider both relevant theory as well as empirical evidence from a wide range of scientific disciplines (e.g., epidemiology, clinical medicine, toxicology, exposure assessment). Because experts (as well as lay people) tend to bring to mind the evidence with which they are most familiar or to which they have been most recently exposed, the role of the elicitors in this discussion is to bring forward evidence that an expert may not have considered. While the protocol introduced the conditioning questions in a particular sequence, experts were offered the opportunity to respond in the order that made the most sense to them.

### 3.1.1 MAJOR CAUSES OF AND MECHANISMS FOR $PM_{2.5}$-RELATED MORTALITY

The quantitative characterization of $PM_{2.5}$-related mortality focused on total mortality. Consequently, the first set of questions in the protocol was important for understanding what the experts' thought the principal “drivers” of total mortality might be, such as the causes of death, the biological mechanisms, and the relative importance of long-term exposures versus short-term exposures in contributing to total mortality. These discussions also provided an important foundation for the experts' later evaluations of the strength of the causal relationship and their articulation of the potential existence of thresholds in the C-R function.

Experts were first asked to discuss whether they thought the mechanisms for PM related mortality differed between short-term exposures and long-term exposures. Experts A, B, C, F, G, H, K, and L chose to discuss the effects separately and the remaining four experts discussed the effects together. Despite their distinguishing between the effects of long and short-term exposures, it became clear that these eight experts saw some overlap across the two temporal domains.[27]

Regardless of experts' decisions to discuss the mechanisms and causes of death from short-term and long-term exposures separately or together, the types of effects often fell into similar categories. The main causes of death resulting from short-term exposures to $PM_{2.5}$ discussed by the experts were related to acute cardiac or respiratory events. Some experts also mentioned ischemic stroke as another plausible outcome. The three main contributors to mortality from long-term exposure discussed were cardiovascular mortality, chronic respiratory disease, and lung cancer.

Although the summaries below discuss some of the general patterns observed and the literature cited, it is important to recognize that there was often substantial variation in the depth and detail provided by individual experts. Some provided more general statements about kinds of evidence; others provided either detailed diagrams of mechanistic pathways or cited individual papers in support of particular viewpoints.

#### Cardiovascular disease

The mechanism that most experts thought was most plausible for explaining acute cardiac effects resulting from short-term particle exposures involved an oxidative stress response to particles deposited in the lung or translocated systemically, with release of reactive oxygen species leading to acute inflammation, cytokine release, compromise of the cardiac endothelium, and a fatal cardiac event. Acute responses could involve changes in blood coagulability/viscosity (Seaton et al., 1999; Peters et al., 2001; Riediker et al.,

---

[27] In particular, most of the experts cited the potential role of the "oxidative stress" pathways in which exposures to particles lead to inflammation and the release of cytokines, fibrinogen and other factors that may either directly impact the lung or be transported to and affect the heart or brain. Experts thought that this pathway represented a link between mechanisms for effects from short-term and long-term exposures. Pope et al. (2004a) and Ghio et al. (2000 & 2004) were often cited for the basic oxidative stress hypothesis. Additional scientific research supporting this hypothesis most frequently included work by Godleski (2000); Wellenius et al. (2003); Costa and Kodavanti (2003), and Sun et al. (2005). Expert E also cited work by Gurgueira (2002), Evelson and Gonzalez-Flecha (2000), and Rhoden (2004) in support of the role of reactive oxygen species and their impact on inflammation in the endothelium (cells lining the inner walls of blood vessels).

2004), and decreased plaque stability leading to the potential for increased risk of myocardial infarction (Zeka et al., 2005; Wellenius et al., 2003; Dominici et al., 2006). Experts A, E, G, and L also discussed ischemic stroke as potential causes of death, since it too could be triggered by this mechanism. Several experts mentioned "endothelial dysfunction" as another contributor to cardiovascular mortality from short-term exposures. Expert E cited a study by O'Neill et al. (2005) on brachial artery reactivity; Expert K mentioned Brook et al. (2002); Expert L mentioned Yamawaki et al.'s (2006) work on endothelial dysfunction and carbon black, though more in connection with a discussion of long-term exposures.

A second short-term cardiac mechanism discussed by several experts was related to particle-induced changes in the autonomic nervous system. Most experts discussed evidence showing that particle exposures may be associated with disturbances in the autonomic nervous system leading to changes in heart rate variability and other alterations. Here experts cited research on changes in heart rate variability (Pope et al., 1999; Gold et al., 2000; Creason et al., 2001; Devlin et al., 2003; Schwartz et al., 2005) and the defibrillator studies (e.g., Peters et al., 2000; Dockery et al., 2005). Two experts (E, L) thought that it would ultimately be found that this mechanism is related to the oxidative stress pathway, citing Schwartz et al. (2005).

Discussions of the cardiovascular effects of long-term exposures to fine particles were dominated by the hypothesis that chronic oxidative stress and inflammation in the endothelium contributing to accelerated formation of atherosclerotic plaque. The Sun et al. (2005) work was particularly influential in these discussions. This study reported progression of atherosclerosis in a strain of mice genetically pre-disposed to atherosclerosis (ApoE-/-) chronically exposed to fine particles. Many of the experts noted that this study provided a critical empirical link between studies showing the release of reactive oxygen species, thickening of the lining of carotid arteries (e.g., Kunzli et al., 2005), endothelial dysfunction, and epidemiologic studies showing increased cardiovascular mortality in populations exposed to fine particles. Expert L noted that works by Suwa et al. (2002) and Goto et al. (2004) were also supportive in this regard.

### Respiratory Mortality

The second cause of death most experts discussed in connection with exposure to fine particles was respiratory-related diseases. Several experts expressed the view that the evidence was weaker for respiratory than for cardiac effects, due in part to diminished statistical power to detect respiratory related deaths (e.g., deaths from respiratory disease are less prevalent and are more likely to be miscoded).

Several experts expressed a role for short-term exposures to particles in contributing to respiratory mortality. These experts generally indicated that short-term PM exposures contribute to respiratory mortality largely through exacerbation of existing conditions (e.g., Chronic Obstructive Pulmonary Disease (COPD), asthma, allergies, other underlying pulmonary disease, or heart disease). Experts D and F specifically discussed alteration in immune responses; F cited studies by Gilmour et al. (2002) and Zelikoff et al. (2003) showing increased mortality rates in animals exposed to both streptococcus and

particles compared with animals exposed to streptococcus alone and Plopper and Fanucchi (2000) showing altered immune defenses in exposed animals.

Experts E, F, G, H, I, J, K, and L chose to discuss a potential role for long-term exposures to particles in contributing to increased respiratory mortality. They generally focused on mechanistic and epidemiological evidence for changes in lung function and the implications for mortality. Expert E discussed particle related development of COPD, positing a role for reactive oxygen species in promoting inflammation, mucous hyper-secretion, and structural damage to the lung. He cited Saldiva et al.'s (2002) concentrated air particles (CAPs) study showing increased capillary wall thickness in the lungs of animals exposed to particles compared to unexposed animals and epidemiological evidence from the Adventists Health and Smog (AHSMOG) studies (Abbey et al., 1991 & 1999; McDonnell et al., 2000; Chen et al., 2005), Schwartz (1993), and the Children's Health Study (Avol et al., 2001; Gauderman et al., 2004). In support of the mechanism for lung damage, Experts F and H cited other CAPs studies in animals by Ghio et al. (2000) showing increased inflammation as indicated by blood fibrinogen. Experts E, G, K, and L all brought up the Children's Health Study in California (Avol et al., 2001; Gauderman et al., 2004) showing diminished lung function growth in high-pollution communities, and decreases in lung function in children who moved from lower to higher pollution areas as evidence of the possible contribution of chronic particle exposure to changes in lung health and ultimately to respiratory mortality. Expert K was not convinced that these changes were particle specific, noting that $NO_2$ appeared to play a role. Other experts suggested that $NO_2$ might have been a surrogate for traffic-related particulate matter.

Views on the possible contribution of particle exposure to the development of asthma were limited. Two experts cited growing evidence that early exposures to particles might contribute to the development of asthma; Expert K cited Diaz-Sanchez et al. (1999) as some evidence for a role of particles in the development of asthma. Expert L did not think the evidence on particles and asthma development provided a clear story.

### Cancer

Several experts discussed lung cancer in connection with long-term exposures to $PM_{2.5}$. Lung cancer arose in discussions of short-term exposures only to the extent that cancer patients might be a susceptible subgroup for short-term exposure effects.

The most common view expressed was that a connection between long-term PM exposure and lung cancer was scientifically plausible. Many expressed the basic argument that particulates contain mutagenic and/or carcinogenic chemicals that can act as initiators and/or promoters and that lung inflammation and the resulting cell turnover can act as a promoter. Several experts raised smoking as an analogy.

However, most noted that the epidemiologic data remained limited for lung cancer. Several experts cited Pope et al. (2002) as the strongest epidemiologic evidence of a link between particulate exposure and lung cancer and thought that findings from several other studies, though not statistically significant, were generally supportive. The strength of opinion about cancer ranged from Expert B, who thought there was a greater weight of

evidence supporting a link between lung cancer and particle exposure than for cardiovascular mortality, to Expert K who argued that the link was not strong and likely a function of poor control for confounding by smoking (noting the unreliability of personal smoking histories).

### 3.1.2 RELATIVE IMPORTANCE OF MORTALITY IMPACTS FROM SHORT-TERM AND LONG-TERM EXPOSURE CHANGES

The goal of this elicitation was ultimately to obtain a quantitative estimate for the total annual mortality effect that may result from a reduction in annual average $PM_{2.5}$ including both changes in short-term (e.g., 24-hour) and long-term exposures to $PM_{2.5}$. Developing an aggregated mortality estimate that reflects reductions in both short-term peak and long-term average exposures to $PM_{2.5}$ requires both assessing the relative contribution of short-term and long-term impacts to the overall change in mortality and thinking about the potential for overlap in the signals reported in different types of epidemiological studies (e.g., how much of the short-term impacts are captured by long-term cohort studies).[28] To assist experts in approaching this problem, we discussed with each of them the conceptual framework first presented in Kunzli et al. (2001). This framework uses Venn diagrams to describe the relationship between the deaths attributable to long-term exposures and those attributable to short-term exposures to fine particles (see Exhibit 3-1). Experts were encouraged to review and critically evaluate this diagram and discuss their own views about the relative contributions of different types of mortality impacts, developing alternative frameworks if necessary.

Nearly all experts found the structure described by Kunzli et al. (2001) a useful starting point for discussions though most discussed possible modifications to this basic conceptual framework. While the experts were not asked to specifically quantify the relative contributions of the different types of mortality, many discussed their views of the relative sizes of the different sets of mortality impacts. Exhibit 3-2 presents a summary of the experts' views on this issue based on responses to this and other sections of the protocol.

[28] For example, cohort studies focus primarily on analyzing the impact of long-term exposures to $PM_{2.5}$ but may also capture some of the impact of short-term variations in exposure during the cohort follow-up period. Time-series studies analyze the impacts of daily or short-term variations in PM concentrations and can characterize the cumulative impact of exposure over a few days, but not over a longer period of time. Those who rely exclusively on cohort studies may not account for all of the mortality impacts of short-term exposures, and therefore, may underestimate total mortality impacts. Those who rely on a sum of effects estimated in both cohort and time-series studies may overestimate mortality impacts.

**EXHIBIT 3-1: CONCEPTUAL FRAMEWORK FOR SHORT-TERM AND LONG-TERM MORTALITY EFFECTS**




Circle sizes do not reflect relative effects. (Adapted from Kunzli et al., 2001).

| Category of Cases | Impact of Air Pollution | |
|---|---|---|
| | Underlying frailty due to air pollution | Occurrence of death (event) triggered by air pollution |
| A | Yes | Yes |
| B | Yes | No |
| C | No | Yes |
| D | No | No |

**A:** Air pollution increases both the risk of underlying diseases leading to frailty and the short-term risk of death among the frail. For example, patients with chronic bronchitis that has been enhanced by long-term air pollution exposure may be hospitalized with an acute air pollution-related exacerbation of their illness leading to death shortly afterward.

**B:** Air pollution increases the risk of chronic diseases leading to frailty but is unrelated to timing of death. For example, a person's suffering from chronic bronchitis may be enhanced by long-term ambient air pollution exposure but the person may die due to acute pneumonia acquired during a clean air period.

**C:** Air pollution is unrelated to risk of chronic disease but short-term exposure increases mortality among persons who are frail. For example, a person with diabetes mellitus may be susceptible to heart attacks due to long-standing coronary disease; in such a case, an air pollution episode may trigger the fatal infarction leading to death.

**D:** Neither underlying chronic disease nor the event of death is related to exposure to air pollution.

### EXHIBIT 3-2: RELATIVE IMPORTANCE OF SHORT-TERM AND LONG-TERM IMPACTS

| RESPONSE | EXPERTS | COMMENTS |
|---|---|---|
| Emphasized longer-term impacts | A, B, C, E, F, G, H, I, J, L | Emphasized categories A, B, and/or A+B. Category C viewed as small contributor to overall mortality. |
| Uncertain | D | Thought he had insufficient information to discuss relative sizes of sets and their overlap, but relied on cohort studies for quantification |
| Emphasized short-term impacts | K | Emphasized the importance of peak exposure episodes in exacerbation of underlying disease process. |

All but two experts placed much more weight on long-term exposure changes as drivers of changes in mortality. This conclusion was based on epidemiological evidence, supported by toxicological and clinical evidence for plausible mechanisms. These experts emphasized the potential for cumulative chronic damage over time from PM exposure leading to increased frailty and corresponding risk of death (Category B), with or without the involvement of short-term exposures as acute triggers of mortality. All experts in this group thought that the short-term mortality impacts not included in relative risk estimates from the cohort studies represented a very small percentage of the total mortality impact.[29] Though not explicitly addressed by the protocol, some experts did discuss their views on latency for mortality related to long-term $PM_{2.5}$ exposures. Most experts believed that the cardiovascular and respiratory mortality effects observed in the cohort studies are primarily due to exposures over the previous five to 10 years. Experts mentioned intervention studies, as well as the Six Cities follow-up analysis of Laden et al. (2006), as empirical support for latency periods measured in years rather than decades. Experts noted that we still lack empirical data on this important question.

One expert (K) expressed greater confidence that the mortality impacts reflect changes in short-term peak exposures. He found the body of evidence for short-term impacts more complete, compelling, and coherent than that for long-term impacts. Expert K expressed the belief that the mortality impact largely represents acute exacerbation of underlying disease processes. He also noted that his interpretation of this framework would

[29] In support of this position, Experts H and J cited studies that cast doubt on the hypothesis that time-series results represented "harvesting" (i.e., the displacement of mortality among the frail by a very short time period). H cited an analysis by Zeger et al. (1999) that simulated the potential effect of harvesting on a dataset and could not demonstrate the anticipated harvesting effects upon analysis of the data. In addition, he indicated that papers by Joel Schwartz (2000) found increasing coefficient size with longer time window, which "is the opposite of … harvesting." Expert J cited the work by Zeger and Schwartz as well as a study of the harvesting issue by Dominici et al. (2003). He thought that the evidence suggests, "that daily time-series studies utilizing only short-term time, day to day variability, are observing more than just the phenomena of short-term harvesting or mortality displacement. These results suggest the daily time-series studies capture only a small amount of the overall health effect of long-term-related exposure to particulate air pollution."

significantly shrink the size of the sets of air pollution-related deaths (circles B and C) relative to All Deaths (circle D).

One expert (Expert D) thought the categories of death postulated in the Kunzli diagram made sense conceptually, but thought he lacked sufficient data to inform a decision regarding the relative sizes and overlap of the different categories. He did indicate that he was comfortable that the estimates from cohort studies of long-term exposures are capturing the percent change in mortality associated with changes on in annual average $PM_{2.5}$ levels.

### 3.1.3 KEY EPIDEMIOLOGICAL EVIDENCE

Discussions of key epidemiological evidence supporting or refuting a relationship between $PM_{2.5}$ and mortality permeated the interviews. As part of the conditioning questions, experts first discussed the role of epidemiologic study design in characterizing the total impacts of $PM_{2.5}$ on mortality and then were asked to describe the characteristics of an "ideal" epidemiologic study for addressing this issue. The discussion then turned to the strengths and limitations of the existing epidemiological evidence, and how it compares with their ideal study. The experts revisited this topic during the quantitative questions while deciding the relative emphasis they would place on each study in developing their quantitative estimates. Experts were not required to provide quantitative weights, but were asked to indicate when or how they used specific studies in developing quantitative estimates. This section focuses on the theoretical discussion and the initial survey and evaluation of studies the experts found relevant.

#### The Role of Epidemiological Study Design in Characterizing the Total Impacts of $PM_{2.5}$ Exposures on Mortality

The experts were first asked to describe the types of epidemiologic study designs that they thought were most useful for estimating the change in total annual mortality related to a permanent reduction in ambient $PM_{2.5}$ concentration. The protocol then asked the experts to explain the extent to which the study designs that they chose capture effects from short-term and long-term exposures.

All of the experts thought that cohort studies would capture a large portion of the annual deaths from a drop in annual average ambient $PM_{2.5}$ exposures. Experts thought that these studies captured long-term effects as well as some short-term effects. Most of the experts thought that cohort studies missed deaths caused by very short-term exposure-responses. However, most thought that this small proportion of deaths missed by cohort studies was very small in relation to those captured by cohort studies. For example, Expert F estimated that roughly 97% of the mortality effects reported by cohort studies were due to long-term exposures with the remaining 3% attributable to cumulative short-term exposure effects, whereas Expert L thought that the short-term effects missed by the cohort studies might be around 0.5% per 10 $\mu g/m^3$ (i.e., similar to the effect estimates found in the NMMAPS study (Samet et al., 2000a & b)), which is equivalent to about five one-hundredths of a percent for a change of 1 $\mu g/m^3$. Expert E thought that cohort studies looking at changes in air pollution over time were the most directly relevant for measuring the mortality effects of changes in annual average $PM_{2.5}$ concentrations. He

thought that the Six Cities follow-up (Laden et al., 2006) is the only such study that has assessed the effect of long-term annual average PM changes over time on mortality.

All of the experts also thought time-series studies with various lag lengths could be useful in capturing true short-term effects (e.g., lags up to one week) and potentially some intermediate length effects (e.g., lags up to 1-2 months), depending on the length of the lag. Expert H thought that since the majority of short-term effects were already captured by the cohort studies, that time-series studies were more informative in establishing plausibility than in quantifying mortality effects. Ultimately, as discussed below, most experts did not rely on time-series studies when creating their quantitative distributions, except in some cases to support a lower-bound effect estimate.

All of the experts discussed intervention studies to some extent when answering this question. Some thought of them as supporting evidence, and not directly useful for quantifying the C-R function. Others thought these studies quantified some intermediate-length effects (e.g., between time-series and cohort) and some short-term effects. Expert G thought they were useful for determining which PM components might be causing the mortality. Expert A indicated that intervention studies would be most informative for the quantitative question because he thought most of the mortality effects occur in weeks to months. However he noted that the re-analysis of the Six Cities data (Laden et al., 2006), which looks over the last 10 years, might capture some long-term effects as well.

Experts H and J thought that cross-sectional or ecologic studies would capture the same effects as cohort studies (long-term and some short-term), but Expert H expressed concern about the lack of control for individual level confounders in these studies. Expert F thought that case-crossover studies would capture the same effects as time-series studies (short-term). Expert L indicated that case-control studies were useful for examining long-term effects for specific outcomes, such as lung cancer or COPD.

#### Ideal Epidemiologic Study

Experts were asked to describe an ideal epidemiologic study for answering the specific quantitative question posed by the protocol. The intent of this question was to provide experts with a “gold standard” against which to evaluate existing epidemiologic studies. The following are characteristics of an ideal epidemiologic study that were mentioned by several experts:

- Geographically representative of the entire U.S. (e.g., monitoring sites across the country);
- Collection of information on individual risk factors and residential information both at the beginning and throughout the follow-up period;
- Large sample size that is representative of the general U.S. population;
- Collection of genetic information from cohort members to identify and assess potential effect modifiers;
- Monitoring of individual exposures (e.g., with a personal monitor);

- Collection of data on levels of several co-pollutants (not only those that are monitored for compliance purposes);
- Accurate characterization of outcome (i.e., cause of death);
- Follow-up for a long period of time, up to a lifetime; and
- Prospective study design.

Experts E and J thought it would be useful to include cities that have differing changes in air pollution over time. Expert G said he would conduct a cohort and time-series study in the same population. He would then conduct studies in three cities, each of which has a different level of PM (although of a similar mix). Expert K expressed a preference for having an intervention in exposure. Expert L thought that having spatially resolved exposure data at the neighborhood level would be useful.

### Epidemiologic Evidence for the Impact of Exposures to $PM_{2.5}$ on Mortality

Experts were asked to discuss which specific existing epidemiologic studies they think are informative for addressing the quantitative question and to describe their strengths and limitations.

Exhibit 3-3 indicates the epidemiologic studies mentioned by each expert in response to the conditioning question. All of the experts cited the following long-term, cohort-based studies as major evidence in support of a positive relationship between ambient annual average $PM_{2.5}$ concentrations and mortality:

- The Six Cities Cohort Studies (including the original study (Dockery et al., 1993), the reanalysis (Krewski et al., 2000a & b) and the follow-up (Laden et al., 2006)); and
- The ACS Studies (including the original study (Pope et al., 1995), the reanalysis (Krewski et al., 2000a & b), the follow-up (Pope et al., 2002) and analysis of follow-up data with a focus on cardiovascular outcomes (Pope et al., 2004))

The experts were uniform in their statements that the original Six Cities and ACS studies were well-conducted and that their results proved robust upon extensive reanalysis by Krewski et al. (2000a & b). One key strength of the Six Cities study often noted was that it was designed specifically for the purpose of evaluating the relationships between air pollution and health. The Six Cities study was prospective in nature, included recruitment of representative samples of subjects in each community, had reasonable control for possible confounders and effect modifiers, and set up purposeful air monitoring at sites chosen to characterize cohort exposures. In addition, some experts thought the choice of six cities with a wide range of PM levels was a strength. Frequently cited limitations of the Six Cities study included the small sample size, limited number of cities, and concerns about the representativeness of the six cities for the U.S. as a whole (since important regions of the U.S., such as the Southwest, Midwest and California, were not represented).

## EXHIBIT 3-3: EPIDEMIOLOGIC STUDIES DISCUSSED BY EXPERTS WHILE ANSWERING CONDITIONING QUESTIONS

| | Six Cities (Dockery et al., 1993; Krewski et al., 2000a & b; Laden et al., 2006) | ACS (Pope et al., 1995, 2002 & 2004; Krewski et al., 2000a & b) | ACS LA Reanalysis (Jerrett et al., 2003 & 2005 | Utah Valley (Pope et al., 1989, 1991, 1996; Ghio et al., 2004) | Netherlands Cohort Study (Hoek et al., 2002) | AHSMOG (Abbey et al., 1991 & 1999; McDonnell et al., 2000; Chen et al., 2005) | Veteran's (Lipfert et al., 2000, 2003 & 2006) | Dublin Study (Clancy et al., 2002) | Elderly Californians Study (Enstrom et al., 2005) | Hong Kong Study (Hedley et al., 2002) | APHEA[1] | NMMAPS (Samet et. al., 2000a & b) | Willis et al., 2002 | Canadian Time-Series Studies (Burnett et al., 2000 & 2003) | Finkelstein et al., 2004 | MESA Cohort[2] | Mallick et al., 2002 | Filluel et al., 2005 | Woodruff et al., 1997 | Women's Health Initiative[2] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Expert A | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | | | ✓ | ✓ | | | | ✓ | | | | |
| Expert B | ✓ | ✓ | ✓ | | | ✓ | ✓ | | | | ✓ | ✓ | ✓ | ✓ | | | ✓ | | | |
| Expert C | ✓ | ✓ | ✓ | ✓ | | | | ✓ | | ✓ | | | | | | | | | | |
| Expert D | ✓ | ✓ | ✓ | ✓ | | | ✓ | | ✓ | | | | | | | | | | | |
| Expert E | ✓ | ✓ | ✓ | | ✓ | | | | | | | | ✓ | | | | | | | |
| Expert F | ✓ | ✓ | ✓ | | | | | | | | | | | | | | | | | |
| Expert G | ✓ | ✓ | | ✓ | | | | | | ✓ | | | | | | | | | | |
| Expert H | ✓ | ✓ | | | | ✓ | ✓ | | | | | | | | | | | | | |
| Expert I | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | | ✓ | | |
| Expert J | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | | ✓ | | | | | | ✓ | | | | ✓ | ✓ |
| Expert K | ✓ | ✓ | ✓ | | | | | ✓ | | | | | | | | | | | | |
| Expert L | ✓ | ✓ | ✓ | | ✓ | ✓ | | | ✓ | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |
| Total: | 12 | 12 | 10 | 5 | 5 | 5 | 5 | 4 | 4 | 3 | 3 | 2 | 2 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |

[1] The Air Pollution and Health - A European Approach (APHEA) includes a large group of studies. For full list of papers, please consult http://airnet.iras.uu.nl/products/reports_and_annexes/APHEA/APHEA_publications.pdf.

[2] Study not yet published at the time of the interview.

Many of the experts praised the ACS study for its large sample size, the large number of cities, broad geographic scope, and collection of individual risk factors, including those pertaining to cancer and cardiovascular disease. The limitation of the ACS study mentioned by most experts was the method of recruitment for the study, which resulted in a group with higher income, more education, and a greater proportion of whites than is representative of the general U.S. population. Also, several experts thought that the ACS exposure assessment was more problematic than the Six Cities study; the ACS study had to rely on whatever monitors were available to the study. This led to a single monitor representing exposure for an entire metropolitan area (containing several counties), whereas the Six Cities study often had exposures assigned at the county level.

Ten out of the twelve experts discussed the ACS Los Angeles (ACS LA) reanalysis by Jerrett et al. (2005). Experts explained that this study examined a subset of ACS cohort members in LA, assigning them to exposures based on a model estimating $PM_{2.5}$ in the same zip code as their residence. The effect estimates were two- to three-fold higher than the original ACS study. Experts thought that the better spatial resolution in this study was its main strength, and many believed that the higher effect estimates reflected reduced exposure errors. However, several experts were concerned that it only included one city with a specific mix of PM that may differ from the rest of the U.S. Experts F and H thought that only including one city may lead to spatial autocorrelation and residual confounding and Expert F added that there could be within-MSA mobility impacts on exposure. Two experts discussed other analyses examining the effect of improving exposure characterization. Expert B discussed a paper by Mallick et al. (2002) that performed a hypothetical analysis that attempted to correct for exposure misclassification in the Six Cities data. This study also found two- to three-fold higher effect estimates than the original study. Experts B and E mentioned a paper by Willis et al. (2003) that only included those individuals in the ACS cohort who lived in the same county as the exposure monitor. There was a doubling of the sulfate coefficient for all-cause mortality in the restricted cohort compared to including all individuals in the metropolitan-area. Although this coefficient was for sulfates, he thought that it provided evidence that better spatial resolution reduces exposure misclassification and leads to increased effect estimates.

Three other cohorts that were either discussed by experts or brought up during the interviews by the elicitors included the Veterans' Association (VA) Cohort Studies (Lipfert et al., 2000, 2003 & 2006), AHSMOG study of Seventh Day Adventists in southern California (Abbey et al., 1991 & 1999; McDonnell et al., 2000; Chen et al., 2005), and a study of elderly Californian's (Enstrom et al., 2005). Generally, experts did not weight these studies as highly as the cohort studies described above and only Expert J used these studies to inform his uncertainty in the C-R coefficient. Many of the experts were not familiar with the methodological details of these studies. Of the experts that did discuss the studies, many thought that they were generally supportive of the PM-mortality relationship and could be used qualitatively, but not quantitatively. Some of the main limitations of the AHSMOG study mentioned by experts included small sample size, too many subgroup analyses, and poor exposure characterization. Some experts thought the analytical approach used in the VA study was unclear. Experts thought all three studies

included populations that were not representative of the general U.S. population and also were concerned that they were not published in, and thus did not receive peer review by, epidemiologic journals.[30]

Eight experts discussed intervention or exposure change studies during this section of the protocol. The studies most often cited by experts included the "Dublin Study" (Clancy et al., 2002), the "Hong Kong Study" (Hedley et al., 2002), the "Utah Valley Studies" (Pope et al., 1989, 1991 & 1996; Ghio et al., 2004) and the Six Cities "Change" analysis (Laden et al., 2006). Six of these experts thought that these studies provided supporting evidence for plausibility, rather than informing the quantitative question. The exception is the Laden et al., 2006 "change" estimate, which was relied on by a two experts (see Exhibit 3-14). The most commonly cited strengths of these studies include large changes in exposure and avoidance of potential confounders associated with differences between populations. Expert E also thought that the Laden et al., 2006 was the only existing study that directly addressed the question posed by the protocol. Commonly discussed limitations included potential confounding by time-varying covariates, the fact that not all of these studies used $PM_{2.5}$ as an exposure measure, and the fact that they do not capture all of the long-term effects, as discussed above.

### 3.1.4 CONFOUNDING

Confounding is an issue that often is raised when interpreting quantitative results of epidemiologic studies. In the present context, a potential confounder is a variable that is both an independent risk factor for premature mortality and also is correlated with $PM_{2.5}$ concentrations. Only if both conditions are met can a variable act as a confounder. If not adequately controlled in the design and/or analysis of an epidemiology study, confounders could lead to biased results (either upwards or downwards) in the effect estimate for $PM_{2.5}$. Because of the potential importance of this issue in the present context, discussion of potential confounders was a key component of the elicitation interview.

Questions on confounding were directed at understanding each expert's views on the influence, if any, of confounding in the specific studies he cited as most relevant to his quantitative judgments concerning the form, magnitude, and uncertainty in the C-R function for mortality related to ambient $PM_{2.5}$ exposure. Experts began by listing what they believed to be potential confounders of the relationship between exposure to $PM_{2.5}$ and mortality in relevant studies of long-term and/or short-term exposures. Examples from the epidemiologic literature were provided as a starting point for discussion. Experts then discussed the theoretical rationale (e.g., biological or toxicological mechanism) or empirical evidence (e.g., clinical, epidemiological, animal, or exposure studies) for the impact of each potential confounder on the $PM_{2.5}$-mortality effect.

[30] The VA study assessed male Veterans with high blood pressure, originally recruited to assess the efficiency of anti-hypertension drugs, and the AHSMOG study involves only Seventh Day Adventists, a relatively small pool likely to be representative of a healthier population. The Enstrom et al. paper only included elderly Californians.

Experts discussed their views on the extent to which each potential confounder had been adequately controlled for in the relevant epidemiologic studies. For confounders that were considered to have not been adequately controlled, experts discussed the direction and magnitude of the possible resulting bias in the $PM_{2.5}$ effect estimate. We asked experts to try to classify the magnitude of bias on a three-level scale: 1 for minimal bias; 2 for medium bias; and 3 for major bias. The quantitative interpretation of this scale was left to the expert to define.

Experts mentioned a number of potential confounders in the interviews, but most of them believed that most or all of the key potential confounders had been adequately controlled for in the key studies they cited (i.e., the ACS and Six Cities studies, and their re-analyses and extended analyses: Pope et al., 1995 & 2002; Krewski et al., 2000a & b; Jerrett et al., 2005; Dockery et al., 1993; Laden et al., 2006).[31] For this reason, few made adjustments to their quantitative judgments to take account of bias due to confounding (see below). Three of 12 (F, G, D) made some mention of confounding (by co-pollutants and/or occupational exposures) in deriving their median estimate for the mortality effect of $PM_{2.5}$.

Contextual socio-economic status (SES) variables and co-pollutants were the two categories of potential confounders that were discussed most extensively and for which moderate concern regarding bias was sometimes noted.

- **Contextual SES.** The ACS and Six Cities cohort studies both assessed SES based on educational attainment, which is only one of many possible measures of economic status. The Jerrett et al. (2005) re-analysis of the Los Angeles ACS cohort explored the influence of an extended set of Census-based SES variables on the mortality- $PM_{2.5}$ relationship. In general, adding more of these "contextual" variables tended to diminish but not eliminate the $PM_{2.5}$ effect estimate. Some Experts viewed this as evidence that contextual SES variables are confounders that, if not taken into account, lead to positive bias in the $PM_{2.5}$ effect estimate. Others, such as Expert L, pointed out that some of the contextual SES variables might be surrogates for exposures to $PM_{2.5}$, in which case including them would lead to a negative bias in the $PM_{2.5}$ effect estimate. Ultimately however, no experts adjusted their median effect estimates for this factor.
- **Co-pollutants.** Co-pollutants were also frequently discussed. Most experts considered the $SO_2$ effect observed in the ACS study as implausible since $SO_2$ levels were quite low and most $SO_2$ deposits in the upper respiratory system. Several experts were of the opinion that $SO_2$ can be viewed as a surrogate for PM in the ACS study, since sulfate particles are derived from $SO_2$. Expert D made a case for confounding by volatile and semi-volatile organic compounds freshly emitted from motor vehicles. He noted that these compounds have been shown in laboratory studies to have relevant health effects, and also correlate with patterns

[31] Potential confounders cited included smoking, age, socio-economic position (at both the individual and contextual levels), ethnicity, occupation, co-pollutants, diet, exercise/obesity, weather, pre-existing health status, time-varying trends in health-care, indoor exposures, and differential migration.

of $PM_{2.5}$ concentrations in the ambient air, making them plausible confounders. Expert D adjusted his median effect estimate downwards slightly to account for the positive bias that may exist in the cohort studies. Expert K also noted concern about un-regulated co-pollutants, but made no adjustment for this factor. Expert G believed that the Six Cities study was biased upwards due to confounding by co-pollutants (NO2, ozone, $SO_2$, semi-volatile organics), and took account of this in deriving his median effect estimate. In the context of later discussions of exposure issues, Expert J mentioned the difficulty of directly addressing the quantitative question that was the focus of the elicitation (i.e., what is the mortality effect of a change in $PM_{2.5}$ concentration, holding all co-pollutants constant). Since $PM_{2.5}$ contrasts (spatial as well as temporal) occur in concert with contrasts in co-pollutants (due to overlapping sources), it is difficult to quantify the marginal impact of $PM_{2.5}$. If one wants the marginal effect of $PM_{2.5}$ alone, which is the stated focus of the elicitation, the PM effect estimates in key epidemiology studies could be moderate over-estimates of the true PM effect for the U.S. population since they incorporate some unknown quantity of co-pollutant effects. This issue was also discussed by other experts, as well as the related issue of differential toxicity for different particle components.

Among the other potential confounders, occupational exposures and smoking were frequently mentioned. Only Expert F adjusted his median effect estimate downwards slightly to account for possible bias due to occupational exposures. Smoking was mentioned by most experts, while noting that both the ACS and Six Cities studies controlled well for this factor using individual-level smoking histories. Only Expert K thought that smoking had not been adequately controlled for in the cohort studies. Expert K rated smoking as a potential level 1-2 positive bias, but ultimately did not incorporate this into his quantitative judgments.

### 3.1.5 EFFECT MODIFICATION

Effect modification is a term used by epidemiologists to refer to the phenomenon in which the magnitude of an estimated health effect (e.g., percent change in mortality for a 1 $\mu g/m^3$ change in exposure to $PM_{2.5}$) differs for different groups of people defined on the basis of some variable such as age, gender, race, economic status etc. The variable used to stratify the population is referred to as the effect modifier. Whereas uncontrolled confounding may result in biased and invalid effect estimates, effect modification does not threaten the validity of a study. It can, however, influence the generalizability of an effect estimate reported by an individual study to the general population. This can happen if the distributions of the effect modifier differ in the general population as compared with the study population. Depending on the direction and magnitude of this difference, the effect reported by the study may underestimate or overestimate the effect in the general population. Because of the potential importance of this issue in the present context, discussion of effect modification was a key component of the elicitation interview.

Discussions were directed at understanding experts' views on the influence, if any, of effect modification in the specific studies upon which they planned to base their

quantitative judgments concerning the form, magnitude, and uncertainty in the C-R function for mortality related to ambient $PM_{2.5}$ exposure. Experts began by listing what they believed to be potential effect modifiers in the relevant studies of long-term and/or short-term exposures. Examples from the epidemiologic literature were provided as a starting point for discussion. Experts then discussed the theoretical rationale (e.g., biological or toxicological mechanism) or empirical evidence (e.g., clinical, epidemiological, animal, or exposure studies) for the impact of each effect modifier on the $PM_{2.5}$-mortality effect. Experts discussed their views on the influence each effect modifier may have had on the relative risks reported in the relevant epidemiologic studies, and whether these reported risks were likely to be underestimates or overestimates of the average effect for the full U.S. adult population. Experts discussed the direction and magnitude of the possible under- or overestimation. We again asked Experts to try to classify the magnitude of the under- and overestimation on a three-level scale: 1 for minimal; 2 for medium; 3 for major. The quantitative interpretation of this scale was left to the Expert to define.

Experts mentioned a broad array of factors that could serve as effect modifiers of long- and/or short-term mortality effects of $PM_{2.5}$, including educational attainment and related SES factors, co-pollutants such as $SO_2$, housing characteristics like air conditioner use, race, smoking, and pre-existing conditions including diabetes, obesity, systemic inflammation, and genetic predisposition. Of these, educational attainment, co-pollutants, and race were each discussed by three or more experts.

Several experts noted that educational attainment was reported by Krewski et al. (2000a & b) to be an effect modifier in both the ACS and Six Cities studies, with mortality effects of $PM_{2.5}$ greatest in the sub-populations with less than a high school education and lowest or non-existent in the sub-population with more than a high school education. Because of the recruitment strategy employed in the ACS study, that population under-represented persons with less than high school education (11 percent) compared to statistics for persons 25 years or older in the nation as a whole (30 percent in 1980). In the Six Cities study population, 28 percent had less than a high school education, similar to the national average in 1980. These statistics suggested to many experts that the effect estimates reported by the ACS study were likely to underestimate effects for the adult U.S. population. Several experts noted that education per-se is unlikely to be responsible for the observed effect modification, but rather that education may represent a constellation of factors including housing, income, access to medical care, exercise, diet, underlying health status. Effect modification by educational attainment was discussed at some length during the pre-elicitation workshop, where Dr. Pope presented numerical results from a then-unpublished analysis that re-calculated ACS RR's based on re-weighting on educational attainment prevalence reported in the Six Cities study. These calculations resulted in a 30-50 percent increase in the RR compared to that originally reported in the ACS study. Several experts referred to this analysis during the elicitation. Six experts (A, C, E, G, I, J) chose to take account of this in deriving their median effect estimate in the quantification, either by inflating the reported ACS effects by 30-50 percent, or by placing weight on the Six Cities study, which, unlike the ACS study, did not under-represent persons with less than a high school education as compared to the

U.S. adult population. Dr. Pope's analysis has been published recently as part of a critical review of PM health effects (Pope and Dockery, 2006).

Among the other potential effect modifiers discussed, three experts (C, E, J) discussed race, mainly on a theoretical basis. Both the ACS and Six Cities studies under-represented non-whites in their populations, but experts noted that there are few empirical data demonstrating effect modification by race to-date. Some noted that it's difficult to separate race from various measures of SES. In the end, none made any quantitative adjustments for race.

Co-pollutants were also raised as theoretical effect modifiers, with little empirical evidence, by three experts (F, H, K). Higher $SO_2$ levels in the northeastern U.S. was noted as a possible explanation for high reported $PM_{2.5}$ effects in the Six Cities study. Expert F referred to this issue in deriving his quantitative judgments. Housing factors like air conditioner use were mentioned by two experts (E, K), mainly from the perspective of modifying indoor exposure to PM of outdoor origin.

#### EXHIBIT 3-4: SUMMARY OF EXPERTS' VIEWS ON EFFECT MODIFIERS

| EFFECT MODIFIER | EXPERT RESPONSES | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | F | G | H | I | J | K | L |
| Education | ⊗ | | ⊗ | | ⊗ | x | ⊗ | x | ⊗ | ⊗ | x | x |
| Co-pollutant | | | | | | ⊗[1] | | x | | | x | |
| Housing | | | | | x | | | | | | x | |
| Race | | | x | | x | | | | | x | | |
| Smoking | | | | | | x | | | | | | |
| Underlying Susceptibilities (e.g., diabetes, obesity, systemic inflammation, COPD) | | | | | x | | | | | | | |
| Genetic Polymorphisms | | | | | x | | | | | | | |
| Air Conditioning | | | | | x | | | | | | | |

Key:

X = Discussed

⊗ = Discussed and adjusted median to account for factor

[1]Specifically for $SO_2$

### 3.1.6 EXPOSURE ISSUES

Exposure assessment is both an essential and particularly challenging component of air pollution epidemiology. The challenge for exposure assessment is to measure health-relevant contrasts in exposures with as much accuracy and precision as possible. Exposure contrasts in currently-available epidemiology studies of particulate matter are based on either concentration variations occurring over time within a single location or variations in average concentrations across locations. In either case, population-based

studies typically rely on one or more central-site ambient monitors in a city to estimate air pollution exposure contrasts. This raises questions about the relationship between temporal/spatial *concentration* contrasts measured at the central site and temporal/spatial *exposure* contrasts experienced by the population at risk. Uncertainties in this relationship may arise due to variations in ambient concentrations over space within a city, incomplete penetration of ambient pollution into homes and workplaces, and patterns of population activity. Indoor sources may also contribute significantly to individual $PM_{2.5}$ exposures. In addition to uncertainties related to central site vs. individual exposures, there may be uncertainties regarding the timing of relevant exposures. In a cohort study of mortality, what is the relevant period of exposure that leads to increased mortality risk? Furthermore, what uncertainties are introduced if cohort members migrate to or from a location with different long-term $PM_{2.5}$ concentrations? Finally, there are uncertainties in both whether there are differences in toxicities of different $PM_{2.5}$ component species (e.g., sulfates, nitrates, elemental and organic carbon, metals) and the extent to which such potential differential toxicity may be responsible for differences in the relationship between health and PM exposure observed in different studies. Such differential toxicity would have implications for comparing studies conducted in different cities as well as interpreting analyses that use city-to-city differences in fine PM mass to characterize variations in exposure.

The elicitation interview probed experts' views on the influence, if any, of these exposure issues on their judgments concerning the form, magnitude and uncertainty in the C-R functions for mortality related to ambient $PM_{2.5}$ exposure, with particular reference to the key studies upon which they planned to base their quantitative judgments. Experts began by listing and defining what they believed to be the most influential exposure issues, and then discussed the theoretical rationale (e.g., biological or toxicological mechanism) or empirical (e.g., clinical, epidemiological, animal, or exposure studies) evidence for the impact of each potential exposure issue on the $PM_{2.5}$-mortality effect. Experts were then asked to characterize the direction and magnitude of any under- or overestimate in reported mortality relative risks (RRs) from specific studies that may have resulted from the exposure issue. The magnitude of under- or overestimation of RRs was reported on a three level scale, with one indicating minimal, two indicating medium, and three indicating major effect. The quantitative interpretation of this scale was left to the expert to define.

Uncertainties in population exposures assessed using central-site monitoring was raised by all experts as an important issue, and in many cases as a major issue (level 3), and nine experts took this issue into account when deriving their median effect estimate of the mortality effects of a 1 $\mu g/m^3$ change in $PM_{2.5}$. Most considered this to be a more important uncertainty for the ACS main study, where central sites were used to represent exposure over entire metropolitan areas, and many thought that this issue caused underestimation of the effects of $PM_{2.5}$ on mortality. The reason citied for this underestimation was the well-known effect of exposure measurement error (“misclassification”) in biasing epidemiological effect estimates towards the null. Experts noted that the higher RRs reported in Six Cities might relate in part to finer spatial scale of monitoring there vs. ACS. Also the Jerrett LA ACS analysis, which

featured a finer spatial resolution of exposure assessment than the original ACS study and reported results more comparable to Six Cities, was often cited in support of this idea. However, some experts thought that the larger effects reported by Jerrett might also be due to a different mix of particle components in LA vs. the U.S. as a whole, perhaps related to motor vehicle pollution, or might reflect some bias due to spatial confounding by SES. Two experts also referred to the Willis et al. (2003) reanalysis of sulfate data from the ACS cohort, using only monitors located in the county of residence of cohort members. The RR based on the county-level subset was approximately double that in the full cohort where the unit of observation had been the metropolitan area. Also noted was the theoretical analysis of Mallick et al. (2002). One expert pointed out that there is likely to be an optimal spatial resolution that is fine enough to avoid spatial error but large enough to capture the spatial activity range of community residents. Several experts noted that a recent unpublished analysis by Jerrett and colleagues for NYC gave contrasting results to those observed in the LA analysis. These data were also discussed at some length at the Post-elicitation Workshop. However, given the lack of detailed information on this unpublished work, the NYC results were not relied upon by experts for the purposes of the elicitation.

Nine of the experts discussed whether the relevant time course of historical exposures was well-captured in the published cohort studies. A mismatch could introduce additional random exposure misclassification or could theoretically result in upward bias in effect estimates. Theoretically, as noted by Expert J, "if the time scale [for long-term effects] is on the order of decades and we use more recent $PM_{2.5}$ measures where the rank ordering is the same, but the [concentrations] are lower, then we are overestimating the effects." In other words, a more recent, more-narrow range of measured exposure differences across cities would serve as a surrogate for a larger, health-relevant, but unmeasured range of exposure differences that existed in the past. After considering the evidence and theory, however, experts decided not to take this into account in their quantification, noting that the bias would be significant only if latency periods were very long (i.e., multiple decades), for which there is little epidemiologic evidence.

A few experts thought that migration of cohort members out of the community of initial residence could lead to additional uncertainties, leading to underestimate of RR. This effect was thought to be greater for the ACS study, which lacked follow-up data on residence after initial enrollment. Differential migration by SES might lead to different degrees of misclassification of exposure, and might explain some of the effect modification noted in ACS study. No experts took this issue into account in quantifying their median effect estimate.

Expert J mentioned the difficulty of directly addressing the quantitative question that was the focus of the elicitation (i.e., what is the mortality effect of a change in $PM_{2.5}$ concentration, holding all co-pollutants constant). Since $PM_{2.5}$ contrasts (spatial as well as temporal) occur in concert with contrasts in co-pollutants (due to overlapping sources), it is difficult to quantify the marginal impact of $PM_{2.5}$. If one wants the marginal effect of $PM_{2.5}$ alone, which is the stated focus of the elicitation, the PM effect estimates in key epidemiology studies could be moderate over-estimates of the true PM effect for the U.S.

population since they incorporate some unknown quantity of co-pollutant effects. This issue was also discussed by other experts, as well as the related issue of differential toxicity for different particle components, but in the end, experts concluded that there was insufficient empirical data to guide any quantification of these influences. It should be noted that this issue is really one of confounding by co-pollutants. Other issues raised but left un-quantified by experts included the use of estimated rather than measured $PM_{2.5}$ data in the Six Cities follow-up analysis (Laden et al., 2006), and the influence of air conditioning use on penetration of ambient $PM_{2.5}$ indoors. Experts thought that these issues might introduce some biases, but were not able to quantify them.

#### EXHIBIT 3-5 SUMMARY OF EXPERTS' VIEWS ON EXPOSURE ISSUES

| EFFECT MODIFIER | EXPERT RESPONSES | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | F | G | H | I | J | K | L |
| Spatial resolution | ⊗ | ⊗ | ⊗ | x | ⊗ | ⊗ | x | ⊗ | ⊗ | ⊗ | x | ⊗ |
| Migration | | | | | | x | | | | ⊗ | | |
| Co-pollutants | | | | | | | | | | ⊗ | | |
| Temporal changes in exposure | | x | x | | x | x | x | x | x | x | | x |
| Estimated $PM_{2.5}$ | x | | | x | x | | | | | | | |
| $PM_{2.5}$ composition | | | x | x | | | | | x | | | x |
| Air conditioning use | | | x | | | | | | | | | |

Key:
X = Discussed
⊗ = Discussed and adjusted median to account for factor

#### 3.1.7 LIKELIHOOD OF A CAUSAL RELATIONSHIP BETWEEN LONG- AND SHORT-TERM $PM_{2.5}$ EXPOSURES AND MORTALITY

One of the more influential discussions held with each expert involved his assessment of the likelihood of a causal relationship between annual average exposures to $PM_{2.5}$ and total annual all-cause mortality (from both short-term and long-term exposures). Experts were asked to estimate this likelihood after completing most of the other conditioning questions, which were designed to evaluate the scientific evidence on causes of and mechanisms for $PM_{2.5}$-related mortality, epidemiological evidence, and factors relating to the quality of the key epidemiological studies (e.g., confounding, effect modification, exposure issues). The question began by having each expert talk generally about the types and/or strength of scientific evidence he would like to have in order to believe that an exposure/response relationship is actually causal. Experts were not required to follow a particular rubric or set of causal criteria. In addition to providing a framework from which to view individual experts' assessments of causality, this component of the question also provided some insight into some of the differences between experts' approaches to weighing evidence.

Each expert was then asked to estimate quantitatively the probability that the relationships between short-term exposures and mortality, between long-term exposures and mortality, or both were causal. They were asked for a "best estimate" as well as for a range of probabilities to give a sense of the level of uncertainty in their estimate.

Although this question had been discussed both at the EPA expert elicitation symposium and at the pre-elicitation workshop, the estimation of the causal likelihood and its use in the characterization of uncertainty was difficult and controversial in practice. Questions about the clarity of the question on causal likelihood and its use in the development of the final quantitative uncertainty distributions were a major focus of discussions at the post-elicitation workshop.

Some experts questioned whether the causal likelihood should be linked to different concentrations, that the question should be "causal at what concentration?" A related question was whether they might think differently about the likelihood of a change in mortality for a small incremental change in concentration (e.g., 1 $\mu g/m^3$) versus a large incremental change (e.g., 25 $\mu g/m^3$). In our view, these types of questions could be addressed in discussions of thresholds or in the mathematical expression of the concentration response relationship. We anticipated an answer to, "What is the likelihood that there is a causal relationship between reductions in annual average exposures to $PM_{2.5}$ (including reductions in both short-and/or long-term exposures) and changes in mortality at $PM_{2.5}$ levels currently experienced in the U.S. (e.g., annual averages of 4-30 $\mu g/m^3$)?"

Asking the experts to develop probabilities reflecting some joint judgment about the role of short-term and long-term exposures also added to difficulties in answering the question and interpreting responses. As indicated in the summaries in the exhibit, though many experts thought long-term exposures were dominant determinants of mortality, several thought repeated short-term exposures were important. Separating their roles was difficult.

Three experts B, D, and K discussed an additional interpretation of the question. Expert D made a distinction between the likelihood that there is a causal relationship between $PM_{2.5}$ (on a mass concentration basis) and the likelihood that particles are "causing all the effects ascribed to them." He thought the former was highly likely but that the latter was very low, but appropriately based his response on the first question. Expert B echoed this view: "It's not to say that $PM_{2.5}$ is the only air pollutant that may have a causative role in mortality, but certainly if you ask does $PM_{2.5}$ contribute to mortality, my answer is almost certainly yes." Expert K appeared to base his likelihood of a causal relationship at least in part on his assessment of whether particles *per se* were responsible for the mortality effects observed in studies.

Next, experts sometimes found it difficult to make the conceptual distinction between a statistical confidence interval and the uncertainty assessment for this project. As noted by Expert D, "on statistical grounds, 95% confidence is sufficient grounds for 'conviction" (i.e., for rejecting the null hypothesis of no relationship). However, the development of a subjective probability distribution allows for judgments to be made over the whole

interval from 0 to 1 on the basis of an aggregate assessment of the strength of evidence. Some experts found it to be almost a conceptual conflict to say that they were highly certain of a causal relationship (often 95%) but then to have to reflect that they were implicitly putting a 5% probability of no causal relationship. In fact, we are talking about two entities -- statistical confidence intervals on a particular finding and a subjective confidence interval or "credible" interval as it is sometime referred to in Bayesian statistics.

### Basis for Causal Likelihood

Although not specifically mentioned by name, many of the experts drew on one or more of the basic Bradford Hill causal criteria (Hill et al., 1965). The following are conditions that the experts frequently mentioned as helpful for assessing whether an association is causal:

- Consistency (across epidemiological study designs);
- Biological Plausibility;
- Coherence (see associations across range of health outcomes);
- Temporal Relationship (between exposure and outcome);
- Strength (of the association);
- Analogy (to other exposures);
- Specificity (of response); and
- Statistically significant findings (robust to concerns about confounding, effect modification).

Not all experts focused on the same attributes, nor relied on the same studies when citing support for particular attributes.

### Short term vs. Long term Exposures

Prior to developing their quantitative assessment of the likelihood of a causal relationship between total annual all-cause mortality and annual average ambient $PM_{2.5}$ exposures, experts were asked whether they would like to make a distinction between the likelihood of a causal relationship for short-term and long-term exposures in preparation for their overall assessment. Five experts (B, F, G, I, J, K) initially indicated they would, though only one gave separate causal likelihood for short-term exposures (Expert F placed 90% confidence in the causal relationship between short term exposures and mortality versus 100% for long term). Ultimately, most of the experts relied on assessment of the strength of the literature relating to the effects of long-term exposures. In their discussions of the conceptual framework for mortality effects, most expert indicated that long-term effects predominate (See Section 3.1.2)

### Likelihood of a Causal Relationship

Exhibit 3-6 summarizes the probabilities given by each of the experts to describe their assessment of the likelihood of a causal relationship between exposures to $PM_{2.5}$ and total

mortality. The first column shows each expert's "best estimate", the estimate on which they would place their greatest probability weight, while the second column gives the range of values they thought were plausible. The final column provides qualitative summary statements, if given, to describe the expert's qualitative sense of the strength of the relationship. As part of this question, however, we had them consider the range of possible values as they evaluated alternative ways of weighing or interpreting the existing data. For example, they were asked to think about what factors or constellation of factors made it least plausible that there was a causal relationship and to contrast that with what factors made the relationship more plausible. This approach was sometimes helpful as an intermediate step.

As indicated in Exhibit 3-6, 10 of the 12 of the experts thought there was strong scientific support for a causal relationship with best estimates ranging from 90 to 100%. These experts most often cited the following kinds of arguments: the consistency in the pattern of epidemiological results across multiple study designs; the robustness of the Six Cities and ACS epidemiological results under the scrutiny of Health Effects Institute (HEI) re-analyses (Krewski et al., 2000a & b); the importance of intervention studies as "experiments" establishing the temporal relationship between decline of exposures and in mortality; the support from toxicological studies in animals (in particular, but not restricted to, the recent Sun et al. studies (2005)) and from *in vitro* studies for a plausible biological explanation. Only one expressed absolute certainty that there was no alternative explanation. Most expressed an unwillingness to eliminate all doubt, some indicating that "nothing is for certain."

The two experts who expressed stronger reservations about the plausibility of the causal relationships focused on similar concerns with the available scientific data although they ultimately selected different likelihoods. In our discussions, both essentially argued that that statistical associations from epidemiological studies, in particular the cohort studies, were not sufficient to establish a causal link. Expert K in addition raised at least two concerns that undermined his confidence in epidemiological studies; he thought that there was still a potential for confounding by smoking in cohort studies relying on questionnaire data and he thought that the absence of personal exposure data in both cohort and more recent defibrillator studies made it difficult to link mortality definitively to particular exposures. Both thought the Sun et al. (2005) study was an important new contribution but questioned whether the mouse model or exposures were truly relevant to humans and chronic ambient exposures to $PM_{2.5}$.

### EXHIBIT 3-6: LIKELIHOOD OF A CAUSAL RELATIONSHIP BETWEEN $PM_{2.5}$ AND ALL-CAUSE MORTALITY

| EXPERT | "BEST ESTIMATE" | RANGE | QUALITATIVE STATEMENTS |
|---|---|---|---|
| F | 100 | 100 | -- |
| J | 99 | 80-99 | "[P]retty likely … the literature is pretty compelling … that there is a causal relationship both for short-term exposure and long-term." |
| C | 99 | 99 | "[V]ery, very likely" |
| L | 99 | 90-100 | "The evidence in the short-term … is so strong that … [it] is actually enough to say that it is a cause of death … I think it's extremely hard to argue that this is only an acute effect story and nothing else." |
| E | 99 | 80-99 | "I'm pretty convinced, … but nothing is for certain" |
| B | 98 | 90-99 | "[E]xtremely likely" |
| A | 95 | 70-95.5 | -- |
| I | 95 | 80-100 | -- |
| D | 95 | 90-100 | "[E]xtremely high likelihood for both" |
| H | 90 | 80-95 | -- |
| G | 70 | 60-80 | The state of the science "strongly suggests a causal relationship." |
| K | 35 | 5-50 | "[I] don't have at this point great confidence that … bringing down the levels currently experienced in the U.S. are going to change mortality." |

-- Expert did not give a summary statement about likelihood of a causal relationship.

### 3.1.8 THRESHOLDS

The protocol asked experts for their judgments regarding whether a threshold exists in the $PM_{2.5}$ mortality C-R function. The protocol focused on assessing expert judgments regarding theory and evidential support for a population threshold (i.e., the concentration below which no member of the study population would experience an increased risk of death).[32] If an expert wished to incorporate a threshold in his characterization of the concentration-response relationship, the team then asked the expert to specify the threshold $PM_{2.5}$ concentration probabilistically, incorporating his uncertainty about the true threshold level.

From a theoretical and conceptual standpoint, all experts generally believed that individuals exhibit thresholds for PM-related mortality. However, 11 of them discounted the idea of a population threshold in the C-R function on a theoretical and/or empirical basis. Seven of these experts noted that theoretically one would be unlikely to observe a population threshold due to the variation in susceptibility at any given time in the study population resulting from combinations of genetic, environmental, and socioeconomic factors.[33] All 11 thought that there was insufficient empirical support for a population threshold in the C-R function. In addition, two experts (E and L) cited analyses of the ACS cohort data in Pope et al. (2002) and another (J) cited Krewski et al. (2000a & b) as supportive of a linear relationship in the study range.

Seven of the experts favored epidemiological studies as ideally the best means of addressing the population threshold issue, because they are best able to evaluate the full range of susceptible individuals at environmentally relevant exposure levels. However, those who favored epidemiologic studies generally acknowledged that definitive studies addressing thresholds would be difficult or impossible to conduct, because they would need to include a very large and diverse population with wide variation in exposure and a long follow-up period. Furthermore, two experts (B and I) cited studies documenting difficulties in detecting a threshold using epidemiological studies (Cakmak et al. 1999, and Brauer et al., 2002, respectively). The experts generally thought that clinical and toxicological studies are best suited for researching mechanisms and for addressing thresholds in very narrowly defined groups. One expert, B, thought that a better understanding of the detailed biological mechanism is critical to addressing the question of a threshold.

One expert, K, believed it was possible to make a conceptual argument for a population threshold. He drew an analogy with smoking, indicating that among heavy smokers,

[32] As part of this section, the elicitation team reviewed the key assumptions about the study population for this elicitation. We assume the following about the U.S. population: 1) the population is 25 years of age or older, 2) the distribution of susceptible individuals across population reflects current patterns of susceptibility, and 3) this pattern will remain the same. The impact of projected changes in the age distribution on mortality, however, is incorporated directly into EPA's benefits model.

[33] Ten of the experts addressed this issue in an integrated fashion with respect to impacts of short-term and long-term exposures, or focused on long-term impacts, which they thought were the dominant contributor to changes in mortality. Two experts (B and G) suggested that a threshold may be more plausible conceptually for short-term mortality impacts of $PM_{2.5}$ than for long-term impacts, based on the postulated mechanisms.

only a proportion of them gets lung cancer or demonstrates an accelerated decline in lung function. He thought that the idea that there is no level that is biologically safe is fundamentally at odds with toxicological theory. He did not think that a population threshold was detectable in the currently available epidemiologic studies. He indicated that some of the cohort studies showed greater uncertainty in the shape of the C-R function at lower levels, which could be indicative of a threshold.

Expert K chose to incorporate a threshold into his C-R function. He indicated that he was 50 percent sure that a threshold existed. If there were a threshold, he thought that there was an 80 percent chance that it would be less than or equal to 5 $\mu g/m^3$, and a 20 percent chance that it would fall between 5 and 10 $\mu g/m^3$.

## 3.2 RESPONSES TO THE QUANTITATIVE QUESTION

In the final part of the interview, experts were asked to address the following question:

> **What is your estimate of the true percent change in annual, all-cause mortality in the adult U.S. population resulting from a permanent 1 $\mu g/m^3$ reduction in annual average ambient $PM_{2.5}$ across the U.S.? In formulating your answer, please consider mortality effects of both reductions in long-term and short-term exposures. To characterize your uncertainty in the C-R relationship, please provide the 5th, 25th, 50th, 75th, and 95th percentiles of your estimate.**

In addressing this question, the experts first specified a functional form for the $PM_{2.5}$ mortality C-R function and then developed an uncertainty distribution for the slope of that function (the mortality impact per unit change in annual average $PM_{2.5}$), taking into account the evidence and judgments discussed during the conditioning questions. We present the quantitative results provided by each expert below.

### 3.2.1 SHAPE OF THE CONCENTRATION-RESPONSE FUNCTION

The experts were asked to provide their judgments about the true shape of the C-R function relating mortality with changes in annual average $PM_{2.5}$ concentrations across the specified study range of 4 to 30 $\mu g/m^3$. Experts specified the functional form and indicated if the function included a threshold (i.e., a $PM_{2.5}$ level below which changes in annual average concentration would have no impact on mortality). The experts' responses are summarized in Exhibit 3-7. Eight of the 12 experts specified a log-linear C-R function with no threshold; three specified a non-linear function comprised of two log-linear segments with no threshold. One expert specified a non-linear function comprised of two log-linear segments that included a threshold.[34]

[34] As noted in the section on thresholds (3.1.8), the experts all discussed a theoretical model in which the C-R relationship should exhibit a threshold at the individual level. That is, an individual might have a threshold for a particular cause of death. However, individual thresholds may vary both across individuals and by cause of death for a given individual. Most experts agreed that variation in thresholds among individuals or population subgroups limited the ability of epidemiological studies to detect a population-level threshold. Though one expert's quantitative estimates employed a threshold, none of the experts could cite a study that provided strong evidence of a threshold for $PM_{2.5}$ mortality effects.

### EXHIBIT 3-7 EXPERT JUDGEMENTS CONCERNING FORM OF THE C-R FUNCTION

| FORM | EXPERT RESPONSES | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | F | G | H | I | J | K | L |
| Log-linear, No threshold | x | | x | x | x | | x | x | x | x | | |
| Piecewise Log-linear, No threshold | | x | | | | x | | | | | | x |
| Piecewise Log-linear, Threshold | | | | | | | | | | | x | |

All of the eight experts who specified a single log-linear function for the entire range believed that the available cohort data were consistent with a log-linear interpretation and that existing data did not support the identification of any population thresholds.

The remaining experts specified non-linear functions using two log-linear segments across the study range of $PM_{2.5}$. These experts chose a nonlinear function to characterize what they believed to be the increased uncertainty in mortality effects at lower concentrations seen in the major epidemiological studies. The break point defining "lower concentrations" differed a bit among these experts, as shown in Exhibit 3-8. One expert (K) thought he had insufficient data to support anything other than splitting the study range in half. The other three experts cited the lower ranges of observed data in the cohort studies such as ACS in determining their break point, but acknowledged that data are limited to specify precisely the location where the slope changes and/or where uncertainty in the mortality impact increases.

### EXHIBIT 3-8: BREAK-POINTS DELINEATING SEGMENTS OF THE $PM_{2.5}$-MORTALITY C-R FUNCTION

| EXPERTS | BREAK-POINT CONCENTRATION |
|---|---|
| F | 7 $\mu g/m^3$ |
| B, L | 10 $\mu g/m^3$ |
| K | 16 $\mu g/m^3$ |

The detailed results for these experts will be discussed below in the section on the experts' distributions. In general, the changes expressed at lower PM concentrations by these experts were modest and indicate a shallower slope for the lower range and/or slightly expanded uncertainty.

### 3.2.2 EXPERT CHARACTERIZATION OF UNCERTAINTY

Following the discussions on the shape of the concentration-response (C-R) function, experts were asked to begin the process of developing the probability distributions that would be used to characterize uncertainty in the PM-mortality relationship. Because all of the experts described the overall C-R function as linear or log-linear over all or portions of the study's concentration range, this step essentially characterized the distribution of possible values for the $PM_{2.5}$ mortality coefficient (i.e., the percent change in mortality per unit change in $PM_{2.5}$ concentration). The experts were specifically asked to estimate the minimum and maximum and the 5th, 25th, 50th, 75th, and 95th quantiles of their distributions.

The elicitation protocol and accompanying elicitation tools were designed to allow experts some flexibility in developing their distributions. They were given options in 1) the incorporation of their judgments about the likelihood of a causal relationship, and 2) the elicitation of specific quantiles. Experts first decided whether they wanted to integrate their uncertainty about the likelihood of a causal relationship (as elicited in the conditioning questions, described in Chapter 2) directly in their uncertainty distributions, or whether they preferred to characterize uncertainty in the mortality effect conditional on the assumption that the relationship was causal.[35] The uncertainty distributions for the latter group of experts would then theoretically reflect sources of uncertainty other than those affecting the experts' judgments about whether or not the causal relationship exists. Five experts (A, C, F, H, and J) chose to incorporate their causal likelihood estimates directly into their distributions. The remaining experts (B, D, E, G, I and K) preferred that these two judgments be presented separately and combined only if deemed by EPA for the purposes of a benefits analysis.

The Elicitation Team then worked with each expert to elicit individual quantiles of his distribution. The basic approach outlined in the protocol was direct elicitation of individual quantiles, beginning with the minimum and maximum, the 5th and 95th percentiles, and followed by the elicitation of the 25th and 75th percentiles, and finally the median. However, in response to feedback received by the Project Team during the EPA Symposium and the Pre-elicitation Workshop, experts who preferred to work with parametric distributions were given the opportunity to elicit a more limited number of quantiles and to fit a parametric distribution using the Crystal Ball™ software. Experts B, F, H and L developed distributions using the first approach. Seven of the remaining experts decided it was intuitively more straightforward to develop rationales for two or more quantiles, or to estimate a mean and standard error, adjusted for additional uncertainty (Expert E), and to fit a distribution with Crystal Ball. Expert I preferred to characterize uncertainty by choosing three studies whose effect estimates represented different conditions about which he was uncertain, assigning subjective weights to each study, and combining their results via Monte Carlo simulation. Whatever their approach, individual experts were asked to explain the rationale for every quantile elicited and to

---

[35] In the latter case, the experts were informed that their conditional C-R coefficient uncertainty distribution and their probabilistic distribution for causality would ultimately be integrated when applied by EPA in future benefits analyses.

conduct "reality checks" of the values they selected. These reality checks included using the spreadsheet tools described in Chapter 2 to: 1) allow each expert to visualize his distribution and compare and contrast it with distributions from the key published studies he cited as relevant; and 2) generate example national-scale back-of-the-envelope benefit calculations based on quantiles of the experts C-R coefficient distribution and compare them with data on other major causes of death in the U.S.

Exhibit 3-9 displays the individual values for each of the percentiles requested of the experts.[36] The first column indicates the distributional form of the distributions developed by each expert. The term "Custom" indicates that all of the percentiles were individually elicited. Of the eight who selected parametric distributions, six fit normal (i.e., Gaussian) distributions, one chose a triangular distribution, and one a Weibull. Individually elicited values for each expert are indicated in boldface and italic type; all other values were generated by the elicitation team using Crystal Ball™ statistical software to replicate the expert-specified distributions. Note that the experts who chose normal distributions to characterize their uncertainty distributions chose different percentiles with which to fit their distributions. For the four experts who used piecewise log-linear functions to characterize the C-R relationship over the 4-30 $\mu g/m^3$ range of $PM_{2.5}$, the table displays both of their distributions.

[36] Note that all results presented in this report in Exhibits 3-9 through 3-13 reflect the experts' final judgments after making changes after the Post-elicitation Workshop, if applicable.

#### EXHIBIT 3-9: SUMMARY OF EXPERT SUBJECTIVE UNCERTAINTY DISTRIBUTIONS FOR C-R COEFFICIENTS

| | DISTRIBUTION TYPE | MINIMUM | 5TH PERCENTILE | 25TH PERCENTILE | 50TH PERCENTILE (MEDIAN) | 75TH PERCENTILE | 95TH PERCENTILE | MAXIMUM | INCLUDES LIKELIHOOD OF CAUSALITY?[3] | CAUSALITY LIKELIHOOD | THRESHOLD SPECIFIED? |
|---|---|---|---|---|---|---|---|---|---|---|---|
| A | Normal | *0* | *0.29* | 1.1 | 1.6 | 2.1 | *2.9* | *4.0* | Y | 0.95 | N |
| B (4-10 $\mu g/m^3$) | Custom | *0.01* | *0.10* | *0.20* | *1.2* | *2.1* | *2.6* | *2.8* | N | 0.98 | N |
| B (>10-30 $\mu g/m^3$) | Custom | *0.10* | *0.20* | *0.50* | *1.2* | *2.1* | *2.6* | *2.8* | N | 0.98 | N |
| C | Normal | *0* | 0.40 | 0.90 | **1.2** | 1.5 | *2.0* | N/A | Y | 0.99 | N |
| D[1] | Triangular | *0.10* | 0.35 | 0.66 | 0.90 | 1.1 | 1.4 | *1.6* | N | 0.95 | N |
| E | Normal | *0* | 1.0 | 1.6 | *2.0* | 2.4 | *3.0* | N/A | N | 0.99 | N |
| F (4-7 $\mu g/m^3$) | Custom | *0.37* | *0.58* | *0.73* | *0.93* | *1.1* | *1.4* | *1.7* | Y | 1.0 | N |
| F (>7-30 $\mu g/m^3$) | Custom | *0.29* | *0.77* | *0.96* | *1.1* | *1.4* | *1.6* | *1.8* | Y | 1.0 | N |
| G | Normal | N/A | 0.70 | 0.88 | *1.0* | 1.1 | **1.3** | *1.5* | N | 0.70 | N |
| H | Custom | *0* | *0* | *0.40* | *0.70* | *1.3* | *2.0* | *3.0* | Y | 0.90 | N |
| I[2] | Normal | *0.20* | 0.38 | 0.90 | 1.3 | 1.6 | 2.1 | *2.3* | N | 0.95 | N |
| J | Weibull | *0* | *0.15* | 0.53 | *0.90* | 1.3 | **2.0** | *3.0* | Y | 0.99 | N |
| K (4-16$\mu g/m^3$) | Normal | N/A | *0.10* | 0.28 | *0.40* | 0.52 | 0.70 | *0.80* | N | 0.35 | Y |
| K (>16-30$\mu g/m^3$) | Normal | N/A | *0.10* | 0.45 | *0.7* | 0.95 | 1.3 | *1.5* | N | 0.35 | Y |
| L (4-10 $\mu g/m^3$) | Custom | *0* | *0.20* | *0.57* | *1.0* | *1.4* | *1.6* | *2.7* | N | 0.75 | N |
| L (>10-30$\mu g/m^3$) | Custom | *0.02* | *0.20* | *0.57* | *1.0* | *1.4* | *1.6* | *2.7* | N | 0.99 | N |

Note: Numbers in bold indicate a percentile value directly provided by the expert. All other numbers were generated by the elicitation team using Crystal Ball for the expert's specified parametric distribution based on percentiles and other information provided by the expert.

Expert K chose to incorporate a threshold into his C-R function. He indicated that he was 50% sure that a threshold existed. If there were a threshold, he thought that there was an 80% chance that it falls between 0 and 5 $\mu g/m^3$, and a 20% chance that it falls between >5 and 10 $\mu g/m^3$. The elicitation team took this information and created a probabilistic distribution in Crystal Ball with 50% of the weight at zero, 40% of the weight between >0 and 5 $\mu g/m^3$, and 10% of the weight between >5 and 10 $\mu g/m^3$.

[1] Expert D also provided a most likely value of 0.95 that was used to generate a triangular distribution in Crystal Ball.

[2] Expert I provided three beta coefficients and standard deviations from three epidemiologic studies and had the elicitation team combine these into a single distribution using Crystal Ball (placing equal weights on each study). The resulting data was fit to a normal distribution, as specified by the expert.

[3] Values in this column represent the expert's view on the likelihood that a causal relationship exists between $PM_{2.5}$ and mortality, as described in Section 3.1.7.

Because of the varied approaches taken by the experts to characterizing their views about uncertainty in the $PM_{2.5}$ mortality relationship, it is difficult to convey and to compare all their results directly in one exhibit. Direct comparison can only be done when their distributions are applied to the same scenario in a benefits analysis. We consequently portray the results in a series of graphs, grouping experts on the basis of whether they incorporated causal likelihoods into their distributions and whether they characterized the C-R function as linear or non-linear over the study range of $PM_{2.5}$.

Exhibits 3-10 and 3-11 provide comparisons of the experts' distributions in the form of boxplots. The "whiskers" delimit the lower 5th and upper 95th percentiles. The box represents the interquartile range. The median is represented by a closed circle and the mean, generated by Crystal Ball™, is represented by the open circle. The two boxplots on the far right give the analogous percentiles for the mortality coefficients from the two epidemiological studies often used in benefits analysis to characterize the $PM_{2.5}$-mortality relationship, Pope et al. (2002), and Dockery et al. (1993). The vertical axis is in units of percent decrease in mortality per unit decrease in $PM_{2.5}$ and the horizontal axis displays the individual experts.

Exhibit 3-10 compares the distributions for those experts who preferred to give conditional uncertainty distributions and keep their probabilistic judgment about the likelihood of a causal or non-causal relationship separate (Group 1). Exhibit 3-11 displays the distributions for those experts who chose to incorporate the likelihood of a causal relationship directly into their distributions (Group 2). Both Exhibits 3-10 and 3-11 array the experts in order of decreasing elicited likelihood of a causal relationship, with the experts on the left being most convinced the relationship is causal. The likelihood of a causal relationship elicited from each expert is shown below his letter on the horizontal axis. The two sets of graphs for each group provide comparisons of the experts at two annual average $PM_{2.5}$ concentrations, 18 $\mu g/m^3$ and 7 $\mu g/m^3$, in order to observe the implications of particular experts' assumptions about non-linearities in the C-R function and about differing degrees of uncertainty in the slope of the function across specific ranges of PM.

Exhibit 3-11 illustrates how experts in Group 2 incorporated assumptions about the likelihood of a causal relationship into their uncertainty distributions. For example, Expert H, who was 90 percent sure that the relationship between $PM_{2.5}$ and mortality was causal, has a 10 percent chance that there is no causal relationship (and thus that the C-R coefficient is zero). The 5th percentile of Expert H's boxplot therefore extends to zero.

**EXHIBIT 3-10: GROUP 1: EXPERT UNCERTAINTY DISTRIBUTIONS FOR $PM_{2.5}$- MORTALITY C-R COEFFICIENTS; CONDITIONAL ON THE EXISTENCE OF A CAUSAL RELATIONSHIP**







Note: Box plots represent distributions as provided by the experts to the elicitation team. When asked, experts in this group preferred to give conditional distributions and keep their probabilistic judgment about the likelihood of a causal or non-causal relationship separate.

Expert K specified a threshold (not shown).

Expert L provided two different likelihoods of causality for his C-R coefficient distributions at 7 and 18 $\mu g/m^3$, although his distribution appears in the same location in both graphs.

*Experts' C-R coefficient distribution changes between 7 and 18 $\mu g/m^3$.

## EXHIBIT 3-11: GROUP 2: EXPERT UNCERTAINTY DISTRIBUTIONS FOR THE $PM_{2.5}$-MORTALITY COEFFICIENT INCORPORATING THE EXPERT'S LIKELIHOOD OF A CAUSAL RELATIONSHIP







Note: Box plots represent distributions as provided by the experts to the Elicitation Team. When asked, experts in this group preferred to give distributions that incorporate their likelihood that the $PM_{2.5}$ mortality association may be non-causal.
* Experts' C-R coefficient distribution changes between 7 and 18 μg/m$^3$.

Generally, the results for the experts in each group show substantial variation in the amount of uncertainty expressed, even among individuals expressing similar views on the strength of the causal relationship. For example, in Group 2, Expert F (100% likelihood) predicts a much narrower range of values for the $PM_{2.5}$ mortality coefficient than Experts A or H, whose likelihoods of a causal relationship were 95% and 90% respectively. We see similarity in the variation in Group 1, for example Expert B has a much wider range of values than Expert L, although both have similar causality likelihoods (at 18 $\mu g/m^3$). We do not see dramatic differences in uncertainty between the subjective probability distributions at high versus low concentrations (i.e., the upper and lower panels of Exhibits 3-10 and 3-11).

Exhibit 3-12 displays the box and whiskers plots of the distributions given for each PM range by each of the four experts who favored a non-linear function. The exhibit shows that with the possible exception of Expert K, the changes in the C-R slope and uncertainty expressed by the experts between high and low $PM_{2.5}$ concentrations were very modest:

- Only two experts, F and K, specified a lower median slope estimate for the lower range of their functions. Expert F reduced his median estimate by 18 percent, K by 43 percent.
- Expert B expanded his uncertainty by reducing his minimum, 5th and 25th percentile estimates for the lower range, leaving the rest of his distribution unchanged. The mean of his distribution, which was not directly elicited, moved slightly closer to his median (1.2 percent) as the result of the changes in the lower distribution.
- Expert F specified a distribution for the lower range with slightly lower values for all percentiles elicited. The lower distribution was slightly more skewed towards lower values, but the spread of his two distributions was similar. He thought equally confident in his distributions for both segments, but that the distribution for the lower range would be shifted downwards.[37]
- Expert L's lower and upper box plots appear identical; however, there are two differences in his distributions. First, his minimum value for the lower distribution is zero, as compared to 0.02 for the upper distribution. Secondly, Expert L expressed less confidence in a causal relationship at lower PM concentrations, specifying a 75 percent best estimate likelihood that the relationship is causal in the lower range and a 99 percent best estimate likelihood of a causal relationship in the upper range. The difference in causality could have an impact when Expert L's

[37] He thought that there might be a mechanism operating that would adversely affect health, but believed that at lower levels of exposure that mechanism would operate more slowly, so that some exposed people would be likely to die from another cause first.

judgments are applied in a benefits analysis context where judgments about causality are factored in along with the mortality impact distributions.[38]

- Expert K's function displays the most significant differences between his upper and lower distributions in values for the C-R slope. Also unlike the other three experts in this exhibit, the spread of his lower distribution is much narrower ("more informative" in expert elicitation terms) than his upper distribution, indicating greater confidence in his lower range estimate than his upper range.

As discussed in Section 3.1.8, Expert K thought that a population threshold could exist at lower PM concentrations, although he was uncertain about where it might fall.[39] Exhibit 3-13 shows the difference in the subjective probability distribution for Expert K with and without his assumptions about a threshold for an example application to a sample of $PM_{2.5}$ annual average concentrations. As one might expect, the impact of incorporating a threshold is to shift the distribution downward to some degree. Ultimately, the implications for estimated mortality benefits of Expert K's views on thresholds as well as of the other experts' judgments about the non-linearities in the C-R function at lower concentrations are best explored as part of a sensitivity analysis. We report on such an analysis in the next chapter. Only with application to a common scenario can all of the experts' quantitative judgments be directly compared.

[38] Assuming Expert L's causality distribution and mortality impact distribution are independent, incorporating the causality judgment as part of the evaluation of a regulatory change in PM would result in lesser benefits being estimated, on average, for individuals whose annual mean $PM_{2.5}$ concentration before the change is 10 ug/m$^3$ or less. The overall extent of this impact would depend on what proportion of the population in the benefits analysis experiences baseline $PM_{2.5}$ annual average concentrations of 10 ug/m$^3$ or less.

[39] He indicated that he was 50 percent sure that a threshold existed. If there were a threshold, he thought that there was an 80 percent chance that it would be less than or equal to 5 $\mu$g/m$^3$, and a 20 percent chance that it would fall between 5 and 10 $\mu$g/m$^3$.

## EXHIBIT 3-12: C-R COEFFICIENT DISTRIBUTIONS FOR EXPERTS WHO SPECIFIED NON-LINEAR FUNCTIONS




Note: Box plots represent distributions as provided by the experts to the elicitation team. When asked, Experts B, K, and L preferred to give conditional distributions and keep their probabilistic judgment about the likelihood of a causal or non-causal relationship separate, whereas Expert F preferred to give a distribution that incorporated his likelihood that the $PM_{2.5}$ mortality association may be non-causal.

Expert K specified a threshold (not shown).

**EXHIBIT 3-13: THE EFFECT OF INCORPORATING A THRESHOLD INTO THE C-R COEFFICIENT UNCERTAINTY DISTRIBUTION OF EXPERT K**




Note: Expert K indicated that he was 50% sure that a threshold existed. If there were a threshold, he thought that there was an 80% chance that it falls between 0 and 5 µg/m³, and a 20% chance that it falls between >5 and 10 µg/m³. The elicitation team created a probabilistic distribution in Crystal Ball™ with 50% of the weight at zero, 40% of the weight between >0 and 5 µg/m³, and 10% of the weight between >5 and 10 µg/m³. The elicitation team then used Monte Carlo sampling to integrate Expert K's C-R coefficient and threshold distributions for a sample of population-weighted $PM_{2.5}$ concentrations in the U.S.

A visual comparison of the experts' distributions to those from the two primary cohort studies, Pope et al. (2002) and Dockery et al. (1993) suggests that most of the subjective distributions encompass the 90% confidence intervals from both those studies. The medians and/or estimated means fall at or between the median for the ACS study (0.6% per µg/m³) and the median for the original Six Cities study (1.3% per µg/m³) for most of the experts. Experts A and E centered their distributions above the original Six Cities results although both their distributions place some probability weight on the ACS results as well.

Exhibit 3-14 helps explain some of the rationales behind both the similarities and the differences. It summarizes the studies that the experts specifically cited in connection with the development of either their median or with the percentiles characterizing uncertainty (minimum, 5th, 25th, 75th, and 95th, and maximum). The closed circle [⊙] indicates those studies from which the experts drew particular effect estimates or which they used to support adjustments to the primary effect estimate on which they relied for the median. The open circle [○] indicates studies mentioned in association with one or more of the percentiles used to characterize uncertainty. More detail on how each expert chose to use data from particular studies may be found in their individual summaries in the Technical Support Document for this study (IEc, under development).

Exhibit 3-14 shows a strong reliance by most experts on the Pope et al. (2002) ACS study, the Jerrett et al. (2005) re-analysis of the ACS cohort in the LA basin, the Dockery et al. (1993) original Six Cities study and finally, the Laden et al. (2006) cross-sectional analysis based on the Six Cities cohort for their median estimates. However, the particular use of individual studies varied from expert to expert.

For many experts, the original ACS study by Pope et al. (2002) and Six Cities study by Dockery et al. (1993) formed an important initial foundation for their judgments. However, questions about the implications of the non-representativeness of the original ACS cohort with respect to educational attainment level (see Pope and Dockery, 2006) and questions about potential exposure misclassification (due to spatial resolution of exposure) raised by the Jerrett et al. (2005) study played critical roles in how the experts weighed the findings from both studies. Several experts thought that the original ACS study results were likely to have been underestimates of U.S. effects due to under-representation of the poorly educated and/or to exposure misclassification and adjusted their median estimates to reflect the impact of educational attainment, exposure misclassification, or both (see also Exhibits 3-4 and 3-5). Others saw the Jerrett et al. (2005) findings as rationale for placing more confidence in the original Six Cities study and its extended analyses than they previously had or to rely more extensively on the Jerrett et al. (2005) study itself. The effect on the central estimates from these two approaches was essentially to converge on a similar range of values. Median effect estimates were lower when experts argued against adjusting the original estimates for one of these factors (e.g., Expert H did not think it appropriate to adjust for educational attainment; Expert K adjusted for neither).

## EXHIBIT 3-14: EPIDEMIOLOGIC STUDIES RELIED UPON BY EXPERTS IN CREATING THEIR C-R COEFFICIENT UNCERTAINTY DISTRIBUTIONS

| | ACS (Pope et al., 2002) | ACS LA Reanalysis (Jerrett et al., 2005) | Six Cities (Dockery et al., 1993) | Six Cities (Laden et al., 2006 (Cross-Sectional)) | ACS (Pope et al., 1995) | Netherlands Cohort Study (Hoek et al., 2002) | Six Cities (Laden et al., 2006 (Change estimate)) | Mallick et al., 2002 | Willis et al., 2002 | NMMAPS (Samet et al., 2000) | Women's Health Initiative[2] | AHSMOG (Abbey et al., 1991 & 1999; McDonnell et al., 2000; Chen et al., 2005) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Expert A | ○ | ⊙ | ○ | ⊙ | | | ○ | | | ○ | | |
| Expert B | ⊙ | ⊙ | | | ⊙ ○ | | | ⊙ | | | | |
| Expert C | ⊙ | ⊙ | ⊙ | | | | | | | | | |
| Expert D | ⊙ | | ⊙ | | | | | | | | | |
| Expert E | ⊙ | ⊙ | | ⊙ | | ⊙ | ⊙ | | ⊙ | | | |
| Expert F | ○ | ○ | ⊙ | ⊙ | | | | | | | | |
| Expert G | ⊙ ○ | | ⊙ ○ | | | | | | | | | |
| Expert H | ⊙ | ⊙ ○ | ○ | | | | | | | | | |
| Expert I | ⊙ | ⊙ | | ⊙ | | | | | | | | |
| Expert J[1] | ⊙ | ⊙ ○ | ⊙ ○ | | | O | | | | ○ | ○ | ○ |
| Expert K | ⊙ | | ⊙ ○ | | | | | | | | | |
| Expert L | ○ | ⊙ ○ | | ○ | | | | | | ○ | | |
| | | | | | | | | | | | | |
| Total ⊙: | 9 | 8 | 6 | 4 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 |
| Total ○: | 4 | 4 | 5 | 1 | 1 | 1 | 1 | 0 | 0 | 3 | 1 | 1 |

⊙ = Expert used the study to inform the median of his C-R coefficient distribution(s).

○ = Expert used the study to inform the uncertainty of his C-R coefficient distribution(s).

[1] Expert J also cited the following short-term studies as support for his uncertainty: Levy et al., 2000; Steib et al., 2002; Anderson et al., 2005; Ostro et al., 2005; Schwartz et al., 1996, Klemm et al., 2000; Burnett et al., 2003).

[2] Study not yet published at the time of the interview.

Another influential factor was the particular statistical model on which experts chose to rely on from the Jerrett et al. (2005) study. The authors explored several different models that varied with respect to the number and nature of variables included in the model. Experts who found the base model with 44 individual covariates more compelling for their median estimates (e.g., Experts A and E) discussed them in the context of the Laden et al. (2006) study and tended to have higher median estimates. Other experts (e.g., Experts D and L) made arguments for use of the Jerrett et al. (2005) model that included parsimonious contextual covariates in addition to the 44 individual covariates.

The Hoek et al. (2002), Mallick et al. (2002), and Willis et al. (2003) studies were cited occasionally in experts' rationales for median estimates but usually in support of the Jerrett et al. (2005) findings or in support of upward adjustments to the original ACS study to account for possible exposure misclassification.

Short term studies, (e.g., NMMAPS (Samet et al., 2000a & b) were cited relatively rarely in the development of experts distributions, even among those experts who generally found the data base for the effects of short term exposures more compelling. They were most often raised to help define the lower limits of the distributions, minimum to 25th percentiles. This use of the studies appears consistent with the views of those experts who argued that mortality from short-term exposures (i.e., those deaths caused primarily by an acute exposure) were likely to make up a small proportion of total deaths from $PM_{2.5}$ exposure.

### 3.3. POST-ELICITATION WORKSHOP

The purpose of this workshop was to reconvene the panel of experts to present preliminary results of the study and hold discussions on the elicitation process. The workshop consisted of a briefing describing preliminary results followed by several discussion sessions. The discussion sessions were intended to explore topics where expert opinions varied significantly; discuss new scientific evidence that emerged during the course of conducting the 12 interviews; and encourage each expert to critically review his judgments. The workshop was not intended to promote consensus with in the group, but rather to share ideas among experts and discuss evidence for or against such ideas. The workshop also served as an opportunity for experts to provide EPA with feedback on the expert elicitation process.

Topics discussed during the workshop included quantification of effects by PM level, the role of intervention studies in quantifying impacts, exposure error due to the use of central site monitors, effect modification due to educational attainment, and the integration of each expert's judgments on the likelihood of a causal relationship into his overall distribution. There was also an open session at the end where experts could discuss other topics and provide feedback to EPA and the Project Team.

At the end of the workshop, the experts were given instructions on the process by which experts could update their judgments. It required completing a modification form in which the expert was asked to specify the changes he wished to make and provide detailed rationale explaining and supporting the changes.

Although the workshop gave the opportunity to discuss a number of topics where cogent, but conflicting arguments had been made, most of the discussion focused on three topics: exposure misclassification, effect modification, and causality.

### 3.3.1 EXPOSURE MISCLASSIFICATION

The purpose of this session was to discuss the issue of adjusting effect estimates for exposure misclassification due to the use of central site monitor exposure estimates. This topic was raised primarily because of the variance in opinions expressed by the experts as to the importance of this issue, and the LA ACS results, for developing C-R coefficient distributions. Another reason for discussing it was that during the time the elicitation interviews were being conducted, preliminary results from an analysis by Jerrett et al. of ACS data in New York (NY ACS) were presented at the annual Health Effects Institute (HEI) meeting in April. Like the LA ACS study, the NY ACS study used modeling in an attempt to improve exposure characterization for the cohort. Some of the experts who were interviewed subsequent to the HEI meeting discussed the preliminary NY ACS results, which did not generally corroborate the findings of the earlier analysis of the LA ACS data, when reflecting on the overall evidence for the role of improved spatial resolution. Thus, the Project Team also raised the issue in order to give all experts an opportunity to discuss and critique the newer findings.

The topic sparked a lively discussion that focused less on the Jerrett findings in NY and more about when it is appropriate to cut off the introduction of new information to an elicitation process in general, and what criteria should be used to decide what studies are introduced. The concern expressed by some experts was that new information is always becoming available and that allowing individual studies to be considered on an ad hoc basis could reflect bias. The project team generally agreed that while it made sense to allow experts to use whatever knowledge they have available to them, the project should have some formal cut-off for the introduction of new information.

Experts did discuss some possible reasons for the different results in the NY study, including the smaller range of PM levels over a smaller geographic area, and about uncertainty in the exposure surface model applied to NYC with its street canyons. Ultimately, however, most experts simply thought that the results are too new and too preliminary to give them much weight.

None of the experts chose to alter their quantitative judgments with respect to this topic.

### 3.3.2 EFFECT MODIFICATION

The purpose of this session was to discuss the issue of adjusting ACS cohort effect estimates for effect modification due to educational attainment, as demonstrated in the HEI reanalysis (Krewski et al., 2000). A number of experts adjusted their effect estimates upward to account for this effect, or relied on studies (e.g., Six Cities) that the experts thought were less affected by it. The discussion centered around whether or not the adjustment of the ACS estimate was reasonable, given the observation during the interviews that the focus of the current elicitation was on the U.S. population today and the fact that the percentage of high-school educated people in the U.S. today is more similar to that in the ACS cohort than in the Six Cities cohort.

One expert argued that re-weighting for education is helpful to see if it explains differences between the Six Cities and ACS study results. Because he believes the education factor really is a proxy for other factors related to socioeconomic status, he was not convinced that changes in education over time would necessarily affect the true factors underlying the difference attributed to education. Others agreed with this interpretation, one calling it an issue of normalizing the results of the ACS and Six Cities studies. One expert added that the HEI reanalysis found effect modification by education in both the original ACS and Six Cities studies (Krewski et al., 2000).

On the subject of the relevance of current educational attainment rates, one expert suggested that a high school degree implied more about education and lifestyle/SES in the past than it does today. Another expert noted that unpublished results from the Women's Health Initiative, a study involving a modern, highly educated cohort, showed some of the largest effect estimates observed to date and no effect modification by education.

One expert, Expert I, made changes to his uncertainty distribution, partially in response to this discussion. He modified his approach (described previously) to include a specific upward adjustment of the 2002 ACS results for educational attainment and revised the subjective weights he had assigned to the three studies he had chosen to combine (adjusted 2002 ACS, LA ACS, and the Six Cities Follow-up) to weight each equally.

### 3.3.3 CAUSALITY

The most extensive discussion during the workshop focused on the question of how judgments about causal likelihoods were incorporated into distributions characterizing uncertainty in the $PM_{2.5}$-mortality coefficient. As discussed in section 3.2.2, the protocol gave each expert the choice of 1) incorporating his views directly into his uncertainty distribution; or 2) first developing his distribution conditional on the assumption that the relationship was causal, and then having the elicitation team combine that distribution probabilistically with his previously elicited likelihood of a causal relationship. During each elicitation interview, experts who chose the second option (the "disaggregated approach") were shown box plots of both their distribution "conditional on causality" and a joint distribution that incorporated both their judgments about the C-R coefficient and about causality.[40] The joint distribution was presented to help these experts assess the potential impact of their beliefs on causality on their distribution of C-R coefficients. During the Post-elicitation Workshop, these joint distributions were presented along side distributions from experts who chose the first option above (the "aggregated approach"), in order to facilitate comparison across experts.

As discussed in Section 3.1.7, the approach to causality, although a small component of the protocol, engendered an extensive discussion during the workshop. Comments raised during the discussion of causality included the following:

[40] The joint distribution was generated using the spreadsheet tools described in Chapter 2 and Crystal Ball, assuming the two distributions were independent.

- One expert suggested that the quantitative estimates of causality are overly precise and recommended that the experts instead be assigned to qualitative categories based on their responses.
- One expert said the causality question was confusing and poorly defined.
- Others thought that it was unclear during the interview how the causality results were to be combined with their distributions if they were first developed first conditional on a causal relationship. Although this approach had been laid out in the Pre-elicitation Workshop and in the briefing book, not all experts had fully considered the implications of the approach.
- One expert said it was difficult to completely eliminate the concept of causal likelihood when characterizing an uncertainty distribution conditional on the existence of a causal relationship, and therefore, that combining their distribution with causality was potentially double counting. Another expert suggested the probabilities might not be independent and if so, cannot be multiplied.
- One expert argued that his uncertainty distribution was derived from his interpretation of the literature and that it was conceptually distinct from his evaluation of the likelihood of a causal relationship. For example, he noted that his views on the findings of a particular well-designed epidemiological study might not necessarily change over time; however, independent toxicology, mechanisms, clinical studies might change his views of the likelihood that the relationships observed in the epidemiological study are real. He therefore preferred that these concepts be kept separate in the final report.

Overall, the discussion highlighted the difficulties of eliciting conditional distributions from the experts as well as a general unease among the experts with applying the concept of expected value in this context to their mortality effect estimates. Because several expressed discomfort with presenting the joint distributions, we have not included them in this report.

Experts also asked to see a revised causality question. The Project Team agreed to review the causality question following the workshop, but after further review concluded the question was sufficiently clear.

Of the eight experts who originally specified a C-R coefficient distribution conditional on causality, four specified changes to their quantitative judgments following the workshop discussion:[41]

- Expert A changed the interpretation of his distribution from conditional on a causal relationship to NOT conditional, because of the concern over double-counting described above;
- Expert E changed his best estimate of the likelihood of a causal relationship from 95 percent to 99 percent. In explaining the rationale for his change, Expert E

[41] Note that Exhibits 3-9 through 3-14 incorporate the changes made by expert following the post-elicitation workshop.

referred to a statement made by another expert during the workshop that the assigning of some probability of no effect was really an assigning of a finite probability that there was not even a very small effect. After considering his previously cited evidence in light of this statement, he changed his previous assumption that there was a five percent probability of zero effect to there being a one percent probability of there being zero effect;

- Expert L expressed different causal likelihoods for the two segments of his non-linear C-R function. He lowered his best estimate of the likelihood of a causal relationship for the lower PM range (4-10 $\mu g/m^3$) from 99 percent to 75 percent, keeping his estimate for the higher range unchanged at 99 percent. Expert L cited the inherent difficulty of assessing effects at annual average $PM_{2.5}$ levels below 10 given current data. He changed his likelihood of a causal relationship responses for the lower segment of his function to a range of zero to 95 percent with a best estimate of 75 percent;

- Expert K expanded his range of causality estimates from 20 to 50 percent to 5 to 50 percent, but left his best estimate of causality unchanged at 35 percent. Expert K cited concerns about exposure error and unaccounted for potential confounders in extending his lower bound on the likelihood of a causal relationship.

# CHAPTER 4 | DISCUSSION

In response to recommendations made in the 2002 National Academy of Sciences (NAS) report, "Estimating the Public Health Benefits of Proposed Air Pollution Regulations," EPA has been exploring ways to improve the characterization of uncertainty in its analyses of the health benefits of proposed or existing regulations affecting air quality. EPA has now conducted two projects, a pilot study (IEc, 2004) and a larger-scale study that has been the focus of this report. Both studies sought to provide a more complete characterization, in qualitative and quantitative terms, of the uncertainties associated with the relationship between reductions in ambient $PM_{2.5}$ and mortality, using judgments elicited from scientific experts.

The previous chapter summarized the results of the expanded study, which were generated though detailed interviews with 12 experts. The experts were selected via a peer nomination process intended to yield a set of highly qualified experts from key scientific disciplines who have extensively studied the health effects of $PM_{2.5}$ exposures. The peer nomination process led to selection of eight epidemiologists, one clinician/scientist, and three toxicologists. Experts were invited to attend a Pre-elicitation Workshop to discuss evidence relevant to the project and review the protocol in detail; to participate in a one-day elicitation session; and to attend a final Post-elicitation Workshop to review results and discuss remaining questions.

As discussed in detail in the preceding chapter, the experts relied on a broad array of evidence from varied scientific disciplines to develop their judgments about the likelihood and magnitude of a relationship between $PM_{2.5}$ and mortality. The epidemiological studies based on the Six Cities and ACS cohorts were central to many discussions, but their results were critiqued in the context of newer evidence from more recent epidemiological studies in the U.S. and abroad, as well as toxicological and clinical studies. The various "intervention" studies, the Jerrett et al. (2005) re-analyses of the ACS cohort in Los Angeles, and the Sun et al. (2005) studies were an important focus of many discussions. Overall, the impact of these more recent studies led to larger mortality effect estimates and greater certainty about a causal relationship than was observed in the pilot.

The remainder of this chapter provides additional perspective on these results. We first present findings from analyses conducted to evaluate the sensitivity of the quantitative judgments to various factors. We next compare the results of this study to those of the pilot study. We conclude with an evaluation of the strengths and limitations of this expert judgment study.

## 4.1 SENSITIVITY ANALYSIS

IEc conducted a simplified benefits analysis to assess the sensitivity of the results generated to the responses of individual experts and to three factors in the study design: the use of parametric or non-parametric approaches by experts to characterize their uncertainty in the $PM_{2.5}$-mortality coefficient, participation in the pre-elicitation workshop, and allowing experts to change their judgments after the post-elicitation workshop.

The details of the simplified example benefits analysis can be found in Appendix C. In brief, the individual quantitative expert judgments were used to estimate a distribution of benefits, in the form of number of deaths avoided, associated with a reduction in ambient, annual average $PM_{2.5}$ concentrations from 12 to 11 $\mu g/m^3$. The 12 individual distributions of estimated avoided deaths were then pooled using equal weights to create a single overall distribution reflecting input from each expert. This distribution served as the baseline for the sensitivity analysis, which compared the means and standard deviations of the baseline distribution with several variants.

### 4.1.1 SENSITIVITY TO INDIVIDUAL EXPERTS

The first analysis examined sensitivity of the mean and standard deviation of the overall mortality distribution to the removal of individual expert's distributions. Individual expert distributions were sequentially removed from the combined distribution, the mean and standard deviation were re-calculated, and the percent change from the full set of experts calculated.

The results of the analysis are shown in Exhibit 4-1 in the form of a histogram of the percent changes in mean and standard deviation resulting from the removal of individual experts. The histogram shows that the mean of the combined distribution shifted less than +/- 4 percent for 10 of the 12 experts and by +/- 2 percent for seven of the 12 experts. Two experts were more influential, with removal of Expert E causing the distribution mean to shift downward by eight percent and the removal of Expert K causing the distribution to shift upward by eight percent. In general, the results suggest a fairly equal split between those experts whose removal shifts the distribution mean up and those who shift it down, and relatively modest impacts of individual experts.

**EXHIBIT 4-1: PERCENT CHANGE IN THE MEAN AND STANDARD DEVIATION OF AN EXAMPLE POOLED MORTALITY BENEFIT ESTIMATE BASED ON RESULTS OF THE EXPERT ELICITATIONS, AFTER REMOVING EACH EXPERT**




Note: Mortality benefits were pooled of a 1 μg/m$^3$ decrease in $PM_{2.5}$, beginning at an annual average concentration of 12 μg/m$^3$. The pooled estimate weighted each expert equally.

The standard deviation of the combined distribution was also not strongly affected by removal of individual experts; Experts E and K again had the greatest influence on the spread of results both causing the overall standard deviation to decline by five percent (K) and eight percent (E) when removed. Overall, these results indicate that no one expert dominates the results.

### 4.1.2 SENSITIVITY TO CHOICE OF DISTRIBUTIONAL FORM TO CHARACTERIZE UNCERTAINTY

The protocol gave experts some latitude in how to estimate the value of the $PM_{2.5}$ mortality coefficient for different percentiles. They could estimate individual percentiles directly or they could fit parametric distributions either by estimating the parameters of the distribution (e.g., mean and standard deviation) or fitting distributions to individual elicited percentiles (e.g., 50th and 95th percentiles). The elicitation team had some concern that experts fitting parametric distributions might ultimately be more overconfident. While we have no way of knowing ultimately which judgments are closer to the "truth," we can observe how the distributions derived using the two approaches differ.

The sensitivity analysis suggests that the standard deviation of the pooled distribution of experts who specified parametric distributions in fact is slightly larger than that of the pooled distribution of experts from whom all the individual percentiles were elicited (i.e.,

those specifying "custom" or non-parametric distributions). The standard deviation of the pooled estimate for the parametric group was 23 percent greater than that for the non-parametric group. (The means of the two distributions remained close to that of the overall mean for all experts.) It is worth noting, however, that the two most influential experts in the sensitivity analysis above, E and K, are both in the parametric group. When Experts E and K are removed from the parametric group, the difference in the spread of the distributions for the parametric and non-parametric groups falls to less than 3 percent. Thus, this analysis suggests that the use of parametric distributions led to distributions with similar or slightly increased uncertainty compared to experts who provided percentiles of a non-parametric distribution.

#### 4.1.3 SENSITIVITY TO PRE-ELICITATION WORKSHOP PARTICIPATION AND TO CHANGES MADE AFTER THE POST-ELICITATION WORKSHOP

Reviewers of the pilot study suggested that more opportunities for communication and sharing of information between experts, including after the individual interviews, would improve the elicitation process. The goal of such communication is to facilitate sharing of new information and to resolve questions that might have arisen during the elicitation process. However, residual concerns about such workshops remain based on early approaches to expert elicitation, most notably Delphi methods, where sharing of individual results was used to help bring experts to consensus.

Participation in the Pre-elicitation Workshop did not appear to have a significant effect on experts' judgments. The mean and standard deviation for a pooled estimate of avoided deaths for those experts who did not attend the Pre-elicitation Workshop were within 10 percent of the mean and standard deviation of the pooled estimate for Pre-elicitation Workshop attendees.

As discussed in earlier sections, we found the Post-elicitation Workshop to be important for discussing some critical points about the design of the study and presentation of results, most notably on the question of causal likelihood. Only four experts chose to make changes to their distributions following our discussions at the Post-elicitation Workshop. Using the same methodology as above, we compared the combined distributions using results prior to and following the Post-elicitation Workshop. We found a minimal impact due to the changes made after the Post-elicitation Workshop. The overall mean number of estimated deaths increased by approximately one percent compared to the estimate prior to the Workshop, and the standard deviation did not change.

### 4.2 COMPARISON TO THE PILOT STUDY FINDINGS

It is reasonable to ask whether the results of the current study are comparable to those observed in the pilot study (IEc, 2004). The pilot study was conducted in preparation for the current study and thus has many similarities; however a number of changes, both in the basic formulation of the fundamental questions asked, and in the body of available scientific data, make it necessary to be careful about direct quantitative comparisons of individual responses. Some of the differences between the two study designs include:

- The pilot study asked experts to develop separate quantitative distributions for the $PM_{2.5}$-mortality effect for long-term (annual average) and for short-term exposures (24 hour average). The current study asked experts to estimate a total mortality effect integrating effects of long-term and short-term exposures. However, most experts in this study ultimately relied on PM studies that focused on the effects of long-term or intermediate exposures for their quantitative estimates of the total mortality effect, and relied on short-term studies only when estimating possible lower bounds. As a result, the distributions in this study may be most comparable to those elicited for the effects of long-term exposure in the pilot study (See Exhibit 4-2).

**EXHIBIT 4-2: PILOT STUDY RESULTS - COMPARISON OF EXPERTS' JUDGMENTS ABOUT THE PERCENT INCREASE IN ANNUAL NON-ACCIDENTAL MORTALITY ASSOCIATED WITH A 1 $\mu g/m^3$ INCREASE IN ANNUAL AVERAGE EXPOSURES TO $PM_{2.5}$ (U.S. BASELINE 8 TO 20 $\mu g/m^3$)**




*Expert B specified this distribution for the PM-mortality coefficient above an uncertain threshold, which he characterized as ranging between 4 and 15 with a modal value of 12 $\mu g/m^3$

- The pilot study asked experts to estimate a PM mortality effect assuming an 8-20 $\mu g/m^3$ concentration range for annual average exposures in the U.S. The current study asked experts to assume a 4-30 $\mu g/m^3$ concentration range for annual average $PM_{2.5}$. For those experts who assumed linear or log-linear functions, we might not expect the quantitative estimates to change dramatically as a result of expanding the range. Expanding the range on the lower end may have influenced some experts' decision to provide a segmented, non-linear function.

- In the pilot study, the protocol design led experts to incorporate their estimates of the likelihood of a causal relationship directly into their overall distributions. In the current study, the protocol gave experts the option of incorporating their causal likelihoods directly into their distributions or to have them probabilistically combined with their mortality effect distribution conditional on the existence of a causal relationship. Following the post-elicitation workshop, nearly half the experts expressed a preference for displaying their distributions and likelihoods of causality separately. The distributions for these two approaches are therefore presented in separate exhibits, making it difficult to compare across all 12 experts directly and to compare the conditional distributions directly to the distributions in the pilot study.

Despite these differences, some interesting observations can be made about the results of the interviews in the current study (See Exhibits 3-10 and 3-11) relative to the pilot study (Exhibit 4-2).

- While the overall range of median estimates given by the experts in this study is similar to that given by experts in the pilot study, most experts in the current study had higher effect estimates than in the pilot study. In the pilot study, most experts provided median values of 0.5 percent or less for the reduction in mortality per 1 $\mu g/m^3$ reduction in $PM_{2.5}$, and the bulk of most distributions was below 1 percent (only one included a 75th percentile above 1). In this study, most of the experts estimated the median to be near or above 1 percent.

- The experts' distributions in the current study display a similar diversity in the degree of uncertainty expressed as in the pilot study. The distributions range from Expert F whose uncertainty was similar in spread to that of the Pope et al. (2002) study, to Expert A whose uncertainty was 3-4 times broader. However, all of the experts in this study gave distributions that were roughly similar or wider than those published in the ACS and Six City cohort studies.

- In the pilot study, two of five experts incorporated a threshold into their distribution; in the current study only one of 12 experts incorporated a threshold.

- The experts' views on the likelihood of a causal relationship between $PM_{2.5}$ exposure and mortality also appeared to show some marked changes from the pilot study. (Note that the experts in the current study were asked about the likelihood of a relationship between annual average exposures, including the influence short-term or peak exposures, and all-cause mortality, whereas the pilot study asked the experts about long-term and short-term exposures separately.) In general, both the best estimate likelihoods and the likelihood ranges were higher in the current study than in the pilot study. In the current study, two of 12 experts expressed some doubt about the strength of the causal relationship, giving overall likelihoods of 35% and 70%. The remainder expressed probabilities of 90% or above. As indicated in Exhibit 4-3, the experts participating in the pilot study expressed much more skepticism, and were less convinced by the evidence for long-term exposures than for short-term exposures.

### EXHIBIT 4-3: PILOT STUDY RESULTS ON THE LIKELIHOOD OF A CAUSAL RELATIONSHIP BETWEEN $PM_{2.5}$ AND NON-ACCIDENTAL PREMATURE MORTALITY

| EXPERT | EFFECTS OF LONG-TERM $PM_{2.5}$ EXPOSURE | | EFFECTS OF SHORT-TERM $PM_{2.5}$ EXPOSURE | |
|---|---|---|---|---|
| | LIKELIHOOD (CATEGORICAL) | LIKELIHOOD RANGE[A] (BEST ESTIMATE) % | LIKELIHOOD (CATEGORICAL) | LIKELIHOOD RANGE[A] (BEST ESTIMATE) % |
| A | Highly likely | 85-90 (88) | Highly likely | 90-95 (93) |
| B | Somewhat unlikely | 40-50 | Somewhat likely | 65-80 |
| C | Somewhat unlikely | 50[b] | Somewhat unlikely to somewhat likely | 50 [b] |
| D | Somewhat likely | 50 | Somewhat to highly likely | 80-90 |
| E | Likely | 80-98 (95) | Likely | 80-98 (95) |

a. Represents minimum to maximum for categorical likelihood specified. Each expert specified his own quantitative probability estimates to match his qualitative categorical description.

b. Expert C wanted to answer this question separately for different parts of the range. The 50 percent value represents his "average" for the range, with little or no probability of a causal relationship at the low end of the range and a high probability at the upper end of the range.

The differences in results compared with the pilot appear to reflect the influence of new research on the interpretation of the key epidemiological studies that were the focus of both elicitation studies, more than the influence of changes to the structure of the protocol. They may also reflect differences in the composition of the expert panel.

The higher central tendency appears to have been influenced in particular by research that has been published since the pilot study was conducted. More of the experts in the current study made explicit adjustments to their estimates to account for effect modification and exposure misclassification in the ACS cohort studies. While effect modification by educational attainment was raised by several experts in the pilot study as a result of the Krewski et al. (2000) reanalysis, it was viewed there more as a source of uncertainty rather than a rationale for adjustment of study findings. The Pope and Dockery (2006) evaluation of the impact of educational attainment, discussed at the pre-elicitation workshop and by many of the experts during their interviews, appeared to convince several experts that the Pope et al. (2002) mortality effect estimates were likely to be biased low to some degree relative to the effect estimate that might have been observed in a population more representative of the U.S. population. The Jerrett et al. (2005) study, which many experts believed to demonstrate the effect of improved spatial resolution of exposure in reducing exposure misclassification, influenced several experts to think that the Pope et al. (2002) estimates were likely to be biased low and that the higher effect estimates in the Dockery et al. (1993) study might reflect in part better exposure measurement. Results from the various intervention and exposures change studies (Clancy et al., 2002; Laden et al., 2006), which showed higher mortality effects than Pope et al. (2002), were also cited as support for experts' subjective judgments about the magnitude of potential mortality reductions, although experts varied in their views about what types of exposures (long- or short-term) may have contributed to these changes in mortality. The impact of recent literature illustrates how expert views can

evolve in the face of new information and suggests that there may be benefits to following up with experts in the future as the scientific knowledge of this issue continues to advance.

It also appears that experts' increased overall confidence in a causal effect of $PM_{2.5}$ on mortality was driven by the recent contributions to the body of scientific evidence. These were discussed in greater detail in Chapter 3 of the report, but some examples include the Clancy et al. (2002) and Laden et al. (2006) studies which several experts cited as specifically relevant to this elicitation because they showed declines in mortality following declines in particle air pollution. The long-term animal study of Sun et al. (2005) was considered by several experts to provide important support for a causal link between long-term $PM_{2.5}$ exposures and the development of atherosclerosis and increased risk for cardiovascular related mortality. As discussed above, several experts also believed the Jerrett et al. (2005) study lent support not just to the ACS findings but also to the Six Cities study, which had received less weight in the pilot study. The impact of the differences between the current and pilot study in the strength of the causal relationship are not so evident in the displays of the distributions themselves. It will become more evident in benefits analyses where the causal likelihoods will factor directly into the calculations of numbers of deaths.

## 4.3 EVALUATION OF THE EXPERT ELICITATION PROCESS

We begin our evaluation of the expert elicitation process with a summary discussion of the strengths and potential concerns arising from the particular design of this study. The discussion touches on some of the differences between the design of the pilot study and the current study.

### 4.3.1 STRENGTHS

Below we cite strengths of the process in the areas of the expert panel size, expert communication, and elicitation protocol and interview process.

#### Expert Panel Size

This study involved a larger number of experts than the pilot study. The purpose of the larger panel was primarily to achieve broad representation of prevailing scientific opinions about $PM_{2.5}$ and mortality. The availability of a larger panel also permitted some observations about the marginal contribution of additional experts, particularly when they share highly similar views or rely on the same data.

Our study tends to corroborate the work of others (e.g., Clemen et al., 1985) that show when judgments are highly correlated, the marginal influence any individual on the predictive value of the group of judgments is small. As discussed in previous sections, all of our experts relied on many of the same core studies, though their evaluations of those studies were colored by differing experience, perspectives, and knowledge of additional research. We therefore expect that many of these judgments are not independent. We do not have means of calibrating these judgments, individually or collectively, but our sensitivity analysis suggests that none of our individual experts, even those with more

independent views, had a strong influence on the outcome of the simple mortality estimates. This result suggests that adding more experts would add relatively little information. Recall that a broad representation of viewpoints in this context does not mean a statistically representative sample but rather a range of well-reasoned opinions.

### Expert Communication

The current study allowed for a substantial degree of inter-expert communication. The EPA Symposium in April 2005 gave a wide variety of interested scientists and policy makers the opportunity to hear about the project and to comment on the proposed protocol. Several changes were made as a result, including the decision to drop separate questions about the role of $PM_{2.5}$ components, and to offer a disaggregated approach to incorporating causal likelihood into the uncertainty distributions.

The workshops held with the experts prior to and following the individual interviews were an important element of the process. The Pre-elicitation Workshop was used to improve the level of preparedness for the interviews by increasing understanding of project objectives, clarifying questions and assumptions in the protocol, sharing and critiquing new data or analysis. The Post-elicitation Workshop was very valuable for re-visiting points of confusion or concern about the protocol, in particular regarding presentation of the causal likelihood information, as well as for providing feedback to the project team. Unlike some elicitation processes where these sessions may be used to bring scientists with divergent views "into the fold," these workshops were explicit that consensus was not the goal. We did see that information presented and discussed at the pre-elicitation workshop was influential in interviews and that clarifications in the post-elicitation workshop led four experts to change their distributions slightly. The sensitivity analysis suggests that these modifications did not lead to substantial changes or movement towards a consensus view. We found that individual expert's views were often deeply held and resistant to challenge.

### Elicitation Protocol and Interview Process

Newly-developed, computerized elicitation tools facilitated the development of quantitative distributions in the current study. In response to the varied approaches to characterizing the $PM_{2.5}$-mortality relationship in the pilot study, in particular the specification of thresholds and other non-linear functions, we developed spreadsheets to enable the experts see in "real-time" the implications of some of their stated assumptions or opinions. They allowed the experts the freedom to characterize their uncertainties in the $PM_{2.5}$-mortality effect using a variety of distributional forms, parametric and non-parametric. They allowed for reality checks on the mortality implications of any individual estimate. While we had some concern that parametric approaches might lead to greater reliance on the "anchoring and adjustment" heuristic, the sensitivity analysis suggest that is not the case. The distributions given by the experts who assumed parametric distributions were collectively broader than the non-parametric distributions.

Compared to the pilot study, the protocol for the current study used a more systematic approach to discussing some of key sources of uncertainty in each epidemiologic study the expert relied upon for his quantitative estimates, such as confounding, effect

modification, and exposure measurement. Though some experts were more comfortable with identifying and discussing individual factors than others, the process did give the elicitation team a clearer record with which to revisit specific assumptions during the quantitative step of the protocol.

The protocol for the current study was designed with a focus on a question of particular relevance to regulatory analysis, the impact of annual average exposures (including the long and short-term exposures) on all cause mortality. The experts were faced with developing one uncertainty distribution rather than two (effects of long-term and effects of short-term) as in the pilot study. This approach did add some complexity to the task since experts essentially had to integrate their views on the influence of long-term and short-term exposures into their final responses.

### 4.3.2 LIMITATIONS

Below we cite potential limitations of the process in the areas of expert selection, protocol development, eliciting probabilities, and generalizability.

#### Expert Selection

Some experts expressed concerns about the breadth of expertise (as indicated by professional training) and institutional affiliations represented by the current panel. We are aware that the initial expert selection process followed in this study was not as successful at identifying individuals with as broad a range of expertise and institutions as anticipated. The expert selection process did specify a number of criteria for peer nominators to consider that were intended to foster nomination of individuals with different backgrounds. However, it appeared that in some cases nominators overlooked these criteria in favor of choosing names that were most familiar. The additional steps taken with the assistance of HEI to augment the numbers of experts with backgrounds in fields outside epidemiology were essential. In the end, the expert selection process did succeed at recruiting 12 individuals representing key disciplines whose work has been widely-cited and respected in the PM-mortality field.

We do not believe that having multiple experts from the same institution is necessarily detrimental to the study. Merely being colleagues does not necessarily imply that experts share the same views. We do recognize that many of the experts have collaborated on projects together; however, restricting expert selection on this basis would severely limit the pool of qualified experts and restrict our ability to interview top-notch researchers.

The process is labor intensive and requires a substantial commitment by the experts. The level of commitment can and did in some cases impact the willingness of experts to participate in the project, and this can also affect the final composition of the group.

Finally, as we observed in the pilot study, defining "expert" for complex multi-disciplinary questions like those posed in this study is a difficult task. Making judgments about $PM_{2.5}$ mortality requires extensive scientific knowledge spanning epidemiological studies of various designs, in vitro and in vivo toxicological studies, clinical medicine, and exposure analysis, among other fields. Few, if any experts are equally knowledgeable about all these fields. This limitation poses challenges for expert

selection and the design of elicitation protocols, and for interpreting the experts' uncertainty distributions, which reflect these differing degrees of knowledge.

#### Protocol Development

Assessing the appropriate degree of disaggregation for quantitative questions remains a challenge. As noted above, the current study tried to simplify the process by re-aggregating the quantitative question relative to the pilot but may have made it more challenging to be certain about the elements included in the final response from a few experts. While a disaggregated approach has intuitive appeal, it can sometimes introduce complications by requiring that the exact mathematical relationship between the elements be specified. When experts agree on the basic relationship, it is not a problem. In the case of the discussions on causal likelihoods and how to incorporate them into distributions, we encountered disagreements during the elicitation exercises that were resolved only in the post-elicitation workshop.

#### Eliciting Probabilities

As in the pilot study, we observed some variability in the ease with which experts could translate their opinions into quantitative probabilities. Expertise in a particular scientific discipline does not always require expertise in probability and, even when it does, subjective probability elicitations can be challenging. Yet, one of the key challenges facing the acceptance of expert subjective judgments is whether experts have successfully represented their knowledge and expertise in the form of distributions. This is an issue that is common to all subjective probability elicitations and one which has been addressed in some studies by incorporating a calibration step to evaluate the expert's judgments relative to known values or by combining the judgments for use in analysis.

#### Generalizability

It is important to recognize the constraints on the generalizability of the results from this study. As with any study, this one was conducted with a particular objective in mind – to estimate the effect on all-cause mortality of a 1 $\mu g/m^3$ decline in $PM_{2.5}$. It required a number of simplifying assumptions (e.g., regarding baseline conditions in the U.S., the impact of regulation on co-pollutants and components, and the distribution of susceptible individuals in the U.S. population, among many others), as described in the protocol in Appendix A, which should be reviewed when considering the applicability of these results.

# CHAPTER 5 | CONCLUSIONS

Several conclusions can be drawn from the results of this expert elicitation project.

- The experts' distributions in the current study display a similar diversity in the degree of uncertainty expressed as in the pilot study. Compared to the pilot study, experts in this study were in general more confident in a causal relationship, less likely to incorporate thresholds, and reported higher mortality effect estimates. The differences in results compared with the pilot study appear to reflect the influence of new research on the interpretation of the key epidemiological studies that were the focus of both elicitation studies, more than the influence of changes to the structure of the protocol. They may also reflect differences in the composition of the expert panel.
- Experts in this study tended to be confident that $PM_{2.5}$ exposure can cause premature death. Ten of twelve experts believed that the likelihood of a causal relationship was 90 percent or higher. The remaining two experts gave causal probabilities of 35 and 70 percent. Recent research in both epidemiology (e.g., Jerrett et al., 2005, Laden et al., 2006) and toxicology (e.g., Sun et al., 2005) significantly contributed to experts' confidence.
- Among the experts who provided distributions that were conditional on the existence of a causal relationship, medians ranged from 0.4 to 2.0 percent (Exhibit 3-10). For five of the seven experts in the group, the effect of integrating causality in a benefits assessment would be small, given the high likelihoods of causality they expressed. Median benefits estimated using the distributions of two of the experts in this group would show more significant declines.
- Among the experts who directly incorporated their views on the likelihood of a causal relationship into their distributions (Exhibit 3-11), the central (median) estimates of the percent change in all-cause mortality in the adult U.S. population that would result from a permanent 1 $\mu g/m^3$ drop in annual average $PM_{2.5}$ concentrations ranged from 0.7 to 1.6 percent
- Distributions of uncertainty around these median estimates varied across experts, but in almost all cases exceeded the statistical uncertainty bounds reported by any one epidemiologic study, suggesting that the expert elicitation process was successful in developing more comprehensive estimates of uncertainty for the $PM_{2.5}$ mortality relationship.
- Only one of 12 experts explicitly incorporated a threshold into his C-R function. The rest beloved there was a lack of empirical and/or theoretical support for a population threshold. However, three other experts gave differing effect estimate

distributions above and below some cut-off concentration. The adjustments these experts made to median estimates and/or uncertainty at lower $PM_{2.5}$ concentrations were modest.

- Although the quantitative question asked experts to consider mortality changes due both to short-term and long-term $PM_{2.5}$ exposures, all experts based their median effect estimates on effects due to long-term exposures. Short-term exposure effects were sometimes used to derive lower-bound effect estimates.

- A sensitivity analyses conducted using a simplified benefits analysis demonstrated that no individual expert's distribution of effect estimates had more than a plus or minus eight percent impact on an overall, pooled distribution of effects. The influence of individual experts appeared symmetrically distributed (see Exhibit 4-1).

- Confounding of epidemiological results tended to be a minor concern for most experts. Only one of 12 experts expressed substantial concern about confounding as a source of error in the key literature on $PM_{2.5}$ and premature mortality.

- Experts relied upon a core set of cohort epidemiology studies to derive their quantitative estimates, mainly those associated with the ACS and Six Cities cohorts. The Six Cities results tended to be weighted more highly by experts in this study than in the pilot study. The greater emphasis on Six Cities appeared to result from corroborating evidence in the recent Six Cities follow-up (Laden et al., 2006) and from concerns about potential exposure misclassification issues and/or effect modification in the ACS cohort.

- Experts' concerns regarding potential negative bias in the ACS main study results due to effect modification (see Pope and Dockery et al., 2006) and/or exposure misclassification (Jerrett et al., 2005; Willis et al., 2003; Mallick et al., 2002) led many experts to adjust the published results upwards when considering the percentiles of their distribution.

## REFERENCES

Abbey, D. E., P.K. Mills, et al. (1991). Long-term ambient concentrations of total suspended particulates and oxidants as related to incidence of chronic disease in California 7th-Day-Adventists. *Environmental Health Perspectives* 94: 43-50.

Abbey, D.E., N. Nishino, et al. (1999). Long-term inhalable particles and other air pollutants related to mortality in nonsmokers. *American Journal of Respiratory and Critical Care Medicine* 159(2): 373-382.

Avol, E.L., W.J. Gauderman, et al. (2001). Respiratory effects of relocating to areas of differing air pollution levels. *American Journal of Respiratory and Critical Care Medicine* 164:2067-2072.

Brauer, M., J. Brumm, et al. (2002). Exposure misclassification and threshold concentrations in time series analyses of air pollution health effects. *Risk Analysis* 22(6): 1183-1193.

Brook, R.D., J.R. Brook, et al. (2002). Inhalation of fine particulate air pollution and ozone causes acute arterial vasoconstriction in healthy adults. *Circulation* 105(13): 1534-1536.

Cakmak, S., R.T. Burnett, et al. (1999). Methods for detecting and estimating population threshold concentrations for air pollution-related mortality with exposure measurement error. *Risk Analysis* 19(3): 487-496.

Chen, L.H., S.F. Knutsen, et al. (2005). The association between fatal coronary heart disease and ambient particulate air pollution: Are females at greater risk? *Environmental Health Perspectives* 113: 1723-1729.

Clancy, L., P. Goodman, et al. (2002). Effect of air-pollution control on death rates in Dublin, Ireland: an intervention study. *Lancet* 360(9341): 1210-4.

Clemen, R.T, R.L. Winkler (1985). Limits for the Precision and Value of Information from Dependent Sources. *Operations Research* 33(2): 427-442.

Cooke, R.M. (1991). Experts in uncertainty: opinion and subjective probability in science. (New York: Oxford University Press).

Costa, D.L., U.P. Kodavanti (2003). Toxic responses of the lung to inhaled pollutants: benefits and limitations of lung-disease models. *Toxicology Letters* 140-141: 195-203.

Creason, J., L.M. Neas, et al. (2001). Particulate matter and heart rate variability among elderly retirees: the Baltimore 1998 PM study. *Journal of Exposure Analysis and Environmental Epidemiology* 11(2): 116-122.

Devlin, R. B., A. J. Ghio, et al. (2003). Elderly humans exposed to concentrated air pollution particles have decreased heart rate variability. *European Respiratory Journal* 21: 76S-80S.

Diaz-Sanchez, D., A. Tsien, et al. (1999). Effect of topical fluticasone propionate on the mucosal allergic response induced by ragweed allergen and diesel exhaust particle challenge. *Clinical Immunology* 90(3): 313-22.

Dockery, D.W., C.A. Pope, et al. (1993). An association between air pollution and mortality in six U.S. cities. *New England Journal of Medicine* 329(24): 1753-1759.

Dockery, D.W., H. Luttmann-Gibson, et al. (2005). Association of air pollution with increased incidence of ventricular tachyarrhythmias recorded by implanted cardioverter defibrillators. *Environmental Health Perspectives* 113(6): 670-674.

Dominici, F., A. McDermott, et al. (2003). Airborne particulate matter and mortality: timescale effects in four U.S. cities. *American Journal of Epidemiology* 157(12): 1055-1065.

Dominici, F., R.D. Peng, et al. (2006). Fine particulate air pollution and hospital admission for cardiovascular and respiratory diseases. *Journal of the American Medical Association* 295(10): 1127-1134.

Enstrom, J.E. (2005) Fine particulate air pollution and total mortality among elderly Californians, 1973-2002. *Inhalation Toxicology* 17: 803-816.

Evelson, P., B. Gonzalez-Flecha (2000). Time course and quantitative analysis of the adaptive responses to 85% oxygen in the rat lung and heart. *Biochimica et Biophysica Acta* 1523(2-3): 209-216.

Gauderman, W.J., E. Avol, et al. (2004). The effect of air pollution on lung development from 10 to 18 years of age. *New England Journal of Medicine* 351(11): 1057-1067.

Ghio, A.J., C. Kim, et al. (2000). Concentrated ambient air particles induce mild pulmonary inflammation in healthy human volunteers. *American Journal of Respiratory and Critical Care Medicine* 162(3 Pt 1): 981-988.

Ghio, A.J. (2004). Biological effects of Utah Valley ambient air particles in humans: a review. *Journal of Aerosol Medicine* 17(2): 157-164.

Gilmour, P.S., I. Rahman, et al. (2002). Histone acetylation regulates epithelial IL-8 release mediated by oxidative stress from environmental particles. *American Journal of Physiology. Lung Cellular and Molecular Physiology* 284(3): L533-40.

Godleski, J. J., R. L. Verrier, et al. (2000). Mechanisms of morbidity and mortality from exposure to ambient air particles. Research Report 91, Health Effects Institute, Boston, MA.

Gold, D.R., A. Litonjua, et al. (2000). Ambient pollution and heart rate variability. *Circulation* 101(11): 1267-1273.

Goto, Y., J.C. Hogg, et al. (2004). Exposure to ambient particles accelerates monocyte release from bone marrow in atherosclerotic rabbits. *American journal of physiology. Lung cellular and molecular physiology* 287(1): L79-85.

Guigueira, S.A., J. Lawrence, et al. (2002). Rapid increases in the steady-state concentration of reactive oxygen species in the lungs and heart after particulate air pollution inhalation. *Environmental Health Perspectives* 110(8): 749-755.

Hawkins, N.C., J.D. Graham (1990). Expert scientific judgment and cancer risk assessment: a pilot study of pharmacokinetic data. *Risk Analysis* 8: 615-625.

Hedley, A.J., C.M. Wong, et al. (2002). Cardiorespiratory and all-cause mortality after restrictions on sulphur content of fuel in Hong Kong: an intervention study. *Lancet* 360(9359): 787-788.

Hill, A.B. (1965). The Environment and Disease: Association or Causation? *Proceedings of the Royal Society of Medicine* 58: 295-300.

Holmstead, J. (2005). EPA, Office of Air and Radiation. Letter to Robert O'Keefe, Health Effects Institute. July 11.

Hora, S.C. (1992). Acquisition of expert judgment: Examples from risk assessment. *Journal of Energy Engineering* 118(2): 136-148.

Industrial Economics, Inc. (2004). An expert judgment assessment of the concentration-response relationship between $PM_{2.5}$ exposure and mortality. Prepared for the Office of Air Quality Planning and Standards, Research Triangle Park, NC.

Industrial Economics, Inc. (2006). Briefing Book Binder. January.

Industrial Economics, Inc. (Under Development). Technical Support Document for Expanded Expert Judgment Assessment Of The Concentration-Response Relationship Between $PM_{2.5}$ Exposure And Mortality: Expert Interview Summaries. Prepared for the U.S. EPA Office of Air Quality Planning and Standards.

Jerrett, M., R.T. Burnett, et al. (2005). Spatial analysis of air pollution and mortality in Los Angeles. *Epidemiology* 16(6): 1-10.

Kahneman, D., P. Slovic, et al. (1982) Judgment Under Uncertainty: Heuristics and Biases. Cambridge University Press, Cambridge, UK.

Krewski, D., R.T. Burnett, et al. (2000). Reanalysis of the Harvard Six Cities Study and the American Cancer Society Study of Particulate Air Pollution and Mortality. Special Report to the Health Effects Institute, Boston MA, July.

Kunzli, N., S. Medina, et al. (2001). Assessment of deaths attributable to air pollution: should we use risk estimates based on time series or cohort studies? *American Journal of Epidemiology* 153(11): 1050-1055.

Kunzli, N., M. Jerrett, et al. (2005). Ambient air pollution and atherosclerosis in Los Angeles. *Environmental Health Perspectives* 113(2): 201-206.

Laden, F., J. Schwartz, et al. (2006). Reduction in Fine Particulate Air Pollution and Mortality: Extended Follow-up of the Harvard Six Cities Study. *American Journal of Respiratory and Critical Care Medicine* 173: 667-672.

Lipfert, F. W., H. M. Perry, et al. (2000). The Washington University-EPRI veterans' cohort mortality study: Preliminary results. *Inhalation Toxicology* 12: 41-73.

Lipfert, F.W., H.M. Perry Jr., et al. (2003). Air pollution, blood pressure, and their long-term associations with mortality. *Inhalation Toxicology* 15(5): 493-512.

Lipfert, F.W., R.E. Wyzga, et al. (2006). Traffic density as a surrogate measure of environmental exposures in studies of air pollution and health effects: Long-term mortality in a cohort of U.S. veterans. *Atmospheric Environment* 40: 154-169.

Mallick, R., K. Fung, et al. (2002). Adjusting for measurement error in the Cox Proportional Hazards Regression Model. *Journal of Cancer Epidemiology and Prevention* 7(4): 155-164.

McDonnell, W. F., N. Nishino-Ishikawa, et al. (2000). Relationships of mortality with the fine and coarse fractions of long-term ambient PM10 concentrations in nonsmokers. *Journal of Exposure Analysis and Environmental Epidemiology* 10(5): 427-436.

Morgan, M.G., S.C. Morris, et al. (1984). Technical uncertainty in quantitative policy analysis - a sulfur air pollution example. *Risk Analysis* 4: 201-216.

Morgan, M.G., M. Henrion, (1990). Uncertainty: a guide to dealing with uncertainty in quantitative risk and policy analysis. (New York: Cambridge University Press).

M. Granger Morgan, L.F. Pitelka, et al. (2001). Elicitation of Expert Judgments of Climate Change Impacts on Forest Ecosystems. *Climate Change* 49: 279-307.

Murphy, A.H, R.L. Winkler, (1992). Diagnostic verification of probability forecasts. *International Journal of Forecasting* 7(4): 435-455.

National Research Council (NRC). (2002). Estimating the public health benefits of proposed air pollution regulations. The National Academies Press: Washington, D.C.

O'Keefe, R. (2005). Health Effects Institute. Letter to Jeff Holmstead, EPA Office of Air and Radiation. August 15.

O'Neill, M.S., A. Veves, et al. (2005). Diabetes enhances vulnerability to particulate air pollution-associated impairment in vascular reactivity and endothelial function. *Circulation* 111:2913-2920.

Otway, H., D. von Winterfeldt (1992). Expert judgment in risk analysis and management: process, context, and pitfalls. *Risk Analysis* 12(1): 83-93.

Peters, A., E. Liu, et al. (2000). Air pollution and incidence of cardiac arrhythmia. *Epidemiology* 11(1): 11-7.

Peters, A., M. Frohlich, et al. (2001). Particulate air pollution is associated with an acute phase response in men; results from the MONICA-Augsburg Study. *European Heart Journal* 22(14): 1198-1204.

Plopper, C.G., M.V. Fanucchi (2000). Do urban environmental pollutants exacerbate childhood lung diseases? *Environmental Health Perspectives* 108(6): A252-253.

Pope, C.A. (1989). Respiratory disease associated with community air pollution and a steel mill, Utah Valley. *American Journal of Public Health* 79(5): 623-628.

Pope, C.A. (1991). Respiratory hospital admissions associated with PM10 pollution in Utah, Salt Lake, and Cache Valleys. *Archives of Environmental Health* 46(2): 90-97.

Pope, C. A., M. J. Thun, et al. (1995). Particulate air-pollution as a predictor of mortality in a prospective-study of U.S. adults. *American Journal of Respiratory and Critical Care Medicine* 151(3): 669-674.

Pope, C.A. (1996). Particulate pollution and health: a review of the Utah valley experience. *Journal of Exposure Analysis and Environmental Epidemiology* 6(1): 23-34.

Pope, C.A., D.W. Dockery, et al. (1999). Oxygen saturation, pulse rate, and particulate air pollution: a daily time-series panel. *American Journal of Respiratory and Critical Care Medicine* 159(2): 365-372.

Pope, C.A. (2000). Epidemiology of fine particulate air pollution and human health: biologic mechanisms and who's at risk? *Environmental Health Perspectives* 108(Suppl 4): 713-723.

Pope, C. A., R. T. Burnett, et al. (2002). Lung cancer, cardiopulmonary mortality, and long-term exposure to fine particulate air pollution. *Journal of the American Medical Association* 287(9): 1132-1141.

Pope, C.A., R.T. Burnett, et al. (2004). Cardiovascular mortality and long-term exposure to particulate air pollution: epidemiological evidence of general pathophysiological pathways of disease. *Circulation* 109(1): 71-77.

Rhoden, C.R., J. Lawrence, et al. (2004). N-acetylcysteine prevents lung inflammation after short-term inhalation exposure to concentrated ambient particles. *Toxicological Sciences* 79(2): 296-303.

Riediker, M., R.B. Devlin, et al. (2004). Cardiovascular effects in patrol officers are associated with fine particulate matter from brake wear and engine emissions. *Particle and Fibre Technology* 1(1): 2.

Saldiva, P.H., R.W. Clarke, et al. (2002). Lung inflammation induced by concentrated ambient air particles is related to particle composition. *American Journal of Respiratory and Critical Care Medicine* 165(12): 1610-1617.

Samet, J. M., F. Dominici, et al. (2000a). The National Morbidity, Mortality, and Air Pollution Study Part I: Methods and Methodologic Issues. Research Report 94, Health Effects Institute, Boston, MA.

Samet, J. M., S. L. Zeger, et al. (2000b). The National Morbidity, Mortality, and Air Pollution Study Part II: Morbidity and Mortality from Air Pollution in the United States. Research Report 94, Health Effects Institute, Boston, MA.

Schwartz J. (1993) Particulate air pollution and chronic respiratory disease. *Environmental Research* 62: 7-13.

Schwartz, J., D.W. Dockery, et al. (2000). Harvesting and long term exposure effects in the relation between air pollution and mortality. *American Journal of Epidemiology* 151:440-448.

Schwartz J., S.K. Park, et al. (2005). GSTM1, Obesity, Statins, and autonomic effects of particles: gene by drug by environment interaction. *American Journal of Respiratory and Critical Care Medicine* 172:1529-1533.

Seaton, A., A. Soutar, et al. (1999). Particulate air pollution and the blood. *Thorax* 54: 1027-1032.

Sun, Q., A. Wang, et al. (2005). Long-term air pollution exposure and acceleration of atherosclerosis and vascular inflammation in an animal model. *Journal of the American Medical Association* 294(23): 3003-3010.

Suwa, T., J.C. Hogg, et al. (2002). Particulate air pollution induces progression of atherosclerosis. *Journal of the American College of Cardiology* 39: 935-942.

U.S. Environmental Protection Agency. (1997). The benefits and costs of the Clean Air Act, 1970 to 1990. Prepared for U.S. Congress by U.S. EPA, Office of Air and Radiation/Office of Policy Analysis and Review, Washington, DC

U.S. Environmental Protection Agency. (1999). Benefits and costs of the Clean Air Act: 1990-2010, EPA Report to Congress. U.S. EPA, Office of Air and Radiation and Office of Policy. Washington, DC. Document No. EPA-410-R-99-001. November.

U.S. Environmental Protection Agency. (2000). Regulatory impact analysis for the heavy-duty standards/diesel fuel rulemaking. Prepared by: Innovative Strategies and Economics Group, Office of Air Quality Planning and Standards, Research Triangle Park, NC December.

U.S. Environmental Protection Agency, Science Advisory Board. (2004). Advisory on plans for health effects analysis in the analytical plan for EPA's second prospective analysis – benefits and costs of the Clean Air Act, 1990-2020. Advisory by the Health Effects Subcommittee of the Advisory Council on Clean Air Compliance Analysis. EPA-SAB-COUNCIL-ADV-04-002.

U.S. Environmental Protection Agency. (2004). Final regulatory impact analysis: control of emissions from non-road diesel engines. Office of Transportation and Air Quality. EPA-420-R-04-007.

U.S. Environmental Protection Agency. (2005a) Regulatory impact analysis for the final Clean Air Interstate Rule. Office of Air and Radiation. EPA-452/R-05-002.

U.S. Environmental Protection Agency. (2005b). Regulatory impact analysis for the final Clean Air Visibility Rule or the Guidelines for Best Available Retrofit Technology (BART) Determinations under the Regional Haze Regulations. Office of Air and Radiation. EPA-452/R-05-004.

Walker, K.D., P. Catalano, et al. (2003). Use of expert judgment in exposure assessment: part 2. Calibration of expert judgments about personal exposures to benzene. *J Expo Anal Environ Epidemiol.* 13(1): 1-16.

Walker, K.D. (2004). Industrial Economics, Inc. Memorandum to Jim Neumann, Henry Roman, and Tyra Gettleman, Industrial Economics, Inc. Appropriate Number of Experts for the Particulate Matter Expert Judgment Project. November 11.

Wellenius, G.A., B.A. Coull, et al. (2003) Inhalation of concentrated ambient air particles exacerbates myocardial ischemia in conscious dogs. *Environmental Health Perspectives* 111(4): 402-408.

Willis, A., M. Jerrett, et al. (2003). The association between sulfate air pollution and mortality at the county scale: an exploration of the impact of scale on a long-term exposure study. *Journal of Toxicology and Environmental Health, Part A* 66(16-19): 1605-1624.

Winkler, R.L., R.M. Poses (1993). Evaluating and combining physicians' probabilities of survival in an intensive care unit. *Management Science* 39(12): 1526-1543.

Winkler, R. L., T.S. Wallsten (1995). An assessment of the risk of chronic lung injury attributable to long-term ozone exposure. *Operations Research* 43(1): 19-28.

Wolff, S.K., N.C. Hawkins, et al. (1990). Selecting experimental data for use in quantitative risk assessment: an expert judgment approach. *Toxicology and Industrial Health* 6:275-291.

Yamawaki H., N. Iwai (2006). Mechanisms underlying nano-sized air-pollution-mediated progression of atherosclerosis: carbon black causes cytotoxic injury/inflammation and inhibits cell growth in vascular endothelial cells. *Circulation Journal* 70(1): 129-140.

Zeger, S.L., F. Dominici, et al. (1999). Harvesting-resistant estimates of air pollution effects on mortality. *Epidemiology* 10(2): 171-175.

Zeka, A., A. Zanobetti, et al. (2005). Short term effects of particulate matter on cause specific mortality: effects of lags and modification by city characteristics. *Occupational and Environmental Medicine* 62(10): 718-725.

Zelikoff J.T., L.C. Chen, et al. (2003) Effects of inhaled ambient particulate matter on pulmonary antimicrobial immune defense. *Inhalation Toxicology* 15(2): 131-150.

IEc

# Uncertainty Analyses to Support the Second Section 812 Benefit-Cost Analysis of the Clean Air Act

Final Report - March 2011


prepared for:

James DeMocker

Office of Air and Radiation

US Environmental Protection Agency

prepared by:

Industrial Economics, Incorporated

2067 Massachusetts Avenue

Cambridge, MA 02140

617/354-0074


INDUSTRIAL ECONOMICS, INCORPORATED

## TABLE OF CONTENTS

**CHAPTER 1 | INTRODUCTION**

1.1 Purpose and Scope *1-1*
1.2 Overview of Uncertainty Analysis Approach in the First Prospective *1-3*
1.2.1 Probabilistic Modeling *1-3*
1.2.2 Alternative Paradigms *1-3*
1.2.3 Sensitivity Tests *1-3*
1.2.4 Qualitative Approaches *1-4*
1.3 Overview of Uncertainty Analysis Plan for Second Prospective *1-5*
1.4 Relationship of This Document to Other Second Prospective Analysis *1-5*
1.5 Organization of Document *1-8*

**CHAPTER 2 | DIRECT COST-RELATED UNCERTAINTY**

2.1 Introduction *2-1*
2.2 Methods *2-2*
2.2.1 Local Controls Analysis *2-2*
2.2.2 Composition of Motor Vehicle Sales and Fleet Fuel Efficiency *2-2*
2.2.3 Vehicle Inspection Failure Rate *2-4*
2.2.4 Default Learning Rate *2-4*
2.2.5 Other Uncertainties *2-6*
2.3 Results *2-8*
2.3.1 Local Controls Analysis *2-8*
2.3.2 Composition of Motor Vehicle Sales and Fleet Fuel Efficiency *2-9*
2.3.3 Vehicle Inspection Failure Rate *2-10*
2.3.4 Default Learning Rate *2-10*

**CHAPTER 3 | EMISSIONS AND AIR QUALITY MODELING UNCERTAINTY**

3.1 Introduction *3-1*
3.2 Description of Analytical Tools *3-2*
3.2.1 Response Surface Model (RSM) *3-2*
3.2.2 BENMAP *3-5*
3.3 Methods for Quantitative Emissions Uncertainty Analyses *3-5*
3.3.1 Core Scenarios *3-6*
3.3.2 Sector-Specific Emission Scenarios *3-7*

3.3.3 Alternative EGU Emission Scenarios *3-8*

3.4 Results *3-9*

3.4.1 Core Scenarios *3-9*

3.4.2 Sector-specific Emission Scenarios *3-13*

3.4.3 Alternative EGU Emission Scenarios *3-18*

3.5 Discussion *3-22*

**CHAPTER 4 | CONCENTRATION-RESPONSE FUNCTION UNCERTAINTY**

4.1 Introduction *4-1*

4.2 Selection of Alternate C-R Functions *4-2*

4.2.1 Particulate Matter Concentration-Response Functions *4-2*

4.2.2 Ozone Concentration-Response Functions *4-4*

4.3 Results *4-6*

4.3.1 Effects of Alternative PM Concentration-Response Functions *4-6*

4.3.2 Effects of Alternative Ozone Concentration-Response Functions *4-6*

**CHAPTER 5 | DIFFERENTIAL TOXICITY OF PM COMPONENTS**

5.1 Introduction *5-1*

5.2 Historical Approach *5-2*

5.3 Importance of Differential Toxicity for Benefits Analysis *5-5*

5.4 Current Understanding of Differential Toxicity *5-6*

5.4.1 Component-Oriented Evaluations *5-6*

5.4.2 Source-Oriented Evaluations *5-15*

5.5 Conclusions *5-19*

**CHAPTER 6 | PARTICULATE MATTER/MORTALITY CESSATION LAG**

6.1 Selection of PM/Mortality Lag Structures *6-1*

6.1.1 Default Twenty-Year Distributed Lag *6-1*

6.1.2 Five-Year Distributed Lag *6-2*

6.1.3 Smooth Function Lag *6-3*

6.2 Calculation of Mortality Incidence and Valuation Using Lag Structures *6-7*

6.3 Effect of Alternatives Cessation Lag Structures *6-7*

6.3.1 Cessation Lag Results Based on the Primary C-R Function Estimate *6-7*

6.3.2 Cessation Lag Results Based on Pope et al., 2002 *6-11*

6.3.3 Cessation Lag Results Based on Laden et al., 2006 *6-14*

**CHAPTER 7 | DYNAMIC POPULTION MODELING**

7.1 Introduction *7-1*

7.2 Description of the Population Simulation Model *7-1*

7.3 Application of the Population Simulation Model *7-2*

7.4 Results *7-4*

7.5 Discussion *7-9*

**CHAPTER 8 | VALUATION UNCERTAINTY**

8.1 Uncertainty in Economic Valuation *8-1*

8.2 Results *8-3*

8.2.1 Alternate VSLs *8-3*

8.2.2 Alternate Discount Rates *8-3*

**CHAPTER 9 | CONCLUSIONS**

9.1 Advances in Quantitative Analysis *9-1*

9.2 Summary of Key Uncertainties *9-2*

9.2.1 Cost Uncertainties *9-4*

9.2.2 Benefits Uncertainties *9-4*

9.2.3 Additional Observations *9-6*

*APPENDICES:*

**APPENDIX A: QUALITATIVE UNCERTAINTY ANALYSIS TABLES FROM THE FIRST PROSPECTIVE ANALYSIS**

**APPENDIX B: UNCERTAINTY ANALYSIS OF THE INTEGRATED AIR QUALITY MODELING SYSTEM**

**APPENDIX C: QUALITATIVE UNCERTAINTY SUMMARY TABLES FOR SECOND SECTION 812 PROSPECTIVE ANALYSIS OF THE CLEAN AIR ACT**

# CHAPTER 1 | INTRODUCTION

Section 812 of the Clean Air Act Amendments of 1990 (CAAA) established a requirement that the U.S. Environmental Protection Agency (EPA) develop periodic reports that estimate the benefits and costs of the Clean Air Act (CAA). The first analysis conducted was a retrospective analysis, addressing the original CAA and covering the period 1970 to 1990. The retrospective analysis was completed in 1997. The second Section 812 report was completed in 1999 and addressed the incremental costs and benefits of the CAAA. This first prospective analysis covered implementation of the CAAA over the period 1990 to 2010.

EPA's Office of Air and Radiation (OAR) began work on the second prospective with the drafting of an analytical plan for the study. This analytical plan was reviewed by a statutorily-mandated outside peer review group, the Advisory Council for Clean Air Compliance Analysis (Council), and the Council provided comments, which have been incorporated into the technical analysis planning. This report explores and provides some perspective on uncertainties associated with the benefits and costs estimated for the second prospective section 812 analysis.

## 1.1 PURPOSE AND SCOPE

The second prospective analysis of the CAA provides a comprehensive economic analysis of air regulations using the best available methods and data. Nonetheless, as with any complex policy analysis, the costs and benefits generated by this analysis are estimated with uncertainty. This uncertainty reflects an array of issues: data and model limitations, measurement error, and the various modeling assumptions and choices necessary to implement such a sophisticated and large-scale analysis. The identification and appropriate characterization of these uncertainties is an integral part of the second prospective analysis because it provides appropriate context for the results, highlights key limitations of the current analysis, and helps readers to understand the potential impact of alternative analytical choices on benefits and costs.

This uncertainty analysis reflects some significant new efforts on the part of EPA to more rigorously investigate and in some cases quantify an array of factors that contribute to uncertainty. Most of these analyses focus on key uncertainties in the estimation and monetization of avoided mortality benefits, which is appropriate given they represent a majority of the monetized benefits estimates associated with the CAAA. These analyses include a more expansive analysis of particulate matter (PM)-mortality concentration-response (C-R), alternative means of modeling mortality risk changes and how they are realized over time, and the sensitivity of monetized benefits to the choice of alternative

distributions for the metric used to value avoided mortalities, the value of statistical life (VSL). This study also includes updated assessments of uncertainties in the "upstream" analytical elements of emission estimation and air quality modeling, an analysis of uncertainties in visibility benefits of the CAAA, and targeted cost uncertainty analyses addressing the impacts of key analytical assumptions on cost projections.

Conducting a comprehensive uncertainty analysis for a national-scale study with a scope as expansive as the Section 812 Benefit-Cost Analysis is a challenging task. The complexity of the air quality modeling system used in the analysis, and the time and resources needed to run it, make it impractical to employ simulation techniques that use statistical sampling to analyze the impact of upstream uncertainties in emissions and air quality modeling inputs on the criteria pollutant concentration outputs. Both the National Research Council (NRC) in its 2002 report evaluating EPA's air quality benefits analysis procedures and the EPA Science Advisory Board's Advisory Council on Clean Air Compliance Analysis (the Council) in numerous advisories have encouraged more comprehensive analysis of uncertainties in benefits analyses for air quality regulations.[1] While the NRC report presents ambitious and laudable long-tem goals for Agency analysis, the data and methodologies required to meet many of these goals are not available for application in the current 812 analysis.

To make progress toward improved treatment of analytical uncertainty, the 812 Project Team (the Project Team) pursued a more incremental strategy in the second 812 prospective, guided by four objectives that we shared with the Council in 2007:

- Identify reasonable incremental advances in uncertainty analysis suitable for application within a complex national-scale study;
- Conduct sensitivity analyses that provide policy-relevant insights concerning impacts of alternative assumptions on benefit and cost estimates for the CAA;
- Where appropriate, incorporate EPA's latest tools and data for uncertainty analysis (e.g. the PM mortality expert elicitation, EPA's Response Surface Model (RSM) for PM); and
- Enhance presentation of results and uncertainty through the use of graphics to complement tabular summaries.

Before providing an overview of the Project Team's approach to uncertainty analysis, we review the approach taken in the First Prospective Study.

[1] National Research Council (2002). *Estimating the Public Health Benefits of Proposed Air Pollution Regulations*. National Academies Press, Washington ,D.C.

## 1.2 OVERVIEW OF UNCERTAINTY ANALYSIS APPROACH IN THE FIRST PROSPECTIVE

EPA made use of four methods for characterizing uncertainty in the first prospective: probabilistic modeling; sensitivity tests; alternative paradigms; and qualitative characterizations.

### 1.2.1 PROBABILISTIC MODELING

In the first prospective, the Project Team used probabilistic analysis to model uncertainty in the human health effects of criteria pollutants and in the economic valuation of human health effects. For example, the VSL input was based on analysis of results of 26 mortality risk valuation studies. In order to characterize uncertainty in this important input parameter, we used the "discrete distribution of the best available estimates [i.e., the 26 studies] as a basis for quantitatively characterizing the probability of alternative values."

The probabilistic approach in the first prospective was limited in scope to those portions of the analysis where the Project Team could readily generate probabilistic characterizations of uncertainty - this included the C-R and valuation steps. In addition, the quantitative characterizations largely reflected measurement uncertainty and cross-study variability in those steps, and did not extend to model or paradigm uncertainty. The scope of the quantitative results also did not include quantitative characterizations of uncertainty in emissions, air quality modeling, or cost estimates.

### 1.2.2 ALTERNATIVE PARADIGMS

The Project Team used the alternative paradigms approach in the first prospective to examine the impact of several key methodological choices, including: the choice to use a statistical life approach, rather than a statistical life years approach, to estimate the economic benefits of reduced mortality; the choice of a single study to characterize the relationship between PM exposure and premature mortality; and the choice to omit several quantifiable but less well-supported categories of environmental benefits (e.g., residential visibility). Ideally, we would have liked to examine these model choices using some sort of probabilistic analysis. Short of an expert elicitation approach, however, we found no reliable means to assess the relative likelihood of these model choices being “correct.” As a result, the direction and magnitude of the uncertainty in these model choices was considered by examining the effects of employing alternative paradigms or models.

### 1.2.3 SENSITIVITY TESTS

The Project Team applied sensitivity analysis in a number of different sections of the first prospective. One of the most prominent examples was in the cost estimates, where sensitivity analysis was used to evaluate the effect of altering certain key input parameters. Sensitivity tests were used to examine the impact of key assumptions and data limitations on estimates of direct costs of six major cost-driving provisions, and

qualitative characterizations were used to examine the potential impact of other factors on the overall uncertainty in cost estimates. The six provisions were: California Reformulated Gasoline, PM National Ambient Air Quality Standards (NAAQS) controls, the Low Emissions Vehicle (LEV) program (the National and California programs combined), Non-utility Stationary Source NOx controls, and the Tailpipe/Extended Useful Life standard. In each of these sections, we found it difficult to assign a quantitative distribution to some of the input parameters, in part because resource and time limitations precluded even informal expert elicitation of variability and uncertainty. Although this approach enabled us to characterize some of the important but uncertain inputs to the cost estimates, it did not allow us to describe either the likelihood of obtaining a given result or the probability distribution of results.

Sensitivity tests were also used to examine the effect of different assumptions regarding the discount rate. The analysis found that changes in the discount rate had only a small effect on annual cost and benefit estimates. Although changes in the discount rate had a larger effect on the net present value calculations, and a substantial effect on the Title VI results, the study's central conclusion that the benefits of the CAA exceed its costs remained robust to alternative discount rate assumptions.

Sensitivity analyses were also conducted to evaluate the potential effect of a threshold in the PM-mortality relationship, and the effect of introducing a new procedure for estimating changes in willingness-to-pay (WTP) as individual real income changes over time. Both of these sensitivity tests were confined to appendices in the First Prospective. The income elasticity adjustment, however, is now standard practice for primary benefits estimation throughout the Agency, with sensitivity analyses using alternative estimates of the income elasticity also being conducted in many of the Agency's benefits analyses.

### 1.2.4 QUALITATIVE APPROACHES

Qualitative approaches to characterizing uncertainty were used in virtually every component of the first prospective, in an effort to be comprehensive in the identification of sources of uncertainty. They were used in the summaries of uncertainty in the cost analysis to examine the uncertainty associated with learning curves and tax-interaction effects and also to examine uncertainty regarding model specification. In addition, qualitative tables were used extensively in the benefits analysis. For example, while it was impractical to quantitatively model uncertainty in the emissions estimation and air quality modeling components of the analysis, several specific uncertainties in these steps were assessed qualitatively, with estimates of the direction and magnitude of the uncertainty (e.g., the effect of incomplete characterizations of direct PM and precursor emissions composition). Qualitative tables were also used in the first prospective to characterize uncertainty in the valuation of ecological benefits. Appendix A presents the qualitative uncertainty summary tables from the first prospective Report to Congress.

## 1.3 OVERVIEW OF UNCERTAINTY ANALYSIS PLAN FOR SECOND PROSPECTIVE

Exhibit 1-1 illustrates the Project Team's approach to uncertainty analysis in the second prospective Section 812 study. The grey box represents the extent of uncertainty analysis in the first section 812 prospective analysis. As noted above the modifications employed in the current analysis included both "online" analyses (shown in color), that feed information on uncertainty into the analytical chain at various points and propagate it through the remaining steps in the chain, and separate "offline" analyses and research that will provide insights into the uncertainty, sensitivity, and robustness of results to alternative assumptions that are currently most easily modeled outside the main analytical process.

The online analyses consist of the selection of alternative inputs for mortality C-R and valuation in BenMAP, as well as a "modified" online analysis of the effect on benefits of sector specific, marginal changes in PM-related emissions from the core scenarios. This modified online analysis substitutes EPA's RSM for CMAQ, a less resource intensive meta-model of CMAQ used to rapidly approximate PM concentrations.

The bottom box in Exhibit 1-1 lists additional offline research and analysis that we incorporated into the current 812 study, and Exhibit 1-2 provides additional information on each analysis. As with the online analyses, these analyses were chosen because they address uncertainty in key analytical elements or choices that may significantly influence benefit or cost estimates. Also, as in the first prospective, each analytical element (starting with emissions profile development) features a comprehensive qualitative evaluation of key uncertainties, presented in Appendix C of this report.

## 1.4 RELATIONSHIP OF THIS DOCUMENT TO OTHER SECOND PROSPECTIVE ANALYSES

This report describes the analyses conducted by the Project Team to assess and characterize uncertainty in the estimated benefits and costs of the CAAA presented in the full integrated report. The analyses are designed to assess these uncertainties typically by re-running benefit or cost analyses, changing specific model parameters, employing alternative scenarios or varying key assumptions, and even substituting alternative models. As such, the benefit and cost estimates presented in this report rely on results generated in prior analytic components of the second prospective study. As illustrated in Exhibit 1-1, EPA conducted both emissions estimation and air quality modeling analyses to generate data that underlies the benefits estimation approaches. EPA plans to make full reports on each of these major analytic steps available to the public online at the project website, www.epa.gov/oar/sect812.

The results presented in this report do not represent EPA's primary benefits or costs, except where such results are presented (and identified as such) for the purposes of comparison to alternative estimates. EPA's primary benefits estimates are based on EPA's preferred set of analytic assumptions, models, and data sources, many of which have been explicitly reviewed by the Council over the course of many years and have been embodied in standard benefits estimation practice as carried out by EPA's Office of Air and Radiation in Regulatory Impact Analyses. Details surrounding the methods used

to derive the primary benefit and costs results are described in separate reports, *Benefits Analyses to Support the Second Section 812 Prospective Benefit-Cost Analysis of the Clean Air Act*, and *Cost Analyses to Support the Second Section 812 Prospective Benefit-Cost Analysis of the Clean Air Act.*

**EXHIBIT 1-1. UNCERTAINTY ANALYSIS PLAN FOR SECOND PROSPECTIVE SECTION 812 BENEFIT COST ANALYSIS OF THE CLEAN AIR ACT AMENDMENTS OF 1990**




**Offline Analyses**

1. Dynamic versus Static Population Modeling (Benefits)
2. Cessation lag (Benefits)
3. Differential Toxicity of PM Components (Benefits)
4. Emissions and Air Quality Modeling Uncertainty Literature Review and Qualitative Analysis (Benefits)
5. Unidentified Controls (Costs)
6. Fleet Composition, I&M Failure Rates (Costs)
7. Learning Curve Assumptions (Costs)

* In addition, we perform a computable general equilibrium (CGE) analysis of costs alone and of costs and benefits, but we omit this step from the diagram because we do not conduct uncertainty analyses on the CGE modeling.

**EXHIBIT 1-2. "OFFLINE" UNCERTAINTY ANALYSES**

| ISSUE | APPROACH | ANALYTICAL ELEMENTS AFFECTED | OUTPUT |
|---|---|---|---|
| Emissions/Air Quality Parameter Uncertainty | Identification of key factors through extensive literature review | Emissions and air quality modeling | Characterization of current state of knowledge concerning uncertainty assessment for large-scale air quality modeling applications. |
| Emissions Scenario Uncertainty | Model effects on benefits of incremental changes to emissions from individual emissions sectors. | Benefits side elements (PM only) | Dollar per ton estimates of marginal benefits from incremental changes in each of the major emitting sectors in 2010 and 2020. |
| Emissions Scenario Uncertainty | Examine effects of alternative modeling of emissions in 2000 from EGU sources. Use continuous emissions monitoring (CEM) data instead of IPM results, coupled with alternative counterfactual consistent with CEM approach. | Benefits side elements (PM only) | Alternative year 2000 benefit results for comparison with output from IPM-based results from main analysis. |
| Benefits "Cessation Lag" | As a post-processing step to BenMAP, apply alternative approaches to describe how mortality risk in a population changes over time following a reduction in air pollution, as the population moves from its initial steady-state risk level to its new level (all other factors being held constant). | Benefits side elements (PM mortality only) | Alternative net present value results for avoided premature mortality due to PM reductions in 2000, 2010, and 2020. |
| Dynamic Population Modeling | Evaluate the impact of estimating benefits using a dynamic rather than static population modeling approach, by applying a life-table based air quality risk assessment tool. | Benefits side elements (PM mortality only) | Changes in numbers of deaths per year, life years gained, and changes in period conditional life expectancy due to PM reductions in 2000, 2010, and 2020. |
| Differential Toxicity of PM Components | Review of feasibility and policy relevance of potential notional analysis of evidence-based alternative assumptions concerning the relative toxicity of major PM components. | Benefits side elements (PM mortality only) | Review concluded that available data do not support a policy relevant notional analysis at this time. |
| Unidentified Controls | Develop cost estimates using alternative assumptions about the threshold for, and cost of, applying unidentified local controls to achieve NAAQS compliance. | Direct Costs | Alternative direct cost estimates for each target year reflecting sensitivity of costs to these assumptions. |

| ISSUE | APPROACH | ANALYTICAL ELEMENTS AFFECTED | OUTPUT |
|---|---|---|---|
| Fleet Composition and I&M Failure Rates | Develop cost estimates for mobile source sector using alternative assumptions about 1) future fleet composition and fuel efficiency; and 2) alternative failure rates for I&M program testing. | Direct Costs | Alternative direct cost estimates for each target year reflecting sensitivity of costs to these assumptions. |
| Learning Curve Assumptions | Develop cost estimates using alternative assumptions about the degree to which learning effects reduce costs of pollution control over time, focusing on industries lacking published learning effect estimates in the peer-reviewed literature. | Direct Costs | Alternative direct cost estimates for each target year reflecting sensitivity of costs to these assumptions. |
| Unquantified Uncertainties | Comprehensive qualitative uncertainty analysis | All | Summary tables describing key uncertainties and the size and direction of their likely impact on results (if known). |

The Agency has prepared an integrated report for the entire project.[2] The integrated report addresses each of the major analytic components, and presents comparisons of benefits and costs for each of the target years. It also integrates the implications of uncertainty analyses that characterize confidence in these results.

## 1.5 ORGANIZATION OF DOCUMENT

The remainder of the document is split into eight chapters:

- **Chapter 2: Direct Cost-Related Uncertainty** – This chapter explores the uncertainty surrounding key inputs to the direct cost estimates, including local controls, composition of motor vehicle sales and fleet fuel efficiency, inspection failure rates and learning rates.
- **Chapter 3: Emissions and Air Quality Modeling Uncertainty** – This chapter describes our analysis of uncertainty in emissions estimates and air quality modeling. This includes sensitivity analyses of the emitting sector and characterizing model uncertainty in the EGU sector emissions estimation approach.
- **Chapter 4: Concentration-Response Function Uncertainty** – This chapter provides estimates of CAAA-related avoided deaths resulting from application of alternative C-R functions for both PM and ozone.

[2] U.S. Environmental Protection Agency (2011). *The Benefits and Costs of the Clean Air Act from 1990 to 2020*. Final Report, March 2011. Office of Air and Radiation.

- **Chapter 5: Differential Toxicity of PM Components** – This chapter provides our assessment of potential approaches to account for differential toxicity of PM components.
- **Chapter 6: Particulate Matter/Mortality Cessation Lag** – This chapter explores uncertainty in the assumption of the cessation lag between CAAA-related PM exposure changes and the resulting avoided mortality.
- **Chapter 7: Dynamic Population Modeling** – This chapter provides a comparison between the benefits results from BenMAP, which does not take into account previous air pollution changes, and a dynamic population simulation model which tracks the effects of air pollution changes in the U.S. population over time.
- **Chapter 8: Valuation Uncertainty** – This chapter describes our analysis of uncertainty in monetary valuation of benefits, including a presentation of estimates resulting from different assumptions of VSL and discount rates.
- **Chapter 9: Conclusions** – This chapter provides our overall conclusions about the uncertainty analyses presented in the report.

# CHAPTER 2 | DIRECT COST-RELATED UNCERTAINTY

## 2.1 INTRODUCTION

Most of this document addresses uncertainties in the benefits of the 1990 Clean Air Act Amendments (CAAA). The Project Team also assessed various uncertainties associated with the costs of the Amendments. The key uncertainties that we examined include the following:

- ***Local Controls***: As indicated in Chapter 7 of the Second Prospective Cost Report, the Project Team used a cost cap of $15,000 per ton to estimate the costs of identified local controls and also applied a cost of $15,000 per ton to unidentified controls. To assess the sensitivity of the local controls analysis to changes in these values, we estimated the costs of local controls based on a $10,000 per ton cost cap for identified controls and a $10,000 per ton cost for unidentified controls.
- ***Composition of Motor Vehicle Sales and Fleet Fuel Efficiency***: In Chapter 3 of the Second Prospective Cost Report, the 812 Project Team estimated CAAA-related costs for the on-road sector based on projections of vehicle sales and fuel consumption derived from the Department of Energy's (DOE's) *Annual Energy Outlook 2005* (AEO 2005). To examine the sensitivity of the Project Team's on-road sector cost estimates to alternative assumptions about the composition of light-duty vehicle sales and the fuel economy of the light-duty vehicle fleet, we developed alternative cost estimates based on AEO 2008, which contains more up-to-date projections of both these variables.
- ***Inspection Failure Rates***: To estimate the repair costs associated with vehicle inspection and maintenance (I&M) programs mandated by the CAAA, the Project Team used failure rate estimates derived from 2003 and 2004 Wisconsin I&M program data. A 2001 National Research Council (NRC) report on I&M programs, however, presents failure rates much lower than those suggested by the Wisconsin data.[3] As a sensitivity analysis, we estimated the total costs of I&M programs using failure rates derived from the NRC report.
- ***Learning Rates***: Throughout the Second Prospective Cost Report, the Project Team used a series of "learning rates" to capture the extent to which costs decline

[3] Committee on Vehicle Emission Inspection and Maintenance Programs, Board on Environmental Studies and Toxicology, Transportation Research Board, National Research Council, *Evaluating Vehicle Emissions Inspection and Maintenance Programs*. 2001.

as firms gain experience with air pollution control technologies. The learning rate for a technology represents the percentage reduction in costs associated with each doubling in the cumulative production of that technology. Where possible, the Project Team used published estimates of technology- or industry-specific learning rates. For sectors and control technologies for which no empirical estimates of the learning rate were readily available, the Project Team employed a default learning rate of 10 percent based on advice provided by the EPA Science Advisory Board's Advisory Council on Clean Air Compliance Analysis.[4] To assess the extent to which this default rate influences the results of the cost analysis, we estimated the costs of the Amendments using alternative default learning rates of 5 and 20 percent.

## 2.2 METHODS

In the following four sections, we present our approach for analyzing each of the uncertainties described above.

### 2.2.1 LOCAL CONTROLS ANALYSIS

As indicated above, the Project Team's analysis of local controls assumed a $15,000 per ton cost cap for identified controls (i.e., the analysis assumed that local air quality managers would not require the implementation of controls costing more than $15,000 per ton of emissions controlled).[5] In addition, in areas where these identifiable control measures would be insufficient for attainment with the 8-hour ozone National Ambient Air Quality Standards (NAAQS), the Project Team assumed a fixed cost of $15,000 per ton for unidentified volatile organic compound (VOC) and nitrogen oxide ($NO_x$) controls. To assess the sensitivity of the local controls cost analysis to an alternative cost cap and an alternative fixed cost per ton for unidentified controls, we estimated the total cost of local controls based on a cost cap of $10,000 per ton for identified controls and a fixed cost of $10,000 per ton for unidentified measures.

### 2.2.2 COMPOSITION OF MOTOR VEHICLE SALES AND FLEET FUEL EFFICIENCY

The Project Team's analysis of the costs associated with motor vehicle tailpipe and fuel rules is based on sales and fuel efficiency projections from the 2005 version of DOE's *Annual Energy Outlook*. Since the release of AEO 2005, however, fuel prices have been more volatile than in previous years, leading many consumers to shift to more fuel efficient vehicles, and the Department of Transportation revised the Federal Corporate Average Fuel Economy (CAFE) standards. Given these developments, AEO 2008 projects that passenger cars will make up a greater portion of light-duty vehicle sales in 2010 and 2020 than is projected by AEO 2005. AEO 2008 also assumes that the light-

---

[4] U.S. Environmental Protection Agency Science Advisory Board, EPA-SAB-COUNCIL-ADV-07-002, "Benefits and Costs of Clean Air Act – Direct Costs and Uncertainty Analysis", Advisory Letter, June 8, 2007. Available at http://www.epa.gov/sab/pdf/council-07-002.pdf.

[5] E.H. Pechan & Associates, Inc. and Industrial Economics, Inc., *Direct Cost Estimates for the Clean Air Act Second Section 812 Prospective Analysis: Draft Report*, prepared for U.S. EPA, Office of Air and Radiation, October 31, 2008.

duty vehicle fleet will be more fuel efficient relative to the projections in AEO 2005. As indicated in Exhibit 2-1, AEO 2008 estimates that the light-duty vehicle fleet in 2020 will be nearly 15 percent more fuel efficient than was projected by AEO 2005. In addition, whereas sales projections derived from AEO 2005 suggest that passenger cars will make up 42 percent of light-duty vehicle sales in 2020, AEO 2008 suggests that passenger cars will represent 49 percent of light-duty vehicle sales in 2020.[6]

**EXHIBIT 2-1. LIGHT DUTY VEHICLE FUEL EFFICIENCY, CAR SALES, AND TRUCK SALES FOR 2010 AND 2020 BASED ON AEO 2005 AND AEO 2008**

| | AEO 2005 (PRIMARY ESTIMATES)[A] | AEO 2008 (ALTERNATIVE ESTIMATES)[B] |
|---|---|---|
| **FLEET AVERAGE VEHICLE FUEL EFFICIENCY (MPG)** | | |
| 2010 | 20.14 | 20.30 |
| 2020 | 20.73 | 23.75 |
| **2010 LIGHT-DUTY VEHICLE SALES (THOUSANDS)** | | |
| Passenger Cars | 8,417 | 8,542 |
| Light-Duty Trucks | 8,172 | 8,046 |
| **2020 LIGHT-DUTY VEHICLE SALES (THOUSANDS)** | | |
| Passenger Cars | 7,377 | 8,548 |
| Light-Duty Trucks | 10,106 | 8,935 |

Sources:

a. Light-duty vehicle fuel efficiency values obtained from Table 47 of AEO 2005. Light-duty vehicle sales values derived from the sales data presented in Table 45 of AEO 2005 using the methodology described in Chapter 3 of E.H. Pechan & Associates, Inc. and Industrial Economics, Inc., *Direct Cost Estimates for the Clean Air Act Second Section 812 Prospective Analysis: Draft Report*, prepared for U.S. EPA, Office of Air and Radiation, October 31, 2008.

b. Light-duty vehicle fuel efficiency values obtained from Table 49 of AEO 2008. Sales estimates for passenger cars and light-duty trucks based on the primary (AEO 2005-based) estimate of total light-duty vehicle sales, re-distributed between passenger cars and light-duty trucks based on the distribution of sales between these vehicle categories presented in Table 47 of AEO 2008.

To assess the extent to which the Project Team's cost estimates for the on-road sector would change under the alternative AEO 2008 assumptions, we estimated the cost of motor vehicle tailpipe and fuel rules for both the 2010 and 2020 target years based on the AEO 2008 data.

[6] It is important to note that Exhibit 2-3 does not present the sales estimates reported in AEO 2008. Because our goal is to examine the sensitivity of the cost analysis to the *composition* of light-duty vehicle sales rather than to the total number of vehicles sold, we use the AEO 2008 data to estimate the distribution of light-duty vehicle sales between passenger cars and light-duty trucks. We then apply this distribution to the total light-duty vehicle sales estimates derived from AEO 2005.

### 2.2.3 VEHICLE INSPECTION FAILURE RATE

In the Second Prospective Cost Report, the Project Team's estimates of the repair costs associated with motor vehicle I&M programs employed program- and year-specific inspection failure rates derived from 2003 and 2004 data for Wisconsin I&M programs. The Wisconsin data suggested that the failure rate associated with annual dynamometer-based I&M programs is 14 percent, and the Project Team used this rate to derive failure rates for annual idle, biennial idle, and biennial dynamometer-based I&M programs. In its June 2007 review of the Draft Direct Cost Report, the Science Advisory Board Advisory Council on Clean Air Compliance Analysis (the Council) noted that a 2001 NRC report referenced a failure rate of 2.1 percent for annual dynamometer-based programs, which is approximately one-seventh the value derived from the Wisconsin data.[7]

To assess the sensitivity of the I&M cost analysis to the assumed failure rate for annual dynamometer-based programs, we developed alternative cost estimates for CAAA-mandated I&M programs based on the failure rate reported by the NRC. Because the Project Team used the estimated failure rate for annual dynamometer-based programs as a basis for estimating the failure rates for annual idle, biennial idle, and biennial dynamometer-based I&M programs, an initial step in this sensitivity analysis was re-estimation of the failure rates for these program types. We generated these values using the same approach as employed in the Second Prospective Cost Report and the 2.1 percent failure rate for annual dynamometer-based programs reported by the NRC. Exhibit 2-2 presents the adjusted failure rates for each program type and the corresponding values used in the Second Prospective Cost Report.

### 2.2.4 DEFAULT LEARNING RATE

In the Second Prospective Cost Report, the Project Team adjusted total program costs to account for "learning curve" impacts ( i.e., the extent to which the costs of a technology decline as experience with that technology increases over time). Wherever possible, the Project Team employed technology- or industry-specific learning rates obtained from the literature. Where industry-specific learning rates were not readily available, the Council advised the Project Team to employ a default learning rate of 5 to 10 percent. Based on this advice, the Project Team applied a default rate of 10 percent to the following technologies:

- Selective non-catalytic reduction at electric generating units (EGUs) (O&M costs only);
- Activated carbon injection at EGUs;

[7] Committee on Vehicle Emission Inspection and Maintenance Programs, Board on Environmental Studies and Toxicology, Transportation Research Board, National Research Council. *Evaluating Vehicle Emissions Inspection and Maintenance Programs*. 2001.

**EXHIBIT 2-2. SUMMARY OF PRIMARY AND ALTERNATIVE FAILURE RATES FOR MOTOR VEHICLE INSPECTION AND MAINTENANCE PROGRAMS**

| PROGRAM | FAILURE RATES (PERCENT) | | | | | |
|---|---|---|---|---|---|---|
| | 2000 | | 2010 | | 2020 | |
| | Primary Failure Rate Estimates (based on Wisconsin data) | Alternative Failure Rate Estimates (based on NRC-reported value) | Primary Failure Rate Estimates (based on Wisconsin data) | Alternative Failure Rate Estimates (based on NRC-reported value) | Primary Failure Rate Estimates (based on Wisconsin data) | Alternative Failure Rate Estimates (based on NRC-reported value) |
| Annual Idle | 7.00 | 1.05 | 13.09 | 1.96 | 14.00 | 2.10 |
| Biennial Idle | 9.25 | 1.16 | 17.30 | 2.18 | 18.50 | 2.33 |
| Annual Dynamometer | 14.00 | 2.10 | 14.00 | 2.10 | 14.00 | 2.10 |
| Biennial Dynamometer | 18.50 | 2.33 | 18.50 | 2.33 | 18.50 | 2.33 |

- Motor vehicle fuel rules;
- Non-road engine and fuel rules;
- Non-EGU point source controls;
- Nonpoint source controls; and
- Local controls: EGU, non-EGU point source, and nonpoint source.

We tested the sensitivity of the cost analysis to the choice of a default learning rate by re-estimating the total costs of the Amendments using alternative default learning rates of five and 20 percent for the program areas listed above. The five percent default rate represents the low end of the range recommended by the Council, while the 20 percent value represents the central tendency presented in the peer-reviewed literature for several technologies.[8] For the program areas not listed above (i.e., those for which technology- or industry specific learning rates were available), we left cost estimates unchanged.

### 2.2.5 OTHER UNCERTAINTIES

In addition to the uncertainties outlined above, we identified several other areas of uncertainty related to the costs of the Amendments that we did not address quantitatively. These include the Project Team's projections of economic activity, the impact of CAAA compliance on productivity, the influence of technological innovation on CAAA compliance costs, the impact of input substitution on the costs of complying with the Amendments and the effects of the CAAA on product quality.

- ***Economic Activity Projections***: The cost of the Amendments in 2010 and 2020 will depend in large part on the future size and composition of the U.S. economy. If the AEO 2005 economic growth projections employed by the Project Team underestimate economic activity in 2010 and 2020, the Project Team most likely underestimated the costs of the Amendments. Conversely, the Project Team may have overestimated CAAA compliance costs if AEO 2005 overestimates economic activity in 2010 and 2020. In addition, to the extent that the composition of economic output in 2010 and 2020 deviates from the AEO 2005 projections, the Project Team's cost projections may not reflect the actual costs of the Amendments. *A priori*, it is unclear whether the Project Team would have underestimated or overestimated costs under these circumstances.
- ***Industrial Productivity***: The Project Team's cost estimates represent the direct costs of the Amendments (i.e., the expected expenditures of regulated facilities to comply with the Amendments). Several peer-reviewed studies have suggested, however, that the direct costs of pollution control measures do not adequately represent the total costs of environmental protection, due to the effects of

---

[8] For an analysis of the learning rates estimated in the empirical literature, see John M. Dutton and Annie Thomas, "Treating Progress Functions as a Managerial Opportunity," *Academy of Management Review*, Vol 9, No. 2, 1984.

pollution abatement on industrial productivity.[9] Although the Project Team's cost estimates do not capture these productivity effects, the literature is not clear on the magnitude and direction of these effects. While some studies have found that pollution control negatively affects productivity, others have found that the productivity impact is positive or ambiguous.[10]

- ***Technological Innovation***: As indicated above, the Project Team's cost estimates reflect the impact of learning (i.e., technological change) as it relates to existing control technologies. The Amendments, however, could serve as in impetus for technological *innovation* in the development of new, low-cost technologies or processes to reduce emissions. Because the Project Team did not attempt to model these technological innovations, the Second Prospective Cost Report may overestimate costs.

- ***Input Substitution***: To minimize the cost of complying with the Amendments, regulated facilities may alter the mix of inputs used in the production of goods and services. With the exception of fuel switching by EGUs, the Project Team did not capture input substitution as a control strategy in the Second Prospective Cost Report. Accordingly, the Project Team may overestimate the costs of the Amendments.

- ***Effects of the CAAA on Product Quality:*** In addition to increasing the cost of producing goods and services, CAAA requirements may also affect product quality. For example, motor vehicle emission control requirements may reduce the performance of automobiles, and changes in paint formulations (to reduce VOC emissions) may adversely affect how well paint adheres to unfinished surfaces. On the other hand, changes in product quality may also have unquantified benefits – while we capture the fuel saving benefits of many motor vehicle engine changes, the benefits of low-VOC paint in improving indoor air quality and human health are not captured in our estimates. As a result, product quality effects may reduce the welfare of households that consume products affected by the CAAA, or they may improve welfare. Households that substitute to other products due to CAAA-related quality changes (e.g., households that

---

[9] Barbera, A.J. and McConnell, V.D. (1986) "Effects of Pollution Control on Industry Productivity: A Factor Demand Approach." The Journal of Industrial Economics. Vol. XXXV, 161-172.

Barbera, A.J. and McConnell, V.D. (1990) "The Impact of Environmental Regulations on Industry Productivity: Direct and Indirect Effects." Journal of Environmental Economics and Management. Vol. 18, 50-65.

Gray, W.B. and Shadbegian, R.J. (1994) "Pollution Abatement Costs, Regulation, and Plant-Level Productivity." Center for Economic Studies.

Morgenstern, R.D., Pizer, W.A., and Shih, J-S. (1998) "The Cost of Environmental Protection." Discussion Paper 98-36. Resources for the Future.

[10] Barbera and McConnell (1986) found a negative impact of pollution control on productivity, while Barbera and McConnell (1990) and Gray and Shadbegian (1994) found an ambiguous impact, and Morgenstern et al. (1998) found a positive impact.

substitute from automobiles to light-duty trucks due to CAAA requirements that affect the performance of automobiles more than light-duty trucks) may also experience welfare losses or gains, as they would have otherwise preferred the product(s) that they would have consumed in the absence of the CAAA but may, in the balance, experience previously unrecognized gains.

## 2.3 RESULTS

The following four sections present the results obtained using the analytic approach described above for the key cost-related uncertainties.

### 2.3.1 LOCAL CONTROLS ANALYSIS

The Project Team used a cost cap of $15,000 per ton to estimate the costs of identified local controls and also applied a cost of $15,000 per ton to unidentified controls. To assess the sensitivity of the local controls analysis to changes in these values, we estimated the costs of local controls based on a $10,000 per ton cost cap for identified controls and a $10,000 per ton cost for unidentified controls. As indicated in Exhibits 2-3 and 2-4, this alternative approach yields lower cost estimates for both identified local controls and unidentified measures. The estimated costs of identified controls decline when the $10,000 cap is applied because controls that cost between $10,000 and $15,000 per ton are assumed not to be implemented. In addition, although the application of the $10,000 cost cap increases the emissions reductions to be achieved through unidentified controls (relative to when the $15,000 cost cap is used), reducing the cost of unidentified controls to $10,000 per ton more than offsets the costs associated with these additional emissions reductions.

EXHIBIT 2-3. 2010 LOCAL CONTROLS SENSITIVITY ANALYSIS

| PROGRAM AND SECTOR | 2010: $15,000/TON CAP AND $15,000/TON FOR UNIDENTIFIED CONTROLS (MILLION 1999$) | 2010: $10,000/TON CAP AND $10,000/TON FOR UNIDENTIFIED CONTROLS (MILLION 1999$) |
|---|---|---|
| **Identified Controls** | **$4,564.7** | **$3,380.0** |
| Ozone NAAQS | $3,729.6 | $2,629.4 |
| PM NAAQS | $835.1 | $750.6 |
| **Unidentified Controls** | **$7,581.5** | **$6,959** |
| **Total Cost of Local Controls** | **$12,146.2** | **$10,339.0** |

Notes:
The cost estimates presented in this exhibit do not reflect the Project Team's cost adjustments for learning curve effects. As indicated in the Second Prospective Cost Report, these adjustments are not applied to unidentified controls and do not have a significant impact on the estimated cost of identified controls.

**EXHIBIT 2-4. 2020 LOCAL CONTROLS SENSITIVITY ANALYSIS**

| PROGRAM AND SECTOR | 2020: $15,000/TON CAP AND $15,000/TON FOR UNIDENTIFIED CONTROLS (MILLION 1999$) | 2020: $10,000/TON CAP AND $10,000/TON FOR UNIDENTIFIED CONTROLS (MILLION 1999$) |
|---|---|---|
| **Identified Controls** | **$5,757.8** | **$4,387.2** |
| Ozone NAAQS | $4,130.3 | $2,849.2 |
| PM NAAQS | $618.5 | $541.6 |
| CAVR | $1,009.0 | $996.4 |
| **Unidentified Controls** | **$11,368.7** | **$9,725** |
| **Total Cost of Local Controls** | **$17,126.5** | **$14,112.2** |

Notes:
The cost estimates presented in this exhibit do not reflect the Project Team's cost adjustments for learning curve effects. As indicated in the Second Prospective Cost Report, these adjustments are not applied to unidentified controls and do not have a significant impact on the estimated cost of identified controls.

### 2.3.2 COMPOSITION OF MOTOR VEHICLE SALES AND FLEET FUEL EFFICIENCY

To assess the extent to which cost estimates for the on-road sector would change under the alternative AEO 2008 assumptions, the Project Team estimated the cost of motor vehicle tailpipe and fuel rules for both the 2010 and 2020 target years based on the AEO 2008 data. As indicated in Exhibit 2-5, this would increase the estimated cost of motor vehicle tailpipe standards and reduce the estimated cost of motor vehicle fuel rules, with each effect more pronounced in 2020 than in 2010. In proportional terms, these adjustments would have the most significant effect on the estimated cost of motor vehicle fuel rules in 2020, which would decline by 9 percent relative to the primary cost estimates presented in the Second Prospective Cost Report. Overall, however, the fuel efficiency and sales adjustments would not have a significant effect on the estimated costs of CAAA motor vehicle programs in aggregate. Combined, the sales and fuel efficiency adjustments would reduce the estimated cost of these programs by 0.2 percent in 2010 and by 3.6 percent in 2020.

**EXHIBIT 2-5. CAAA-RELATED ON-ROAD SECTOR COSTS BASED ON AEO 2005 AND AEO 2008 ASSUMPTIONS**

| PROGRAM | TOTAL PROGRAM COSTS (MILLION 1999$) | | | | | |
|---|---|---|---|---|---|---|
| | 2010 | | | 2020 | | |
| | PRIMARY ESTIMATE (BASED ON AEO 2005) | ALTERNATIVE ESTIMATE (BASED ON AEO 2008) | PERCENT DIFFERENCE | PRIMARY ESTIMATE (BASED ON AEO 2005) | ALTERNATIVE ESTIMATE (BASED ON AEO 2008) | PERCENT DIFFERENCE |
| Tailpipe Rules | $8,137 | $8,140 | 0.03% | $8,282 | $8,292 | 0.12% |
| Fuel Rules | $8,262 | $8,216 | -0.56% | $9,375 | $8,512 | -9.20% |
| Inspection and Maintenance (I/M) Rules | $5,251 | $5,251 | 0.00% | $6,099 | $6,099 | 0.00% |
| **Total On-road Sector Costs** | **$21,650** | **$21,606** | **-0.20%** | **$23,757** | **$22,904** | **-3.59%** |

### 2.3.3 VEHICLE INSPECTION FAILURE RATE

To assess the sensitivity of the I&M cost analysis to the assumed failure rate for annual dynamometer-based programs, the Project Team developed alternative cost estimates for CAAA-mandated I&M programs based on the failure rate reported by the NRC. Exhibit 2-6 shows the impact of the alternative failure rates on the estimated cost of CAAA-related I&M programs. As indicated in the exhibit, the estimated cost of these programs declines by more than 40 percent when the alternative failure rates are used in place of those supporting the Second Prospective Cost Report. In addition, using these alternative values reduces total CAAA-related costs for the on-road sector by 11 to 14 percent, depending on the target year. This suggests that the cost estimates for the on-road sector are fairly sensitive to the assumed failure rate for I&M programs, given the range of failure rates obtained from readily available data sources.

### 2.3.4 DEFAULT LEARNING RATE

The Project Team tested the sensitivity of the cost analysis to the choice of a default learning rate by re-estimating the total costs of the Amendments using alternative default learning rates of five and 20 percent for the program areas listed above. Exhibit 2-7 presents our estimates of total CAAA compliance costs, by sector, using the primary default learning rate of 10 percent and the alternate default learning rates of five and 20 percent. As indicated in the exhibit, the use of alternative default learning rates has only a small effect on the estimated costs of the Amendments. The effect is most pronounced for the 2020 target year. Using a five percent default learning rate in 2020 increases the estimated cost of the Amendments by 3.2 percent, while a 20 percent default learning rate reduces costs by six percent.

**EXHIBIT 2-6. CAAA-RELATED ON-ROAD SECTOR COSTS UNDER PRIMARY AND ALTERNATIVE FAILURE RATE ASSUMPTIONS**

| PROGRAM | TOTAL PROGRAM COSTS (MILLION 1999$) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2000 | | | 2010 | | | 2020 | | |
| | PRIMARY ESTIMATE | ALTERNATE ESTIMATE | PERCENT DIFFERENCE | PRIMARY ESTIMATE | ALTERNATE ESTIMATE | PERCENT DIFFERENCE | PRIMARY ESTIMATE | ALTERNATE ESTIMATE | PERCENT DIFFERENCE |
| Tailpipe and Fuel Rules | $8,219 | $8,219 | 0.00% | $16,399 | $16,399 | 0.00% | $17,657 | $17,657 | 0.00% |
| Inspection and Maintenance (I/M) Rules | $3,888 | $2,217 | -42.97% | $5,251 | $2,801 | -46.66% | $6,099 | $3,201 | -47.52% |
| **Total On-road Sector Costs** | **$12,107** | **$10,436** | **-13.80%** | **$21,650** | **$19,200** | **-11.32%** | **$23,757** | **$20,858** | **-12.20%** |

**EXHIBIT 2-7. SENSITIVITY OF CAAA COMPLIANCE COST ESTIMATES TO ALTERNATIVE DEFAULT LEARNING RATES**

| | ANNUAL COST (MILLION 1999$) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2000 | | | 2010 | | | 2020 | | |
| | 5% LEARNING RATE (ALTERNATE ESTIMATE) | 10% LEARNING RATE (PRIMARY ESTIMATE) | 20% LEARNING RATE (ALTERNATE ESTIMATE) | 5% LEARNING RATE (ALTERNATE ESTIMATE) | 10% LEARNING RATE (PRIMARY ESTIMATE) | 20% LEARNING RATE (ALTERNATE ESTIMATE) | 5% LEARNING RATE (ALTERNATE ESTIMATE) | 10% LEARNING RATE (PRIMARY ESTIMATE) | 20% LEARNING RATE (ALTERNATE ESTIMATE) |
| Electric Utilities | $1,154 | $1,154 | $1,154 | $5,583 | $5,583 | $5,583 | $8,836 | $8,772 | $8,671 |
| On-road Vehicles and Fuels | $12,458 | $12,107 | $11,462 | $22,483 | $21,650 | $20,119 | $24,692 | $23,757 | $22,039 |
| Non-road Engines and Fuels | $280 | $250 | $196 | $520 | $302 | -$100 | $1,292 | $967 | $369 |
| Non-EGU Point Sources | $2,561 | $2,630 | $2,787 | $4,407 | $4,356 | $4,247 | $4,448 | $4,323 | $4,070 |
| Nonpoint Sources | $529 | $557 | $624 | $596 | $582 | $552 | $691 | $644 | $553 |
| Local Controls | $0 | $0 | $0 | $4,491 | $4,415 | $4,256 | $5,475 | $5,194 | $4,638 |
| **Sub-Total, Excl. Unidentified Measures** | **$16,981** | **$16,699** | **$16,223** | **$38,082** | **$36,888** | **$34,657** | **$45,434** | **$43,657** | **$40,340** |
| **ADDITIONAL COSTS FOR UNIDENTIFIED CONTROLS FOR 8-HOUR OZONE COMPLIANCE** | | | | | | | | | |
| Non-California areas | | | $0 | | | $7,315 | | | $7,137 |
| California areas | | | $0 | | | $267 | | | $4,232 |
| **TOTAL** | **$16,981** | **$16,698** | **$16,223** | **$45,664** | **$44,470** | **$42,239** | **$56,803** | **$55,025** | **$51,709** |
| Percent Difference from Primary Estimate | 1.7% | - | -2.8% | 2.7% | - | -5.0% | 3.2% | - | -6.0% |

# CHAPTER 3 | EMISSIONS AND AIR QUALITY MODELING UNCERTAINTY

## 3.1 INTRODUCTION

This chapter summarizes results from two quantitative sensitivity tests that characterize uncertainty in the emissions and air quality modeling steps of the second prospective analysis.

- **Sectoral emissions sensitivity analyses:** These analyses are designed to explore the relative importance of the emitting sector in marginal benefits estimates, provide a sense of the shape of the marginal benefits curve around the point represented by the *with-Clean Air Act Amendments (CAAA)* scenario emissions inventory, and explore spatial variability in benefits estimates with respect to the emitting sector. The approach adopted is to develop a standardized emissions increment for each of the five major emitting sectors (electric generating units (EGUs); non-EGU point sources; on-road vehicles; nonroad engines; and area sources), and run the alternative scenarios through a reduced form air quality modeling tool and EPA's Environmental Benefits Mapping and Analysis Program (BenMAP) to estimate changes in benefit estimates.
- **EGU sector alternative emissions model:** This analysis estimates model uncertainty for the EGU sector emissions estimation approach, using an alternative emissions estimation approach described in Appendix B of the primary emissions report, *Emission Projections for the Clean Air Act Second Section 812 Prospective Analysis*. The analysis compares the benefits estimates using the Integrated Planning Model (IPM)-based emissions outputs with comparable estimates using Continuous Emissions Monitor (CEM) data and an alternative approach to estimating counter-factual scenario emissions.

Note that, in addition to these quantitative analyses, IEc subcontractor Sonoma Technology, Inc (STI) conducted a three part literature review relating to the uncertainties in Integrated Air Quality Modeling Systems (IAQMSs). The first part of this literature review looks at the source of uncertainty and methods for quantifying these uncertainties. The second part looks at the literature relating to the evaluation and overall reliability of IAQMSs. The third part discusses the uncertainties specifically relating to the IAQM used in the Second Prospective Analysis (i.e., the Community Multiscale Air Quality (CMAQ) modeling system). This literature review can be found in its entirety in Appendix B. The literature review is part of our overall suite of uncertainty analyses that inform characterization of the costs and benefits of CAAA programs.

## 3.2 DESCRIPTION OF ANALYTICAL TOOLS

The main tools used to develop these analyses are EPA's Particulate Matter Response Surface Model (PM RSM), a reduced form air quality estimation tool, and BenMAP. PM RSM estimates air quality outcomes from emissions inputs, and BenMAP estimates health effects and economic benefits outcomes from air quality inputs. The two tools are linked in our analyses to estimate the impact of uncertainties in emissions estimates.

### 3.2.1 RESPONSE SURFACE MODEL

The description of this tool is largely taken from EPA's *Technical Support Document for the Proposed PM NAAQS Rule: Response Surface Modeling*.[11] Response surface modeling provides a means to address the limitations of using complex air quality models for policy analysis. Air quality models such as CMAQ typically require complicated emission inputs and processing, and the resources needed to conduct model runs can be substantial. These requirements make such sophisticated models less well-suited for uncertainty analysis, where the analyst may want to conduct multiple model runs while varying key inputs or assumptions. Response surface modeling builds reduced form modeling tools by using advanced statistical techniques to characterize, in a more parsimonious manner, the relationship between the outputs of a complex model and its input parameters. The result is a more flexible, less resource intensive model of the original model (a "meta-model) that can be used as a reasonable proxy for conducting uncertainty analysis within the calibration range of the meta-model. This analysis makes use of a PM RSM developed by EPA to estimate results from the CMAQ Modeling System.

CMAQ is a three-dimensional regional grid-based air quality model designed to simulate particulate matter and ozone concentrations and deposition over large spatial scales (e.g., over the contiguous U.S.) over an extended period of time (e.g., up to a year). The CMAQ model includes state-of-the-science capabilities for conducting urban to regional scale simulations of multiple air quality issues, including tropospheric ozone, fine particles, air toxics, acid deposition, and visibility degradation. The PM RSM used in this analysis is based on air quality modeling using CMAQ version 4.4.

Response surface models are typically developed using a limited number of runs of the complex model at a set of statistically selected points in the design space. A total of 180 CMAQ model runs, meant to cover a change in baseline precursor emissions of zero to 120 percent, were conducted for development of the PM RSM. The response-surface method uses statistical techniques to relate a response variable from these runs (in this case, $PM_{2.5}$ concentration output from CMAQ) to a set of factors (in this case, $PM_{2.5}$ precursor pollutants from particular sources and locations). To develop a response surface approximation for CMAQ, EPA used an interpolation approach, implemented through the MIXED procedure in SAS software. The PM RSM models changes in $PM_{2.5}$

[11] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards. Technical Support Document for the Proposed PM NAAQS Rule: Response Surface Modeling. February 2006.

concentration at the grid cell level as a function of the weighted average of the modeled responses from the 180 CMAQ runs. Weights were assigned based on the distance between the factor levels defining the policy to be predicted and the factors defining the CMAQ experimental run.

The main purpose of the PM RSM is to demonstrate the impact on ambient $PM_{2.5}$ concentrations of reductions in $PM_{2.5}$ precursor emissions from different sources. EPA selected the precursor emission type and source combinations used as input factors into the model to provide maximum information for use in comparing relative effectiveness of different emission control strategies. Emission input factors are expressed as a percent of a 2015 baseline scenario that includes the Clean Air Interstate Rule (CAIR), Clean Air Non-Road Diesel Rule, Heavy Duty Diesel Rule, Tier 2, and the $NO_x$ SIP Call. EPA selected the following 12 emission input factors for use in the PM RSM; users of the PM RSM can adjust these at a local or regional scale:

1) $NO_x$ EGU – Nitrogen oxide ($NO_x$) emissions from EGU point sources forecast using the Integrated Planning Model (IPM);

2) $NO_x$ Non-EGU and Area – $NO_x$ emissions from Non-EGU point sources forecast using IPM and from area sources, including agricultural sources;

3) $NO_x$ Mobile – $NO_x$ emissions from non-road and on-road mobile sources;

4) $SO_x$ EGU – Sulfur oxide ($SO_x$) emissions from EGU point sources forecast using IPM;

5) $SO_x$ Non-EGU – $SO_x$ emissions from Non-EGU point sources forecast using IPM;

6) $SO_x$ Area – $SO_x$ emissions from area sources, including agricultural sources, and from non-road and on-road mobile sources[12];

7) $NH_3$ Area – Ammonia ($NH_3$) emissions from area source, including agricultural sources;

8) $NH_3$ Mobile – Ammonia emissions from non-road and on-road mobile sources;

9) POC/PEC Point – Particulate organic carbon (POC) and Particulate elemental carbon (PEC) emissions from EGU and Non-EGU point sources forecast using IPM;

10) POC/PEC Mobile – POC and PEC emissions from non-road and on-road mobile sources;

11) POC/PEC Area – POC and PEC emissions from area sources, including agricultural sources; and

[12] When it was developed by EPA this factor included only area-source emissions and mobile-source $SO_x$ emissions were not included as an emission input factor in the model. Feeling that these emissions were significant, the Project Team elected to include them as part of this factor rather than leave them out of the model.

12) VOC All – Volatile organic carbon (VOC) emissions from EGU point sources, non-EGU point sources, area sources including agricultural sources, non-road and on-road mobile sources.

The PM RSM includes an independent response surface for particular urban areas, as well as a generalized response surface for all other locations. A rigorous area-of-influence analysis was conducted for selection of PM RSM urban locations to discern the degree of overlap between different urban areas in terms of air quality impacts, and to tease out local versus regional impacts. The analysis concluded that ambient $PM_{2.5}$ in each of the nine selected urban areas is largely independent of the precursor emissions in all other included urban areas. The nine selected urban areas are New York/Philadelphia (combined), Chicago, Atlanta, Dallas, San Joaquin, Salt Lake City, Phoenix, Seattle, and Denver.

Potential limitations of the PM RSM are that:

- The PM RSM is designed to estimate $PM_{2.5}$ concentrations resulting from changes in precursor emissions between zero and 120 percent of 2015 baseline emission levels. The model has not been validated for accuracy outside of these bounds. The overall second prospective analysis does in many cases look at changes in precursor emission greater than 120 percent. The Project Team limits changes to 500 percent of the baseline to avoid straying too far outside the calibrated bounds of the PM RSM. The 500 percent limitation was developed based on Project Team analysis of results and inspection of the marginal response curves for PM outcomes relative to each of the twelve emissions inputs.

- The PM RSM is only capable of dealing with geographical differentiation of emission policies within the nine local areas. In general, our analysis is focused on National-level emissions policy, but the emissions changes are not uniform at the county-level resolution of our emissions inventories. Our sectoral emissions sensitivity analyses therefore focus on relative comparisons of uniform emissions changes, rather than absolute differences in PM RSM outcomes.

One result of these limitations is that core scenario air quality and benefit results are very different for PM RSM and CMAQ. For the same 2010 emissions scenarios, PM RSM results yield an estimated 31,000 avoided premature mortalities, while CMAQ results yield 102,000, a difference of more than three-fold.[13] This large discrepancy in results is the main reason that our analyses focus mainly on relative comparisons of PM RSM runs, rather than hypotheses that depend on absolute air quality or benefits outcomes.

---

[13] These avoided premature mortality estimates are based on the PM/mortality concentration-response (C-R) function from Pope et al. (2002). The integrated report and the remainder of this report rely on an alternative C-R function (i.e., a Weibull distribution based on epidemiological evidence and expert elicitation results) that was recommended by the Council following the completion of this emissions uncertainty analysis. Despite this discrepancy, we believe the relative results of this analysis compared across sectors provide useful insights.

### 3.2.2 BENMAP

EPA's BenMAP benefits modeling tool generates national-level estimates of avoided health effects due to changes in $PM_{2.5}$ between a baseline scenario (i.e., air pollution levels in the absence of control regulations) and a control scenario (i.e., air pollution levels after a control regulation is put into place). BenMAP applies health impact functions relating the change in $PM_{2.5}$ concentration to the change in the incidence of a health endpoint, taking into consideration the baseline incidence rate of the health endpoint and the exposed population in the target year of the analysis. BenMAP then applies valuation functions to estimate the economic benefits of the changes in the incidence of the health effect.

The $PM_{2.5}$ concentration output from CMAQ and PM RSM was used as input for BenMAP to generate health impacts and associated economic values for each emissions and air quality modeling scenario. Exhibit 3-1 presents the 27 BenMAP runs undertaken for this analysis grouped by scenario type. The PM RSM and/or CMAQ output for each scenario was converted into air quality grids that could be uploaded into BenMAP. Exhibit 3-1 also shows which scenario was used for the baseline and control scenarios in BenMAP. The Project Team then ran BenMAP using incidence and pooling/aggregation configuration files patterned after those used in the PM National Ambient Air Quality Standards (NAAQS) Regulatory Impact Analysis (RIA).[14] However, we did not incorporate a population-level threshold in the $PM_{2.5}$ mortality impact functions from the Pope et al. (2002) and Laden et al. (2006) studies, as was done in that analysis.[15,16]

## 3.3 METHODS FOR QUANTITATIVE EMISSIONS UNCERTAINTY ANALYSES

The Project Team quantitatively analyzed uncertainty related to emissions by running various emissions scenarios through PM RSM and BenMAP and analyzing the results. We grouped these into three categories:

- Core scenarios – *with*- and *without-CAAA* scenarios for the three target years (2000, 2010, and 2020). These were essentially "control runs" to examine how PM RSM performed relative to the CMAQ.
- Sector-specific emission scenarios – these scenarios were developed in an attempt to estimate changes in $PM_{2.5}$ concentration and corresponding health benefits associated with small incremental changes in sector-specific emissions.

[14] U.S. Environmental Protection Agency. (2006). *Final Regulatory Impact Analysis: $PM_{2.5}$ NAAQS. Office of Air and Radiation*, Research Triangle Park, NC.

[15] Pope, C. A., R. T. Burnett, et al. (2002). Lung cancer, cardiopulmonary mortality, and long-term exposure to fine particulate air pollution. *Journal of the American Medical Association* 287(9): 1132-1141.

[16] Laden, F., J. Schwartz, et al. (2006). Reduction in Fine Particulate Air Pollution and Mortality: Extended Follow-up of the Harvard Six Cities Study. *American Journal of Respiratory and Critical Care Medicine* 173: 667-672.

- Alternative EGU emission scenarios – these scenarios assess model uncertainty by evaluating benefits results for an alternative method of estimating EGU emissions.

We describe each of these scenario categories in more detail below.

**EXHIBIT 3-1. BENMAP RUNS FOR THE 812 UNCERTAINTY ANALYSIS**

| BENMAP SCENARIO | AIR QUALITY MODEL USED | BASELINE SCENARIO | CONTROL SCENARIO |
|---|---|---|---|
| **CORE SCENARIOS** | | | |
| 2000 | CMAQ and PM RSM | 2000 without CAAA | 2000 with CAAA |
| 2010 | CMAQ and PM RSM | 2010 without CAAA | 2010 with CAAA |
| 2020 | CMAQ and PM RSM | 2020 without CAAA | 2020 with CAAA |
| **ALTERNATIVE EGU SCENARIOS** | | | |
| 2000 Alt EGU | PM RSM | 2000 Ellerman Counterfactual | 2000 CEM data |
| **SECTOR-SPECIFIC EMISSION SCENARIOS** | | | |
| 2010 EGU hi | PM RSM | 2010 with CAAA | 2010 with CAAA, EGU hi |
| 2010 Non-EGU hi | PM RSM | 2010 with CAAA | 2010 with CAAA, Non-EGU hi |
| 2010 Area hi | PM RSM | 2010 with CAAA | 2010 with CAAA, Area hi |
| 2010 On-Road hi | PM RSM | 2010 with CAAA | 2010 with CAAA, On-Road hi |
| 2010 Non-Road hi | PM RSM | 2010 with CAAA | 2010 with CAAA, Non-Road hi |
| 2010 EGU lo | PM RSM | 2010 with CAAA | 2010 with CAAA, EGU lo |
| 2010 Non-EGU lo | PM RSM | 2010 with CAAA | 2010 with CAAA, Non-EGU lo |
| 2010 Area lo | PM RSM | 2010 with CAAA | 2010 with CAAA, Area lo |
| 2010 On-Road lo | PM RSM | 2010 with CAAA | 2010 with CAAA, On-Road lo |
| 2010 Non-Road lo | PM RSM | 2010 with CAAA | 2010 with CAAA, Non-Road lo |
| 2020 EGU hi | PM RSM | 2020 with CAAA | 2020 with CAAA, EGU hi |
| 2020 Non-EGU hi | PM RSM | 2020 with CAAA | 2020 with CAAA, Non-EGU hi |
| 2020 Area hi | PM RSM | 2020 with CAAA | 2020 with CAAA, Area hi |
| 2020 On-Road hi | PM RSM | 2020 with CAAA | 2020 with CAAA, On-Road hi |
| 2020 Non-Road hi | PM RSM | 2020 with CAAA | 2020 with CAAA, Non-Road hi |
| 2020 EGU lo | PM RSM | 2020 with CAAA | 2020 with CAAA, EGU lo |
| 2020 Non-EGU lo | PM RSM | 2020 with CAAA | 2020 with CAAA, Non-EGU lo |
| 2020 Area lo | PM RSM | 2020 with CAAA | 2020 with CAAA, Area lo |
| 2020 On-Road lo | PM RSM | 2020 with CAAA | 2020 with CAAA, On-Road lo |
| 2020 Non-Road lo | PM RSM | 2020 with CAAA | 2020 with CAAA, Non-Road lo |

### 3.3.1 CORE SCENARIOS

The Project Team generated six "core scenarios" representing the ambient $PM_{2.5}$ concentrations in three target years (2000, 2010, and 2020) under each of two scenarios (a "*with-CAAA*" scenario and a "*without-CAAA*" scenario). The *with-CAAA* scenarios rely on emissions input data that reflects expected or likely future measures implemented since the 1990 CAAA. The counterfactual *without-CAAA* scenarios utilize emission input

data that is derived by freezing the scope and stringency of emissions controls at their 1990 levels, while allowing for growth in population and economic activity. The core scenarios were also run through CMAQ and provide a base from which to compare the other scenarios used to gauge emission uncertainty. The CMAQ results provide the basis for the primary benefits estimates generated for the study. Because the PM RSM is much less resource-intensive to run, we use the PM RSM runs to evaluate a much broader range of alternative emissions outcomes.[17]

### 3.3.2 SECTOR-SPECIFIC EMISSION SCENARIOS

The sector scenarios attempt to estimate changes in $PM_{2.5}$ concentration and corresponding health benefits associated with small incremental changes in sector-specific emissions both above and below the emissions estimates used in the 2010 and 2020 core *with-CAAA* scenarios. It was difficult to select a fixed amount to increase or decrease emissions within each sector because emission levels and pollutant mix vary greatly over the five emitting sectors. For example, 2010 $SO_x$ emissions from non-road sources equal approximately 16,900 tons, while $SO_x$ emissions from EGU sources equal approximately 6,370,000 tons. Because of this variation, incremental changes were determined as a percentage of sector-specific emissions.

The Project Team determined that increasing/decreasing sector-specific emissions by ten percent results in changes large enough to impact $PM_{2.5}$ concentrations for all sectors, yet small enough to be considered incremental. The Project Team also determined that changes in precursor emissions should be limited to five times the 2015 baseline emission levels (i.e., limited factors to a value of five).[18] As is described above, the PM RSM is designed to cover changes in the baseline precursor emissions between zero and 120 percent. EPA has not validated the model for changes outside these bounds and the Project Team has found that changes above 500 percent may lead to unexpected results.

After determining how to calculate the incremental change, it was necessary to determine how to distribute the change over the local (Atlanta, Chicago, NYC/Philadelphia, Dallas, Denver, Salt Lake City, Phoenix, San Joaquin, and Seattle) and regional (East and West) PM RSM domains. The most straightforward manner in which to distribute the incremental change is based on a local area or region's share of the total sector-specific emissions. For example, if the Atlanta area has 25 percent of the SOx EGU emissions in 2010, then 25 percent of the incremental change in SOx EGU emissions was applied to the Atlanta area.

[17] Note that the PM RSM was originally calibrated to CMAQ, but for a more limited range of emissions inputs than we ultimately need for the core comparison of the *with-CAAA* and *without-CAAA* scenario. As a result, it remains limited in its ability to assess the emissions changes implied by the *without-CAAA* core scenarios, because the absolute emissions in those scenarios are outside the range of calibration for the tool. As a result, in this chapter we rely on PM RSM only for those scenarios that most closely match its range of calibration.

[18] The Project Team initially analyzed scenarios that increased/decreased sector-specific emissions by 25 percent and limited emission input factor levels to ten times the 2015 baseline level (i.e., limited factors to a value of ten). After conducting this analysis, we determined that a smaller percentage change could be used and that, in some cases, factors above five lead to unexpected results.

Applying the ten percent incremental change both above and below the emissions estimates used in the 2010 and 2020 core *with-CAAA* scenarios resulted in 20 sector scenario PM RSM runs (five sectors per scenario per year). Exhibit 3-2 provides the resulting emissions changes for pollutant/sector combinations used to develop PM RSM inputs.

**EXHIBIT 3-2 10 PERCENT CHANGE IN PRECURSOR EMISSIONS FROM *WITH-CAAA* SCENARIO EMISSIONS LEVELS (TONS)**

| SCENARIO | VOC | $NO_X$ | $SO_2$ | $NH_3$ | POC AND PEC | TOTAL |
|---|---|---|---|---|---|---|
| **2010** | | | | | | |
| EGU | 4,266 | 243,722 | 636,546 | 82 | 3,096 | 890,809 |
| NonEGU | 143,550 | 224,660 | 217,706 | 17,392 | 4,078 | 611,462 |
| Area | 887,228 | 368,831 | 187,765 | 371,317 | 86,673 | 1,988,486 |
| OnRoad | 261,401 | 434,906 | 2,995 | 33,442 | 8,236 | 749,216 |
| NonRoad | 187,472 | 164,341 | 1,693 | 204 | 14,132 | 381,974 |
| **2020** | | | | | | |
| EGU | 4,699 | 198,646 | 427,013 | 56 | 4,313 | 639,040 |
| NonEGU | 164,756 | 250,903 | 238,732 | 20,163 | 4,661 | 683,877 |
| Area | 971,557 | 372,498 | 194,175 | 398,677 | 88,595 | 2,114,096 |
| OnRoad | 167,062 | 191,584 | 3,646 | 39,532 | 5,732 | 413,288 |
| NonRoad | 148,964 | 99,892 | 275 | 240 | 9,164 | 267,698 |

### 3.3.3 ALTERNATIVE EGU EMISSION SCENARIOS

In response to differences between the spatial distribution of emissions as modeled by IPM and the actual spatial distribution from CEM data, and differences in modeled versus actual fuel and allowance prices for the historical (*with-CAAA*) case, the Project Team has developed an alternative approach for modeling the effect of the CAAA on the EGU sector in the year 2000. The Project Team generated EGU point source emissions data for the *with-CAAA* scenario using continuous CEM data available on EPA's Clean Air Markets website.[19] We estimated EGU data for the *without-CAAA* scenario using an alternative counterfactual approach based on work done by Dr. A. Denny Ellerman of Massachusetts Institute of Technology.[20] The data for all other emission sources (non-EGU, on-road, non-road, and area) were held constant at levels consistent with the *with-CAAA* 2000 core scenario level.

[19] U.S. Environmental Protection Agency. Clean Air Markets – Data and Maps <http://camddataandmaps.epa.gov/gdm/> Accessed March 2009.

[20] Dr. A. Denny Ellerman's approach relies on multiplying a "baseline" pre-Title IV emissions rate by 2001 CEM heat input observations for each electric generating unit.

## 3.4 RESULTS

### 3.4.1 CORE SCENARIOS

Exhibit 3-3 depicts the PM RSM results for each of the core scenarios. The core scenario PM RSM results are presented here mainly for context, because the results of the *with-CAAA* scenario are used as a baseline in evaluating the marginal effect of changes in emissions from major emitting sectors.

The PM RSM results match the general trends in the emissions inputs, as follows:

1. As expected, for each year in the analysis the *without-CAAA* scenario has higher $PM_{2.5}$ concentrations than the *with-CAAA* scenario.
2. Overall and on average $PM_{2.5}$ concentrations gradually decrease over time for the *with-CAAA* scenarios and the *without-CAAA* scenarios.
3. Over time, the gap between $PM_{2.5}$ concentrations in the *with-CAAA* and *without-CAAA* scenario widens.

The PM RSM results also provide a reasonable approximation of the results based on CMAQ, a much more complex and highly resolved model. There are nonetheless some important differences in the PM RSM and CMAQ results, as illustrated in Exhibit 3-4 for the target year 2010.[21] First, the PM RSM *with-CAAA* results indicate higher PM concentrations than CMAQ. This suggests that PM RSM may be somewhat less responsive to input changes than CMAQ, at least for our scenario. Second, PM RSM shows lower PM concentrations in the East, and higher concentrations in the West, particularly California, than CMAQ. This may be attributable to PM RSM's more limited ability to reflect complex interactive effects among pollutants, which could be important in the East where $SO_x$ is affected by the ammonium levels, and in the West where precursors contribute to high levels of both PM and ozone (the PM RSM does not simulate ozone formation). Third, although differences between the two scenarios are not presented in Exhibit 3-4, the impact of the first two factors is that CMAQ estimates a much greater impact of the CAAA on air quality differences.

These factors suggestion caution is warranted in drawing conclusions based on the PM RSM estimates. We believe that comparisons of PM RSM runs provide insights into the marginal effect of emissions, and relative effect among emitting sectors, but also that PM RSM in general is likely to be less sensitive to emissions changes. As a result, the results we present in this chapter likely understate the absolute value of emissions differences among scenarios.

[21] The CMAQ results presented in Exhibit 3-4 reflect the impact of the MATS calibration procedure.

**EXHIBIT 3-3 CORE SCENARIO PM RSM RESULTS FOR 2000, 2010, AND 2020**



## EXHIBIT 3-4 2010 PM RSM AND CMAQ RESULTS[22]

**2010 with CAAA** **2010 without CAAA**

PM RSM



CMAQ



[22] Note that these results do not take into account the PM adjustment factors that were applied to the $PM_{2.5}$ concentrations in the integrated report and the results reflected in the other chapters of this report. However, the purpose of these figures is to make relative comparisons between CMAQ and RSM rather than to represent absolute $PM_{2.5}$ results.

**EXHIBIT 3-5 PM BENEFITS OF CAAA DERIVED USING RSM OUTPUT**

| ENDPOINT GROUP | INCIDENCE | | | VALUATION (MILLION 2006$) | | |
|---|---|---|---|---|---|---|
| | PERCENTILE 5 | MEAN | PERCENTILE 95 | PERCENTILE 5 | MEAN | PERCENTILE 95 |
| **2000** | | | | | | |
| Mortality – Pope et al., 2002 | 4,540 | 12,300 | 20,100 | $32,700 | $83,100 | $141,000 |
| | | | Total | $34,200 | $89,200 | $158,000 |
| **2010** | | | | | | |
| Mortality – Pope et al., 2002 | 11,600 | 31,300 | 51,000 | $89,100 | $225,000 | $380,000 |
| | | | Total | $93,100 | $241,000 | $426,000 |
| **2020** | | | | | | |
| Mortality – Pope et al., 2002 | 12,500 | 38,900 | 65,100 | $109,000 | $303,000 | $525,000 |
| | | | Total | $114,000 | $324,000 | $587,000 |

Notes:

1. Results are rounded to three significant figures.
2. The valuation totals represent low, central, and high estimates. The low and high estimates were calculated by taking the sum of the 5th and 95th percentiles of the valuation estimates for each health endpoint. An alternative would be to calculate actual percentiles for the aggregated valuation estimates, but this is not what is presented here.
3. 20-year distributed lag and five percent discount rate applied to mortality results.
4. These results are based on the PM-mortality C-R function from Pope et al. (2002) rather than the primary estimate (Weibull distribution) used in the integrated and benefits reports as well as in the remainder of this report. In addition, these results have not been adjusted using the PM adjustment factors to correct analytical issues affecting the $PM_{2.5}$ concentration values. However, these results are intended to provide a relative comparison of RSM with CMAQ, rather than absolute benefits results.

We generated benefits results for the PM RSM core scenarios as well, using PM RSM air quality outputs as BenMAP inputs.[23] The summary results are illustrated in Exhibit 3-5. As expected, mortality benefits dominate the health benefit results. In addition, health benefits of the CAAA increase over time. This result is consistent with the increasing gap in $PM_{2.5}$ concentrations observed in the PM RSM results. Also consistent with the PM RSM results is the fact that there is a large increase in the number of avoided deaths (as well as other health benefits) between 2000 and 2010, but only a moderate increase between 2010 and 2020. Overall and on average the difference between $PM_{2.5}$ concentrations in the *with*- and *without-CAAA* scenarios also increases steeply between 2000 and 2010, but only moderately between 2010 and 2020. Comparing these PM RSM results to CMAQ results in Chapter 2 of the Second Prospective Benefits Report, however, it is clear that PM RSM estimates much smaller benefits of the CAAA than CMAQ for the same emissions scenarios. This result provides further reason for interpreting the absolute PM RSM results with caution.

### 3.4.2 SECTOR-SPECIFIC EMISSION SCENARIOS

Exhibit 3-6 depicts the difference in $PM_{2.5}$ concentrations between each of the 10 sector scenarios for 2020 and the corresponding core *with-CAAA* scenario. Difference maps are used to depict these results because the differences in actual $PM_{2.5}$ concentrations over the scenarios are not noticeable on a map. In this exhibit, shades of green indicate that $PM_{2.5}$ concentrations are lower in the sector scenario than in the corresponding core scenario and shades of yellow, orange, and red indicate that $PM_{2.5}$ concentrations are higher in the sector scenario than in the corresponding core scenario.

These maps indicate that increasing/decreasing EGU and Area emissions seem to have the greatest impact on $PM_{2.5}$ concentrations. These results are not surprising because the overall level of Area- and EGU-specific emissions are higher than the other sector-specific emissions (Non-EGU, On-Road, and Non-Road) and thus a 10 percent change will necessarily lead to greater impacts.

Exhibit 3-7 provides the mean incidence and valuation results for sector-specific emission increases and decreases in 2010 and 2020. The BenMAP results are in line with the PM RSM results in that increases in Area- and EGU-specific emissions lead to the greatest damages, while conversely, decreases in these sector-specific emissions lead to the greatest benefits, consistent with the overall greater level of Area- and EGU-specific emissions. Damages and benefits are of approximately the same scale of magnitude, but differ across years and sector in a curious pattern. In 2010, the EGU and non-EGU sectors show very close agreement between damages and benefits, but in the non-road, onroad, and area source sectors, decreases in emissions yield larger benefits than the

[23] The benefits results are based on the PM-mortality C-R function from Pope et al. (2002) rather than the primary estimate (Weibull distribution) used in the integrated and benefits reports as well as in the remainder of this report. In addition, these results have not been adjusted using the PM adjustment factors to correct analytical issues affecting the $PM_{2.5}$ concentration values. However, these results are intended to provide a relative comparison of RSM with CMAQ, rather than absolute benefits results.

comparable increase in emissions yields damages. This might suggest that, at the margin in 2010, there is an increasing marginal benefit curve for additional reductions for these three sectors. By 2020, all the sectors except for area sources emissions show close agreement between damages from a 10 percent increase and benefits from a 10 percent decrease, which may suggest that the marginal benefits curve for most sectors is flat, but for area sources remains upward sloping.

**EXHIBIT 3-6 2020 SECTOR-SPECIFIC EMISSION SCENARIO DIFFERENCE MAPS**



**EXHIBIT 3-7 MEAN DAMAGES/BENEFITS ARISING FROM A 10% INCREASE/DECREASE IN SECTOR-SPECIFIC EMISSIONS**

| ENDPOINT GROUP | EGU | | NON-ROAD | | ON-ROAD | | NON-EGU | | AREA | |
|---|---|---|---|---|---|---|---|---|---|---|
| | INCIDENCE | VALUATION (MIL 2006$) | INCIDENCE | VALUATION (MIL 2006$) | INCIDENCE | VALUATION (MIL 2006$) | INCIDENCE | VALUATION (MIL 2006$) | INCIDENCE | VALUATION (MIL 2006$) |
| **2010 - INCREASE** | | | | | | | | | | |
| Mortality – Pope et al., 2002 | -2,860 | -$19,400 | -472 | -$3,150 | -648 | -$4,380 | -1,110 | -$7,490 | -4,050 | -$27,200 |
| Total | -- | -$20,900 | -- | -$3,400 | -- | -$4,740 | -- | -$8,040 | -- | -$29,400 |
| **2010 - DECREASE** | | | | | | | | | | |
| Mortality – Pope et al., 2002 | 2,800 | $20,200 | 450 | $3,230 | 688 | $4,970 | 1,170 | $8,500 | 4,300 | $31,100 |
| Total | -- | $21,600 | -- | $3,470 | -- | $5,350 | -- | $9,080 | -- | $33,400 |
| **2020 - INCREASE** | | | | | | | | | | |
| Mortality – Pope et al., 2002 | -2,420 | -$18,800 | -388 | -$3,000 | -554 | -$4,320 | -1,570 | -$12,200 | -4,610 | -$35,900 |
| Total | -- | -$20,100 | -- | -$3,210 | -- | -$4,640 | -- | -$13,000 | -- | -$38,500 |
| **2020 - DECREASE** | | | | | | | | | | |
| Mortality – Pope et al., 2002 | 2,310 | $18,100 | 343 | $2,650 | 557 | $4,350 | 1,480 | $11,600 | 5,050 | $39,300 |
| Total | -- | $19,300 | -- | $2,840 | -- | $4,670 | -- | $12,300 | -- | $41,100 |

Notes:

1. Results are rounded to three significant figures.
2. The valuation totals represent low, central, and high estimates. The low and high estimates were calculated by taking the sum of the 5th and 95th percentiles of the valuation estimates for each health endpoint. An alternative would be to calculate actual percentiles for the aggregated valuation estimates, but this is not what is presented here.
3. 20-year distributed lag and five percent discount rate applied to mortality results.
4. Negative values reflect damages relative to the baseline and are the result of higher $PM_{2.5}$ ambient air quality concentrations in the control scenario than in the baseline. Control scenarios with lower concentrations than the baseline yield positive benefits.
5. These results are based on the PM-mortality C-R function from Pope et al. (2002) rather than the primary estimate (Weibull distribution) used in the full integrated and benefits report as well as in the remainder of this report. In addition, these results have not been adjusted using the PM adjustment factors to correct analytical issues affecting the $PM_{2.5}$ concentration values. However, these results are intended to provide a relative comparison of sector-specific emissions using RSM, rather than absolute benefits results.

In order to better compare the relative damages/benefits associated with changes in sector-specific emissions the Project Team calculated dollar per ton values. The methodology used to calculate dollar per ton values is similar to that used in the Ozone NAAQS RIA to calculate benefit per-ton metrics that were used as the basis for estimating the $PM_{2.5}$ co-benefits.[24] After benefits/damaged were calculated using BenMAP, the Project Team divided these monetized values by the total precursor emission reductions/increases for each scenario.

Exhibit 3-8a presents a graph of the dollar per ton benefits associated with a 10 percent change in sector-specific emissions for 2010; Exhibit 3-8b shows comparable results for 2020. Overall, dollar per ton benefits are greater in 2020 than 2010. This means that further reducing emissions yields a greater benefit per ton in 2020 than 2010. Conversely, increasing emissions in 2020 leads to greater damages per ton than increasing emissions in 2010. In both 2010 and 2020 decreasing EGU-specific emissions has the highest dollar per ton value, followed by Area-specific and then Non-EGU specific. In 2010, decreasing Non-road-specific emissions has a higher dollar per ton value than on-road-specific, but the opposite is true in 2020.

**EXHIBIT 3-8A MEAN DOLLAR PER TON DAMAGES/BENEFITS ARISING FROM A 10% INCREASE/DECREASE IN SECTOR SPECIFIC EMISSIONS IN 2010 (2006$)**




[24] U.S. Environmental Protection Agency. Technical Support Document: Calculating Benefit Per-ton Estimates. Final Ozone Regulatory Impact Analysis.

**EXHIBIT 3-8B MEAN DOLLAR PER TON DAMAGES/BENEFITS ARISING FROM A 10% INCREASE/DECREASE IN SECTOR SPECIFIC EMISSIONS IN 2020 (2006$)**




### 3.4.3 ALTERNATIVE EGU EMISSION SCENARIOS

Exhibit 3-9 depicts the PM RSM results for the 2000 alternative EGU scenarios, and Exhibit 3-10 shows the differences in PM RSM estimated air quality between the primary and alternative EGU emissions estimation methods. The results in Exhibit 3-9 using the alternative EGU data appear very similar to the results using the IPM EGU data, but the difference maps indicate that overall and on average $PM_{2.5}$ concentrations are slightly lower using the CEM data for the *with-CAAA* scenario in 2000, and slightly higher using the data derived using the Ellerman counterfactual method for the *without-CAAA* scenario compared to the corresponding core scenarios.

These results carry over into the benefits calculations. Exhibit 3-11 provides summary BenMAP results for the alternative EGU scenarios, and provides a comparison of the mean BenMAP incidence and valuation results for the 2000 core scenario and the 2000 scenario using the alternative EGU data. This exhibit shows that the health benefits of the CAAA in 2000 estimated with the alternative EGU emissions are approximately 50 percent greater than the benefits in the 2000 core scenario. This result is consistent with the PM RSM results.

**EXHIBIT 3-9 ALTERNATIVE EGU EMISSION SCENARIOS PM RSM RESULTS**






**EXHIBIT 3-10 DIFFERENCE BETWEEN ALTERNATIVE EGU AND PRIMARY EGU RSM REULTS**






### EXHIBIT 3-11 COMPARISON OF MEAN VALUES FOR 2000 CORE AND ALTERNATIVE EGU SCENARIOS

| ENDPOINT GROUP | 2000 CORE SCENARIO | | 2000 ALTERNATIVE EGU SCENARIO | | PERCENT DIFFERENCE |
|---|---|---|---|---|---|
| | INCIDENCE | VALUATION (MIL 2006$) | INCIDENCE | VALUATION (MIL 2006$) | VALUATION |
| **Mortality** | | | | | |
| Mortality – Pope et al., 2002 | 12,300 | $83,100 | 18,600 | $125,000 | 50.4% |
| **Morbidity** | | | | | |
| Infant Mortality – Woodruff et al, 1997 | 33 | $252 | 48 | $368 | 46.0% |
| Chronic Bronchitis | 7,250 | $2,990 | 10,700 | $4,410 | 47.5% |
| Nonfatal Myocardial Infarction | 17,400 | $1,780 | 25,900 | $2,650 | 48.9% |
| Hospital Admissions, Respiratory | 2,770 | $38.6 | 4,210 | $58.7 | 52.1% |
| Hospital Admissions, Cardiovascular | 5,340 | $153 | 8,200 | $238 | 55.6% |
| Emergency Room Visits, Respiratory | 13,000 | $4.79 | 19,300 | $7.12 | 48.6% |
| Acute Bronchitis | 21,200 | $9.23 | 30,200 | $13.1 | 41.9% |
| Lower Respiratory Symptoms | 255,000 | $4.69 | 365,000 | $6.70 | 42.9% |
| Upper Respiratory Symptoms | 196,000 | $6.01 | 282,000 | $8.63 | 43.6% |
| Asthma Exacerbation | 230,000 | $11.8 | 330,000 | $16.9 | 43.2% |
| Minor Restricted Activity Days | 9,420,000 | $557 | 13,900,000 | $820 | 47.2% |
| Work Loss Days | 1,620,000 | $244 | 2,380,000 | $359 | 47.1% |
| TOTAL | | **$89,200** | | **$134,000** | **50.2%** |

Note: These mortality benefits results are based on the PM-mortality C-R function from Pope et al. (2002) rather than the primary estimate (Weibull distribution) used in the integrated and benefits reports as well as in the remainder of this report. In addition, these results have not been adjusted using the PM adjustment factors to correct analytical issues affecting the $PM_{2.5}$ concentration values. However, these results are intended to provide a relative comparison between the core and alternative EGU scenarios using RSM, rather than absolute benefits results.

## 3.5 DISCUSSION

The sector scenario results suggest the following broad conclusions:

- The marginal benefits of additional reductions are greatest in the EGU, non-EGU point source, and area source emitting sectors, largely because the pollutant mix in those sectors yields a high benefit per ton of pollutant reduced.

- The spatial pattern of emissions, and therefore of proportional emissions reductions, across major emitting sectors show some differences, but they are not dramatic. The maps in Exhibit 3-6 indicate that, in 2020, most of the remaining emissions remain concentrated in the Northeast and in California, with non-EGU emissions concentrating more in the Southeast, and nonroad emissions concentrated in the agriculturally oriented North Central and California areas of the country.

- Benefits per ton of emissions across all sectors are higher in 2020 than 2010. The reason appears to be that, for all sectors, the *with-CAAA* emissions mix in 2020 includes a higher percentage of direct particulate emissions (POC and PEC) than in 2010. Other EPA analyses conducted with PM RSM have suggested that reductions of directly emitted particulates have a higher benefit per ton than other reductions of other pollutants.

- The shape of the marginal benefits curves across sectors are generally flat for the EGU and non-EGU sectors, somewhat positive for the non-road and onroad sectors, and much more positive for the area source sector. The shape of marginal pollutant response curves in PM RSM can differ dramatically across pollutants, across space, and across levels of pollutant emissions. The reason marginal benefits of pollutant reduction exceed marginal damages of pollutant increases for the area source sector may therefore be a complex combination of factors. Further analysis of the reasons underlying these marginal benefits results could yield further policy-relevant insights that could be used to target future emissions strategies beyond the "on the books" CAAA regulations that are the subject of the second prospective.

- For the alternative EGU emissions scenarios, the substantial, 50 percent difference in air quality outcomes and benefits results is the result of our construction of a substantially different *without-CAAA* scenario. The original motivation of the analysis was concern that the spatial pattern of emissions for the *with-CAAA* scenario for 2000 predicted by an IPM run for a historical year differed from the spatial pattern observed in the emissions monitor data for the same year. Exhibits 3-9 through 3-11 above illustrate that the difference in benefits results is instead due primarily to differences in the *without-CAAA* scenario among the two alternative scenario specifications. The result probably suggests that IPM performs reasonably well in estimating the 2000 *with-CAAA* scenario, but it appears uncertainty in estimating a counterfactual scenario is

much larger than uncertainty in estimating the factual case. While we can clearly conclude that the alternative counterfactuals assumptions have a large effect on results, we are left without a clear answer to the question of which method of estimating emissions without the CAAA regulations in place is superior.

# CHAPTER 4 | CONCENTRATION-RESPONSE FUNCTION UNCERTAINTY

## 4.1 INTRODUCTION

One key source of uncertainty in Clean Air Act Amendment (CAAA)-related avoided mortality estimates is the true shape and slope of the concentration-response (C-R) function linking air pollutant exposures with premature mortality. Since the completion of the First Prospective Study, significant advances have occurred that allow for a more thorough evaluation of uncertainties in both particulate matter (PM) and ozone mortality C-R. On the PM side, follow-up studies for both the American Cancer Society (ACS) (Pope et al., 2002) and Six Cities (Laden et al., 2006) cohorts have enhanced our understanding of the potential mortality impacts of changes in annual fine PM (i.e., $PM_{2.5}$) exposures over broad geographical areas.[25,26] In addition, EPA's 12-expert PM-mortality expert elicitation (EE) study provided EPA with 12 comprehensive probabilistic characterizations of statistical, methodological, and scientific uncertainties in the PM-mortality relationship.[27] On the ozone side, advances include the growing literature linking short-term ozone exposures with mortality, including multi-city studies (Schwartz, 2005; Bell et al., 2004; Huang et al., 2005) and three meta-analyses (Ito et al., 2005; Levy et al., 2005; Bell et al., 2005); a cohort study examining long-term effects of ozone (Jerrett et al., 2009); and the 2008 National Research Council (NRC) review.[28,29,30,31,32,33,34,35] The Project Team assessed the sensitivity of the Second

---

[25] Pope, CA III, et al. (2002). Lung cancer, cardiopulmonary mortality, and long-term exposure to fine particulate air pollution. *JAMA* 287: 1132-1141.

[26] Laden, F., J. Schwartz, et al. (2006). Reduction in Fine Particulate Air Pollution and Mortality: Extended Follow-up of the Harvard Six Cities Study. *American Journal of Respiratory and Critical Care Medicine* 173: 667-672.

[27] Industrial Economics, Inc. (2006). *Expanded Expert Judgment Study of the Concentration-Response Relationship Between $PM_{2.5}$ Exposure and Mortality*. Prepared for the Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, September.

[28] Ito, K., S. F. De Leon and M. Lippmann, 2005. Associations between ozone and daily mortality: analysis and meta-analysis. Epidemiology. Vol. 16 (4): 446-57.

[29] Schwartz, J., 2005. How sensitive is the association between ozone and daily deaths to control for temperature? Am J Respir Crit Care Med. Vol. 171 (6): 627-31.

[30] Bell, M.L., et al., 2004. Ozone and short-term mortality in 95 US urban communities, 1987-2000. Jama, 2004. 292(19): p. 2372-8.

[31] Bell, M. L., F. Dominici and J. M. Samet, 2005. A meta-analysis of time-series studies of ozone and mortality with comparison to the national morbidity, mortality, and air pollution study. Epidemiology. Vol. 16 (4): 436-45.

[32] Levy, J. I., S. M. Chemerynski and J. A. Sarnat, 2005. Ozone exposure and mortality: an empiric bayes metaregression analysis. Epidemiology. Vol. 16 (4): 458-68.

Prospective 812 estimates of PM- and ozone-related mortality incidence to C-R function uncertainty by substituting alternative PM and ozone C-R functions in BenMAP and reanalyzing benefits with the core scenario CMAQ air quality grids for each target year.[36]

## 4.2 SELECTION OF ALTERNATIVE C-R FUNCTIONS

### 4.2.1 PARTICULATE MATTER CONCENTRATION-RESPONSE FUNCTIONS

The primary estimate of the second prospective study is based on a Weibull distribution of C-R coefficients with a mean of 1.06 percent decrease in annual all-cause mortality per 1 $\mu g/m^3$ and an interquartile range bracketed by the Pope et al. (2002) ACS estimate (0.55 percent) on the low end and the Six Cities Laden et al. (2006) extended follow-up estimate (1.5 percent) at the high end.[37] We conducted a sensitivity analysis by first substituting the primary C-R distribution with two alternative C-R functions, one based on the Pope et al. (2002) ACS study and the other based on the Laden et al. (2006) Six Cities cohort study. In addition, we used results from the *Expanded Expert Judgment Assessment of the Concentration-Response Relationship Between $PM_{2.5}$ Exposure and Mortality*. This EE study obtained from a panel of 12 leading experts in the field their subjective judgment of the true C-R function relating exposure to $PM_{2.5}$ and mortality in the US. Exhibit 4-1 presents each expert's C-R function uncertainty distribution. We generated 12 estimates of CAAA-related avoided mortality incidence based on the C-R distributions provided by each of the 12 EE study experts.

---

[33] Huang, Y., F. Dominici and M. L. Bell, 2005. Bayesian hierarchical distributed lag models for summer ozone exposure and cardio-respiratory mortality. Environmetrics. Vol. 16: 547–562.

[34] Jerrett M. et al., 2009. Long-term Ozone Exposure and Mortality. JAMA 360 (11): 1085-1095.

[35] National Research Council of the National Academies, 2008. Estimating Mortality Risk Reduction and Economic Benefits from Controlling Ozone Air Pollution. Committee on Estimating Mortality Risk Reduction Benefits from Decreasing Tropospheric Ozone Exposure, Board on Environmental Studies and Toxicology, Division on Earth and Life Studies. National Academies Press, Washington, D.C.

[36] The alternate C-R functions used in our analysis are programmed into BenMAP, as explained in the BenMAP manual in Appendices F and G (Abt Associates, Inc. (2008). BenMAP User's Manual. Prepared for the U.S. EPA's Office of Air Quality Planning and Standards, Research Triangle Park, NC. September).

[37] The parameters for the Weibull distribution are mean = 0.0106, $\alpha$ = 0.0119, and ß = 1.622173.

**EXHIBIT 4-1. UNCERTAINTY DISTRIBUTIONS FOR THE $PM_{2.5}$-MORTALITY C-R COEFFICIENT FOR ANNUAL AVERAGE $PM_{2.5}$ CONCENTRATIONS OF 4 TO 30 $\mu g/m^3$**




Key: Closed circle = median; Open circle = mean; Box = interquartile range; Solid line = 90% credible interval

Note: Box plots represent distributions as provided by the experts to the elicitation team. Experts in Group 1 preferred to give conditional distributions and keep their probabilistic judgment about the likelihood of a causal or non-causal relationship separate. Experts in Group 2 preferred to give distributions that incorporate their likelihood that the $PM_{2.5}$ mortality association may be non-causal. Therefore, the expert distributions from these two groups are not directly comparable.

#### 4.2.2 OZONE CONCENTRATION-RESPONSE FUNCTIONS

The primary estimate used to quantify CAAA-related reductions in ozone-related mortality in the integrated report is a pooled estimate that equally weights the C-R functions from six short-term ozone mortality studies, three of which are meta-analyses (Ito et al., 2005; Levy et al., 2005; Bell et al., 2005), and three of which are individual studies reporting estimates based on data from multiple cities (multi-city studies). Two of the multi-city estimates are derived from the National Morbidity, Mortality, and Air Pollution Study (NMMAPS) (Bell et al., 2004 and Huang et al., 2005) and one is an analysis of 14 U.S. cities (Schwartz, 2005).

We generated results for seven alternative ozone/mortality C-R functions to compare with our primary pooled estimate. Exhibit 4-2 summarizes the ozone mortality C-R functions included in our uncertainty analysis. The first six generate estimates of CAAA-related avoided mortality incidence based on each of the six short-term ozone mortality studies included in the pooled primary estimate. The seventh estimate is based on the results of a recent analysis of the ACS cohort (Jerrett et al., 2009), as recommended by the Council Health Effects Subcommittee (HES).[38] Exhibit 4-2 indicates the type of study, the geographic scope, the specific type of mortality examined, the averaging time of the estimate and the percent change in mortality per 10-ppb change in ozone.

---

[38] U.S. Environmental Protection Agency Advisory Council on Clean Air Act Compliance Analysis, Health Effects Subcommittee (2010). Review of EPA's Draft Health Benefits of the Second Section 812 Prospective Study of the Clean Air Act, EPA-COUNCIL-10-001, June 16, 2010, available at http://yosemite.epa.gov/sab/sabpeople.nsf/WebCommittees/COUNCIL.

**EXHIBIT 4-2. OZONE/MORTALITY CONCENTRATION-RESPONSE FUNCTIONS INCLUDED IN 812 UNCERTAINTY ANALYSIS**

| | STUDY TYPE | GEOGRAPHIC COVERAGE | HEALTH ENDPOINT | AVERAGING TIME | PERCENT CHANGE IN MORTALITY PER 10 PPB CHANGE IN OZONE |
|---|---|---|---|---|---|
| Ito et al. (2005) | Meta-analysis of short-term Studies | 43 U.S. and international studies | Non-accidental mortality | 8-hour max from 24-hour mean for warm season | 1.17%[a] |
| Levy et al. (2005) | Meta-analysis of short-term studies | 28 U.S. and international studies | All-cause mortality | 8-hour max from 1-hour max for warm season | 1.12%[b] |
| Bell et al. (2005) | Meta-analysis of short-term studies | 39 U.S. and international studies | All-cause mortality | 8-hour max from 24-hour mean for warm season | 0.80% [c] |
| Schwartz (2005) | Short-term study | 14 U.S. cities | Non-accidental mortality | 8-hour max from 1-hour max for warm season | 0.43% [d] |
| Bell et al. (2004) | Short-term study | 95 U.S. cities from NMMAPS | Non-accidental mortality | 8-hour max from 24-hour mean for warm season | 0.26% [e] |
| Huang et al. (2005) | Short-term study | 19 U.S. cities from NMMAPS | Cardiopulmonary mortality | 8-hour max from 24-hour mean for warm season | 0.81% [f] |
| Jerrett et al. (2009) | Long-term cohort (analysis of the ACS cohort) | 86 U.S. metropolitan statistical areas (MSAs) | Respiratory mortality | 8-hour max from 1-hour max for warm season | 4.47%[g] |

Note: All estimates have been converted to an 8-hour max using ratios of 8-hour max to either 24-hour mean or 1-hour max. See the BenMAP manual for further details (USEPA, 2008).

[a] This estimate represents the combined random-effects estimate for warmer seasons (see page 448 of Ito et al., 2005).

[b] This estimate is based on the single-pollutant grand mean for summer (see page 462 of Levy et al., 2005).

[c] This estimate represents the total mortality effects for U.S. and non-U.S. locations for warmer time periods (see Table 6 of Bell et al., 2005).

[d] This estimate represents the results using the temperature-matched controls for the warm season (see Table 2 of Schwartz, 2005).

[e] This estimate represents the results generated with the constrained distributed-lag model for all communities for days from April to October (see page 2376 of Bell et al., 2004).

[f] This estimate represents the results using summer ozone levels over the previous week (see page 554 of Huang et al., 2005).

[g] This estimate is from the two-pollutant model, which also included particulate matter ($PM_{2.5}$) (Table 3 in Jerrett et al., 2009).

## 4.3 RESULTS

We present below the results of the alternative C-R function analyses, first for PM and then for ozone.

### 4.3.1 EFFECTS OF ALTERNATIVE PM CONCENTRATION-RESPONSE FUNCTIONS

Exhibit 4-3 presents the incidence results using the primary C-R function for PM mortality for each target year (2000, 2010, and 2020) as well as the relative changes in mortality incidence associated with using the alternative C-R functions (Pope et al., 2002; Laden et al., 2006; and the EE study results). Exhibit 4-4 compares box plots of the primary and alternative results distributions. These two exhibits show the following:

- The mean benefits estimates generated from the Pope et al. (2002) study are 44 percent lower than the primary estimate, while the Laden et al. (2006) study results are roughly 40 percent higher, due to the difference in the magnitude of the relative risks (RRs) from these two studies.
- The mean estimates of annual avoided deaths due to CAAA generated from the PM EE results vary by expert and range between 83 percent lower than the mean primary estimate up to 76 percent higher at the extremes. The rest of the estimates are within approximately 40 percent or less of the primary estimate.
- As shown in Exhibit 4-4, the spread of the confidence bounds of the alternative C-R function estimates of avoided mortality results vary, with the largest spread found in the distribution provided by Expert A from the EE study and the smallest spread associated with the Pope et al., 2002, which only estimates statistical uncertainty. However, there is some overlap between the confidence bounds of all of the alternate C-R functions, implying that the results are not all statistically significantly different from each other.

### 4.3.2 EFFECTS OF ALTERNATIVE OZONE CONCENTRATION-RESPONSE FUNCTIONS

Exhibit 4-5 presents changes in mortality incidence based on the primary C-R function for ozone mortality for each target year (2000, 2010, and 2020), as well as the relative changes in mortality incidence associated with using the alternative C-R functions. Exhibit 4-6 is a box plot that illustrates the primary and alternative results distributions. These exhibits show the following:

- The mean benefits estimates generated from the Levy et al. (2005) study are the largest; they are roughly 66 percent higher than the primary estimate, though these are very similar to the Ito et al. estimates. The mean benefits estimates generated from the Bell et al. (2004) study are the lowest, roughly 63 percent lower than the primary estimate.
- In general, the results derived from the three meta-analyses (Ito et al. (2005), Levy et al. (2005), Bell et al. (2005)) are greater than the results derived from three multi-city studies (Schwartz (2005), Bell et al. (2004), Huang et al. (2005)). The results derived from Jerrett et al. (2009) are similar to the results derived

from the meta-analyses and greater than the results derived from the NMMAPS-based studies.[39]

- As shown in Exhibit 4-6, the spread of the confidence bounds of the alternative C-R function estimates incidence results vary, with the largest spread found in the distribution associated with Jerrett et al. (2009) and the smallest spread associated with Bell et al. (2004). The distribution associated with Jerrett et al. (2009) is very similar to that of our primary estimate (the pooling of all six studies). There is some overlap between the confidence bounds of all of the alternate C-R functions, implying that the results are not all statistically significantly different from each other.

**EXHIBIT 4-3. ALTERNATIVE C-R FUNCTION MORTALITY INCIDENCE RESULTS FOR $PM_{2.5}$**

| MORTALITY C-R FUNCTION | PERCENTILE 5 | MEAN | PERCENTILE 95 |
|---|---|---|---|
| **Primary Estimate - 2000** | **20,000** | **110,000** | **230,000** |
| **Primary Estimate - 2010** | **31,000** | **160,000** | **350,000** |
| **Primary Estimate - 2020** | **44,000** | **230,000** | **480,000** |
| | *Percent Change from Mean Primary Estimate* | | |
| Pope et al. (2002) | -77% | -44% | -11% |
| Laden et al. (2006) | -22% | 40% | 98% |
| Expert A | -71% | 38% | 150% |
| Expert B | -87% | 1% | 95% |
| Expert C | -59% | 10% | 79% |
| Expert D | -95% | -21% | 28% |
| Expert E | -9% | 76% | 156% |
| Expert F | -41% | -9% | 24% |
| Expert G | -100% | -34% | 20% |
| Expert H | -100% | -21% | 83% |
| Expert I | -90% | 10% | 83% |
| Expert J | -86% | -11% | 83% |
| Expert K | -100% | -83% | -24% |
| Expert L | -99% | -28% | 24% |
| Note: All values in the table represent the percent change from the mean primary estimate. Percent change estimates do not vary by target year. | | | |

[39] Although the coefficient from the study is much higher than those reported in the meta-analyses or multi-city studies, the endpoint is restricted to respiratory mortality and therefore the avoided mortality results are similar to the meta-analyses, which are based on non-accidental or all-cause mortality.

**EXHIBIT 4-4. BOX-PLOT OF 90 PERCENT CONFIDENCE BOUNDS FOR ALTERNATIVE C-R FUNCTION MORTALITY INCIDENCE**



**EXHIBIT 4-5. ALTERNATIVE C-R FUNCTION MORTALITY INCIDENCE RESULTS FOR OZONE**

| MORTALITY C-R FUNCTION | PERCENTILE 5 | MEAN | PERCENTILE 95 |
|---|---|---|---|
| **Primary Estimate - 2000** | 210 | 1,400 | 2,800 |
| **Primary Estimate - 2010** | 790 | 4,300 | 8,700 |
| **Primary Estimate - 2020** | 1,200 | 7,100 | 15,000 |
| | *Percent Change from Mean Primary Estimate* | | |
| **Meta-Analyses (short-term)** | | | |
| Ito et al. (2005) | 1% | 63% | 123% |
| Levy et al. (2005) | 17% | 66% | 113% |
| Bell et al. (2005) | -41% | 17% | 76% |
| **Multi-City Studies (short-term)** | | | |
| Schwartz (2005) | -81% | -45% | -8% |
| Bell et al. (2004) | -87% | -63% | -41% |
| Huang et al. (2005) | -75% | -40% | -5% |
| **Cohort Study (long-term)** | | | |
| Jerrett et al. (2009) | -41% | 52% | 138% |
| Note: Incidence results are rounded to two significant figures. | | | |

**EXHIBIT 4-6. BOX-PLOT OF THE 90 PERCENT CONFIDENCE BOUNDS FOR ALTERNATIVE C-R FUNCTION RESULTS FOR OZONE**



# CHAPTER 5 | DIFFERENTIAL TOXICITY OF PM COMPONENTS[40]

## 5.1 INTRODUCTION

In the current 812 prospective analysis, EPA estimates particulate matter (PM)-related health benefits using functions that relate these effects with changes in $PM_{2.5}$ or $PM_{10}$ as a whole, measured as the total mass of particles. This approach is consistent with historical EPA practice and with past Advisory Council for Clean Air Compliance Analysis (Council) advice (see below). However, the mass of PM includes a number of different components, and these components may vary in their toxicity and therefore in the degree to which they contribute to the mortality and other adverse health effects observed in the epidemiological literature. The assumption that all particle components have identical toxicity (or, for that matter, any assumption regarding the relative toxicity of various particle components without a strong empirical basis) may introduce bias to estimates of health benefits, if the health benefits of PM reductions depend specifically on the types of particles being reduced. More generally, even if no systematic biases can be identified, the issue of differential toxicity contributes to increased uncertainty in the estimates of health benefits.

It is important to recognize that our ability to address the issue of differential toxicity in quantitative health benefits analysis is limited for a variety of reasons. While some of the limitations will likely decrease over time given improvements in scientific understanding, others are intrinsic to the question and will remain. Specifically, while increasing availability of speciation network data allow for epidemiological studies addressing individual components, many components covary in the atmosphere to such a degree that it would make it difficult to separate their effects. In some respects, this issue is a variant of an issue that EPA has addressed successfully in other settings, when attempting to separate the health effects of individual criteria pollutants from one another based on epidemiological evidence. However, the case of PM components extends beyond this domain (which is generally addressed through a combination of multivariate statistical analyses and study designs/locations that help to isolate the effects of individual pollutants), as particles in the atmosphere are often complex agglomerations of a variety of components. This indicates that the topic of differential toxicity is not only a statistical issue, but also a physical interpretability issue. The composition of the atmosphere also varies considerably over time and space, making it challenging to determine (for example) whether a reduction in sulfate concentrations in Massachusetts in 2010 is

[40] We gratefully acknowledge the substantial contributions of Dr. Jonathan Levy of the Harvard School of Public Health in the development and review of this chapter.

functionally equivalent to the same unit reduction in sulfate concentrations in California in 2020. These and other limitations are discussed in more detail below.

From a practical standpoint, the relevant question is whether uncertainty related to differential toxicity would be significant enough in magnitude to invalidate results of benefits analyses. While this uncertainty could be substantial for control strategies only addressing a single component on the margin, many control measures under consideration by EPA are "blended" strategies addressing multiple PM sources and components simultaneously, which will tend to reduce errors in the aggregate benefits estimates.

This chapter describes some of the significant questions and challenges that remain to be addressed before differential toxicity could be meaningfully introduced into benefits analysis, either through adjustments to component-specific concentration-response (C-R) functions or through addition of uncertainty analyses that go beyond hypothetical "what if" scenarios. Currently, EPA and its Council support the use of PM mass as the most defensible means of estimating benefits and believe the results of any uncertainty analysis should be interpreted with caution. While we agree that the use of PM mass remains the most defensible strategy and that there is neither an empirical nor logical basis for incorporating quantitative differential toxicity at this time, in this chapter, we formally evaluate the evidence for differential toxicity, considering the nature of the evidence that would be required to address this topic and the way in which this evidence would need to be structured and analyzed. This discussion is intended to explore the approaches that can be taken to quantify differential toxicity and the challenges in conducting such analyses.

The remainder of this chapter reviews how this issue has been addressed in past 812 analyses, discusses the importance of this uncertainty and the nature of the evidence needed to incorporate quantitative differential toxicity into benefits analyses, gives a brief overview of our current understanding of the issue, lays out key challenges to a meaningful uncertainty analysis of differential toxicity, and discusses key data gaps that need to be addressed before a policy relevant analysis can be conducted.

## 5.2 HISTORICAL APPROACH

EPA's approach to estimating avoided mortality and morbidity associated with reductions in fine particles uses estimates of changes in exposure to $PM_{2.5}$ mass as the exposure input in the damage function. The implication of this approach is that we assume that all fine particles, regardless of their chemical composition, are equally potent per unit concentration in producing premature mortality and other health outcomes. More precisely, we assume that the most credible quantitative estimate for policy decision-making involves using the same toxicity value for all fine PM mass components, given an insufficient basis to quantitatively deviate from this assumption. Uncertainty surrounding this assumption is not generally quantified, but is usually discussed.

This approach reflects several considerations. First, it is worth recognizing that there is a biological rationale for a focus on particulate mass below a specified aerodynamic diameter, as size has clearly been demonstrated to influence deposition patterns in the lung, with fine particles penetrating more deeply and being less likely to be cleared than coarser particles. Thus, even if chemical composition has an influence on the resulting

toxicity, the size of the particle is clearly important (and, indeed, this is the primary rationale for a regulatory system oriented around particle size).

Second, the equal toxicity approach reflects the consistency of findings in epidemiological studies conducted across countries, states, and cities that $PM_{2.5}$ concentrations are associated with increased mortality and morbidity rates, despite geographic variations in composition. If there were stark differences in the toxicity of various particle components, epidemiological findings would be expected to be far more discordant. For example, time-series studies in the US, Europe, Australia, and Asia have all yielded statistical significant effects of PM on premature mortality (Pope and Dockery 2006), in spite of substantial differences in diesel fuel utilization, coal combustion, and other activities that would influence the chemical composition of fine particles in these varied settings.[41]

Not only are the findings qualitatively similar (with statistical significance in diverse geographic settings), but the C-R functions do not appear to be substantially different across different countries or regions of the US. Meta-analyses and multi-city studies of the PM-mortality literature to date have found some spatial heterogeneity by region, but have not found large systematic differences that would exonerate specific components or support direct quantitative estimation of differential toxicity among specific particle components. For example, the National Morbidity Mortality and Air Pollution Study (NMMAPS) found higher C-R functions for $PM_{10}$ in the Northeast (where sulfates predominate) and in Southern California (which nitrates and organic carbon predominate), relative to other regions (Dominici et al., 2005).[42] A more recent multi-city study of $PM_{2.5}$ morbidity concluded that C-R functions for respiratory and cardiovascular hospital admissions were higher in the Northeast for a same-day effect, but were higher in the Southwest for a two-day lag for respiratory hospital admissions (Bell et al., 2008).[43] More generally, this study concluded that there was significant spatial heterogeneity for cardiovascular but not respiratory hospital admissions. Another multi-city study of $PM_{2.5}$ mortality (Franklin et al., 2007) found higher C-R functions in the East than in the West, but the difference was not significant and was best explained by air conditioning prevalence.[44]

Thus, there do not appear to be stark geographic patterns in C-R functions, making extreme differential toxicity outcomes (e.g., that toxicity is due solely to a single PM component) appear unlikely. Further, any spatial variations in the PM C-R function may

[41] Pope, C.A. and Dockery, D.W., 2006. Health Effects of Fine Particulate Air Pollution: Lines that Connect. Air Waste Management Association. Vol. 56: 709-742.

[42] Dominici, F. et al., 2005. Revised Analyses of the National Morbidity, Mortality, and Air Pollution Study: Mortality Among Residents of 90 Cities. Journal of Toxicology and Environmental Health. Vol. 68 (13): 1071-1092)

[43] Bell ML, Ebisu K, Peng RD, Walker J, Samet JM, Zeger SL, Dominici F. 2008. Seasonal and regional short-term effects of fine particles on hospital admissions in 202 US counties, 1999–2005. Am J Epidemiol Vol. 168:1301–1310.

[44] Franklin M, Zeka A, Schwartz J. 2007. Association between $PM_{2.5}$ and all-cause and specific-cause mortality in 27 US communities. J Expo Sci Environ Epidemiol. Vol. 17(3):279-87.

be attributable to factors beyond the chemical composition of the fine particles, including concentration-exposure relationships and vulnerability characteristics. This evidence reinforces the suggestion that an assumption that the same C-R function is applicable to all control strategies (especially blended PM reduction strategies) in all settings is a reasonable one. This evidence also reflects the judgment of EPA and its Council that the research conducted to date does not yet provide sufficiently clear evidence for quantification of particle mortality impacts at a finer level than total $PM_{2.5}$ mass.

The Council has supported this approach in the past two 812 analyses and also in its review of plans for the current analysis, while encouraging EPA to explore the possible implications of differential toxicity uncertainties on results. In its March 2004 review of the analytical blueprint, the 812 Council Health Effect Subcommittee (HES) provided advice to EPA on this issue. First, in response to a charge question regarding a potential expert elicitation initiative on PM mortality that included questions on relative component toxicity, the committee states:

> "Regarding the question of component relative toxicity, the evidence at this time supporting differential toxicities based on particle chemistry is provided by a few studies of short-term exposure (e.g., Laden et al., 2000). Currently, there is little evidence from the long-term exposure studies to suggest differential toxicity. Therefore, it is appropriate at this time for EPA to assume equal toxicity across particle components and it is reasonable to explore alternative possible implications of differential particle component potency in supplementary sensitivity analyses."[45]

The HES commented further on a relative toxicity sensitivity analysis in their response to a charge question on aggregation and presentation of results:

> "There are only a few C-R functions for source-specific health effects and therefore limited information for sector-specific PM health benefits or for apportioning health benefits among sources or sectors other than as a function of source-specific contributions to ambient PM mass. With the exception of particle size considerations, the toxicity of all PM is treated as equivalent regardless of its origin. There is limited evidence (i.e., Laden et. al., 2000) to suggest some differential toxicity of PM, at least regarding mortality and daily PM exposures. If the data are available on source-specific changes in PM, EPA should consider conducting a limited sensitivity analysis utilizing some of this evidence." [46]

---

[45] U.S. Environmental Protection Agency, Science Advisory Board. 2004. Advisory on Plans for Health Effects Analysis in the Analytical Plan for EPA's Second Prospective Analysis - Benefits and Costs of the Clean Air Act, 1990-2020; Advisory by the Health Effects Subcommittee of the Advisory Council on Clean Air Compliance Analysis. EPA-SAB-COUNCIL-ADV-04-002, page 20.

[46] *Ibid.* page 37.

## 5.3 IMPORTANCE OF DIFFERENTIAL TOXICITY FOR BENEFITS ANALYSIS

From a benefits analysis perspective, treatment of all $PM_{2.5}$ mass as equally toxic may lead to biases in benefits estimates. Likewise, any arbitrary assumption about the differential toxicities of particle components may also lead to biases in benefits estimates. Any of these biases may mask important spatial variation in the distribution of benefits of Clean Air Act (CAA) programs across the U.S. due to regional variation in PM speciation, which could affect selection of the most health beneficial measures to meet CAA requirements such as the National Ambient Air Quality Standards (NAAQS).

The significance of the uncertainty related to differential toxicity will likely differ substantially by application. An analysis of the entire CAA Amendments or of the benefits of attaining the NAAQS (which would likely use a blended strategy) would likely be affected less by these uncertainties than an analysis of the Clean Air Interstate Rule (CAIR) or non-road diesel rule which focus on more narrow emissions control strategies. Similarly, an analysis of CAIR or other multi-pollutant power plant control strategies would be less uncertain than an analysis of $SO_2$ controls exclusively. However, even more "narrow" emissions control strategies invariably result in control of multiple pollutants, either by design (e.g., CAIR and the non-road diesel rule each reduced NOx, $SO_2$, and directly-emitted PM) or due to the nature of the emission reduction strategies that would be implemented, which often do not influence only one pollutant at a time. Even in cases where a single pollutant may be reduced, the ultimate effect on ambient particles is more complicated, because of the complex atmospheric chemistry involved in particle formation. For example, reductions in $SO_2$ can affect not only sulfate, but also nitrate and ammonium particle levels, and can affect transport and form of metals in particle mixtures.

A focus on benefits analysis also influences the type of evidence that would be necessary to incorporate differential toxicity. Within benefits analysis of fine PM control strategies, C-R functions are developed from epidemiological evidence, reflecting the anticipated change in health outcomes across the human population (including sensitive subpopulations) associated with changes in ambient air pollution levels. As this reflects a population C-R function (a combination of individual functions that reflects variability in individual response thresholds), this captures aspects of human vulnerability to $PM_{2.5}$-related health effects. The ideal study of differential toxicity would therefore be an epidemiological investigation with sufficient information about particle composition and related exposures (varying over both time and space), good characterization of vulnerable populations, and good specificity in health outcomes.

Clearly, toxicological studies are important for determining the health effects of pollutants and for providing an understanding of the biological underpinnings of the associations observed in epidemiological studies. However, in the specific context of differential toxicity for health benefits analysis, it is necessary but not sufficient to establish mechanisms, even if they appear to be differential by component. For toxicological studies to be directly and quantitatively applicable to health benefits analysis, they would need to be conducted in animal populations with disease models that

appropriately capture the vulnerable individuals at the lower end of the C-R function; they would need to provide quantitative outputs that can be translated directly into outcomes such as cardiovascular hospital admissions or premature mortality from long-term exposure; and they would need to utilize exposure measures that are directly translatable to the exposure measures used in epidemiological studies, both considering the level of exposure and the type of exposure. Even a toxicological study that uses ambient-derived aerosols in animal models of cardiovascular disease and provides quantitative estimates of effects on heart rate variability or measures of atherosclerosis would not be directly applicable to benefits analysis, given the difficulty in linking high-concentration pre-clinical effects in animals with quantitative low-concentration health outcomes in humans. Moreover, even if models could be developed to link this toxicological insight to the human population, identical translation would need to occur for a variety of mixtures of components, including consideration of the marginal effects of changes in the mixture.

Because of these issues, it is likely that the relative contributions of epidemiology and toxicology would be similar in a differential toxicity analysis as in a benefits analysis for $PM_{2.5}$ as a whole – the quantitative functions would be solely based on epidemiology, with toxicology providing corroboration of biological plausibility and mechanisms of disease, and perhaps eventually contributing to expert opinions within elicitation protocols. More specifically, in the absence of epidemiological evidence for differential toxicity, it would be exceedingly difficult to determine quantitative C-R functions for individual particle components that would be applicable to human populations.

## 5.4 CURRENT UNDERSTANDING OF DIFFERENTIAL TOXICITY

The following section provides a general overview of the strength of epidemiological and toxicological evidence examining possible differential toxicity of PM components and sources. We first provide an illustrative discussion of some of the key epidemiological and toxicological evidence linking specific PM components to health outcomes and then examine source-oriented evaluations.

### 5.4.1 COMPONENT-ORIENTED EVALUATIONS

This section briefly reviews the current state of knowledge on the differential toxicity of specific PM components. The aim of this section is not to be exhaustive, but the evidence below does reflect the nature and size of the epidemiological literature on PM components to date.

The major components of PM, some or all of which may contribute to its toxicity, include metals (e.g., iron, vanadium, nickel, copper), organic compounds that are either adsorbed onto other particles or may form particles themselves, biologic elements (e.g., viruses, bacteria), ions such as sulfate ($SO_4^{2-}$), nitrate ($NO_3^-$), and acidity (H+), reactive gases (e.g., ozone, aldehydes) adsorbed to particles, and carbonaceous material that constitutes the particle core (HEI, 2002; NRC, 2004).[47,48] Of note, some of the above-mentioned

[47] Health Effects Institute, 2002. Understanding the Health Effects of Components of the Particulate Matter Mix: Progress and Next Steps. Boston, MA.

components are particle components that may be differentially affected by common control strategies (such as sulfate and nitrate particles), while others (such as reactive gases adsorbed to particles or biologic elements) reflect factors that complicate the assessment of differential toxicity for the components conventionally evaluated in a differential toxicity analysis of PM.

A study by Bell et al. (2007) analyzed EPA monitoring data on 52 $PM_{2.5}$ components in 187 U.S. counties between February 2000 and December 2005 to identify $PM_{2.5}$ components that would be important to target in future epidemiological studies.[49] The study found that only seven of the 52 components contributed at least 1 percent to total mass for yearly or seasonal averages. This included ammonium ($NH_4^+$), elemental carbon (EC), organic carbon matter (OCM), nitrate ($NO_3^-$), silicon, sodium (Na+), and sulfate ($SO_4^{2-}$). The study also postulated that in order for a component to be a mediator of the risk associated with total $PM_{2.5}$ mass, the concentration of the component must co-vary with the concentration of $PM_{2.5}$. The authors found six components that met this criterion: $NH_4^+$, $SO_4^{2-}$, OCM, $NO_3^-$, bromine, and EC. Therefore, it is likely that these components would be of greatest interest in explaining the health risks seen from exposure to $PM_{2.5}$ in epidemiological studies.

It is important to recognize that this does not imply that other components would not be toxic or exhibit health effects at current levels of exposure, but rather that the epidemiological findings of health effects of $PM_{2.5}$ could not be explained by components that did not covary with $PM_{2.5}$. While it is not impossible for low-mass components to explain all of the observed effects (if such components were highly toxic and covaried with $PM_{2.5}$), it is also unlikely that the totality of the epidemiological effects could be explained by components that contribute minimal mass. In addition, from a practical standpoint, control strategies to meet the NAAQS would tend to target the high-mass components as the only viable strategies to achieve attainment. Examining the intersection of the high-mass and high-correlation compounds, and considering the fact that ammonium is generally bound to either sulfate or nitrate, this study emphasizes that the primary components of interest would likely include sulfate, nitrate, OCM, and EC. In the context of differential toxicity, the key question is whether the health risks of fine particles can be plausibly apportioned among these (and other) components, in such a way that is consistent with the evidence for $PM_{2.5}$ as a whole.

As a general point, a number of epidemiological studies, mostly time-series studies, have associated one or more of these $PM_{2.5}$ components with mortality, but no clear picture has emerged. The National Research Council (NRC) in its report entitled “Research Priorities for Airborne Particulate Matter” indicated that:

---

[48] National Research Council. 2004. Research Priorities for Airborne Particulate Matter: IV. Continuing Research Progress. National Academies Press: Washington, DC.

[49] Bell, M.L. et al., 2007. Spatial and Temporal Variation in $PM_{2.5}$ Chemical Composition in the United States for Health Effects Studies. Environmental Health Perspectives. Vo. 115(7): 989-995.

> "Although substantial relevant research has been carried out on this topic, the [NRC] committee's review showed a collection of evidence with little convergence … This topic has proved particularly challenging because of the many aspects of particles that might plausibly determine toxicity and the strong possibility that different characteristics of particles could be relevant to different health outcomes."[50]

The following sections provide a brief overview of epidemiological and toxicological evidence regarding the relative toxicity of various PM components, focusing on sulfate, nitrate, OCM, and EC, but also considering metals, which do not contribute substantial mass to the total but remain of interest given evidence about their effects and potential interactions with the high-mass components (e.g., the tendency of metals to bind with sulfates and potentially become more bioavailable).

#### 5.4.1.1 Sulfate

Sulfate is the PM component with the greatest body of literature examining its toxicity to date. Epidemiological studies (both time-series and long-term cohort) as well as toxicological studies have been conducted that include effect estimates for PM and sulfates, allowing (in theory) for assessments that evaluate the toxicity of sulfate relative to the total mass. In a recently published paper reviewing studies on sulfates, Reiss et al. (2007) found 48 risk estimates for $PM_{2.5}$ and sulfate across 11 time-series epidemiological studies.[51] Five of the 11 studies had at least one statistically significant endpoint for sulfate (versus 8 of the 11 studies for $PM_{2.5}$), so from a significance standpoint, the evidence appears weaker for sulfate than for $PM_{2.5}$.

However, statistical significance is only one component of the type of comparison that would be necessary, with the size of the C-R function also being of great interest. Focusing on all-cause mortality, the magnitude of effects with sulfate from the time-series studies reported in Reiss et al. (2007) range from no association up to a relative risk (RR) of 1.2 for a 10 $\mu g/m^3$ change in sulfate, a generally similar range as observed for $PM_{2.5}$ as a whole in those same studies. Taking the eight studies listed in Reiss et al. that had quantified sulfate relative risks and $PM_{2.5}$ relative risks, one can perform an inverse-variance weighted pooling, using methods to account for potential heterogeneity in effect estimates.[52] This results in a pooled central estimate of a 1.2% increase in mortality per 10 $\mu g/m^3$ increase in $PM_{2.5}$ (95% CI: 0.7%, 1.7%) vs. a 2.0% increase in mortality per 10 $\mu g/m^3$ increase in sulfate (95% CI: 0.3%, 3.8%), which shows that sulfate has a higher central estimate than $PM_{2.5}$ as a whole, but with wider confidence intervals (and overlapping confidence intervals for both C-R functions).

Some subsequent time-series studies not included in Reiss et al. (2007) have shown effects of sulfate on mortality (i.e., Maynard et al., 2007; Franklin and Schwartz,

---

[50] National Research Council., *op. cit.*

[51] Reiss, R. et al., 2007. Evidence of Health Impacts of Sulfate-and-Nitrate-Containing Particles in Ambient Air. Inhalation Toxicology. Vol. 19(5): 419-449.

[52] DerSimonian, R., Laird, N. (1986). Meta-Analysis in Clinical Trials. Controlled Clinical Trials, 7: 177-188.

2008).[53,54] A multi-city study examining factors explaining variability in the relationship between $PM_{2.5}$ and mortality concluded that cities with a higher proportion of sulfate (as well as aluminum and nickel) tended to have higher $PM_{2.5}$ C-R functions (Franklin et al., 2008).[55] However, a multi-city study focusing on hospital admissions found no associations between sulfate and either respiratory or cardiovascular admissions (Bell et al., 2009).[56] In addition, panel studies have found associations between short-term exposures to sulfate and markers of cardiovascular disease (e.g., Luttmann-Gibson et al., 2006; Sarnat et al., 2006; and O'Neill et al., 2005).[57,58,59]

Some evidence also exists for an association between mortality and sulfates in long-term cohort epidemiological studies. Positive relative risks for sulfate in relation to all-cause mortality were found in the American Cancer Society (ACS) cohort study (Pope et al., 1995) and its extended analysis (Pope et al., 2002).[60,61] Within the ACS study, the relative risk for sulfate was generally slightly greater than that for $PM_{2.5}$ per unit concentration. Similarly, in the Harvard Six Cities study (Dockery et al, 1993; Krewski et al., 2000), effects for sulfate were similar to those for $PM_{2.5}$ as a whole, with a greater C-R function per unit concentration, although with a smaller number of sites and high correlations between sulfate and $PM_{2.5}$, it would be difficult to separate out the effects.[62,63]

---

[53] Maynard, D., B.A. Coull, A.Gryparis, and J. Schwartz. 2007. Mortality Risk Associated with Short-Term Exposure to Traffic Particles and Sulfates. Environ Health Perspect. Vol. 115(5): 751–755.

[54] Franklin, M. and Schwartz, J. 2008. The Impact of Secondary Particles on the Association Between Ambient Ozone and Mortality. Environ Health Perspect. Vol. 116(4):453-8.

[55] Franklin, M. et al., 2008. The Role of Particle Composition on the Association Between $PM_{2.5}$ and Mortality. Epidemiology. Vol. 19(5): 680-689.

[56] Bell, M.L. et al., 2009. Hospital Admissions and Chemical Composition of Fine Particle Air Pollution. American Journal of Respiratory and Critical Care Medicine. Vol. 179: 1115-1120.

[57] Luttmann-Gibson H, H.H.Suh, B.A. Coull, D.W. Dockery, S.E. Sarnat, J. Schwartz, P.H. Stone, D.R. Gold. 2006. Short-Term Effects Of Air Pollution On Heart Rate Variability In Senior Adults In Steubenville, Ohio. J Occup Environ Med. Vol. 48(8):780-8.

[58] Sarnat SE, H.H. Suh, B.A. Coull, J. Schwartz, P.H. Stone, D.R. Gold. 2006. Ambient Particulate Air Pollution And Cardiac Arrhythmia In A Panel Of Older Adults In Steubenville, Ohio. Occup Environ Med. Vol. 63(10):700-6.

[59] O'Neill, M.S. et al., 2005. Diabetes Enhances Vulnerability to Particulate Air Pollution-Associated Impairment in Vascular Reactivity and Endothelial Function. Circulation. Vol. 111: 2913-2920.

[60] Pope, C.A., III, M.J. Thun, M.M. Namboodiri, D.W. Dockery, J.S. Evans, F.E. Speizer, and C.W. Heath, Jr., 1995. "Particulate Air Pollution as a Predictor of Mortality in a Prospective Study of U.S. Adults." American Journal of Respiratory Critical Care Medicine 151:669-674.

[61] Pope, CA III, et al. (2002). Lung cancer, cardiopulmonary mortality, and long-term exposure to fine particulate air pollution. *JAMA* 287: 1132-1141.

[62] Dockery, D.W., C.A. Pope, X.P. Xu, J.D. Spengler, J.H. Ware, M.E. Fay, B.G. Ferris, and F.E. Speizer, 1993. "An Association between Air Pollution and Mortality in Six U.S. Cities." New England Journal of Medicine 329(24):1753-1759.

[63] Krewski D., R.T. Burnett, M.S. Goldbert, K. Hoover, J. Siemiatycki, M. Jerrett, M. Abrahamowicz, and W.H. White, July 2000. Reanalysis of the Harvard Six Cities Study and the American Cancer Society Study of Particulate Air Pollution and Mortality. Special Report to the Health Effects Institute, Cambridge MA.

Thus, the epidemiological evidence to date appears supportive of an effect of sulfate particles on health outcomes, with modest but inconsistent evidence that the C-R functions per unit concentration may be slightly greater than for $PM_{2.5}$ as a whole. However, these results have not generally been supported by the toxicological database consisting of controlled animal and human clinical exposure studies. A comprehensive review of such literature by Schlesinger and Cassee (2003) concluded that "[e]valuation of the toxicological database suggest that [sulfates] have little biological potency in normal humans or animals, or in the limited compromised animal models studied at environmentally relevant levels."[64] That being said, Schlesinger and Cassee temper their conclusion somewhat by raising the important point that the physicochemical characteristics of sulfates in these controlled studies differ somewhat from those to which humans are exposed. In addition, the controlled human exposure studies within this review do not (and generally could not) include the most sensitive subpopulations, who may be responsive at different levels or in different ways when compared with healthy populations. That being said, other recent review studies have made similar conclusions, indicating that the toxicological data linking sulfates to health effects have not found significant toxicity at ambient exposure levels (Schwarze et al., 2006; Grahame and Schlesinger, 2007).[65,66]

A portion of this inconsistency between the epidemiological and toxicological evidence may be attributable to the fact that exposures to ambient sulfate invariably occur in combination with a variety of other components, which are often not captured in toxicological studies. Beyond the usual complications of finding concordance between epidemiology and toxicology, this reflects the specific difficulty in trying to assign relative toxicity values to each individual component given that people are exposed to numerous components simultaneously. Hypothetically, if it were true that sulfates were not toxic when people were exposed to them in isolation, but that they enhanced the potency of metals that were ubiquitous in the atmosphere, reductions in sulfate concentrations would tend to lead to public health benefits, and this would need to be addressed within health benefits analysis.

#### 5.4.1.2 Nitrate

Nitrate has not been as extensively studied as sulfate in terms of epidemiological or toxicological evidence. The limited time-series studies that have included nitrates in their analyses have found statistically significant results for all-cause and/or cardiovascular mortality (Fairley 2003; Ostro et al., 2007; Hoek, 2003).[67,68,69] A recent study of

[64] Schlesinger RB, and F. Cassee. 2003. Atmospheric Secondary Inorganic Particulate Matter: The Toxicological Perspective As A Basis For Health Effects Risk Assessment. Inhal Toxicol. Vol. 15(3):197-235.

[65] PE Schwarze, J Øvrevik, M La°g, M Refsnes, P Nafstad, RB Hetland and E Dybing. 2006. Particulate Matter Properties And Health Effects: Consistency Of Epidemiological And Toxicological Studies.

[66] Grahame, T.J. and Schlesinger, R.B., 2007. Health Effects of Airborne Particulate Matter: Do We Know Enough to Consider Regulating Specific Particle Types or Sources. Inhalation Toxicology. Vol. 19(6): 457-481.

[67] Fairley, D. 2003. Mortality and air pollution for Santa Clara County, California, 1989–1996. In *Revised analyses of time-series studies of air pollution and health, Special report*, pp. 97–106. Boston, MA: Health Effects Institute.

cardiovascular mortality in southern California did find a significant effect of nitrate with a nearly identical C-R function as $PM_{2.5}$ as a whole, although interpretation is complicated by the high correlation between nitrate and $PM_{2.5}$ in California (Ostro et al., 2008).[70] A multi-city study focusing on hospital admissions found a weak positive association with cardiovascular hospital admissions and no association with respiratory hospital admissions (Bell et al., 2009).[71] Nitrate has not been included in large, long-term cohort studies.

An extensive review study examining toxicological data on the health effects of nitrate concluded that these studies have not found effects at ambient exposure levels (Schlesinger and Cassee, 2003).[72] However, the limited database for nitrate makes it difficult to make conclusions about its possible effects, and similar issues exist in interpreting toxicological evidence for nitrate as described for sulfate above.

#### 5.4.1.3 EC/OC

There is limited epidemiological evidence supporting the development of C-R functions between elemental or organic carbon and mortality or morbidity. Cardiovascular mortality was found to be associated with EC and OC in California in Ostro et al. (2007) and with EC in Phoenix in Mar et al. (2000 & 2003).[73,74] EC and OC showed effects in a recent study of cardiovascular mortality in southern California that were slightly weaker than those of $PM_{2.5}$ as a whole (Ostro et al., 2008).[75] Coefficient of haze (CoH) was used as a proxy for EC in a study in Canada, which found a positive but statistically weak association between CoH and daily mortality (Burnett 2000 & 2003).[76] In a multi-city study, EC was associated with increased cardiovascular and respiratory hospital admissions, while OC was weakly associated with respiratory hospital admissions and not

[68] Ostro, B. et al., 2007. The Effects of Components of Fine Particulate Air Pollution on Mortality in California: Results from CALFINE. Environmental Health Perspectives. Vol. 115(1): 13-19.

[69] Hoek, G. 2003. Daily mortality and air pollution in The Netherlands. In: Revised analyses of time-series studies of air pollution and health. Special report. Boston, MA: Health Effects Institute; pp. 133-142.

[70] Ostro, B. et al., 2008. The Impact of Components of Fine Particulate Matter on Cardiovascular Mortality in Susceptible Subpopulations. Occup Environ Med. Published Online 16 April 2008.

[71] Bell, M.L. et al., 2009. *op. cit.*

[72] Schlesinger RB, and F. Cassee. 2003. *op. cit.*

[73] Ostro, B. et al., 2007. *op. cit.*

[74] Mar, T. F., Norris, G. A., Koenig, J. Q., and Larson, T. V. 2000. Associations between air pollution and mortality in Phoenix, 1995–1997. *Environ. Health Perspect.* 108:347–353. and Mar, T. F., Norris, G. A., Larson, T. V., Wilson, W. E., and Koenig, J. Q. 2003. Air pollution and cardiovascular mortality in Phoenix, 1995– 1997. In *Revised analyses of time-series studies of air pollution and health. Special report*, pp. 172–182. Boston: Health Effects Institute.

[75] Ostro, B. et al., 2008. *op. cit.*

[76] Burnett RT, Brook J, Dann T, Delocla C, Philips O, Cakmak S, Vincent R, Goldberg MS, Krewski D. 2000. Association between particulate- and gas-phase components of urban air pollution and daily mortality in eight Canadian cities. Inhal Toxicol. Vol. 12 Suppl 4:15-39. and Burnett, R. T.; Goldberg, M. S. 2003. Size-fractionated particulate mass and daily mortality in eight Canadian cities. In: Revised analyses of time-series studies of air pollution and health. Special report. Boston, MA: Health Effects Institute; pp. 85-90.

with cardiovascular admissions (Bell et al., 2009).[77] No association has been found in some panel studies looking at markers of cardiovascular health (e.g., Luttmann-Gibson et al., 2006; Sarnat et al, 2006), although other studies have demonstrated links with ST-segment depression (Gold et al., 2005) and myocardial repolarization (Henneberger et al., 2005).[78,79,80,81]

Thus, this literature does not demonstrate either the size or consistency necessary to determine quantitative relative toxicity values, but there is clearly no basis to exonerate EC or OC as a contributor to $PM_{2.5}$ health effects.

Studies examining the health effects of diesel exhaust from on-road and non-road vehicles may provide some additional insight into the health effects of EC and OC. The exhaust from new diesel vehicles (post-1990) has been found to be comprised of 75 percent (33- 90 percent) EC and 19 percent OC (7-49 percent) (USEPA, 2002).[82] In 2002, EPA published the "Health Assessment Document for Diesel Engine Exhaust," which was a comprehensive review of potential health effects from ambient exposure to exhaust from diesel engines (USEPA, 2002).[83] This document indicates that there is limited animal and human data showing short-term effects, such as neurophysiological symptoms (lightheadedness, nausea) and respiratory symptoms (cough, phlegm) as well as exacerbation of allergic responses and asthma-like symptoms.

Chronic effects of diesel exhaust have been studied in occupational cohort studies. Results of these studies show increased risk of respiratory symptoms (Gamble et al., 1987; Reger et al., 1982; Attfield et al., 1978) but do not indicate a consistent effect on pulmonary function (Battigelli et al., 1964; Ames et al., 1984; Attfield et al., 1982; Gamble et al., 1983).[84,85,86,87,88,89,90] However, these studies suffer from a number of

---

[77] Bell, M.L. et al., 2009 *op. cit.*

[78] Luttmann-Gibson H, H.H.Suh, B.A. Coull, D.W. Dockery, S.E. Sarnat, J. Schwartz, P.H. Stone, D.R. Gold. 2006. *op. cit.*

[79] Sarnat SE, H.H. Suh, B.A. Coull, J. Schwartz, P.H. Stone, D.R. Gold. 2006. *op. cit.*

[80] Gold DR, Litonjua AA, Zanobetti A, Coull BA, Schwartz J, MacCallum G, Verrier RL, Nearing BD, Canner MJ, Suh H, Stone PH. 2005. Air pollution and ST-segment depression in elderly subjects. Environ Health Perspect. Vol. 113(7):883-7.

[81] Henneberger A, Zareba W, Ibald-Mulli A, Rückerl R, Cyrys J, Couderc JP, Mykins B, Woelke G, Wichmann HE, Peters A. 2005. Repolarization changes induced by air pollution in ischemic heart disease patients. Environ Health Perspect. Vol.113(4):440-6.

[82] USEPA (2002). Health assessment document for diesel engine exhaust. Office of Research and Development, Washington, DC. EPA/600/8-90/057F.

[83] *Ibid.*

[84] Gamble J, Jones W, Minshall S. 1987. Epidemiological-environmental study of diesel bus garage workers: chronic effects of diesel exhaust on the respiratory system. Environ Res. Vol. 44(1):6-17.

[85] Reger R, Hancock J, Hankinson J, Hearl F, Merchant J. 1982. Coal miners exposed to diesel exhaust emissions. Ann Occup Hyg. Vol. 26(1-4):799-815.

[86] Attfield, MD. 1978. The effect of exposure to silica and diesel exhaust in underground metal and nonmetal miners. In: Industrial hygiene for mining and tunneling: proceedings of a topical symposium; November; Denver, CO. Kelley, WD, ed. Cincinnati, OH: The American Conference of Governmental Industrial Hygienists, Inc.; pp. 129-135.

methodological issues such as incomplete information on diesel exhaust exposure, the presence of confounding factors, and short duration and low intensity of exposures. Several occupational cohort studies have also found a relationship between diesel exhaust and lung cancer mortality (e.g., Saverin et al., 1999; Hansen et al., 1993; Gustavsson et al., 1990).[91,92,93] However, it is difficult to directly apply findings from occupational cohort studies to the general population, especially for outcomes such as chronic respiratory disease and given the goal to establish quantitative population C-R functions.

#### 5.4.1.4 Metals

According to the HEI report, "Understanding the Health Effects of Components of the Particulate Matter Mix: Progress and Next Steps," metals are an important component of the PM mass of urban air in many settings (HEI, 2002).[94] Even though they generally constitute a small fraction of the total PM mass in most US settings, this component could be important to investigate given a small but growing base of epidemiological and toxicological evidence, and given that metals may be bound to other components comprising a greater portion of the total mass.

Limited epidemiological evidence exists examining the health effects of metals. Burnett et al. (2000) found that iron, nickel, and zinc were associated with increased mortality.[95] In fact, these metals were better predictors for mortality than total mass. In addition, Ostro et al. (2007) found positive statistically significant associations between daily mortality and iron, copper, vanadium, and zinc.[96] Franklin et al. (2008) determined that $PM_{2.5}$ mortality C-R functions were higher when the mass contained more aluminum, arsenic, and nickel.[97] Bell et al. (2009) found that communities with higher levels of

---

[87] Battigelli, MC; Mannella, RJ; Hatch, TF. 1964. Environmental and clinical investigation of workmen exposed to diesel exhaust in railroad engine houses. Ind Med Surg 33:121-124.

[88] Ames, RG; Reger, RB; Hall, DS. 1984. Chronic respiratory effects of exposure to diesel emissions in coal mines. Arch Environ Health 39:389-394.

[89] Attfield MD, Trabant GD, Wheeler RW. 1982. Exposure to diesel fumes and dust at six potash mines. Ann Occup Hyg. Vol. 26(1-4):817-31.

[90] Gamble, JF, Jones WG. 1983. Respiratory Effects of Diesel Exhaust in Salt Miners. Am Rev Respir Dis. 128:389-394.

[91] Saverin. R; Bräunlich, A; Dahman, D; et al. 1999. Diesel exhaust and lung cancer mortality in potash mining. Am J Ind Med 36:415-422.

[92] Hansen, ES. 1993. A follow-up study on the mortality of truck drivers. Am J Ind Med. 23:811-821.

[93] Gustavsson, P; Plato, N; Lidström, EB; et al. (1990) Lung cancer and exposure to diesel exhaust among bus garage workers. Scand J Work Environ Health 16:348-354.

[94] Health Effects Institute, 2002. Understanding the Health Effects of Components of the Particulate Matter Mix: Progress and Next Steps. Boston, MA.

[95] Burnett, R.T. et al., 2000. Association Between Particulate- and- Gas-Phase Components of Urban Air Pollution and Daily Mortality in Eight Canadian Cities. Inhalation Toxicology. Vol. 12(4): 15-39.

[96] Ostro, B. et al., 2007. *op. cit.*

[97] Franklin, M. et al., 2008. *op. cit.*

nickel and vanadium had elevated C-R functions for PM-related hospitalizations, a finding supported by others (Lippmann et al., 2006).[98,99]

Experimental studies on humans and animals suggest that metals could play an important role in both pulmonary inflammation and cardiovascular effects induced by PM (Schwarze et al, 2006).[100] For instance, *in vitro* and *in vivo* studies performed on PM filter extracts from Utah Valley in an area near a steel mill have documented pulmonary injury or inflammation (Ghio et al., 2004; Dye et al., 2001; Frampton et al., 1999).[101,102,103] These particles have been found to contain high levels of iron, copper, nickel, lead and zinc. In addition, several experimental studies suggest that metals could play a role in PM-induced cardiovascular effects. For example, copper, zinc and vanadium have been shown to induce a range of cardiovascular effects, such as vasoconstriction and vasodilation (Graff et al., 2004; Li et al., 2005; Bagate et al., 2004).[104,105,106]

According to Schwarze et al. (2006) in a review of the effects of metals, study approaches to date have not been able to pinpoint a specific metal or group of metals responsible for the health effects of PM; however, "vanadium, zinc, iron, copper and nickel stand out as potentially more important than other metals."[107]

#### 5.4.1.5 Summary

There is a limited but growing literature addressing the health effects of various PM components, including (but not limited to) sulfate, nitrate, EC, OC, and metals. The conclusions are generally mixed for all individual components, with none either showing consistently greater effects than PM as a whole or demonstrating that they should not be assigned any toxicity. However, the epidemiological evidence base is clearly limited by

---

[98] Bell, M.L. et al., 2009. *op. cit.*

[99] Lippmann M, Ito K, Hwang JS, Maciejczyk P, Chen LC. 2006. Cardiovascular effects of Ni in ambient air. Environ Health Perspect 114:1662–1669.

[100] PE Schwarze et. al., *op. cit.*

[101] Ghio, A.J. 2004. Biological effects of Utah Valley ambient air particles in humans: a review. *Journal of Aerosol Medicine* 17(2): 157-164.

[102] Dye, J. A.; Lehmann, J. R.; McGee, J. K.; Winsett, D. W.; Ledbetter, A. D.; Everitt, J. I.; Ghio, A. J.; Costa, D. L. 2001. Acute pulmonary toxicity of particulate matter filter extracts in rats: coherence with epidemiological studies in Utah Valley residents. Environ. Health Perspect. 109(suppl. 3): 395-403.

[103] Frampton, M. W.; Ghio, A. J.; Samet, J. M.; Carson, J. L.; Carter, J. D.; Devlin, R. B. 1999. Effects of aqueous extracts of $PM_{10}$ filters from the Utah Valley on human airway epithelial cells. Am. J. Physiol. 277: L960-L967.

[104] Graff DW, Cascio WE, Brackhan JA, Devlin RB. 2004. Metal particulate matter components affect gene expression and beat frequency of neonatal rat ventricular myocytes. Environ Health Perspect. Vol. 112(7):792-8.

[105] Li Z, Carter JD, Dailey LA, Huang YC. 2005. Pollutant particles produce vasoconstriction and enhance MAPK signaling via angiotensin type I receptor. Environ Health Perspect. Vol.113(8):1009-14.

[106] Bagate K, Meiring JJ, Gerlofs-Nijland ME, Vincent R, Cassee FR, and Borm PJ. 2004. Vascular effects of ambient particulate matter instillation in spontaneous hypertensive rats. Toxicology and applied pharmacology Vol. 197(1):29-39.

[107] PE Schwarze et. al., *op. cit.*

the high correlations among many PM components (and between those components and PM as a whole), and it is difficult to corroborate this evidence toxicologically given the fact that human exposure to single particle components is not a realistic scenario. More generally, for this evidence base to be applicable to a differential toxicity analysis, it would need to be able to provide quantitative C-R functions for all of the key components, derived in a manner so that the total reflected the observed effects of $PM_{2.5}$ and so that the estimates reflected possible interactions among components. The evidence base cannot currently support this sort of assessment.

### 5.4.2 SOURCE-ORIENTED EVALUATIONS

In light of the high correlations among various particle components, often owing to common sources, a smaller number of studies have used factor analyses and other techniques to determine latent source contributions that can be related with health outcomes (Laden et al, 2000; Mar et al., 2000). [108,109] These studies typically relate daily concentrations of PM components and gaseous co-pollutants to underlying source types (e.g., motor vehicle emissions, soil, etc.), using weighted linear combinations of associated individual variables. Although the results differ somewhat across studies, coal and oil combustion, vegetation burning, and motor vehicle emissions tend to be positively associated with mortality, whereas crustal particles tend to have a lesser association with mortality.

This approach is appealing in many respects, as EPA is evaluating the benefits of control strategies targeting specific sources, and these sorts of analyses can provide insight about which sources are most strongly associated with health outcomes. However, from a benefits analysis perspective, these evaluations have a number of limitations, and are unlikely to yield the evidence necessary for a quantitative differential toxicity analysis.

For example, emissions controls and technological changes may lead to changes in relative concentrations of components over time, complicating the application of a factor-specific C-R function to prospective analyses. For example, the study by Laden et al. (2000) used monitoring data from 1979-1988, at which point lead still served as a reasonable target element for a motor vehicle factor. [110] This term would not be directly applicable to the 812 prospective analysis, whose study period post-dates the phase-out of lead in gasoline. With the numerous regulations that have been implemented or promulgated over the years, it is unlikely that a “source” characterized at a given point in time would be directly applicable to a future scenario.

More generally, it is impractical to link the results of these studies with the outputs obtained from a dispersion model, a necessary condition for application in health benefits analysis. For example, if a study predicted a coal-related PM factor loading heavily on

---

[108] Laden, F.; Neas, L. M.; Dockery, D. W.; Schwartz, J. 2000. Association of fine particulate matter from different sources with daily mortality in six U.S. cities. Environ. Health Perspect. 108: 941-947.

[109] Mar, T. F.; Norris, G. A.; Koenig, J. Q.; Larson, T. V. 2000. *op. cit.*

[110] Laden, F.; Neas, L. M.; Dockery, D. W.; Schwartz, J. 2000. *op. cit.*

sulfur and selenium, characterizing those emissions and modeling those concentrations can prove challenging. Relatedly, the relative contribution of components from a source would vary by distance, complicating the application of a source-specific signature at a given receptor, which would not be the same as the composition of emissions or the signature at a different distance from a source.

Also, any individual PM component may come from a variety of sources. Correlated concentrations and multiple sources of specific components complicate the identification of individual effects of various $PM_{2.5}$ components on a national scale (Bell et al, 2007).[111] Thus, while these studies have tremendous value in interpreting the epidemiological literature, they are not likely to be practical for health benefits analysis.

Despite improved monitoring and a growing database of speciated PM data, significant challenges and uncertainties remain when trying to address the issue of differential toxicity within benefits analysis. For a number of reasons, even with the growth of epidemiological evidence utilizing speciated PM data, it may remain challenging to provide quantitative C-R functions for individual PM components. The reasons for this include:

- Components may interact; effects may not be a linear combination of exposures and may depend on particular combinations of components. Epidemiological studies have not modeled nonlinear combinations, and it would be challenging to capture synergistic or antagonistic effects of particle combinations in light of the numerous covarying exposures, the size of the anticipated signal, and the lack of biological understanding of the potential interactions.
- It will remain difficult for the foreseeable future to assess the concordance of epidemiological and toxicological results. Even if toxicological studies or controlled human exposure studies could determine that specific particle components (e.g., nitrate) do not produce adverse effects at ambient concentrations, it would be difficult for such studies to capture phenomena where particles may be heterogeneous combinations of multiple components, and where some particles may act as carriers for some chemical or biological toxic agent. The increasing use of concentrated ambient particles (CAPs) provides a realistic ambient aerosol for toxicological studies, but has difficulty in separating out the effects of individual components in a way that would be useful for benefits analysis.
- Data remain limited on the spatial and temporal variability of $PM_{2.5}$ components, though as noted above, progress is being made here based on the growing speciation network (Bell et al. 2007). [112]
- Even when epidemiological evidence is derived from the speciation network, the C-R functions for different components will vary by site, and it is difficult to

[111] Bell, M.L. et al., 2007. *op. cit.*

[112] *Ibid.*

determine the extent to which this is related to potential unique aspects of PM composition in each location or to random variability. More generally, in multi-city comparisons using between-city differences to evaluate differential toxicity, it is difficult to isolate the exclusive effect of differential toxicity, given other important effect modifiers and confounders that exist in site-specific studies (e.g., concentration-exposure relationships modified by air conditioning prevalence, vulnerability distributions).

- Control strategies would remove a combination of components that may not be the same as the combinations observed in prior epidemiological or toxicological studies. Understanding the effects of sulfate particles in the past may not be the same as understanding the benefits of removing sulfate particles from the current atmosphere.

These are daunting challenges that are not likely to be resolved soon. However, the literature on the health effects of individual components or component mixtures is growing rapidly, and one could consider how the current epidemiological evidence base could be used to construct sensitivity analyses that remain notional but are logically consistent, as well as how an "ideal" epidemiological evidence base could be used in the future to provide an empirical basis for differential toxicity sensitivity analyses.

In general, these sorts of analyses are likely to rely on time-series estimates for mortality and morbidity, given a sufficient number of studies and sites to formally and quantitatively explore differential toxicity. There are relatively fewer cohort studies, and as described above, only a handful of PM component estimates from those studies. In addition, the differential toxicity analyses would most likely be derived from meta-analyses of single-city epidemiological studies, or from multi-city investigations using Bayesian hierarchical models or related methods, depending on the nature of the available evidence. The latter approach might be preferable, since individual epidemiological studies may report only a subset of components, potentially biasing pooled estimates, but meta-analytic approaches can provide valuable insight in the absence of large multi-city studies.

In either case, this would allow for pooled estimates to be developed for a number of individual components, as done in studies such as Bell et al. (2009). [113] Figure 3 from this paper is replicated below, as it helps to illustrate the potential and pitfalls of such investigations.

---

[113] Bell, M.L. et al., 2009. *op. cit.*



In principle, functions such as these could be used to directly estimate C-R functions for individual PM components. However, this does not account for the covariance among components. For example, ammonium would generally be found bound to either sulfate or nitrate, and many particles covary due to common sources or atmospheric processes. Moreover, if C-R functions were developed per μg/m$^3$ (as would be necessary for a differential toxicity assessment), the values would vary enormously across components, mostly within confidence intervals that are quite large. Focusing on only the high-mass components would make this problem somewhat less intractable, but the uncertainties would remain large in any relative toxicity assessment.

For example, just focusing on EC and V for cardiovascular hospital admissions (which are both statistically significant, reducing uncertainties in the relative toxicity comparison), Bell et al. report a 25.8% increase per interquartile range increase of EC (95% CI: 4.4%, 47.2%), versus a 27.5% increase per interquartile range increase of V (95% CI: 10.6%, 44.4%). Given interquartile ranges of 0.245 μg/m$^3$ for EC and 0.001 μg/m$^3$ for V, a literal interpretation of these functions implies potency for V that is over 200 times that of EC using the central estimates. If these confidence intervals were uncorrelated, a simple simulation method analysis indicates that the 95% confidence interval for the ratio of V potency to EC potency is (-380, 1,900). If the confidence intervals were correlated at the level of correlation between EC and V (0.33), the 95% confidence interval for the ratio would be (-13, 1,400). Even assuming a correlation of 0.90, the 95% confidence interval would be approximately (100, 730).

Clearly, these specific results are dependent on a single study and its values. However, it has been documented previously that comparing ratios of two uncertain distributions will have an extremely large confidence interval, to the extent that estimates of relative

potency using central estimates would be highly misleading (Finkel, 1995).[114] Thus, even "gold standard" epidemiological studies with component data would likely yield relative toxicity values that are quite uncertain. These uncertainties could be reduced if the original studies directly estimated relative potency values, rather than having them interpreted after the fact from published studies.

## 5.6 CONCLUSIONS

We conclude that the current evidentiary base from the epidemiological and toxicological literatures is insufficient to support a meaningful policy-relevant analysis of the implications of estimating avoided mortality using C-R functions based on individual PM components instead of $PM_{2.5}$ mass. The epidemiological evidence collected to date provides limited and inconsistent evidence on the relative potency of the key PM components that are both a significant contributor to, and co-vary with, total PM mass. These data gaps would limit the informativeness of even the most straightforward (linear) combination of potencies. Furthermore, the available epidemiological and toxicological evidence suggests that we are dealing with a much more complex system of particle interactions that could be improperly characterized by a simple linear combination approach. Characterization of any of these more complicated "what if" potency scenarios would require more support from the epidemiological and toxicological literatures and more detailed air quality modeling data on metals and other PM components.

The current data gaps are significant. Advancements that would be needed to undertake a meaningful and interpretable policy relevant treatment of uncertainty in the potency of individual PM components include:

**Epidemiology.** Improved epidemiology is key to development of the population C-R functions. The ideal study of differential toxicity would be a multi-city epidemiological investigation with sufficient information about particle composition and related exposures (varying over both time and location), good characterization of vulnerable populations, and good specificity in health outcomes (with characterization of multiple such outcomes). Useful studies would need to be able to provide quantitative concentration-response functions for all of the key components, both those that co-vary with PM mass and others (e.g., metals) that have been implicated in existing studies, derived in a manner so that the total reflected the observed effects of $PM_{2.5}$ and so that the estimates reflected possible interactions and correlations among components. For reasons discussed above, studies that provide estimates of potency of individual components from single pollutant models are less useful due to extensive correlations among particles and the wide uncertainty bounds associated with developing potency ratios across such results.

Multi-city epidemiological investigations or meta-analyses of numerous individual-city studies could also provide insights about differential toxicity by investigating compositional/correlational factors explaining between-city variability. Approaches could include meta-regression techniques or forms of cluster analysis, which have been

---

[114] Finkel, A.M. 1995. Towards Less Misleading Comparisons of Uncertain Risks: The Example of Aflatoxin and Alar. Environmental Health Perspectives, Vol. 103(4), 376-385.

successful in related analyses. However, as discussed above, such analyses would be challenged by the fact that numerous characteristics associated with exposures or outcomes vary across cities and regions, including weather, personal exposure patterns (driven by air conditioning and other factors), and vulnerability characteristics. Moreover, the relative consistency of estimates across settings in the present literature would indicate the likely challenges in such an assessment. However, such assessments would likely represent the only means for developing quantitative estimates of relative toxicity and should be explored.

**Source-oriented epidemiologic studies.** While these studies are intrinsically limited by the fact that source contributions vary spatially and by the challenges in linking source-oriented epidemiologic studies with outputs from atmospheric models used in health benefits analysis, there may be limited settings in which such studies would be fruitful. Specifically, in the near-roadway environment, epidemiological studies that characterize the contribution from various traffic sources could ultimately be applied in the narrow context of evaluating the health benefits for near-field populations associated with primary pollutant control strategies. Factor-analytic approaches would need to be developed jointly with atmospheric model refinements to ensure that the relevant pollutants could be characterized and that the correlation structures implicit in the source-oriented factors exist within the designated receptor domain.

**Toxicology.** While not likely to provide the basis for the C-R function, sound toxicology is needed to provide corroboration of biological plausibility and mechanisms of disease and to contribute to our understanding of uncertainty in potency estimates. In theory, sound toxicological evidence could help to determine the subset of constituents plausibly associated with targeted health outcomes, allowing for other constituents to be dismissed as non-causal and therefore excluded from epidemiological investigation. However, developing such toxicological evidence would be challenging. Future studies should not focus on the toxic effects of exposures to individual components; rather they should focus on mixtures, doses, and outcomes (e.g., cardiovascular disease and mortality) that would be relevant to the exposures experienced in epidemiological studies. Ideally these would be conducted on animal populations with disease models that capture particularly vulnerable individuals. Toxicological studies that are conducted in parallel with multi-city epidemiological studies and that evaluate exposures to PM samples collected from at least a subset of the cities being studied could help provide useful corroborating toxicological evidence that may identify key elements of more potent PM mixtures.

**Air Quality Modeling**. As attention shifts towards the role of components such as metals that contribute less mass to overall $PM_{2.5}$, or to components that may be prominent indicators of key PM sources, air quality models need to adapt to model the transport and transformation of these components to produce concentration estimates that could be coupled with more traditionally modeled PM components in a benefits analysis.

# CHAPTER 6 | PARTICULATE MATTER/MORTALITY CESSATION LAG

## 6.1 SELECTION OF PM/MORTALITY LAG STRUCTURES

Based in part on prior advice from the Advisory Council on Clean Air Compliance Analysis (hereafter, the Council), EPA typically assumes that there is a time lag between reductions in particulate matter (PM) exposures in a population and the full realization of reductions in premature mortality. Within the context of benefits analyses, this term is often referred to as "cessation lag." The existence of such a lag is important for the valuation of reductions in premature mortality because economic theory suggests that dollar-based representations of health effect incidence changes occurring in the future should be discounted. We applied a five percent discount rate to calculate the net present value of a stream of future benefits that begins in each target year of the analysis (i.e., 2000, 2010, or 2020).

The Project Team explored the effect on monetized benefits of model uncertainty related to the cessation lag for PM-related reductions in mortality risk. We selected two alternative cessation lag structures to include in our analysis in addition to the default lag employed in the primary 812 benefits assessment (the 20-year distributed lag). The default lag and one of the alternative lags (five-year distributed lag) have been used by EPA in previous benefits analyses and are step functions. The third is a new alternative lag structure, which we developed based on an exponential decay function (hereafter, the "smooth function"). We describe below the default cessation lag structure as well as the two alternative structures and the rationale for including them in the analysis.

### 6.1.1 DEFAULT TWENTY-YEAR DISTRIBUTED LAG

The 20-year distributed lag, which is applied in the integrated report, assumes that 30 percent of the total mortality reductions occur in the first year, 50 percent are distributed evenly among years two through five, and the remaining 20 percent are distributed evenly among years six through 20. In 2002, the National Research Council (NRC) of the National Academy of Sciences evaluated EPA's use of the five-year distributed lag model in previous air pollution benefits analysis and found little justification for the five-year time course of exposure and outcome. In response to the NRC report, the EPA identified three alternative options in the analytic blueprint for the Second Section 812 Prospective Study:[115] (1) the currently employed five-year distributed lag, (2) an alternative based on a range of lag structures from zero to 20-30 years, and (3) construction of a 3-parameter Weibull distribution configured to match (undefined) expected low, most likely, and

[115] US EPA (2003). Benefits and Costs of the Clean Air Act 1990-2020: Revised Analytical Plan for EPA's Second Prospective Analysis. Prepared by Industrial Economics, Inc for the Office of Policy Analysis and Review.

expected high values. The EPA requested comment from the Council's Health Effects Subcommittee (HES) on these three approaches.

In a March 2004 advisory report, the Council HES provided an in-depth assessment of the cessation lag issue and the three approaches put forth by the EPA.[116] This report echoed the earlier reports by the HES predecessor, the Health and Ecological Effects Subcommittee (HEES), and NRC in noting that the empirical evidence is lacking to inform the choice of lag distribution directly and further, that there is little evidence supporting a five-year cessation lag structure. The Council HES urged the EPA "to begin to move from the relatively arbitrary assumptions of the five-year lag structure to an approach based on some plausible models of the disease process involved," and goes on to state that lacking direct empirical evidence, "new insights regarding the shape of the cessation lag can only come from improved understanding of the mechanism of the exposure-response relationship." Taking this advice into consideration and working with the Office of Management and Budget (OMB) on the non-road diesel rule, EPA identified an alternative lag structure that assumes 20 percent of the mortality reductions occur in the first year, 50 percent are distributed evenly among years two through five, and the remaining 30 percent are distributed evenly among years six through 20.

A December 6, 2004 letter from the Council reviewed the 20-year lag proposed by the EPA and states that "this proposal is broadly consistent with our recommendations, and preferable to the five-year distributed lag used earlier," but suggests a slight modification.[117] Based on the air pollution evidence, which is generally suggestive of greater impacts in the first year, and some recent evidence from intervention studies, which suggest that substantial benefits might occur in the first year, the Council recommended that the EPA use a 20-year lag structure, where 30 percent of the mortality reductions occur in the first year, 50 percent are distributed evenly among years two through five, and the remaining 20 percent are distributed evenly among years six through 20. This is the 20-year lag structure applied as the basis for the primary benefits estimate.

### 6.1.2 FIVE-YEAR DISTRIBUTED LAG

The first alternative lag structure we employed as one of our alternatives is a five-year distributed lag structure, which was used in *The Benefits and Costs of the Clean Air Act, 1990 to 2010* and in other rulemaking analyses, such as the Heavy Duty Diesel Regulatory Impact Analysis (RIA) and the Tier II Motor Vehicle Emissions Standards

---

[116] Science Advisory Board (2004). Advisory on Plans for Health Effects Analysis in the Analytical Plan for EPA's Second Prospective Analysis—Benefits and Costs of the Clean Air Act, 1990-2020: Advisory by the Health Effects Subcommittee of the Advisory Council on Clean Air Compliance Analysis. EPA-SAB-COUNCIL-ADV-04-002.

[117] Science Advisory Board (2004). *Advisory Council on Clean Air Compliance Analysis Response to Agency Request on Cessation Lag*. Letter from the Health Effects Subcommittee to the U.S. Environmental Protection Agency Administrator, December.

RIA.[118] The five-year distributed lag assumes that 25 percent of the mortality reductions occur in the first year, an additional 25 percent occur in the second year, and the remaining 50 percent are distributed evenly among years three through five. This five-year distributed lag structure was adopted by EPA in 1999 after review of various structures by the HEES. EPA asked the HEES to consider three lag options: (1) a zero lag, the current practice at the time, (2) a five-year distributed lag, which had been used in an illustrative analysis in the proposed Tier II RIA and (3) a 15-year lag proposed by OMB that assumed all incidence changes occur in the 15th year following the change in exposure. The HEES concluded that the five-year distributed lag was preferable to the zero and 15-year options, both of which they considered implausible. The HEES also indicated that available data on smoking cessation generally supported the five-year distributed lag (although it did not provide any specific citations). The health effects of PM exposure are similar to other long-term inhalation exposures, such as cigarette smoking. Therefore, HEES considered information from the smoking cessation literature relevant to the PM/mortality cessation lag question.

### 6.1.3 SMOOTH FUNCTION LAG

In its 2004 letter recommending a 20-year lag structure, the Council urged EPA to review and keep abreast of the emerging literature in this area, including information from the smoking cessation literature; provide the best available justification for the lag structure used; and strongly consider conducting sensitivity analyses of other possible lag structures. Specifically, the Council indicated that EPA should consider using smoothed distributions. In response to these suggestions, the Project Team performed a literature review that included studies published since 2004. Using the PubMed search engine (www.pubmed.gov), we searched for articles related to PM/mortality cessation lag as well as recently published papers on smoking cessation and environmental tobacco smoke (ETS) exposure cessation.

Through our search of literature exploring the PM/mortality cessation lag, we identified a 2005 paper by Roosli et al.[119] The authors of this study developed a smooth function lag that assumes that mortality risks decrease exponentially after exposure termination. This assumption is based on the fact that an exponential model is often observed in biological systems. We chose to base our third lag structure on the approach employed by this paper because it allowed us to use data from existing PM/mortality cohort studies as well as intervention studies as described further below. In addition, its use is consistent with

---

[118] United States Environmental Protection Agency (1999). *The Benefits and Costs of the Clean Air Act 1990 to 2010*. EPA Report to Congress.

United States Environmental Protection Agency (2000). *Regulatory Impact Analysis: Heavy-Duty Engine and Vehicle Standards and Highway Diesel Fuel Sulfur Control Requirements*. Office of Air and Radiation. EPA420-R-00-026.

United States Environmental Protection Agency (1999). *Regulatory Impact Analysis - Control of Air Pollution from New Motor Vehicles: Tier 2 Motor Vehicle Emissions Standards and Gasoline Sulfur Control Requirements*. Office of Air and Radiation. EPA420-R-99-023.

[119] Roosli, M., N. Kunzli, et al. (2005). Years of life lost attributable to air pollution in Switzerland: dynamic exposure-response model. *International Journal of Epidemiology* 34(5): 1029-35.

the Council's advice to explore smoothed distributions. Details of the lag structure are provided below.

#### 6.1.3.1 Description of the Roosli Model

Roosli et al. developed a dynamic model that estimates the course of mortality after a sudden reduction of air pollution exposure. The model assumes an exponential decrease of risk of death after exposure termination at time $t_0$, of the form $risk = \exp^{-kt}$, where $k$ is the time constant and $t$ is the time after $t_0$. The relative risk from air pollution (RR) at a given time ($t$) can be calculated from the excess relative risk (ERR) attributable to air pollution from PM cohort studies ($ERR = RR - R_0$), as follows:

$$RR(t) = ERR \cdot \exp^{-kt} + R_0 , \qquad (1)$$

where $R_0$ is the baseline relative risk in the absence of air pollution ($R_0 = 1$). After cessation of exposure, mortality will start to decline and approach the baseline level. The change in mortality ($\Delta M$), in units of percent-years, can be derived from Equation (1) as follows:

$$\Delta M = ERR \cdot t - \int_0^t ERR \cdot \exp^{-kt} \, dt \qquad (2)$$

Estimates of $\Delta M$ can be obtained from PM intervention studies. Integrating Equation (2) gives:

$$\Delta M = ERR \cdot t - \frac{ERR}{k} + \frac{ERR}{k} \exp^{-kt} . \qquad (3)$$

#### 6.1.3.2 Application of the Roosli Model

We first identified possible PM cohort studies to use as the source of *ERR* values in Equation 3. We included the follow-up analyses of the two major existing cohorts, the Six Cities Cohort (Laden et al., 2006) and the American Cancer Society (ACS) Cohort (Pope et al., 2002).[120,121] We standardized the published RR estimates from these two studies to represent a 10 μg/m$^3$ increase in $PM_{10}$.[122] In addition, we used the primary estimate of the PM/mortality concentration-response (C-R) function used in the integrated report, which is based on a Weibull distribution of C-R coefficients with a mean of 1.06 percent decrease in annual all-cause mortality per 1 μg/m$^3$ and an interquartile range bracketed approximately by the Pope et al. 2002 ACS estimate (0.55 percent) on the low

[120] Pope, CA III, et al. (2002). Lung cancer, cardiopulmonary mortality, and long-term exposure to fine particulate air pollution. *JAMA* 287: 1132-1141.

[121] Laden, F., et al. (2006). Reduction in fine particulate air pollution and mortality – Extended follow-up of the Harvard Six Cities Study. *Am J Respir Crit Care Med* 173: 667-672.

[122] In order to convert the published RRs from $PM_{2.5}$ to $PM_{10}$, we used the same factor used in the Roosli et al. analysis of 1.33.

end and the Six Cities Laden et al., 2006 extended follow-up estimate (1.5 percent) at the high end.

We then collected information from PM intervention studies to develop estimates of $\Delta M$ for Equation 3. In particular, we relied on data on the time course of the change in mortality from two PM intervention studies to determine $\Delta M$. Clancy et al. (2002) analyzed the change in mortality in Dublin following the ban of coal sales (hereafter, the "Dublin Coal Ban" study).[123] This study found a 1.6 percent decrease in mortality per 10 $\mu g/m^3$ $PM_{10}$ over a six-year period, resulting in a $\Delta M$ of 0.1 percent-years (0.016 × 6). A study by Pope et al. (1992) examined the change in mortality resulting from the closure of a steel mill in the Utah Valley (hereafter, the "Utah Valley" study).[124] This study reported a 2.1 percent decrease in mortality per 10 $\mu g/m^3$ $PM_{10}$ over a 13-month period (corresponding to a $\Delta M$ of 0.02 percent-years (0.021 × 1.083)).[125]

We iteratively solved Equation (3), to calculate values for the time constant, *k*, using the $\Delta M$ values from the two intervention studies along with the *ERR* values from the two cohort studies.

Finally, to address the Council's suggestion to incorporate data from the smoking cessation literature, we also used information from a study that developed a dynamic model that took into account the decrease in risk after the termination of an exposure to air pollution using smoking cessation as a proxy for air pollution exposure (Leksell and Rabl, 2001).[126,127,128] This study relied on a time constant of 9.55 years, which was based on studies examining the body's ability to repair the damage after an individual stops smoking. This was derived by calculating a weighted average of a time constant of 1.5 years for acute myocardial infarction and stroke (Lightwood and Glantz, 1997; weighted with 0.3) and a time constant of 13 years for total mortality (Doll et al., 1994; weighted with 0.7).[129,130]

---

[123] Clancy, L., P. Goodman, et al. (2002). Effect of air-pollution control on death rates in Dublin, Ireland: an intervention study. *Lancet* 360(9341): 1210-4.

[124] Pope, C.A., J. Schwartz, M.R. Ransom. (1992). Daily mortality and PM10 pollution in Utah Valley. *Archives of Environmental Health* 47:211-17.

[125] Note that we also considered data from the Six Cities study update (Laden et al., 2006), which found a 27 percent decrease in mortality risk per 10 $\mu g/m^3$-reduction of $PM_{2.5}$ in Period 2 (1990-1998) when controlling for exposure in Period 1 (1974-1989). However, the value of k resulting from this estimate is very large and therefore is equivalent to applying no lag. Therefore, we did not include this in our sensitivity analysis.

[126] Leksell, I. And Rabl, A. (2001). Air pollution and mortality: Quantification and valuation of years of life lost. *Risk Analysis* 21(5): 843-857.

[127] An external reviewer, Lauraine Chestnut of Stratus Consulting, Inc., also recommended deriving a k value from Leksell and Rabl (2001). Her comments and recommendations are summarized in a memorandum dated March 31, 2009 (Chestnut, 2009).

[128] We were unable to identify any articles providing information on the length of the lag between the cessation of environmental tobacco smoke (ETS) exposure and mortality. We identified several additional studies examining the change in health risks after cessation of smoking, however, few specifically estimated all-cause mortality effects.

[129] Lightwood, J.M. and Glantz, S.A. (1997). Short-term economic and health benefits of smoking cessation: Myocardial infarction and stroke. *Circulation* 96: 1089-1096.

We then used the derived values of $k$ to calculate the decrease in risk after exposure termination using the following equation: $risk = \exp^{-kt}$. Exhibit 6-1 below provides the $k$ values we used in our uncertainty analysis as well as the studies underlying them.

**EXHIBIT 6-1. VALUES OF THE TIME CONSTANT (k) USED IN THE EXPONENTIAL DECAY PM/MORTALITY CESSATION LAG FUNCTION**

| VALUE OF K | COHORT STUDY | INTERVENTION STUDY |
|---|---|---|
| 0.05 | Six Cities[1] | Dublin Coal Ban[2] |
| 0.08 | Primary Estimate | Dublin Coal Ban |
| 0.10 | Smoking Cessation Literature[3] | |
| 0.15 | ACS[4] | Dublin Coal Ban |
| 0.37 | Six Cities | Utah Valley[5] |
| 0.57 | Primary Estimate | Utah Valley |
| 1.24 | ACS | Utah Valley |

[1] Laden, F., et al. (2006). Reduction in fine particulate air pollution and mortality – Extended follow-up of the Harvard Six Cities Study. *Am J Respir Crit Care Med* 173: 667-672.
[2] Clancy, L., P. Goodman, et al. (2002). Effect of air-pollution control on death rates in Dublin, Ireland: an intervention study. *Lancet* 360(9341): 1210-4.
[3] Leksell, I. And Rabl, A. (2001). Air pollution and mortality: Quantification and valuation of years of life lost. *Risk Analysis* 21(5): 843-857.
[4] Pope, CA III, et al. (2002). Lung cancer, cardiopulmonary mortality, and long-term exposure to fine particulate air pollution. *JAMA* 287: 1132-1141.
[5] Pope, C.A., J. Schwartz, M.R. Ransom. (1992). Daily mortality and PM10 pollution in Utah Valley. *Archives of Environmental Health* 47:211-17.

Exhibit 6-2 below displays the relationship between the *ERR* and $\Delta M$ terms in Equation 2 when deriving the k values. Combining the *ERR*s from the cohort studies with the Dublin Coal Ban study (shown in the top three graphs) results in lower k values (i.e., a more gradual decline in risk) than when the Utah Valley intervention study is used. This is because the Utah Valley study found a larger total decrease in mortality (2.1 percent versus 1.6 percent) within a shorter timeframe (13 months versus 6 years). Therefore, the evidence from this study supports a cessation lag structure where deaths are accrued more quickly after the PM change. In addition, for a given intervention study (and therefore $\Delta M$), smaller *ERR*s result in higher k values. For instance, the k derived from the combination of the Utah Valley intervention study and the Laden cohort study is 0.37, compared to a k of 1.24 from the Pope cohort study. This is because in order to achieve the percent reduction in mortality found in the intervention study within the given

[130] Doll, R., et al. (1994). Mortality in relation to smoking: 40 years' observations on British doctors. *British Medical Journal* 309: 901-911.

timeframe, *t*, a smaller *ERR* requires a more rapid decline to occur in the *ERR(t)* function, and hence a larger decay constant.

## 6.2 CALCULATION OF MORTALITY INCIDENCE AND VALUATION USING LAG STRUCTURES

BenMAP currently does not have the capability to apply a cessation lag to the mortality incidence results data. Therefore, the Project Team constructed a spreadsheet that would apply alternate cessation lag models to the BenMAP results as a post-processing step.

The spreadsheet uses the estimates of avoided deaths from BenMAP generated from the use of the Community Multi-scale Air Quality model (CMAQ) exposure model for each target year, along with an estimate of the default Value of a Statistical Life (VSL) of $7.4 million in 1990 (in 2006$), and a five percent discount rate, to calculate the net present economic value of the modeled stream of monetized benefits under each lag assumption.[131]

## 6.3 EFFECT OF ALTERNATIVE CESSATION LAG STRUCTURES

The exponential decay function that we employed as a new alternative lag structure relies on time constant values derived from combining information from a particular PM cohort and intervention study pair. Therefore, use of this smooth function implies that selecting an alternate C-R function will affect not only the total avoided mortality (as described in Chapter 4) but also the way in which that avoided mortality accrues over time following a change in exposure. We first present the effects of applying the two step functions and the exponential functions derived from the primary C-R function to the mortality incidence results generated with the primary C-R function. We also compare the results of applying the exponential decay function lag based on the smoking literature to the primary C-R function. We next present the relative benefits resulting from applying the two step functions and the exponential decay functions derived from the Pope and Laden studies to the mortality incidence results generated from Pope and Laden C-R functions.

### 6.3.1 CESSATION LAG RESULTS BASED ON THE PRIMARY C-R FUNCTION ESTIMATE

Exhibits 6-3 and 6-4 show the difference in the timing of avoided deaths due to Clean Air Act Amendment (CAAA)-related $PM_{2.5}$ changes in 2020 when applying the various cessation lag structures to the primary mortality incidence results. Exhibit 6-3 shows the number of deaths that would occur in each year and Exhibit 6-4 compares the cumulative number of avoided deaths over time. Exhibit 6-5 displays the mean valuation results using the default 20-year distributed lag and the percent change in valuation that occurs as a result of employing each of the alternative cessation lag structures. We present below a summary of the key impacts of varying the cessation lag model on the primary estimates of mortality reductions due to CAAA programs:

[131] This approach is equivalent to discounting future VSLs from the years in which mortality reductions are expected to occur and multiplying each discounted VSL times avoided deaths in that year. The approach does not discount future avoided deaths.

**EXHIBIT 6-2. RELATIONSHIP BETWEEN THE CHANGE IN MORTALITY OBSERVATION STUDIES AND THE EXCESS RELATIVE RISKS FROM PM COHORT STUDIES WHEN DERIVING AN EXPONENTIAL DECAY TIME CONSTANT**



- The five-year distributed lag valuation results are roughly nine percent higher than the 20-year distributed lag assumption. This is due to the fact that the avoided deaths in the 20-year lag assumption are spread over a longer time period and the corresponding VSLs are more heavily discounted, while under the five-year lag assumption, 50 percent of deaths occur within the first two years and all deaths occur within five years.
- The results based on the smooth function lag structure vary depending on the time constant selected. When relying on the k value derived from the primary C-R function and the Dublin Coal Ban study (k = 0.08), the economic value decreases 23 percent from the default. This reflects the fact that the avoided deaths are spread over a longer period of time after the exposure change. The benefits that accrue far into the future are assigned less economic value because the VSL is more heavily discounted. Applying the k value derived from primary C-R function and the Utah Valley study (k = 0.57) results in valuation estimates that are 10 percent higher than the default lag assumption. Use of the k value derived from the smoking cessation literature (k = 0.10) results in a monetary benefits estimate that is 18 percent lower than the 20-year distributed lag.
- Assuming no lag, and therefore no discounting of VSL, results in an increase in benefits of approximately 16 percent above the default, 20-year distributed lag.

**EXHIBIT 6-3. ALTERNATE CESSATION LAGS - ANNUAL DEATHS (PRIMARY ESTIMATE)**



**EXHIBIT 6-4. ALTERNATE CESSATION LAGS - CUMULATIVE DEATHS (PRIMARY ESTIMATE)**




**EXHIBIT 6-5. VALUATION RESULTS FOR THE PRIMARY C-R FUNCTION ESTIMATE AND THE EFFECT OF USING ALTERNATIVE LAG STRUCTURES**

| MORTALITY CESSATION LAG | |
|---|---|
| **Primary Estimate with 20-Year Distributed Lag - 2000** | **710,000** |
| **Primary Estimate with 20-Year Distributed Lag - 2010** | **1,200,000** |
| **Primary Estimate with 20-Year Distributed Lag - 2020** | **1,700,000** |
| | ***Percent Change from the Primary Estimate with Default Lag**** |
| Primary Estimate with 5-Year Distributed Lag | 9% |
| Primary Estimate with Smooth Function, k = 0.08 (Dublin Intervention Study) | -23% |
| Primary Estimate with Smooth Function, k = 0.10 (Smoking cessation) | -18% |
| Primary Estimate with Smooth Function, k = 0.57 (Utah Valley Intervention Study) | 10% |
| No Lag, No Discounting | 16% |
| * All values in the table represent the percent change from the mean primary estimate. Percent change estimates do not vary by target year. | |

### 6.3.2 CESSATION LAG RESULTS BASED ON POPE ET AL., 2002

Exhibits 6-6 and 6-7 show the difference in the timing of avoided deaths due to CAAA-related $PM_{2.5}$ changes in 2020 when applying the various cessation lag structures to the Pope mortality incidence results. Exhibit 6-6 shows the number of deaths that would occur in each year and Exhibit 6-7 compares the cumulative number of avoided deaths over time. Exhibit 6-8 displays the percent change in valuation results from the primary estimate (i.e., the primary C-R function estimate with the 20-year distributed lag) as a result of employing each of the alternative lag structures to the Pope incidence results. We present below a summary of the key results of varying both the C-R function employed and the cessation lag model on the primary estimates of avoided mortality due to CAAA programs:

- The use of the Pope et al. incidence estimates along with the default 20-year distributed lag result in valuation estimates that are 43 percent lower than the primary estimate. Since we are only varying the incidence estimate and not the lag structure, this difference is solely due to the different magnitudes of the two C-R functions.
- Applying the 5-year distributed lag to the Pope incidence results in a benefits estimate that is 42 percent lower than the primary estimate. In this case, the reduction in avoided mortality due to the lower Pope C-R coefficient dominates the effect of shortening the lag period and increasing the percentage of benefits accrued in early years.
- The results based on the smooth function lag structure vary depending on the time constant selected. When relying on the k value derived from Pope and the Dublin Coal Ban study (k = 0.15), the economic value decreases 52 percent from the default. This reflects the fact that the avoided deaths are spread over a longer period of time after the exposure change, but again the bulk of the impact comes from changing the C-R function. Applying the k value derived from Pope and the Utah Valley study (k = 1.24) results in valuation estimates that are similar to assuming no lag, since 71 percent of avoided mortality occurs within the first year. These results are 37 percent lower than the default lag assumption, again illustrating that the results are less sensitive to the choice of cessation lag than they are to the choice of C-R coefficient.

**EXHIBIT 6-6. ALTERNATE CESSATION LAGS - ANNUAL DEATHS (POPE ET AL., 2002)**



**EXHIBIT 6-7. ALTERNATE CESSATION LAGS - CUMULATIVE DEATHS (POPE ET AL., 2002)**




**EXHIBIT 6-8. RELATIVE VALUATION RESULTS USING ALTERNATIVE LAG STRUCTURES - POPE ET AL., 2002**

| MORTALITY CESSATION LAG | PERCENT CHANGE FROM PRIMARY ESTIMATE WITH DEFAULT LAG* |
|---|---|
| Pope et al. 2002 with 20-Year Distributed Lag | -43% |
| Pope et al. 2002 with 5-Year Distributed Lag | -42% |
| Pope et al. 2002 with Smooth Function, k = 0.15 (Dublin Intervention Study) | -52% |
| Pope et al. 2002 with Smooth Function, k = 1.24 (Utah Valley Intervention Study) | -37% |

* All values in the table represent the percent change from the mean primary estimate. Percent change estimates do not vary by target year.

### 6.3.3 CESSATION LAG RESULTS BASED ON LADEN ET AL., 2006

Exhibits 6-9 and 6-10 show the difference in the timing of avoided deaths due to CAAA-related $PM_{2.5}$ changes in 2020 when applying the various cessation lag structures to the Laden mortality incidence results. Exhibit 6-9 shows the number of deaths that would occur in each year and Exhibit 6-10 compares the cumulative number of avoided deaths over time. Exhibit 6-11 displays the percent change in valuation results from the primary estimate (i.e., the primary C-R function estimate with the 20-year distributed lag) as a result of employing each of the alternative lag structures to the Laden incidence results. We present below a summary of the key results of varying both the C-R function employed and the cessation lag model on the primary estimates of avoided mortality due to CAAA programs:

- The use of the Laden incidence results with the 20-year distributed lag result in benefits estimates that are 37 percent higher than the primary estimate, due to the larger RR reported by Laden et al. as compared with the primary C-R function.
- Applying the 5-year distributed lag to the Laden incidence estimates results in benefits that are 47 percent higher than the primary estimate. This is due to both the difference in the magnitude of the C-R functions as well as the fact that the avoided deaths in the 20-year lag assumption are spread over a longer time period and the corresponding VSLs are more heavily discounted, while under the five-year lag assumption, 50 percent of deaths occur within the first two years and all deaths occur within five years. In this case, the increase in avoided mortality due to the higher Laden C-R coefficient dominates the effect of shortening the lag period and increasing the percentage of benefits accrued in early years.
- As with the primary C-R function estimate and the Pope results, the results based on the smooth function lag structure vary depending on the intervention study selected. When relying on the k value derived from Laden and the Dublin Coal Ban study (k = 0.05), the economic value is 12 percent lower the primary estimate. Application of this time constant spreads the avoided deaths over a very long time period, causing the economic value to be heavily reduced due to discounting. In this case, the application of the alternative lag dominates over the different C-R function, reducing the benefits estimate below the primary estimate. Applying the k value derived from Laden and the Utah Valley study (k = 0.37) results in valuation estimates that are 47 percent higher than the default value, a similar estimate to the five-year lag application.

**EXHIBIT 6-9. ALTERNATE CESSATION LAGS - ANNUAL DEATHS (LADEN ET AL., 2006)**



### EXHIBIT 6-10. ALTERNATE CESSATION LAGS - CUMULATIVE DEATHS (LADEN ET AL., 2006)




### EXHIBIT 6-11. MEAN VALUATION RESULTS USING ALTERNATIVE LAG STRUCTURES – LADEN ET AL., 2006

| MORTALITY CESSATION LAG | PERCENT CHANGE FROM PRIMARY ESTIMATE WITH DEFAULT LAG* |
|---|---|
| Laden et al. 2006 with 20-Year Distributed Lag | 38% |
| Laden et al. 2006 with 5-Year Distributed Lag | 50% |
| Laden et al. 2006 with Smooth Function, k = 0.05 (Dublin Intervention Study) | -13% |
| Laden et al. 2006 with Smooth Function, k = 0.37 (Utah Valley Intervention Study) | 45% |
| * All values in the table represent the percent change from the mean primary estimate. Percent change estimates do not vary by target year. | |

# CHAPTER 7 | DYNAMIC POPULATION MODELING

## 7.1 INTRODUCTION

EPA's standard approach to estimating the mortality effects of air pollutant exposure involves application of the BenMAP tool. Although BenMAP incorporates growth in population over time, the fundamental approach is based on a static population model, which does not differ across scenarios or update over time.

In this chapter, we describe the Project Team's deployment of a supplementary approach to $PM_{2.5}$-related premature mortality and population effects using a dynamic population model. The dynamic population simulation model was developed with EPA funding and is described briefly in this chapter and in detail elsewhere.[132]

## 7.2 DESCRIPTION OF THE POPULATION SIMULATION MODEL

The dynamic population simulation model we applied is a spreadsheet-based approach that is based on principles established in prior research.[133] The model was designed to track the effect of alternative assumptions about the mortality effects of $PM_{2.5}$ in the U.S. population over time. The tool incorporates detailed life table data for historical years, by age, gender, and cause of death, obtained from the Census Bureau and the Centers for Disease Control and Prevention (CDC). It also incorporates Census mortality and population projections for future years, again by age and gender, using the projected death and birth rates that underlie the Census Bureau's published population projections.

This model allows users to:

- Simulate population in the U.S. by single year of age and gender for years between 1990 and 2050 under alternative assumptions about the degree of hazard posed by air pollution relative to baseline historical and projected Census mortality rates;
- Estimate changes in life years relative to baseline Census mortality rates;
- Apply air pollution hazards differentially by cause of death; and

[132] Industrial Economics, Inc. (2006). *Population Simulation Model for Air Pollution Hazards, Version 1.1 - User Manual and Documentation*. Prepared for the Office of Policy Analysis and Review, U.S. Environmental Protection Agency, September.

[133] See, for example, B.G. Miller and J.F. Hurley, "Life table methods for quantitative impact assessments in chronic mortality," *Journal of Epidemiology and Community Health*, 57:200–206, 2003, and Röösli, M., N. Künzli, C. Braun-Fahrländer, and M. Egger. 2005. Years of life lost attributable to air pollution in Switzerland: Dynamic exposure-response model. *International Journal of Epidemiology*. 34(5):1029-1035.

- Analyze the effect of alternative cessation lag structures on the timing of total mortality and on total life years in the U.S. population, based on differential application by cause of death or other specifications of cessation lag.

The model provides users the capability to manually enter a user-specified beta coefficient or use the epidemiologic data pre-loaded into the model, and accounts for the impact of overlapping cessation lags for each change to determine the net impact on mortality hazard in each year. In addition, users can specify the trajectory of PM changes over time as either a step function or through linear interpolation between target years. Users can also incorporate a $PM_{2.5}$ threshold concentration, explore the impacts of varying susceptibility to air pollution by age; and, using the Crystal Ball™ spreadsheet overlay software, can run a version of the model using probabilistic inputs for the beta coefficient and threshold concentration to model the effect of uncertainty in these parameters on the outcome measures.

All calculations and results in the model are conducted at the national level, using average changes in national average PM levels or population-weighted exposure. The model can be used to estimate changes in mortality risk for years between 1990 and 2050. The temporal range provides a "run-up" period using the more highly resolved by-cause mortality data available for historical years, and allows for testing of hypotheses on a retrospective and prospective basis.

The model consists of five linked components, as illustrated in Exhibit 7-1: Inputs, Hazard Estimation, Baseline Life Table, Regulatory Life Table, and Outputs. The five components include seven spreadsheets in total, one each for Inputs, Hazard Estimation, and Outputs, and two each (one for males and one for females) for the Baseline and Regulatory Life Table Modules.

## 7.3 APPLICATION OF THE POPULATION SIMULATION MODEL

The Project Team used the spreadsheet-based dynamic population simulation model described above to explore the effect of CAAA-related PM changes on the population. The population simulation model at this time can only estimate changes in mortality due to a single change in $PM_{2.5}$ nationwide. However, the CMAQ output consists of $PM_{2.5}$ concentrations at the CMAQ 36 km grid cell level. Therefore, we calculated national population-weighted average $PM_{2.5}$ concentrations for each target year and scenario (*with*- and *without-CAAA*) using the CMAQ data for the core scenarios and population data at the CMAQ 36 km grid cell level generated using EPA's PopGrid program.[134]

[134] This program relies on population projections from Woods and Poole.

**EXHIBIT 7-1. CONCEPTUAL FRAMEWORK FOR UPDATED POPULATION SIMULATION MODEL**




We then input the incremental difference in $PM_{2.5}$ concentration between the baseline and control scenario for the first target year (2000) and then the incremental difference in $PM_{2.5}$ concentration from the previous target year to the current target year for 2010 and 2020. We input incremental changes rather than absolute changes in PM because the population simulation model assumes that each concentration change is permanent. Therefore, each subsequent change results in an impact on the mortality rate equivalent to the cumulative total effect of air pollution changes up to that point in time. We also assumed that the PM changes would occur gradually over time. For instance, we took the total CMAQ-derived PM change in 2000 and spread it evenly between 1990 and 2000, assuming a linear trajectory. In addition, we applied the default 20-year distributed lag to each PM change. We chose to apply this incremental, linear change in PM because it is a standard option in the population simulation model and it is a reasonably close approximation of how CAAA-related PM changes would occur over time and how the baseline mortality rate would be affected in the control scenario.

The results presented below are based on application of the Pope et al. (2002) PM C-R function and EPA's current standard 20-year distributed cessation lag. Other C-R function and cessation lag assumptions are possible in the model, but were not explored for this draft. No threshold was applied.

## 7.4 RESULTS

Exhibits 7-2 through 7-4 below provide the standard output from the population simulation model for the runs configured as outlined above, in terms of changes in number of deaths per year, life years gained, and changes in period conditional life expectancy. Exhibit 7-2 provides the estimated change in number of deaths per year by age cohort for the simulation period 1990 through 2050. The estimates presented are for a single year (they are not cumulative for the prior or next five-year period) based on differences in population tables by cohort and year between two life tables – one that simulates population with the CAAA, which is our baseline scenario, and one that simulates population without the CAAA, a scenario with higher PM concentrations and, as a consequence higher mortality rates in cohorts where the PM C-R function applies (adults age 30 and over). The estimates represent differences from the baseline, *with-CAAA* scenario, so most of the estimates are negative, indicating higher mortality in the *without-CAAA* scenario. The simulation could have been run in the opposite direction, but the Project Team believes that the baseline population data from Census is meant to illustrate mortality rates consistent with the factual, *with-CAAA* scenario – and because this is a dynamic model, the results are not reflexive.

As illustrated in the table, changes in the life tables begin in 1995 and the difference in total deaths continues to grow through 2020. Not surprisingly, initially all cohorts experience fewer deaths in the cleaner, *with-CAAA* scenario, but because more individuals are alive to enter older, higher baseline mortality cohorts, the oldest three cohorts in particular begin to quickly experience more deaths in the *with-CAAA* scenario, and the number of additional deaths grows in these cohorts over time. This phenomenon is only seen in the oldest cohorts – in all other cohorts, there are fewer deaths in the *with-CAAA* scenario. Note that the CAAA is not the cause of more deaths – it is that the life-extending qualities of less air pollution exposure yield higher numbers of individuals surviving to cohorts with high non-pollution mortality rates. Examination of the life tables shows that more individuals survive in all cohorts.

The number of deaths estimate, then, is fundamentally different from that estimated by BenMAP. While BenMAP estimates the number of deaths that will eventually be avoided as a result of a single improvement in air pollutant exposure for a given year, the population simulation approach incorporates a series of dynamic processes, including multiple annual exposure changes, overlapping lag periods, and dynamic effects of changes in air pollutant mortality rates that operate each year in concert with age-specific mortality rates. Individuals are "passed" from year to year and each year experience a new level of mortality risk, depending on age-specific non-air-pollutant risks and an exposure dependent air pollutant risk. Deaths tabulated in Exhibit 7-2 are therefore total

number of deaths from all causes, a fundamentally different measure that cannot be compared to the estimate from BenMAP, but which supplements that estimate.

Exhibit 7-3 illustrates a second output from the population simulation model, estimated life years gained by age cohort and year of the simulation. These estimates effectively compare the number of individuals in each age cohort in the two simulations; in other words, each additional individual in a cohort represents an additional life year lived for that cohort. For this measure, age cohorts are smaller, and the total population is also smaller, for all years of the *without-CAAA* simulation compared to the *with-CAAA* simulation. The gain from CAAA implementation is therefore positive. Interestingly, individuals less than 30 years of age also experience gains from implementing the CAAA, even though the air pollutant effect is assumed not to apply to those under 30 years of age. In this simulation, more adults of child-bearing age exist in the cleaner, *with-CAAA* scenario, because of the effects of air pollutant mortality risk, meaning more children are born to those cohorts. This effect is quite small early on in the simulation period, but grows rapidly over the course of the simulation, until in 2045 more than 1,500 infants that are born in the *with-CAAA* scenario are not born in the *without-CAAA* scenario, because the prospective parents have succumbed prematurely to the effects of air pollution. Over the course of the full simulation, through 2050, implementation of the CAAA accounts for an estimated 120 million additional life years lived in the US population.[135]

Exhibit 7-4 provides estimates of the increase in period life expectancy from the model. Period life expectancy is constructed using age-specific mortality rates for a single year, with no allowance for projected changes in mortality – it is sometimes summarized as the life-expectancy at a certain age as if the individual were to experience the mortality risk of other cohorts alive at that time. In fact all individuals instead will experience a future, unknown risk of mortality that unfolds through their lifetime, but period life expectancy is the methodology that is used to calculate the life expectancy statistics that are generally reported by the CDC, so we report it here.[136] Effects on life expectancy are immediately experienced across all cohorts, and grow rapidly to a gain in the *with-CAAA* scenario of approximately 0.7-0.9 years per individual for all cohorts up to about age 60. Interestingly, while it is typically stated that older cohorts are the main recipients of the benefits of cleaner air, the life expectancy gains among older cohorts are actually

---

[135] This estimate represents the cumulative life years across the entire study period (i.e., a sum of all of the additional life years accrued in each individual year between 1990 and 2050. Therefore, this estimate does not match the results presented in Exhibit 7-3, which only presents annual life year results in 5-year increments.

[136] The model also calculates cohort conditional life expectancy. Cohort life expectancy is constructed using age-specific mortality rates that reflect projected changes in mortality in future years. In our case, differences in cohort conditional life expectancy reflect our projection of changes in air pollutant-induced mortality risk. The cohort conditional life expectancy tables show an almost immediate gain in life expectancy among younger cohorts because of the anticipated much cleaner air through their lifetime, but those results are of course dependent on our projection of future air quality.

**EXHIBIT 7-2. CHANGE IN NUMBER OF DEATHS BY AGE COHORT MOVING FROM *WITH-CAAA* TO *WITHOUT-CAAA* SCENARIO**

| AGE COHORT | 1990 | 1995 | 2000 | 2005 | 2010 | 2015 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 to 4 | 0 | 0.088 | 0.62 | 1.3 | 1.3 | 1.5 | 1.8 | 2.1 | 2.2 | 2.3 | 2.3 | 2.3 |
| 5 to 9 | 0 | 0 | 0 | 0.04 | 0.10 | 0.12 | 0.13 | 0.15 | 0.18 | 0.19 | 0.19 | 0.20 |
| 10 to 14 | 0 | 0 | 0 | 0 | 0.037 | 0.11 | 0.13 | 0.14 | 0.16 | 0.19 | 0.21 | 0.22 |
| 15 to 19 | 0 | 0 | 0 | 0 | 0.0081 | 0.13 | 0.38 | 0.48 | 0.54 | 0.63 | 0.75 | 0.84 |
| 20 to 24 | 0 | 0 | 0 | 0 | 0 | 0.014 | 0.18 | 0.47 | 0.57 | 0.64 | 0.75 | 0.89 |
| 25 to 29 | 0 | 0 | 0 | 0 | 0 | 0 | 0.013 | 0.18 | 0.48 | 0.58 | 0.66 | 0.77 |
| 30 to 34 | 0 | (490) | (810) | (1,100) | (1,400) | (1,700) | (2,000) | (1,900) | (1,800) | (1,800) | (1,800) | (1,800) |
| 35 to 39 | 0 | (650) | (1,300) | (1,600) | (1,900) | (2,200) | (2,500) | (2,600) | (2,400) | (2,200) | (2,200) | (2,300) |
| 40 to 44 | 0 | (780) | (1,900) | (2,400) | (2,600) | (2,800) | (3,000) | (3,200) | (3,300) | (3,100) | (2,800) | (2,800) |
| 45 to 49 | 0 | (910) | (2,500) | (3,400) | (4,100) | (4,200) | (4,300) | (4,400) | (4,500) | (4,500) | (4,200) | (3,800) |
| 50 to 54 | 0 | (1,100) | (3,100) | (4,700) | (6,100) | (6,800) | (6,700) | (6,500) | (6,300) | (6,500) | (6,400) | (6,000) |
| 55 to 59 | 0 | (1,300) | (3,700) | (6,200) | (8,200) | (10,000) | (11,000) | (10,000) | (9,400) | (9,100) | (9,400) | (9,200) |
| 60 to 64 | 0 | (1,900) | (4,500) | (7,300) | (11,000) | (13,000) | (16,000) | (16,000) | (14,000) | (13,000) | (13,000) | (13,000) |
| 65 to 69 | 0 | (2,800) | (6,000) | (8,500) | (12,000) | (17,000) | (20,000) | (23,000) | (22,000) | (20,000) | (18,000) | (18,000) |
| 70 to 74 | 0 | (3,700) | (8,200) | (10,000) | (12,000) | (16,000) | (22,000) | (25,000) | (27,000) | (26,000) | (23,000) | (22,000) |
| 75 to 79 | 0 | (4,100) | (10,000) | (12,000) | (13,000) | (15,000) | (19,000) | (24,000) | (26,000) | (28,000) | (27,000) | (25,000) |
| 80 to 84 | 0 | (4,200) | (9,700) | (12,000) | (12,000) | (13,000) | (14,000) | (16,000) | (19,000) | (20,000) | (22,000) | (23,000) |
| 85 to 89 | 0 | (3,300) | (7,200) | (6,800) | (6,900) | (6,200) | (5,600) | (4,500) | (4,000) | (4,500) | (5,000) | (6,400) |
| 90 to 94 | 0 | (1,800) | (2,700) | (820) | 1,100 | 3,400 | 5,300 | 7,500 | 9,700 | 13,000 | 16,000 | 18,000 |
| 95 to 99 | 0 | (480) | 160 | 1,800 | 4,700 | 8,000 | 12,000 | 15,000 | 17,000 | 20,000 | 25,000 | 33,000 |
| 100+ | 0 | (76) | 300 | 1,100 | 2,800 | 5,400 | 8,800 | 13,000 | 18,000 | 21,000 | 25,000 | 31,000 |
| Total Change in Deaths: | 0 | (28,000) | (61,000) | (74,000) | (83,000) | (92,000) | (100,000) | (100,000) | (95,000) | (86,000) | (70,000) | (51,000) |

Note: Results in the table are rounded to two significant figures.

**EXHIBIT 7-3. ESTIMATED LIFE YEARS GAINED AS A RESULT OF CAAA IMPLEMENTATION**

| AGE COHORT | 1990 | 1995 | 2000 | 2005 | 2010 | 2015 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 to 4 | 0 | 17 | 240 | 670 | 850 | 1,000 | 1,300 | 1,600 | 1,900 | 2,100 | 2,300 | 2,600 |
| 5 to 9 | 0 | 0 | 17 | 240 | 670 | 850 | 1,000 | 1,300 | 1,600 | 1,900 | 2,100 | 2,300 |
| 10 to 14 | 0 | 0 | 0 | 17 | 230 | 670 | 850 | 1,000 | 1,300 | 1,600 | 1,900 | 2,100 |
| 15 to 19 | 0 | 0 | 0 | 0 | 17 | 230 | 670 | 850 | 1,000 | 1,300 | 1,600 | 1,900 |
| 20 to 24 | 0 | 0 | 0 | 0 | 0 | 17 | 230 | 660 | 840 | 1,000 | 1,300 | 1,600 |
| 25 to 29 | 0 | 0 | 0 | 0 | 0 | 0 | 17 | 230 | 660 | 840 | 1,000 | 1,300 |
| 30 to 34 | 0 | 460 | 1,200 | 2,000 | 2,400 | 3,100 | 3,600 | 3,800 | 3,700 | 4,100 | 4,400 | 4,500 |
| 35 to 39 | 0 | 890 | 4,100 | 6,900 | 9,100 | 11,000 | 13,000 | 15,000 | 15,000 | 13,000 | 14,000 | 14,000 |
| 40 to 44 | 0 | 1,100 | 6,000 | 13,000 | 17,000 | 20,000 | 23,000 | 27,000 | 29,000 | 28,000 | 26,000 | 26,000 |
| 45 to 49 | 0 | 1,200 | 7,600 | 19,000 | 28,000 | 32,000 | 37,000 | 41,000 | 46,000 | 47,000 | 45,000 | 41,000 |
| 50 to 54 | 0 | 1,400 | 9,500 | 25,000 | 41,000 | 54,000 | 58,000 | 62,000 | 66,000 | 72,000 | 73,000 | 69,000 |
| 55 to 59 | 0 | 1,800 | 11,000 | 31,000 | 55,000 | 79,000 | 96,000 | 98,000 | 100,000 | 100,000 | 110,000 | 110,000 |
| 60 to 64 | 0 | 2,600 | 14,000 | 37,000 | 71,000 | 110,000 | 140,000 | 160,000 | 160,000 | 150,000 | 150,000 | 160,000 |
| 65 to 69 | 0 | 3,900 | 20,000 | 44,000 | 82,000 | 140,000 | 190,000 | 240,000 | 250,000 | 240,000 | 230,000 | 230,000 |
| 70 to 74 | 0 | 5,300 | 28,000 | 58,000 | 94,000 | 150,000 | 230,000 | 300,000 | 360,000 | 370,000 | 340,000 | 330,000 |
| 75 to 79 | 0 | 6,100 | 36,000 | 79,000 | 120,000 | 160,000 | 240,000 | 350,000 | 430,000 | 490,000 | 500,000 | 460,000 |
| 80 to 84 | 0 | 6,600 | 39,000 | 94,000 | 140,000 | 180,000 | 240,000 | 330,000 | 460,000 | 550,000 | 620,000 | 630,000 |
| 85 to 89 | 0 | 5,900 | 36,000 | 87,000 | 150,000 | 200,000 | 230,000 | 290,000 | 390,000 | 530,000 | 620,000 | 700,000 |
| 90 to 94 | 0 | 3,900 | 24,000 | 62,000 | 110,000 | 160,000 | 200,000 | 240,000 | 290,000 | 380,000 | 510,000 | 600,000 |
| 95 to 99 | 0 | 1,600 | 10,000 | 27,000 | 53,000 | 85,000 | 120,000 | 160,000 | 180,000 | 220,000 | 290,000 | 390,000 |
| 100+ | 0 | 490 | 2,800 | 7,600 | 18,000 | 35,000 | 60,000 | 93,000 | 130,000 | 160,000 | 200,000 | 270,000 |
| Total Life Years Gained | 0 | 43,000 | 250,000 | 590,000 | 980,000 | 1,400,000 | 1,900,000 | 2,400,000 | 2,900,000 | 3,400,000 | 3,800,000 | 4,100,000 |

Note: Results in the table are rounded to two significant figures.

**EXHIBIT 7-4. INCREASE IN PERIOD CONDITIONAL LIFE EXPECTANCY ATTRIBUTABLE TO THE CLEAN AIR ACT**

| AGE COHORT | 1990 | 1995 | 2000 | 2005 | 2010 | 2015 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0 | 0.15 | 0.36 | 0.52 | 0.64 | 0.76 | 0.86 | 0.90 | 0.90 | 0.91 | 0.90 | 0.89 |
| 10 | 0 | 0.15 | 0.36 | 0.52 | 0.65 | 0.76 | 0.86 | 0.90 | 0.91 | 0.91 | 0.91 | 0.90 |
| 20 | 0 | 0.15 | 0.36 | 0.52 | 0.65 | 0.76 | 0.87 | 0.90 | 0.91 | 0.91 | 0.91 | 0.90 |
| 30 | 0 | 0.15 | 0.36 | 0.53 | 0.65 | 0.77 | 0.87 | 0.91 | 0.92 | 0.92 | 0.91 | 0.90 |
| 40 | 0 | 0.14 | 0.35 | 0.51 | 0.63 | 0.74 | 0.84 | 0.88 | 0.89 | 0.89 | 0.88 | 0.87 |
| 50 | 0 | 0.13 | 0.32 | 0.47 | 0.59 | 0.70 | 0.79 | 0.83 | 0.84 | 0.84 | 0.84 | 0.83 |
| 60 | 0 | 0.12 | 0.29 | 0.42 | 0.53 | 0.63 | 0.71 | 0.75 | 0.76 | 0.77 | 0.76 | 0.76 |
| 70 | 0 | 0.094 | 0.23 | 0.35 | 0.44 | 0.52 | 0.59 | 0.62 | 0.64 | 0.64 | 0.64 | 0.64 |
| 80 | 0 | 0.067 | 0.17 | 0.25 | 0.32 | 0.38 | 0.43 | 0.46 | 0.47 | 0.48 | 0.48 | 0.48 |
| 90 | 0 | 0.040 | 0.10 | 0.15 | 0.19 | 0.22 | 0.25 | 0.26 | 0.27 | 0.27 | 0.27 | 0.26 |
| 100+ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Note: Results in the table are rounded to two significant figures. | | | | | | | | | | | | |

truncated because older cohorts may die of something else before experiencing the full benefit from air pollution reduction. Instead, in life expectancy terms, younger cohorts experience the greatest gains.

## 7.5 DISCUSSION

The Project Team's application of the population simulation model illustrates additional, supplementary characterizations of the benefits of the CAAA, as well as new insights not available from a static approach. They demonstrate the substantial effect of the CAAA on population unfolding through time, and add insights into the life expectancy gains attributed to cleaner air.

Our results for the CAAA simulation are not directly comparable to those from BenMAP – our results reflect a long-term trajectory of improved air quality; and because the effects of changes in exposure are lagged over time as the risk is reduced, our results for any given year represent the cumulative effect of overlapping lagged mortality risk changes from multiple years. It is nonetheless possible to design experiments with the population simulation model that approximate a BenMAP result, in particular for the life-years lost/gained metric. To compare the BenMAP and population simulation approaches and estimate the impact of using a dynamic versus static population approach, we estimated the long-term effect of a one year change in exposure in 2010 and 2020 comparable to the one-year national population-weighted change that is developed in the BenMAP runs for those two target years.

The results of our comparison suggest that the effect of using a dynamic model is substantial, as illustrated in Exhibit 7-5 below. The total effect of using a dynamic approach is roughly a factor of three – in 2020, for example, the dynamic approach estimates almost 9 million life years saved through 2050, while the BenMAP approach estimates just more than 3 million life years saved for a single year's exposure improvement. The results by cohort could be somewhat misleading, as they reflect different approaches to allocating life year gains among cohorts. BenMAP attributes life year gains to the cohort that is of a certain age in the year in which exposure changes (in this case, either 2010 or 2020), regardless of when those life-year gains accrue, while the population simulation model attributes gains to the cohort in the year they are experienced. This difference in approach means that BenMAP attributes more of the life-year gains to younger cohorts, but both approaches are simulating the same effect. The main difference is that the population simulation approach incorporates the effects of a dynamically growing population as a result of the gain in air pollution – the end result is that the life-years-gained measure of the mortality benefit of clean air is likely underestimated by the static approach, and perhaps by a substantial margin.

**EXHIBIT 7-5. COMPARISON OF LIFE YEARS GAINED FROM A ONE-YEAR EXPOSURE CHANGE FOR BENMAP AND POPULATION SIMULATION MODEL**

| AGE COHORT | | BENMAP RESULTS | | POPULATION SIMULATION MODEL | |
|---|---|---|---|---|---|
| START AGE | END AGE | 2010 | 2020 | 2010 | 2020 |
| 30 | 34 | 70,000 | 94,000 | 11,000 | 12,000 |
| 35 | 44 | 220,000 | 260,000 | 110,000 | 130,000 |
| 45 | 54 | 390,000 | 420,000 | 300,000 | 320,000 |
| 55 | 64 | 560,000 | 770,000 | 700,000 | 720,000 |
| 65 | 74 | 530,000 | 890,000 | 1,400,000 | 1,600,000 |
| 75 | 84 | 480,000 | 610,000 | 2,300,000 | 2,600,000 |
| 85 | 99 | 220,000 | 300,000 | 2,900,000 | 3,500,000 |
| | Total | 2,500,000 | 3,300,000 | 7,700,000 | 8,900,000 |

# CHAPTER 8 | VALUATION UNCERTAINTY

Another key factor contributing to uncertainty in the monetized benefit estimates associated with the Clean Air Act Amendments of 1990 (CAAA) is uncertainty in the "value of statistical life" (VSL) estimates that we apply to reductions in premature mortality. The VSL is a summary measure of willingness-to-pay (WTP) values for small reductions in mortality risk experienced by a large number of people. The VSL approach applies information from several published value-of-life studies to determine a reasonable monetary value of preventing premature mortality. EPA's primary benefits estimate is calculated using a distribution of VSLs based on 26 studies that assumes a Weibull distribution with a mean of $4.8 million in 1990$ ($7.4 million in 2006$).

However, the literature on VSL is extensive, and studies have measured VSL using different methodological approaches (e.g., revealed versus stated preference) on a variety of study populations (e.g., workers versus a general population sample) in a variety of different risk contexts (e.g., fatal workplace accidents versus mortality risk from disease). In addition, several meta-analyses of the literature have been conducted in an attempt to synthesize the literature, including those by Viscusi and Aldy (2003), Mrozek and Taylor (2002) and Kochi et al. (2006).[137] In this chapter, we explore the implications of assuming alternative distributions for VSL on the net present value (NPV) monetized estimates of CAAA-related reductions in premature mortality.

## 8.1 UNCERTAINTY IN ECONOMIC VALUATION

The Project Team explored the uncertainty in the estimated economic value of avoided deaths due to $PM_{2.5}$ by applying several different estimates of VSL to the mortality incidence results from the core scenarios for each of the three target years. We compare all estimates against the primary estimate, which is based on a Weibull distribution of VSL values derived from 26 studies. We generated alternative NPV mortality benefits estimates using the following alternative VSL distributions:[138]

[137] Viscusi, W. K. and J. E. Aldy. 2003. The Value of a Statistical Life: A Critical Review of Market Estimates throughout the World. AEI-Brookings Joint Center for Regulatory Studies. Washington, DC. January.; Mrozek, J.R., Taylor, L.O. 2002. What Determines the Value of Life? A Meta-Analysis. *Journal of Policy Analysis and Management* 21(2): 253-270.; and Kochi, I., Hubbell, B., Kramer, R. 2006. An Empirical Bayes Approach to Combining and Comparing Estimates of the Value of a Statistical Life for Environmental Policy Analysis. *Environment and Resource Economics* 34: 385-406.

[138] Note that the VSL estimates are presented as they were originally published. All of our results are presented in 2006$. After applying the VSLs to the mortality incidence estimates, we converted the benefits estimates from their original currency year to 2006$ using inflation adjustment factors from BenMAP (Abt Associates, Inc. (2008). BenMAP User's Manual. Prepared for the U.S. EPA's Office of Air Quality Planning and Standards, Research Triangle Park, NC. September.)

- A VSL distribution derived from estimates reported in a 2003 meta-analysis by Viscusi and Aldy (specifically, the mean predicted VSL and confidence interval for the U.S. sample, derived using Model 5 as reported in Table 8). This specific estimate was selected because it provided the best model fit to the data, had relatively tight confidence bounds, and reduced non-normality in the error term by using Huber weighting. The Project Team applied this estimate by assuming a lognormal distribution with a geometric mean of $6.3 million (in 2000$).[139]
- An estimate from Viscusi and Aldy (2003) Model 2 from Table 8, assuming a log-normal distribution with a geometric mean of $5.8 million (in 2000$)[140];
- The estimate used in the recent PM National Ambient Air Quality Standards (NAAQS) Regulatory Impact Analysis (RIA) assuming a normal distribution with a mean of $5.5 million (in 2000$);[141] and
- An estimate from a wage-risk study by Viscusi (2004) assuming a truncated normal distribution with a mean of $4.8 million, a minimum of $2.3 million, and a maximum of $7.1 million (in 1997$ and at 1997 income levels).[142,143]

We generated NPV estimates of monetized reductions in premature mortality discounted to each target year using the same simulation sampling approach applied in the primary analysis, and assumed that avoided mortality benefits are accrued over time in the pattern described in the 20-year cessation lag model advocated by the Advisory Council for Clean Air Compliance Analysis (Council).[144] EPA's Benefits Analysis and Mapping Program (BenMAP) uses statistical sampling methods to generate a mortality valuation distribution that integrates uncertainty in total avoided mortality with VSL uncertainty described by a user-specified VSL distribution. We then scale this distribution using a

---

[139] The chosen model is semi-log in form and reports a 95 percent confidence interval that is consistent with a log-normally distributed VSL, although the paper itself does not report a specific VSL distribution.

[140] As is the case with the VSL estimate from Model 5, the chosen model is semi-log in form and reports a 95 percent confidence interval that is consistent with a log-normally distributed VSL, although the paper itself does not report a specific VSL distribution.

[141] http://www.epa.gov/ttn/ecas/ria.html (see Chapter 5).

[142] This estimate was derived by Dr. Joseph Aldy of Resources for the Future by taking 100,000 random draws of two normal distributions: 1) a distribution of coefficient estimate of on-the-job mortality risk variables from Viscusi (2004); and 2) a distribution of workers' hourly wages. He then took the product of each pair of draws. According to Aldy, the 95 percent confidence bounds of the resulting distribution were "virtually identical" to the result assuming the product is normally distributed. Therefore, we assumed that the distribution was normally distributed with a mean of $4.8 million, as reported by Aldy, truncated at the minimum and maximum values also reported by Aldy. See Appendix A from the report, *Valuing Mortality Risk Reductions inHomeland Security Regulatory Analyses,* Final Report, June 2008, Prepared by Lisa A. Robinson, Independent Consultant for Elena Ryan, U.S. Customs and Border Protection, Department of Homeland Security, under subcontract to Jennifer Baxter and Henry Roman, Industrial Economics Incorporated.

[143] Viscusi, W.K. (2004). The value of life: Estimates with risks by occupation and industry. Economic Inquiry 42(1): 29-48.

[144] Science Advisory Board (2004). Advisory on Plans for Health Effects Analysis in the Analytical Plan for EPA's Second Prospective Analysis—Benefits and Costs of the Clean Air Act, 1990-2020: Advisory by the Health Effects Subcommittee of the Advisory Council on Clean Air Compliance Analysis. EPA-SAB-COUNCIL-ADV-04-002.

target-year specific adjustment factor that accounts for income growth over time,[145] the effect of cessation lag on accrual of the mortality benefits from air pollution changes in the target year, and the effect of discounting VSL values for mortality benefits expected to occur after the target year. The result of this scaling calculation is a distribution of NPVs for avoided mortality benefits, based on an assumed 20-year distributed cessation lag for PM mortality effects and application of a 5 percent discount rate.

We also generated alternative results substituting discount rates of 3 and 7 percent, in addition to the default discount rate of 5 percent.[146]

## 8.2 RESULTS

### 8.2.1 ALTERNATIVE VSLs

Exhibit 8-1 provides a table of valuation results for the three target years using alternative VSL distributions. Exhibit 8-2 presents these same results using box plots that illustrate alternative results distributions.

- Overall, the mean valuation estimates from BenMAP for premature mortality due to CAAA-related changes in $PM_{2.5}$ using the alternative estimates of VSL range from 20 percent lower to equivalent to our primary estimate when applying the Viscusi et al., 2004 and Viscusi and Aldy (2003) Model 5 distributions, respectively.
- The spread of the confidence bounds of the VSL estimates vary, with the distribution of the primary estimate (Weibull) having the largest spread and the Viscusi (2004) results having the smallest spread.

### 8.2.2 ALTERNATIVE DISCOUNT RATES

Exhibit 8-3 provides the economic valuation results for each target year, applying alternative discount rates to calculate the NPV. Exhibit 8-4 provides a graphical representation of the 90 percent confidence bounds around each of the benefits estimates. Applying alternative discount rates has little effect on the benefits estimates; applying a discount rate of 7 percent results in benefits that are four percent lower than the default and applying a 3 percent discount rate results in a benefits estimate four percent higher than the default.

[145] Income adjustment factors reflecting future income growth projections and the income elasticity of VSL were obtained from BenMAP (Abt Associates, Inc. (2008). BenMAP User's Manual. Prepared for the U.S. EPA's Office of Air Quality Planning and Standards, Research Triangle Park, NC. September.)

[146] Alternative discount rates of three and seven percent are recommended in U.S. EPA (2000). *Guidelines for Preparing Economic Analyses*, EPA 240-R-00-003, September.

**EXHIBIT 8-1. RELATIVE PM/MORTALITY VALUATION RESULTS USING ALTERNATIVE ESTIMATES OF VSL (MILLIONS OF 2006$)**

| VSL ESTIMATE | PERCENTILE 5 | MEAN | PERCENTILE 95 |
|---|---|---|---|
| **Weibull Distribution (Primary) - 2000** | **$66,000** | **$710,000** | **$2,200,000** |
| **Weibull Distribution (Primary) - 2010** | **$110,000** | **$1,200,000** | **$3,600,000** |
| **Weibull Distribution (Primary) - 2020** | **$170,000** | **$1,700,000** | **$5,300,000** |
| | ***Percent Change from Mean Primary Estimate**** | | |
| Viscusi and Aldy (2003) - Model 5 | -80% | 0% | 122% |
| Viscusi and Aldy (2003) - Model 2 | -82% | -7% | 108% |
| Normal Distribution | -87% | -14% | 122% |
| Viscusi et al. (2004) | -85% | -20% | 71% |

* All values in the table represent the percent change from the mean primary estimate. Percent change estimates do not vary by target year.

**EXHIBIT 8-2. BOX-PLOT OF 90 PERCENT CONFIDENCE BOUNDS FOR ALTERNATIVE VSL RESULTS**



**EXHIBIT 8-3. RELATIVE PM/MORTALITY VALUATION RESULTS USING ALTERNATIVE DISCOUNT RATES (MILLIONS OF 2006$)**

| VSL ESTIMATE | PERCENTILE 5 | MEAN | PERCENTILE 95 |
|---|---|---|---|
| **Baseline (5 percent) - 2000** | **$66,000** | **$710,000** | **$2,200,000** |
| **Baseline (5 percent) - 2010** | **$110,000** | **$1,200,000** | **$3,600,000** |
| **Baseline (5 percent) - 2020** | **$170,000** | **$1,700,000** | **$5,300,000** |
| | ***Percent Change from Mean Primary Estimate**** | | |
| High (7 percent) | -91% | -4% | 191% |
| Low (3 percent) | -90% | 4% | 223% |

***** All values in the table represent the percent change from the mean primary estimate. Percent change estimates do not vary by target year.

## EXHIBIT 8-4. BOX-PLOT OF 90 PERCENT CONFIDENCE BOUNDS FOR ALTERNATIVE DICSOUNT RATE RESULTS



# CHAPTER 9 | CONCLUSIONS

This chapter summarizes the advances in the quantitative treatment of uncertainty in the Second Prospective Section 812 Study of the Clean Air Act Amendments (CAAA) and their implications for interpreting the benefit and cost results.

## 9.1 ADVANCES IN QUANTITATIVE ANALYSES

This uncertainty analysis has made significant incremental advances in the quantitative treatment of uncertainty in several elements of the analytical chain of the second prospective analysis of the benefits and costs of the Clean Air Act. Areas of advancement include:

- **Emissions.** Using EPA's cutting-edge meta-model, the Response Surface Model (RSM), as a cost-effective, reduced-form substitute for Community Multiscale Air Quality Model (CMAQ), we were able to evaluate the impact of marginal changes in emissions in each of the five major particulate matter (PM) source categories on PM levels nationwide and on estimates of avoided mortality due to the CAA. These offline analyses allow us to compare the marginal benefits of additional reductions in each sector, and give us some sense of the potential sensitivity of results to changes in emissions. In addition, we conducted an analysis of the impacts of scenario uncertainty in both the *with*- and *without-CAAA* cases on emissions from the Electric Generating Unit (EGU) sector in 2000.

- **Concentration-Response.** We evaluated both parameter and model uncertainty in concentration-response (C-R) function estimates for PM-related mortality, replacing the primary C-R function with functions with alternative C-R coefficient distributions from individual studies from the literature and with the 12 EPA expert elicitation (EE)-based functions that present alternative coefficient distributions and, in some cases, alternative shapes of the PM-mortality C-R function. In addition, we evaluated parameter uncertainty in the C-R function for ozone mortality.

- **Cessation Lag.** We completed an evaluation of the effects on monetized benefits of model uncertainty in the temporal realization of avoided mortality benefits following reductions in PM exposure (i.e., cessation lag). This included assessment of the impacts of assuming alternative forms for the cessation lag structure instead of the primary 20-year step function, including a more rapid 5-year step function and a variety of smooth functions that incorporate information from both PM intervention studies and long- term cohort studies of PM mortality.

- **Dynamic Population Modeling.** We also assessed the implications of an alternative damage function approach that incorporates dynamic changes in population over time using a life-table approach to benefit assessment. Though the model employed a simplified treatment of exposure changes due to the CAAA, it nonetheless provided useful insights into the potential magnitude of the CAAA's effect on population size, life-years gained, and life expectancy.
- **Valuation.** We assessed the sensitivity of monetized results to an array of alternative distributions from the published literature for value of statistical life (VSL) and alternative assumptions about the discount rate applied to VSL for avoided mortality benefits expected to accrue in future years.
- **Direct Costs.** We assessed several sources of uncertainty in direct cost estimates, including scenario uncertainty in predictions of the future composition and fuel economy of the U.S. vehicle fleet and parameter uncertainty in three factors: (1) the assumed rate at which experience applying control technologies reduces control costs; (2) vehicle failure rates associated with inspection and maintenance (I&M) programs; and (3) the cost per ton of unidentified local pollution controls.

For additional uncertainties, we developed revised qualitative uncertainty tables that update the tables presented in the First Prospective 812 Study. These tables describe the uncertainty; present our assessment, where possible, of the likely direction of bias in net benefits associated with that uncertainty; and give our characterization of the potential significance of the uncertainty ("potentially major" if the effect could exceed five percent of current net benefits, "probably minor" if less than five percent, or "unknown"). In addition, this report included a detailed and extensive evaluation of the potential for notional sensitivity analyses of the impacts of uncertainty about the relative toxicity of the various components that comprise $PM_{2.5}$ and concluded that significant data gaps in both toxicology and epidemiology preclude the development of useful, policy-relevant analysis at this time.

## 9.2 SUMMARY OF KEY UNCERTAINTIES

Exhibit 9-1 presents a tabular summary of the results of the analyses presented in this report for both costs and benefits. Exhibit 9-2 presents a graphical illustration of the impacts of effect of alternative assumptions and models on the central estimate and distribution of monetized avoided mortality benefits, the primary contributor to monetized benefits.

**EXHIBIT 9-1. QUANTITATIVE ANALYSES OF UNCERTAINTY IN THE 812 SECOND PROSPECTIVE ANALYSIS**

| FACTOR | TYPE OF UNCERTAINTY EVALUATED | ALTERNATIVE ASSUMPTIONS | IMPACT OF ALTERNATIVE ASSUMPTIONS ON 2020 PRIMARY ESTIMATE |
|---|---|---|---|
| **UNCERTAINTIES RELATED TO COST ESTIMATES** | | | |
| Unidentified controls (Ch 2) | Parameter | Alternate assumption about the threshold for, and cost of, applying unidentified local controls to achieve NAAQS compliance ($10,000/ton). | -18% of local control costs;<br>-2.1% of total costs |
| I&M program vehicle failure rates(Ch 2) | Parameter | Alternative assumption about failure rates for I&M program testing based on NRC (2001). | -12% for mobile source costs;<br>-6.5% of total costs |
| Learning curve assumptions (Ch 2) | Parameter | Alternate assumptions about the learning rate (5 and 20%) | -6.0% to 3.2% of total costs |
| Fleet composition and fuel efficiency (Ch 2) | Scenario | Alternate assumption about future fleet composition and fuel efficiency using AEO 2008. | -3.6% for mobile source costs;<br>-2.0% of total costs |
| **UNCERTAINTIES RELATED TO BENEFITS ESTIMATES** | | | |
| Alternate C-R function for PM (Ch 4)[a] | Parameter | Alternative C-R functions – two from empirical literature (Pope et al., 2002 and Laden et al., 2006) and 12 subjective estimates from the expert elicitation study | -83% to 76%,<br>Based on most extreme estimates from PM EE study.<br>Rest of alternatives range from -44% to 40% |
| Emissions from EGU sources (Ch 3) | Scenario | Use continuous emissions monitoring (CEM) data in place of Integrated Planning Model (IPM) results, coupled with alternative counterfactual consistent with CEM approach. | +50% in 2000<br>Due almost entirely to the impact of the alternative *without-CAAA* scenario. |
| PM/Mortality Cessation lag (Ch 6)[a] | Model and parameter | Alternative lag structures – one step function and a series of smooth functions (based on an exponential decay). Smooth functions in some cases also require change in C-R coefficient. | -23% to 16% when using primary C-R function.<br>-52 to 50% when also changing C-R function. |
| VSL (Ch 8)[a] | Parameter | Alternative VSL estimates | -20% to 0% |
| Discount rates (Ch 8)[a] | Parameter | Alternate discount rates (5% and 7%) | -4% to 4% |
| Alternate C-R function for ozone (Ch 4) | Parameter | Alternative C-R functions – three from multi-city studies and three meta-analyses | 0% for total mortality benefits.<br>-63% to 66%<br>For ozone-related mortality. |

| FACTOR | TYPE OF UNCERTAINTY EVALUATED | ALTERNATIVE ASSUMPTIONS | IMPACT OF ALTERNATIVE ASSUMPTIONS ON 2020 PRIMARY ESTIMATE |
|---|---|---|---|
| Emissions changes by emitting sector (Ch 3) | Scenario | Altering each sector-specific emissions by 10 percent | $/ton marginal benefit for proportional EGU sector reductions is about 3 times that for nonroad and on-road sectors, and 50% higher than that for area and non-EGU point source sectors. |
| Differential toxicity of PM components (Ch 5) | Parameter | Potential alternative estimates of toxicity for specific PM components | N/A. No quantitative sensitivity analysis performed due to significant data gaps. |
| Dynamic population modeling (Ch 7) | Model | Incorporation of dynamic population estimates to calculate life years gained and changes in life expectancy | N/A. Life years gained and changes in life expectancy are supplemental estimates of PM/mortality effects and cannot be directly compared to the primary estimate. |

### 9.2.1 COST UNCERTAINTIES

Exhibit 9-1 shows that the impact of our alternative assumptions about mobile source cost parameters, learning curves, and unidentified local control costs each have relatively modest impacts on total costs, with the I&M failure rate and learning curve assumptions have slightly more of an impact on total costs.[147] In addition, the assumptions underlying our primary cost estimates tend to be conservative; most of the alternatives decrease total compliance costs and none increase costs more than about three percent.

### 9.2.2 BENEFIT UNCERTAINTIES

On the benefits side, Exhibits 9-1 and 9-2 show that the most influential assumptions affecting benefits are the choice of the C-R function, the cessation lag model for the accrual of benefits, and the VSL distribution. While the two most extreme results from EPA's EE study imply substantial effects of C-R choice (about 80 percent in either direction) most of the alternatives from the EE study and the published epidemiological studies suggest effects on benefits of about 40 percent or less in either direction. By themselves, longer cessation lag alternatives can reduce monetized benefits by as much as a 23 percent and if coupled with a change in the C-R function, by close to half; however, the Council suggested much of the risk reduction benefits from $PM_{2.5}$ controls are more

[147] The estimate of the impact on total costs is derived from the relative contribution of the affected cost sector to the overall costs of compliance, assuming all other sectors are unaffected.

likely to accrue sooner rather than later. Accelerating benefits increases benefits by about 16 percent when maintaining the same C-R function, but could increase them by as much as half when using a smooth function based on the Laden Six Cities follow-up effect estimate. VSL distribution choices in one case produce the same central estimate; in others reduce VSL between 7 and 20 percent.

A review of the box plots in Exhibit 9-2 for the factors that have the greatest potential to change the central estimate shows that most of the alternatives do not have a dramatic effect on the spread of uncertainty. Some alternatives suggest the high end of the distribution could be lower, including all of the alternative VSL distributions, which give less weight to higher VSL values than the 26-study Weibull. On the other hand, only a few alternatives (from the EE study) significantly extend the upper end and hardly any extend the lower end, suggesting our primary estimate is unlikely to understate the uncertainty in avoided mortality benefits.

**EXHIBIT 9-2. SUMMARY OF QUANTITATIVE ANALYSIS OF UNCERTAINTY IN MONETIZED MORTALITY BENEFITS ESTIMATES**




Note: that the Project Team assessed the impact Of alternative ozone C-R functions on the total mortality benefits and found that these did not alter the primary estimate. Therefore, alternative ozone C-R functions are not included in this graph.

### 9.2.3 ADDITIONAL OBSERVATIONS

Offline modeling of marginal changes in emissions by sector suggests that the EGU sector yields the most benefits at the margin in 2020 (on a dollar per ton basis), followed by area sources, non-EGU point sources, on-road sources, and non-road sources. The benefit per ton ratio in 2020 is about 3:2 for when comparing EGU emissions to area emissions and to non-EGU emissions; the ratio is 3:1 for EGU emissions to both mobile source categories. These results rank the expected sensitivity of benefit results to uncertainties in emissions inventories for these sectors, and could provide perspective on the ordering of priorities for additional reductions in future air regulations.

Scenario uncertainty related to the details of the *without-CAAA* scenario for EGUs, as discussed in Chapter 3, is another potentially significant uncertainty for benefits; use of the Ellerman-based alternative *without-CAAA* scenario in 2000 coupled with the CEM-based *with-CAAA* scenario produces a central estimate of avoided mortality benefits approximately 50 percent greater than the standard scenarios. Given that the differences between the alternative *without-CAAA* scenario RSM runs were often much greater than the differences between the CEM- and IPM-based *with-CAAA* RSM runs, the difference in benefits appears to be due predominantly to the changes in the *without-CAAA* scenario. While we are unable to determine which represents the more accurate counterfactual, the *without-CAAA* scenario we apply for the primary results appears to be the more conservative choice.

The 812 Project Team's use of a damage model with dynamic population simulation yielded striking results that demonstrate the substantial effect of the CAAA on population over time and provide useful insights into gains in life expectancy due to the CAAA. Use of a dynamic model showed an approximate tripling of the expected life years saved due to a single year's exposure improvement, suggesting that the static approach to benefits assessment likely underestimates the mortality benefits of improved air quality, possibly by a substantial margin.

A comparison of the qualitative uncertainty tables from the First and Second Prospective studies indicates that significant advancements over the First Prospective include the use of improved monitoring data for $PM_{2.5}$, an improved understanding and treatment of atmospheric chemistry and the composition of $PM_{2.5}$ emissions, and the use of longer-term simulations with integrated modeling of criteria pollutants using CMAQ rather than a collection of separate air quality models. Other potentially major uncertainties affecting benefits estimates in the Second Prospective not mentioned above include the inclusion in the *with-CAAA* scenario of CAIR and CAMR, both of which are being re-tooled by EPA in the wake of court rulings.

# APPENDICES

# APPENDIX A | QUALITATIVE UNCERTAINTY ANALYSIS TABLES FROM THE FIRST PROSPECTIVE ANALYSIS

**TABLE A-1. KEY UNCERTAINTIES ASSOCIATED WITH COST ESTIMATION**

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES ON NET BENEFITS ESTIMATE[1] |
|---|---|---|
| Costs are based on today's technologies. Innovations in future emission control technology and competition among equipment suppliers tend to reduce costs over time. | Underestimate | Probably minor. Available evidence suggests that estimates of pollution control costs based on current engineering can substantially overestimate the ultimate cost incurred, resulting in understanding net benefits.[2] |
| Uncertainty of final State strategies for meeting Reasonable Further Progress (RFP) requirements. | Underestimate | Probably minor. We apply a conservative estimate for costs of RFP measures. Available evidence for identified RFP measures suggests costs could be as much as 70 percent lower than this value. The bias most likely results in significantly understating net benefits. |
| Errors in emission projections that form the basis of selecting control strategies and costs in both the IPM and ERCAM models. | Unable to determine based on current information | Probably minor. In many cases, emissions reductions are specified in the regulations, suggesting that errors in the estimation of absolute levels of emissions under Pre- and Post-CAAA scenarios may have only a small impact on cost estimates. The effect on net benefits is unknown. |
| Exclusion of the impact of economic incentive provisions, including banking, trading, and emissions averaging provisions. | Underestimate | Probably minor. Economic incentive provisions can substantially reduce costs, but the major economic programs for trading of sulfur and nitrogen dioxide emissions are reflected in the analysis. |
| Incomplete characterization of certain indirect costs, including vehicle owner opportunity costs associated with Inspection and Maintenance Programs and performance degradation issues associated with the incorporation of emission control technology. | Overestimate | Probably minor. Preliminary evidence suggests that the opportunity costs of vehicle owners is most likely small relative to other cost inputs.[3] In addition, it will vary from State to State and is subject to a variety of influencing factors. The potential magnitude of indirect costs associated with performance degradation is more uncertain, because few data currently exist to quantify this effect. |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES ON NET BENEFITS ESTIMATE[1] |
|---|---|---|
| Choice to model direct costs rather than social costs. | Unable to determine based on current information | Probably minor. The relationship of social cost to direct cost estimates is influenced by multiple factors that operate in opposite directions, suggesting the magnitude of the net effect is reduced. Social cost estimates can reflect the net welfare changes across the full range of economic sectors in the U.S., and so may yield higher estimates of costs than a direct cost approach. In addition, social cost estimates can be constructed to reflect the potentially substantial cost magnifying effect of existing tax distortions. Direct cost estimates, however, are likely to overstate costs in the primary market because they do not reflect consumer and producer responses. The extent to which a direct cost estimate will overstate or understate a social cost estimate depends on the magnitude of the "ripple effects" in economic sectors not targeted by a regulation. In addition, assessment of the effect on net benefit estimates must also account for any economy-wide effects of direct benefits (e.g., the broader implications of improving health status, and improving environmental quality). |
| Use of costs for rules that are currently in draft form (i.e., not yet finalized). | Unable to determine based on current information | Probably minor. Rules that are most important to the overall cost estimate are largely finalized. For example, there is some uncertainty as to how the cap-and-trade program through the SIP process will lower $NO_x$ emissions in an efficient manner. The expected effect on net benefits is minimal. |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES ON NET BENEFITS ESTIMATE[1] |
|---|---|---|
| Exclusion of costs of 7-year and 10-year MACT standards and the residential risk standards for the 2- and 4-year MACT standards. | Unable to determine based on current information | Probably minor. Costs for the 7- and 10-year MACT standards are likely to be less than for the 2- and 4-year standards included in the analysis and the need for, and potential scope and stringency of, future Title III residual risk standards remain highly uncertain. For consistency, benefits of the 7- and 10-year standards and the residual risk standards are also excluded. |

1 The classification of each potential source of error reflects the best judgment of the section 812 Project Team. The Project Team assigns a classification of "potentially major" if a plausible alternative assumption or approach could influence the overall monetary benefit estimate by approximately five percent or more; if an alternative assumption or approach is likely to change the total benefit estimate by less than five percent, the Project Team assigns a classification of "probably minor."

2 For more detail, see Harrington et al. (1999).

3 Preliminary evidence based on Arizona's Enhanced I/M program indicates that major components of the programs costs are associated with test and repair costs rather than the costs of waiting and travel for vehicle owners. (Harrington and McConnell, 1999). To date, Enhanced I/M programs have been implemented in only four States.

**TABLE A-2. KEY UNCERTAINTIES ASSOCIATED WITH EMISSIONS ESTIMATION**

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS ESTIMATE | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES IN NET BENEFIT ESTIMATE* |
|---|---|---|
| $PM_{2.5}$ emissions are largely based on scaling of $PM_{10}$ emissions. | Overall, unable to determine based on current information, but current emission factors are likely to underestimate $PM_{2.5}$ emissions from combustion sources, implying a potential underestimation of benefits. | Potentially major. Source-specific scaling factors reflect the most careful estimation currently possible, using current emissions monitoring data. However, health benefit estimates related to changes in $PM_{2.5}$ constitute a large portion of overall CAAA-related benefits. |
| Primary $PM_{2.5}$ emissions estimates are based on unit emissions that may not accurately reflect composition and mobility of the particles. For example, the ratio of crustal to primary carbonaceous particulate material likely is high. | Underestimate. The effect of overestimating crustal emissions and underestimating carbonaceous when applied in later stages of the analysis, is to reduce the net impact of the CAAA on primary $PM_{2.5}$ emissions by underestimating $PM_{2.5}$ emissions reductions associated with mobile source tailpipe controls. | Potentially major. Mobile source primary carbonaceous particles are a significant contributor to public exposure to $PM_{2.5}$. Overall, however, compared to secondary $PM_{2.5}$ precursor emissions, changes in primary $PM_{2.5}$ emissions have only a small impact on $PM_{2.5}$ related benefits. |
| The post-CAAA scenario includes implementation of a region-wide $NO_x$ emissions reduction strategy to control regional transport of ozone that may not reflect the $NO_x$ controls that are actually implemented in a regional ozone transport rule. | Unable to determine based on current information. | Probably minor. Overall, magnitude of estimated emissions reductions is comparable to that in expected future regional transport rule. In some areas of the 37-state region, emissions reductions are expected to be overestimated, but in other areas, $NO_x$ inhibition of ozone leads to underestimates of ozone benefits (e.g., some eastern urban centers). |
| VOC emissions are dependent on evaporation, and future patterns of temperature are difficult to predict. | Unable to determine based on current information. | Probably minor. We assume future temperature patterns are well characterized by historic patterns, but an acceleration of climate change (warming) could increase emissions. |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS ESTIMATE | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES IN NET BENEFIT ESTIMATE* |
|---|---|---|
| Use of average temperatures (i.e., daily minimum and maximum) in estimating motor-vehicle emissions artificially reduces variability in VOC emissions. | Unable to determine based on current information. | Probably minor. Use of averages will overestimate emissions on some days and underestimate on other days. Effect is mitigated in Post-CAAA scenarios because of more stringent evaporative controls that are in place by 2000 and 2010. |
| Economic growth factors used to project emissions are an indicator of future economic activity. They reflect uncertainty in economic forecasting as well as uncertainty in the link to emissions. | Unable to determine based on current information. | Probably minor. The same set of growth factors are used to project emissions under both the Pre-CAAA and Post-CAAA scenarios, mitigating to some extent the potential for significant errors in estimating differences in emissions. |
| Uncertainties in the stringency, scope, timing, and effectiveness of Post-CAAA controls included in projection scenarios. | Unable to determine based on current information. | Probably minor. Future controls could be more or less stringent, wide-reaching (e.g., $NO_x$ reductions in OTAG region - see above), or effective (e.g., uncertainty in realizing all Reasonable Further Progress requirements) than projected. Timing of emissions reductions may also be affected (e.g., sulfur emissions reductions from utility sources have occurred more rapidly than projected for this analysis). |

* The classification of each potential source of error reflects the best judgment of the section 812 Project Team. The Project Team assigns a classification of "potentially major" if a plausible alternative assumption or approach could influence the overall monetary benefit estimate by approximately five percent or more; if an alternative assumption or approach is likely to change the total benefit estimate by less than five percent, the Project Team assigns a classification of "probably minor."

TABLE A-3. KEY UNCERTAINTIES ASSOCIATED WITH AIR QUALITY MODELING

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES ON NET BENEFITS ESTIMATE* |
|---|---|---|
| $PM_{10}$ and $PM_{2.5}$ concentrations in the East (RADM domain) are based exclusively on changes in the concentrations of sulfate and nitrate particles, omitting the effect of anticipated reductions in organic or primary particulate fractions. | Underestimate | Potentially major. Nitrates and sulfates constitute major components of PM, especially $PM_{2.5,}$ in most of the RADM domain and changes in nitrates and sulfates may serve as a reasonable approximation of changes in total $PM_{10}$ and total $PM_{2.5}$. Of the other components, primary crustal particulate emissions are not expected to change between scenarios; primary organic carbon particulate emissions are expected to change, but an important unknown fraction of the organic PM is from biogenic emissions, and biogenic emissions are not expected to change between scenarios. If the underestimation is major, it is likely the result of not capturing reductions in motor vehicle primary elemental carbon and organic carbon particulate emissions. |
| The number of $PM_{2.5}$ ambient concentration monitors throughout the U.S. is limited. As a result, cross estimation of $PM_{2.5}$ concentrations from $PM_{10}$ (or TSP) data was necessary in order to complete the "monitor-level" observational dataset used in the calculation of air quality profiles. | Unable to determine based on the current information. | Potentially major. $PM_{2.5}$ exposure is linked to mortality, and avoided mortality constitutes a large portion of overall CAAA benefits. Cross estimation of $PM_{2.5}$, however, is based on studies that account for seasonal and geographic variability in size and species composition of particulate matter. Also, results are aggregated to the annual level, improving the accuracy of cross estimation. |
| Use of separate air quality models for individual pollutants and for different geographic regions does not allow for a fully integrated analysis of pollutants and their interactions. | Unable to determine based on current information | Potentially major. There are uncertainties introduced by different air quality models operating at different scales for different pollutants. Interaction is expected to be most significant for PM estimates. However, important oxidant interactions are represented in all PM models and the models are being used as designed. The greatest likelihood of error in this case is for the summer period in areas with $NO_x$ inhibition of ambient ozone (e.g., Los Angeles). |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES ON NET BENEFITS ESTIMATE* |
|---|---|---|
| Future-year adjustment factors for seasonal or annual monitoring data are based on model results for a limited number of simulation days. | Overall, unable to determine based on current information | Probably minor. RADM/RPM and REMSAD PM modeling simulation periods represent all four seasons and characterize the full seasonal distribution. Potential overestimation of ozone, due to reliance on summertime episodes characterized by high ozone levels and applied to the May-September ozone season, is mitigated by longer simulation periods, which contain both high and low ozone days. Also, underestimation of UAM-V western and UAM-IV Los Angeles ozone concentrations (see below) may help offset the potential bias associated with this uncertainty. |
| Comparison of modeled and observed concentrations indicates that ozone concentrations in the western states were somewhat underpredicted by the UAM-V model, and ozone concentrations in the Los Angeles area were underestimated by the UAM-IV model. | Unable to determine based on current information | Probably minor. Because model results are used in a relative sense (i.e., to develop adjustment factors for monitor data) the tendency for UAM-V or UAM to underestimate absolute ozone concentrations would be unlikely to affect overall results. To the extent that the model is not accurately estimating the relative changes in ozone concentrations across regulatory scenarios, the effect could be greater. |
| Ozone modeling in the eastern U.S. relies on a relatively coarse 12 km grid, suggesting $NO_x$ inhibition of ambient ozone levels may be under represented in some eastern urban areas. Coarse grid may affect both model performance and response to emissions changes. | Unable to determine based on current information | Probably minor. Though potentially major for eastern ozone results in those cities with known $NO_x$ inhibition, ozone benefits contribute only minimally to net benefit projections in this study. Grid size affects chemistry, transport, and diffusion processes which in turn determine the response to changes in emissions, and may also affect the relative benefits of low-elevation versus high-stack controls. However, the approach is consistent with current state-of-the-art for regional-scale ozone modeling. |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES ON NET BENEFITS ESTIMATE* |
|---|---|---|
| UAM-V modeling of ozone in the western U.S. uses a coarser grid than the eastern UAM-V (OTAG) or UAM-IV models, limiting the resolution of ozone predictions in the West. | Unable to determine based on current information | Probably minor. Also, probably minor for ozone results. Grid cell-specific adjustment factors for monitors are less precise for the west and may not capture local fluctuations. However, exposure tends to be lower in the predominantly non-urban west, and models with finer grids have been applied to three key population centers with significant ozone concentrations. May result in underestimation of benefits in the large urban areas not specifically modeled (e.g., Denver, Seattle) with finer grid. |
| Emissions estimated at the county level (e.g., area source and motor vehicle $NO_x$ and VOC emissions) are spatially and temporally allocated based on land use, population, and other surrogate indicators of emissions activity. Uncertainty and error are introduced to the extent that area source emissions are not perfectly spatially or temporally correlated with these indicators. | Unable to determine based on current information | Probably minor. Potentially major for estimation of ozone, which depends largely on VOC and $NO_x$ emissions; however, ozone benefits contribute only minimally to net benefit projections in this study. |
| The REMSAD model underpredicted western PM concentrations during fall and winter simulation periods. | Unable to determine based on current information | Probably minor. Because model results are used in a relative sense (i.e., to develop adjustment factors for monitor data) REMSAD's underestimation of absolute PM concentrations would be unlikely to significantly affect overall results. To the extent that the model is not accurately estimating the relative changes in PM concentrations across regulatory scenarios, or the individual PM components (e.g., sulfates, primary emissions) do not vary uniformly across seasons, the affect could be greater. |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES ON NET BENEFITS ESTIMATE* |
|---|---|---|
| Lack of model coverage for acid deposition in Western states. | Underestimate | Probably minor. Because acid deposition tends to be a more significant problem in the eastern U.S. and acid deposition reduction contributes only minimally to net monetized benefits, the monetized benefits of reduced acid deposition in the western states would be unlikely to significantly alter the total estimate of monetized benefits. |
| Uncertainties in biogenic emissions inputs increase uncertainty in the AQM estimates. | Unable to determine based on current information | Probably minor. Potentially major impacts for ozone outputs, but ozone benefits contribute only minimally to net benefit projects in this study. Uncertainties in biogenics may be as large as a factor of 2 to 3. These biogenic inputs affect the emissions-based VOC/$NO_x$ ratio and, therefore, potentially affect the response of the modeling system to emissions changes. |
| * The classification of each potential source of error reflects the best judgment of the section 812 Project Team. The Project Team assigns a classification of “potentially major” if a plausible alternative assumption or approach could influence the overall monetary benefit estimate by approximately five percent or more; if an alternative assumption or approach is likely to change the total benefit estimate by less than five percent, the Project Team assigns a classification of “probably minor.” | | |

TABLE A-4. KEY UNCERTAINTIES ASSOCIATED WITH HUMAN HEALTH EFFECTS MODELING

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS ESTIMATE | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES IN NET BENEFIT ESTIMATE* |
|---|---|---|
| Application of C-R relationships only to those subpopulations matching the original study population. | Underestimate | Potentially major. The C-R functions for several health endpoints (including PM-related premature mortality) were applied only to subgroups of the U.S. underestimate the whole population benefits of reductions in pollutant exposures. In addition, the demographics of the study population in the Pope et al. study (largely white and middle class) may result in an underestimate of PM-related mortality, because the effects of PM tend to be significantly greater among groups of lower socioeconomic status. |
| No quantification of health effects associated with exposure to air toxics. | Underestimate | Potential major. According to EPA criteria, over 100 air toxics are known or suspected carcinogens, and many air toxics are also associated with adverse health effects such as neurotoxicity, reproductive toxicity, and developmental toxicity. Unfortunately, current data and methods are insufficient to develop (and value) quantitative estimates of the health effects of these pollutants. |
| Use of long-term global warming estimates in Title VI analysis that show more severe warming than is now generally anticipated. | Overestimate (for Title VI estimate only) | Potentially major. Global warming can accelerate the pace of stratospheric ozone recovery; if warming is less severe than anticipated at the time the Title VI analyses were conducted, the modeled pace of ozone recovery may be overestimated, suggesting benefits of the program could be delayed, perhaps by many years. The magnitude of estimated Title VI benefits suggests that the impact of delaying benefits could be major. |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS ESTIMATE | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES IN NET BENEFIT ESTIMATE* |
|---|---|---|
| The quantitative analysis of Title VI (see next section) does not account for potential increases in averting behavior (i.e., people's efforts to protect themselves from UV-b radiation). | Unable to determine based on current information | Potentially major. Murdoch and Thayer (1990) estimate that the cost-of-illness estimates for nonmelanoma skin cancer cases between 2000 and 2050 may be almost twice the estimated cost of averting behavior (application of sunscreen). Our Title VI analysis relies on epidemiological studies, which incorporate averting behavior as currently practiced. Omission of future increases in averting behavior, however, may overstate the benefits of reduced emissions of ozone-depleting chemicals. Benefits could be understated if individuals alter their behaviors in ways that could increase exposure or risk (e.g., sunbathing more frequently). A recent European study by Autier et al. (1999) found that the use of high sun protection factor (SPF) sun screen is associated with increased frequency and duration of sun exposure. |
| Analysis assumes a causal relationship between PM exposure and premature mortality based on strong epidemiological evidence of a PM/mortality association. However, epidemiological evidence along cannot establish this causal link. | Unable to determine based on current information | Potentially major. A basic underpinning of this analysis, this assumption is critical to the estimation of health benefits. However, the assumption of causality is suggested by the epidemiologic evidence and is consistent with current practice in the development of a best estimate of air pollution-related health benefits. At this time, we can identify no basis to support a conclusion that such an assumption results in a known or suspected overestimation bias. |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS ESTIMATE | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES IN NET BENEFIT ESTIMATE* |
|---|---|---|
| Across-study variance/application of regionally derived C-R estimates to entire U.S. | Unable to determine based on current information | Potentially major. The differences in the expected changes in health effects calculated using different underlying studies can be large. If differences reflect real regional variation in the PM/mortality relationship, applying individual C-R functions throughout the U.S. could result in considerable uncertainty in health effect estimates. |
| Estimate of non-melanoma skin cancer mortality resulting from reductions in stratospheric ozone is calculated indirectly, by assuming the mortality rate is a fixed percentage of non-melanoma incidence. | Unable to determine based on current information | Potentially major. New data on the death rate for non-melanoma skin cancer may significantly influence the Title VI mortality estimate. Some preliminary estimates suggest that this estimate may need to be adjusted downward. |
| The baseline incidence estimate of chronic bronchitis based on Abbey et al. (1995) excluded 47 percent of the cases reported in that study because those reported "cases" experienced a reversal of symptoms during the study period. These "reversals" may constitute acute bronchitis cases that are not included in the acute bronchitis analysis (based on Dockery et al. 1996). | Underestimate | Probably minor. The relative contribution of acute bronchitis cases to the overall benefits estimate is small compared to other health benefits such as avoided mortality and avoided chronic bronchitis. |
| CAAA fugitive dust controls implemented in PM non-attainment areas would reduce lead exposures by reducing the re-entrainment of lead particles emitted prior to 1990. This analysis does not estimate these benefits. | Underestimate | Probably minor. While the health and economic benefits of reducing lead exposure can be substantial (e.g., see section 812 Retrospective Study Report to Congress), most additional fugitive dust controls implemented under the Post-CAAA scenario (e.g., unpaved road dust suppression, agricultural tilling controls, etc.) tend to be applied in relatively low population areas. |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS ESTIMATE | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES IN NET BENEFIT ESTIMATE* |
|---|---|---|
| Exclusion of C-R functions from short-term exposure studies in PM mortality calculations. | Underestimate | Probably minor. Long-term PM exposure studies may be able to capture some of the impact of short-term peak exposure one mortality; however, the extent of overlap between the two study types is unclear. |
| Age-specific C-R functions for PM related premature mortality not reported by Pope et al. (1995). Estimation of the degree of life-shortening associated with PM-related mortality used a single C-R function for all applicable age groups. | Unable to determine based on current information | Unknown, possibly major when using a value of life year's approach. Varying the estimate of degree of prematurity has no effect on the aggregate benefit estimate when a value of statistical life approach is used, since all incidences of premature mortality are valued equally. Under the alternative approach based on valuing individual life-years, the influence of alternative values for number of average life years lost may be significant. |
| Assumption that PM-related mortality occurs over a period of five-years following the critical PM exposure. Analysis assumes that 25 percent of deaths occur in year one, 25 percent in year two, and 16.7 percent in each of the remaining three years. | Unable to determine based on current information | Probably minor. If the analysis underestimates the lag period, benefits will be overestimated, and vice-versa. However, available epidemiological studies do not provide evidence of the existence or potential magnitude of a lag between exposure and incidence. Thus, an underestimate of the lag seems unlikely. If the assumed lag structure is an overestimate, even if benefits are fully discounted from the future year of death, application of reasonable discount rates over this period would not significantly alter the monetized benefit estimate. |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS ESTIMATE | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES IN NET BENEFIT ESTIMATE* |
|---|---|---|
| Extrapolation of criteria pollutant concentrations to populations distant from monitors. | Unable to determine based on current information | Probably minor. Extrapolation method is most accurate in areas where monitor density is high. Monitor density tends to be highest in areas with high criteria pollutant exposures; thus most of this uncertainty affects low exposure areas where benefits are likely to be low. In addition, an enhanced extrapolation method incorporation modeling results is used for areas fare (> 50 km) from a monitor. |
| Exposure analysis in areas beyond 50 km is based on a new technique that relies on the direct use of air quality modeling results in combination with adjusted monitor data. | Unable to determine based on current information | Probably minor. The new technique is used for less than 10 percent of the country for PM exposure, and less than 15 percent for ozone. The approach we use should be more accurate than the alternative approach of linear interpolation over long distances. The new method nonetheless requires further testing against monitor data to access its accuracy. |
| Pope et al. (1995) study did not include pollutants other than PM. | Unable to determine based on current information | Probably minor. If ozone and other criteria pollutants correlated with PM contribute to mortality, that effect may be captured in the PM estimate. Thus, PM is essentially used as a surrogate for a mix of pollutants. This uncertainty does make it difficult to disaggregate avoided mortality benefits by pollutant, however other studies (besides Pope) suggest that PM is the dominant factor in premature mortality. |
| * The classification of each potential source of error reflects the best judgment of the section 812 Project Team. The Project Team assigns a classification of "potentially major" if a plausible alternative assumption or approach could influence the overall monetary benefit estimate by approximately five percent or more; if an alternative assumption or approach is likely to change the total benefit estimate by less than five percent, the Project Team assigns a classification of "probably minor." | | |

**TABLE A-5. KEY UNCERTAINTIES ASSOCIATED WITH ECOLOGICAL EFFECTS ESTIMATION**

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES ON NET BENEFITS ESTIMATE* |
|---|---|---|
| Incomplete coverage of ecological effects identified in existing literature, including the inability to adequately discern the role of air pollution in multiple stressor effects on ecosystems. | Underestimate | Potentially major. The extent of unquantified and unmonetized benefits is largely unknown, but the available evidence suggests the impact of air pollutants on ecological systems may be widespread and significant. At the same time, it is possible that a complete quantification of effects might yield economic valuation results that remain small in comparison to the total magnitude of health benefits. |
| Omission of the effects of nitrogen deposition as a nutrient with beneficial effects. | Overestimate | Probably minor. Although nitrogen does have beneficial effects as a nutrient in a wide range of ecological systems, nitrogen in excess also has significant and in some cases persistent detrimental effects that are also not adequately reflected in the analysis. |
| Incomplete assessment of long-term bioaccumulative and persistent effects of air pollutants. | Underestimate | Potentially major. Little is currently known about the longer-term effects associated with the accumulation of toxins in ecosystems. But what is known suggests the potential for major impacts. Future research into the potential for threshold effects is necessary to establish the ultimate significance of this factor. |
| The PnET II modeling of the effects of ozone on timber yields relies on a simplified mechanism of response (i.e., changes in net primary productivity). | Overestimate | Probably minor. Existing evidence suggests that the growth changes PnET II projects are relatively large, however none of the currently available points of comparison fully address such issues as the impact of stand-level competition, and the net primary productivity results are within the range of results of other studies of environmental and anthropogenic stressors. |

* The classification of each potential source of error reflects the best judgment of the section 812 Project Team. The Project Team assigns a classification of "potentially major" if a plausible alternative assumption or approach could influence the overall monetary benefit estimate by approximately five percent or more; if an alternative assumption or approach is likely to change the total benefit estimate by less than five percent, the Project Team assigns a classification of "probably minor."

**TABLE A-6. SUMMARY OF KEY SOURCES OF UNCERTAINTY AND THEIR IMPACT ON COSTS AND BENEFITS**

| SOURCE OF UNCERTAINTY | DESCRIPTION OF ALTERNATIVE PARAMETER INPUTS | IMPACT ON ANNUAL ESTIMATES IN 2010 | |
|---|---|---|---|
| | | COSTS | BENEFITS |
| Measurement error and uncertainty in the physical effects and economic valuation steps. | Use a range of input assumptions to reflect statistical measurement uncertainty in concentration-response functions, modeling of physical effects, and estimation of economic values. Most important input parameters are value of statistical life and estimated relationship between particulate matter and premature mortality (see Chapters 5, 6, and 7). | None | For Titles I through V, effect of the use of alternative input assumptions ranges from $84 billion decrease (5th percentile) to a $160 billion increase (95th percentile). |
| Measurement error and uncertainty in direct cost inputs | Use alternative assumptions for key input parameters for six of the highest cost provisions. Conduct sensitivity tests for each provision separately (see Chapter 3, pages 30 to 32). As discussed in Chapter 3 and in this chapter, aggregation of provision-specific results would be inappropriate. | High estimates for some provisions are $1 billion higher than primary estimate. Low estimates are as much as $2 billion below primary estimates. | None |
| Value of statistical life-based estimates do not reflect age at death. | Use estimates of the incremental number of life-years lost from exposure to ambient PM and a value of statistical life-year as opposed to measuring number of lives lost and a value of statistical life (see Chapters 5 and 6). | None | Decrease by $47 billion |
| Basis of estimate of avoided mortality from PM exposure | The Dockery et al. study provides an alternative estimate of the long-term relationship between chronic PM exposure and mortality (see Chapter 5). | None | Increase by $100 to $150 billion |

| SOURCE OF UNCERTAINTY | DESCRIPTION OF ALTERNATIVE PARAMETER INPUTS | IMPACT ON ANNUAL ESTIMATES IN 2010 | |
|---|---|---|---|
| | | COSTS | BENEFITS |
| Uncertainties in title VI health benefits analysis | Major uncertainties include: estimating fatal cancer cases resulting from UV-b exposure; not accounting for future averting behavior; and not accounting for future improvements in the early detection and treatment of melanoma (see Table 5—6). | None | Not quantified, but net effect is probably that benefits estimates are too low. |
| Omission of potentially important benefits categories from primary estimates. | Non-quantified categories of impacts summarized in Chapters 5 and 7. Quantified but omitted categories include household soiling, nitrogen deposition, and residential viability (see Chapter 7). | None | Increase by at least $8 billion, (does not reflect unquantified categories). |

# APPENDIX B | UNCERTAINTY ANALYSIS OF THE INTEGRATED AIR QUALITY MODELING SYSTEM

March 30, 2009

To: James Neumann, Industrial Economics, Inc. STI-908026.02-3537-TM

From: Neil Wheeler and Kenneth Craig

Re: Uncertainty Analysis of the Integrated Air Quality Modeling System for use in the U.S. Environmental Protection Agency's Section 812 Second Prospective Analysis

Under Section 812 of the Clean Air Act Amendments (CAAA), the U.S. Environmental Protection Agency (EPA) is requested to periodically conduct and submit to Congress a report on economic benefits and costs of all provisions of the Act and its Amendments. The EPA delivered the first of these reports, a retrospective analysis covering provisions of the original Clean Air Act during the period 1970-1990, in 1997, and the second report, a prospective analysis covering provisions of the CAAA during the period 1990-2010, in 1999.

The EPA is currently working on the third report to be developed under Section 812. This "Second Prospective Analysis" will estimate benefits and costs for provisions of the Amendments as they are expected to be implemented during the period 1990-2020.

In September 2004, Sonoma Technology, Inc. (STI) completed a literature review that summarized much of the existing uncertainty literature and assessed the possible application of existing approaches to the Second Prospective Analysis for estimating the uncertainties in the integrated air quality modeling system (IAQMS), which includes the emissions, meteorological, and air quality models.[148]

This memorandum covers the two deliverables for Work Assignment 4-15 as revised on October 15, 2008. The first deliverable is an updated literature review of uncertainties in IAQMSs and methods for quantifying them (Section 1) and the evaluation and overall reliability of IAQMSs (Section 2). The second deliverable is a discussion of the IAQMS used in the Second Prospective Analysis and a draft table that summarizes key uncertainties in the IAQMS, potential sources of error, potential biases for the net benefits estimate, and the likely significance relative to key uncertainties in net benefit estimate (Section 3). References cited throughout this document are provided in Section 4.

[148] See September 30, 2004 memorandum to Nona Smoke and James DeMocker, EPA/OAR/OPAR, from Neil Wheeler and Kiren Baum, Sonoma Technology, Inc., "Response to Council Comments on the May 2003 Draft Analytical Plan for the Section 812 Second Prospective – Options for Uncertainty Analysis for Emissions and Air Quality Analyses".

## UNCERTAINTIES IN THE IAQMS

*Sources of Uncertainty*

Uncertainty in estimated values for future air quality arises from at least three sources: (1) inherent or stochastic variability in the observations; (2) errors in model physics and chemistry assumptions; and (3) errors caused by uncertainties in model input variables. For prospective analyses, we need to focus on uncertainty in the context of model response to future-year emissions. For example, an air quality model (AQM) may be very sensitive to a particular input without affecting its response to emission changes. Alternatively, an AQM may show little sensitivity to an input under current conditions (e.g., boundary conditions) but become increasingly sensitive to that input in future years as anthropogenic emissions are reduced.

*Measurement Uncertainty*

While measurement uncertainty is less important when using relative reduction factors (RRFs) and linear cost-response functions, it can affect the ability to evaluate model performance and gain confidence that a model is getting the right answer for the right reason. For gases, instruments can be calibrated using gases of known concentrations, and the uncertainty in the measurement is reasonably well known. However, this is not the case for PM. Uncertainties in PM mass and speciation can be significant, which limits our ability to critically evaluate model performance and reduce uncertainty in model simulations.

Hogrefe et al. (2000) developed an approach to gain insight into the distribution of future air quality predictions attributable to variability in currently observed air quality at a given location. The procedure is to fit a theoretical statistical distribution to the tail of a set of daily observations at a monitoring site (e.g., over a three-year period) and compute a design value consistent with the form of the National Ambient Air Quality Standards (NAAQS). The next step is to perform a bootstrapping operation several hundred times to obtain different sets of air quality data. For each instance, a design value is determined from the resulting data. The result is a distribution of current design values, which can be translated into a distribution of future air quality estimates using the RRF approach recommended in EPA guidance. While work so far has focused on the 1-hr and 8-hr NAAQS for ozone, it may be possible to apply the methodology to PM-related applications.

*Model Uncertainty*

Emissions, meteorological, and air quality models are mathematical representations of the physical world, and as such, have inherent uncertainties associated with their formulation, assumptions, and implementation. Some of the uncertainties are due to the limitations of our scientific knowledge. Other uncertainties are a result of simplifications or approximations needed to make the model practical. At the present time, we do not see a way to completely quantify uncertainty caused by inherent limitations in a model. However, methods and a body of research are available to help us understand the importance of uncertainty in individual model components. We can also reduce uncertainty by using models whose scientific basis is fully and satisfactorily explained in its accompanying documentation.

In some cases, it is necessary to use a simplified "engineering" or "reduced-form" version of a model. Uncertainty inherent in such results may be reduced if it has been shown that the engineering and more complete versions of a model produce similar results under the conditions that are of greatest interest for a particular application.

*Input Uncertainty*

The best-formulated and least uncertain models are only as good as their inputs. Model input uncertainty has been explored extensively in past decades and has driven research to improve these model inputs. In some cases, these inputs are based on measurements, which may be available only at limited temporal or spatial resolutions. In other cases, the input for one model may be the output of another model (i.e., the use of a mobile source emissions model to provide input to an AQM).

*Methods for Assessing the Effects of Uncertainty*

Sensitivity analysis is the most widely used method for assessing the effects of uncertainty on future-year air quality outcomes. Process analysis has been used in more recent AQM applications to identify those processes in the AQM that contribute the most to predicted pollutant concentrations and, thus, may be most affected by uncertainty. These methods and their use are discussed in greater detail below.

*Sensitivity Analysis*

The response of AQM predictions to changes of input parameters or model options can provide valuable information about uncertainties in model predictions. Such information can be obtained by sensitivity analysis, the systematic calculation of sensitivity coefficients, to quantitatively measure these dependencies. Basic sensitivity analysis may involve perturbing input parameters or model options one at a time or in combinations.

Beck et al. (1997) provide an overview of evaluations and uncertainties of environmental models, with emphasis on water quality models. They stress the need to specify a hypothesis or question to be answered by the model, and describe three alternatives to basic sensitivity analysis: (1) brute-force MC uncertainty analysis; (2) response surface evaluation; and (3) first-order error analysis, which is sometimes called sensitivity or "small perturbation" analysis. Each technique is discussed below.

<u>Basic Sensitivity Analysis</u>

Because of its ease of use and interpretation, there exist many examples of basic sensitivity analysis applied to AQMs. For example, Seigneur et al. (1981) estimated the sensitivities of an urban model to variations in input data. Winner et al. (1995) and Dabdub et al. (1999) showed that ozone predictions are especially sensitive to the inflow boundary conditions in Los Angeles and the San Joaquin Valley, respectively. Hass et al. (1997) carried out a sensitivity study of four European long-range transport and dispersion models, finding factors of 2 to 3 differences in the sensitivities of the different models to variations in emissions. Our review of these sensitivity studies suggests that the results are applicable only to a narrow range of conditions associated with the specific scenario. Because photochemical processes are often non-linear, the magnitude and even the sign of the sensitivity coefficients may vary as the scenario varies.

While meteorological parameters are undoubtedly important in photochemical grid models, it is not easy to decide how to account for variations in meteorology, especially wind speed and direction. The problem is that it is necessary for the wind field to always satisfy mass-continuity, so that it is not correct to simply randomly vary the winds in each grid square of the model. Photochemical grid models make use of meteorological preprocessors, which may adjust the wind fields so they are mass-consistent. Hanna et al. (1998) avoided this problem by assuming that the perturbations in wind speed and direction applied uniformly across all grid squares. Schere and Coates (1992) suggested a more elegant (and time-consuming) method of accounting for uncertainties or variations in winds. Bergin et al. (1999) attacked the problem by generating a small number of alternate wind fields based on systematically "withdrawing" data from the meteorological preprocessor. This method is a useful first estimate but will underestimate the total uncertainty because of the limited number of runs and the failure to account for the full range of wind uncertainty.

Meteorologists have accounted for variability in weather forecasts by applying the "ensemble" method in which several forecast models (i.e., an ensemble) are run for the same scenario, and the best-guess forecast is assumed to be given by the mean of the several forecasts. These methods have been applied to air quality models by Straume et al. (1998), who showed that the ensemble method produced improved forecasts of tracer concentrations for the long-range ETEX tracer experiment in Europe. It is implied that the uncertainty would be given by the variability of the forecasts. These methods have also been extended to regulatory air quality modeling by using and evaluating alternative AQMs. For example, Ozone Transport Assessment Group (1997) modeling used multiple meteorological models (SAIMM and RAMS) and multiple AQMs (UAM-V and CAMx) for some episodes. However, it is clear that the full range of possible input conditions can not be covered by these ensemble methods.

The EPA guidance documents on attainment demonstrations (U.S. Environmental Protection Agency, 1999, 2001) identify three sensitivity tests that may be useful for assessing uncertainty in AQM predictions. The first of these, which has been proposed by Reynolds et al., (1996), is to prepare "alternative base-case" emission estimates, reflecting reasonable alternative assumptions about current emissions that lead to comparable or better model performance. A second test is to assume alternative (reasonable) growth assumptions. This could reflect using differing growth rates or placement of new sources in different, equally probable locations. Combinations of these first two tests are also possible. A third test involves simulating a future-year case with an alternative grid resolution or with different (reasonable) meteorological assumptions. For example, due to resource constraints, it might be necessary to perform modeling using a grid with 36-km grid cells (horizontal dimension). Differences in projected air quality obtained with a grid having 12-km or 4-km cells could then be evaluated.

The EPA guidance documents on modeling for attainment demonstrations were influenced by earlier guidance developed at the California Air Resources Board (CARB), which specifically addressed uncertainty (DaMassa, 1992). CARB applied this guidance in a series of uncertainty analyses to support the development of California's State Implementation Plans (SIPs). This program included analyses of uncertainty associated with future-year boundary conditions (Wagner and Wheeler, 1988), meteorology (Wagner and Wheeler, 1989; Wheeler, 1992), emission inventory bias (Wagner et al., 1992), horizontal advection solvers (Odman et al.,

1996), chemical mechanisms (Whitten and Killus, 1998), and photolysis rates (Vuilleumier et al., 2000).

Monte Carlo Uncertainty Analysis

Monte Carlo (MC) methods are the most widely used means for uncertainty analysis. These methods involve random sampling from the distribution of inputs and successive model runs until a statistically significant distribution of outputs is obtained. There has been a rapid growth in the use of MC uncertainty analysis with photochemical AQMs in recent years. This "brute-force" method is computer-intensive because it requires 50 to 100 or more model runs for each base-year and future emission scenario. However, because of the exponential growth of computer speed and storage, it is now possible to carry out MC runs with a complex photochemical grid model applied to large domain. This method has been widely used in other environmental fields (e.g., water pollution modeling), as described in the reviews by International Atomic Energy Agency (IAEA) (1989), National Council on Radiation Protection and Measurements (NCRP) (1996), and Beck et al. (1997).

One of the first applications of MC uncertainty analysis to photochemistry was the study of relationships between stratospheric ozone and chlorine reported by Solarski et al. (1978). Alcamo and Bartnicki (1987) used MC methods to study the uncertainties in sulfur deposition predicted by the EMEF-W model in Europe. They found that it is more important to specify the width (i.e., the standard deviation) rather than the shape of the probability density function of the input variables. Irwin et al. (1987) performed an MC uncertainty analysis to estimate error bounds from the output of a Gaussian dispersion model. Uncertainties in wind speed, standard deviation of vertical and lateral wind direction fluctuations, and plume rise were propagated through the modeling system. It was found that the error bounds for the maximum concentration could be double that of the error bounds for the input parameters. This is one of the earlier papers on using uncertainty analysis on a dispersion model. Gao et al. (1996) applied MC uncertainty analysis to the chemical rate parameters. Deuel et al. (1998) studied the uncertainties of the UAM-V model using MC methods; however, the uncertainty ranges that they assumed for the input variables (vertical resolution, vertical diffusivity, plume-in-grid method, land-use, chemical reaction rates, and emissions) were a third or less than those recommended by the experts in the studies by Hanna et al. (1998, 2001). Bergin et al. (1999) applied MC methods with Latin Hypercube Sampling (LHS) to a Lagrangian photochemical AQM (i.e., not a grid model) in Southern California. They accounted for meteorological variability by using several solutions of a mass-consistent wind model, run with random data-withholding assumptions.

Frey (1992) discusses the decision process followed in applications of MC uncertainty analysis, stressing the importance of good estimates of input data uncertainties. Conover (1971) provides guidance concerning the computation of statistical tolerance limits from a simple random sample. Bergin et al. (1999) discuss the use of LHS, which they believe provides a better coverage of the data distribution than Simple Random Sampling (SRS). However, the advantage of LHS comes with a price—only with SRS can the confidence in the results be interpreted through statistical tolerance limits.

From a practical standpoint, Hanna et al. (2001) demonstrated that MC methods could be applied to larger photochemical modeling studies (i.e., OTAG) by performing 100 simulations each for a base-case and three emission reduction scenarios. Hanna and Davis (2002) evaluated

the UAM-V photochemical grid model by examining probability density functions of the variations in modeled ozone concentrations. The probability density functions are generated from 100 MC uncertainty simulations based on uncertainties in model input variables.

Houyoux et al. (2003) simplified the use of AQMs for assessing emission inventory uncertainties by generating multiple realizations of model-ready emissions with the Sparse Matrix Operator Kernel Emissions (SMOKE) processing system (Coats and Houyoux, 1996) by modifying SMOKE to accept parametric and empirical probability distributions to describe the uncertainty about them. This approach allows emissions modelers to assign uncertainty information about an existing inventory without having to change the actual inventory files. The same inventories can be used for both deterministic (i.e., without uncertainty) modeling and stochastic modeling (i.e., with uncertainty), and the type of modeling that is performed depends only on the presence of the additional inventory uncertainty file.

Wang et al. (2000) estimated uncertainties in incremental reactivities for the SAPRC-97 chemical mechanism, with an emphasis on aromatic mechanism parameters, using Monte Carlo analysis with LHS. Rodriguez and Dadbub (2003) performed an MC uncertainty and sensitivity analysis of the Caltech Atmospheric Chemistry Mechanism (CACM), with an emphasis placed on secondary organic aerosol. Uncertainties were propagated through box model simulations.

Hanna et al. (2006) performed a Monte Carlo uncertainty analysis with ISCST3 and AERMOD to study uncertainties in annual average benzene and 1,3-butadiene concentrations in the Houston Ship Channel area caused by uncertainties in meteorological inputs, emissions inputs, and dispersion model parameters.

Martien et al (2006) developed a continuous adjoint sensitivity analysis procedure for a three-dimensional photochemical model to determine the sensitivity of a small number of model responses to many parameters. Menut (2003) also applied an adjoint sensitivity method for a photochemical sensitivity analysis.

Deguillaume et al. (2007) applied a Bayesian Monte Carlo uncertainty analysis to a regional-scale inverse emission modeling study to estimate emission uncertainty in the Ile-de-France region. Deguillaume et al. (2008) applied a Bayesian Monte Carlo analysis to evaluate model uncertainty in ozone production and its sensitivity to emission changes in the CHIMERE model for the Ile-de-France region during the 1998 and 1999 summer seasons. The use of observations to constrain the analysis reduced uncertainty of predicted ozone concentrations.

Response Surface Analysis

Forms of response surface approximations have been used in a variety of scientific, engineering, and economic modeling applications, including groundwater flow using the Stochastic Response Surface Method (SRSM) (Balakrishnan et al., 2003, 2005); radiative forcing by anthropogenic sulfate aerosol Probability Collocation Method (PCM) (Pan et al., 1998); climate change using the PCM (Webster and Sokolov, 2000; Webster et al., 2006), and soil moisture in the NOAA Land Surface Model (Hossain et al., 2004).

Response surface models have been used in the air quality field for the past decade. Calbo et al. (1998) used PCM to develop a parameterization consisting of a set of analytical expressions that approximate the predictions by the CIT Urban Airshed Model. Parameterization

development was the ultimate focus of this work, but the authors mentioned that their parameterization was applicable to detailed uncertainty and sensitivity analysis. Isukapalli et al., (1998) applies SRSM to propagate uncertainty through the Reactive Plume Model (RPM-IV). The results agreed closely with those of traditional MC and LHS methods, while significantly reducing the required number of model simulations. Isukapalli et al. (2000) coupled SRSM to the Automatic Differentiation of FORTRAN (ADIFOR) to propagate uncertainty through the Reactive Plume Model (RPM-IV). EPA has developed and used an RSM based on the Community Multiscale Air Quality (CMAQ) model to develop emissions control scenarios in support of the Regulatory Impact Assessment for the $PM_{2.5}$ NAAQS (U.S. Environmental Protection Agency, 2006b).

The response surface method is at the other extreme from simple one-at-a-time sensitivity studies. This method (Tatang et al., 1997) attempts to fit orthogonal polynomials to the input conditions and the predictions of numerical geophysical models. For this approach, it is necessary to run the models a sufficient number of times to have enough data to develop the response surfaces. It is claimed that 25 to 60 times fewer runs are needed than for a MC SRS exercise. However, in a Response Surface Model (RSM) pilot study, Hubbell (2003) reported that 144 REMSAD runs were required to characterize a second order polynomial surface to develop an RSM for $PM_{2.5}$.

Nevertheless, the response surface is a model of a model and, therefore, is susceptible to problems associated with scenarios outside of the range of parameters used to generate the data for deriving the model.

First-order Sensitivity Analysis

Sensitivity analysis has not been used as extensively as desired because of implementation complexity and computational limitations. As a result, the simple “brute-force” method has been used most frequently to determine model sensitivities, especially in multidimensional chemistry transport models. By this method, a separate simulation is required to calculate the effects of each parameter or emission rate in the model. However, this approach rapidly becomes impractical when a large number of sensitivity coefficients need to be computed.

A number of other approaches have been developed to calculate sensitivity coefficients. One method of reducing this effort is determining the equations governing the sensitivity coefficients and solving them directly. In this method, the sensitivity equations are derived from the model equations and solved simultaneously with the model equations. This method proved to be unstable and inefficient when applied to stiff equations found in many air quality problems (Dunker, 1984). Other techniques rely on Green’s function (Rabitz et al., 1983; Cho et al., 1987; Harley et al., 1997) or the adjoint method, in which the sensitivity coefficients are computed from integrals of the Green’s function of sensitivity equations derived from the model equations.

The automatic differentiation of Fortran (ADIFOR) technique (Bischof et al., 1992) automatically translates large FORTRAN codes to a subprogram that includes the original functions as well as those for the desired sensitivity coefficients. This method has been used in past studies for sensitivity analysis of the advection equation as used for atmospheric modeling (Hwang et al., 1997), and initial concentrations and reactions rates in photochemical models

(Carmichael et al., 1997). Because ADIFOR is designed for general-purpose sensitivity analysis, the expanded codes do not take advantage of the program structure and re-use of calculations. Also, computing some sensitivity coefficients, such as those with respect to the subdomain emissions or the boundary conditions, requires additional modifications that can be cumbersome.

Another approach for computing sensitivity coefficients is the decoupled direct method (DDM) (Dunker, 1981; 1984), in which the sensitivity equations are derived from the model equations, but solved separately. DDM does not share the instability problem found with the direct and adjoint methods. Furthermore, the implementation of this method is more straightforward than the coupled direct or adjoint methods because the sensitivity equations are linear, even though they are functions of concentrations. Therefore, the calculations of sensitivity coefficients are much less computationally demanding. Milford et al. (1992) and Seefeld and Stockwell (1999) also applied the DDM to study variations in chemical rate constants.

Another technique for sensitivity study is DDM-3D (decoupled direct method in three dimensions), which has been successfully implemented in the CIT, CAMx, and CMAQ photochemical AQMs. This approach is highly computation-efficient and capable of calculating a full set of model sensitivity in a three-dimensional domain. Yang et al. (1997) first implemented DDM in a three-dimensional photochemical model (now known as DDM-3D). This implementation was used to calculate first-order ozone sensitivities to dry deposition velocity, initial conditions, rate constants, and $NO_x$ and VOC emissions for a 1987 South Coast ozone episode. DDM-3D was implemented into CAMx version 3.0.0 by Dunker et al. (2002) to calculate first-order ozone sensitivities with respect to emissions and boundary conditions for a 1995 Lake Michigan ozone episode.

<u>Higher-order Sensitivity Analysis</u>

First-order DDM sensitivity analysis is limited because it assumes linear responses to input changes. The use of the higher-order direct decoupled method (HDDM) and its higher-order coefficients allows DDM to be extended to study non-linear responses, and can be used to study the uncertainty of modeled sensitivities. Most studies that have implemented and tested HDDM have not specifically used the technique to examine uncertainty in pollutant response attributable to uncertainties in inputs.

Hakami et al. (2003) extended DDM-3D to calculate higher-order ozone sensitivities in the MAQSIP photochemical grid model for the 1990 SARMAP domain. HDDM was initially implemented for the CB-IV chemical mechanism, and later extended to the more complex SAPRC chemical mechanism (Hakami et al., 2004). HDDM was ported to CMAQ by Cohan et al. (2005) to CMAQ and applied to a 2001 ozone episode during the Fall Line Air Quality Study. Recently, DDM-3D was extended to calculate first-order sensitivities of $PM_{2.5}$ species in CMAQ (Napelenok et al. 2006).

Hakami et al. (2003) and Cohan et al. (2005) suggested that second-order sensitivity coefficients calculated from HDDM could be applied to quantitatively determine the uncertainty in pollutant sensitivity to uncertain photochemical model inputs. Cohan et al. (2005) used higher-order sensitivity coefficients from HDDM to illustrate how sensitivity and source apportionment estimates can be affected by uncertainty in emissions inventories. Jin et al. (2008) used the second-order sensitivity coefficients from HDDM in CMAQ to assess the

influences of uncertainties in various model inputs. Uncertainties in $NO_x$ and anthropogenic VOC emissions, and the rate coefficient for the OH + $NO_2$ termination reaction were found to have the greatest effect on first-order ozone responses to changes in $NO_x$ emissions.

Though Jin et al. (2008) and Cohan et al. (2005) use HDDM to assess uncertainty, true quantitative uncertainty estimates of pollutant sensitivity to uncertain model inputs remain elusive. An attempt is currently underway to perform a quantitative uncertainty analysis using CMAQ-HDDM, with a Monte Carlo analysis as a post-processor (Digar et al. 2008).

*Process Analysis*

A technique called process analysis (PA) has been used to assess relative importance of various model assumptions as well as simulated physical and chemical phenomena contributing to an ozone concentration at a particular time and location (Jeffries, 1997; Jeffries et al., 1996; Jang et al., 1995; and Lo and Jeffries, 1997). Because models used to simulate ozone and secondary particulate matter are similar, process analysis should also be useful for addressing $PM_{2.5}$ issues. The technique works by breaking down a modeled simulation into a sequence of physical and chemical processes that lead to a predicted concentration at a given location and time and by tracking the contributions of those processes. PA has been implemented in CMAQ and CAMx but not REMSAD.

While PA requires a substantial amount of expertise to be interpreted to full advantage, useful insights are possible with less detailed analyses. PA takes advantage of numerical grid models that address physical and chemical factors affecting ozone in a sequential manner. For example, a typical sequence followed in a model for each time step might be (1) advection of $PM_{2.5}$ components and precursors present at the beginning of the time step, (2) $PM_{2.5}$ and precursor emissions added during the time step, (3) vertical diffusion of the advected material and fresh emissions, (4) estimated cloud cover and its effects on photolysis rates, (5) atmospheric chemistry involving advected and diffused material with fresh emissions, and (6) deposition of certain compounds. PA examines incremental effects on changes in component and/or $PM_{2.5}$ predictions from hour to hour attributable to each of the processes described above. In this way, one gets a sense of how important each process is as a contributor to predicted air quality at a specific time and location.

<u>Quantifying Uncertainty in Model Inputs and Options</u>

The first step in uncertainty analysis is to estimate the uncertainties in model input variables and options. Model options may include alternative techniques for solving model equations or alternative physical or chemical submodels. The two primary methods available for the Second Prospective Analysis are literature reviews and expert elicitation. For longer-term efforts in assessing uncertainty, these methods could be supplemented with specific applications of methods already discussed in the literature and in new research.

*Literature Reviews*

Past and current literature can provide estimates of uncertainties in model inputs based on measurement and sensitivity studies. Because models and measurements are constantly evolving, care must be taken to ensure that estimates of uncertainty in the literature are still valid.

Emission Inventories

Table 1 provides an overview of methods reviewed for the Emission Inventory Improvement Program (EIIP) in its final report on evaluating the uncertainty of emission estimates (Emission Inventory Improvement Program, 1996). While many of the studies cited are now out of date, the report provides a good summary of the methods available for quantifying uncertainty. NARSTO (2005) prepared an assessment of emission inventories across North America. NARSTO's findings on the relative confidence levels for emission inventories are summarized in Table 2.

Additional research has been performed to develop and demonstrate improved methods for quantifying uncertainty in emission inventories. A complete review of research on quantifying uncertainty in emission estimates was not possible within the scope of this work assignment. However, the following discussion provides many examples of the methods used and the results obtained.

In the area of mobile source emissions, Kini and Frey (1997) developed quantitative estimates of uncertainty associated with Mobile5b emission factor model estimates of light-duty gasoline-vehicle base emissions and speed-corrected emissions and found that the uncertainty in average emissions is often ±20% or more. Pollack et al. (1999) performed a similar study on California's EMFAC7G highway vehicle emission factor model. Frey et al. (1999) revisited the earlier analysis of Mobile5b emission factor estimates to include uncertainties associated with temperature corrections. Rhodes and Frey (1997) quantified variability and uncertainty in AP-42 emission factors using a bootstrap simulation method.

Table 1. Overview of methods for evaluating the uncertainty of emission estimates.

| Method | Description | References |
|---|---|---|
| Qualitative Discussion | Sources of uncertainty are listed and discussed. General direction of bias and relative magnitude of imprecision are given if known. | Steiner et al., 1994 |
| Subjective Data Quality Ratings | Subjective rankings based on professional judgment are assigned to each emission factor or parameter. | U.S. EPA, 1995<br>Saeger, 1994 |
| Data Attribute Rating System (DARS) | Numerical values representing relative uncertainty are assigned through objective methods. | Beck et al., 1994 |
| Expert Estimation Method | Emission distribution parameters (i.e., mean, standard deviation, and distribution type) are estimated by experts. Simple analytical and graphical techniques can then be used to estimate confidence limits from the assumed distributional data. In the Delphi method, expert judgment is used to estimate uncertainty directly. | Linstene and Turoff, 1975<br>SCAQMD, 1982<br>Horie, 1988<br>Horie and Shorpe, 1989 |
| Propagation of Errors Method Direct Simulation Method | Emission parameter means and standard deviations are estimated using expert judgment, measurements, or other methods. Standard statistical techniques of error propagation typically based on Taylor's series expansions are then used to estimate the composite uncertainty. | Mangat et al., 1984<br>Benkovitz, 1985<br>Benkovitz and Oden, 1989<br>Balentine et al., 1994<br>Environment Canada, 1994 |
| Direct Simulation Method | Monte Carlo, Latin hypercube, bootstrap (resampling), and other numerical methods are used to estimate directly the central value and confidence intervals of individual emission estimates. In the Monte Carlo method, expert judgment is used to estimate the values of the distribution parameters prior to performance of the Monte Carlo simulation. Other methods require no such assumptions. | Freeman et al., 1986<br>Iman and Helton, 1988<br>Oden and Benkovitz, 1990<br>Efron and Tibshirani, 1991<br>Environment Canada, 1994<br>Gatz and Smith, 1995a<br>Gatz and Smith, 1995b |
| Direct or Indirect Measurement (Validation) Method | Direct or indirect field measurements of emissions are used to compute emissions and emission uncertainty directly. Methods include direct measurement such as stack sampling and indirect measurement such as tracer studies. These methods also provide data for validating emission estimates and emission models. | Pierson et al., 1990<br>Spellicy et al., 1992<br>Fujita et al., 1992<br>Peer et al., 1992<br>Mitchell et al., 1995 |

| Method | Description | References |
|---|---|---|
| | | Claiborn et al., 1995 |
| Receptor Modeling (Source Apportionment) Method | Receptor modeling is an independent means to estimate the relative contribution of specific source types to observed air quality measurements. The method works best for nonreactive pollutants for which unique emission composition "fingerprints" exist for all significant source categories. The method provides a measure of the relative contribution of each source type but not absolute emission estimates. | Watson et al., 1984<br>Lowenthal et al., 1992<br>Chow et al., 1992<br>Scheff et al., 1995 |
| Inverse Air Quality Modeling Method | Air quality simulation models are used in an inverse, iterative approach to estimate the emissions that would be required to produce the observed concentrations fields. | Hartley and Prinn, 1993<br>Chang et al., 1993<br>Chang et al., 1995<br>Mulholland and Seinfeld, 1995 |

Table 2. Estimated relative confidence levels of emission inventories.

| Pollutants | Source | Canada | United States | Mexico |
|---|---|---|---|---|
| $SO_2$ | Utilities | high | high | high |
| | Other point sources | medium | medium | low-medium |
| | On-road | medium | medium | low |
| | Nonroad mobile | low-medium | medium | low |
| | Stationary nonpoint | low | low | low |
| | Biogenic sources | low | low | low |
| | Other man-made sources (noncombustion) | low | low | low |
| $NO_x$ | Utilities | medium-high | high | medium |
| | Other point sources | medium | medium | medium |
| | On-road | medium-high | medium-high | medium |
| | Nonroad mobile | medium | medium | low |
| | Stationary nonpoint | low | low | low |
| | Biogenic sources | low | low | low |

| Pollutants | Source | Canada | United States | Mexico |
|---|---|---|---|---|
| | Other man-made sources (noncombustion) | medium | medium | low |
| VOC | Utilities | medium-high | medium-high | medium |
| | Other point sources | low-medium | low-medium | medium |
| | On-road | low-medium | low-medium | low |
| | Nonroad mobile | low-medium | low-medium | low |
| | Stationary nonpoint | low | low | low |
| | Biogenic sources | low | low | low |
| | Other man-made sources (noncombustion) | medium | medium | low |
| HAP | Utilities | medium | medium | medium |
| | Other point sources | low-medium | low-medium | low |
| | On-road | low-medium | low-medium | low |
| | Nonroad mobile | low-medium | low-medium | low |
| | Stationary nonpoint | low | low | low |
| | Biogenic sources | low | low | low |
| | Other man-made sources (noncombustion) | low | low | low |

Bergin and Milford (2000) applied a Bayesian Monte Carlo analysis to estimate uncertainties in ozone concentrations in a Lagrangian photochemical air quality model. Bayesian updating reduced the estimated uncertainty in predicted peak ozone concentrations. Beekmann and Derognat (2003) used a similar approach to analyze uncertainty in a Eulerian photochemical model (CHIMERE). Uncertainties in peak ozone ranged between ±15% and ±30%. Measurement constraint reduced uncertainties by a factor of 1.5 to 2.7.

Frey and Bammi (2002) estimated uncertainty in the emission factors for lawn and garden (L&G) equipment. For 2-stroke L&G engines, the 95% confidence intervals for the mean emission factors for total hydrocarbon (THC) and $NO_x$ emissions were -30% to +41% and -45% to +75%, respectively. For 4-stroke L&G engines, the confidence intervals were -33% to +46% for THC and -27% to +35% for $NO_x$.

Frey and Li (2003) applied quantitative methods for characterizing variability and uncertainty to case studies of emission factors from AP-42 for stationary natural gas-fueled internal combustion engines. The approximate range of uncertainty in mean emission factors

varies from as little as ±10% to as much as -60% to +80%, depending on the pollutant, control technology, and nature of the available data.

Frey and Zheng (2002a) developed a probabilistic methodology for quantifying variability and uncertainty in highway vehicle emission factors based on data used in MOBILE5b. Empirical distributions of emissions measurement data were used to characterize variability, while the bootstrap simulation method was used to characterize uncertainty. Inter-vehicle variability in emissions was found to span 2 or 3 orders of magnitude. The uncertainty in fleet average emission factors ranged from ±10% to as much as -90% to +280%.

Frey and Zheng, (2002b) quantified the variability and uncertainty in emission factors and activity factors for power plant $NO_x$ emissions using the Monte Carlo and bootstrap simulation. The uncertainties were then propagated through an emission inventory to produce a probabilistic power plant $NO_x$ emission inventory for North Carolina.

Frey and Bammi (2003) estimated variability and uncertainty in $NO_x$ and total hydrocarbon emission factors for construction, farm, and industrial (non-road) engines. Bootstrap simulations were used to develop confidence intervals for the mean. The 95% confidence intervals for the mean emission factors were as small as –10 to +11% and as large as –48 to +49%, with an average range of –26 to +27%.

Abdel-Aziz and Frey (2003a) used univariate stochastic time series models, and ordinary least-squares regression models were employed to quantify hourly uncertainty in capacity emission factors and heat rate, respectively. The models were used to develop an hourly probabilistic power plant $NO_x$ emission inventory for a four-day period. Abdel-Aziz and Frey (2003b) used multivariate time series models (time series approach) to account for the dependence between emissions from correlated units.

Zhao and Frey (2004) developed probabilistic toxic emission inventories for 1,3-butadiene, mercury, arsenic, benzene, formaldehyde, and lead for Jacksonville, Florida. Parametric and empirical bootstrap simulations were used to quantify the uncertainty in urban air toxic emission factors. The emission inventory 95% uncertainty ranges were as small as -25% to +42% for chromium to as large as -75% to +224% for arsenic with correlated surrogates. Uncertainty was dominated by only a few source categories. Using a similar approach, Frey and Zhao (2004) developed a probabilistic inventory of urban toxic emissions of benzene, formaldehyde, chromium, and arsenic for Houston, Texas. Maximum likelihood estimation was used to deal with censored (non-detected) values in emission data, and bootstrap simulation in combination with maximum likelihood estimation was used to estimate uncertainty in the mean emission factors. Zhao and Frey (2006) used maximum likelihood estimation and bootstrap simulation to determine asymptotically unbiased mean values and uncertainty for air toxic emission factors. Uncertainty in the mean was also estimated. The largest range of uncertainty in the mean was obtained for the external coal combustion benzene emission factor, with 95th confidence interval of the mean equal to -93% to +411%.

Chi et al. (2004) used bootstrap sampling, expert elicitation, and MC simulations to characterize uncertainty of nonroad emissions for Georgia from the EPA NONROAD model. Tools used were a bootstrap resampling technique and a parametric bootstrap analysis method in

Zheng and Frey's Analysis of Uncertainty and Variability Tool (AuvTool). Overall uncertainty ranged from -23 to +33%; however, fuel consumption, growth factors, equipment age distributions, PM and HC speciation profiles, temporal activity adjustments, fuel sulfur effects, and evaporative emissions were not accounted for in the analysis.

Meteorological and Air Quality Models

Derwent and Hov (1988) made estimates of uncertainty in photochemical model inputs based on "best judgments" for an application of sensitivity and analysis techniques. They estimated uncertainties to be ±50% for concentrations aloft; ±30% for emissions and deposition velocities, and hydroxyl radical sinks; ±20% for boundary layer depth; and ±10% wind speed. In preparation for an MC uncertainty analysis of Ozone Transport Assessment Group (OTAG) (1997) modeling, Frey (1998) developed estimates of uncertainty in the AQM inputs based on expert elicitation. Frey reported the uncertainty range, which includes 95% of the data, to be a factor of 5 for initial VOC and $NO_x$ concentrations; a factor of 3 for initial ozone concentrations, boundary conditions of VOC and $NO_x$, and vertical diffusivity above 1000 m and at times other than 8:00 a.m. to 6:00 p.m.; and a factor of 2 for photolysis rates, cloud liquid water content, rainfall amounts, and emissions except major point sources. The range of uncertainty for chemical reactions in the Carbon Bond IV chemical mechanism varied, by reaction, from a factor of 1.01 to 3.02. The least uncertain model inputs were major point source emissions (±50%), horizontal boundary condition for ozone (±50%), concentrations aloft (±50%), wind direction (±40 degrees), cloud cover (±30%), vertical diffusivity below 1000 m from 8:00 a.m. to 6:00 p.m. (±30%), relative humidity (±30%), and ambient temperature (±3°C).

Yang et al. (1995) propagated uncertainties in reaction rate parameters, through simulations of urban ozone formation to estimated uncertainties in incremental reactivities of VOCs. Uncertainty (±1σ) in reactivity ranged from 30% to 70%.

While formal estimates of uncertainty are not typically made of the meteorological model outputs used as inputs to AQMs, some information about uncertainty can be gained from the performance evaluations of these models. Often statistical comparisons of the model predictions to observations are provided. While these statistics provide a first-order estimate of the uncertainty, it must be kept in mind that model estimates and observations may not be spatially and temporally commensurate. Model predictions represent grid-cell volume averages of the predicted parameters at a particular time while observations are most often for a point location and may be averaged over various periods of time. Therefore, model performance-based estimates of uncertainty are likely to be larger than the actual uncertainty.

Olerud et al. (2000) performed meteorological modeling with MM5 for all of 1996 on a grid covering the entire continental United States at 36-km resolution. The results of this modeling have been used by EPA and regional planning organizations (RPOs) in subsequent air quality modeling studies with REMSAD, UAM-V, CAMx, and Community Multiscale Air Quality (CMAQ) model. The root mean square errors for the entire domain were reported by season and ranged from 1.15 to 1.47 m/s for wind speed, 35.2 to 38.5 degrees for wind direction, 2.3°C to 4.2°C for temperature, and 0.8 to 1.7 g/kg for humidity. Doty et al. (2002) reported on meteorological modeling with the RAMS model for the Southern Appalachian Mountains Initiative (SAMI). They found that for their 12-km domain, over all days modeled, the root mean square error for wind speed was 2.18 m/s, the gross error for wind direction was

39 degrees, the gross error for temperature was 1.9°C with a bias of –0.8°C, and the gross error for humidity was 0.8 g/kg with a bias of –0.1 g/kg.

Fish and Burton (1997) performed an uncertainty analysis on a Lagrangian photochemical model applied to stratospheric ozone destruction. Uncertainties in chemical kinetic and photochemical rate data were propagated through the modeling system. Arctic and mid-latitude ozone destruction could be modeled with ±25% and ±50% uncertainty (1 sigma), respectively. It was found that two reactions (out of more than 100) were responsible for more than a third of the uncertainty in the model calculations of Arctic ozone loss.

Moore and Londergan (2001) used a modification of the basic MC method to determine uncertainty. The computationally intensive aspects of the full methodology are replaced by a highly restricted sampling approach that exploits the spatial persistence found in predicted concentration fields. The approach was tested in an application of UAM-IV to assess the uncertainty in the differences in predicted maximum ozone concentration between the base-case and control scenarios. Uncertainty in model inputs and parameters were simulated using stochastic models driven by LHS. They propagated uncertainty in 168 model inputs for emissions, chemistry, meteorology, and boundary conditions.

A probabilistic hourly $NO_x$ emission inventory was developed for 32 units of nine coal-fired power plants in the Charlotte, North Carolina, region for 1995 (Abdel-Aziz and Frey, 2003a,b). The uncertainty was then propagated through the MAQSIP model to estimate the uncertainty in maximum 1-hr and 8-hr concentrations for the Charlotte, North Carolina, modeling domain using an MC simulation (Abdel-Aziz and Frey, 2004). Statistical dependencies between power plant units (inter-unit variability), as well as temporal autocorrelation for each individual unit (intra-unit variability), were accounted for. A total of 50 simulations were performed to represent the ranges of uncertainty in hourly emissions and predicted ozone levels. The range of uncertainty in predicted peak 1-hr ozone concentrations solely attributable to utility $NO_x$ emissions was as large as 25 ppb. Uncertainties in peak ozone concentrations at specific locations could be pinpointed to emissions from a specific power plant. Exceedances of the 8-hr standard were more widespread and not attributable to any one plant.

Mallet and Sportisse (2006) estimated uncertainty in a chemistry transport model due to physical parameterizations and numerical approximations using an ensemble modeling approach. The turbulent closure parameterization and chemical mechanism introduced the highest uncertainties.

Zhang et al. (2007) ran an ensemble of meteorological simulations with perturbed initial conditions through CMAQ to explore the sensitivity of ozone predictions caused by small meteorological perturbations. Significant uncertainties in ozone predictions for the Houston area were attributed to meteorological uncertainties, particularly from wind and temperature.

*Expert Elicitation*

Quantifying the uncertainties in model input variables may be difficult because there is little specific information on this subject in the literature for the complete spectrum of inputs (e.g., initial and boundary conditions, emissions components, meteorological variables, model parameterization constants, photolysis rates, and chemical rate constants). When quantifying the

uncertainties is difficult, Morgan and Henrion (1990) suggest that it is appropriate to carry out an expert elicitation where "experts" are asked to give estimates of uncertainties based on their experience. To combine information from a number of different experts, each expert can be assigned a subjective weight indicating the relative extent of the individual's expertise with respect to the other experts participating in the elicitation (National Council on Radiation Protection and Measurements [NCRP], 1996). In many instances, each expert may be given equal weight, but in those areas for which the degree of expertise differs markedly, unequal weights may be assigned to each expert.

Hanna et al. (1998) estimated uncertainties in model inputs by taking the median of the uncertainty values (expressed as a plus and minus percentile that would include 95% of the variability) suggested by 10 modelers (experts) who responded to questionnaires. That is, each expert was given equal weight. In that study, no attempt was made to carry out a comprehensive survey of modelers (experts) or to encourage discussions among modelers.

Hanna et al. (2001) improved on this process by attempting to reach about 100 experts via a web page where the experts could enter their estimates of input uncertainties. The 100 experts included 10 or 20 from each major category of input data (e.g., emissions, boundary and initial conditions, chemical rate constants, and meteorology). However, only about 20 experts responded to the request. It was found that better information could be obtained by meeting with groups of experts at several different laboratories. One reason for the difficulty is that many photochemical modeling experts have not thought much about uncertainties in input parameters and, therefore, the estimates are largely based on intuition and compromise. Hanna et al. suggested that future expert elicitations should be more thorough, including workshops where experts come together to discuss the uncertainties. Experts should also assign weights to themselves based on their degree of expertise. The problem with the approach is that it is time-consuming and resource-intensive (two or three weeks of effort over a time period of about six months plus travel costs for two or three meetings for each of about 20 experts).

Uncertainties in BEIS3 biogenic emission outputs have been thoroughly examined. Hanna et al. (2002) used a Monte Carlo approach, while Hanna and Wilkinson (2004) used an analytical approach. The analytical equations for relative uncertainties agreed approximately with the results of the full Monte Carlo method. The total relative variance in isoprene emissions varied from 0.10 to 0.40, depending on temperature. The total oxygenated volatile organic compounds and monoterpene relative variances were similar, with values ranging from 0.10 to 0.26. They estimated that the relative uncertainty in BEIS3 emissions was in the range of about 0.3 to 0.8 (i.e., ± 30% to 80%). Hanna et al. (2003, 2005) evaluated consequences of the BEIS3 uncertainties in chemical transport models (CTMs). The MC uncertainties in the CTM-predicted 1-hr and 8-hr averaged ozone concentrations were studied by drawing 20 random samples from the 1000 sets of BEIS3 outputs and running each CTM (MAQSIP, UAM-V, and URM) 20 times for the three episodes. The estimated total uncertainties of ±15 to 20% are found to be nearly the same for the three CTMs over the three time periods, for 1-hr and 8-hr averages.

Winiwarter and Rypdal (2001) estimated uncertainty associated with the Austrian Greenhouse Gas emission inventory for $CO_2$, $CH_4$, and $N_2O$, and for the overall greenhouse potential. Expert elicitation was used to obtain uncertainties in inventory input data. Error distributions were then developed and combined using MC analysis. Overall uncertainty for all

sources and gases was 10.5% and 12%, respectively. Uncertainties were attributed to $N_2O$ emissions from soils, $CH_4$ from landfills, and $CO_2$ sinks in forests.

## RELIABILITY OF INTEGRATED MODELING SYSTEMS

Much of the available literature on uncertainty in models only addresses the model's sensitivity to model inputs within their range of uncertainty. However, sensitivity to an input does not mean that the sensitivity will influence the IAQMS's response to emission changes. The literature in general indicates that when an IAQMS exhibits reasonable model performance, the system's response to emission changes may be more reliable than its ability to estimate absolute concentrations at monitoring sites.

### Relative Response of Models

Hogrefe et al. (2008) suggest that operational model evaluation metrics provide little insight into the reliability of the actual model application in a regulatory setting (i.e., the estimation of relative changes), and that more emphasis should be placed on the development of dynamic evaluation approaches that test model response to changes in emission and meteorology. As a demonstration, Hogrefe et al. (2008) simulated an emission reduction scenario using two different vertical mixing parameterizations. While the model-to-model differences in daily maximum 8-hr ozone concentrations were up to 20 ppb, only minor differences were detected in the relative response of ozone concentrations to emission reductions, resulting in differences of a few ppb or less in estimated future year design values.

Jones et al. (2005) assessed the sensitivity and reliability of the RRF approach in the development of 8-hr ozone attainment plans. They examined the sensitivity of model-predicted responses to emission reductions to the choice of meteorology and chemistry mechanism. The different simulations agreed on whether predicted future-year design values would be above or below the NAAQS threshold at nearly 95% of the monitoring locations in the domain. Jones et al. (2005) also tested the ability of the attainment demonstration procedure to predict changes in monitored ozone design values through a retrospective analysis. An average gross error of around 5 ppb was found between modeled and observed design values. Also, at 27% of sites, model-predicted and observed design values disagreed as to whether the design value was above or below the NAAQS threshold.

Sistla et al. (2004) assert the need to provide uncertainty estimates of predicted RRFs. An operational assessment found that model-to-model differences could introduce an uncertainty in the future estimated design value of 3 to 5 ppb.

### Dynamic Evaluation of Models

Dennis et al. (2008) reviews approaches to the evaluation of regional-scale air quality modeling systems, and introduces a conceptual model evaluation framework to provide a context for the evaluation process. The framework involves the complementary application of operational, diagnostic, dynamic, and probabilistic evaluation methods. Methods for each type of evaluation are reviewed, and examples of their application to air quality models are discussed. Data needs for model evaluation are also discussed.

Dennis et al. (2008) suggest that model performance methodologies developed for local and mesoscale model applications during the 1980s and 1990s may not extend for regional-scale

applications. Model evaluation criteria should be dependent on the context of the application. Three primary objectives of air quality model evaluation are presented:

1. Determining the suitability of a modeling system for a specific application and configuration.
2. Distinguishing the performance among different models or different versions of the same model.
3. Guiding model improvement.

Dennis et al. (2008) define "dynamic evaluation" as an evaluation that assesses the ability of a model to predict changes in air quality concentrations in response to changes in source emissions or meteorology. A dynamic evaluation requires historical case studies where changes in emissions or meteorology are known, or can be confidently estimated, and the changes in emission or meteorology have a discernable impact on air quality. Cases that potentially meet these criteria include major regulatory programs (e.g., the $NO_x$ SIP Call), cyclical emissions changes (e.g., day-of-the week mobile-source emission changes), and unique events (e.g., the 2003 black out).

Because air quality models are inherently deterministic, they do not explicitly account for uncertainties. A "probabilistic evaluation" attempts to qualify this uncertainty, but no specific widely used prescribed method exists. Ensemble methods are discussed by Dennis et al. (2008), and the authors note that results from a finite set of ensemble simulations are not a true measure of model uncertainty, as they represent only a limited view of a portion of the uncertainty spectrum. Monte Carlo techniques are also briefly discussed, and the authors note that input variables in air quality modeling systems can be correlated, which complicates the interpretation of results. Uncertainty in the model's relative response to emission reductions is briefly discussed, as are Bayesian approaches, rank order statistics, and extreme value theory. Dennis et al. (2008) conclude that regional air quality modeling systems cannot be validated in the formal sense, but can be shown to have predictive and diagnostic value.

Gilliland et al. (2008) suggest that "dynamic evaluation" is only possible if a retrospective case exists in which substantial emission reductions have resulted in discernable changes in air quality and the change in emissions can be quantified with reasonable confidence. They evaluated the CMAQ model's ability to predict ozone response to $NO_x$ emission reductions associated with the $NO_x$ SIP Call. Two different post-$NO_x$ SIP Call summer periods were used to address the influence of meteorological changes on the ozone response. Simulations using SAPRC99, CB-IV, and CB-05 were performed to assess the sensitivity of ozone responses to the choice of chemical mechanism. CMAQ underestimated ozone reductions observed after the $NO_x$ SIP Call was implemented. A spatial correlation analysis and comparison with aircraft ozone observations suggested that CMAQ underestimates the contribution of long-range transport of ozone and its precursors. Simulations using SAPRC more accurately predicted ozone response than simulations using CB-IV.

Recent research on modeling weekend/weekday ozone effects has used models as a tool to assess the causes of these effects for specific urban airsheds; however, they do not really address the issue of using the weekend/weekday as an observational basis for dynamic model evaluations. Yarwood et al. (2003) used CAMx to investigate hypotheses for the causes of

weekday/weekend ozone differences in the Los Angeles area. They used first-order sensitivities calculated from DDM-3D in CAMx to study the contributions of VOC and $NO_x$ reductions to weekday/weekend ozone changes. Jimenez et al. (2005) modeled weekend/weekday effects in the northeastern Iberian Peninsula.

Hogrefe et al. (2007) compared CMAQ weekend/weekday changes in ozone to observations. While they noted that weekend/weekday differences existed for observed and modeled ozone during summer 2001, the differences appeared to be mainly attributable to changes in meteorology. The authors suggested that to further compare observed and predicted weekend/weekday differences, methods to remove the effects of meteorological variations on ozone needed to be developed. They outlined steps for future research in this area, as they recognize the potential usefulness of using the weekend/weekday effect as a way to evaluate the modeling system's ability to reproduce observed response to emission changes.

A recent request for proposals from the Coordinating Research Council (CRC Project A-69, "Regional Modeling of Weekday/Weekend Ozone Changes") requires the contractor to perform a dynamic evaluation to test the ability of a regional modeling system to simulate ozone changes in response to weekday/weekend emission changes. They specifically reference Gilliland et al. (2008) as a source of useful approaches.

Marufu et al. (2004) used the August 2003 North American electrical blackout to quantify the direct contribution of power plants to regional haze and ozone. Aircraft observations collected over Pennsylvania, Maryland, and Virginia during the blackout were compared to observations taken during the previous summer in the same locations and under similar meteorological conditions. Marufu et al. (2004) found $SO_2$ and ozone reductions of 90% and 50% (7 ppb), respectively, and an improvement in visual range of > 40 km.

Hu et al. (2006) used CMAQ DDM-3D model simulations to quantify the effects of power plant emission reductions on $SO_2$ and ozone during the 2003 blackout. Sensitivity results show that the emission reductions led to $SO_2$ concentration reductions of 42%, sulfate concentration reductions of 22%, and ozone reductions of less than 5% (2 ppb), and that mobile $NO_x$ emission reductions linked to the blackout had a larger impact on ozone than EGU $NO_x$ emission reductions. The authors use these results to suggest that the observational results from Marufu et al. (2004) are overestimates.

Even though Hu et al. (2006) suggest that the Marufu et al. (2004) observational analysis overestimated ozone response to emission changes induced by the blackout, some recent SIPs (e.g., 2007 Baltimore Ozone SIP, New Jersey Ozone SIP) have used the results of Hu et al. (2006) as an authoritative argument that CMAQ underestimates ozone response to emission reductions.

## UNCERTAINTIES IN THE IAQMS FOR THE SECOND PROSPECTIVE ANALYSIS

The Second Perspective Analysis is the first Section 812 analysis to use an integrated modeling system, the CMAQ model, to simulate national and regional-scale pollutant concentrations and deposition. The CMAQ model (National Exposure Research Laboratory, 1999) is a state-of-the-science, regional air quality modeling system that is designed to simulate

the physical and chemical processes that govern the formation, transport, and deposition of gaseous and particulate species in the atmosphere. The CMAQ modeling system was designed to approach air quality as a whole by including state-of-the-science capabilities for modeling multiple air quality issues, including tropospheric ozone, fine particles, toxics, acid deposition, and visibility degradation. CMAQ was also designed to have multiscale capabilities so that separate models were not needed for urban- and regional-scale air quality modeling.

Douglas et al. (2008) applied the CMAQ model for seven core CAAA scenarios that include four different years that span a 30-year period: 1990, 2000, 2010, and 2020. Scenarios that incorporate the emission reductions associated with the CAA are referred to as *with-CAAA* while those that do not are referred to as *without-CAAA*. The scenarios include

- Retrospective Base-year Scenario
  - 1990 without-CAAA
- Base- and Future-year Scenarios without 1990 CAAA Controls
  - 2000 without-CAAA
  - 2010 without-CAAA
  - 2020 without-CAAA
- Base- and Future-year Scenarios with 1990 CAAA Controls
  - 2000 with-CAAA
  - 2010 with-CAAA
  - 2020 with-CAAA

For $PM_{2.5}$ and related species, the CMAQ model was applied in annual simulations for the period January through December. A 36-km resolution modeling domain that encompasses the contiguous 48 states was used for the annual modeling. For ozone and related species, the CMAQ model was applied for a five-month simulation period that captures the key ozone-season months of May through September. Two 12-km resolution modeling domains (that when combined cover the contiguous 48 U.S. states) were used for the ozone-season modeling.

E. H. Pechan & Associates, Inc. (E. H. Pechan & Associates, Inc. and Industrial Economics, Inc. 2006; Wilson et al., 2008) developed the base and projection year emission estimates that were used in the CMAQ modeling. These emission inventories have several unique features. One is the use of consistent economic assumptions from the Department of Energy's Annual Energy Outlook 2005 (AEO 2005) projections as the basis for estimating 2010 and 2020 emissions for all sectors. Another is the analysis of the different emissions paths for both with and without CAAA scenarios. Other features of this analysis include being the first EPA analysis that uses the 2002 National Emission Inventory files as the basis for making 48-state emission projections, incorporating control factor files from RPOs that had completed emission projections at the time the analysis was performed, and modeling the emission benefits of the expected adoption of measures to meet the 8-hr ozone NAAQS, the Clean Air Visibility Rule, and the $PM_{2.5}$ NAAQS.

Model-ready meteorological input files for 2002 were provided by EPA for use in the CMAQ modeling. The meteorological inputs to CMAQ were developed with the fifth-generation Penn State/NCAR mesoscale model (MM5) (Grell et al., 1994). Dolwick et al. (2007) describe the 36-km and eastern 12-km MM5 modeling and model performance for the eastern 12-km domain. The western 12-km modeling used MM5 meteorology that was developed by the Western Regional Air Partnership (WRAP) (Kemball-Cook et al., 2005). Brewer et al. (2007) described the MM5 model performance on the eastern 12-km domain and a limited analysis of model performance on the 36-km domain. These 2003 meteorological fields were used and described in the technical support document for the final Locomotive/Marine Rule (U.S. Environmental Protection Agency, 2008). The most complete description of the 2002 MM5 evaluation for all domains is in a yet-to-be-released internal EPA document for the entire 2002 CMAQ modeling platform (Dolwick, 2008).

Uncertainties in IAQMS will be assessed using EPA's Response Surface Metamodels (RSMs) for ozone (U.S. Environmental Protection Agency, 2006a) and particulate matter (U.S. Environmental Protection Agency, 2006b). The RSMs are based on an approach known as air quality metamodeling that aggregates numerous pre-specified individual air quality modeling simulations into a multi-dimensional air quality "response surface". Simply, this metamodeling technique is a "model of the model" and has been shown to reproduce the results from an individual modeling simulation with little bias or error over the range of conditions for which they were developed. The RSM incorporates statistical relationships between model inputs and outputs to provide a real-time estimate of air quality changes. The RSM provides a wide breadth of model outputs, which we can use to assess the impact of emission uncertainties. This approach allows for the rapid assessment of air quality impacts of different combinations of emission levels.

While the RSM-based uncertainty assessments have not been documented yet, Table 3 provides an initial description of emissions, meteorological, and air quality uncertainties in the IAQMS based on our review of relevant literature. The literature demonstrates a continuing process of uncertainty identification and reduction over the past several decades. Of the three main components in the IAQMS, the emissions component is still the most complex and uncertain with uncertainties in quantity, composition, spatial and temporal allocation, and future year projection. The literature also shows significant improvements in the meteorological and air quality modeling components of the IAQMS with more complete and accurate representations of atmospheric physics and chemistry, larger modeling domains, finer grid-resolution, and longer (i.e., annual or seasonal) simulation lengths. The current meteorological models still show regional and season biases in variables that can influence $PM_{2.5}$ formation but the longer term simulations tend to ameliorate the effects of these biases and more clearly define the extent and magnitude of the biases. The air quality model used in the Second Prospective Analysis includes a more complete treatment of aerosol chemistry than used previously but has been shown to underestimate the formation of secondary organic aerosols. The availability of $PM_{2.5}$ measurements (mass and speciation) since the first prospective Analysis has greatly improved our ability to assess model performance and uncertainties in estimates of $PM_{2.5}$. However, the lack of an available model performance evaluation for the CMAQ 2002 base case modeling limits our ability to understand and quantify the modeling uncertainties and their effects in this analysis.

Uncertainties in Table 3 are separated into broad categories for types of models such as emissions, meteorological, and air quality. In cases where a particular uncertainty is poorly defined or the literature is out of date, the opinions of experts were relied upon to refine the available information. Uncertainties are ranked based on their potential to affect the specific model with which they are associated and their overall effect on the IAQMS response to emission changes.

Table 3. Uncertainties associated with the Integrated Air Quality Modeling System in the Second Prospective Analysis.



| Category [a] | Key Uncertainties Associated with Emissions Estimation Potential Source of Error | Direction of Potential Bias for Net Benefits Estimate | Likely Significance Relative to Key Uncertainties in Net Benefit Estimate [b] |
|---|---|---|---|
| E | Uncertainties in biogenic emissions inputs increase uncertainty in the AQM estimates. Uncertainties in biogenic emissions may be large (± 80%). The biogenic inputs affect the emissions-based VOC/NOx ratio and, therefore, potentially affect the response of the modeling system to emissions changes. | Underestimate. The underestimate of biogenic emissions would reduce overall reactivity leading to underestimates of the model's response to emission reductions. | Potentially major. Impacts for ozone and $PM_{2.5}$ results. Both oxidation potential and secondary organic aerosol formation could influence $PM_{2.5}$ formation significantly. However, ozone benefits contribute only minimally to net benefit projections in this study. |
| E | The *with-CAAA* scenario includes implementation of the Clean Air Mercury Rule (CAMR), which has been vacated, and Clean Air Interstate Rule (CAIR), which was vacated but has since been remanded. | Overestimate. | Potentially major. Significance in 2020 will depend on the speed and effectiveness of implementing CAIR and replacing CAMR. In some areas, emissions reductions are expected to be overestimated, but in other areas, $NO_x$ inhibition of ozone leads to underestimates of ozone benefits (e.g., some urban centers). |
| E | VOC emissions are dependent on evaporation, and future patterns of temperature are difficult to predict. | Overestimate. | Probably minor. An acceleration of climate change (warming) could increase emissions but the increase over 30 years would not likely be significant. |
| E | Use of average temperatures (i.e., daily minimum and maximum) in estimating motor-vehicle emissions artificially reduces variability in VOC emissions. | Unable to determine based on current information. | Probably minor. Use of averages will overestimate emissions on some days and underestimate on other days. Effect is mitigated in *with-CAAA* scenarios because of more stringent evaporative controls that are in place by 2000 and 2010. |

Table 3. Uncertainties associated with the Integrated Air Quality Modeling System in the Second Prospective Analysis.



| Category [a] | Key Uncertainties Associated with Emissions Estimation Potential Source of Error | Direction of Potential Bias for Net Benefits Estimate | Likely Significance Relative to Key Uncertainties in Net Benefit Estimate [b] |
|---|---|---|---|
| E | Economic growth factors used to project emissions are an indicator of future economic activity. These growth factors reflect uncertainty in economic forecasting as well as uncertainty in the link to emissions. IPM projections may be reasonable regionally but may introduce significant biases locally. Also, the Annual Energy Outlook 2005 growth factors do not reflect the recent economic downturn or the volatility in fuel prices since the fall of 2005. | Unable to determine based on current information. | Probably minor. The same set of growth factors are used to project emissions under both the *without-CAAA* and *with-CAAA* scenarios, mitigating to some extent the potential for significant errors in estimating differences in emissions. Some specific locations may be more significantly influenced. |
| E | Uncertainties in the stringency, scope, timing, and effectiveness of *with-CAAA* controls included in projection scenarios. | Unable to determine based on current information. | Probably minor. Future controls could be more or less stringent, wide, or effective than projected. Timing of emissions reductions may also be affected. |
| E | Emissions estimated at the county level (e.g., low-level source and motor vehicle $NO_x$ and VOC emissions) are spatially and temporally allocated based on land use, population, and other surrogate indicators of emissions activity. Uncertainty and error are introduced to the extent that area source emissions are not perfectly spatially or temporally correlated with these indicators. | Unable to determine based on current information. | Probably minor. Potentially major for estimation of ozone, which depends largely on VOC and $NO_x$ emissions; however, ozone benefits contribute only minimally to net benefit projections in this study. |
| E | The location of the emissions reductions achieved from unidentified measures is uncertain. We currently treat these reductions as if they're achieved from non-point sources, but this may not be correct in all cases. | Unable to determine based on current information. | Probably minor. Impacts from these uncertainties would be localized and would not significantly change the overall net benefit estimate. |

| Category [a] | Key Uncertainties Associated with Emissions Estimation Potential Source of Error | Direction of Potential Bias for Net Benefits Estimate | Likely Significance Relative to Key Uncertainties in Net Benefit Estimate [b] |
|---|---|---|---|
| E | The on-road source emissions projections reflect MOBILE6.2 data on the composition of the vehicle fleet. If recent volatility fuel prices persists or if fuel prices rise significantly (like they did in 2007 and 2008), the motor vehicle fleet may include more smaller, lower-emitting automobiles and fewer small trucks (e.g., SUVs). | Underestimate | Probably minor. |
| M | Unknown meteorological biases in the 12-km western and 36-km MM5 domains due to the lack of model performance evaluations. | Unable to determine based on current information. | Probably minor. Other evaluations using 2002 and similar meteorology and CMAQ have shown reasonable model performance. Although potentially major affects on nitrate results in western areas with wintertime $PM_{2.5}$ problems. |

Table 3. Uncertainties associated with the Integrated Air Quality Modeling System in the Second Prospective Analysis.

Page 3 of 3

| Category [a] | Key Uncertainties Associated with Emissions Estimation Potential Source of Error | Direction of Potential Bias for Net Benefits Estimate | Likely Significance Relative to Key Uncertainties in Net Benefit Estimate [b] |
|---|---|---|---|
| M | Known metrological biases in the 12-km eastern MM5 domain. MM5 has a cold bias during the winter and early spring, and has a general tendency to underestimate the monthly observed precipitation. MM5's under prediction was greatest in the fall and least in the spring months. | Unable to determine based on current information. | Probably minor. These biases would likely influence $PM_{2.5}$ formation processes, which was modeled on the 36-km domain. |
| A | Secondary organic aerosol (SOA) chemistry. CMAQ version 4.6 has known biases (underprediction) in SOA formation. | Underestimate. | Probably minor. A significant portion of SOA forms from biogenic emissions. |
| A | The CMAQ modeling relies on a modal approach to modeling $PM_{2.5}$ instead of a sectional approach. The modal approach is effective in modeling sulfate aerosol formation but less effective in modeling nitrate aerosol formation than the sectional approach. | Unable to determine based on current information. | Probably minor in the eastern U.S. where annual $PM_{2.5}$ is dominated by sulfate. Potentially major in some western U.S. areas where $PM_{2.5}$ is dominated by secondary nitrate formation. |
| A | No model performance evaluation of CMAQ for 2002. | Unable to determine based on current information. | Probably minor. Other evaluations using 2002 and similar meteorology and CMAQ have shown reasonable model performance. |

| Category [a] | Key Uncertainties Associated with Emissions Estimation Potential Source of Error | Direction of Potential Bias for Net Benefits Estimate | Likely Significance Relative to Key Uncertainties in Net Benefit Estimate [b] |
|---|---|---|---|
| A | Ozone modeling relies on a 12-km grid, suggesting $NO_x$ inhibition of ambient ozone levels may be under-represented in some urban areas. Grid resolution may affect both model performance and response to emissions changes. | Unable to determine based on current information. | Probably minor. Though potentially major ozone results in those cities with known $NO_x$ inhibition, ozone benefits contribute only minimally to net benefit projections in this study. Grid size affects chemistry, transport, and diffusion processes, which in turn determine the response to changes in emissions, and may also affect the relative benefits of low-elevation versus high-stack controls. |
| A | Emissions estimated at the county level (e.g., low-level source and motor vehicle $NO_x$ and VOC emissions) are spatially and temporally allocated based on land use, population, and other surrogate indicators of emissions activity. Uncertainty and error are introduced to the extent that area source emissions are not perfectly spatially or temporally correlated with these indicators. | Unable to determine based on current information. | Probably minor. Potentially major for estimation of ozone, which depends largely on VOC and $NO_x$ emissions; however, ozone benefits contribute only minimally to net benefit projections in this study. |

[a] Categories are E (emissions), M (meteorological model), or A (air quality model)

[b] The classification of each potential source of error is based on those used in the first prospective Analysis. The classification of "potentially major" is used if a plausible alternative assumption or approach could influence the overall monetary benefit estimate by approximately 5% or more; if an alternative assumption or approach is likely to change the total benefit estimate by less than 5%, the classification of "probably minor" is used.

The summary tables of key uncertainties that were prepared for the first prospective Analysis (Tables 4 and 5) are provided for comparison to uncertainties in the Second Prospective Analysis. Table 4 includes uncertainties associated with emissions estimation while Table 5 includes uncertainties associated with air quality modeling. Significant improvements are apparent in both the modeling systems and model inputs since the first prospective Analysis was performed. While there have been many improvements in emission inventories the largest improvements have occurred in the air quality modeling system and the availability of $PM_{2.5}$ measurements. The use of longer term simulations with a single "one atmosphere" model in the Second Prospective Analysis significantly reduces many of the original sources of error such as the use of multiple models, different physical and chemical mechanisms, inadequate grid resolution and spatial coverage, and lack of adequate secondary aerosol chemistry. The increased availability of $PM_{2.5}$ measurements has increased our ability to assess model performance, quantify biases and errors, and gain confidence in the modeling system's estimates. These improvements have reduced the uncertainty in the IAQMS and the overall analytical chain and allowed us to provide better estimates of the effect and significance of key uncertainties on the net benefit estimate.

Table 4. Key uncertainties associated with emissions estimation identified in the First Prospective Analysis.



| Potential Source of Error | Direction of Potential Bias for Net Benefits Estimate | Likely Significance Relative to Key Uncertainties in Net Benefit Estimate* |
|---|---|---|
| $PM_{2.5}$ emissions are largely based on scaling of $PM_{10}$ emissions. | Overall, unable to determine based on current information, but current emission factors are likely to underestimate $PM_{2.5}$ emissions from combustion sources, implying a potential underestimation of benefits. | Potentially major. Source-specific scaling factors reflect the most careful estimation currently possible, using current emissions monitoring data. However, health benefit estimates related to changes in $PM_{2.5}$ constitute a large portion of overall CAAA-related benefits. |
| Primary $PM_{2.5}$ emissions estimates are based on unit emissions that may not accurately reflect composition and mobility of the particles. For example, the ratio of crustal to primary carbonaceous particulate material likely is high. | Underestimate. The effect of overestimating crustal emissions and underestimating carbonaceous emissions when applied in later stages of the analysis, is to reduce the net impact of the CAAA on primary $PM_{2.5}$ emissions by underestimating $PM_{2.5}$ emissions reductions associated with mobile source tailpipe controls. | Potentially major. Mobile source primary carbonaceous particles are a significant contributor to public exposure to $PM_{2.5}$. Overall, however, compared to secondary $PM_{2.5}$ precursor emissions, changes in primary $PM_{2.5}$ emissions have only a small impact on $PM_{2.5}$-related benefits. |
| The *with-CAAA* scenario includes implementation of a region-wide NOx emissions reduction strategy to control regional transport of ozone that may not reflect the $NO_x$ controls that are actually implemented in a regional ozone transport rule. | Unable to determine based on current information. | Probably minor. Overall, magnitude of estimated emissions reductions is comparable to that in an expected future regional transport rule. In some areas of the 37 state region, emissions reductions are expected to be overestimated, but in other areas, $NO_x$ inhibition of ozone leads to underestimates of ozone benefits (e.g., some eastern urban centers). |

Table 4. Key uncertainties associated with emissions estimation identified in the First Prospective Analysis.



| Potential Source of Error | Direction of Potential Bias for Net Benefits Estimate | Likely Significance Relative to Key Uncertainties in Net Benefit Estimate* |
|---|---|---|
| VOC emissions are dependent on evaporation, and future patterns of temperature are difficult to predict. | Unable to determine based on current information. | Probably minor. We assume future temperature patterns are well characterized by historic patterns, but an acceleration of climate change (warming) could increase emissions. |
| Use of average temperatures (i.e., daily minimum and maximum) in estimating motor-vehicle emissions artificially reduces variability in VOC emissions. | Unable to determine based on current information. | Probably minor. Use of averages will overestimate emissions on some days and underestimate on other days. Effect is mitigated in *with-CAAA* scenarios because of more stringent evaporative controls that are in place by 2000 and 2010. |
| Economic growth factors used to project emissions are an indicator of future economic activity. They reflect uncertainty in economic forecasting as well as uncertainty in the link to emissions. | Unable to determine based on current information. | Probably minor. The same set of growth factors are used to project emissions under both the *without-CAAA* and *with-CAAA* scenarios, mitigating to some extent the potential for significant errors in estimating differences in emissions. |
| Uncertainties in the stringency, scope, timing, and effectiveness of *with-CAAA* controls included in projection scenarios. | Unable to determine based on current information. | Probably minor. Future controls could be more or less stringent, wide reaching (e.g., $NO_x$ reductions in OTAG region - see above), or effective (e.g., uncertainty in realizing all Reasonable Further Progress requirements) than projected. Timing of emissions reductions may also be affected (e.g., sulfur emissions reductions from utility sources have occurred more rapidly than projected for this analysis). |

* The classification of each potential source of error reflects the best judgment of the section 812 Project Team. The Project Team assigns a classification of “potentially major” if a plausible alternative assumption or approach could influence the overall monetary benefit estimate by approximately 5% or more; if an alternative assumption or approach is likely to change the total benefit estimate by less than 5%, the Project Team assigns a classification of “probably minor”.

Table 5. Key uncertainties associated with air quality modeling from the First Prospective Analysis.

Page 1 of 3

| Potential Source of Error | Direction of Potential Bias for Net Benefits Estimate | Likely Significance Relative to Key Uncertainties in Net Benefit Estimate* |
|---|---|---|
| $PM_{10}$ and $PM_{2.5}$ concentrations in the East (RADM domain) are based exclusively on changes in the concentrations of sulfate and nitrate particles, omitting the effect of anticipated reductions in organic or primary particulate fractions. | Underestimate. | Potentially major. Nitrates and sulfates constitute major components of PM, especially $PM_{2.5}$, in most of the RADM domain and changes in nitrates and sulfates may serve as a reasonable approximation of changes in total $PM_{10}$ and total $PM_{2.5}$. Of the other components, primary crustal particulate emissions are not expected to change between scenarios; primary organic carbon particulate emissions are expected to change, but an important unknown fraction of the organic PM is from biogenic emissions, and biogenic emissions are not expected to change between scenarios. If the underestimation is major, it is likely the result of not capturing reductions in motor vehicle primary elemental carbon and organic carbon particulate emissions. |
| The number of $PM_{2.5}$ ambient concentration monitors throughout the U.S. is limited. As a result, cross estimation of $PM_{2.5}$ concentrations from $PM_{10}$ (or TSP) data was necessary to complete the “monitor level” observational data set used in the calculation of air quality profiles. | Unable to determine based on current information. | Potentially major. $PM_{2.5}$ exposure is linked to mortality, and avoided mortality constitutes a large portion of overall CAAA benefits. Cross estimation of $PM_{2.5}$, however, is based on studies that account for seasonal and geographic variability in size and species composition of particulate matter. Also, results are aggregated to the annual level, improving the accuracy of cross estimation. |
| Use of separate air quality models for individual pollutants and for different geographic regions does not allow for a fully integrated analysis of pollutants and their interactions. | Unable to determine based on current information. | Potentially major. There are uncertainties introduced by different air quality models operating at different scales for different pollutants. Interaction is expected to be most significant for PM estimates. However, important oxidant interactions are represented in all PM models and the models are being used as designed. The greatest likelihood of error in this case is for the summer period in areas with $NO_x$ inhibition of ambient ozone (e.g., Los Angeles). |

| Potential Source of Error | Direction of Potential Bias for Net Benefits Estimate | Likely Significance Relative to Key Uncertainties in Net Benefit Estimate* |
|---|---|---|
| Future-year adjustment factors for seasonal or annual monitoring data are based on model results for a limited number of simulation days. | Overall, unable to determine based on current information. | Probably minor. RADM/RPM and REMSAD PM modeling simulation periods represent all four seasons and characterize the full seasonal distribution. Potential overestimation of ozone, due to reliance on summertime episodes characterized by high ozone levels and applied to the May-September ozone season, is mitigated by longer simulation periods, which contain both high and low ozone days. Also, underestimation of UAM-V western and UAM-IV Los Angeles ozone concentrations (see below) may help offset the potential bias associated with this uncertainty. |

Table 5. Key uncertainties associated with air quality modeling from the First Prospective Analysis.



| Potential Source of Error | Direction of Potential Bias for Net Benefits Estimate | Likely Significance Relative to Key Uncertainties in Net Benefit Estimate* |
|---|---|---|
| Comparison of modeled and observed concentrations indicates that ozone concentrations in the western states were somewhat underpredicted by the UAM-V model, and ozone concentrations in the Los Angeles area were underestimated by the UAM-IV model. | Unable to determine based on current information. | Probably minor. Because model results are used in a relative sense (i.e., to develop adjustment factors for monitor data) the tendency for UAM-V or UAM to underestimate absolute ozone concentrations would be unlikely to affect overall results. To the extent that the model is not accurately estimating the relative changes in ozone concentrations across regulatory scenarios, the effect could be greater. |
| Ozone modeling in the eastern U.S. relies on a relatively coarse 12-km grid, suggesting $NO_x$ inhibition of ambient ozone levels may be under-represented in some eastern urban areas. Coarse grid may affect both model performance and response to emissions changes. | Unable to determine based on current information. | Probably minor. Though potentially major for eastern ozone results in those cities with known $NO_x$ inhibition, ozone benefits contribute only minimally to net benefit projections in this study. Grid size affects chemistry, transport, and diffusion processes, which in turn determine the response to changes in emissions, and may also affect the relative benefits of low-elevation versus high-stack controls. However, the approach is consistent with current state-of-the-art regional-scale ozone modeling. |
| UAM-V modeling of ozone in the western U.S. uses a coarser grid than the eastern UAM-V (OTAG) or UAM-IV models, limiting the resolution of ozone predictions in the west. | Unable to determine based on current information. | Probably minor. Also, probably minor for ozone results. Grid cell-specific adjustment factors for monitors are less precise for the west and may not capture local fluctuations. However, exposure tends to be lower in the predominantly non-urban west, and models with finer grids have been applied to three key population centers with significant ozone concentrations. May result in underestimation of benefits in the large urban areas not specifically modeled (e.g., Denver, Seattle) with finer grid. |

| Potential Source of Error | Direction of Potential Bias for Net Benefits Estimate | Likely Significance Relative to Key Uncertainties in Net Benefit Estimate* |
|---|---|---|
| Emissions estimated at the county level (e.g., area source and motor vehicle $NO_x$ and VOC emissions) are spatially and temporally allocated based on land use, population, and other surrogate indicators of emissions activity. Uncertainty and error are introduced to the extent that area source emissions are not perfectly spatially or temporally correlated with these indicators. | Unable to determine based on current information. | Probably minor. Potentially major for estimation of ozone, which depends largely on VOC and $NO_x$ emissions; however, ozone benefits contribute only minimally to net benefit projections in this study. |

Table 5. Key uncertainties associated with air quality modeling from the First Prospective Analysis.



| Potential Source of Error | Direction of Potential Bias for Net Benefits Estimate | Likely Significance Relative to Key Uncertainties in Net Benefit Estimate* |
|---|---|---|
| The REMSAD model underpredicted western PM concentrations during fall and winter simulation periods. | Unable to determine based on current information. | Probably minor. Because model results are used in a relative sense (i.e., to develop adjustment factors for monitor data) REMSAD's underestimation of absolute PM concentrations would be unlikely to significantly affect overall results. To the extent that the model is not accurately estimating the relative changes in PM concentrations across regulatory scenarios, or the individual PM components (e.g., sulfates, primary emissions) do not vary uniformly across seasons, the effect could be greater. |
| Lack of model coverage for acid deposition in western states. | Underestimate. | Probably minor. Because acid deposition tends to be a more significant problem in the eastern U.S. and acid deposition reduction contributes only minimally to net monetized benefits, the monetized benefits of reduced acid deposition in the western states would be unlikely to significantly alter the total estimate of monetized benefits. |
| Uncertainties in biogenic emissions inputs increase uncertainty in the AQM estimates. | Unable to determine based on current information. | Probably minor. Potentially major impacts for ozone outputs, but ozone benefits contribute only minimally to net benefit projections in this study. Uncertainties in biogenics may be as large as a factor of 2 to 3. These biogenic inputs affect the emissions-based VOC/$NO_x$ ratio and, therefore, potentially affect the response of the modeling system to emissions changes. |

* The classification of each potential source of error reflects the best judgment of the section 812 Project Team. The Project Team assigns a classification of "potentially major" if a plausible alternative assumption or approach could influence the overall monetary benefit estimate by approximately 5% or more; if an alternative assumption or approach is likely to change the total benefit estimate by less than 5%, the Project Team assigns a classification of "probably minor".

## REFERENCES

Abdel-Aziz A. and Frey H.C. (2003a) Development of hourly probabilistic utility NOx emission inventories using time series techniques: Part I–univariate approach. *Atmos. Environ.* **37**, 5379-5389.

Abdel-Aziz A. and Frey H.C. (2003b) Development of hourly probabilistic utility $NO_x$ emission inventories using time series techniques: Part II–multivariate approach. *Atmos. Environ.* **37**, 5391-5401.

Abdel-Aziz A. and Frey H.C. (2004) Propagation of uncertainty in hourly utility $NO_x$ emissions through a photochemical grid air quality model: a case study for the Charlotte, NC Modeling Domain. *Environ. Sci. Technol.* **38** (7), 2153-2160.

Alcamo J. and Bartnicki J. (1987) A framework for error analysis of a long-range transport model with emphasis on parameter uncertainty. *Bull. Am. Meteorol. Soc.* **21** (10), 2121-2131.

Balakrishnan S., Roy A., Ierapetritou M.G., Flach G.P., and Georgopoulos P.G. (2003) Uncertainty reduction and characterization for complex environmental fate and transport models: An empirical Bayesian framework incorporating the stochastic response surface method. *Water Resources Research* **39**, 1350-1362.

Balakrishnan S., Roy A., Ierapetritou M.G., Flach G.P., and Georgopoulos P.G. (2005) A comparative assessment of efficient uncertainty analysis techniques for the environmental fate and transport models: Application to the FACT model. *Journal of Hydrology* **307**, 204-218.

Balentine H.W., Dickson R.J., and Oliver W.R. (1994) Development of uncertainty estimates for the Grand Canyon Visibility Transport Commission Emissions Inventory. Radian Corporation technical memorandum, Sacramento, CA, December.

Beck M.B., Ravetz J.R., Mulkey L.A., and Barnwell T.O. (1997) On the problem of model validation for predictive exposure assessments. *Stochastic Environmental Research and Risk Assessment* **11** (3), 229-254 (DOI 210.1007/BF02427917).

Beekmann M. and Derognat C. (2003) Monte Carlo uncertainty analysis of a regional-scale transport chemistry model constrained by measurements from the atmospheric pollution over the Paris area (ESQUIF) campaign. *J. Geophys. Res.* **108**, 8559.

Benkovitz C.M. and Oden N.L. (1989) Individual versus averaged estimates of parameters used in large scale emissions inventories. Atmos. Environ. 23, 903-909.

Benkovitz C.M. (1985) Framework for uncertainty analysis of the NAPAP emissions inventory. Prepared for the U.S. Environmental Protection Agency, Air and Energy Engineering Research Laboratory, EPA/600/7-85/036.

Bergin M.S., Noblet G.S., Petrini K., Dhieux J.R., Milford J.B., and Harley R.A. (1999) Formal uncertainty analysis of a Lagrangian photochemical air pollution model. *Environ. Sci. Technol.* **33** (7), 1116-1126.

Bergin M.S. and Milford J.B. (2000) Application of Bayesian Monte Carlo analysis to a Lagrangian photochemical air quality model. *Atmos. Environ.* **34**, 781-792.

Bischof C.A., Carle A., Corliss G., Griewank A., and Hovland P. (1992) ADIFOR: Generating derivative codes from Fortran programs. *Scientific Programming* **1** (1), 11-29.

Brewer J., Dolwick P., and Gilliam R. (2007) Regional and local scale evaluation of MM5 meteorological fields for various air quality modeling applications, Presented at the *87th Annual American Meteorological Society Annual Meeting, San Antonio, TX, January 15-18*.

Calbo J., Pan W., Webster M., Prinn R.G., and McRae G.J. (1998) Parameterization of urban subgrid scale processes in global atmospheric chemistry models. *J. Geophys. Res.* **103** (D3), 3437-3451.

Carmichael G.R., Sandu A., and Potra F. (1997) Sensitivity analysis for atmospheric chemistry models via automatic differentiation. *Atmos. Environ.* **31**, 475-489.

Chang M., Cardelino C., Chameides W., and Chang W. (1993) An iterative procedure to estimate emission inventory uncertainties. Presented at the *Regional Photochemical Measurement and Modeling Studies Meeting of the Air & Waste Management Association, San Diego, CA, November*.

Chang M., Cardelino C., Hartley D., and Chang W. (1995) Inverse techniques for developing historical and future year emission inventories. Presented at *The Emission Inventory: Programs and Progress Specialty Conference of the Air & Waste Management Association, Research Triangle Park, NC, October 11-13*.

Chi T.R., Unal A.D., and Tian R.A. (2004) Uncertainty of NONROAD emissions in Georgia. Presented at the *U.S. Environmental Protection Agency's 13th Annual Emission Inventory Conference, Clearwater, FL, June 7-10*.

Cho S.-Y., Carmichael G.R., and Rabitz H. (1987) Sensitivity analysis of the atmospheric reaction-diffusion equation. *Atmos. Environ* **21**, 2589-2598 (doi:2510.1016/0004-6981(2587)90190-90199).

Chow J.C., Watson J.G., Lowenthal D.H., Solomon P.A., Magliano K., Ziman S., and Richards L.W. (1992) $PM_{10}$ source apportionment in California's San Joaquin Valley. *Atmos. Environ.* **26A**, 3335-3354.

Claiborn C., Mitra A., Adams G., Bamesberger L., Allwine G., Kantamaneni R., Lamb B., and Westberg H. (1995) Evaluation of $PM_{10}$ emission rates from paved and unpaved roads using tracer techniques. *Atmos. Environ.* **29**, 1075-1089.

Coats C.J.J. and . H.M.R. (1996) Fast emissions modeling with the Sparse Matrix Operator Kernel Emissions modeling system. Paper presented at *The Emission Inventory: Key to Planning, Permits, Compliance, and Reporting, Air and Waste Management Association, New Orleans, LA, September 4- 6*.

Cohan D.S., Hakami A., Hu Y., and Russell A.G. (2005) Nonlinear response of ozone to emissions: Source apportionment and sensitivity analysis. *Environ. Sci. Technol.* **39** (17), 6739-6748.

Conover W.J. (1971) *Practical nonparametric statistics*, 2nd Ed., Wiley, New York.

Dabdub D., DeHaan L.L., and Seinfeld J.H. (1999) Analysis of ozone in the San Joaquin Valley of California. *Atmos. Environ.* **33**, 2501-2514.

DaMassa J. (1992) Technical guidance document for photochemical modeling. Technical Support Division, California Air Resources Board, Sacramento, CA.

Deguillaume L., Beekmann M., and Menut L. (2007) Bayesian Monte Carlo analysis applied to regional-scale inverse emission modeling for reactive trace gases. *J. Geophys. Res.* **112**, D02307.

Deguillaume L., Beekmann M., and Derognat C. (2008) Uncertainty evaluation of ozone production and its sensitivity to emission changes over the Ile-de-France region during summer periods. *J. Geophys. Res.* **113**, D02304.

Dennis R.L., Fox T., Fuentes M., Gilliland A.B., Hanna S., Hogrefe C., Irwin J., Rao S.T., Scheffe R., Schere K., Steyn D., and Venkatram A. (2008) On the evaluation of regional-scale photochemical air quality modeling systems. *Atmosperic Environment* (submitted).

Derwent R. and Hov Ø. (1988) Application of sensitivity and uncertainty analysis techniques to a photochemical ozone model. *J. Geophys. Res.* **93** (D5), 5185-5199.

Deuel H.P., Douglas S.G., and Burton C.S. (1998) Estimation of modeling system noise for two applications of the UAM-V modeling system: one-hour ozone, eight-hour ozone, and ozone exposure. Final report the Utility Air Regulatory Group, C/O Hunton and Williams, Washington, D.C., and Southern Company Services, Inc., Birmingham, AL, by Systems Applications International., Inc., San Rafael. CA, SYSAPP-98/27, August.

Digar A., Cohan D.S., Cox D., Boylan J., Kim B., and Khan M. (2008) Incorporating uncertainty into air quality modeling and planning—a case study for Georgia. Presented at the *7th Annual Community Modeling and Analysis System (CMAS) Conference Chapel Hill, NC, Chapel Hill, NC, October 6-8*.

Dolwick P. (2008) Personal communication with personnel at the U.S. Environmental Protection Agency, December 22.

Dolwick P., Gilliam, R. Reynolds L. and Huffman, A. (2007) Regional and local-scale evaluation of the 2002 MM5 meteorological fields for various air quality modeling applications. Extended abstract for the *6th Annual CMAS Conference, Chapel Hill, NC, October 1-3.*

Doty K., Tesche T.W., McNally D.E., Timin B., Mueller S.F. (2002) Meteorological modeling for the Southern Appalachian Mountains Initiative (SAMI). Final report prepared by University of Alabama in Huntsville, Huntsville, AL, July.

Douglas S.G., Haney J.L., Hudischewskyj A.B., Myers T.C., and We i.Y. (2008) Second prospective analysis of air quality in the U.S.: air quality modeling. Draft report prepared for the Office of Policy Analysis and Review, U.S. Environmental Protection Agency, Research Triangle Park, NC, by ICF International, San Rafael, CA, September.

Dunker A.M. (1981) Efficient calculation of sensitivity coefficients for complex atmospheric models. *Atmos. Environ.* **15** (7), 1155-1161.

Dunker A.M. (1984) The decoupled direct method for calculating sensitivity coefficients in chemical kinetics. *J. Chem. Phys.* **81**, 2385.

Dunker A.M., Yarwood G., Ortmann J.P., and Wilson G.M. (2002) The decoupled direct method for sensitivity analysis in a three-dimensional air quality model—implementation, accuracy, and efficiency. *Environ. Sci. Technol.* **36** (13), 2965-2976.

E. H. Pechan & Associates, Inc. and Industrial Economics, Inc. (2006) Emissions Projections for the Clean Air Act Second Section 812 Prospective Analysis. Draft report prepared for U.S. Environmental Protection Agency Office of Policy Analysis and Review (OPAR), Washington, D.C., June.

Efron B., and Tibshirani R. (1991) Statistical data analysis in the computer age. *Science* **253**, 390-395.

Emission Inventory Improvement Program (1996) Evaluating the uncertainty of emission estimates. Final report prepared for the Quality Assurance Committee, Emission Inventory Improvement Program, by Radian Corporation, Research Triangle Park, NC, July.

Environment Canada (1994) Uncertainties in Canada's 1990 greenhouse gas emission estimates, a quantitative assessment. Prepared by T.J. McCann & Associates. Unpublished report. Ottawa, Ontario, March.

Fish D.J. and Burton M.R. (1997) The effect of uncertainties in kinetic and photochemical data on model predictions of stratospheric ozone depletion. *J. Geophys. Res.* **102**, 25537-25542.

Freeman D.L., Egami R.T., Robinson N.F., and Watson J.G. (1986) A method for propagating measurement uncertainties through dispersion models. *J. Air Pollut. Control Assoc.* **36**, 246-253.

Frey C.H. and Zheng J. (2002a) Probabilistic analysis of driving cycle-based highway vehicle emission factors. *Environ. Sci. Technol.* **36** (23), 5184-5191.

Frey H.C. (1997) Quantitative analysis of uncertainty and variability in environmental policy making. *Uncertainty Modeling and Analysis in Civil Engineering*, B.M. Ayyub ed., CRC Press, Washington, D.C.

Frey H.C. (1998) Estimates of uncertainty in air quality model inputs based upon expert elicitation. Prepared for Hanna Consultants, Kennebunkport, ME by North Carolina State University, Raleigh, NC, September.

Frey H.C., Bharvirkar R., and Zheng J. (1999) Quantitative analysis of variability and uncertainty in emissions estimation. Prepared for the U.S. Environmental Protection Agency, Research Triangle Park, NC, by North Carolina State University, Raleigh,NC, July.

Frey H.C. and Bammi S. (2002) Quantification of variability and uncertainty in lawn and garden equipment $NO_x$ and total hydrocarbon emission factors. *J. Air & Waste Manag. Assoc.* **52** (4), 435-448.

Frey H.C. and Zheng J. (2002b) Quantification of variability and uncertainty in air pollutant emission inventories: method and case study for utility $NO_x$ emissions. *J. Air & Waste Manag. Assoc.* **52** (9), 1083-1095.

Frey H.C. and Bammi S. (2003) Probabilistic nonroad mobile source emission factors. *J. Environ. Eng.* **129**, 162-168.

Frey H.C. and Zhao Y. (2004) Quantification of variability and uncertainty for air toxic emission inventories with censored emission factor data. *Environ. Sci. Technol.* **38**, 6094-6100.

Fujita E.M., Croes B.E., Bennett C.L., Lawson D.R., Lurmann F.W., and Main H.H. (1992) Comparison of emission inventory and ambient concentration ratios of CO, NMOG, and $NO_x$ in California's South Coast Air Basin. *J. Air & Waste Manag. Assoc.* **42**, 264-276.

Gao D., Stockwell W.R., and Milford J.B. (1996) Global uncertainty analysis of a regional-scale gas-phase chemical mechanism. *J. Geophys. Res.* **101**, 9107-9119.

Gatz D.F., and Smith L. (1995a) The standard error of a weighted mean concentration **-** I. bootstrapping vs. other methods. *Atmos. Environ.* **29**, 1185-1193.

Gatz D.F., and Smith L. (1995b). Statistical data analysis in the computer age **-** I. estimating confidence intervals. *Atmos. Environ.* **29**, 1195-1200.

Gilliland A.B., Hogrefe C., Pinder R.W., Godowitch J.M., Foley K.L., and Rao S.T. (2008) Dynamic evaluation of regional air quality models: assessing changes in $O_3$ stemming from changes in emissions and meteorology. *Atmos. Environ.* **42**, 5110-5123.

Grell G.A., Dudhia J., and Stauffer D.R. (1994) A description of the fifth-generation Penn State/NCAR mesoscale model (MM5). Prepared by the National Center for Atmospheric Research, Boulder, CO, NCAR Technical Note-398.

Hakami A., Odman M.T., and Russell A.G. (2003) High-order, direct sensitivity analysis of multidimensional air quality models. *Environ. Sci. Technol.* **37** (11), 2442-2452.

Hakami A., Odman M.T., and Russell A.G. (2004) Nonlinearity in atmospheric response: a direct sensitivity analysis approach. *J. Geophys. Res.* **109**, D15303.

Hanna S.R., Chang J.C., and Fernau M.E. (1998) Monte Carlo estimates of uncertainties in predictions by a photochemical grid model (UAM-IV) due to uncertainties in input variables. *Atmos. Environ.* **32**, 3619-3628.

Hanna S.R., Lu Z., Frey H.C., Wheeler N., Vukovich J., Arunachalam S., Fernau M., and Hansen D.A. (2001) Uncertainties in predicted ozone concentrations due to input uncertainties for the UAM-V photochemical grid model applied to the July 1995 OTAG Domain. *Atmos. Environ.* **35** (5), 891-903 (ISSN 1352-2310).

Hanna S.R. and Davis J.M. (2002) Evaluation of a photochemical grid model using estimates of concentration probability density functions. *Atmos. Environ.* **36** (11), 1793-1798.

Hanna S.R., Russell A.G., Wilkinson J., and Vukovich J. (2003) Review of BEIS3 formulation and consequences relative to air quality standards: estimation of effects in uncertainties in BEIS3 emissions on uncertainties in ozone predictions by chemical transport models. Technical report prepared for EPRI, Palo Alto, CA, EPRI 1005244.

Hanna S.R. and Wilkinson J. (2004) Analytical estimation of uncertainties in biogenic emissions calculated by BEIS3 due to uncertainties in model inputs and parameters. Presented at the *U.S. Environmental Protection Agency's 13th Annual Emission Inventory Conference Clearwater, FL, June 7-10*.

Hanna S.R., Russell A.G., Wilkinson J.G., Vukovich J., and Hansen D.A. (2005) Monte Carlo estimation of uncertainties in BEIS3 emission outputs and their effects on uncertainties in chemical transport model predictions. *J. Geophys. Res.* **110**, D01302.

Hanna S.R., Paine R.J., Heinold D.W., Kintigh E., and Baker D. (2006) A Monte Carlo study of uncertainties in benzene and 1,3-butadiene concentrations calculated by AERMOD and ISC in the Houston ship channel area. Presented at the *14th Joint Conference on the Applications of Air Pollution Meteorology with the Air and Waste Management Association, Atlanta, GA, January 30-February 2*.

Hanna S.R., et al. (1998) Evaluations of Numerical Weather Prediction (NWP) models from the point of view of inputs required by atmospheric dispersion models. *5th International Conference on Harmonization within Atmospheric Dispersion Modeling for Regulatory Purposes, Rhodes, Greece, May 18-21*.

Harley R.A., Sawyer R.F., and Milford J.B. (1997) Updated photochemical modeling for California's south coast air basin: comparison of chemical mechanisms and motor vehicle emissions inventories. *Environ. Sci. Technol.* **31**, 2829-2839.

Hartley D., and Prinn R.J. (1993) Feasibility of determining surface emissions of trace gases using an inverse method in a three-dimensional chemical transport model. *J. Geophys. Res.* **98**, 5183-5197.

Hass H., Builtjes P.J.H., Simpson D., and Stern R. (1997) Comparison of model results obtained with several European regional air quality models. *Atmos. Environ.* **31**, 259-3279.

Hogrefe C., Rao S.T., Zurbenko I.G., and Porter P.S. (2000) Interpreting the information in ozone observations and model predictions relevant to regulatory policies in the eastern United States. *Bull. Am. Meteorol. Soc.* **81**, 2083-2106 (9). Available on the Internet at <http://dx.doi.org/10.1175/1520-0477(2000)081<2083:ITIIOO>2.3.CO;2>.

Hogrefe C., Jones J.M., Gilliland A., Porter P.S., Gégo E., Gilliam R., Swall J., Irwin J., and Rao S.T. (2007 ) Evaluation of an annual simulation of ozone and fine particulate matter over the continental United States—which temporal features are captured? *Air Pollution Modeling and Its Application XVII*, C. Borrego and A. Norman eds., Springer, United States (DOI 10.1007/978-0-387-68854-1).

Hogrefe C., Civerolo K.L., Hao W., Ku J.-Y., Zalewsky E.E., and Sistla G. (2008) Rethinking the assessment of photochemical modeling systems in air quality planning applications. *J. Air & Waste Manag. Assoc.* **58** (8), 1086-1099.

Horie Y. (1988) Handbook on Procedures for Establishing the Uncertainties of Emission Estimates. Prepared for the California Air Resources Board Research Division, by Valley Research Corporation, ARB Contract A5-184-32.

Horie Y. and Shorpe A.L. (1989) Development of procedures for establishing the uncertainties of emission estimates. Paper 89-24.7 presented at the *82nd Annual Air and Waste Management Association Meeting Anaheim, CA, June*.

Hossain F., Anagnostou E.N., and Lee K.-H. (2004) A non-linear and stochastic response surface method for Bayesian estimation of uncertainty in soil moisture simulation from a land surface model. *Nonlinear Process in Geophysics* **11**, 427-440.

Houyoux M.R., Loughlin D.H., Holland A.P., Frey H.C., and Abdel-Aziz A. (2003) Design, Application, and Recommendations for Including Inventory Uncertainties in Emission Inventory Preparation for Modeling. *12th International Emission Inventory Conference, Emission Inventories - Applying New Technologies, San Diego, April 29 - May 1*.

Hu Y., Odman M.T., and Russell A.G. (2006) Re-examination of the 2003 North American electrical blackout impacts on regional air quality. *Geophys. Res. Lett.* **33**, L22810.

Hubbell B. (2003) Identification of cost effectiveness measures using response-surface modeling. Presented at the *Symposium on Cost-Effectiveness Analysis for Multiple Benefits, Washington, D.C., September 9*.

Hwang D., Byun D., and Odman M.T. (1997) An automatic differentiation technique for sensitivity analysis of numerical advection schemes in air quality. *Atmos. Environ.* **31** (6), 879-888.

Iman R.L., and Helton J.C. (1988) An investigation of uncertainty and sensitivity analysis techniques for computer models. *Risk Analysis* **8**, 71-90.

International Atomic Energy Agency (1989) Evaluating the reliability of predictions made using environmental transfer models. prepared by the International Atomic Energy Agency, Vienna, Austria, IAEA Safety Series No. 100.

Irwin J.S., Rao S.T., Petersen W.B., and Turner D.B. (1987) Relating error bounds for maximum concentration estimates to diffusion meteorology uncertainty. *Atmos. Environ.* **21**, 1927-1937.

Isukapalli S.S., Roy A., and Georgopoulos P.G. (1998) Stochastic response surface methods (SRSMs) for uncertainty propagation: Application to environmental and biological systems. *Risk Anal.* **18** (3), 351-363.

Isukapalli S.S., Roy A., and Georgopoulos P.G. (2000) Efficient sensitivity/uncertainty analysis using the combined stochastic response surface method and automated differentiation: Application to environmental and biological systems. *Risk Anal.* **20** (5), 591-602.

Jang J.C.C., Jeffries H.E., and Tonnesen S. (1995) Sensitivity of Ozone to Model Grid Resolution-I. Detailed Process Analysis for Ozone Chemistry. *Atmos. Environ.* **29** (21), 3085-3100.

Jeffries H.E., Keating T., and Wang Z. (1996) Integrated process rate analysis of the impact of $NO_x$ emission height on UAM-modeled peak ozone levels. Final topical report prepared for the Gas Research Institute, Chicago, IL.

Jeffries H.E. (1997) Use of integrated process rate analyses to perform source attribution for primary and secondary pollutants in Eulerian air quality models. Presented at the *U.S. EPA Source Attribution Workshop, Research Triangle Park, NC, July 16-18*.

Jimenez P., Parra R., Gasso S., and Baldasano J.M. (2004) Modeling the ozone weekend effect in very complex terrains: a case study in the Northeastern Iberian Peninsula. *Atmos. Environ.* **39** (3), 429-444.

Jin L., Tonse S., Cohan D.S., Mao X., Harley R.A., and Brown N.J. (2008) Sensitivity analysis of ozone formation and transport for a central California air pollution episode. *Environ. Sci. Technol.* **42** (10), 3683-3689.

Jones J.M., Hogrefe C., Henry R.F., Ku J.-Y., and Sistla G. (2005) An assessment of the sensitivity and reliability of the relative reduction factor (RRF) approach in the development of 8-hr ozone attainment plans. *J. Air & Waste Manag. Assoc.* **55** (1), 13-19.

Kemball-Cook, S., Jia Y., Emery C., Morris R., Wang Z., and Tonnesen G. (2005) Annual 2002 MM5 meteorological modeling to support regional haze modeling of the western United States. Report prepared for The Western Regional Air Partnership (WRAP), Denver, CO 80202, March.

Kini M.D. and Frey H.C. (1997) Probabilistic evaluation of mobile source air pollution. Prepared for the Center for Transportation and Environment by North Carolina State University, Raleigh, NC.

Linstone H.A. and Turoff M. (2002) *The Delphi Method, Techniques and Applications*, Addison-Wesley.

Lo C.S. and Jeffries H.E. (1997) A quantitative technique for assessing pollutant source location and process composition in photochemical grid models. Presented at the *Annual Air & Waste Management Association Meeting, Toronto, Ontario*.

Lowenthal D.H., Chow J.C., Watson J.G., Neuroth G.R., Robbins R.B., Shafritz B.P., and Countess R.J. (1992) The effects of collinearity in the ability to determine aerosol contributions from diesel- and gasoline-powered vehicles using the chemical mass balance model. *Atmos. Environ*. **26A**, 2341-2351.

Mallet V. and Sportisse B. (2006) Uncertainty in a chemistry-transport model due to physical parameterizations and numerical approximations: An ensemble approach applied to ozone modeling. *J. Geophys. Res.* **111**, D01302.

Mangat T.S., Robinson L.H., and Switzer P. (1984) Medians and percentiles for emission inventory totals. Presented at the *77th Annual Meeting of the Air Pollution Control Association, San Francisco, CA. June*.

Martien P.T., Harley R.A., and Cacuci D.G. (2006) Adjoint sensitivity analysis for a three-dimensional photochemical model: Implementation and method comparison. *Environ. Sci. Technol.* **40** (8), 2663-2670.

Marufu L.T., Taubman B.F., Bloomer B., Piety C.A., Doddridge B.G., Stehr J.W., and Dikerson R.W. (2004) The 2003 North American electrical blackout: An accidental experiment in atmospheric chemistry. *Geophys. Res. Lett.* **31**, L13106.

Menut L. (2003) Adjoint modeling for atmospheric pollution process sensitivity at regional scale. *J. Geophys. Res.* **108** (D17), 8562.

Milford J.B., Gao D., Russell A.G., and McRae G.J. (1992) Use of sensitivity analysis to compare chemical mechanisms for air-quality modeling. *Environ. Sci. Technol.* **26**, 1179-1189.

Mitchell W.J., Suggs J.C., and Streib E.W. (1995) A statistical analysis of stationary source compliance test audit data. *J. Air & Waste Manag. Assoc*. **45**, 83-88.

Moore G.E. and Londergan R.J. (2001) Sampled Monte Carlo uncertainty analysis for photochemical grid models. *Atmos. Environ.* **35**, 4863-4876.

Morgan M.G. and Henrion M. (1990) *Uncertainty: a guide to fealing with uncertainty in quantitative risk and policy analysis*, Cambridge University Press, New York, NY.

Mulholland M., and Seinfeld J.H. (1995) Inverse air pollution modelling of urban-scale carbon monoxide emissions. *Atmos. Environ*. **29**, 497-516.

Napelenok S.L., Cohan D.S., Hu Y., and Russell A.G. (2006) Decoupled direct 3D sensitivity analysis for particulate matter (DDM-3D/PM). *Atmos. Environ.* **40** (32), 6112-6121.

NARSTO (2005) *Improving emission inventories for effective air quality management across north america--a NARSTO assessment*, J.D. Mobley, ed., (NARSTO-05-001).

National Council on Radiation Protection and Measurements (1996) A guide for uncertainty analysis in dose and risk assessments related to environmental contamination. NCRP Commentary Number 14 prepared by the National Council on Radiation Protection and Measurements, Bethesda, MD, ed., F.O. Hoffman.

National Exposure Research Laboratory (1999) Science algorithms of the EPA Models-3 Community Multiscale Air Quality (CMAQ) modeling system. Report prepared by the National Exposure Research Laboratory, Research Triangle Park, NC, EPA/600/R-99/030 (peer reviewed), March.

Oden N.L. and Benkovitz C.M. (1990) Statistical implications of the dependence between the parameters used for calculations of large scale emissions inventories. *Atmos. Environ.* **24A** (3), 449-456.

Odman T. and Ingram C.L. (1996) Multiscale Air Quality Simulation Platform (MAQSIP): source code documentation and validation. MCNC Technical Report, ENV-96TR002-v1.0.

Olerud D., Alapaty K., and Wheeler N. (2000) Meteorological modeling of 1996 for the United States with MM5. Final report to the U.S. Environmental Protection Agency under task order number CAA689805, MCNC, Research Triangle Park, NC, September.

Ozone Transport Assessment Group (1997) OTAG regional and urban scale modeling, Version 1.1. Modeling Report.

Pan W., Tatang M.A., McRae G.J., and Prinn R.G. (1998) Uncertainty analysis of indirect radiative forcing by anthropogenic suflate aerosols. *J. Geophys. Res.* **103** (D4), 3815-3824.

Peer R.L., Epperson D.L., Campbell D.L., and von Brook P. (1992) Development of an empirical model of methane emissions from landfills. United States Environmental Protection Agency, Air and Energy Engineering Laboratory, Research Triangle Park, NC, EPA-600/R-92-037.

Pierson W.R., Gertler A.W., and Bradow R.L. (1990) Comparison of the SCAQS Tunnel Study with other on-road vehicle emission data. *J. Air & Waste Manag. Assoc.* **40** (11), 1495-1504.

Pollack A.K., Bhave P., Heiken J., Lee K., Shepard S., Tran C., Yarwood G., Sawyer R.F., and Joy B.A. (1999) Investigation of emission factors in the California EMFAC7G model. Prepared for the Coordinating Research Council by ENVIRON International Corporation, Novato, CA, PB99-149718NZ.

Rabitz H., Kramer M., and Docol D. (1983) Sensitivity analysis in chemical kinetics. *Annu. Rev. Phys. Chem.* **34**, 419-461.

Reynolds S.D., Michaels H.M., Roth P.M., Tesche T.W., McNally D., Gardner L., and Yarwood G. (1996) Alternative base cases in photochemical modeling: their construction, role and value. *Atmos. Environ.* **30** (12), 1977-1988.

Rhodes D.S. and Frey H.C. (1997) Quantification of variability and uncertainty in AP-42 emission factors using bootstrap simulation. *Air and Waste Management Association's Conference on Emission Inventory: Planning for the Future, Pittsburgh, PA, October*.

Rodriguez M.A. and Dabdub D. (2003) Monte Carlo uncertainty and sensitivity analysis of the CACM chemical mechanism. *J. Geophys. Res.* **108**, 1443.

Saeger M. (1994) Procedures for verification of emissions inventories, Final report. prepared for the Emissions Inventory Branch, Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, Research Triangle Park, NC, EPA Contract No. 68-D3-0030.

Scheff P.A., Wadden R.A., Kenski D.M., and Chang J. (1995) Receptor model evaluation of the SEMOS ambient NMOC measurements. Paper 95-113C.03. Presented at the *88th Annual Meeting of the Air Pollution Control Association, San Antonio, Texas, June*.

Schere K.L. and Coats C.J. (1992) A stochastic methodology for regional wind-field modeling. *J. Appl. Meteor.* **31**, 1407-1425.

Seefeld S. and Stockwell W.R. (1999) First-order sensitivity analysis of models with time-dependent parameters: an application to PAN and ozone. *Atmos. Environ.* **33**, 2941-2953.

Seigneur C., Tesche T.W., Roth P.M., and Reid L.E. (1981) Sensitivity of a complex urban air quality model to input data. *J. Appl. Meteorol.* **20**, 1020-1040.

Sistla G., Hogrefe C., Hao W., Ku J.-Y., Zalewsky E., Henry R.F., and Civerolo K. (2004) An operational assessment of the application of the relative reduction factors in the demonstration of attainment of the 8-hr ozone national ambient air quality standard. *J. Air & Waste Manag. Assoc.* **54** (8), 950-959.

Solarski R.S., Butler D.M., and Rundel R.D. (1978) Uncertainty propogation in a stratospheric model, 2. Monte Carlo analysis of imprecisions due to reaction rates. *J. Geophys. Res.* **83**, 3074-3078.

South Coast Air Quality Management District (SCAQMD) (1982) Uncertainty of 1979 emissions data, Chapter IV: 1983 Air Quality Management Plan Revision, Appendix IV-A; 1979 Emissions Inventory for the South Coast Air Basin, Revised October 1982. Planning Division, El Monte, California. October.

Spellicy F.L., Draves J.A., Crow W.L., Herget W.F., and Buchholtz W.F. (1992) A demonstration of optical remote sensing in a petrochemical environment. Presented at the A*ir & Waste Management Association Specialty Conference on Remote Sensing, Houston, TX, April 6-9*.

Steiner C.K.R., Gardner L., Causley M.C., Yocke M.A., and Steorts W.L. (1994) Inventory quality issues associated with the development of an emissions inventory for the Minerals Management Service Gulf of Mexico Air Quality Study. In *The Emission Inventory: Perception and Reality: Proceedings of an International Specialty Conference, VIP-38. Air & Waste Management Association*, Pittsburgh, Pennsylvania.

Straume A.G., N'Dri Koffi E., and Nodop K. (1998) Dispersion modeling using ensemble forecasts compared to ETEX measurements. *J. Applied Meteorology* **37**, 1444-1456.

Tatang M.A., Pan W., Prinn R.G., and McRae G.J. (1997) An efficient method for parametric uncertainty analysis of numerical geophysical models. *J. Geophys. Res.* **102**, 21925-21932.

U.S. Environmental Protection Agency (1995) Compilation of air pollutant emission factors, volume I: stationary point and area sources, Fifth Edition, AP-42. U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards. Research Triangle Park, NC.

U.S. Environmental Protection Agency (1999) Draft guidance on the use of models and other analyses in attainment demonstrations for the 8-hour ozone NAAQS. Prepared by the Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, Research Triangle Park, NC, EPA-454/4-99-004.

U.S. Environmental Protection Agency (2001) Draft guidance for demonstrating attainment of air quality goals for $PM_{2.5}$ and regional haze, Draft 2.1. Prepared by the Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, Research Triangle Park, NC, January.

U.S. Environmental Protection Agency (2006a) Technical support document for the proposed Mobile Source Air Toxics Rule: Ozone modeling. Prepared by the U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, Research Triangle Park, NC, February.

U.S. Environmental Protection Agency (2006b) Technical support document for the proposed PM NAAQS rule: response surface modeling. U.S. Environmental Protection Agency, Office of Air Quality and Planning Standards, Research Triangle Park, NC. Available on the Internet at <http://www.epa.gov/scram001/reportsindex.htm>, February

U.S. Environmental Protection Agency (2007) Technical support document for the final Mobile Source Air Toxics Rule: Ozone modeling. Prepared by Air Quality Assessment Division, Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, Research Triangle Park, NC, EPA454/R-07-003, February. Available on the Internet at <http://epa.gov/otaq/regs/toxics/454r07003.pdf>.

U.S. Environmental Protection Agency (2008) Technical support document for the final locomotive/marine rule: air quality modeling analyses, EPA-454/R-08-002, January.

Vuilleumier L., Brown N.J., Orlando E., Harley R.A., and Reynolds S.D. (2000) Review and improvement of methods for estimating rates of photolysis in photochemical models. Final report prepared for California Air Resources Board and the California Environmental Protection Agency, Sacramento, CA, by Lawrence Berkeley National Laboratory, Berkeley, CA, Contract No. 96-335, December.

Wagner K.K. and Wheeler N.J.M. (1988) 1995 Ozone modeling boundary condition sensitivity. Memorandum prepared by the Modeling and Meteorology Branch, California Air Resources Board, July.

Wagner K.K. and Wheeler N.J. (1989) Variability of photochemical modeling emission sensitivity with respect to meteorology. Preprints from the *Sixth Joint Conference on Applications of Air Pollution Meteorology, Anaheim, CA, January 30–February 3*, 222-223, American Meteorological Society.

Wagner K.K., Wheeler N.J.M., and McNerny D.L. (1992) The effect of emission inventory uncertainty on Urban Airshed Model sensitivity to emission reductions. In Transactions of an international conference *Tropospheric Ozone: Nonattainment and Design Value Issues*, TR-23, 123-134, J.J. Vostal, ed., Air and Waste Management Association.

Wang L., Milford J.B., and Carter W.P.L. (2000) Reactivity estimates for aromatic compounds. Part 2: Uncertainty in incremental reactivities. *Atmos. Environ.* **34**, 4349-4360.

Watson J.G., Cooper J.A., and Huntzicker J.J. (1984) The effective variance weighing for least squares calculations applied to the mass balance receptor model. *Atmos. Environ.* **18,** 1347-1355.

Webster M. and Sokolov A.P. (2000) A methodology for quantifying uncertainty in climate projections. *Climatic Change* **46**, 417-446.

Webster M., Scott J., Sokolov A.P., and Stone P. (2006) Estimating probability distributions from complex models with bifurcations: the case of ocean circulation collapse. Prepared by the MIT Joint Program on the Science and Policy of Global Change, Report No. 133, March.

Wheeler N.J.M. (1992) Urban Airshed Model sensitivity to horizontal transport paths. In Transactions of an international conference *Tropospheric Ozone and the Environment II: Effects, Modeling and Control, Atlanta, GA, November 5-7, 1991*, TR-20, 400-410, R.L. Berglund, ed., Air and Waste Management Association.

Whitten G. and Killus J. (1998) Effect of chemical mechanism uncertainty on airshed model results. Final report prepared for the California Air Resources Board, Technical Support Division, Sacramento, CA, by Systems Applications International, Inc., SYSAPP-97/57, February.

Wilson, J. H., Mullen M. A., Bollman A. D., Thesing K. B.  Salhotra M., Divita F., Neumann, J.  Price J. C., and DeMocker J. (2008) Emissions projections for the U.S. Environmental Protection Agency Section 812 second prospective Clean Air Act cost/benefit analysis. *J. of Air & Waste Manage. Assoc*. **58**, 657-672.

Winiwarter W. and Rypdal K. (2001) Assessing the uncertainty associated with national greenhouse gas emission inventories: a case study for Austria. *Atmos. Environ.* **35**, 5425-5440.

Winner D.A., Cass G.R., and Harley R.A. (1995) Effect of alternative boundary conditions on predicted ozone control strategy performance: A case study in the Los Angeles area. *Atmos. Environ.* **29**, 3451-3464.

Yang Y.-J., Stockwell W.R., and Milford J.B. (1995) Uncertainties in incremental reactivities of volatile organic compounds. *Environ. Sci. Technol.* **29**, 1336-1345.

Yang Y.-J., Wilkinson J.G., and Russell A.G. (1997) Fast, direct sensitivity analysis of multidimensional photochemical models. *Environ. Sci. Technol.* **31**, 2859-2868.

Yarwood G., Stoeckenius T.E., Heiken J.G., and Dunker A.M. (2003) Modeling weekday/weekend ozone differences in the Los Angeles Region for 1997. *J. Air & Waste Manag. Assoc.* **53**, 864-875.

Zhang F., Bei N., Nielsen-Gammon J.W., Li G., Zhang R., Stuart A., and Aksoy A. (2007) Impacts of meteorological uncertainties on ozone pollution predictability estimated through meteorological and photochemical ensemble forecasts. *J. Geophys. Res.* **112**, D04304, doi:04310.01029/02006JD007429.

Zhao Y. and Frey H.C. (2004) Development of probabilistic emission inventories of air toxics for Jacksonville, Florida, USA. *J. Air & Waste Manag. Assoc.* **54**, 1405-1421.

# APPENDIX C | QUALITATIVE UNCERTAINTY SUMMARY TABLES FOR SECOND SECTION 812 PROSPECTIVE ANALYSIS OF THE CLEAN AIR ACT

**TABLE C-1. KEY UNCERTAINTIES ASSOCIATED WITH EMISSIONS ESTIMATION**

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES ON NET BENEFITS ESTIMATE[1] |
|---|---|---|
| **UNCERTAINTIES RELATED TO BASE-YEAR EMISSIONS** | | |
| Uncertainties in modeling a counterfactual emissions scenario. Estimating EGU emissions using an alternate counterfactual projection approach yielded increases in air quality impacts and health benefits of 50% relative to the core scenario's IPM-generated estimates. | Underestimate. The IPM-based counterfactual generated substantially lower benefits than the alternative counterfactual scenario specification we tested, which was based on published and readily replicated methodologies. It is possible, however, that other counterfactual specifications would yield lower benefits. It is also possible that the direction of effect might be different for other pollutant source categories where this is no accepted basis to generate an alternative counterfactual scenario estimate. | Potentially major. Analysis confirmed that IPM performs well when estimating with-CAAA emissions, but also highlighted high degree of uncertainty in estimating counterfactual emissions. Similar uncertainties exist for emissions from other emitting sectors. There is no clear way, however, to determine which approach to estimating counterfactual emissions is superior. |
| Uncertainties in biogenic emissions inputs increase uncertainty in the air quality modeling estimates. Uncertainties in biogenic emissions may be large (± 80%). The biogenic inputs affect the emissions-based VOC/NOx ratio and, therefore, potentially affect the response of the modeling system to emissions changes. | Unable to determine based on current information. The biogenic emissions change overall reactivity, leading to either an underestimate or overestimate of the model's response to emission reductions. | Probably minor. Impacts for ozone and $PM_{2.5}$ results. Both oxidation potential and secondary organic aerosol formation could influence $PM_{2.5}$ formation significantly. However, biogenic emissions are assumed to be unaffected by the CAAA, so this uncertainty should not significantly affect net benefits. Furthermore, ozone benefits contribute only minimally to net benefit projections in this study. |
| Emissions estimated at the county level (e.g., low-level source and motor vehicle $NO_x$ and VOC emissions) are spatially and temporally allocated based on land use, population, and other surrogate indicators of emissions activity. Uncertainty and error are introduced to the extent that area source emissions are not perfectly spatially or temporally correlated with these indicators. | Unable to determine based on current information. | Probably minor. Potentially major for estimation of ozone, which depends largely on VOC and $NO_x$ emissions; however, ozone benefits contribute only minimally to net benefit projections in this study. |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES ON NET BENEFITS ESTIMATE[1] |
|---|---|---|
| **UNCERTAINTIES RELATED TO GROWTH FACTORS** | | |
| Economic growth factors used to project emissions are an indicator of future economic activity. These growth factors reflect uncertainty in economic forecasting as well as uncertainty in the link to emissions. IPM projections may be reasonable regionally but may introduce significant biases locally. Also, the Annual Energy Outlook 2005 growth factors do not reflect the recent economic downturn or the volatility in fuel prices since the fall of 2005. | Unable to determine based on current information. | Potentially major. The same set of growth factors are used to project emissions under both the *Without-CAAA* and *With-CAAA* scenarios, mitigating to some extent the potential for significant errors in estimating differences in emissions. Some specific locations may be more significantly influenced. We estimated gross benefits using AEO low-growth and high-growth scenarios and found differences of ±20%. However, due to nonlinearities in the benefits estimation model, we could not reliably determine in what direction over- or underestimating growth might bias net benefits estimates. |
| The on-road source emissions projections reflect MOBILE6.2 data on the composition of the vehicle fleet. If recent volatility in fuel prices persists or if fuel prices rise significantly (like they did in 2007 and 2008), the motor vehicle fleet may include more smaller, lower-emitting automobiles and fewer small trucks (e.g., SUVs). | Overestimate | Probably minor. Overall, fuel prices affect fleet composition at the margin, and we expect changes in fleet composition to occur gradually over long periods, suggesting that any effect would take several years to fully manifest. |
| **UNCERTAINTIES RELATED TO EMISSIONS CONTROL MODELING** | | |
| The *With-CAAA* scenario includes implementation of the Clean Air Mercury Rule (CAMR), which has been vacated, and Clean Air Interstate Rule (CAIR), which was vacated but has since been remanded. | Unable to determine based on current information. | Potentially major. Significance in 2020 will depend on the speed and effectiveness of implementing potential alternatives to CAIR and CAMR. In some areas, emissions reductions are expected to be overestimated, but in other areas, $NO_x$ inhibition of ozone leads to underestimates of ozone benefits (e.g., some urban centers). |
| VOC emissions are dependent on evaporation, and future patterns of temperature are difficult to predict. | Underestimate. Higher temperatures in the future are more likely than lower temperatures because of climate change, and higher temperature would lead to more emissions in the *without-CAAA* case but controls would keep the *with-CAAA* emissions roughly constant. | Probably minor. The analysis uses meteorological data from 2002 to characterize temperatures during the 30-year period from 1990 to 2020. An acceleration of climate change (warming) could increase emissions but the increase relative to 2002 levels would not likely be significant. |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES ON NET BENEFITS ESTIMATE[1] |
|---|---|---|
| Use of average temperatures (i.e., daily minimum and maximum) in estimating motor-vehicle emissions artificially reduces variability in VOC emissions. | Unable to determine based on current information. | Probably minor. Use of averages will overestimate emissions on some days and underestimate on other days. Effect is mitigated in *With-CAAA* scenarios because of more stringent evaporative controls that are in place by 2000 and 2010. |
| Uncertainties in the stringency, scope, timing, and effectiveness of *With-CAAA* controls included in projection scenarios. | Unable to determine based on current information. | Probably minor. Future controls could be more or less stringent, widely applicable, or effective than projected. Timing of emissions reductions may also be affected. |
| The location of the emissions reductions achieved from unidentified measures is uncertain. We currently treat these reductions as if they are achieved from non-point sources, but this may not be correct in all cases. | Unable to determine based on current information. | Probably minor. Impacts from these uncertainties would be localized and would not significantly change the overall net benefit estimate. |

1 The classification of each potential source of error reflects the best judgment of the section 812 Project Team. The Project Team assigns a classification of "potentially major" if a plausible alternative assumption or approach could influence the overall monetary benefit estimate by approximately five percent or more; if an alternative assumption or approach is likely to change the total benefit estimate by less than five percent, the Project Team assigns a classification of "probably minor."

**EXHIBIT C-2. KEY UNCERTAINTIES ASSOCIATED WITH COST ESTIMATION**

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES ON NET BENEFITS ESTIMATE[1] |
|---|---|---|
| Uncertainty in the maximum per ton costs for local controls to comply with the 8-hour Ozone and $PM_{2.5}$ NAAQS. | Unable to determine based on current information | Probably minor. Our analysis of local controls assumes a maximum cost of $15,000 per ton for local controls implemented to comply with 8-hour Ozone and $PM_{2.5}$ NAAQS requirements.[5] Local areas may implement more costly controls to comply with the NAAQS, but technological innovation may lead to the development of less expensive controls. |
| Uncertainty in the projected composition of motor vehicle sales and the fuel efficiency of the motor vehicle fleet. | Unable to determine based on current information | Probably minor. We projected the composition of motor vehicle sales and the fuel efficiency of the motor vehicle fleet based on AEO 2005 data. The sensitivity analysis of alternative sales and fuel efficiency projections presented in this report suggests that this uncertainty has a small impact on net benefits. |
| Uncertainty regarding failure rates for motor vehicle inspections. | Unable to determine based on current information | Probably minor. The repair costs for vehicles that fail emission inspections represent a small fraction of the estimated net benefits of the amendments. The failure rate sensitivity analysis presented in this report suggests that alternative failure rate assumptions could have a large effect on the costs for this component of the CAAA, but only a minor effect on the estimated net benefits of the amendments as a whole. |
| Costs for some technologies and emissions sectors reflect default assumptions about the rates at which learning affect costs because empirical information is unavailable. | Underestimate | Probably minor. Based on the advice of the Council on Clean Air Compliance Analysis, we used a conservative learning rate of 10 percent for those sectors where no empirical data were available.[2] In contrast, the learning curve literature suggests that the average learning rate is approximately 20 percent, suggesting that learning will reduce costs more than is reflected in the present analysis.[3] |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES ON NET BENEFITS ESTIMATE[1] |
|---|---|---|
| Uncertainties in the economic growth projections that form the basis of the cost analysis. | Unable to determine based on current information | Probably minor. The project team used AEO 2005 economic growth projections, which suggest that the economy will grow at an annual rate of 3.1 percent through 2025.[4] This growth rate is in line with historical GDP growth. |
| Incomplete characterization of certain indirect costs, such as productivity impacts for regulated industry. | Unable to determine based on current information | Probably minor. The literature on the productivity impacts of the CAAA is unclear with respect to the direction and magnitude of these effects. |
| Product quality degradation associated with emission control technology. | Unable to determine based on current information | Unable to determine based on current information. Conceptually, the potential for CAAA requirements to affect product quality could result in an underestimate or overestimate of the welfare effects of compliance costs, and therefore an indeterminate effect on net benefits. Unfortunately, few studies exist that address the potential product quality effects of CAAA regulations. |
| Exclusion of the impact of technological innovation and input substitution on compliance costs. | Underestimate | Probably minor. Minimal information is available on the potential effects of technological innovation on costs. Though input substitution is a potential source of cost savings, the analysis primarily models mature industries and compliance strategies which have been established as least-cost compliance paths. In addition, many regulations, such as RACT, are technology-based and may not allow for much input substitution. |
| Partial estimation of costs for compliance with the $PM_{2.5}$ NAAQS, due to the unavailability of emission reduction targets for non-attainment areas. | Overestimate | Probably minor. The 2006 $PM_{2.5}$ NAAQS RIA estimates that the incremental costs of residual non-attainment (i.e., costs of additional reductions from unidentified controls needed to reach attainment) are approximately $4.3 billion in 2020, yielding total cost estimates that exceed the estimates presented here by a factor of five or more.[6] However, we estimate that the costs of the $PM_{2.5}$ NAAQS represent less than 5 percent of the net benefits of the amendments.[7] |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES ON NET BENEFITS ESTIMATE[1] |
|---|---|---|
| Uncertainty in the emission reduction estimates used to estimate the costs for select rules. | Unable to determine based on current information | Probably minor. Costs for many rules are not dependent on the corresponding emissions reductions (e.g., fuel sulfur limits, tailpipe standards, etc.) |
| Exclusion of the impact of economic incentive provisions, including banking, trading, and emissions averaging provisions. | Underestimate | Probably minor. Economic incentive provisions can substantially reduce costs, but the major economic programs for trading of sulfur and nitrogen dioxide emissions are reflected in the analysis. |
| Potential for overestimation biases in engineering cost estimates. | Underestimate | Probably minor. A study by Harrington, Morgenstern, and Nelson (1999) evaluated the accuracy of EPA and OSHA estimates of 25 *ex ante* regulatory cost estimates relative to *ex post* studies of actual costs, and concluded that initial cost estimates by EPA tend to overstate costs. The source of these biases include a built-in conservative bias, inaccuracies in estimating the size of the affected universe, the effect of learning on reducing costs, the effect of innovation on reducing costs, and cost-reducing features of regulatory design. Some of these factors are discussed elsewhere in this table. The magnitude of these biases varies substantially, but in no case would we expect the overall impact to exceed five percent of overall net benefits. |

1 The classification of each potential source of error reflects the best judgment of the section 812 Project Team. The Project Team assigns a classification of "potentially major" if a plausible alternative assumption or approach could influence the overall monetary benefit estimate by approximately five percent or more; if an alternative assumption or approach is likely to change the total benefit estimate by less than five percent, the Project Team assigns a classification of "probably minor."

2 U.S. Environmental Protection Agency Science Advisory Board, EPA-SAB-COUNCIL-ADV-07-002, "Benefits and Costs of Clean Air Act – Direct Costs and Uncertainty Analysis", Advisory Letter, June 8, 2007. Available at http://www.epa.gov/sab/pdf/council-07-002.pdf.

3 For an analysis of the learning rates estimated in the empirical literature, see John M. Dutton and Annie Thomas, "Treating Progress Functions as a Managerial Opportunity," *Academy of Management Review*, Vol 9, No. 2, 1984.

4 U.S. Department of Energy, Energy Information Administration, *Annual Energy Outlook 2005*, February 2005.

5 The Project Team uses this maximum unit cost value in two ways. First, the Project Team assumes that local areas would not implement identified controls costing more than $15,000 per ton. Second, the Project Team assumes a cost of $15,000 per ton for unidentified controls.

6 U.S. Environmental Protection Agency. *Regulatory Impact Analysis for the Particulate Matter NAAQS*. October, 2006.

7 For detailed estimates of the costs of $PM_{2.5}$ NAAQS compliance, see E.H. Pechan and Associates, Inc. and Industrial Economics, Inc., *Direct Cost Estimates for the Clean Air Act Second Section 812 Prospective Analysis*, prepared for U.S. EPA, March 2009.

**TABLE C-3. KEY UNCERTAINTIES ASSOCIATED WITH AIR QUALITY MODELING**

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES ON NET BENEFITS ESTIMATE* |
|---|---|---|
| Unknown meteorological biases in the 12-km western and 36-km MM5 domains due to the lack of model performance evaluations. | Unable to determine based on current information. | Probably minor. Other evaluations using 2002 and similar meteorology and CMAQ have shown reasonable model performance. Although potentially major affects on nitrate results in western areas with wintertime $PM_{2.5}$ problems. |
| Known metrological biases in the 12-km eastern MM5 domain. MM5 has a cold bias during the winter and early spring, and has a general tendency to underestimate the monthly observed precipitation. MM5's under prediction was greatest in the fall and least in the spring months. | Unable to determine based on current information. | Probably minor. These biases would likely influence $PM_{2.5}$ formation processes, which was modeled on the 36-km domain. |
| Secondary organic aerosol (SOA) chemistry. CMAQ version 4.6 has known biases (underprediction) in SOA formation. | Underestimate. | Possibly major. The modeling system underpredicts SOA, which has both biogenic and anthropogenic components. Reductions in NOx can reduce both biogenic and anthropogenic SOA and reductions in VOC will reduce anthropogenic SOA. Since both of these precursors are significantly impacted by the CAAA, there may be large benefits from SOA related reductions that are not currently captured by the modeling system. |
| The CMAQ modeling relies on a modal approach to modeling $PM_{2.5}$ instead of a sectional approach. The modal approach is effective in modeling sulfate aerosol formation but less effective in modeling nitrate aerosol formation than the sectional approach. | Unable to determine based on current information. | Probably minor in the eastern U.S. where annual $PM_{2.5}$ is dominated by sulfate. Potentially major in some western U.S. areas where $PM_{2.5}$ is dominated by secondary nitrate formation. |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES ON NET BENEFITS ESTIMATE* |
|---|---|---|
| Limited model performance evaluation of CMAQ for 2002. | Unable to determine based on current information. | Probably minor. While a comprehensive model evaluation was not completed, the overall results of the CMAQ runs for the Second Prospective were assessed using AMET, and bias and error statistics were within acceptable ranges. Further, our application of the MATS procedure provides further assurance that air quality results used in the subsequent health assessments are consistent with available monitor data. |
| Ozone modeling relies on a 12-km grid, suggesting $NO_x$ inhibition of ambient ozone levels may be under-represented in some urban areas. Grid resolution may affect both model performance and response to emissions changes. | Unable to determine based on current information. | Probably minor. Though potentially major ozone results in those cities with known $NO_x$ inhibition, ozone benefits contribute only minimally to net benefit projections in this study. Grid size affects chemistry, transport, and diffusion processes, which in turn determine the response to changes in emissions, and may also affect the relative benefits of low-elevation versus high-stack controls. |
| Emissions estimated at the county level (e.g., low-level source and motor vehicle $NO_x$ and VOC emissions) are spatially and temporally allocated based on land use, population, and other surrogate indicators of emissions activity. Uncertainty and error are introduced to the extent that area source emissions are not perfectly spatially or temporally correlated with these indicators. | Unable to determine based on current information. | Probably minor. Potentially major for estimation of ozone, which depends largely on VOC and $NO_x$ emissions; however, ozone benefits contribute only minimally to net benefit projections in this study. |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES ON NET BENEFITS ESTIMATE* |
|---|---|---|
| Use of MATS relative response factors to calculate changes in $PM_{2.5}$ | Indeterminate | Probably minor. Using MATS, air quality modeling results were projected in a "relative" sense. In this approach, the ratio of future year model predictions to base year model predictions are used to adjust ambient measured data up or down depending on the relative (percent) change in model predictions for each location. The use of ambient data as part of the calculation helps to reduce uncertainties in the future year predictions, especially if the absolute model concentrations are over-predicted or under-predicted. |
| Modeling artifacts created by changes in emissions inventory estimation methods between the 1990 inventories used for the *without-CAAA* scenario and the 2002 inventories used for the *with-CAAA* scenarios were mitigated through application of adjustment factors for primary PM from non-EGU point sources, and for the certain subsectors of area sources, in the *without-CAAA* case. Application of these adjustments may result in overestimated or underestimated changes in primary PM contributions to ambient concentrations for these particular sources. | Unable to determine based on current information. | Probably minor. While primary PM can make a significant contribution to ambient $PM_{2.5}$ in some locations, secondarily formed fine particles dominate the estimates for ambient concentration change in this analysis. In addition, the effect of the inventory adjustments was to significantly reduce the differentials between the control and counterfactual scenarios, implying any residual error is more likely to reflect an underestimation bias than an overestimation bias, particularly since the non-EGU primary PM reductions were adjusted to a scenario differential of zero. |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES ON NET BENEFITS ESTIMATE* |
|---|---|---|
| Adjustments to take account of processes that remove fugitive dust from the ambient air at or close to the source of emissions, owing to the effect of forests, vegetation, and urban structures on fugitive dust. Analysis of the chemical species collected by ambient air samplers suggests that the modeling process may overestimate $PM_{2.5}$ from fugitive dust sources by as much as an order of magnitude, if not adjusted for this effect. The Project Team incorporated adjustments post-CMAQ modeling but prior to use of PM air quality estimates in subsequent steps of the analysis. | Unable to determine based on current information. | Probably minor. If adjustment factors had been applied as part of the CMAQ modeling, evidence suggests the entrainment effect would have been adequately accounted for. The largely linear processes of direct PM emissions to air quality suggest that our *post-hoc* adjustment should also be adequate to account for this factor. Further assurance that this factor has been accounted for is our application of the MATS monitor calibration procedure, which provides a speciated calibration to ensure better agreement between air quality modeling results and comparable monitor data, and the fact that the adjustment applies to both scenarios, further mitigating the impact of this source of uncertainty. |

* The classification of each potential source of error is based on those used in the First Prospective Analysis. The classification of "potentially major" is used if a plausible alternative assumption or approach could influence the overall monetary benefit estimate by approximately 5% or more; if an alternative assumption or approach is likely to change the total benefit estimate by less than 5%, the classification of "probably minor" is used.

**TABLE C-4. KEY UNCERTAINTIES ASSOCIATED WITH HUMAN HEALTH EFFECTS MODELING**

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS ESTIMATE | MAGNITUDE OF IMPACT ON NET BENFITS ESTIMATE | DEGREE OF CONFIDENCE |
|---|---|---|---|
| **UNCERTAINTIES RELATED TO PREMATURE MORTALITY BENEFITS ESTIMATES** | | | |
| Analysis assumes a causal relationship between PM exposure and premature mortality based on strong epidemiological evidence of a PM/mortality association. However, epidemiological evidence alone cannot establish this causal link. | Overestimate | Potentially major. PM/mortality effects are the largest contributor to the net benefits estimate. If the PM/mortality relationship is not causal, it would lead to a significant overestimation of net benefits. | High. The assumption of causality is suggested by the epidemiologic and toxicological evidence and is consistent with current practice in the development of a best estimate of air pollution-related health benefits. At this time, we can identify no basis to support a conclusion that such an assumption results in a known or suspected overestimation bias. |
| Analysis assumes a causal relationship between ozone exposure and premature mortality based on strong epidemiological and experimental evidence of an ozone/mortality association. | Overestimate | Probably minor. Ozone mortality effects are a large contributor to the net benefits estimate, but total monetized ozone mortality benefits remain less than five percent of total net benefits. If the ozone mortality relationship is not causal, it would lead to an overestimation of net benefits. | Medium. Several epidemiological studies provide strong evidence for associations between ozone and mortality. This data is supported by human and animal experimental studies that provide suggestive evidence for plausible mechanisms. Overall, the evidence is highly suggestive, but additional research is needed to more fully establish underlying mechanisms. |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS ESTIMATE | MAGNITUDE OF IMPACT ON NET BENFITS ESTIMATE | DEGREE OF CONFIDENCE |
|---|---|---|---|
| It is possible that the PM/mortality relationship is modified by socioeconomic status (SES). | Unable to determine based on current information. Consideration of both the Pope and Laden studies avoids the possible underestimation effect from the ACS cohort, owing to the demographics of that study population, and the possible overestimation bias associated with the more limited geographic scope of the Harvard Six-Cities cohort. | Potentially major. Sensitivity analyses reported in this chapter indicate the high sensitivity of benefits results to the choice of the PM/mortality C/R function. | Medium. Studies have found effect modification of the PM/mortality effect by SES, as assessed through education attainment (Krewski et al., 2000). However, this effect is likely to affect only the Pope et al. estimate. Our inclusion of both the Pope et al. and Laden et al. (which does includes a more diverse population) helps account for the possible significance of this uncertainty. |
| Exposure misclassification due to reliance on ambient monitoring data to estimate $PM_{2.5}$ exposures rather than measuring personal exposures. | Underestimate. Concentrations measured at central site monitors may not accurately reflect exposure experienced by the population due to variation in ambient concentrations over space within a geographic area, incomplete penetration of ambient pollution into homes and workplaces, patterns of population activity and indoor sources that can contribute significantly to individual $PM_{2.5}$ exposures. Reducing exposure error can result in stronger associations between pollutants and health effects than generally observed in studies having less exposure detail. | Potentially major. Recent analyses reported in Krewski et al. (2009) demonstrate the relatively significant effect that this source of uncertainty can have on effect estimates. | High. The results from Krewski et al. (2009) and Jerrett et al. (2005) suggest that exposure error may underestimate effect estimates (PM ISA). |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS ESTIMATE | MAGNITUDE OF IMPACT ON NET BENFITS ESTIMATE | DEGREE OF CONFIDENCE |
|---|---|---|---|
| Exclusion of C-R functions from short-term exposure studies in PM mortality calculations. | Underestimate | Potentially major. PM/mortality is the top contributor to the net benefits estimate. If short-term functions contribute substantially to the overall PM-related mortality estimate, then the net benefits could be underestimated. | Medium. Long-term PM exposure studies likely capture a large part of the impact of short-term peak exposure on mortality; however, the extent of overlap between the two study types is unclear. |
| Assumption that PM-related mortality occurs over a period of 20 years following the critical PM exposure. Analysis assumes that 30% of mortality reductions in the first year, 50% over years 2 to 5, and 20% over the years 6 to 20 after the reduction in $PM_{2.5}$ | Unable to determine based on current information | Potentially major. PM/mortality is the largest contributor to monetary benefits. Our quantitative sensitivity analysis indicated that alternative plausible cessation lag structures could alter the benefits estimate between 23% lower to 16% higher than the primary estimate. | Medium. Recent epidemiological studies (e.g., Schwartz, 2008) have shown that the majority of the risk occurs within 2 years of reduced exposure. However, our default lag assumes 43% of mortality reductions would occur within the first 2 years. The evidence directly informing the cessation lag structure is somewhat limited, but the current lag is supported by the Council HES. |
| Assumption of a linear, no-threshold model for PM and ozone mortality | Overestimate | Probably minor. Although consideration for alternative model forms (Krewski et al., 2009) does suggest that different models can impact risk estimates to a certain extent, generally this appears to be a moderate source of overall uncertainty. | High. The current scientific literature does not support a population-based threshold, which consistently shows effects down to the lowest measureable levels. If a threshold does exist, it is likely below the range of concentrations of regulatory interest. |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS ESTIMATE | MAGNITUDE OF IMPACT ON NET BENFITS ESTIMATE | DEGREE OF CONFIDENCE |
|---|---|---|---|
| Mortality health impact did not include pollutants other than PM or ozone. | Unable to determine based on current information | Probably minor. If other criteria pollutants correlated with PM contribute to mortality, that effect may be captured in the PM estimate. This uncertainty does make it difficult to disaggregate avoided mortality benefits by pollutant. | High. PM and ozone are the two pollutants most strongly linked to mortality in the epidemiological literature. It is likely that we've captured the majority of mortality benefits due to criteria pollutants in our analysis. |
| Pooling with equal weights of ozone mortality incidence estimates to present a primary estimate. | Unable to determine based on current information | Probably minor. Pooling with equal weights provides a central estimate of ozone mortality benefits, but it is not clear that the six ozone mortality incidence studies should be combined in this manner. Relying on a particular single study or another combination of studies may result in significantly different estimated benefits from ozone reductions. However, ozone-related avoided mortality benefits are a minor contributor to total monetized benefits. | Medium. All six studies are associated with different strengths and limitation. No single study has emerged as solely suitable to support a primary estimate. Therefore, a pooled estimate provides a central estimate of the available literature. |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS ESTIMATE | MAGNITUDE OF IMPACT ON NET BENFITS ESTIMATE | DEGREE OF CONFIDENCE |
|---|---|---|---|
| No cessation lag was used for ozone mortality. | Overestimate | Probably minor. If there is a time lag between changes in ozone exposure and the total realization of changes in health effects then benefits occurring in the future should be discounted. The use of no lag assumes that all mortality benefits are realized in the year of the exposure change and therefore no discounting occurs. This may lead to an overestimate of benefits. | High.<br>Due to the use of short-term studies of ozone mortality, use of a no lag structure is appropriate and supported by the Council HES. |
| **UNCERTAINTIES RELATED TO APPLICATION OF C-R FUNCTIONS** | | | |
| Application of C-R relationships only to those subpopulations matching the original study population. | Underestimate | Probably minor. The C-R functions for several health endpoints (including PM-related premature mortality) were applied only to subgroups of the U.S. population (e.g. adults 30+) and thus may underestimate the whole population benefits of reductions in pollutant exposures. However, the background incidence rates for these age groups are likely low and therefore would not contribute many additional cases. | High.<br>The baseline mortality and morbidity rates for PM-related health effects are significantly lower in those under the age of 30 (other than neonates). |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS ESTIMATE | MAGNITUDE OF IMPACT ON NET BENFITS ESTIMATE | DEGREE OF CONFIDENCE |
|---|---|---|---|
| Application of regionally derived C-R estimates to entire U.S. | Unable to determine based on current information | Probably minor. This is likely to affect morbidity estimates rather than mortality, as mortality estimates are based on studies that include multiple cities. Since morbidity is not as large of a contributor to overall benefits, this is not likely to have a large impact on net benefits. | Medium. The differences in the expected changes in health effects calculated using different underlying studies can be large. If differences reflect real regional variation, applying individual C-R functions throughout the U.S. could result in considerable uncertainty in health effect estimates. |
| **UNCERTAINTIES RELATED TO HEALTH VALUATION** | | | |
| Use of a Value-of-a-Statistical-Life (VSL) estimate based on a Weibull distribution of 26 studies | Unable to determine based on current information | Potentially major. Mortality valuation generally dominates monetized benefits. | Medium. The VSL used in this analysis is based on 26 labor market and stated preference studies published between 1974 and 1991. Although there are many more recent studies, including meta-analyses, sensitivity analyses reported above suggest that these alternative sources generate results that are close to the estimates used in the analysis. |
| Use of cost of illness (COI) estimates to value some morbidity endpoints | Underestimate | Probably minor. Mortality valuation generally dominates monetized benefits; therefore specific estimates used to generate morbidity benefits likely would not have a large impact on net benefits. | Low. Morbidity benefits such as hospital admissions and heart attacks are calculated using COI estimates, which some studies have shown are generally half as much as WTP to avoid the illness. However, WTP estimate are currently not available for all health endpoints. |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS ESTIMATE | MAGNITUDE OF IMPACT ON NET BENFITS ESTIMATE | DEGREE OF CONFIDENCE |
|---|---|---|---|
| Benefits transfer for mortality risk valuation, including differences in age, income degree of risk aversion, the nature of the risk, and treatment of latency between mortality risks presented by PM/ozone and the risks evaluated in the available economic studies. | Unable to determine based on currently available information | Potentially major. The mortality valuation step is clearly a critical element in the net benefits estimate, so any uncertainties can have a large effect. | Medium. Information on the combined effect of these known biases is relatively sparse, and it is therefore difficult to assess the overall effect of multiple biases that work in opposite directions. However, our VSL estimate is based on a distribution of the results of 26 individual studies, which cover a range of characteristics. |
| Inability to value some quantifiable morbidity endpoints, such as impaired lung function. | Underestimate | Probably minor. Reductions in lung function are a well-established effect, based on clinical evaluations of the impact of air pollutants on human health, and the effect would be pervasive, affecting virtually every exposed individual. However, the lack of a clear symptomatic presentation of the effect, however, could limit individual WTP to avoid lung function decrements. | Low. There currently is no evidence to determine the monetary value of the benefits of avoided lung function reductions. |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS ESTIMATE | MAGNITUDE OF IMPACT ON NET BENFITS ESTIMATE | DEGREE OF CONFIDENCE |
|---|---|---|---|
| **UNCERTAINTIES IN FORECASTED DATA SUPPORTING HEALTH EFFECTS ESTIMATES** | | | |
| Uncertainty in projecting baseline incidence rates | Both | Probably minor. The magnitude varies with the health endpoint. Mortality baseline incidence is at the county level and projected for 5-year increments. Morbidity baseline incidence has varying spatial resolution for year 2000 only. | Medium. The county-level baseline incidence and population estimates were obtained from databases where the relative degree of uncertainty is low. The baseline data for other endpoints are not location specific (e.g., those taken from studies) and therefore may not accurately represent the actual location-specific rates. |
| Income growth adjustments | Both | Potentially major. Income growth increases willingness-to-pay valuation estimates, including mortality, over time. | Medium<br><br>It is difficult to forecast future income growth, owing to unpredictability of future business and employment cycles. These can have a substantial effect on short term growth rate projections, although over longer periods economic growth rates have tended to converge. The use of data from AEO 2005, however, omits the effect of the most recent economic downturn. |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS ESTIMATE | MAGNITUDE OF IMPACT ON NET BENFITS ESTIMATE | DEGREE OF CONFIDENCE |
|---|---|---|---|
| Population projections | Both | Probably minor. The magnitude varies with the health endpoint. Mortality baseline incidence is at the county level and projected for 5-year increments. Morbidity baseline incidence has varying spatial resolution for year 2000 only. | Medium. The county-level baseline incidence and population estimates were obtained from databases where the relative degree of uncertainty is low. The baseline data for other endpoints are not location-specific (e.g., those taken from studies) and therefore may not accurately represent the actual location-specific rates. |
| Income growth adjustments | Both | Potentially major. Income growth increases willingness-to-pay valuation estimates, including mortality, over time. | Medium. It is difficult to forecast future income growth, owing to unpredictability of future business and employment cycles. These can have a substantial effect on short-term growth rate projections, although over longer periods, economic growth rates have tended to converge. The use of data from AEO 2005, however, omits the effect of the most recent economic downturn. |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS ESTIMATE | MAGNITUDE OF IMPACT ON NET BENFITS ESTIMATE | DEGREE OF CONFIDENCE |
|---|---|---|---|
| Population projections | Both | Probably minor. The demographics of population forecasting are relatively well-established, however migration estimates are quite uncertain, particularly for specific locations. Overall, we believe that population projections are not likely to vary more than 5 percent at the national level. | Medium. Population projections cannot adequately account for future population migration due to catastrophic events. Projected population and demographics may not well represent future-year population and demographics. |
| **OTHER UNCERTAINTIES** | | | |
| Variation in effect estimates reflecting differences in $PM_{2.5}$ composition | Unable to determine based on current information | Unable to determine based on current information | Medium. Epidemiology studies examining regional differences in $PM_{2.5}$-related health effects have found differences in the magnitude of those effects. While these may be the result of factors other than composition (e.g., different degrees of exposure misclassification), composition remains one potential explanatory factor. |
| Very limited quantification of health effects associated with exposure to air toxics. | Underestimate | Probably minor. Studies have found air toxics cancer risks to be orders of magnitude lower than those of criteria pollutants. | N/A Current data and methods are insufficient to develop (and value) national quantitative estimates of the health effects of these pollutants. |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS ESTIMATE | MAGNITUDE OF IMPACT ON NET BENFITS ESTIMATE | DEGREE OF CONFIDENCE |
|---|---|---|---|
| CAAA fugitive dust controls implemented in PM non-attainment areas would reduce lead exposures by reducing the re-entrainment of lead particles emitted prior to 1990. This analysis does not estimate these benefits. | Underestimate | Probably minor. The health and economic benefits of reducing lead exposure can be substantial (e.g., see section 812 Retrospective Study Report to Congress). However, most additional fugitive dust controls implemented under the *with-CAAA* scenario (e.g., unpaved road dust suppression, agricultural tilling controls, etc.) tend to be applied in relatively low population areas. | N/A |

**TABLE C-5. KEY UNCERTAINTIES ASSOCIATED WITH ECOLOGICAL EFFECTS ESTIMATION**

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES ON NET BENEFITS ESTIMATE* |
|---|---|---|
| Incomplete coverage of ecological effects identified in existing literature, including the inability to adequately discern the role of air pollution in multiple stressor effects on ecosystems. Examples of categories of potential ecological effects for which benefits are not quantified include: reduced eutrophication of estuaries, reduced acidification of soils, reduced bioaccumulation of mercury and dioxins in the food chain. | Underestimate | Potentially major. The extent of unquantified and unmonetized benefits is largely unknown, but the available evidence suggests the impact of air pollutants on ecological systems may be widespread and significant. |
| Incomplete geographic scope of recreational fishing benefits associated with reduced lake acidification analysis due to case study approach. | Underestimate | Potentially major. As a case study limited to the Adirondack region of New York State, the estimated benefits to recreational fishing reflect only a portion of the overall benefits of reduced acidification on this service flow, but based on the magnitude of effects in the Adirondacks, the national estimate is nonetheless likely to be less than five percent of total benefits. |
| Incomplete assessment of long-term bioaccumulative and persistent effects of air pollutants. | Underestimate | Potentially major. Little is currently known about the longer-term effects associated with the accumulation of toxins in ecosystems. What is known suggests the potential for major impacts. Future research into the potential for threshold effects is necessary to establish the ultimate significance of this factor. |
| Omission of the effects of nitrogen deposition as a nutrient with beneficial effects. | Overestimate | Probably minor. Although nitrogen does have beneficial effects as a nutrient in a wide range of ecological systems, nitrogen in excess also has significant and in some cases persistent detrimental effects that are also not adequately reflected in the analysis. |

| POTENTIAL SOURCE OF ERROR | DIRECTION OF POTENTIAL BIAS FOR NET BENEFITS | LIKELY SIGNIFICANCE RELATIVE TO KEY UNCERTAINTIES ON NET BENEFITS ESTIMATE* |
|---|---|---|
| Use of CMAQ model to estimate air pollutant deposition levels. | Unable to determine. As part of a performance evaluation of CMAQ, EPA compared model predictions for some forms of deposition relevant to this analysis (wet SO2, NOx, and ammonium) to observed deposition data).** The evaluation indicated that CMAQ overpredicted some forms of deposition and underpredicted others. The relative accuracy of the model's predictions varied seasonally and geographically. | Probably minor.<br>The Adirondack lake acidification analysis uses deposition estimates as inputs, but they are calibrated to lake-level monitoring data, and the monetized benefits estimates for that component are a small part of the overall net benefits. We also use the CMAQ deposition estimates to generate maps that highlight the relative distribution of deposition for various air pollutants across the U.S. With respect to net impacts, the extent to which the forms of deposition and geographic areas that are overpredicted by those that re underpredicted is unknown. |

* The classification of each potential source of error reflects the best judgment of the section 812 Project Team. The Project Team assigns a classification of "potentially major" if a plausible alternative assumption or approach could influence the overall monetary benefit estimate by approximately five percent or more; if an alternative assumption or approach is likely to change the total benefit estimate by less than five percent, the Project Team assigns a classification of "probably minor."

** See U.S. EPA, Office of Air Quality Planning and Standards, Emissions Analysis and Monitoring Division, Air Quality Modeling Group. CMAQ Model Performance Evaluation Report for 2001: Updated March 2005. CAIR Docket OAR-2005-0053-2149.

# On the Accuracy of Regulatory Cost Estimates

***Winston Harrington***
***Richard D. Morgenstern***
***Peter Nelson***

***Abstract***

*This study compares* ex ante *estimates of the direct costs of individual regulations to* ex post *assessments of the same regulations. For total costs the results support conventional wisdom, namely that the costs of regulations tend to be overestimated. This is true for 14 of the 28 rules in the data set discussed, while for only 3 rules were the* ex ante *estimates too low. For unit costs, however, the story is quite different. At least for EPA and OSHA rules, unit cost estimates are often accurate, and even when they are not, overestimation of abatement costs occurs about as often as underestimation. In contrast, for those rules that use economic incentives, unit costs are consistently overestimated. The difference between the total-cost and the unit-cost results is caused by frequent errors in estimates of the effects of individual rules, which suggests, in turn, that the rule's benefits may also be overestimated. The quantity errors are driven both by difficulties in determining the baseline and by incomplete compliance. In cases of unit-cost overestimation, unanticipated technological innovation appears to be an important factor—especially for economic incentive rules, although procedural and methodological explanations may also apply. © 2000 by the Association for Public Policy and Management.*

## INTRODUCTION

Reflecting increasing concern about the accuracy of cost estimates of environmental and occupational safety regulations, the Office of Management and Budget (http://whitehouse.gov/OMB/inforeg.appendix.html) in 1998 observed that, "industry representatives and think tanks assert…that [government] estimates understate costs…while public interest groups and Federal agencies generally assert…that [government] estimates overstate costs." A great deal of debate has focused on the normative question of how (if at all) cost information should be used in regulatory decisionmaking. Beyond the occasional anecdote, however, little serious attention has been devoted to assessing the overall accuracy of cost information generated by and available to regulators. Is there evidence of systematic errors in these so-called *ex ante* cost estimates? If so, are the estimates too high or too low? What lessons are suggested for reform of rulemaking processes?

There is an interesting ideological divide in the types of evidence brought to bear in addressing these questions. Those who believe costs are underestimated often have in mind the costs of an entire program or legislative initiative. Superfund is a prime example. Critics argue that the program, originally designed to clean up Love Canal

Journal of Policy Analysis and Management, Vol. 19, No. 2, 297–322 (2000)
© 2000 by the Association for Public Policy Analysis and Management
Published by John Wiley & Sons, Inc.

and a few other large sites, expanded its scope and became a "behemoth, towering over American environmental policy" [Cairncross, 1993]. Some have focused on the discrepancy between initial objectives of U.S. environmental laws, for example, the Clean Air Act (1970), and progress toward meeting those objectives.[1] Others argue that the *ex ante* estimates leave out some important cost categories, for example, regulatory-induced job losses, claims on management attention, discouraged investment, and retarded innovation. Dynamic general equilibrium analyses suggest that the long-run social costs of regulation exceed direct compliance expenditures by 30 to 50 percent [Hazilla and Kopp, 1990; Jorgenson and Wilcoxen, 1990].

In contrast, those who believe costs are overestimated prefer to look at the direct costs of complying with specific regulations. The most often cited example involves reductions of sulfur dioxide ($SO_2$) emissions mandated under the Clean Air Act Amendments (1990). In that case, the huge discrepancy between the early industry cost estimates (as high as $1,500 per ton) and recent allowance prices (currently about $200 per ton, up from $75 per ton in 1997) is taken as evidence of a problem of government overestimates [e.g., Browner, 1997].

The subject of this article is comparing the costs before and after implementation of such specific regulations, but not the broader and more contentious question of whether environmental programs grow far beyond their initial legislative intent (in part because of the challenge of even stating the question in an empirically testable way). So too, is avoided the question of indirect costs, largely because of the inability to obtain such information for individual regulations. Except as possible influences on agency estimates, we exclude industry cost estimates. Thus, the focus here is on cost estimates prepared by the government agencies directly involved in rulemaking.

Systematic errors in cost estimates prepared by regulatory agencies, if they exist, may have significant implications for resource allocation. If costs are routinely overestimated, thereby raising the apparent cost of new regulations, rulemaking would generally favor selection of less stringent emission control options (and, conversely, if costs are consistently underestimated). Large discrepancies would lead not only to bad decisions, but would misrepresent the true burden of regulation on society and undermine public confidence in the regulatory process. Not surprisingly, the belief held by many environmentalists that costs tend to be overestimated (and benefits underestimated) by regulatory agencies underlies many of their concerns about allowing cost information, and particularly benefit–cost analysis, to play a prominent role in regulatory decisions.

The only sure way of assessing systematic errors in regulatory cost estimates is to compare *ex ante* cost estimates, prepared at the time the regulation is issued, with actual costs determined *ex post*. However, *ex post* studies of the costs of regulation are scarce because rulemaking agencies have neither a legislative mandate nor a bureaucratic incentive to perform such analyses.[2] In fact, the conduct of *ex post* studies may detract from an agency's mission by using limited resources and by generating outcomes that may prove embarrassing. Not surprisingly, most detailed *ex post* studies have been carried out by independent researchers.

[1] The National Ambient Air Quality Standards, for example, were originally thought to be achievable within a decade. Yet, even today we still are still unsure how, when, or even if the original goals will be met.

[2] Recently Congress has shown greater interest in *ex post* information. For example, the Clean Air Act Amendments (1990) required the Environmental Protection Agency (EPA) to develop a retrospective assessment of the overall benefits and costs of the first 20 years of the act. The Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA) also contains requirements for retrospective studies.

## LITERATURE REVIEW

It is a little surprising that so many observers believe that regulatory cost estimates overestimate the true costs of regulation, considering that costs of other government activities, especially procurement and public investment, are usually thought to be *under*estimated. "Government cost overruns" are a staple of headlines, call-in radio shows, and popular historical accounts,[3] whether the government in question is local (e.g., stadiums or convention centers), state (expressways), or national (defense projects).

Academic studies tend to support the popular view; for example, cost escalation in defense and other public investment projects has been called "pervasive and massive" by Quirk and Terasawa [1986].[4] Analytical models have proposed strategic and nonstrategic explanations for project cost underestimation. The former have generally relied on a principal-agent setup, often (but not necessarily) tied to particular forms of contract, for example, Quirk and Terasawa [1986], Harris and Raviv [1979], and Weitzman [1980].[5] In the absence of strategic behavior, models have also demonstrated that costs can escalate without strategic behavior, resulting from uncertainty in the production schedule [Terasawa, Quirk, and Womar, 1984] or from the "winner's curse" [Quirk and Terasawa, 1986]. That is, if actual project costs are uncertain and lowest-bidding contractors are selected, their tendency will be to underestimate project costs.

The literature on regulatory cost estimation is much thinner and focuses on strategic behavior by regulated firms. But in this case the analytic models suggest that costs may be either over- or underestimated.[6] Unlike the public investment literature, where little distinction is made between contractor and government cost estimates (the latter being the sum of the winning bids in a multi-contract project), the source of the estimate is important in regulatory cost estimation. And while no analytical models have been developed to explain *ex ante* cost estimation by regulatory bodies, a less

[3] Robert Caro [1974], for example, documents the legendary practices of Robert Moses, bureaucrat extraordinaire, who is said to have routinely and purposely underestimated the costs of the public works projects that transformed New York City (and state) between the 1920s and 1960s. Once construction got underway he would reestimate costs (usually multiplying them several-fold) and seek supplemental funding for the partially completed projects. In an even more striking example, McCullough [1978] recounts the disastrous French attempt to build an ocean-connecting canal in Panama in the 1880s. Costs were honestly underestimated initially because French engineers, misled by their Suez experience, failed utterly to understand the magnitude of their task. As the true scope of the project became known, however, the leaders of the quasi-public corporation, established to build and operate the canal, refused to revise the costs or acknowledge the difficulties for fear of embarrassing early backers of the project, especially its biggest backer, the French government.

[4] But this is not invevitable. In a comparison of realized and forecast construction costs of federal water projects, Haveman [1972] shows substantial variation and a tendency toward overestimating costs. More recently, McVeigh et al. [1999] have found estimates made in the 1970s and 1980s of the cost of renewable energy technologies to be reasonably accurate.

[5] A non-defense example of strategic cost underestimation can be found in federal support for local transit projects, which one observer attributes largely to the perverse incentives in the funding mechanism that favor capital-intensive projects, such as fixed rail over buses and other more flexible systems [Pickrell, 1992].

[6] Kwerel [1977] and Spulber [1988] conclude that the incentives depend on the instrument: Under a price instrument (e.g., effluent fee), firms have an incentive to underestimate compliance costs, while under a quantity instrument (marketable permits or command and control), the incentive is reversed. This assumes, of course, that the firm seeks to avoid regulation. A firm may also seek regulation of its industry as a way of "raising rivals' costs" [Salop and Scheffman, 1983], in which case these incentives are reversed. Perhaps an example is provided by du Pont's seemingly enlightened response to Chlorofluorocarbon (CFC) regulation. Since it owned patents on a number of promising substitutes, the company may have viewed the CFC phaseout as an opportunity to increase market share [Morrisette, 1989]. Yet Hammitt [1997] still found that costs were overestimated, at least in the early phases of regulatory development.

formal literature addresses the procedures used in agency rulemaking and reveals problem areas that can lead to over- or underestimates. Thus, Higgins and Buc [1997] argue that inadequacies in the Environmental Protection Agency (EPA) methods bias the cost estimate toward a cost overestimate.[7] Fraas and Lutter [1996] also find fault with the EPA's cost estimates. However, they believe that costs are more likely to be underestimated because of errors of omission during the rulemaking process.[8]

The other relevant strand of literature consists of a handful of papers, like the present one, that attempt to compile broad-based assessments of the accuracy of environmental or occupational regulations affecting the private sector. An early study compared sector-level capital expenditures for pollution control to EPA forecasts [Putnam, Hayes, and Bartlett, 1980]. The authors found overestimates were more prevalent than underestimates, with EPA's forecasts ranging from 25 percent below to more than 150 percent above actuals. Industry overestimates were both larger and more frequent. Unfortunately, the use of aggregate self-reported data clouds the interpretation of the results.[9]

The Office of Technology Assessment [OTA, 1995] conducted a broad-scale review of Occupational Safety and Health Administration's (OSHA) methodologies for regulatory impacts. The OTA review considers a number of studies containing *ex ante/ex post* cost comparisons, some of which are included in the present study.[10] OTA found that most attention is placed on so-called "conventional" control measures rather than on new technology. Overall, the OTA report concluded that "the actual compliance response that was observed included advanced or innovative control measures that had not been emphasized in the rulemaking analysis, and the actual cost burden proved to be considerably less than what OSHA had estimated" (p. 10).

A recent study by Goodstein and Hodges [1997] of a dozen EPA and OSHA regulations finds that most pollution control programs turn out to be less costly than had been estimated beforehand. They find that "reducing pollution emissions at the source... is almost certain to be [substantially] cheaper than we think it will be." They argue that overestimates result from new technologies developed in response to the regulations. Our approach differs from that of Goodstein and Hodges in several ways. First, Goodstein and Hodges do not grapple with key baseline issues, which can affect the quantity of emission reductions actually induced by the regulation [Squitieri 1998]. Second, their conclusions rest, in part, on comparisons with *ex ante* studies conducted by industry. Since strategic behavior on the part of industry may lead them to overstate costs, the present study focuses exclusively on *ex ante* cost estimates developed by the regulatory agencies. Third, Goodstein and Hodges include in their list not only

[7] In particular, Higgins and Buc [1997] argue that in addition to the failure to consider innovation or cost-reductions through learning by doing, EPA analyses generally fail to acknowledge the overhead or "fixed" nature of certain costs, treating them as marginal to the environmental regulation when they probably are not.

[8] In three of the five Resource Conservation and Recovery Act (RCRA) rules examined by the authors, the EPA failed to include the costs of an important waste stream consisting of "nonhazardous" toxic wastes, such as batteries and fluorescent lamps. These wastes were excluded from the cost estimate because of uncertainty whether they would be subject to the rule, as well as a lack of data at the time of the analysis. The rules were later judged to apply to these waste; however, a subsequent rule exempted these wastes at an estimated savings of $200 million, an amount the authors infer to be a cost that should have been in the original rule.

[9] The Putnam, HayesBartlett (PHB) [1980] study is based, in part, on the Pollution Abatement Cost and Expenditure Survey (PACE) collected by the Bureau of the Census (1972–1995). Although the PACE data are neither regulation specific nor disaggregated beyond the environmental receiving medium, PHB argued that they were suitable for at least rough *ex ante/ex post* comparisons of the early period of environmental regulation. However, this is highly debatable.

[10] For some of the cases OTA reviewed, available information was insufficient to develop reliable *ex post* estimates.

comparisons of *ex ante* and *ex post* costs, but also comparisons of *ex ante* estimates with later *ex ante* estimates. This article is limited to the former.

## DEFINING REGULATORY COST ESTIMATES

Although the notion of accuracy in regulatory cost estimation may appear straightforward, in actuality it is anything but. The hard part is to identify just what it is that ought to be compared. After all, comparing costs *ex ante* and *ex post* means more than just determining what is spent; care is also required to ensure comparability in what is being purchased. To shed light on the conceptual issues we ask: What is meant by "cost"? What is meant by "regulation"? What is meant by "estimates"? And what is meant by "accuracy"?

### Cost

To determine the cost (or benefits) of a regulation, one must compare conditions in a world with the regulation to conditions in a world without it. To produce *ex ante* estimates, both the "with" and the "without" scenarios must be modeled; they cannot be observed. For the *ex post* calculation, the world with the regulation is observed, but the counterfactual is not. To produce an *ex post* estimate, one must determine the actual outcome empirically and compare it to a hypothetical baseline with the *status quo ante*. The definition of baselines is thus somewhat arbitrary, depending on the analysts' beliefs about what would have happened without the regulation. In other words, regulatory cost estimates can hardly escape being to some degree hypothetical whether they are made *ex post* or *ex ante*.

To an economist, the cost of a good or service is the maximum value of the opportunities foregone in obtaining that good or service.[11] Regulatory analyses generally account for the most obvious categories of costs but for practical reasons ignore costs that are difficult to measure. The most commonly considered costs are the capital and operating expenditures associated with regulatory compliance. Such activities are typically carried out and paid for by the private sector, although some activities fall on state and local governments (e.g., drinking water) and some on the federal government (e.g., compliance expenditures of the Tennessee Valley Authority [TVA] and Bonneville Power Administration).

Other direct costs are also often included in government analyses. They are particularly noticeable in analyses of automobile regulations, and they often show up as negative costs. Thus, an important element in the estimates of the cost of standards for new motor vehicles is the improved fuel economy and reduced maintenance requirements attributable to the introduction of computerized fuel injection, a technology that provides many engine benefits besides lower emissions [USEPA, 1993]. The cost analysis for the vehicle inspection and maintenance program also claims large fuel economy benefits resulting from better engine performance [USEPA, 1992]. But these other direct costs are not always negative costs. For example, inspection and maintenance cost analysis counts the cost of motorists waiting in line at testing stations.

In contrast, the other categories of costs—including government administration of environmental statutes and regulations, some of the other direct costs, general equilibrium effects, and transition costs—are rarely considered in regulatory cost

[11] More precisely, the cost of a regulation is equal to "the change in consumer and producer surpluses associated with the regulation and with any price and/or income changes that may result" [Cropper and Oates, 1992, p.721].

estimates. For one thing, often it makes sense to speak only of these costs with respect to regulation in the aggregate rather than for specific regulations. The cost of administration of environmental statutes is usually omitted because of a joint cost allocation problem; besides, the government's costs are thought to be small relative to those of the private sector. As for the other costs, the principal reason they are excluded is lack of credible information or analytical resources to apply whatever data or models do exist. Thus, additional management resources or disrupted production is plausibly important, but no *ex ante* estimates have been prepared.[12]

In the 1970s and 1980s, the effects of some EPA regulations on plant closures and unemployment were estimated, albeit crudely, as a part of the economic analysis, for example, effluent guidelines for industrial water pollutant discharges. In recent years, this style of economic analysis has been generally superseded by more sophisticated analyses of the welfare effects of regulations. The Unfunded Mandates Reform Act of 1995 requires that cost estimates take into account transitional and indirect costs. The cost analyses examined here were conducted before the growing interest in indirect cost and thus do not generally include these cost categories.[13]

## Regulation

The issue for regulation is one of scale. There may be good reasons why one would want to estimate the cost of meeting an emission regulation at a particular plant, the cost of an emission regulation for the entire country, or the cost of meeting an ambient environmental quality objective. As the scale increases, the uncertainties multiply, and biases of estimation not evident at low levels of aggregation may become important.

The focus here is on the cost estimates prepared by regulatory agencies for specific rules. As required by presidential executive order, for every major rule (those with an estimated annual cost in excess of $100 million) agencies must prepare a regulatory impact analysis (RIA)[14] containing an estimate of compliance costs of the alternatives considered. It may be possible to make some judgments about the qualities of those estimates and give at least a preliminary answer to the question of whether systematic errors exist.

## Estimates

In evaluating the quality and usefulness of a regulatory cost estimate, it is important to keep in mind who is making the estimate and what its purpose is. Before a regulation

[12] There have been some attempts to measure these costs *ex post*, at least indirectly, such as Gray and Shadbegian [1995] and Joshi and colleagues [1997] in the steel industry, and most recently, Morgenstern, Pizer, and Shih [1998a]. These studies estimate cost functions to examine the effect of reported abatement expenditures (as measured by PACE) on total cost. The other direct costs are positive if and only if the coefficient on the pollutant abatement expenditure variable is positive. While the Joshi at al (1997) study finds multipliers up to 12, Morgenstern and colleagues (1998a) estimate the likely multiplier to be less than one, suggesting that other direct costs are more than offset by savings elsewhere in the production process. This may indicate the joint cost aspect of some environmental spending. Of course, this analysis can be done only for fairly large aggregates of regulations, for that is the only way the *ex post* compliance expenditure data are reported. Also, at least one study has considered the effect of regulation-induced uncertainty on stock prices, and hence on firms' cost of capital (Garber and Hammitt, 1998).

[13] In any event, the number of plant closures or jobs lost as a result of environmental regulation is likely small. [Morgenstern, Pizet, & Shih (1998b)].

[14] Referred to as "Economic Analyses" in Executive Order 12866.

is adopted, information about response options and costs may be asymmetrically distributed; potentially regulated parties generally have better information about alternatives for meeting requirements than regulatory agencies and advocacy groups. At the same time, however, industry cost estimates may be too high if firms do not fully anticipate cost-saving measures they may discover once resources are directed to compliance.[15]

These characteristics are clearly important for cost comparisons. Even more important, however, is the fact that credible *ex ante/ex post* comparisons cannot be made if the relevant studies do not include the same components or do not refer to the same cost concepts. For purposes of this article, it is far more important to match studies with the same components than to answer the question of whether the indirect costs belong in the estimate.[16]

Part of the difficulty of making cost comparisons is that actual outcomes can deviate from predicted ones in so many ways that it is not easy to know what is comparable. Consider the following example. Suppose a cost estimate for a pollution-abatement regulation is to be prepared based on an industry of 100 plants, with pre-regulatory emissions averaging 100 units per day. Suppose further that the regulation calls for emissions to be reduced to 25 units per day at a cost of $200,000 per plant. After implementation, a survey is conducted to estimate the real cost of the regulation. To simplify the discussion, assume the baseline is identical to the *ex ante* estimate. Some of the possible outcomes are shown in Table 1.[17]

The first of these four cases is an example of mis-estimation of per-plant costs. The next three are examples of various ways in which the "quantity"—that is, emission reductions—of regulatory output is different from prediction.

Case 1. The cost per plant is overestimated by a factor of 2, while all other quantities are estimated correctly, so that costs per emission unit as well as costs per plant are overestimated. This is probably the situation most observers have in mind when they assert that costs are overestimated.

Case 2. In this case, costs are estimated correctly on a per-plant basis, but an underestimate of the number of plants means that the total costs exceed the estimate. This type of uncertainty would include the case where the total number of plants was known but the number of plants with a given characteristic or technology is not. This might apply, for example, to landfill sites subject to corrective action requirements.

Case 3. Again, costs per plant are estimated accurately, but the preregulatory emissions are much less than originally thought. This could be considered a case of accurate estimation because the costs per plant are estimated accurately and the environmental goal is met. Alternatively, it could be considered underestimation because the cost effectiveness, measured by the cost per unit emission reduction, is underestimated.

[15] The hypothesis that environmental regulation triggers innovation that can offset some or all environmental compliance costs was initially proposed by Porter [1991] and supported by Porter and van der Linde [1995]. For a counter view see Jaffe et al [1995] and Palmer, Oates, and Portney [1995].

[16] Smith, Platt, and Ellerman [1998] contains an interesting discussion of how long-run and short-run costs, as well as marginal and average costs, are frequently confused in cost comparisons of the federal $SO_2$ program.

[17] Similar examples can be developed for other types of regulations, although they may not be so easily quantified. For private land-use regulation, for example, the three "quantity" elements of interest are the land area involved and the range of permitted activities before and after regulation. The cost of regulation is the reduction in the market value of the land that would accompany implementation of the regulation.

**Table 1.** Cost estimation: some hypothetical cases.

| | *Ex ante* estimate | Alternative *ex post* outcomes | | | |
|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 |
| Number of plants | 100 | 100 | 150 | 100 | 100 |
| Emissions, pre-regulation | 100 | 100 | 100 | 50 | 100 |
| Emissions, post-regulation | 25 | 25 | 25 | 25 | 50 |
| Cost per plant | $200,000 | $100,000 | $200,000 | $200,000 | $200,000 |
| Aggregate cost (in millions) | $20 | $10 | $30 | $20 | $20 |
| Emission reductions | 7500 | 7500 | 11,250 | 2500 | 5000 |
| Cost per emission unit | $2666 | $1333 | $2666 | $8000 | $4000 |

Case 4. Here again costs per plant are estimated accurately, but the post regulatory emissions are not. Ordinarily, this will not happen with command and control regulation because the post regulation emissions are usually set by the regulation. However, it could occur if the regulation is not enforced successfully or if it calls for the installation of a specific technology, rather than the achievement of an emission target.

## Accuracy

Comparison requires a criterion to define when the *ex ante* estimate of total cost (or unit cost or quantity) is accurate or is an under- or overestimate. It is tempting to equate the *ex ante* and *ex post* estimates with forecasts and actuals, but that terminology overlooks the fact that the knowledge of the *ex post* situation is decidedly imperfect and in some ways, perhaps, little better than the knowledge of the situation *ex ante*. As discussed earlier, the quality of the *ex ante* cost estimate is limited by three basic uncertainties:

- What are firms currently doing?
- What will firms do in response to the regulation, and what will it cost?
- What would firms have done without the regulation, and what would it have cost?

The first of these items is in principle knowable *ex ante* but in practice is usually not known very well. The second and third items are hypothetical, based on economic and process-analysis models, discussions with industry experts, and perhaps analogies from other industries.

The *ex post* cost estimate must deal with the same uncertain elements but from a more favorable position, especially for the first and second possibilities. It can be no worse than the *ex ante* estimate because it has more information to draw on.[18] In

[18] There remains the possibility of bias in the *ex post* study, but as almost all case studies were prepared by academic experts without an interest in the outcome, this possibility is minimized.

addition, the very process of implementation and enforcement generates a great deal of information, not only about the responses of firms to the regulation but about the situation before implementation. (This information may be difficult to collect or assemble, but at least it exists.) What is still missing is information on the third possibility, the counterfactual, and even here there is often better knowledge on exogenous trends and events that can affect costs. This means that the *ex post* estimate will in all likelihood be much closer to the "truth."

Thus, even with the *ex post* estimate's lack of precision, it is probably more accurate than the *ex ante* estimate, which justifies using the former to judge the quality of the latter.

## RESULTS

Literature review and discussions with more than 50 environmental experts were used to develop as large a sample of rules as possible for this study. The basic criteria for inclusion in the study were the existence of an *ex ante* cost estimate developed by a regulatory agency with substantial expertise in cost analysis, and a relatively detailed *ex post* estimate, typically (but not always) prepared by an academic or independent analyst. At the state level four rules, all from California, were identified that met these criteria. Internationally, only three rules were included in the data set. In the end, 28 rules were included.[19]

The list of OSHA rules seems reasonably representative.[20] For EPA, the list has a disproportionate number of larger, more controversial regulations (e.g., SO2 and lead phasedown). Not surprisingly, our EPA list also contains a disproportionate number of rules where the results can be readily measured in observed prices (e.g., reformulated gasoline, chlorofluorocarbons [CFCs], $SO_2$) or quantities (e.g., pesticide rules). Like the EPA regulations, the California and the foreign rules in the sample also tend to cases where the outcomes can be readily measured in terms of either prices or quantities. The bias imparted by these particular sample characteristics is unclear, although one can certainly make the case that larger, more controversial rules tend to involve greater analytical effort on the part of the regulatory agency. Thus, the cost estimates for the rules in the sample may be more accurate than those prepared for "typical" rules. One striking point that emerges from the data set is the relatively

[19] $SO_2$ Phase I and Phase II are actually part of the same regulation. However, because of large differences in the number of facilities covered and the stringency of the emission requirements, they are treated separately. One reviewer pointed to the National Highway Transportation Safety Administration's center-high-mounted stomp lamp rule. Actual costs for this rule were approximately double those forecast in the RIA. It was omitted it here because of the focus on environmental and occupational health and safety regulations. Also omitted were a number of smaller pesticide rules for which *ex post* studies are now in preparation because of their small economic impact.

In the case of CFCs, the initial RIA was significantly revised at the time the domestic rulemaking was finalized. However, since the initial RIA was most influential in the U.S. decision to sign the governing international accord (the Montreal Protocol) we treat it as the relevant *ex ante* analysis. Interestingly, the earlier (1986) analysis generally overestimated costs while the revised analysis (1988) was more accurate. See the appendices. For further discussion see Hammitt [1997].

[20] As the OTA study notes: "To stretch the modest resources OTA had for this project, credible, already published case studies were used where possible. This practice accounts for the Vinyl Chloride, Cotton Dust, and Ethylene Oxide standards in the case study set. (The Vinyl Chloride and Cotton Dust standards are also widely considered 'classic cases' in OSHA's rulemaking history.) Original research efforts by qualified researchers…were commissioned in the other five cases. The Occupational Lead, Formaldehyde, and Grain Handling Facilities standards were included because of their controversial nature and prominent roles in OSHA's rulemaking history in the 1980s. The Mechanical Power Presses and Powered Platforms rulemakings were selected more or less at random from among the full group of safety standards promulgated by OSHA after 1985" [OTA, 1995, p. 53].

large representation of rules incorporating market-based incentives, which account for only a tiny fraction of total regulatory activity in the United States and elsewhere. Eight such rules are included in this data set, half of them drawn from state and foreign experience. [21] Proposed but never promulgated rules are excluded.[22]

Problems of comparability among the different *ex post* analyses precluded a strictly quantitative analysis, and necessitated a qualitative approach. An *ex ante* analysis is considered "accurate" if the *ex post* estimated costs fall within the error bounds of the *ex ante* analysis of if they fall in the range of $\pm$25 percent of the *ex ante* point estimate.[23] Three outcomes are compared: the quantity of emission reductions achieved, unit pollution reduction costs, and total costs. The quantity of emission reductions achieved reflects the net effect of the quantity-related factors discussed in the preceding section, that is, the number of firms or agents subject to regulation and the estimated emission rates with and without regulation.

Unit pollution reduction cost outcomes generally refer to costs per unit of emissions reduced (over the relevant range), although other margins can be important in individual cases. In pesticide regulation, for example, the relevant margin is costs per acre. For the inspection and maintenance rule, costs can be usefully expressed both as costs per unit of emissions or costs per vehicle.

Perusal of Table 2, which summarizes the results for the individual rules, reveals a consistent tendency across all subcategories—EPA, OSHA, state, and foreign— to overestimate total costs and pollution reductions. (Appendix A contains a complete rule-by-rule analysis). Overall, **pollution reductions** were overestimated in 9 of the *ex ante* analyses examined and underestimated in 4 of them. In 13 cases, the quantity predictions were judged to be about right. The **per-unit costs** of regulations were even more likely to be overestimated; in 14 cases, per-unit costs were overestimated, while they were underestimated in 6 cases. **Total costs** were overestimated for 15 rules and underestimated in just 3 cases and were comparatively small regulations—EPA's aldicarb and CDEC bans and OSHA's powered platform regulation.

Both EPA and OSHA tended to overestimate rather than underestimate quantity reductions. EPA overestimated quantities in 4 of the 13 regulations examined and underestimated them in 1. The tendency was even more pronounced for OSHA; the agency overestimated reductions in 5 of 8 cases and underestimated them in none.

In contrast, when the focus is on per unit costs, the outcome is quite different. For rules promulgated by either EPA or OSHA there is no clear evidence of mis-estimation of per unit costs. Specifically, EPA overestimated per-unit costs for five regulations, underestimated them for four regulations, and accurately estimated them for four. Of the four EPA regulations that had per-unit cost underestimates, three were relatively small pesticide rules—the bans of dinoseb, CDEC, and aldicarb. OSHA overestimated per unit costs for three rules, underestimated them for two, and accurately predicted them for three.

Pesticide regulations have some unique features that affect the assessment of the accuracy of their *ex ante* cost forecasts, and for this reason results for federal

[21] The eight are leaded gas, CFCs, $SO_2$ Phase I, $SO_2$ Phase II, RECLAIM ($NO_x$), RECLAIM ($SO_x$), Singapore auto licensing, and the Bergen toll ring. As to why these market-based rules are so heavily represented, two obvious answers are: 1) it is easier to obtain *ex post* information on rules involving market-based incentives; and 2) economists, who conduct most of the *ex post* studies, have a proprietary interest in the performance of economic incentives, much as a parent has a proprietary interest in his child's school performance. While no suggestion that this leads to a bias is implied, it may create a greater interest in conducting the *ex post* studies in the first place.

[22] For example, Indoor Air in the Workplace, *FR* 15968, April 5, 1984.

[23] Sensitivity analyses revealed that the 25 percent figure is reasonably robust. For example, raising the figure to 40 percent only changes one classification. (California Air Resource Board's (CARB) per-unit cost estimate for low-emitting vehicles changes from an overestimate to accurate. RECLAIM $SO_x$ is on the border of a 40 percent cutoff.)

**Table 2.** Case study results, regulation type.

| | Accurate | Overestimate | Underestimate | Unable to determine |
|---|---|---|---|---|
| **All Regulations** (N=28) | | | | |
| Quantity reduction | 13 | 9 | 4 | 2 |
| Unit cost | 8 | 14 | 6 | 0 |
| Total cost | 5 | 15 | 3 | 5 |
| **Federal Regulations** (n=21) | | | | |
| Quantity reduction | 11 | 9 | 1 | 0 |
| Unit cost | 7 | 8 | 6 | 0 |
| Total cost | 4 | 13 | 3 | 1 |
| **EPA Regulations** (n=13) | | | | |
| Quantity reduction | 8 | 4 | 1 | 0 |
| Unit cost | 4 | 5 | 4 | 0 |
| Total cost | 3 | 7 | 2 | 1 |
| **Federal Rules Excluding Pesticides** (n=15) | | | | |
| Quantity reduction | 6 | 8 | 1 | 0 |
| Unit cost | 6 | 6 | 3 | 0 |
| Total cost | 4 | 9 | 1 | 1 |
| **Pesticide Bans** (n=6) | | | | |
| Quantity reduction | 5 | 1 | 0 | 0 |
| Unit cost | 1 | 2 | 3 | 0 |
| Total cost | 0 | 4 | 2 | 0 |
| **OSHA Regulations** (n=8) | | | | |
| Quantity reduction | 3 | 5 | 0 | 0 |
| Unit cost | 3 | 3 | 2 | 0 |
| Total cost | 1 | 6 | 1 | 0 |

regulations excluding pesticide bans are also presented. Perhaps the most important feature is that EPA has a considerable number of options at its disposal if the burdens of a pesticide ban turn out to be too onerous. The agency can grant emergency exemptions to farmers, allowing them temporary use of the banned pesticide or a normally prohibited substitute. Similarly, the agency can approve the use of new pesticide through a new registration, so that farmers have a pest control option that was unavailable at the time of the *ex ante* cost estimate. The regulatory flexibility that the agency possesses with respect to pesticides operates as a safety valve and prevents total costs from becoming too large. Secondly, pesticide regulations tend to be outright bans, so there is usually very little uncertainty with regard to future quantity reductions. Finally, the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) is one of the few environmental statues that requires a cost–benefit test prior to promulgation of a regulation. Most of the other federal *ex ante* studies in this data set were conducted to comply with an executive order mandating an assessment of the costs and benefits of all large regulations. Therefore, in comparison with the other federal rules in the data set, the pesticide regulations tend to be of much lower dollar value, because the *ex ante* studies are not limited to large regulations. The major effect of omitting

pesticide regulations is that the percentage of per-unit underestimates drops. Pesticide regulations make up 29 percent of the federal rules in this sample (6 of 21) but account for half of the price underestimates (three of six). However, the sample size is very small.

An often-discussed issue is whether the accuracy of cost estimates is improving over time. As seen in Table 3, for the seven federal rules enacted before expansion of Executive Office oversight of federal rulemaking in 1981, three had overestimates of unit cost, three had underestimates, and the other was accurate. For the 16 post-1981 rules, 5 had overestimates, 3 had underestimates, and 6 were deemed to be accurate. Although the sample is too small to make meaningful statistical comparisons, a considerably higher percentage of regulations fall into the "accurate" category after 1981.

Similarly, there appears to be some improvement in the accuracy of pollution reduction forecasts over time. For the pre-1981 rules, four of seven overestimated pollution reduction; after 1981, five *ex ante* analyses overestimated quantities, one underestimated them, while eight were classified as accurate. The improvement in quantity forecasting is reflected in the total cost estimates. All but one of the pre-1981

**Table 3.** Case study results, regulation characteristics.

| | Accurate | Overestimate | Underestimate | Unable to determine |
|---|---|---|---|---|
| **Federal Regulations—pre-1981** | | | | |
| Quantity reduction | 3 | 4 | 0 | 0 |
| Unit cost | 1 | 3 | 3 | 0 |
| Total cost | 0 | 6 | 1 | 0 |
| **Federal Regulations—post-1981** | | | | |
| Quantity reduction | 8 | 5 | 1 | 0 |
| Unit cost | 6 | 5 | 3 | 0 |
| Total cost | 4 | 7 | 2 | 1 |
| **Federal Regulations >$100 million/year** | | | | |
| Quantity reduction | 5 | 7 | 1 | 0 |
| Unit cost | 4 | 5 | 4 | 0 |
| Total cost | 3 | 8 | 1 | 1 |
| **Federal Regulations <$100 million/year** | | | | |
| Quantity reduction | 6 | 2 | 0 | 0 |
| Unit cost | 3 | 3 | 2 | 0 |
| Total cost | 1 | 5 | 2 | 0 |
| **Regulations Using Economic Incentives** | | | | |
| Quantity reduction | 3 | 1 | 4 | 0 |
| Unit cost | 1 | 7 | 0 | 0 |
| Total cost | 2 | 4 | 0 | 2 |

*ex ante* analyses overestimated total costs. The post-1981 estimates overestimated total costs in seven cases, underestimated them in two, and were accurate in four cases. While overestimates are still more likely than underestimates, a much larger share of both total cost and quantity predictions have been accurate for recent rules.

Federal rules are also separated by annual dollar values, the arbitrary cutpoint being $100 million per year in 1990 dollars. There does not appear to be a great deal of difference between the two groups, except that quantity forecasts tend to be much more accurate for the smaller regulations. One possible explanation is that a large share of the smaller rules are pesticide rules (four of eight) and, because these rules are bans, there is not much uncertainty associated with the quantity estimates.

For seven of the rules that employed economic incentives, the agencies overestimated per-unit costs, in some cases substantially. For the eighth rule, which reduced the amount of lead permitted in gasoline, costs may also have been overestimated, but the data are inadequate to make a clear case [Nichols, 1997]. Thus, although the sample is small, it appears that rules that use an economic incentive approach are more likely to result in cheaper-than-expected pollution reductions. One likely reason is that the increased flexibility afforded by these regulations makes it harder to predict how firms will achieve compliance.

## DISCUSSION

Examination of the case study results and the extant literature, together with discussions with regulatory experts, generated numerous explanations of why *ex ante* cost estimates by regulatory agencies might differ from *ex post* calculations. Explanations are divided into five categories. The first is technological innovation, considered by Goodstein and Hodges and others to be the primary explanation for cost overestimation. Other explanations include "quantity errors" (both baseline and compliance estimates), plus three procedural and methodological practices of rulemaking. These hypotheses are not mutually exclusive; each can be true for different rules, and in some cases may each apply to the same rule. Some lead to cost overestimation, while others may lead to either over- or underestimation.

### Technological Innovation

Most regulatory cost estimates ignore the possibility of technological innovation. Agencies often have a legal obligation to identify a specific means for firms to meet the regulation, a requirement that seemingly precludes certain types of projections. Technical change is, after all, notoriously difficult to forecast; all that can be said with confidence, based on historical experience, is that the cost of compliance will likely decline, but no one can say at what rate.

In the case of $SO_2$, scrubbing turned out to be more efficient and more reliable than expected. *Ex ante* estimates assumed that scrubbers operate at 85 percent reliability and remove 80 to 85 percent of the sulfur. In fact, scrubbers have typically run in excess of 95 percent reliability, removing 95 percent of the sulfur. Unanticipated opportunities have also arisen to blend low and high sulfur coal in older boilers up to a 40/60 mixture, compared with the 5/95 mixture originally estimated. Analysts have argued that these unanticipated innovations were driven by competition from rail, as well as by market opportunities, enhanced by the $SO_2$ trading scheme which allowed firms to profit from marginal reductions in emissions [Carlson et al., 1998; Smith, Platt, and Ellerman, 1998]. Several OSHA standards (e.g., vinyl chloride and cotton

dust) and the CFC phase-out provide additional examples of unanticipated innovation leading to lower costs. [24,25]

However, unanticipated technical innovation does not always lead to cost overestimates. OTA [1995] cites the case of occupational lead exposures where "…the 'new technologies' envisaged at the time of rulemaking for compliance in the blast furnace area of plants have not progressed…" (p. 57).[26]

Delays can also affect the costs of compliance. Consider the case where a target industry vigorously protests a proposed regulation and produces cost estimates suggesting that implementation would cause widespread economic harm. The protest causes implementation to be delayed. When the rule is eventually promulgated, it is discovered that compliance costs are less than originally predicted. Afterward, the case is cited as yet another example of "wolf sightings" from industry. And yet, chances are that if the regulation had been promulgated immediately the costs would have been higher than initially estimated. Hammitt [1997] notes that during the two-year period the CFC rule was being developed, "great attention was focused on the identification and development of technological alternatives to CFCs." Still, time is not always a decisive factor. Despite extensive delays in the I/M rule beyond the original 1993 deadline, costs were still substantially underestimated.

## Quantity Errors: Baseline Compliance Issues

As shown in Table 2, many prospective analyses have mis-estimated the emissions reductions resulting from a rule. Thus, total costs are different than expected, even though the per-unit costs were accurately forecast. Regulations that have produced lower pollution reductions than were expected are often cited as examples of *ex ante* cost overestimation. However, in these cases, total benefits are also smaller. Society may pay less, but it gets less.

Inaccurate prediction of emissions reductions can occur through mis-estimation of the baseline emissions that would exist without the regulation. Overestimate of the total cost of OSHA's 1972 asbestos regulation is attributable to erroneous exposure assumptions [Mendeloff, 1988]. Similarly, OSHA's cotton dust rule significantly overestimated the number of workers affected by the regulation [Viscusi, 1992]. Analysts can also fail to foresee developments affecting the quantity of emissions that must be reduced to comply with a rule. In the case of $SO_2$, analysts did not foresee an estimated two million tons of reductions that resulted from railroad deregulation and other factors unrelated to the EPA regulations [Burtraw, 1998a]. Curiously, the

[24] When the original cost analysis was performed for the CFC phase-out it was not anticipated that the hydrofluorocarbon HFC-134a could be substituted for CFC-12 in refrigeration. However, as Hammitt [1997] notes, "since 1991 most new U.S. automobile air conditioners have contained HFC-134a (a compound for which no commercial production technology was available in 1986) instead of CFC-12" (p. 13). He cites a similar story for HCFC-141b and 142b, which are currently substituting for CFC-11 in important foam-blowing applications. In contrast, Hammitt notes that "reductions in CFC-113 consumption have not relied as extensively on new compounds; major reductions have been achieved by substituting other solvents and blends and by altering production processes so that smaller quantities of solvent are required" (p. 13).

[25] For OSHA's vinyl chloride rule, OTA [1995] reports that "a significant production improvement not forseen. . . was the proprietary "stripping" process commercialized within a year of promulgation, which provided a substantially improved means for producing PVC resin while reducing vinyl chloride exposures" (p. 57). For cotton dust, the OSHA analysis ". . . missed the sizeable extent to which dust control was achieved as a by-product of an aggressive drive to modernize" (p. 57).

[26] In that industry the emphasis has been on respiratory protection programs, rather than on the expected engineering controls.

data set presented here contains no baseline underestimates. In fact, agencies may have a strategic interest in enhancing the potential seriousness of the problems they are regulating.

Another source of quantity errors arises from the inability to predict a regulation's effectiveness in achieving the desired pollution reduction. A retrospective analysis of OSHA's 1976 coke-oven standard found widespread noncompliance [Mendeloff, 1988]. OSHA's occupational lead standard was not met primarily through the engineering approach envisioned by the *ex ante* analysis, but rather through the use of protective gear for workers. Although workers were protected, air lead levels in plants remained extremely high several years after the regulation's promulgation [OTA, 1995]. Not surprisingly, the high cost of a regulation may result in compliance strategies that do not produce the desired benefits. Thus, underestimation of unit costs can lead to the overestimation of total (social) costs.

### Uncounted Cost Reductions Achieved during the Regulatory Review and Public Comment Periods

Under the Administrative Procedures Act (APA), agencies are required to go through a series of standard procedures, including formal proposal and public notice and comment, before new regulations can become effective. These procedures have become a bit of a ritual in Washington, often spawning complex technical, economic, and legal arguments among agencies and the interested public. Not surprisingly, rules are often modified between proposal and promulgation. Yet the initial cost estimates are not always modified to fully reflect the rule changes.

The conventional wisdom is that agencies propose relatively stringent rules with the tacit understanding that the final regulations will be softened somewhat in response to comments from prospective regulatees. Agency staff often justify such tactics as a means of pressuring an industry reluctant to reveal internal cost or emissions information that is necessary to set "reasonable" rules. One recent analysis documented *net* cost-saving rule changes made during the regulatory development process occurred in all twelve of the rules studied [Morgenstern and Landy, 1997].

Rule changes can occur in response to concerns raised by OMB, as a result of new data or analysis generated inside our outside the regulatory agency, or as a result of lobbying by an interested party. One study of EPA's rulemaking process for effluent guidelines between 1972 and 1978 showed a marked asymmetry in the number and the nature of comments on the rules [Magat, Krupnick, and Harrington, 1986]. The affected industries generated most of the comments on the regulations and virtually all the comments on their specific characteristics (costs predicted and emission reductions required). Environmental and public interest groups commented infrequently, and when they did their comments were often of a general nature, having more to do with the pace with which regulations were being prepared rather than the details of particular regulations. Between the initial contractor document and the proposed regulation, and again between the proposal and promulgation, the effluent guidelines' stringency was generally loosened and cost estimates raised.

The key question is whether the rule changes are always or even systematically captured in the final cost estimates issued by the agency. Especially since rule changes often occur at the very end of the process—sometimes just days before promulgation of the rule—in many cases without the input of the agency's economic experts, many of these changes are not captured in the final cost estimates. The failure to capture the changes, especially since they tend to involve cost savings, almost guarantees that the agency's estimate will overstate the true costs of the rule.

## Estimating Maxima Rather than Means

There is a tendency, sometimes inadvertent and sometimes deliberate, for a regulatory agency to estimate the maximum cost rather than the mean. Inadvertent estimation of the maximum cost may result from the agency's use of out-of-date information on installed pollution control equipment. If such an instance, the agency data may not reflect the most recent pollution control investments, and therefore the quantity of emissions required to meet a particular goal might be overestimated.

Interestingly, the regulated industry is the source, directly or indirectly, of most of the data used to support cost estimates as well as the possible improvements in firm performance that might be called forth by new rules. Sometimes, as in the recently concluded multimedia rulemaking for the pulp and paper industry, the EPA seeks the cooperation of the main trade association, which may, in turn, solicit cost data from its members or serve as a conduit for an EPA-designed questionnaire.[27] The industry also has opportunities during the regulatory process to produce cost estimates even when not specifically requested by the regulators. For example, trade associations sometimes hire contractors to conduct their own cost studeis, as when the auto industry retained Sierra Research to estimate the cost of meeting the low-emitting vehicle (LEV) and ultra low-emitting vehicle (ULEV) standards. Regulators may be skepticial of these estimates, but the estimates still must be addressed in the rulemaking process and some explanation given for major disparities in estimates. The mere existence of such studies may exert upward pressure on regulators' cost estimates.

While the industry may be motivated by strategic considerations, overestimates of costs may also result from firms' unwillingness to devote resources to figuring out the best way to comply with a proposal that may or may not end up as a final rule. Asked "what will it cost?", a firm's analyst may respond with the cost of an "off-the-shelf" compliance technology. Further study may reveal that compliance cost can be cut substantially through an innovative process change. In this case, firms are not necessarily employing strategic behavior, but just choosing not to expend resources in advance of final regulation in determining how compliance could be achieved at minimum cost.

There may also be occasions when the regulator will quite deliberately estimate a maximum cost, for example, if cost underestimation risks embarrassment, if compliance costs are expected to be small, or if legal challenge seems likely. OTA found that "substantial evidence" scrutiny by the courts drove OSHA to overestimate costs. Similarly, in EPA's Effluent Guidelines Division, it is standard practice to provide an upper bound for a compliance cost estimate.[28]

In addition, a good deal of health and safety regulation is technology based, which means that the regulator identifies an emission-reducing technology and then writes the regulation so that the identified technology can meet it. The language used in industrial pollution control statutes makes clear the importance of feasibility: "Best Practicable Technology," "Best Available Technology Economically Achievable," "Best Conventional Technology" (Clean Water Act), "Best Available Control Technology," "Lowest Achievable Emission Rate" (Clean Air Act). Note the emphasis on technology that is available and achievable, words that impose a responsibility on the EPA to identify a technology in use that can meet the standard the agency wishes to impose.

[27] In addition, it is noteworthy that EPA cost studies are frequently done by outside contractors, who hire industry experts (often ex-employees of the industry) to make estimates. If the agency relies on cost and compliance information from the industry, then agency cost estimates might be subject to the same biases as industry estimates.

[28] Personal communication, William Anderson and William Wheeler, Effluent Guidelines Division, June 30, 1988.

Regulated firms are free to meet the standard by any method, and presumably they will use the identified technology only if it is less expensive than the alternatives.

### Asymmetric Correction of Estimation Errors

Some have argued that regulatory agencies may "understate costs . . . because . . . their self-interest lies in regulation" [OMB, 1998; see also Hahn, 1996]. In fact it is difficult to assess the extent to which bureaucrats engage in agency-aggrandizing behavior. Apart from the possible tendency to overstate baselines (and thus the nature of the problem subject to regulation), data collected for this analysis do not support the notion of systematic underestimation of regulatory costs. However, any tendency to underestimate cost may be constrained by countervailing pressure from groups affected by proposed regulations.

Estimation of costs is full of uncertainties in the best of circumstances, and it is understandable that such estimates would be subject to large errors. These estimation errors come not only from an understandable failure to anticipate technological change, but from equally understandable errors in characterizing the universe of firms or agents likely to be affected by the regulation, as well as the cost and effectiveness of the compliance technologies employed. In the absence of bias, of course, costs would be underestimated as often as they were overestimated. Internal and external pressures, as well as new information, can cause the regulation itself to change after the cost estimate is prepared. However, the cost estimate can be revised if errors are pointed out.

Even if agency self-interest leads to underestimation of costs, at least gross underestimates are likely to be brought to the regulator's attention by the regulated community, particularly if it is well organized. For example, the inspection and maintenance program is the most dramatic example of the underestimate of unit costs by EPA. In that case, most of the costs of the program were borne by motorists, a relatively unorganized interest group.[29]

## CONCLUSIONS

The debate over whether the costs of environmental regulatory programs are under- or over-estimated is really two debates—one about omission and the other about accuracy. Many observers argue that important cost elements are left out of regulatory estimates, and if they were included they might swamp the costs that are now included. These omissions include indirect and often difficult-to-measure categories such as diverted management attention, innovations that weren't made because of the time and resources devoted to complying with environmental regulations, and the general equilibrium adjustments that ripple through the economy when resources are diverted from one use to another. It is thus no surprise that those who argue that important costs are ignored in regulatory descisionmaking tend also to be those who point to the costs of environmental regulation in general, rather than to the direct costs of individual regulations.

The present article principally addresses the issue of accuracy: whether the cost elements estimated during the regulatory process contain systematic errors, and if so, what the implications are for regulatory policy. Unlike concerns about the completeness of the cost estimates, this issue is amenable to empirical testing. To resolve it, some experts call for more intensive scrutiny of the procedures used by

[29] Service station owners were also affected in some states, although the predicted gains (or losses) were both uncertain and small. The RIA actually showed small net gains to service owners as the loses in inspection fees were more than offset by increased repair business.

regulatory agencies to collect information, choose rulemaking alternatives, and evaluate costs [for example, Hahn, 1996]. Scrutiny of rulemaking procedures and the documents produced to support them is certainly important but it is not sufficient to determine whether RIAs accurately predict the realized direct costs of regulations. What is needed, in addition, is a systematic comparison of *ex ante* cost estimates generated by RIAs to the *ex post* assessments of the same rules.

This review of more than two dozen *ex ante/ex post* comparisons indicate that *ex ante* estimates of total cost have tended to exceed actuals, which is true of 14 of the 28 rules in the data set, while for only 3 were the *ex ante* estimates too low. Since the overestimates occur more frequently in the larger rules, the dollar-weighted predominance of overestimates is even higher. For federal rules the overestimation of total costs is often due to errors in the quantity of required emission reductions which, in turn, is driven by both baseline and compliance issues. In these cases, the *ex ante* overestimate of total costs implies an overestimate of total benefits (pollution reductions). At least for EPA and OSHA rules, overestimation of per unit abatement costs occurs about as often as underestimation. For those rules that employ economic incentive mechanisms, overestimation of per unit costs seems to be the norm.

In numerous case studies actual compliance costs are lower than predicted because of unanticipated use of new technology. One might ask whether there are particular features of rules that encourage innovation, and here the importance of flexibility is noteworthy. The more flexibility regarding when, how, where, and by whom emission reductions are to be made, the more difficult it is for regulators or anyone else to anticipate the technical responses and, correspondingly, the costs of regulation. Not surprisingly, the rules involving economic incentives contain mostly pleasant surprises on the cost side.

The tendency to mis-estimate compliance costs also arises from the pressures of regulatory politics and from certain practices of cost estimation and rulemaking. To ensure that the public has the EPA's "best estimate" of the regulation, some simple changes to cost estimation procedures could be adopted. Since a number of statutes appear to encourage the development of cost estimates that reflect a maximum rather than a mean, regulatory agencies could issue a "best estimate" along with the statutorily preferred cost estimate. Likewise, they could ensure that any changes in the rule made subsequent to publication of the cost estimate would be manifest in a revised cost estimate.[30]

Some may see these findings as undermining the value of rigorous *ex ante* analysis of the costs of regulation. Such an interpretation ignores the constructive role that cost analysis can serve in the rulemaking process. Cost estimation helps regulators conduct a disciplined process of thinking through the full ramifications of a rule. Findings of high cost can also motivate a search for regulatory options that lower costs, often at little or no reduction in benefits. In fact, it should come as no surprise that *ex ante* estimates can be useful in the rulemaking process without necessarily providing good predictions of costs *ex post*. After all, the cost estimate is usually an input to the rulemaking decision, not an output intended to be judged on its own merits.

Just as the present results point to the need for greater care in estimating baselines and compliance rates—the so-called quantity issues—additional insights into the biases of regulatory cost estimates could be gained by expanding the universe of credible *ex post* studies. Further study of the rulemaking and cost estimation processes would also help sort out the relative significance of these and other possible explanations of cost mis-estimation. Indeed, discovering whether or how to adjust *ex ante* estimates provides the strongest possible justification for more credible *ex post* studies—a research activity that merits greater emphasis.

[30] Currently, revised cost estimates are prepared for some rules but not others.

This project was partially funded by a grant from the Office of Policy, U.S. Environmental Protection Agency. We would like to thank Dallas Burtraw, John Chamberlin, George Eads, Art Fraas, Quindi Franco, Thomas Gillis, James Hammitt, Michael Huguenin, Randall Lutter, Bill Pedersen, Paul Portney, Kate Probst, Lisa Robinson, and Byron Swift for helpful comments on an earlier draft. We are also grateful to the researchers and government officials who generously responded to our appeals for case study information. Of course, any remaining errors are the authors' responsibility. An earlier (popular) version of this article appeared in *Environmental Magazine*, September 1999.

*WINSTON HARRINGTON and RICHARD D. MORGENSTERN are Senior Fellows and PETER NELSON is a Research Assistant at Resources for the Future, Washington, D.C.*

## REFERENCES

Anderson, R., & Rykowski, R. (1998). Reformulated gasoline. In Richard D. Morgenstern (Ed.), Economic analyses at EPA: Assessing regulatory impact. Washington, D.C.: Resources for the Future.

Browner, C. (1997). Testimony before the Committee on Environment and Public Works, U.S. Senate, February 12.

Burtraw, D. (1998a). Appraisal of the $SO_2$ cap-and-trade market. Presented at the Federal Reserve Bank of Chicago, University of Illinois and Chicago Workshop on Market-Based Approaches to Environmental Policy, June 19.

Burtraw, D. (1998b). Summary of nox emission changes/costs under 1990 CAA. Internal memorandum, Resources for the Future.

Cackette, T. (1998). The cost of emission controls on motor vehicles and fuels: Two case studies. Presented at the 1998 Summer Symposium of the EPA Center on Airborne Organics, MIT Endicott House, Dedham, MA, July 9–10.

Cairncross, F. (1993). Costing the earth. Boston: Harvard Business School Press.

Carlson, C., Burtraw, D., Cropper, M., & Palmer, K. (1998). $SO_2$ control by electric utilities: What are the gains from trade? Discussion Paper 98–44. Washington, D.C.: Resources for the Future.

Caro, R. (1974). The power broker: Robert Moses and the fall of New York. New York: Knopf.

Cropper, M.L., & Oates, W.E. (1992). Environmental economics: A survey. Journal of Economic Literature, 30, 675–731.

Fraas, A., & Lutter, R. (1996). Regulatory analysis: Past experience with EPA analysis and new challenges. Prepared for the annual meeting of the Southern Economic Association, November.

Garber, S., & Hammitt, J.K. (1998). Risk premiums for environmental liabilities: Does Superfund increase the cost of capital? Journal of Environmental Economics and Management, 36(3), 267–294.

Gianessi, L.P. (1999). Measuring the economic impacts of pesticide regulation. Washington, D.C.: National Center for Food and Agricultural Policy.

Goodstein, E., & Hodges, H. (1997). Polluted data. The American Prospect, 35, 64–69.

Gray, W., & Shadbegian, R. (1995). Pollution abatement costs, regulation, and plant-level productivity. Working Paper #4994. Cambridge, MA: National Bureau of Research.

Hahn, R. (1996). Regulatory reform: What do the government's numbers tell us? In Robert Hahn (Ed.), Risks, costs and lives saved. New York: Oxford University Press.

Hammitt, J.K. (1997). Are the costs of proposed environmental regulations overestimated? Evidence form the CFC phase-out. Unpublished paper, Center for Risk Analysis, Harvard School of Public Health, Cambridge, MA.

Harrington, W., McConnell, V.D., & Ando, A. (1999). The enhanced I/M program in Arizona: Costs, effectiveness, and a comparison with pre-regulatory estimates. Discussion Paper 99–37. Washington, DC: Resources for the Future.

Harris, M., & Raviv, A. (1979). Optimal incentive contracts with imperfect information. Journal of Economic Theory, 20(2), 231–259.

Hau, T.D. (1992). Congestion charging mechanisms for roads. Working Paper. Transport Division, Infrastructure and Urban Development, WPS 1071. Washington, DC: World Bank.

Haveman, R.H. (1972). The economic performance of public investments: An *ex-post* evaluation of water resources investments. Baltimore: Johns Hopkins University Press.

Hazilla, M., & Kopp, R.J. (1990). Social cost of environmental quality regulations: A general equilibrium analysis. Journal of Political Economy, 98, 853–873.

Higgins, P., & Buc, L. (1997). An analysis of EPA's methods for estimating regulatory compliance costs. Draft paper.

Jaffe, A.B., Petersen, S.R., Portney, P.R., & Stavins, R.N. (1995). Environmental regulation and the competitiveness of U.S. manufacturing: What does the evidence tell us? Journal of Economic Literature 33, 132–163.

Jorgenson, D.W., & Wilcoxen, P.J. (1990). Environmental regulation and U.S. economic growth. Rand Journal of Economics, 21(2), 314–340.

Joshi, S., Lave, L., Shih, J.-S., & McMichael, F. (1997). Impact of environmental regulations on the U.S. steel industry. Mimeo, Carnegie Mellon University, Pittsbugh, PA.

Kwerel, E. (1977). To tell the truth: Imperfect information and optimal pollution control. Review of Economic Studies, 44, 595–601.

Magat, W.A., Krupnick, A.J., & Harrington, W. (1986). Rules in the making. Baltimore: Johns Hopkins University Press.

McCullough, D.G. (1978). The path between the seas. New York: Simon and Schuster.

McVeigh, J., Burtraw, D., Palmer, K., & Darmstadter, J. (1999). Winner, loser or innocent victim? Has renewable energy performed as expected? Discussion Paper 99–28. Washington, DC: Resources for the Future.

Mendeloff, J. (1988). The dilemma of toxic substance regulation: How overregulation causes at underregulation at OSHA. Cambridge, MA: MIT Press.

Morgenstern, R.D., & Landy, M.K. (1997). Economic analysis: Benefits, costs, implications. In Richard D. Morgenstern (Ed.), Economic analyses at EPA: Assessing regulatory impact. Washington, DC: Resources for the Future.

Morgenstern, R.D., Pizer, W., & Shih, Ji-Shyang. (1998a). The cost of environmental protection. Discussion Paper 98–36. Washington, DC: Resources of the Future.

Morgenstern, R.D., Pizer, W., & Shih, Ji-Shyang. (1998b). Jobs versus the environment: Is there a trade-off? Discussion Paper 99–01. Washington, DC: Resources of the Future.

Morrisette, P.M. (1989). The evolution of policy responses to stratospheric ozone depletion. Natural Resources Journal, 29, 793–820.

NAS (National Academy of Sciences). (1975). Decision making for regulatory chemicals in the environment. Washington, DC: NAS.

Nichols, A. (1997). Lead in gasoline. In Richard D. Morgenstern (Ed.), Economic analyses at EPA: Assessing regulatory impact. Washington, DC: Resources for the Future.

OECD (Organization for Economic Cooperation and Development). (1997). Evaluating economic instruments for environmental policy. Paris: OECD.

OMB (U.S. Office of Management and Budget). (1998). Report to Congress on costs and benefits of federal regulations: Appendix. Washington, DC: GPO.

OMOE (Ontario Ministry of Environment and Energy). (1996). Water pollution monitoring costs in Ontario: Comparison of estimated and actual costs. Toronto, ON: Queen's Printer for Ontario.

OTA (U.S. Office of Technology Assessment). (1995). Gauging control technology and regulatory impacts in occupational safety and health: An appraisal of OSHA's analytic approach. Washington, DC: Government Printing Office (GPO).

Palmer, K., Oates, W., & Portney, P. (1995). Tightening environmental standards: The benefit cost of the no-cost paradigm? Journal of Economic Perspectives, 9(4), 119–132.

Pickrell, D.H. (1992). A desire named streetcar: Fantasy and fact in rail transit planning. Journal of the American Planning Association, 58(2),158–176.

Porter, M.E. (1991). America's green strategy. Scientific American, 265, 168.

Porter, M., & van der Linde, C. (1995). Toward a new conception of the environment–competitiveness relationship. Journal of Economic Perspectives 9(4), 97–118.

Putnam, Hayes, & Bartlett, Inc. (1980). Comparisons of estimated and actual pollution capital expenditures for selected industries. Mimeo, Office of Planning and Evaluation, U.S. Environmental Protection Agency, Cambridge, MA.

Quirk, J.P., & Terasawa, K. (1986). Sample selection and cost underestimation bias in pioneer projects. Land Economics, 62(2), 193–200.

Salop, S.C., & Scheffman, D.T. (1983). Raising rivals' costs. American Economic Review 73, 267–271.

SCAQMD (South Coast Air Quality Management District). (1998). RECLAIM program three-year audit and progress report. Diamond Bar, CA: SCAQMD.

Smith, A., Platt, J., & Ellerman, D. (1998). The costs of reducing utility $SO_2$ emissions—Not as low as you might think. Cambridge: MIT Center for Energy and Environmental Policy Research.

Spulber, D.F. (1988). Optimal environmental regulation under asymmetric information. Journal of Public Economics, 35, 163–181.

Squitieri, R. (1998). Do we always overestimate environmental control costs? Unpublished paper. Council of Economic Advisors, Washington, DC.

Terasawa, K., Quirk, J.P., & Womar, K. (1984). Turbulence, cost, escalation, and capital intensity bias in defense contracting. Social Science Working Papers, 508 (March).

USEPA (U.S. Environmental Protection Agency). (1992). I/M costs, benefits, and impacts. Ann Arbor, MI: Government Printing Office.

USEPA (U.S. Environmental Protection Agency). (1993). The cost of a clean environment. Washington, DC: Government Printing Office.

Viscusi, K. (1992). Fatal tradeoffs: Public and private responsibilities for risk. Oxford, England: Oxford University Press.

Weitzman, M.L. (1980). Efficient incentive contracts. Quarterly Journal of Economics 94(4), 719–730.

White, K. (1997). $SO_2$ compliance and allowance trading: Developments and outlook. Electric Power Research Institute.

**Appendix.** Summary of case studies.

| Agency | Regulation | Date of *ex ante* study | Source for *ex post* comparison | Quantity reduction | Unit cost of pollution reduction | Total cost | Comments |
|---|---|---|---|---|---|---|---|
| EPA | CDEC (lettuce) | 1979 | Gianessi [1999] | ↔ | ↓ | ↓ | EPA predicted that hand weeding would replace pesticide. However, as a result of the increased cost of hand weeding, 5000 acres were withdrawn for lettuce production. |
| EPA | Mancozeb | 1979 | Gianessi [1999] | ↔ | ↑ | ↑ | EPA and USDA assumed no available substitutes and large yield losses. After the ban, EPA issued a new registration for a substitute, and yield losses were much smaller than anticipated. |
| EPA | Nitrofen (broccoli) | 1983 | Gianessi [1999] | ↔ | ↑ | ↑ | Farmers discovered new techniques for controlling weeds in response to the ban. |
| EPA | Leaded gas* | 1985 | Nichols [1997] | ↓ | ↔ | ↔ | Costs of the rule were never reestimated. The more rapid-than-expected phase-out of leaded gasoline suggests that costs may have been lower than expected. |
| EPA | Dinoseb | 1986 | Gianessi [1999] | ↔ | ↓ | ↑ | After dinoseb was banned, EPA granted emergency exemptions to peanut farmers, allowing them to use paraquat. Paraquat was more cost effective than dinoseb, so the result was a net savings. |
| EPA | CFCs* | 1986 | Hammitt [1997] | ↔ | ↑ | ↑ | Subsequent regulation backed by treaty and legislation expanded the reductions beyond those initially forecast. |
| EPA | CFCs* | 1988 | Hammitt [1997] | ↔ | ↔ | ↔ | Estimates released after the signing of the Montreal Protocol contained lower forecast costs—one scenario was approximately correct; the other was an underestimate. |

* Economic incentives in regulation.
↔ Accurate
↑ Overestimated
↓ Underestimated

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| EPA | Aldicarb | 1988 | Gianessi and Phillips [1998] | ↑ | ↓ | ↓ | Although EPA accurately forecast farmers' behavior following the ban, the substitutes used were far less effective than predicted. EPA reinstated aldicarb's use in some locations. |
| EPA | $SO_2$ phase I* | 1990 | Smith, Platt, and Ellerman [1998] Carlson et al. [1998] | ↔ | ↑ | ↔ | The effect of rail deregulation allowing more low-sulfur coal to move east was not adequately accounted for. Realized emissions have been lower than expected. However, the predicted total costs of phase I were correct because of the high capital costs of extensive phase I scrubbing and contributions to the bank. |
| EPA | $SO_2$ phase II* | 1990 | White [1997] Carlson et al. [1998] | ↑ | ↑ | ↑ | Recent modeled estimates indicate that costs for phase II were overstated. Emissions in phase II are expected to be higher than initially forecast because of phase I banking. |
| EPA | $NO_x$ (Clean Air Act) | 1990 | Burtraw [1998b] | ↔ | ↔ | ↔ | The program did not involve a fixed emissions cap; instead it involved a reduction in the emission rate. The agency overestimated growth in the demand for electricity and therefore overestimated baseline emissions. Although costs were about accurate, there was a resulting modest (less than 25 percent) overstatement of total emission reductions. |
| EPA | Inspection and maintenance | 1992 | Harrington, McConnell, and Ando [1999] | ↑ | ↓ | ? | Vehicle repair was not as effective as anticipated in acheiving emissions reductions; therefore realized reductions were lower than expected. *Ex ante* study envisioned nationwide program applying to 56 million vehicles. So far the program has been implemented only in four states. |

* Economic incentives in regulation.
↔ Accurate
↑ Overestimated
↓ Underestimated

**Appendix.** Summary of Case Studies (cont'd)

| Agency | Regulation | Date of *ex ante* study | Source for *ex post* comparison | Quantity reduction | Unit cost of pollution reduction | Total cost | Comments |
|---|---|---|---|---|---|---|---|
| EPA | Reformulated gas | 1993 | Anderson and Rykowski [1998] | ↑ | ↔ | ↑ | EPA's predicted cost differentials appear to be reasonably accurate for the largest markets. Public concern about health effects of MTBE led to some states dropping out of the program. |
| EPA | Propargite (strawberries) | 1994 | Gianessi [1999] | ↔ | ↔ | ↑ | *Ex ante* assumed no available substitutes and forecast costs of $12 million/year. After the ban, farmers were granted an emergency exemption for a substitute and costs ended up at less than $500,000/year. |
| OSHA | Asbestos | 1972 | Priest, Bengali (1981), cited in Mendeloff [1988] | ↑ | ↔ | ↑ | *Ex ante* forecast overestimated initial exposure levels. |
| OSHA | Vinyl chloride | 1974 | OTA [1995] | ↔ | ↑ | ↑ | Estimates of direct costs are 20 to 25 percent of those predicted. Price increases are observed, but even if these costs are included, the *ex ante* was an overestimate. |
| OSHA | Coke ovens (OSHA) | 1975 | Arthur Andeson & Co. (1979), cited in Mendeloff [1988] | ↑ | ↓ | ↑ | Total expenditures were far below those predicted by OSHA; this was in large part due to incomplete compliance. |
| OSHA | Cotton dust | 1976 | Viscusi [1992] OTA [1995] | ↑ | ↑ | ↑ | The *ex ante* estimate overstated the number of workers affected by the regulation. In addition, after promulgation the textile industry modernized in response to foreign competition, enabling dust control to be acheived at a lower cost. |

* Economic incentives in regulation.
↔ Accurate
↑ Overestimated
↓ Underestimated

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| OSHA | Occupational lead | 1978 | OTA [1995] | ↑ | ↓ | ↑ | Although costs were lower than OSHA predicted, exposure reductions were acheived through hygiene and worker protected gear, as opposed to the engineering approaches the agency envisioned. As of 1994, lead exposure levels still exceeded permissible exposure levels of the regulation. |
| OSHA | Ethylene oxide | 1984 | OTA [1995] | ↔ | ↔ | ↔ | Cost was slightly higher due in part to overcompliance motivated by long-term exposure and liability concerns. |
| OSHA | Formaldehyde | 1987 | OTA [1995], | ↔ | ↑ | ↑ | The *ex ante* estimate overlooked an important substitute. |
| OSHA | Powered platforms | 1989 | OTA [1995] | ↑ | ↔ | ↓ | The rule was supposedto generate cost savings. An economic downturn in the construction industry prevented the total projected savings from being realized. |
| CARB | LEV | 1990, 1994 | Cackette [1998] | ? | ↑ | ? | *Ex post* survey revealed slight overestimate. |
| CARB | Reformulated gas (CA) | 1991, 1996 | Cackette [1998] | ? | ↑ | ? | Per gallon costs were about half those estimated by CARB. Ambient monitoring detected significant improvements in air quality. |
| SCAQMD | RECLAIM ($NO_x$)* | 1993 | SCAQMD [1998] | ↓ | ↑ | ↑ | Price of $NO_x$ trading credits were significantly lower than forecast, as were emissions. |
| SCAQMD | RECLAIM ($SO_x$)* | 1993 | SCAQMD [1998] | ↔ | ↑ | ↑ | Price of $SO_x$ credits trading slightly lower than forecast. |
| Singapore | Singapore congestion licensing system* | 1975 | Hau [1992] | ↓ | ↑ | ? | Licensing program attempted to reduce morning congestion in central business district. Program was expected to reduce traffic 25 to 30 percent. Traffic dropped between one-third and one-half. The program exacerbated congection in other areas of the city. |

* Economic incentives in regulation.
↔ Accurate
↑ Overestimated
↓ Underestimated

**Appendix.** Summary of Case Studies (cont'd)

| **Agency** | **Regulation** | **Date of *ex ante* study** | **Source for *ex post* comparison** | **Quantity reduction** | **Unit cost of pollution reduction** | **Total cost** | **Comments** |
|---|---|---|---|---|---|---|---|
| Bergen, Norway* | Bergen toll ring* | 1986 | Hau [1992] | ↓ | ↑ | ? | Traffic was projected to fall by 3 percent; fell 6 to 7 percent in the first year. |
| Ontario | Ontario water | 1986 | OMOE [1996] | ↔ | ↔ | ↔ | Rule covered nine major industrial sectors. Although the total cost prediction was accurate, the estimates for individual sectors varied widely. |

* Economic incentives in regulation.
↔ Accurate
↑ Overestimated
↓ Underestimated

Docket ID No. EPA-HQ-OAR-2021-0317

November 2023

# Supplementary Material for the Regulatory Impact Analysis for the Final Rulemaking, "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review"

## EPA Report on the Social Cost of Greenhouse Gases: Estimates Incorporating Recent Scientific Advances

# Report on the Social Cost of Greenhouse Gases:

## Estimates Incorporating Recent Scientific Advances

November 2023

National Center for Environmental Economics
Office of Policy

Climate Change Division
Office of Air and Radiation

U.S. Environmental Protection Agency
Washington, DC 20460

# Table of Contents

List of Figures ..... ii
List of Tables ..... iii
List of Abbreviations ..... iv
Executive Summary ..... 1
1 Background ..... 5
1.1 Overview of SC-GHG Estimates Used in EPA Analyses to Date ..... 6
1.2 Recommendations from the National Academies of Sciences, Engineering, and Medicine ..... 11
1.3 Accounting for Global Damages ..... 12
2 Methodological Updates ..... 19
2.1 Socioeconomic and Emissions Module ..... 21
2.2 Climate Module ..... 33
2.3 Damage Module ..... 45
2.4 Discounting Module ..... 62
2.5 Risk Aversion ..... 73
3 Modeling Results ..... 77
3.1 Social Cost of Carbon (SC-$CO_2$), Methane (SC-$CH_4$), and Nitrous Oxide (SC-$N_2O$) Estimates by Damage Module ..... 77
3.2 Omitted Damages and Other Modeling Limitations ..... 81
3.3 Distribution of Modeled Climate Impacts ..... 94
4 Using SC-GHG Estimates in Policy Analysis ..... 100
4.1 Combining Lines of Evidence on Damages ..... 100
4.2 Application of SC-GHG Estimates in Benefit-Cost Analysis ..... 103
5 Summary ..... 104
References ..... 107
A. Appendix ..... 141
A.1. Additional Discussion of Scientific Updates in IPCC's Sixth Assessment Report ..... 141
A.2. Consumption Rate of Interest and Integration into Benefit-Cost Analysis ..... 142
A.3. Derivations of the SC-GHG Values for use in Analyses ..... 145
A.4. The Climate Beta ..... 151
A.5. Annual Unrounded SC-$CO_2$, SC-$CH_4$, and SC-$N_2O$ Values, 2020-2080 ..... 154
A.6. Additional Figures, Tables, and Results ..... 156
A.7. Valuation Methodologies to Use in Estimating the Social Cost of GHGs ..... 163

A.8. Treatment of Uncertainty ........ 168

## List of Figures

Figure 2.1: The Four Components of SC-GHG Estimation ........ 21
Figure 2.1.1: Global Population under RFF-SPs and SSPs, 1950-2300 ........ 28
Figure 2.1.2: Projections of Growth in Global Income per Capita under RFF-SPs and SSPs, 2020-2300 ........ 30
Figure 2.1.3: Net Annual Global Emissions of Carbon Dioxide ($CO_2$) under RFF-SPs and SSPs, 1900-2300 ........ 33
Figure 2.2.1: Global Atmospheric Concentrations of Carbon Dioxide ($CO_2$), 1900-2300 ........ 39
Figure 2.2.2: Global Mean Surface Temperature Change, 1900-2300 ........ 39
Figure 2.2.3: Global Mean Surface Temperature Anomaly from a Pulse of Carbon Dioxide (1GtC) by Model, 2020-2300 ........ 41
Figure 2.2.4: Global Sea Level Rise in FACTS and BRICK, 1950-2300 ........ 44
Figure 2.3.1: Research on Climate Impacts, 1990-2021 ........ 46
Figure 2.3.2: Annual Consumption Loss as a Fraction of Global GDP in 2100 Due to an Increase in Annual Global Mean Surface Temperature in the three Damage Modules ........ 61
Figure 2.4.1: Distribution of the Dynamic Discount Rates ........ 72
Figure 3.1.1: Distribution of the Discounted Marginal Damages per Metric Ton of Carbon Dioxide ($CO_2$) for 2030 Emissions, by Near-term Ramsey Discount Rate and Damage Module ........ 80
Figure 3.2.1: Population, Temperature, and Sea Level Rise in 2100 ........ 89
Figure 3.2.2: Changes in Local Mean Surface Precipitation in 2100 ........ 90
Figure 3.2.3: Global Ocean pH and Ocean Heat, 2020-2300 ........ 92
Figure A.3.1 The Difference Between using a Certainty-Equivalent Rate and Constant Discount Rate to Discount Climate Benefits from Future Reductions in GHG Emissions Back to the Year of the Analysis ........ 150
Figure A.6.1: Net Annual Global Emissions of Methane ($CH_4$) under the RFF-SPs and the SSPs, 1900-2300 ........ 156
Figure A.6.2: Net Annual Global Emissions of Nitrous Oxide ($N_2O$) under the RFF-SPs and the SSPs, 1900-2300 ........ 156
Figure A.6.3: Net Annual Global Emissions of Carbon Dioxide ($CO_2$) under the RFF-SPs and EMF-22 Scenarios, 1900-2300 ........ 157
Figure A.6.4: Net Annual Global Emissions of Methane ($CH_4$) under the RFF-SPs and EMF Scenarios, 1900-2300 ........ 158
Figure A.6.5: Net Annual Global Emissions of Nitrous Oxide ($N_2O$) under the RFF-SPs and EMF Scenarios, 1900-2300 ........ 158
Figure A.6.6: Global Atmospheric Concentrations of Methane ($CH_4$), 1900-2300 ........ 159
Figure A.6.7: Global Atmospheric Concentrations of Nitrous Oxide ($N_2O$), 2020-2300 ........ 159
Figure A.6.8: Global Temperature Anomaly from a Pulse of Methane ($1MtCH_4$) Emissions, 2020-2300 ........ 160
Figure A.6.9: Global Temperature Anomaly from a Pulse of Nitrous Oxide ($1MtN_2$) Emissions, 2020-2300 ........ 160
Figure A.6.10: Dynamic temperature response of 256 climate science models (the CMIP5 ensemble) and seven IAMs ........ 161
Figure A.6.11: Distribution of the Discounted Marginal Damages per Metric Ton of Methane ($CH_4$) for 2030 Emissions, by Near-term Ramsey Discount Rate and Damage Module ........ 162
Figure A.6.12: Distribution of the Discounted Marginal Damages per Metric Ton of Nitrous Oxide ($N_20$) for 2030 Emissions, by Near-term Ramsey Discount Rate and Damage Module ........ 162

# List of Tables

Table 2.2.1: Summary Statistics for Equilibrium Climate Sensitivity under Reduced-Complexity Climate Models and IPCC statements........37
Table 2.2.2: Summary Statistics for Transient Climate Response under Reduced-Complexity Climate Models and IPCC Statements........38
Table 2.3.1: Current Coverage of Climate Damages in DSCIM........52
Table 2.3.2: Current Coverage of Climate Damages in GIVE........55
Table 2.4.1: Average Real Return on 10-Year Treasury Securities Based on Inflation Measure........68
Table 2.4.2: Calibrated Ramsey Formula Parameters........70
Table 3.1.1: Social Cost of Carbon (SC-$CO_2$) by Damage Module, 2020-2080 (in 2020 dollars per metric ton of $CO_2$)........78
Table 3.1.2: Social Cost of Methane (SC-$CH_4$) by Damage Module, 2020-2080 (in 2020 dollars per metric ton of $CH_4$)........78
Table 3.1.3: Social Cost of Nitrous Oxide (SC-$N_2O$) by Damage Module, 2020-2080 (in 2020 dollars per metric ton of $N_2O$)........78
Table 3.1.4: Impact Category Disaggregation of Social Cost of Carbon (SC-$CO_2$) for 2030 under a 2.0% Near-Term Ramsey Discount Rate (in 2020 dollars per metric ton of $CO_2$)........81
Table 3.2.1: Climate and Earth Science, Impacts, and Damages Included in the Updated SC-GHG Estimates........87
Table 4.1.1: Estimates of the Social Cost of Greenhouse Gases (SC-GHG), 2020-2080 (in 2020 dollars per metric ton)........101
Table 5.1: Implementation of National Academies Recommendations in this Report........106
Table A.5.1: Unrounded SC-$CO_2$, SC-$CH_4$, and SC-$N_2O$ Values, 2020-2080........154
Table A.8.1: Treatment of Uncertainty........168

## List of Abbreviations

| | |
|---|---|
| AR | Assessment Report of the United Nations Intergovernmental Panel on Climate Change |
| BRICK | Building Blocks for Relevant Ice and Climate Knowledge |
| $CH_4$ | Methane |
| CCAPM | Consumption-based Capital Asset Pricing Model |
| CIAM | Coastal Impact and Adaptation Model |
| CMIP | Coupled Model Intercomparison Project |
| $CO_2$ | Carbon Dioxide |
| DICE | Dynamic Integrated Climate and Economy |
| DSCIM | Data-driven Spatial Climate Impact Model |
| ESM | Earth System Models |
| ECS | Equilibrium Climate Sensitivity |
| E.O. | Executive Order |
| FACTS | Framework for Assessing Changes To Sea-level |
| FaIR | Finite Amplitude Impulse Response |
| FrEDI | Framework for Evaluating Damages and Impacts |
| FUND | Climate Framework for Uncertainty, Negotiation, and Distribution |
| GHG | Greenhouse Gas |
| GDP | Gross Domestic Product |
| GIVE | Greenhouse Gas Impact Value Estimator |
| GMSL | Global Mean Sea Level |
| GMST | Global Mean Surface Temperature |
| IAM | Integrated Assessment Model |
| IWG | Interagency Working Group on the Social Cost of Greenhouse Gases |
| MAGICC | Model for the Assessment of Greenhouse Gas Induced Climate Change |
| MER | Market Exchange Rate |
| $N_2O$ | Nitrous Oxide |
| PAGE | Policy Analysis of the Greenhouse Gas Effect |
| PPP | Purchasing Power Parity |
| RC | Reduced Complexity |
| RCP | Representative Concentration Pathway |
| SC | Social Cost |
| SLR | Sea Level Rise |
| SP | Socioeconomic Projections |
| SSP | Shared Socioeconomic Pathways |
| TCR | Transient Climate Response |

# Executive Summary

This report presents new estimates of the social cost of carbon (SC-$CO_2$), social cost of methane (SC-$CH_4$), and social cost of nitrous oxide (SC-$N_2O$), collectively referred to as the "social cost of greenhouse gases" (SC-GHG). These estimates reflect recent advances in the scientific literature on climate change and its economic impacts and incorporate recommendations made by the National Academies of Science, Engineering, and Medicine (National Academies 2017). The SC-GHG allows analysts to incorporate the net social benefits of reducing emissions of greenhouse gases (GHG), or the net social costs of increasing GHG emissions, in benefit-cost analysis and, when appropriate, in decision-making and other contexts. The SC-GHG is the monetary value of the net harm to society from emitting a metric ton of that GHG into the atmosphere in a given year. In principle, the SC-GHG is a comprehensive metric that includes the value of all future climate change impacts (both negative and positive), including changes in net agricultural productivity, human health effects, property damage from increased flood risk, changes in the frequency and severity of natural disasters, disruption of energy systems, risk of conflict, environmental migration, and the value of ecosystem services. The SC-GHG, therefore, also reflects the societal net benefit of reducing emissions of the GHG by a metric ton. The SC-GHG is the theoretically appropriate value to use when conducting benefit-cost analyses of policies that affect GHG emissions. In practice, data and modeling limitations restrain the ability of SC-GHG estimates to include all physical, ecological, and economic impacts of climate change, implicitly assigning a value of zero to the omitted climate damages. The estimates are, therefore, a partial accounting of climate change impacts and likely underestimate the marginal benefits of abatement.

Since 2008, the EPA has used estimates of the SC-GHG in analyses of actions that affect GHG emissions. The values used by the EPA from 2009 to 2016, and since 2021, have been consistent with those developed and recommended by the Interagency Working Group on the SC-GHG (IWG), and the values used from 2017-2020 were consistent with those required by Executive Order (E.O.) 13783. During that time, the National Academies conducted a comprehensive review of the SC-$CO_2$ and issued a final report in 2017 recommending specific criteria for future updates to the SC-$CO_2$ estimates, a modeling framework to satisfy the specified criteria, and both near-term updates and longer-term research needs pertaining to various components of the estimation process. The IWG was reconstituted in 2021 and E.O. 13990 directed it to develop a comprehensive update of its SC-GHG estimates, recommendations regarding areas of decision-making to which SC-GHG should be applied, and a standardized review and updating process to ensure that the recommended estimates continue to be based on the best available economics and science going forward.

The EPA is a member of the IWG and is participating in the IWG's work under E.O. 13990. While that process continues, this EPA report presents a set of SC-GHG estimates that incorporates numerous methodological updates that address the near-term recommendations of the National Academies. The report takes a modular approach. The methodology underlying each of the four components, or modules, of the SC-GHG estimation process – socioeconomics and emissions, climate, damages, and discounting – is developed by drawing on the latest research and expertise from the scientific disciplines relevant to that component. The socioeconomic and emissions module relies on a new set of probabilistic projections for population, income, and GHG emissions developed under the Resources for the Future (RFF) Social Cost of Carbon Initiative (Rennert et al. 2022a). The climate module relies on the Finite Amplitude Impulse

Response (FaIR) model (Millar et al. 2017; Smith et al. 2018, IPCC 2021b), a widely used Earth system model recommended by the National Academies, which captures the relationships between GHG emissions, atmospheric GHG concentrations, and global mean surface temperature. The socioeconomic projections and outputs of the climate module are inputs into the damage module to estimate monetized future damages from climate change. Based on a review of available studies and approaches to damage function estimation, the report uses three separate damage functions to form the damage module. They are:

1. a subnational-scale, sectoral damage function (based on the Data-driven Spatial Climate Impact Model (DSCIM) developed by the Climate Impact Lab (CIL 2023, Carleton et al. 2022, Rode et al. 2021)),
2. a country-scale, sectoral damage function (based on the Greenhouse Gas Impact Value Estimator (GIVE) model developed under RFF's Social Cost of Carbon Initiative (Rennert et al. 2022b)), and
3. a meta-analysis-based damage function (based on Howard and Sterner (2017)).

The discounting module discounts the stream of future net climate damages back to the year of emissions using a set of dynamic discount rates that have been calibrated following the Newell et al. (2022) approach, as applied in Rennert et al. (2022a, 2022b). This approach uses the Ramsey (1928) discounting formula in which the parameters are calibrated such that (1) the decline in the certainty-equivalent discount rate matches the latest empirical evidence on interest rate uncertainty estimated by Bauer and Rudebusch (2020, 2023) and (2) the average of the certainty-equivalent discount rate over the first decade matches a near-term consumption rate of interest. Uncertainty in the starting rate is addressed by using three near-term target rates (1.5%, 2.0%, and 2.5%) based on multiple lines of evidence on observed real market interest rates. This approach results in dynamic discount rate paths and is consistent with the National Academies (2017) recommendation to use three sets of Ramsey parameters that reflect a range of near-term certainty-equivalent discount rates and are consistent with theory and empirical evidence on consumption rate uncertainty. Finally, the value of aversion to risk associated with net damages from GHG emissions is explicitly incorporated into the modeling framework following the economic literature.

Taken together, the methodologies adopted in this report allow for a more holistic treatment of uncertainty than in past estimates by the EPA. The updates incorporate a quantitative consideration of uncertainty into all modules and use a Monte Carlo approach that captures the compounding uncertainties across modules. The estimation process generates nine separate distributions of discounted marginal damages per metric ton – the product of using three damage modules and three near-term target discount rates – for each gas in each emissions year. These distributions have long right tails reflecting the extensive evidence in the scientific and economic literature that shows the potential for lower-probability but higher-impact outcomes from climate change, which would be particularly harmful to society. The uncertainty grows over the modeled time horizon. Therefore, under cases with a lower near-term target discount rate – that give relatively more weight to impacts in the future – the distribution of results is wider. To produce a range of estimates that reflects the uncertainty in the estimation exercise while also providing a manageable number of estimates for policy analysis, this report combines the multiple lines of evidence on damage modules by averaging the results across the three damage module specifications. Table ES.1 summarizes the averaged certainty-equivalent SC-GHG estimates that can be used to value GHG emissions changes in benefit-cost analysis. The table presents the SC-$CO_2$, SC-$CH_4$, and SC-$N_2O$ estimates under each near-term discount rate for emissions years 2020 through 2080.

The methodological updates implemented in this report represent a major step forward in bringing SC-GHG estimates closer to the frontier of climate science and economics and address near-term updating recommendations from the National Academies' (2017). Nevertheless, the SC-GHG estimates presented in this report still have several limitations, as would be expected for any modeling exercise that covers such a broad scope of scientific and economic issues across a complex global landscape. There are still many categories of climate impacts and associated damages that are only partially—or not at all—reflected in these estimates and sources of uncertainty that have not been fully characterized due to data and modeling limitations. For example, the modeling in this report omits most of the consequences of changes in precipitation, damages from extreme weather events, the potential for nongradual damages from passing critical thresholds (e.g., tipping elements) in natural or socioeconomic systems, and non-climate mediated effects of GHG emissions other than $CO_2$ fertilization (e.g., ocean acidification due to $CO_2$ emissions, tropospheric ozone formation due to $CH_4$ emissions). Importantly, this update does not yet reflect interaction effects and feedback effects within, and across, natural and human systems. For example, it does not explicitly reflect potential interactions among damage categories, such as those stemming from the interdependencies of energy, water, and land use. These interactions and feedbacks, and others, were highlighted by the National Academies as an important area of future research for longer-term enhancements in the SC-GHG estimation framework.

Given both the methodological choices and the modeling limitations, primarily the numerous categories of damages that are currently unrepresented, the resulting SC-GHG estimates presented in this report likely underestimate the marginal damages from GHG pollution. The EPA will continue to review developments in the literature, including more robust methodologies for estimating the magnitude of the various direct and indirect damages from GHG emissions, and look for opportunities to further improve SC-GHG estimation going forward.

To ensure that the methodological updates adopted in this report are consistent with economic theory and reflect the latest science, the EPA initiated an external peer review panel to conduct a high-quality technical review, completed in May 2023. The peer reviewers commended the agency on its development of this update, calling it a much-needed improvement in estimating the SC-GHG and a significant step towards addressing the National Academies' recommendations with defensible modeling choices based on current science. The peer reviewers provided numerous recommendations for refining the presentation and for future modeling improvements, especially with respect to climate change impacts and associated damages that are not currently included in the analysis. Additional discussion of omitted impacts and other updates have been incorporated to address peer reviewer recommendations. Complete information about the external peer review, including the peer reviewer selection process, the final report with individual recommendations from peer reviewers, and the EPA's response to each recommendation is available at: https://www.epa.gov/environmental-economics/scghg-tsd-peer-review.[1]

[1] In addition, the EPA solicited public comment on the use of the updated SC-GHG estimates and the external review draft of this report in the docket for EPA's December 2022 Supplemental Notice of Proposed Rulemaking, "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil

*Table ES.1: Estimates of the Social Cost of Greenhouse Gases (SC-GHG), 2020-2080 (2020 dollars)*

| | SC-GHG and Near-term Ramsey Discount Rate | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | $SC\text{-}CO_2$ *(2020 dollars per metric ton of $CO_2$)* | | | $SC\text{-}CH_4$ *(2020 dollars per metric ton of $CH_4$)* | | | $SC\text{-}N_2O$ *(2020 dollars per metric ton of $N_2O$)* | | |
| Emission | Near-term rate | | | Near-term rate | | | Near-term rate | | |
| Year | 2.5% | 2.0% | 1.5% | 2.5% | 2.0% | 1.5% | 2.5% | 2.0% | 1.5% |
| 2020 | 120 | 190 | 340 | 1,300 | 1,600 | 2,300 | 35,000 | 54,000 | 87,000 |
| 2030 | 140 | 230 | 380 | 1,900 | 2,400 | 3,200 | 45,000 | 66,000 | 100,000 |
| 2040 | 170 | 270 | 430 | 2,700 | 3,300 | 4,200 | 55,000 | 79,000 | 120,000 |
| 2050 | 200 | 310 | 480 | 3,500 | 4,200 | 5,300 | 66,000 | 93,000 | 140,000 |
| 2060 | 230 | 350 | 530 | 4,300 | 5,100 | 6,300 | 76,000 | 110,000 | 150,000 |
| 2070 | 260 | 380 | 570 | 5,000 | 5,900 | 7,200 | 85,000 | 120,000 | 170,000 |
| 2080 | 280 | 410 | 600 | 5,800 | 6,800 | 8,200 | 95,000 | 130,000 | 180,000 |

*Values of $SC\text{-}CO_2$, $SC\text{-}CH_4$, and $SC\text{-}N_2O$ are rounded to two significant figures. The annual unrounded estimates are available in Appendix A.5 and at: https://www.epa.gov/environmental-economics/scghg.*

and Natural Gas Sector Climate Review." All the public comments and EPA's responses to the comments are available in the rule docket at: https://www.regulations.gov/docket/EPA-HQ-OAR-2021-0317.

# 1 Background

A robust and scientifically founded assessment of the positive and negative impacts that an action can be expected to have on society facilitates evidence-based policy making. Estimates of the social cost of carbon (SC-$CO_2$), social cost of methane (SC-$CH_4$), and social cost of nitrous oxide (SC-$N_2O$) allow analysts to incorporate the net social benefits of reducing emissions of each of these greenhouse gases, or the net social costs of increasing such emissions, in benefit-cost analysis, and when appropriate, in decision making and other contexts.[2] Collectively, these values are referred to as the "social cost of greenhouse gases" (SC-GHG) in this document. The SC-GHG is the monetary value of the future stream of net damages associated with adding one ton of that GHG to the atmosphere in a given year. The SC-GHG, therefore, also reflects the societal net benefit of reducing emissions of the gas by one ton. The social benefits of abatement are an aggregated measure of the affected individuals' willingness to pay to avoid those damages. The SC-GHG is the marginal social benefit of GHG abatement and is, therefore, the theoretically appropriate value to use when conducting benefit-cost analyses of policies that affect GHG emissions.[3] The marginal social cost will differ by the type of GHG (such as $CO_2$, $CH_4$, and $N_2O$)[4] and by the year in which the emissions change occurs.

In principle, the SC-GHG is a comprehensive metric that includes the value of all climate change impacts (both negative and positive), including (but not limited to) changes in net agricultural productivity, human health effects, property damage from increased flood risk, changes in the frequency and severity of natural disasters, disruption of energy systems, risk of conflict, environmental migration, and the value of ecosystem services. In practice, because of data and modeling limitations, which prevent full representation of harmful climate impacts, estimates of the SC-GHG--including the updated values presented in this report--are a partial accounting of climate change impacts and, as such, lead to underestimates of the marginal benefits of abatement.

---

[2] Note, for example, that EPA has recommended use of SC-GHG estimates in environmental impact statements under NEPA when appropriate. See, e.g., Letter from EPA to USPS, on the Final Environmental Impact Statement for Next Generation Delivery Vehicle Acquisitions, Feb. 2, 2022.

[3] These estimates of social damages should not be confused with the estimated costs of attaining a predetermined emissions or warming limit. Specifically, there is another strand of research that investigates the costs of setting a specific climate target (e.g., capping emissions or temperature increases to a certain level). The expected marginal cost of GHG abatement associated with meeting a specific climate target can be useful in evaluating policy cost-effectiveness but is not an alternative way to value damages from GHG emissions in benefit-cost analysis. For more on how these concepts (e.g., a predetermined target-based approach and a damage (SC-GHG) based approach) can be used when designing climate policy and in policy evaluation, see, for example, Hänsel et al. (2020); Stern et al. (2022); Aldy et al. (2021); and Gundlach and Livermore (2022).

[4] SC-GHG estimates are gas specific because one metric ton of $CO_2$, $CH_4$, $N_2O$, or other GHG differ in the temporal pathway of their impact on society, through both climate mediated effects of emissions (temperature, sea level rise, etc.) and non-climate mediated effects of emissions (e.g., carbon fertilization effects and ocean acidification due to $CO_2$ emissions, tropospheric ozone formation due to $CH_4$ emissions). See Marten and Newbold (2012), Waldhoff et al. (2014), and IWG (2016b) for more discussion.

## 1.1 Overview of SC-GHG Estimates Used in EPA Analyses to Date

The academic literature has published estimates of the social cost of carbon and other GHGs since at least the early 1990s. As early as 2002 researchers began conducting reviews that combined lines of evidence across early SC-$CO_2$ estimates (Clarkson and Deyes 2002). The EPA began regularly incorporating SC-$CO_2$ estimates in regulatory impact analyses following a 2008 court ruling in which an agency was ordered to consider the SC-$CO_2$ in the rulemaking process. Specifically, the U.S. Ninth Circuit Court of Appeals remanded a fuel economy rule to the Department of Transportation for failing to consider the value of reducing $CO_2$ emissions when determining the appropriate level of the fuel economy standard, stating that "while the record shows that there is a range of values, the value of carbon emissions reduction is certainly not zero."[5] The SC-$CO_2$ estimates initially presented in EPA analyses in 2008 and early 2009 were derived from the academic literature.[6]

Beginning in September 2009, EPA's regulatory impact analyses applied SC-$CO_2$ estimates that were developed through a U.S. Government interagency working group (IWG) process. The IWG was launched in early 2009, under the leadership of the Office of Management and Budget (OMB) and the Council of Economic Advisers (CEA), to ensure that Federal agencies had access to the best available information when quantifying the benefits of reducing $CO_2$ emissions in benefit-cost analyses. The IWG included technical experts from the EPA and other federal agencies. The IWG first developed an interim set of SC-$CO_2$ estimates based on an average of estimates published in the peer reviewed academic literature.[7] The EPA chose to use these interim estimates in multiple regulatory impact analyses and sought public comments to inform the estimates for future use.[8] In 2010, the IWG published a Technical Support Document (TSD) with a set of four updated SC-$CO_2$ estimates recommended for use in regulatory analyses in addition to guidance on using the estimates (IWG 2010). Three of these values were based on the average SC-$CO_2$ from three widely cited integrated assessment models (IAMs) in the peer-reviewed literature – DICE, PAGE, and FUND[9] – at constant discount rates of 2.5%, 3%, and 5%. The fourth value

---

[5] *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1200 (9th Cir. 2008).

[6] For more information, see "Technical Support Document on Benefits of Reducing GHG Emissions" (https://www.regulations.gov/document/EPA-HQ-OAR-2008-0318-0078), prepared for EPA's July 2008 Advanced Notice of Proposed Rulemaking for Regulating Greenhouse Gas Emissions Under the Clean Air Act, and EPA's May 2009 Regulatory Impact Analysis for the Renewable Fuel Standard Program (RFS2) Proposed Rule (EPA 2008).

[7] The IWG used a meta-analysis of SC-$CO_2$ estimates (Tol 2008) as the starting point for the development of the interim estimates recommended in 2009. With that starting point, the IWG filtered the existing SC-$CO_2$ estimates in the meta-analysis by using those that (1) were derived from peer-reviewed studies; (2) did not weight the monetized damages to one country more than those in other countries (i.e., no equity weighting); (3) used a "business as usual" climate scenario; and (4) were based on the most recent published version of each of the three major integrated assessment models (IAMs): FUND, PAGE, and DICE. See EPA and DOT (2009) for more discussion of how the filtered estimates were combined to form a set of five recommended interim values.

[8] See, for example, EPA and DOT's joint September 2009 Proposed Rulemaking to Establish Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards (EPA and DOT 2009).

[9] The DICE (Dynamic Integrated Climate and Economy) model by William Nordhaus evolved from a series of energy models and was first presented in 1990 (Nordhaus and Boyer 2000, Nordhaus 2008). The PAGE (Policy Analysis of the Greenhouse Effect) model was developed by Chris Hope in 1991 for use by European decision-makers in

was included to represent the potential for lower-probability, higher-impact outcomes from climate change, that would be particularly harmful to society and thus relevant to the public and policymakers. For this purpose, it selected the SC-$CO_2$ value for the 95th percentile at a 3% discount rate. Absent formal inclusion of risk aversion in the modeling, considering values above the mean in a right skewed distribution with long tails acknowledges society's preference for avoiding risk.

The EPA chose to update the set of SC-$CO_2$ estimates used in regulatory analyses following a May 2013 update of the IWG SC-$CO_2$ estimates (IWG 2013). The 2013 IWG SC-$CO_2$ update incorporated new versions of the IAMs used in the peer-reviewed literature but did not revisit other IWG modeling decisions (i.e., the discount rates or harmonized inputs for socioeconomic and emission scenarios and equilibrium climate sensitivity). Improvements in the way damages are modeled were confined to those that had been incorporated into the latest versions of the models by the developers themselves in the peer-reviewed literature.[10]

In June 2015, the EPA began using estimates of SC-$CH_4$ and SC-$N_2O$ from Marten et al. (2015), which were consistent with the methodology underlying the IWG's estimates of the SC-$CO_2$ estimates. The Marten et al. estimates were first applied in sensitivity analyses in regulatory impact analyses of proposed rulemakings with $CH_4$ and $N_2O$ emission impacts.[11] Following the completion of an external peer review of the application of these estimates to federal regulatory analysis, the estimates were used in the main analysis of other proposed rulemakings with $CH_4$ emissions impacts (EPA 2015a, 2015b).[12] In August 2016, the Marten et al. SC-$CH_4$ and SC-$N_2O$ estimates were adopted by the IWG in an addendum to the IWG's TSD (IWG 2016a, 2016b).[13] The IWG recommended these estimates as a method for improving the analyses of regulatory actions that are projected to influence $CH_4$ or $N_2O$ emissions in a manner consistent with how $CO_2$ emission changes were being valued.

Over the course of developing and updating the SC-GHG estimates that have been used in EPA analyses, there were extensive opportunities for public input on the estimates and underlying methodologies. There

---

assessing the marginal impact of carbon emissions (Hope 2006, Hope 2008). The FUND (Climate Framework for Uncertainty, Negotiation, and Distribution) model, developed by Richard Tol in the early 1990s, was originally used to study international capital transfers in climate policy and was subsequently widely used to study climate impacts (e.g., Tol 2002a, Tol 2002b, Anthoff et al. 2009, Tol 2009).

[10] The IWG subsequently provided additional minor technical revisions in November of 2013 and July of 2015, as explained in Appendix B of the 2016 TSD (IWG 2016a).

[11] The SC-$CH_4$ and SC-$N_2O$ estimates were first used in sensitivity analysis for the Proposed Rulemaking for Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles–Phase 2 (EPA and DOT 2015).

[12] For a discussion of public comments received on the valuation of non-$CO_2$ GHG impacts in general and the use of the Marten et al. (2015) estimates, see, e.g., EPA (2012a, 2012b, 2016a, 2016b), EPA and DOT (2016).

[13] In 2021, the EPA developed analogous estimates of the social cost of hydrofluorocarbons (SC-HFCs) that are consistent with the methodology underlying the SC-$CO_2$, SC-$CH_4$, and SC-$N_2O$ estimates. See, for example, EPA's final Regulatory Impact Analysis for Phasing Down Production and Consumption of Hydrofluorocarbons (HFCs) for more information (EPA 2021a). Similarly, Tan et al. (2023) provides a thorough documentation of the estimation as developed in EPA (2021a), in addition to presenting estimates of the SC-HFCs using an updated version of the GIVE framework.

was a public comment process associated with each proposed EPA rulemaking that used the estimates, and OMB initiated a separate comment process on the IWG TSD in 2013. Commenters offered a wide range of perspectives on all aspects of the process, methodology, and final estimates, and submitted diverse suggestions for improvements. The U.S. Government Accountability Office (GAO) reviewed the development of the IWG SC-$CO_2$ estimates and concluded that the IWG processes and methods reflected three principles: consensus-based decision making, reliance on existing academic literature and models, and disclosure of limitations and incorporation of new information (GAO 2014).

In 2015, as part of the IWG response to the public comments received in the 2013 solicitation, the IWG announced a National Academies review of the IWG estimates (IWG 2015). Specifically, the IWG asked the National Academies to conduct a multi-discipline, two-phase assessment of the IWG estimates and offer advice on approaching future updates to ensure that the estimates continue to reflect the best available science and methodologies. The National Academies' interim (Phase 1) report (National Academies 2016a) recommended against a near-term update of the SC-$CO_2$ estimates within the existing modeling framework. For future revisions, the National Academies recommended a broader update of the climate system module consistent with the most recent, best available science and offered recommendations for how to enhance the discussion and presentation of uncertainty in the SC-$CO_2$ estimates. In addition to publishing estimates of SC-$CH_4$ and SC-$N_2O$, the IWG's 2016 TSD revision responded to the National Academies' Phase 1 report recommendations regarding the presentation of uncertainty. The revisions included: an expanded presentation of the SC-GHG estimates that highlights a symmetric range of uncertainty around estimates for each discount rate; new sections that provide a unified discussion of the methodology used to incorporate sources of uncertainty; a detailed explanation of the uncertain parameters in the FUND and PAGE models; and making the full set of SC-$CO_2$ estimates easily accessible to the public on OMB's website.

In January 2017, the National Academies released their final report, *Valuing Climate Damages: Updating Estimation of the Social Cost of Carbon Dioxide* and recommended specific criteria for future updates to the SC-$CO_2$ estimates, a modeling framework to satisfy the specified criteria, and both near-term updates and longer-term research needs pertaining to various components of the estimation process (National Academies 2017). A description of the National Academies' recommendations for near-term updates is provided in Section 1.2 below. Shortly thereafter, in March 2017, President Trump issued E.O. 13783, which called for the rescission and review of several climate-related Presidential and regulatory actions as well as for a review of the SC-GHG estimates used for regulatory impact analyses. Further, E.O. 13783 disbanded the IWG, withdrew the previous TSDs, and directed agencies to "ensure" SC-GHG estimates used in regulatory analyses "are consistent with the guidance contained in OMB Circular A-4", "including with respect to the consideration of domestic versus international impacts and the consideration of appropriate discount rates" (E.O. 13783, Section 5(c)). The EPA's benefit-cost analyses following E.O. 13783 used SC-GHG estimates that attempted to focus on the specific share of physical climate change impacts occurring in the U.S. as captured by then-available models (which did not reflect many pathways by which climate impacts affect the welfare of U.S. citizens and residents) and were calculated using two default discount rates recommended by OMB Circular A-4 (2003), 3% and 7%. The EPA's regulatory analyses under E.O. 13783 included sensitivity analyses based on global SC-GHG values and using a lower

discount rate of 2.5%.[14] All other methodological decisions and model versions used in SC-GHG calculations under E.O. 13783 remained the same as those used by the IWG in 2010 and 2013, respectively.

On January 20, 2021, President Biden issued E.O. 13990 which re-established an IWG and directed the group to develop an update of the SC-GHG estimates that reflect the best available science and the recommendations of the National Academies (2017). In February 2021, the IWG recommended the interim use of the most recent SC-GHG estimates developed by the IWG prior to the group being disbanded in 2017, adjusted for inflation (IWG 2021). As discussed in the February 2021 TSD, the IWG concluded that these interim estimates reflected the immediate need to have SC-GHG estimates available for agencies to use in regulatory benefit-cost analyses and other applications that were developed using a transparent process, peer reviewed methodologies, and the science available at the time of that process. The February 2021 update also recognized the limitations of the interim estimates and encouraged agencies to use their best judgment in, for example, considering sensitivity analyses using lower discount rates. The IWG published a Federal Register notice on May 7, 2021, soliciting comment on the February 2021 TSD and on how best to incorporate the latest peer-reviewed scientific literature in order to develop an updated set of SC-GHG estimates. The EPA applied the IWG's interim SC-GHG estimates in analyses published following the release of the February 2021 TSD (see, e.g., EPA (2021b, 2021c)).

[14]OMB Circular A-4 (2003) recognizes that special considerations arise when applying discount rates if intergenerational effects are important. In the IWG's 2015 *Response to Comments*, OMB—as a co-chair of the IWG—made clear that "Circular A-4 is a living document," that "the use of 7% is not considered appropriate for intergenerational discounting," and that "[t]here is wide support for this view in the academic literature, and it is recognized in Circular A-4 itself." OMB, as part of the IWG, similarly repeatedly confirmed that "a focus on global SCC estimates in [regulatory impact analyses] is appropriate" (IWG 2015). See Sections 1.3 and 2.3 for further discussion on both issues. In 2023, OMB revised Circular A-4, after the publication of the draft version of this report. Circular A-4 (2023) likewise recognizes that special considerations arise when applying discount rates intergenerationally, including that uncertainty in the future path of the discount rate suggest a focus on lower rates.

To ensure that the methodological updates adopted in this report are consistent with economic theory and reflect the latest science, the EPA initiated an external peer review panel to conduct a high-quality technical review, completed in May 2023. The peer reviewers commended the agency on its development of this update, calling it a much-needed improvement in estimating the SC-GHG and a significant step towards addressing the National Academies' recommendations with defensible modeling choices based on current science.[15] The peer reviewers provided numerous recommendations for refining the presentation and for future modeling improvements, especially with respect to climate change impacts, feedbacks, and associated damages that are not currently included in the analysis. Additional discussion of omitted impacts and other updates have been incorporated to address peer reviewer recommendations. Complete information about the external peer review, including the peer reviewer selection process, the final report with individual recommendations from peer reviewers, and the EPA's response to each recommendation is available at: https://www.epa.gov/environmental-economics/scghg-tsd-peer-review.[16]

---

[15] Examples of supportive statements from each of the seven peer reviewers included:

• The report "*represents a huge advance in estimating the US Social Cost of Carbon (SCC). The estimates reported have successfully incorporated all of the short-term recommendations of the National Research Council (NRC) Committee on Valuing Climate Damages, and some of the longer-term recommendations. The report represents the state-of-the-art in executing the four steps of SCC calculation: (1) calculating probability distributions over future paths of population, GDP and emissions; (2) translating future emissions into future climate impacts; (3) estimating net damages associated with changes in climate; (4) discounting future damages to the present*."

• "*The approach taken to generate SC-GHG estimates is well-designed and executed and the document is well-written and easy to follow, although missing key details (as I describe below in my detailed comments)*."

• "*The update…is a significant step towards addressing the National Academies report in 2017 and continuing to improve the ability to assess the impact on the United States*."

• The document *"provides the basis for both an improved estimate to be used in rulemaking in the near term, as well as providing the core foundation for continuing refinements and improvements in the future….The overall structure of the report is clear and the development of the modular approach as recommended by NASEM is well articulated. By establishing a modular platform, the Agency is well positioned to both improve the current set of estimates and allow for updates over time as the scientific and economic basis for the estimates evolve and improve*."

• "*The document…is, as far as this reader can discern, accurate in its representation of the current literature. The presentation is exceptionally clear and would be accessible to a knowledgeable non-expert working in the climate policy domain. The document's conclusions are sound within the self-constrained scope of its analysis*."

• "*It should be noted that several* [public] *comments were very complimentary for the work EPA had conducted…I concur – EPA is advancing our state of knowledge. There are specific suggestions for improvements I will discuss in more detail below, but I believe the proposed rule is an important step forward*."

• The Report "*represents a real step change in the formal calculation of the U.S. Social Cost of Carbon (SC-CO2), not least because of its explicit calculation of the Social Cost of Methane (SC-CH4) and Nitrous Oxide (SC-N2O). It is generally well-written, technically sound, responsive to a host of comments and inputs (e.g., National Academy of Sciences 2017; Carleton and Greenstone 2021; Wagner et al. 2021) since the prior updates under the Obama administration…and generally represents well the emerging consensus in the literature (e.g., Moore et al. 2023)*."

[16] In addition, the EPA solicited public comment on the use of the updated SC-GHG estimates and the external review draft of this report in the docket for EPA's December 2022 Supplemental Notice of Proposed Rulemaking, "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review." All the public comments and EPA's responses to the comments are available in the rule docket at: https://www.regulations.gov/docket/EPA-HQ-OAR-2021-0317.

## 1.2 Recommendations from the National Academies of Sciences, Engineering, and Medicine

As previously mentioned, in 2015, the IWG requested that the National Academies review and recommend potential approaches for improving its SC-$CO_2$ estimation methodology. In response, the National Academies convened a multidisciplinary committee, called the Committee on Assessing Approaches to Updating the Social Cost of Carbon. In addition to evaluating the IWG's overall approach to SC-$CO_2$ estimation, the committee reviewed its choices of IAMs and damage functions, climate science assumptions, future baseline socioeconomic and emission projections, presentation of uncertainty, and discount rates.

In its final report (National Academies 2017), the National Academies committee recommended that the IWG pursue an integrated modular approach to the key components of SC-$CO_2$ estimation to allow for independent updating and review and to draw more readily on expertise from the wide range of scientific disciplines relevant to SC-$CO_2$ estimation. Under this approach, each step in SC-$CO_2$ estimation is developed as a module—socioeconomic projections, climate science, economic damages, and discounting—that reflects the state of scientific knowledge in the current peer-reviewed literature. In the longer term, it recommended that the IWG communicate research needs and priorities to its member agencies to stimulate research on ways to improve accounting of interactions and feedbacks between these components. In addition, the committee noted that, while the IWG harmonized key inputs across three IAMs, shifting to the use of a single climate module in the nearer-term (2-3 years) and eventually transitioning to a single framework for all modules will enhance transparency, improve consistency with the underlying science, and allow for more explicit representation of uncertainty. It recommended these three criteria also be used to judge the value of other updates to the methodology. It also recommended that the IWG update SC-$CO_2$ estimates at regular intervals, suggesting a five-year cycle.

Regarding the key components of the SC-$CO_2$, the committee recommended the following improvements:

> ***Socioeconomic and emissions projections:*** Use accepted statistical methods and elicit expert judgment to project probability distributions of future annual growth rates of per-capita gross domestic product (GDP) and population, bearing in mind the potential correlation between economic and population projections. Use expert elicitation, guided by information on historical trends and emissions consistent with different climate outcomes, to project emissions for each forcing agent of interest, conditional on population and income scenarios. Additional recommendations were offered pertaining to the time horizon, inclusion of future policies, disaggregation of scenarios, and feedbacks from the damage module to the socioeconomic module.
>
> ***Climate science:*** Adopt or develop a simple Earth system model (such as the Finite Amplitude Impulse Response (FaIR) model) to capture the relationships between $CO_2$ emissions, atmospheric $CO_2$ concentrations, and global mean surface temperature change over time while accounting for non-$CO_2$ forcing and allowing for the evaluation of uncertainty. Adopt or develop a sea level rise component in the climate module that: (1) accounts for uncertainty in the translation of global mean temperature to global mean sea level rise and (2) is consistent with sea level rise projections available in the literature for similar forcing and temperature pathways. The committee also

noted the importance of generating spatially and temporally disaggregated climate information as inputs into damage estimation. It recommended the use of linear pattern scaling (which estimates linear relationships between global mean temperature and local climate variables) to achieve this goal in the near-term.

***Economic damages:*** Improve and update existing formulations of individual sectoral damage functions as feasible; characterize damage function calibrations quantitatively and transparently; present a summary of disaggregated (incremental and total) damage projections and discuss how they scale with temperature, income, and population; and recognize any correlations between formulations when multiple damage functions are used.

***Discounting:*** Account for the relationship between economic growth and discounting; explicitly recognize uncertainty surrounding discount rates over long time horizons using a Ramsey-like approach; select parameters to implement this approach that are consistent with theory and evidence to produce certainty-equivalent discount rates consistent with near-term consumption rates of interest; use three sets of Ramsey parameters to generate a low, central, and high certainty-equivalent near-term discount rate, and three means and ranges of SC-$CO_2$ estimates; discuss how the SC-$CO_2$ estimates should be combined with other cost and benefit estimates that may use different discount rates in regulatory analysis.

Additional details on the National Academies' near-term recommendations are provided in Section 2 below. The National Academies' final report also provided longer-term recommendations pertaining to each module and identified research priorities for addressing these recommendations.

In focusing on the four categories above, the National Academies left various topics for future research. For example, the report pointed to future research that might enable more robust methods of capturing the benefits of reducing climate risks. While the National Academies report did not explicitly address methods to account for the disproportionate climate damages that may accrue to lower-income individuals in SC-GHG estimates, it did outline ways to present evidence on the possible distributional effects of climate change. The National Academies point to the importance of presenting spatially disaggregated results that could, in turn, enable methods that would better identify vulnerable populations and those most at risk. Additional discussion of these dimensions can be found in Section 3.3 of this report.

## 1.3 Accounting for Global Damages

Benefit-cost analyses of U.S. Federal regulations have traditionally focused on the benefits and costs that accrue to individuals that reside within the country's national boundaries and that accrue to regulated industries, regardless of the nationality of the owners of affected physical assets.[17] This approach reflects the fact that for most regulations, those are the two groups primarily affected. It does not reflect any other scientific, legal, or other rationale. The default recommendation in OMB's Circular A-4 (2003) is that, an "analysis should focus on benefits and costs that accrue to citizens and residents of the United

[17] It is customary in the benefit-cost analyses of U.S. Federal regulations to include the full compliance costs that accrue to entities operating in the U.S., even if those costs are fully or partially borne by owners, employees, or consumers that reside outside of the U.S.

States."[18] However, OMB Circular A-4 (2003) states that when a regulation is likely to have international effects, "these effects should be reported"; and though the guidance recommends this be done separately, the guidance also explains that "[d]ifferent regulations may call for different emphases in the analysis, depending on the nature and complexity of the regulatory issues."[19] The National Academies advised that "[i]t is important to consider what constitutes a domestic impact in the case of a global pollutant that could have international implications that affect the United States" (National Academies 2017, p. 13). There are many reasons, as summarized in this section – and as articulated by OMB and in IWG assessments (IWG 2010, 2013, 2016a, 2016b, 2021) and the 2015 Response to Comments (IWG 2015) – why the EPA uses the global value of climate change impacts when analyzing policies that affect GHG emissions. Courts have upheld the use of global estimates of the SC-GHG, partially in recognition of the diverse ways in which U.S. interests, businesses, and residents are impacted by global climate change.[20]

---

[18] OMB's Circular A-4 (2003) provides guidance to Federal agencies on the development of regulatory analysis conducted pursuant to Executive Order (E.O.) 12866. Circular A-4 (2023) notes similarly that "In many circumstances, your primary analysis should focus on the effects of a regulation that are experienced by citizens and residents of the United States (which will often be the primary effects of the regulation)" (OMB 2023).

[19] Circular A-4 (2003) also explains "You will find that you cannot conduct a good regulatory analysis according to a formula. Conducting high-quality analysis requires competent professional judgement." For example, as noted above, benefit-cost analyses have historically often included compliance costs that are ultimately borne by owners, employees, or customers that reside outside of the U.S. It may therefore also be relevant that Circular A-4 generally recommends consistency in the analytical treatment of costs and benefits. ("The same standards of information and analysis quality that apply to direct benefits and costs should be applied to ancillary benefits and countervailing risks" (OMB 2003).) Circular A-4 (2023) states that "In certain contexts, it may be particularly appropriate to include effects experienced by noncitizens residing abroad in your primary analysis. Such contexts include, for example, when:

- assessing effects on noncitizens residing abroad provides a useful proxy for effects on U.S. citizens and residents that are difficult to otherwise estimate;
- assessing effects on noncitizens residing abroad provides a useful proxy for effects on U.S. national interests that are not otherwise fully captured by effects experienced by particular U.S. citizens and residents (e.g., national security interests, diplomatic interests, etc.);
- regulating an externality on the basis of its global effects supports a cooperative international approach to the regulation of the externality by potentially inducing other countries to follow suit or maintain existing efforts; or
- international or domestic legal obligations require or support a global calculation of regulatory effects"

(OMB 2023). As noted in Circular A-4 (2023), "OMB determined in 2021, in its role as a co-chair of the Interagency Working Group on the Social Cost of Greenhouse Gases (IWG), that the effects of changes in greenhouse gas emissions experienced by U.S. citizens and residents could not be separated from the global effects of changes in greenhouse gas emissions in a practical or reasonably accurate manner. At the time, OMB and the IWG noted available models could produce only an unreasonably incomplete underestimate of damages accruing to U.S. citizens and residents. OMB and the IWG recommended use of the IWG's global estimates of damages because—among other reasons—regulating greenhouse gas emissions on the basis of their global effects supports a cooperative international approach to the regulation of greenhouse gas emissions by potentially inducing other countries to follow suit or maintain existing efforts, and the global estimates were a useful proxy for effects on U.S. citizens and residents that were difficult to estimate and for effects on U.S. national interests that were not otherwise fully captured" (OMB 2023).

[20] Zero Zone, Inc. v. Dep't of Energy, 832 F.3d 654, 678-79 (7th Cir. 2016) (rejecting a petitioner's challenge to DOE's use of a global social cost of carbon in setting an efficiency standard under the Energy Policy and Conservation Act,

Unlike many environmental problems where the causes and impacts are distributed more locally, GHG emissions are a global externality making climate change a true global challenge. GHG emissions contribute to damages around the world regardless of where they are emitted. The global nature of GHG pollution and its impacts means that U.S. interests are affected by climate change impacts through a multitude of pathways, and these need to be considered when evaluating the benefits of GHG mitigation to the U.S. population. For example, climate change will directly impact U.S. interests that are located abroad (such as U.S. citizens, investments, military bases and other assets, and resources in the global commons (e.g., through changes in fisheries' productivity and location)). An estimated 9 million U.S. citizens lived abroad as of 2020 (DOS 2020), and the U.S. direct investment abroad position totaled $6.15 trillion at the end of 2020 (BEA 2021). U.S. taxpayers report a substantial amount of income coming from foreign sources,[21] and nearly 40% of U.S. pension assets' equity holdings are in foreign stocks (TAI 2022). Climate impacts occurring outside of U.S. borders have a direct impact on these U.S. citizens and the investment returns on those assets owned by U.S. citizens and residents. In addition, the U.S. has over 500 military sites abroad across 45 foreign countries (see Figure 1 in DoD 2018). Climate change impacts (such as sea level rise) occurring in these locations already affect U.S. military infrastructure and will continue to lead to increased expenditures to maintain bases' viability and readiness (USGCRP 2018a). Failure to do so can lead to impacts on mission execution and increased security risks. As one example, "…the United States has important defense assets located in…the Marshall Islands, and Palau, all of which are vulnerable to these [climate] hazards. Additionally, competitors such as China may try to take advantage of climate change impacts to gain influence" (DoD 2021). The timing and severity of climate events are already affecting missions in some cases and these risks are expected to increase. For example, in the Marshall Islands, the Ronald Reagan Ballistic Missile Defense Test Site, "a pillar of U.S. Strategic Command" used for detecting foreign missile launches, may be "uninhabitable in mere decades" according to a recent study conducted by the Center for Climate and Security's Military Expert Panel (CCS 2018).

The U.S. economy is also inextricably linked to the rest of the world. The U.S. exports over $2 trillion worth of goods and services a year and imports around $3 trillion (BEA 2023a). According to recent data, over 20% of American firms' profits are earned on activities outside the country (BEA 2023c). Climate impacts that occur outside U.S. borders will impact the welfare of individuals and the profits of firms that reside in the U.S. because of their connection to the global economy. This will occur through the effect of climate change on international markets, trade, tourism, and other activities. Supply chain disruptions are a prominent pathway through which U.S. business and consumers are, and will continue to be, affected by climate change impacts abroad. The impact of international supply chain disruptions can be severe. For example, severe flooding in Thailand in 2011 disrupted production of components for global companies including computer disk drives and cars (USGCRP 2018a, DoD 2021). As a result, U.S. consumers faced higher prices for many electronic goods. The U.S.-based firm Western Digital alone posted $199 million in losses and a 51% drop in hard drive shipments, and U.S. vehicle production had to be temporarily halted

holding that DOE had reasonably identified carbon pollution as "a global externality" and concluding that, because "national energy conservation has global effects, . . . those global effects are an appropriate consideration when looking at a national policy.").

[21] For example, in 2016, approximately $216.7 billion, or 2.1% of total worldwide income for all U.S. taxpayers, were reported to come from foreign sources (IRS 2016). For 2018, over 9,800 corporations reported almost $768 billion of foreign-source taxable income (IRS 2018).

or reduced considerably by at least two manufacturers (USGCRP 2018a). As climate change increases the severity and frequency of extreme weather events, it increases the risk of supply chain disruptions. Recent research finds the "probability of a hurricane of sufficient intensity to disrupt semiconductor supply chains may grow two to four times by 2040" and the "probability heavy rare earth [metals] production is severely disrupted from extreme rainfall may increase 2 to 3 times by 2030" (Woetzel et al. 2020).

Additional climate change-induced international spillovers can occur through pathways such as damages across transboundary resources, economic and political destabilization, and global migration that can lead to adverse impacts on U.S. national security, public health, and humanitarian concerns (DoD 2014, CCS 2018). Numerous studies have called attention to how stressors leading to these spillovers are already occurring and are expected to worsen with increasing climate change. For example, the United Nations High Commissioner for Refugees (UNHCR) reports that an average of 21.5 million people were forcibly displaced each year by sudden onset weather-related hazards between 2008 and 2016, and thousands more from slow-onset hazards linked to climate change impacts (UNHCR 2016). As articulated in a landmark 2007 study by retired three- and four-star Generals and Admirals - and echoed in the Department of Defense's (DoD) 2014 Quadrennial Defense Review – the projected effects of climate change act as a "threat multiplier" that will exacerbate many stressors and instabilities that already exist in some of the most volatile regions of the world (CNA 2007, DoD 2014). A follow-up study emphasized that beyond being a threat multiplier, climate change impacts will also "serve as catalysts for instability and conflict" (CNA 2014). For example, in Sub-Saharan Africa regional environmental stressors exacerbated by climate change can help to transform resource competition into ethnopolitical conflict and enable the involvement of transnational terrorist groups (such as Al Qaeda in the Islamic Maghreb (AQIM) in Mali in 2012) (CNA 2014). More recent DoD reports reiterate these concerns, concluding that the impacts of climate change "could stress economic and social conditions that contribute to mass migration events or political crises, civil unrest, shifts in the regional balance of power, or even state failure," with results that affect the national interests of the U.S. (DoD 2021). The key takeaway from the National Intelligence Council's (NIC) 2021 National Intelligence Estimate is that "climate change will increasingly exacerbate risks to US national security interests as the physical impacts increase and geopolitical tensions mount about how to respond to the challenge" (NIC 2021). The NIC finds "the increasing physical effects of climate change are likely to exacerbate cross-border geopolitical flashpoints as states take steps to secure their interests", and as intensifying physical effects "out to 2040 and beyond will be most acutely felt in developing countries, which we assess are also the least able to adapt to such changes…[t]hese physical effects will increase the potential for instability and possibly internal conflict in these countries, in some cases creating additional demands on US diplomatic, economic, humanitarian, and military resources" (NIC 2021).

As described by the National Academies (2017), to correctly assess the total damages to U.S. citizens and residents, one must account for these spillover effects on the U.S. For more discussion and examples of international spillover effects, including the ways that climate change spillovers are exacerbating existing risks and creating new security, health, and humanitarian challenges for U.S. interests, see for example, NIC (2021), DoD (2021), USGCRP (2018a), Freeman and Guzman (2009), Howard and Livermore (2021), Schwartz (2021), and IPCC (2022).

The global models used in SC-GHG estimation do not lend themselves to disaggregation in a way that can provide a comprehensive estimate of climate change damages to U.S. citizens and residents that accounts

for the myriad of ways that global climate change reduces the net welfare of U.S. populations. At present, the only quantitative characterizations of U.S. damages from GHG emissions are based on the share of modeled damages that physically occur within U.S. national borders as represented in current IAMs. Such estimates provide an underestimate of the climate change damages to the citizens and residents of the U.S. because these models do not fully capture the range of climate change impacts and exclude important regional interactions and spillovers discussed above. In addition, a 2020 GAO study observed that "[a]ccording to the National Academies, the integrated assessment models were not premised or calibrated to provide estimates of the social cost of carbon based on domestic damages, and more research would be required to update the models to do so" (GAO 2020). Further, the National Academies observed that existing models "focus primarily on global estimates and do not model all relevant interactions among regions.…More thoroughly estimating a domestic SC-$CO_2$ would therefore need to consider the potential implications of climate impacts on, and actions by, other countries, which also have impacts on the United States" (National Academies 2017, p. 13).

In addition to accounting for the ways that climate change impacts occurring outside of U.S. borders affect U.S. populations, it is also important to consider how changes in U.S. emissions affect the GHG emissions of other countries. This is relevant because the global nature of greenhouse gases means that a ton of GHGs emitted in any other country harms those in the U.S. just as much as a ton emitted within the territorial U.S. This is a classic public goods problem because each country's reductions benefit everyone else, and no country can be excluded from enjoying the benefits of other countries' reductions. As discussed by EPA and other members of the IWG in the 2015 response to comments (IWG 2015), in this situation, the only way to achieve an efficient allocation of resources for emissions reduction on a global basis—and so benefit the U.S. and its citizens and residents—is for all countries to consider estimates of global marginal damages. If each country were to design policies to equate marginal damages with marginal abatement costs using only the damages inflicted by that country on their own citizens and residents, the world would not achieve the socially optimal level of emissions; each country would be relatively worse off from the impact of foreign emissions.[22] In addition, international GHG mitigation activities taken in response to U.S. policies that reduce emissions will also provide a benefit to U.S. citizens and residents. It is, therefore, consistent with best analytical practices to account for the global marginal damages of GHG emissions given their role as a global externality.

Several studies have examined the evidence on international GHG mitigation reciprocity, through both policy diffusion and technology diffusion effects. For example, using panel data on national and subnational carbon pricing policies in place over 1988 to 2021, Linsenmeier et al. (2023) estimate that the adoption of carbon pricing policies in one country increases the probability of carbon pricing adoption in other countries. Based on their empirical results, they find that the indirect GHG emissions reductions attributable to international reciprocity may exceed domestic emission reductions from the policy. In another recent study, Larsen et al. (2023) investigate how U.S. climate policy can lead to reductions in the cost of GHG mitigation technologies globally and thus resulting in foreign emissions reductions. Larsen et

[22] As Morgenstern et al. (2023) explain: "…US greenhouse gas emissions account for about 12 percent of the global total. If all countries considered only the domestic effects of their greenhouse gas emissions, about 88 percent of climate change impacts on US citizens would be ignored. An analytic focus solely on direct impacts to the United States of US emissions, when generalized, therefore omits most of the total climate impacts the United States faces" (Morgenstern et al. 2023, p. 5).

al. (2023) refer to this as technology diffusion effects and they are expected to occur independent of reciprocal policy adoption in other countries. Focusing on the tax incentives for three key emerging climate technologies in the Inflation Reduction Act, they estimate that in the long run the incentives will reduce 2.4 to 2.9 tons of GHGs outside the U.S. for every ton reduced within the U.S. In addition, Houser et al. (2023) present a new analysis quantifying the extent to which other countries have made GHG emission reduction commitments and progressed towards meeting those commitments alongside the U.S. under 2015 Paris Agreement.[23] The authors highlight how the agreed structure of the process – for countries to develop and communicate their "intended nationally determined contributions" (INDCs) "well in advance" of the Paris conference (UNFCCC 2014) - provided time for countries "to assess whether there was sufficient reciprocal action to justify their own intended emission reduction pledge" (Houser et al. 2023). One result of this format was that the U.S. and China ended up jointly announcing their INDCs, after nine months of bilateral negotiations (Lander 2014), stating "The United States and China hope that by announcing these targets now, they can inject momentum into the global climate negotiations and inspire other countries to join in coming forward with ambitious actions as soon as possible" (The White House, 2014). By the start of the Paris conference, 151 countries had announced INDCs (UNFCCC 2023), with emission reduction commitments almost evenly distributed among developed and developing countries (Houser et al. 2023). By comparing countries' submitted emission reduction commitments and plans (NDCs) over time to an independent Pre-Paris Agreement emissions projection baseline, Houser et al. (2023) calculate a ratio of the rest of the world's committed reductions to the U.S.' committed reduction, or "Climate Reciprocity Ratio" (CRR). They estimate CRRs ranging from 2.4 to 10.8. The authors note that the upper end of the range applies to the middle of the century when the U.S. share of global emissions has declined. Relatedly, Schmidt et al. (2022) find that the free-rider hypothesis cannot be supported in the context of climate policy. Using data on emission-weighted carbon prices, while controlling for a variety of other potential explanatory variables, the authors find that the evidence does not support the presence of free riding.

A wide range of scientific and economic experts have emphasized the issue of international cooperation and reciprocity as support for assessing global damages of GHG emissions in domestic policy analysis (e.g., Kopp and Mignone 2013, Pizer et al. 2014, Howard and Schwartz 2017, Pindyck 2017, 2021, Revesz et al. 2017, Carleton and Greenstone 2022, Houser et al. 2023). Kotchen (2018) demonstrates how a country's decision to internalize global damages in domestic policymaking can be individually rational (i.e., in the country's own self-interest) because of the reciprocally induced emissions reductions occurring in other countries.[24] Carleton and Greenstone (2022) discuss examples of how accounting for global damages in past U.S. regulatory analyses may have contributed to additional international action.

[23] Houser et al. (2023) is an update and expansion of an assessment of cumulative emissions reduction pledges under the Paris Agreement by Houser and Larsen 2021.

[24] Kotchen (2018) not only details the "efficiency argument in support of all countries internalizing the GSCC [global social cost of carbon] for domestic policy," but Kotchen (2018) also introduces the concept of countries having a "preferred" social cost of carbon (PSCC) for setting global climate policy and shows that all countries' PSCC exceeds the marginal damages to its own populations. The PSCC is shaped by a country's expected benefits from other countries' emission reductions. Kotchen's study shows that in some countries the PSCC can even exceed the value of global marginal damages (e.g., in small island nations for whom the benefits of stringent worldwide abatement based on a high PSCC would exceed the increase in its own abatement costs due to a high PSCC). Kotchen offers

Assessing global marginal damages of GHG emissions in U.S. analyses of regulatory and other actions allows the U.S. to continue to actively encourage other nations, including emerging economies, to also assess global climate damages of their policies and to take steps to reduce emissions. Many countries and international institutions have either already explicitly adapted the IWG's estimates of global damages in their domestic analyses (e.g., Canada[25], Israel[26]), developed their own estimates of global damages (e.g., Germany[27]), or have taken note of the IWG estimates in their assessments of climate policies (e.g., Japan,[28] Trinidad and Tobago,[29] Australia[30], India's National Green Tribunal[31], Italy[32], New Zealand[33], and the International Monetary Fund[34]). In 2016, Mexico announced its intention to "align approaches [with the U.S. and Canada] to account for the social cost of carbon and other greenhouse gas emissions when assessing the benefits of emissions-reducing policy measures"[35], and references to global estimates of climate damages can be found in Mexican regulatory analyses in 2017.[36] However, the bilateral technical discussions to help implement the announced plan did not occur over 2017-2021 during the time U.S. federal regulatory analyses stopped focusing on SC-GHG estimates that reflect global damages.

Recently, there has been renewed interest by other countries to update their estimates since the draft release of the updated estimates presented in this report. In January 2023, at the North American Leaders Summit, the United States, Canada, and Mexico reaffirmed their commitment to "come together to align approaches on estimating the social cost of greenhouse gas emissions" (CEC 2023). Since then, Mexico has re-engaged in discussions regarding SC-GHG estimation. In April 2023, the government of Canada announced the publication of an interim update to their SC-GHG guidance, recommending SC-GHG estimates identical to the EPA's updated estimates presented in this report (ECCC 2023). The Canadian

---

illustrative estimates of the PSCC for several countries and regions based on research using a regionalized version of the DICE model (Nordhaus 2015). In this analysis Kotchen finds the U.S. PSCC to be nearly 75% of the value of global marginal damages. And as Kotchen has further clarified, "depending on the U.S. government's diplomatic strategies, its expectations of international reciprocity, and the international distribution of costs, it can be rational for the United States to adopt the full global SCC values for use in policy-making" (Kotchen 2021, comment number OMB-2021-0006-0018, available at: https://www.regulations.gov/comment/OMB-2021-0006-0018). Such arguments for accounting for the global value of climate change impacts in analysis of policies affecting U.S. GHG emissions, based on the U.S. derived benefits from reciprocally induced emission reductions elsewhere, are distinct from and additional to arguments above based on spillover effects and U.S. interests beyond our geographic borders.

[25] See ECCC (2016).

[26] See Israel Ministry of Environmental Protection (2020)

[27] See GAO (2020) for a discussion of Germany's SC-GHG values; see also UBA (2020, 2021).

[28] Japan's Ministry of Internal Affairs and Communications explains in its reference manual for regulatory policy evaluations that Japan has no official value for the social cost of carbon but cites the IWG values as a reference. See MIC (2017, 2021).

[29] Trinidad and Tobago used the IWG values in their 2021 Third National Communication to the United Nations Framework Convention on Climate Change (Ministry of Planning and Development 2021).

[30] See, for example, ACT (2019) and Hutley (2021).

[31] See Patel et al. (2020).

[32] A research institute established by the Italian government uses the IWG estimates. See ISPRA (2016a, 2016b).

[33] See Ministry of Transport (2018).

[34] See Clements et al. (2013).

[35] See White House (2016) for a joint statement from Canada, the U.S., and Mexico.

[36] See Secretaria del Medio Ambiete y Recursos Naturals (2016).

interim guidance will be used across all federal departments and agencies, with the values expected to be finalized by the end of the year.

EPA and other members of the IWG found previously and restated in their February 2021 TSD that because of the distinctive global nature of climate change that analysis of Federal regulations and other actions should center on a global measure of SC-GHG (IWG 2021). This is the same approach that was recommended by OMB and other members of the IWG and used by EPA and other agencies in regulatory analyses from 2009 to 2016. It is also consistent with guidance in OMB Circular A-4 (2003) that "[d]ifferent regulations may call for different emphases in the analysis, depending on the nature and complexity of the regulatory issues,"[37] and National Academies' guidance that "it is important to consider what constitutes a domestic impact in the case of a global pollutant that could have international implications that impact the United States." In the case of this global pollutant, for all the reasons articulated in this section, the assessment of global net damages of GHG emissions allows analysts to fully disclose and contextualize the net climate benefits of domestic policies that reduce GHG emissions. The extent that analysis relying on these SC-GHG estimates is considered in setting the stringency of future regulatory actions and other policy decisions would be guided by the statutes under which those decisions are promulgated.[38,39] The EPA will continue to review developments in the literature, including more robust methodologies for estimating the magnitude of the various direct and indirect damages to U.S. populations from climate impacts occurring abroad and reciprocal international mitigation activities.

# 2 Methodological Updates

The SC-GHG is commonly estimated with the use of integrated assessment models (IAM). In the broadest sense IAMs are "approaches that integrate knowledge from two or more domains into a single framework" (Nordhaus 2018a). The literature on "IAMs" is vast and spans many scientific disciplines, e.g., Earth sciences, biological sciences, environmental engineering, economics, and sociology. IAMs have been used to study environmental problems and their connection to economic systems for nearly 40 years (e.g., Freeman 1979, 1982; Mendelsohn 1980; Nordhaus 1993a, 1993b). The National Academies defined IAMs used to study climate change as "computational models of global climate change that include representation of the global economy and greenhouse gas emissions, the response of the climate system

---

[37] The same guidance is in OMB Circular A-4 (2023).

[38] For example, as the Supreme Court stated in *Motor Vehicle Manufacturers Ass'n. v. State Farm Mutual Auto. Ins. Co*., 463 U.S. 29, 41-43 (1983): "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view of the product of agency expertise." This requires agencies to "examine the relevant data and articulate . . . a rational connection between the facts found and the choice made."

[39] Public comments received on the February 2021 TSD argue that key U.S. statutes explicitly require or allow consideration of global climate damages in decision making. See, e.g., the discussion within comments submitted by the Institute for Policy Integrity and the attachments and literature cited therein (Institute for Policy Integrity 2021). The comments discuss, for example, how the National Environmental Policy Act requires that "public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and all agencies of the Federal Government shall…recognize the worldwide and long-range character of environmental problems".

# A. Appendix

## A.1. Additional Discussion of Scientific Updates in IPCC's Sixth Assessment Report

Several updates to the science of greenhouse gas radiative efficiency[161], atmospheric lifetimes, and chemistry have been made since the IWG published its first set of recommended SC-GHG estimates in 2010. In this report projections of temperature change from a pulse of GHG emissions are based on the FaIR climate model, version 1.6.2, rather than using the simplified lifetime and forcing equations from the IPCC AR4 assessment that were embedded in the IAMs underlying the SC-GHG estimates used to date. While FaIR is a more complex model that includes internal feedbacks and chemistry such that gas lifetimes and interactions are not constant, it can be instructive to examine how the more simplistic equations have been updated between AR4 (IPCC 2007b) and AR6 (IPCC 2021b) as FaIR 1.6.2 reflects many of the same scientific advances in understanding.

The radiative efficiency of all gases has been updated, in part because of updates to the science and in part because radiative efficiency is a function of background concentrations. The radiative efficiency of $CO_2$ has decreased by 5% relative to AR4, while the radiative efficiencies of $CH_4$ and $N_2O$ have both increased by about 5%. AR6 also updated the indirect effects of $CH_4$ and $N_2O$ that occur through atmospheric chemistry. The indirect radiative effects of $CH_4$ that occur through increases in ozone and stratospheric water vapor decreased by about 6%. Meanwhile, the radiative effects of $N_2O$ now include the impact of $N_2O$ on $CH_4$ and stratospheric ozone, leading to a decrease in $N_2O$ radiative efficiency of almost 13%. When accounting for all radiative changes, the effective radiative efficiency of $CH_4$ has increased by about 10%, while that of $N_2O$ has decreased by almost 8%, relative to AR4.

Separately, the AR6 estimate of lifetime of $CH_4$ decreased by about 2%, and that of $N_2O$ by about 4%, relative to AR4. The changes in the $CO_2$ lifetime are more complex, but over 100 years, the effective lifetime of $CO_2$ increased by about 13%. AR6 also included the possibility of accounting for the $CO_2$ produced through the oxidation of $CH_4$ of fossil origins in the atmosphere, using an oxidation factor of 0.75 to account for $CH_4$ that does not oxidize to $CO_2$ but rather leaves the atmosphere through a deposition process.[162,163] AR6 also accounts for the climate-carbon feedbacks that result from non-$CO_2$ greenhouse gases warming the atmosphere and impacting the carbon cycle; in AR4, this effect was only included for $CO_2$.

[161] Radiative efficiency is a measure of a gas' greenhouse gas strength, defined as the change in radiative forcing for a unit change in the atmospheric concentration of a gas (in $W/m^2/ppb$).

[162] While FaIR 1.6.2 reflects the advances in understanding presented in AR6, FaIR 1.6.2 uses a constant $CH_4$ lifetime of 9.3 years, which is shorter than the IPCC perturbation lifetime. This assumption was documented in Smith et al. (2018) as being necessary to reproduce historical natural emissions and projected concentration scenarios. While FaIR 1.6.2 has the capability to include the oxidation of fossil $CH_4$ to $CO_2$, the default (and the version used for the AR6 calibration) did not use this capability.

[163] Note that inventories based on using GWPs often use the non-fossil value for all $CH_4$ emissions because in some cases there is a potential for $CO_2$ double counting: for example, if complete combustion is assumed when calculating $CO_2$ emissions from a natural gas turbine, then the carbon from any methane leakage has already been accounted for.

Including all these scientific updates to lifetimes, atmospheric chemistry interactions, and radiative efficiency, the AR6 assessment estimates that the 100-year global warming potential (GWP) of $CH_4$ has increased by almost 9% relative to the estimates from AR4 (from 25 to 27.2), whereas the 100-year GWP of $N_2O$ has decreased by about 8% (from 298 to 273). Between AR4 and AR6 there was also a discussion of climate-carbon feedbacks. Including the climate-carbon feedback means taking into account the effect that a changing climate has on the carbon cycle. AR4 GWPs were calculated with climate-carbon feedbacks included for $CO_2$, but not for non-$CO_2$ greenhouse gases. This inconsistent treatment of climate-carbon feedbacks can lead to underweighting the non-$CO_2$ greenhouse gases relative to their actual impacts. The publication of more studies using climate-carbon feedbacks for all gases, and the determination that a consistent approach was superior, led AR6 to include the climate-carbon feedbacks for all gases in the only GWP that was presented.

Another way of considering the impact of different greenhouse gases is to attribute the temperature changes of the last decade (2010-2019) to historical emissions of each gas. According to the AR6 assessment, historical emissions of carbon dioxide have contributed almost 0.8 degrees of warming to those temperatures, compared to about half a degree for historical emissions of $CH_4$, and almost one tenth of a degree for historical emissions of $N_2O$. These attributed temperature increases sum to more than the observed temperature change of almost 1.1 degrees because some of the warming is masked by various cooling influences, the most important of which is about half a degree of cooling resulting from historical emissions of sulfur dioxide.

## A.2. Consumption Rate of Interest and Integration into Benefit-Cost Analysis

When analyzing policies and programs that result in GHG emission reductions, it is important to account for the difference between the social and private rate of return on any capital investment affected by the action. Market distortions, such as taxes on capital income, cause private returns on capital investments to be different from the social returns. In well-functioning capital markets, arbitrage opportunities will be dissipated, and the cost of investments will equal the present value of future private returns on those investments. Therefore, an individual forgoing consumption or investment of equal amounts as the result of a regulation will face an equal private burden. However, because the social rate of return on the investment is greater than the private rate of return, the overall social burden will be greater in the case where investment is displaced. Thus, society is not indifferent between a regulation that displaces consumption versus investment in equal amounts.

OMB’s Circular A-4 (2003) points out that “the analytically preferred method of handling temporal differences between benefits and costs is to adjust all the benefits and costs to reflect their value in equivalent unitsof consumption and to discount them at the rate consumers and savers would normally use in discountingfuture consumption benefits” (OMB 2003). Similarly, OMB’s Circular A-4 (2023) points out that “The analytically preferred method of handling temporal differences between benefits and costs is to adjust all the benefits and costs to reflect their value in equivalent units of consumption before discounting them” (OMB 2023). The damage estimates developed for use in the SC-GHG are already estimated in consumption-equivalent terms. Therefore, an application of this OMB guidance would use the consumption discount rate to calculate the SC-GHG, while also developing a more complete estimate of social costs to account for the difference in private and social rates of return on capital for any investment displaced as a result of the action being analyzed. This more complete estimate of social costs could be developed using either the shadow price of capital approach or by estimating costs in a general

## A.5. Annual Unrounded SC-$CO_2$, SC-$CH_4$, and SC-$N_2O$ Values, 2020-2080

*Table A.5.1: Unrounded SC-$CO_2$, SC-$CH_4$, and SC-$N_2O$ Values, 2020-2080*

| | SC-GHG and Near-term Ramsey Discount Rate | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | SC-$CO_2$ (2020 dollars per metric ton of $CO_2$) | | | SC-$CH_4$ (2020 dollars per metric ton of $CH_4$) | | | SC-$N_2O$ (2020 dollars per metric ton of $N_2O$) | | |
| Emission | Near-term rate | | | Near-term rate | | | Near-term rate | | |
| Year | 2.5% | 2.0% | 1.5% | 2.5% | 2.0% | 1.5% | 2.5% | 2.0% | 1.5% |
| 2020 | 117 | 193 | 337 | 1,257 | 1,648 | 2,305 | 35,232 | 54,139 | 87,284 |
| 2021 | 119 | 197 | 341 | 1,324 | 1,723 | 2,391 | 36,180 | 55,364 | 88,869 |
| 2022 | 122 | 200 | 346 | 1,390 | 1,799 | 2,478 | 37,128 | 56,590 | 90,454 |
| 2023 | 125 | 204 | 351 | 1,457 | 1,874 | 2,564 | 38,076 | 57,816 | 92,040 |
| 2024 | 128 | 208 | 356 | 1,524 | 1,950 | 2,650 | 39,024 | 59,041 | 93,625 |
| 2025 | 130 | 212 | 360 | 1,590 | 2,025 | 2,737 | 39,972 | 60,267 | 95,210 |
| 2026 | 133 | 215 | 365 | 1,657 | 2,101 | 2,823 | 40,920 | 61,492 | 96,796 |
| 2027 | 136 | 219 | 370 | 1,724 | 2,176 | 2,910 | 41,868 | 62,718 | 98,381 |
| 2028 | 139 | 223 | 375 | 1,791 | 2,252 | 2,996 | 42,816 | 63,944 | 99,966 |
| 2029 | 141 | 226 | 380 | 1,857 | 2,327 | 3,083 | 43,764 | 65,169 | 101,552 |
| 2030 | 144 | 230 | 384 | 1,924 | 2,403 | 3,169 | 44,712 | 66,395 | 103,137 |
| 2031 | 147 | 234 | 389 | 2,002 | 2,490 | 3,270 | 45,693 | 67,645 | 104,727 |
| 2032 | 150 | 237 | 394 | 2,080 | 2,578 | 3,371 | 46,674 | 68,895 | 106,316 |
| 2033 | 153 | 241 | 398 | 2,157 | 2,666 | 3,471 | 47,655 | 70,145 | 107,906 |
| 2034 | 155 | 245 | 403 | 2,235 | 2,754 | 3,572 | 48,636 | 71,394 | 109,495 |
| 2035 | 158 | 248 | 408 | 2,313 | 2,842 | 3,673 | 49,617 | 72,644 | 111,085 |
| 2036 | 161 | 252 | 412 | 2,391 | 2,929 | 3,774 | 50,598 | 73,894 | 112,674 |
| 2037 | 164 | 256 | 417 | 2,468 | 3,017 | 3,875 | 51,578 | 75,144 | 114,264 |
| 2038 | 167 | 259 | 422 | 2,546 | 3,105 | 3,975 | 52,559 | 76,394 | 115,853 |
| 2039 | 170 | 263 | 426 | 2,624 | 3,193 | 4,076 | 53,540 | 77,644 | 117,443 |
| 2040 | 173 | 267 | 431 | 2,702 | 3,280 | 4,177 | 54,521 | 78,894 | 119,032 |
| 2041 | 176 | 271 | 436 | 2,786 | 3,375 | 4,285 | 55,632 | 80,304 | 120,809 |
| 2042 | 179 | 275 | 441 | 2,871 | 3,471 | 4,394 | 56,744 | 81,714 | 122,586 |
| 2043 | 182 | 279 | 446 | 2,955 | 3,566 | 4,502 | 57,855 | 83,124 | 124,362 |
| 2044 | 186 | 283 | 451 | 3,040 | 3,661 | 4,610 | 58,966 | 84,535 | 126,139 |
| 2045 | 189 | 287 | 456 | 3,124 | 3,756 | 4,718 | 60,078 | 85,945 | 127,916 |
| 2046 | 192 | 291 | 462 | 3,209 | 3,851 | 4,827 | 61,189 | 87,355 | 129,693 |
| 2047 | 195 | 296 | 467 | 3,293 | 3,946 | 4,935 | 62,301 | 88,765 | 131,469 |
| 2048 | 199 | 300 | 472 | 3,378 | 4,041 | 5,043 | 63,412 | 90,176 | 133,246 |
| 2049 | 202 | 304 | 477 | 3,462 | 4,136 | 5,151 | 64,523 | 91,586 | 135,023 |
| 2050 | 205 | 308 | 482 | 3,547 | 4,231 | 5,260 | 65,635 | 92,996 | 136,799 |

*Table A.5.1: Unrounded SC-$CO_2$, SC-$CH_4$, and SC-$N_2O$ Values, 2020-2080 (continued…)*

| | SC-GHG and Near-term Ramsey Discount Rate | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | SC-$CO_2$ *(2020 dollars per metric ton of $CO_2$)* | | | SC-$CH_4$ *(2020 dollars per metric ton of $CH_4$)* | | | SC-$N_2O$ *(2020 dollars per metric ton of $N_2O$)* | | |
| Emission Year | 2.5% | 2.0% | 1.5% | 2.5% | 2.0% | 1.5% | 2.5% | 2.0% | 1.5% |
| 2051 | 208 | 312 | 487 | 3,624 | 4,320 | 5,363 | 66,673 | 94,319 | 138,479 |
| 2052 | 211 | 315 | 491 | 3,701 | 4,409 | 5,466 | 67,712 | 95,642 | 140,158 |
| 2053 | 214 | 319 | 496 | 3,779 | 4,497 | 5,569 | 68,750 | 96,965 | 141,838 |
| 2054 | 217 | 323 | 500 | 3,856 | 4,586 | 5,672 | 69,789 | 98,288 | 143,517 |
| 2055 | 220 | 326 | 505 | 3,933 | 4,675 | 5,774 | 70,827 | 99,612 | 145,196 |
| 2056 | 222 | 330 | 510 | 4,011 | 4,763 | 5,877 | 71,866 | 100,935 | 146,876 |
| 2057 | 225 | 334 | 514 | 4,088 | 4,852 | 5,980 | 72,904 | 102,258 | 148,555 |
| 2058 | 228 | 338 | 519 | 4,165 | 4,941 | 6,083 | 73,943 | 103,581 | 150,235 |
| 2059 | 231 | 341 | 523 | 4,243 | 5,029 | 6,186 | 74,981 | 104,904 | 151,914 |
| 2060 | 234 | 345 | 528 | 4,320 | 5,118 | 6,289 | 76,020 | 106,227 | 153,594 |
| 2061 | 236 | 348 | 532 | 4,389 | 5,199 | 6,385 | 76,920 | 107,385 | 155,085 |
| 2062 | 239 | 351 | 535 | 4,458 | 5,280 | 6,480 | 77,820 | 108,542 | 156,576 |
| 2063 | 241 | 354 | 539 | 4,527 | 5,361 | 6,576 | 78,720 | 109,700 | 158,066 |
| 2064 | 244 | 357 | 543 | 4,596 | 5,442 | 6,671 | 79,620 | 110,857 | 159,557 |
| 2065 | 246 | 360 | 547 | 4,666 | 5,523 | 6,767 | 80,520 | 112,015 | 161,048 |
| 2066 | 248 | 363 | 550 | 4,735 | 5,604 | 6,862 | 81,419 | 113,172 | 162,539 |
| 2067 | 251 | 366 | 554 | 4,804 | 5,685 | 6,958 | 82,319 | 114,330 | 164,030 |
| 2068 | 253 | 369 | 558 | 4,873 | 5,765 | 7,053 | 83,219 | 115,487 | 165,521 |
| 2069 | 256 | 372 | 562 | 4,942 | 5,846 | 7,149 | 84,119 | 116,645 | 167,012 |
| 2070 | 258 | 375 | 565 | 5,011 | 5,927 | 7,244 | 85,019 | 117,802 | 168,503 |
| 2071 | 261 | 378 | 569 | 5,085 | 6,013 | 7,344 | 86,012 | 119,027 | 170,013 |
| 2072 | 263 | 382 | 573 | 5,160 | 6,099 | 7,444 | 87,006 | 120,252 | 171,523 |
| 2073 | 266 | 385 | 576 | 5,234 | 6,184 | 7,545 | 87,999 | 121,477 | 173,033 |
| 2074 | 269 | 388 | 580 | 5,309 | 6,270 | 7,645 | 88,992 | 122,702 | 174,543 |
| 2075 | 271 | 391 | 583 | 5,383 | 6,355 | 7,745 | 89,985 | 123,926 | 176,053 |
| 2076 | 274 | 394 | 587 | 5,458 | 6,441 | 7,845 | 90,978 | 125,151 | 177,563 |
| 2077 | 276 | 398 | 591 | 5,532 | 6,527 | 7,946 | 91,971 | 126,376 | 179,073 |
| 2078 | 279 | 401 | 594 | 5,607 | 6,612 | 8,046 | 92,964 | 127,601 | 180,582 |
| 2079 | 282 | 404 | 598 | 5,681 | 6,698 | 8,146 | 93,958 | 128,826 | 182,092 |
| 2080 | 284 | 407 | 601 | 5,756 | 6,783 | 8,246 | 94,951 | 130,050 | 183,602 |

# The Benefits and Costs of the Clean Air Act from 1990 to 2020

Final Report – Rev. A

U.S. Environmental Protection Agency
Office of Air and Radiation

April 2011

Where possible, we based our learning curve adjustments on learning rates presented in the empirical literature. For some sectors, however, empirical estimates of learning rates were not available. We identified learning rate estimates for $SO_2$ and $NO_x$ control technologies in the EGU sector and in the onroad vehicle sector, where we used learning rates for vehicle production to estimate the impact of learning on motor vehicle engine controls. For other technologies and industries affected by the amendments, we applied a default learning rate of 10 percent, consistent with the recommendation of the Council that advised EPA on this study.[22,23]

***Cost Accounting*** – The costs presented in this analysis are expressed as total annualized costs (TAC) in 2000, 2010, and 2020. Annualized costs include both operation and maintenance (O&M) costs and, for CAAA provisions that require investment in pollution control equipment, capital investment costs. In order to make appropriate comparisons of costs in 2000, 2010, and 2020, we annualized these investment costs over the expected life of the control equipment, rather than assigning total capital investment costs to the year in which the investment is expected to be made. We applied a discount rate of five percent to annualize capital costs over an estimated equipment life.[24] These annualized capital costs, combined with the annual O&M costs for a given pollution control measure, make up the total annualized cost estimates that we present for the three target years. Because some control measures require more capital investment than others, the degree to which our discount rate assumption affects our cost estimates varies by source category.

For CAAA-related rules that affect fuel economy, we also incorporate fuel savings or losses into our cost estimates. Where possible, we estimate the value of these benefits or costs based on fuel price projections presented in the Energy Information Administration's *Annual Energy Outlook 2005* (AEO 2005). In addition, for rules that affect the fuel economy of an engine over a period of several years, we estimate these benefits or costs as the present value of the fuel economy impacts realized over the entire life of the engine.

***Local Controls for NAAQS Compliance*** – When estimating the costs of compliance with the 8-Hour Ozone and $PM_{2.5}$ NAAQS, we first estimated the cost of applying known and commercially available control technologies in nonattainment areas. We limited the application of these known controls to those with an estimated cost not exceeding $15,000 per ton for PM and ozone precursors (i.e., $SO_2$, $NO_x$, and VOCs). The rationale for incorporating this threshold into the analysis is that controls more costly than $15,000

---

[22] The Council recommended that we apply a default learning rate of 5 to 10 percent to sectors for which no empirical data are available. We chose 10 percent as a default learning rate because this value is more consistent with the learning rates presented in the empirical literature than the low end of the Council's recommended range.

[23] The Project Team makes no learning curve adjustments for motor vehicle inspection and maintenance programs. Because most states either run centralized inspection centers themselves or regulate the fees charged by decentralized inspection centers, it is unclear whether the learning curve impacts for I&M programs would be significant.

[24] Note that the discount rate we use to annualize capital investment costs is distinct from the discount rate used to calculate the total net present value of costs and benefits incurred through the full 1990 to 2020 study period. The net present value of costs and benefits is examined separately in Chapter 7 where we compare total costs to total benefits.

per ton may not be cost effective. Thus, local air quality agencies would seek reductions from other (unidentified) control measures. This is roughly consistent with the practice of the South Coast Air Quality Management District (SCAQMD 2006) in California, which attempts to identify viable alternatives for any control requirements with an estimated cost exceeding $16,500 per ton. When costs are above this threshold, the SCAQMD also conducts more detailed cost-effectiveness and economic impact analyses of the controls.

For areas projected to remain in nonattainment with the 8-Hour Ozone NAAQS with identified controls, we estimated the costs associated with reducing emissions using additional controls not yet identified. To estimate the cost of these unidentified controls, we assumed that the cost of implementing these measures is $15,000 per ton of pollutant reduced, consistent with the cost threshold for identified controls.

### DIRECT COMPLIANCE COST RESULTS

In this section we summarize the compliance cost analysis results by source category. As noted above, the control measures included in this analysis are consistent with our assumptions in the emissions analysis and reflect any post-1990 regulations promulgated (or reasonably anticipated, such as controls to meet RFP requirements) after passage of the 1990 CAAA. In general, the emissions analysis and this cost analysis reflect all of the regulations that were promulgated before September 2005. Similar to the emissions projection analysis, regulations promulgated after September 2005 (e.g., the revised Lead NAAQS) are not reflected in this report, in an effort to make the costs and benefits analyses as consistent as possible.

Table 3-2 summarizes the estimated costs of the CAAA by sector for the three analysis years: 2000, 2010 and 2020. The table shows that the direct compliance costs in 2000 are estimated to be approximately $20 billion and that these costs are dominated by the costs of motor vehicle-related provisions of the CAAA as well as MACT standards and electric utility controls. The major components of motor vehicle-related control costs in 2000 are for emission standards, fuel standards, and vehicle emission inspection programs in nonattainment areas. Motor vehicle emissions standard costs in 2000 are primarily for low emission vehicle programs, Tier 1 tailpipe standards, and on-board diagnostics. Prominent motor vehicle fuel control programs in 2000 include Federal and California reformulated gasoline. These two reformulated gasoline programs are focused primarily in serious, severe and extreme 1-hour ozone NAAQS nonattainment areas.

Table 3-2 shows that the estimated costs of complying with 1990 CAAA provisions are expected to more than double between 2000 and 2010 as areas develop and implement 8-hour ozone and $PM_{2.5}$ NAAQS State Implementation Plans (SIPs). One of the major components of CAAA compliance costs in 2010 is the estimated cost to achieve sufficient reductions of ozone precursor emissions to demonstrate 8-hour ozone NAAQS attainment. As noted above, we estimated 8-hour ozone compliance costs in two phases: first, we estimated the cost of applying known and commercially available control technologies in nonattainment areas; second, we estimated the costs associated with additional emissions reductions required to reach NAAQS attainment using controls not

# Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone

EPA-452/R-15-007
September 2015

# Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone

U.S. Environmental Protection Agency
Office of Air and Radiation
Office of Air Quality Planning and Standards
Research Triangle Park, NC 27711

inventory combined with details from CoST about possible control measures that could be applied. The identified control cost curve defines how many tons of emissions reductions can be achieved at various cost levels from identified control technologies. While emissions reductions and their associated costs may be available for many different control measures, not all of these measures will be the most cost-effective way of achieving a given level of abatement, and therefore should not be used to construct the marginal abatement cost curve. In addition, we lack information on the control measures and costs for the remaining uncontrolled NOx emissions (see more detailed discussion on incomplete representation of marginal abatement cost curve in section 4.2).

Because the identified control cost curve reflects incomplete information, it is necessary to take steps to identify likely impractical control applications and to remove them from the analysis.[56] We determined that applying an exponential trend line would produce a reasonable cost threshold for identified controls, and we used the assumption in this analysis. To determine a cost threshold for identified NOx controls, we used the full dataset on NOx control measures and plotted an exponential trend line through the identified control cost curve.[57] Figure 4-1 shows the identified control cost curve for all the NOx control measures contained in the CoST database, aggregated by cost per ton, and the exponential trend line. As the figure indicates, the curves intersect at $19,000 per ton, meaning control costs above $19,000 per ton begin increasing at more than an exponential rate. We selected $19,000 per ton as the control cost value above which we would not apply additional identified NOx controls because controls above this value are not likely to be cost-effective. In the control strategy analysis for 70 ppb, there are a total of only eight control applications in three geographic areas where identified NOx controls are applied at a cost of $19,000/ton. In addition, for a standard of 70 ppb, in east Texas, the Northeast, the Great Lakes, and the Ohio River Valley there are a total of 25 control applications between $15,000/ton and $19,000/ton, representing approximately 5 percent of the

[56] Examples of control applications that could be removed from the analysis include: (i) applying SCR to small lean burn natural gas-fired reciprocating internal combustion engines to reduce NOx emissions -- these units are often in very remote locations and the requirements for ammonia or urea storage and replenishment are not practical, and ii) retrofit controls on small ICI boilers with space limitations that make the retrofit too difficult,

[57] The full dataset on NOx control measures includes approximately 120,000 individual observations, and when aggregated by cost per ton, the dataset includes 1,500 observations.

## Jaricus Whitlock

**From:** Shannon Lynn <slynn@trinityconsultants.com>
**Sent:** Monday, August 18, 2025 1:34 AM
**To:** Jaricus Whitlock
**Cc:** Rodney Cuevas
**Subject:** RE: Portable Turbine Information

**This Message Is From an External Sender**
This message came from outside your organization.

Thank you for all of your assistance and apologies for taking so long to get back to you. Just wanted to make sure that what I had was the latest and greatest information.

In response to your queries below here is the information I currently have and will work on obtaining the rest.

Temporary turbine schedule for Duke:

| Primary Column | Assigned To | Status | Start |
|---|---|---|---|
| Phase 1 Pad Extension Cure Complete | Omega | In Progress | 08/13/25 |
| Duke 4 SMT 130 (Cannot Drive though AK on weekend) | Solaris | Not Started | 08/18/25 |
| Duke 5 SMT 130 (Genco) | Solaris | Not Started | 08/19/25 |
| Duke 6 SMT 130 (Genco) | Solaris | Not Started | 08/20/25 |
| Duke 7 TM2500 (Version 8) | Solaris | Not Started | 08/21/25 |
| Duke 8 TM2500 (Version 8) | Solaris | Not Started | 08/23/25 |
| Duke 9 TM2500 (M35) | Solaris | Not Started | 08/25/25 |
| Duke 10 TM2500 (Version 6) | Solaris | Not Started | 08/27/25 |
| Duke 11 TM2500 (Version 6) | Solaris | Not Started | 08/29/25 |
| Duke 12 TM2500 (Version 6) | Solaris | Not Started | 08/31/25 |
| Duke 13 TM2500 (Version 6) | Solaris | Not Started | 09/02/25 |
| Duke 14 TM2500 (Version 7) | Solaris | Not Started | 09/04/25 |
| Duke 15 TM2500 (Version 7) | Solaris | Not Started | 09/06/25 |
| Duke 16 TM2500 (Version 7) | Solaris | Not Started | 09/08/25 |

Turbines 1 through 3 were SMT-130s. Turbine #1 and Turbine #2 were moved to Duke on 8/1/25. Turbine #3 was moved to Duke on 8/8/25. The current plan is to have a total of 16 temporary Turbines at Duke consisting of 6 x SMT-130 and 10 x TM 2500. All 6 of the SMT-130s will have SCRs and all 10 of the TM2500s will use water injection.

**Shannon G. Lynn, P.E., C.M.**
Principal Consultant

P 501.225.6400 x5404  M 501.454.6264
1701 Centerview Drive Suite 109 Little Rock, AR 72211
Email: slynn@trinityconsultants.com

---

**From:** Jaricus Whitlock <jwhitlock@mdeq.ms.gov>
**Sent:** Thursday, August 14, 2025 12:17 PM
**To:** Shannon Lynn <slynn@trinityconsultants.com>
**Cc:** Rodney Cuevas <RCuevas@mdeq.ms.gov>
**Subject:** Portable Turbine Information

Good Afternoon Shannon,

First, thank you for the very helpful update yesterday.  At your convenience, I kindly ask that you provide a response with the following information:

- The number of portable turbines currently on-site (i.e., 2875 Stanton Road South; Southaven, MS);
- The approximate date in which each turbine was brought on-site;
- The load capacity of each on-site portable turbine; and
- A description of any control technology utilized by a portable turbine (if possible, please also include an estimation of $NO_X$ emissions post-control technology).

As you mentioned that more portable turbines will be eventually brought on-site, I kindly ask that you provide that the information outlined above at such time of these additional turbines arriving on-site.

If you have any questions or concerns, please don't hesitate to contact me.

Best Regards,

Jaricus Whitlock, P.E.
Chief, Air Division
Office of Pollution Control
Mississippi Dept. of Environmental Quality
P.O. Box 2261
Jackson, MS  39225

Office: (601) 961-5303

## Jaricus Whitlock

**From:** Shannon Lynn <slynn@trinityconsultants.com>
**Sent:** Saturday, September 6, 2025 2:03 AM
**To:** Jaricus Whitlock
**Subject:** RE: Portable Turbine Information

**This Message Is From an External Sender**
This message came from outside your organization.

Appreciate your patience again, I wanted to make sure I had the correct and latest information.

As of this writing, the overall plan is a total of 17 turbines, 10 2500's and 7 SMT-130's.

Load capacity is projected to be approximately 50%.

As I understand it, none of the 2500's are in operation, as they are pending connection to demin water.
SCR construction has been completed on 6 of the 7 SMT units and likely as of this writing, the 7th is complete.

The next step for the SMT's is ammonia delivery and completion of the SCR commissioning.

If you have any additional questions, please do not hesitate to ask.

Thanks!
Shannon

**Shannon G. Lynn, P.E., C.M.**
Principal Consultant

P 501.225.6400 x5404 M 501.454.6264
1701 Centerview Drive Suite 109 Little Rock, AR 72211
Email: slynn@trinityconsultants.com

---

**From:** Shannon Lynn <slynn@trinityconsultants.com>
**Sent:** Thursday, September 04, 2025 2:30 PM
**To:** Jaricus Whitlock <jwhitlock@mdeq.ms.gov>
**Subject:** RE: Portable Turbine Information

You bet, let me get that and I have some additional updates to share.

**Shannon G. Lynn, P.E., C.M.**
Principal Consultant

P 501.225.6400 x5404 M 501.454.6264
1701 Centerview Drive Suite 109 Little Rock, AR 72211
Email: slynn@trinityconsultants.com

---

**From:** Jaricus Whitlock <jwhitlock@mdeq.ms.gov>
**Sent:** Thursday, September 04, 2025 2:29 PM
**To:** Shannon Lynn <slynn@trinityconsultants.com>
**Subject:** RE: Portable Turbine Information

# 35 MW Turbine Power

*Powered by GE® LM2500+G4*

## Application

With a compact configuration and faster install time, Solaris 35 MW Turbine Power Solution provides increased modularity and fewer interconnects for when speed of power is critical. Its high efficiency helps reduce operating costs and reliance on the local grid, delivering performance with low emissions in a variety of situations.

## Features and Benefits

- 12-hour set up time
- Scalable with compact footprint for quick install
- 13.8 kV (60Hz) or 11.5 kV (50Hz) convertible design
- Fuel capabilities for natural gas, CNG, LNG, diesel #2, water injection for NOx control
- Low voltage transformer on board for 480 VAC power
- Switchgear and protective relays for power motor control centers
- Trailers capable of off-road service, air-ride suspension, steerable axles
- Minimal connections between trailers
- DOT compliant










SOLARIS™
ENERGY INFRASTRUCTURE

# 35 MW Turbine Power

## System Performance

| | |
|---|---|
| Power Output | 35 MW |
| Voltages Output | 13.8 kV |
| Efficiency | 37.2% |
| Fuel Consumption - Natural Gas | 9.15 scf/kW-hr |
| Noise (5 ft.) | 85 dBA |
| Emission NOx | 9 ppm |
| Emission CO | <2 ppm |
| Emission VOC | <2 ppm |



| Case# | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| **Ambient Conditions** | | | | | |
| Dry Bulb, °F | 32.0 | 59.0 | 86.0 | 104.0 | 122.0 |
| RH, % | 60.0 | 60.0 | 28.0 | 25.0 | 30.0 |
| Altitude, ft | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Pressure Losses** | | | | | |
| kW, Gen Terms | 36565 | 35625 | 29943 | 25558 | 22001 |
| Est. Btu/kW-hr, LHV | 9189 | 9281 | 9535 | 9876 | 10262 |

**Engine:** LM2500+ G4 6 Stage (RC) with Flow Enhancer

**Generator:** BDAX 71-193ER 60Hz, 13.8kV, 0.9PF (16294)

**Fuel:** Gas Fuel #10-1, 19000 Btu/lb,LHV

# 35 MW Turbine Power

## Layout and Dimensions








TRAILER #2
NORTH END ELEVATION



TRAILER #1
SOUTH END ELEVATION

**Solar® Turbines**
*A Caterpillar Company*

# SOLAR® MOBILE TURBOMACHINERY
## SMT130 – Powered by Titan™ 130

*Powering the Future Through Sustainable, Innovative Energy Solutions*

**The SMT130 is the economic and sustainable solution for mobile and rapid deployment power generation. The 16 MWe complete power plant is designed around the proven Titan™ 130 gas turbine for quick setup, global transportability and reliable operation. The SMT130 is ready to go anywhere, anytime.**



### COMPLETE SOLUTION

- Fully-Integrated Mobile Power Plant
- 13.8KV/12.47KV (60 Hz) Generator
- Dual Fuel System (Natural Gas and Diesel #2)
- Low Emissions SoLoNOx™ Combustion System
- Lightweight, Dual Frame Design with Separate Air Filtration Module
- Compact Footprint for High Power Density
- Low-Profile Modular Design to Minimize Installed Height
- Easily Relocatable via Highway or Rugged Terrain
- Transcontinental Transportability by Ocean Freight
- World-Class Global Customer Support Network

### PARK, PLUG AND POWER

- Quick and Innovative Setup – Less Than 12 Hours
- No Concrete Foundation Required
- No Crane Lifts Required at Site
- Hydraulic Leveling System
- Rapid Alignment Technology

### STANDARD FEATURES

- Wide Fuel Flexibility (Field Gas, CNG, LPG, etc.)
- Temperature Range from -18°C to 49°C (0°F to 120°F)
- Complete Electrical Equipment Compartment with Motor Control Center and HVAC
- Utility Grade Switchgear and Protective Relay Module
- Compact Medium Voltage Compartment
- Internal 120V Outlet
- Optional Sound Attenuation System
- Add-On Option for Multi-Unit Power Management and Microgrid Control with Solar® StationEdge
- InSight™ Platform Compatible
- Digital Load Sharing Capability Across Solar Fleet
- Standard Offering at 25 PPM NOx with Optional Configurations Down to 15 and 9 PPM NOx

**SMT 130**

**Solar® Turbines**
*A Caterpillar Company*

# SOLAR MOBILE TURBOMACHINERY
## SMT130 – Powered by Titan 130

*Powering the Future Through Sustainable, Innovative Energy Solutions*

| TYPICAL PERFORMANCE* | |
|---|---|
| Output Power | 16 000 kWe |
| Heat Rate | 10 160 kJ/kWe-hr (9630 Btu/kWe-hr) |

*ISO: 15°C (59°F), sea level



## MOBILE POWER PLANT DIMENSIONS

4.27 m (14′)



Turbine Mobile Unit Weight: 48 500 kg (107,000 lbs)

Generator Mobile Unit Weight: 55 500 kg (122,000 lbs)

27.74 m (91′)

3.05 m (10′)



2.50 m (8′)

Air Filter Module
Weight: 4500 kg (10,000 lbs)

5.75 m (19′) with louvers

Note: Displayed weights shown are estimated installed weights

Cat and Caterpillar are registered trademarks of Caterpillar Inc. Solar, Titan, SoLoNOx and InSight Platform are trademarks of Solar Turbines Incorporated.
© 2024 Solar Turbines Incorporated. All rights reserved. Specifications subject to change without notice.
DSSMT130/0724/EO

**Additional Information:**
Web: **www.solarturbines.com**
Email: **infocorp@solarturbines.com** Phone: **+1-619-544-5352**